Jason Varnado (State Bar No. 211067)
jvarnado@jonesday.com
JONES DAY
717 Texas, Suite 3300
Houston, TX 77002
Telephone +1-832-239-3939
Facsimile +1-832-239-3600

Neal J. Stephens (State Bar No. 152071)
nstephens@jonesday.com
Vincent Doctor (State Bar No. 319408)
vdoctor@jonesday.com
JONES DAY
1755 Embarcadero Road
Palo Alto, CA 94303
Telephone:   +1.650.739.3939
Facsimile:    +1.650.739.3900

Kathryn Keneally (appearance *pro hac vice*)
New York State Bar No. 1866250
kkeneally@jonesday.com
JONES DAY
250 Vesey Street
New York, NY 10281-047
Telephone:  +1-212-326-3939
  Facsimile:  +1-212-755-7306

Attorneys for Defendant
ROBERT T. BROCKMAN

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

v.

ROBERT T. BROCKMAN,

Defendant.

Case No. 3.20-cr-00371-WHA

DECLARATION OF KATHRYN KENEALLY IN SUPPORT OF ROBERT T. BROCKMAN'S MOTION TO DISMISS IN PART FOR LACK OF VENUE AND TRANSFER TO THE SOUTHERN DISTRICT OF TEXAS

## DECLARATION OF KATHRYN KENEALLY

I, Kathryn Keneally, declare as follows:

 1. I am a member of the bar of the State of New York and a partner of the law firm Jones Day, counsel for the defendant Robert T. Brockman.  I make this Declaration in support of Defendant Robert T. Brockman's Motion to Dismiss in Part for Lack of Venue and Transfer to the Southern District of Texas.

 2. Robert T. Brockman, the sole defendant in this criminal case, is a 79-year-old resident of Houston, Texas.

3.     Attached hereto as Exhibit A is a webpage printout from Google Maps route planning, showing that Mr. Brockman's home in Houston is 7.4 driving miles from the United States District Court for the Southern District of Texas.  We have redacted Mr. Brockman's address for privacy reasons.

4.     Attached hereto as Exhibit B is a webpage printout using https://check-distance.com/route/houston-tx/san-francisco-ca, showing that San Francisco is 1,642 air miles from Houston.

5.     Mr. Brockman is in failing health, with memory loss and other cognitive issues.  As my partner, Neal Stephens, advised the Court during the hearing on November 17, 2020, the defense intends to move pursuant to 18 U.S.C. § 4241(a), for a hearing to determine whether Mr. Brockman lacks the ability to assist in his own defense.  The Court directed that this motion be filed by December 8, 2020.

6.     Mr. Brockman first disclosed his medical condition and cognitive challenges to counsel in July 2019.

7.     Mr. Brockman subsequently provided us with medical reports from four doctors who had examined him for diagnostic and treatment purposes in late 2018 and early 2019:  Dr. James Pool, a primary care physician affiliated with the Baylor College of Medicine in Houston; Dr. Joseph Jankovic, Director of the Parkinson's Disease Center and Movement Disorders Clinic at Baylor College of Medicine; Dr. Melissa Yu, Associate Medical Director for Baylor Clinic of Neurology and Associate Director, Clinical Operations, for Baylor Alzheimer's Disease and Memory Disorders Centers; and Dr. Michele York, the head of the Section of Neuropsychology at Baylor College of Medicine.

8.     I have spoken with each of these doctors on multiple occasions.  I also obtained the contemporaneous medical reports made by each of the doctors, and in some instances obtained follow up letters to address the specific issue of the impact of Mr. Brockman's medical condition on his ability to assist in his defense.  Dr. York, the neuropsychologist, recommended that she conduct a different series of tests that she described as providing forensic conclusions, which reached the same results as the diagnostic examinations.  I provided copies of all of the

reports and correspondence to the government by letter dated April 9, 2020.  The defense encouraged the government to investigate these medical opinions by providing the necessary waivers from Mr. Brockman (since revoked post-indictment) to allow the prosecutors to contact the physicians separately, without participation by the defense.  I understand from recent discussions with these doctors that the government did not reach out to any of them prior to securing the Indictment.

9.      Dr. Pool has provided a declaration in support of the instant motion to transfer this proceeding to the Southern District of Texas.  As he summarizes, in late 2018 and early 2019, all four medical professionals – Dr. Pool, Dr. Jankovic, Dr. Yu, and Dr. York – concurred that Mr. Brockman's symptoms are consistent with Parkinson's disease, parkinsonism, or Lewy body dementia, or some combination of the three.  This is consistent with what each of the doctors told me in separate discussions.

10.      It is my best understanding, based on my discussions with these doctors, that Parkinson's disease is a progressive nervous system disorder that affects movement and may cause dementia; parkinsonism is a term used to describe a condition that causes a combination of the movement abnormalities seen in Parkinson's disease, especially resulting from the loss of dopamine-containing neurons; and Lewy body dementia results from protein deposits, called Lewy bodies, that develop in nerve cells in the brain regions involved in thinking, memory and movement.

11.      As Dr. Pool states in his declaration:  (1) a precise diagnosis of these conditions can only be confirmed post-mortem; (2) all four conditions are characterized by progressive dementia; and (3) Mr. Brockman's condition is not curable.  See Pool Decl. ¶ 5.

12.      Dr. Pool's statements were also confirmed in my discussions with each of Dr. Jankovic, Dr. Yu, and Dr. York.  Each of these doctors has stated to me and in writing that Mr. Brockman is not capable of assisting in the defense of a criminal case against him.  This conclusion is succinctly set out in Dr. Pool's declaration; as he states: "Mr. Brockman's progressive dementia impairs his cognitive ability in several respects.  These include short term

- 3 -

Decl. of Kathryn Keneally in Support of Mot. to Dismiss in Part for Lack of
Venue and Transfer to the Southern District of Texas 3:20-cr-00371-WHA

1   memory limitations.  In addition, his condition renders long-term memory inaccessible and

2   defective." Pool Decl. ¶ 7.

3       13.     In early October 2020, prior to being notified of the Indictment, Mr. Brockman

4   returned for his annual examination with Dr. Pool.  When I learned that Mr. Brockman had made

5   this appointment, I asked Dr. Pool again to conduct cognitive tests, and to refer Mr. Brockman to

6   Dr. York for an updated set of forensic testing.  I have spoken separately with each of Dr. Pool

7   and Dr. York.  They have both stated that the results of these examinations confirm that Mr.

8   Brockman's impairment is progressive, and render him unable to assist in his defense.

9       14.     Due to his deteriorating health, Mr. Brockman is now fully retired.

10      15.     We anticipate submitting copies of the medical reports and correspondence from

11  all four doctors as part of our § 4241(a) motion for a hearing to determine whether Mr. Brockman

12  lacks the ability to assist in his own defense.

13      16.     We also anticipate calling each of these four doctors as witnesses in a hearing to

14  determine whether Mr. Brockman is capable of assisting in his defense.

15      17.     All four doctors practice and are affiliated with medical facilities in Houston,

16  Texas.

17      18.     We also anticipate calling other witnesses located in the Houston area to establish

18  that Mr. Brockman has demonstrable cognitive and memory challenges, including his wife,

19  Dorothy Brockman, and other friends and colleagues.

20      19.     Three potential witnesses are referenced in the Indictment.  Based on the

21  description in the Indictment, I believe that Individual One is Evatt A. Tamine.  On information

22  and belief, it is my understanding that, during the relevant time period, Tamine was based in

23  either Bermuda or Switzerland; in November 2019, he lived for some period in England and

24  acquired a home in Sydney, Australia; and he has had homes at various times in other locations in

25  Europe.  Attached hereto as Exhibit C is a copy of a November 18, 2019 article in the Australian

26  Financial Review titled, "Point Piper's Most Expensive Block of Rubble Sells for $22m (again)"

27  stating, among other things, "Balmain's suburb high has been reset by the Victorian Italianate

28  mansion Hexham thanks to $7.5 million buyers, returning Bermuda-based expat lawyers Evatt

Tamine and Sophie Tod."  Attached hereto as Exhibit D is a copy of a search warrant dated August 29, 2018, obtained by the Bermuda Police Service to search Tamine's Bermuda home for evidence of criminal activity.

20.     Attached hereto as Exhibit E is a copy of a letter agreement dated October 2, 2018, between Tamine and the Department of Justice, providing him with statutory immunity in exchange for his agreement to cooperate in "the government's investigation of Robert Smith, Robert Brockman," and others.

21.     Based on the description in the Indictment, I believe that "Individual Two" is Robert F. Smith.

22.     Attached hereto as Exhibit F is a screenshot taken on November 28, 2020. at 11:53 a.m. of Smith's LinkedIn Profile, identifying Smith as being located in Austin, Texas.

23.     Attached hereto as Exhibit G is a screenshot taken on November 28, 2020, at 12:08 p.m. of Vista's website, stating that in 2011, Vista's "HQ moves to Austin."

24.     Attached hereto as Exhibit H is a copy of a March 6, 2018 article in Forbes titled, "Richer Than Oprah: How The Nation's Wealthiest African-American Conquered Tech And Wall Street" stating, among other things, "In 2011, seeking to escape the Silicon Valley bubble, Smith moved Vista's headquarters to Austin, Texas."

25.     Attached hereto as Exhibit I is a screenshot taken on November 28, 2020, at 11:55 a.m. of Vista's LinkedIn Profile, identifying Vista as being located in Austin, Texas.

26.     Attached hereto as Exhibit J is a webpage printout of Vista's profile on Pitchbook.com at November 28, 2020, at 12:10 p.m., identifying Vista's "primary office" as 401 Congress Avenue, Suite 3100, Austin, TX 78701.

27.     Attached hereto as Exhibit K is a webpage printout from Google Maps route planning, showing that Vista's headquarters at 401 Congress Street, Austin, Texas is 163 driving miles (estimated 2 hours 34 minutes) from the United States District Court for the Southern District of Texas.

28.     Attached hereto as Exhibit L is a webpage printout using https://check-distance.com/route/austin-tx/houston-tx, showing that Austin is 146 air miles from Houston.

29.     Attached hereto as Exhibit M is a copy of the Non-Prosecution Agreement dated October 9, 2020, between Smith and the U.S. Department of Justice, Tax Division, including the Statement of Facts appended thereto.

30.     Based on the description in the Indictment, I believe that "Individual Three" is the widow of a deceased colleague of Mr. Brockman, who is retired and lives in Oxford, Mississippi.

31.     The Statement of Facts made by Smith as part of his Non-Prosecution Agreement describes the role of "Individual B, a lawyer in private practice in Houston, Texas who specializes in foreign trusts and 'asset protection' planning." See Ex. M, hereto.  Based on the description in the Statement of Facts, I believe that "Individual B" is Carlos E. Kepke.

32.     Attached hereto as Exhibit N is a screenshot taken on November 29, 2020, at 7 a.m. of Carlos Kepke's website, identifying Mr. Kepke's law office as 149 Sage Road, Houston, Texas 77056-1417.

33.     Attached hereto as Exhibit O is a screenshot taken on November 29, 2020, at 7:17 a.m. of Kepke's LinkedIn Profile, identifying him as being based in Houston, Texas.

34.     Attached hereto as Exhibit P is a screenshot taken on November 29, 2020, at 7:13 a.m. of the website for the State Bar of Texas, listing Kepke as based in Houston, Texas.

35.     Mr. Brockman's return preparer for the relevant years is located in Houston, Texas.

36.     While we do not know the entire scope of the investigation, we are aware of at least 17 subpoenas that have been presented to individuals and entities located in and around Houston.

37.     Measured by the number of references in the Indictment, the weight of activity and evidence in this case comes from far beyond this District:  Bermuda (13 references), Indictment ¶¶ 6, 8, 9, 13, 39, 43, 54, 111, 113-115, 121, 123; Switzerland (11 references), Indictment ¶¶ 8, 39, 53-55, 58, 64, 92, 113, 117, 121; Colorado (5 references), Indictment ¶¶ 50, 110, 111, 114, 115; British Virgin Islands (3 references), Indictment ¶¶ 7, 49, 1110; Australia (3 references), Indictment ¶¶ 89, 90, 93; Nevis (3 references), Indictment ¶¶ 7, 11, 12; Delaware (2 references),

Indictment ¶¶ 2, 4; Houston (2 references), Indictment ¶¶ 1, 3; Barcelona, Cayman Islands, Florida and Ohio (1 reference each), Indictment ¶¶ 5, 49, 108, 117.

38.     The government has estimated that it will produce 1.1. terabytes (the equivalent of 22 million pages) of discovery.  To date, nothing has been produced to the defense.

39.     The attorneys with my firm who have met with Mr. Brockman personally during the course of this investigation are based in Houston, Washington, D.C., and New York, and all but one of those meetings took place at Mr. Brockman's home in Houston.  One of these meetings took place in Colorado, where Mr. Brockman was residing during the summer of 2019.

40.     Based on the foregoing, I respectfully submit this Declaration in support of Mr. Brockman's Motion to Dismiss in Part for Lack of Venue and Transfer Proceedings to the United States District Court for the Southern District of Texas.  This Court should transfer this case pursuant to Federal Rule of Criminal Procedure 21(b) and 18 U.S.C. § 3237(b) from the Northern District of California to the Southern District of Texas, and dismiss Counts Nine through Fourteen of the Indictment under Federal Rule of Criminal Procedure 12(b)(3)(A)(i) for improper venue, or in the alternative, transfer Counts Nine through Fourteen to the Southern District of Texas.

41.     I declare under penalty of perjury that the foregoing is true and correct. Executed in New York, New York on November 30, 2020.


_____
Kathryn Keneally

Decl. of Kathryn Keneally in Support of Mot. to Dismiss in Part for Lack of
Venue and Transfer to the Southern District of Texas 3:20-cr-00371-WHA

# EXHIBIT A

 **Google** Maps

[Address Redacted], Houston, TX 77024 to United States District Courthouse

Drive 7.4 miles, 18 min



Map data ©2020    1 mi ├────────┤

🚗 **via Memorial Dr** — **18 min** / 7.4 miles

Best route now, avoids road closure on Bagby St due to construction

⚠️ This route has restricted usage or private roads.

🚗 **via I-10 E** — **18 min** / 9.5 miles

🚗 **via Westcott St and Memorial Dr** — **19 min** / 8.3 miles

## Explore United States District Courthouse

 Restaurants    Hotels    Gas stations    Parking Lots    Less

# EXHIBIT B

11/28/2020

Distance from Houston, TX to San Francisco, CA

Check-Distance.com

## Try other cities

A

B

Let's GO!

# Distance from Houston, TX to San Francisco, CA

Driving distance from Houston, TX to San Francisco, CA is **1929** miles (**3105** km). How far is it from Houston, TX to San Francisco, CA? It's a **29 hours 37 minutes** drive by car. Flight distance is approximately **1642** miles (**2643** km) and flight time from Houston, TX to San Francisco, CA is **03 hours 18 minutes**. Don't forget to check out our "Gas cost calculator" option. It will calculate cost of driving this particular distance. See the map below for the visual display of the upcoming road trip.

### Driving distance
**1929 Miles** / 3105 Km



### Gas consumption
**77.16 Gallons** 294.98 Litres



### Flight distance
**1642 Miles** / 2643 Km



# EXHIBIT C

# Point Piper's most expensive block of rubble sells for $22m (again)

AFR Online

November 18, 2019 Monday 08:03 AM GMT

Copyright 2019 Fairfax Media Publications Pty. Limited All Rights Reserved

**Length:** 646 words

**Byline:** Lucy Macken
**Highlight:** This is the 740 square metres of Wolseley Road real estate that was bought by Hugh Huang in 2013 for $14.35 million.

## Body

Australia's most expensive pile of housing rubble has sold on the Point Piper waterfront for the second time in a year.

This is the 740 square metres of Wolseley Road real estate that was bought by Hugh Huang, son of Shanghai shipping magnate Shannian Huang, in 2013 for $14.35 million from Sydney FC chairman Scott Barlow with DA-approved plans for a Tzannes Associates-designed residence.

The only improvement he made to the block was to demolish the house - unless you also count the awkwardly positioned tree that has accidentally fallen into the harbour - before he sold it last December for $22.5 million to a mystery buyer from the lower north shore. Bill Malouf, of LJ Hooker Double Bay, declined to offer up the latest buyer's identity or the sale result, but Malouf was asking $22 million to $24 million, and sources say it sold in that range.

From contemporary to historic

Insurance mogul and outgoing president of the Insurance Council of Australia Richard Enthoven and his wife Karen are set to swap their contemporary Point Piper home for historic Greenoaks Cottage in Darling Point.

The couple's $18 million purchase comes five months after they sold their Point Piper waterfront for about $21.8 million to developer Barrie Nesbitt and his wife Emma, the latter of whom sold their Bellevue Hill home last weekend above the $10 million to $11 million guide through Ray White Double Bay's Elliott Placks.

The Enthovens' new home is the 1850s-built mansion owned by recruitment boss Phil Kerry and his wife, 1984 Olympic Games gymnast Anne-Marie Kerry. The sale comes just a week after Kerry's brother and K2 Recruitment co-founder Mark Kerry and his wife, interior designer Lynda Kerry sold their nearby Darling Point home for about $18 million.

Point Piper's most expensive block of rubble sells for $22m (again)

Agent Alison Coopes declined to confirm the widely rumoured figure, but was asking $18 million-plus when she listed it and it sold after negotiations with buyer's agent Deb West, of SydneySlice.

Mayo's move pays off in Bellevue Hill

The Bellevue Hill home of Anna Mayo, of the Mayo Hardware family, and BNP Paribas executive Ian Perkins has sold on the quiet for $12 million.

At that level, the sale - through D'Leanne Lewis, of Laing + Simmons Double Bay - is a credit to the renovation undertaken by Mayo given it more than doubles the $5.5 million she paid for it in 2010 and tops a street record of $10.3 million set by Lewis just last month for the house next door of heritage home advocate Susanna Press.

Mayo is not moving far for her next home renovation. Fittingly, she was the more than $9 million buyer of BNP Paribas' nearby Sydney executive residence.

BNP Paribas has held the Victoria Road house since 1960 when it was sold by dentist Henry Spiegel and his wife Rose for $138,000. Lewis declined to reveal the result, but scored more than her $9 million ask.

Hexham hits the heights in Balmain

**Balmain's suburb high has been reset by the Victorian Italianate mansion Hexham thanks to $7.5 million buyers, returning Bermuda-based expat lawyers Evatt Tamine and Sophie Tod**.

The landmark residence built in 1897 for Lewy Pattinson, founder of the Soul Pattinson chemist empire, is set on a whopping 750 square metres (huge by Balmain standards) and last traded in 2001 for $2.1 million when sold by meat merchant Alan East to lawyer Chris Brierley and his wife Kim.

Pillinger's Brad Pillinger made his way out of the eastern suburbs to list the residence last year, and given no comment from the agent, the rumours of the record high were only verified when it settled.

Meanwhile, the Mosman house Tamine bought as an investment in 2014 for $3.9 million has hit the market.

The six-bedroom residence on Balmoral slopes has been renovated and extended to include a guest suite in recent years. Expect to pay $5.5 million to $6 million at the December 7 auction through The Agency's Jon Snead.

This story first appeared at Domain.

**Load-Date:** November 17, 2019

---

# EXHIBIT D

### WARRANT TO ENTER AND SEARCH PREMISES:
### PROCEEDS OF CRIME ACT 1997 - SECTION 39:

**BERMUDA ISLANDS}**

To the Police Constables of Bermuda.

An application having been made on this day by **Paul RIDLEY, Detective Sergeant 2210** of the Organized and Economic Crime Department of the Bermuda Police Service;

I am satisfied that;

(a)    There are reasonable grounds for suspecting that **Evatt Tamine** has benefited from criminal conduct; and

(b)    There are reasonable grounds for suspecting that there is on the premises to which the application applies, any such material relating;

     (i)    to the specified person;

     (ii)    to whether that person has benefited from criminal conduct; or

     (iii)    to locating the proceeds of said criminal conduct,

     as is likely to be of substantial value (whether by itself or together with other material) to the investigation for the purpose of which the application is made, but that the material cannot at the time of the application be particularized; and

(c)    That;

     (i)    it is not practicable to communicate with any person entitled to grant entry to the premises and

     (ii)    entry to the premises will not be granted unless a warrant is produced and

     (iii)    the investigation for the purpose of which the application is made might be seriously prejudiced unless a Police Officer arriving at the premises could secure immediate entry to them

#### THE MATERIAL TO WHICH THIS APPLICATION APPLIES IS:

**Any material relating to the operation, management or control of entities used to evade or attempt to evade the payment of tax. To include, but is not limited to any documentation relating to account opening, account statements, written correspondence including memorandums, accounting statements, business records, foreign currency transactions, trust documentation, financial transaction slips, documentation pertaining to due-diligence, wire transfers, ledgers whether maintained electrically or otherwise, company minutes, email correspondence, voice mail, computers, tablets, laptops, USB sticks or any other forms or electronic storage or any other material not particularized but not subject to legal privilege relating to the evasion of payment of tax or money laundering or to establish whether any person has benefitted from criminal conduct or to establish the whereabouts of any criminal conduct.**

#### THE PREMISES TO WHICH THIS APPLICATION APPLIES ARE:

**2 Hidden Lane, Pembroke HM 06, Bermuda.**

And that a warrant is appropriate by reason of **Section 39 of the Proceeds of Crime Act, 1997**:

**Authority is hereby given for any Police Officer, accompanied by any officer or agent belonging to the United States Internal Revenue Service.**
**to enter the said premises and to search them for the material in respect of which this application is made.**

\* It is not necessary to identify person accompanying by name. A description such as 'Official Receiver' will suffice.

DISCLOSURE OF INFORMATION ABOUT THIS INVESTIGATION MAY CONTRAVENE SECTION 42 OF THE PROCEEDS OF CRIME ACT, 1997. IF YOU ARE CONTACTED BY ANYONE IN CONNECTION WITH THIS SEARCH WARRANT YOU MAY WISH TO SEEK LEGAL ADVICE, OR CONTACT [Chief Inspector Nicholas Pedro, Officer in Charge of the Organized and Economic Crime Department], BEFORE ANY DISCLOSURE IS MADE.

Taken before me this 29th day of August, 2018

.................................................
**Chief Justice**
**Supreme Court of Bermuda.**

# EXHIBIT E



**U.S. Department of Justice**

**Tax Division**

*Washington, D.C. 20530*

REZ:LJW:CJSmith
5-11-23920
20162011033

October 2, 2018

BY EMAIL
Scott S. Balber
Herbert Smith Freehills
450 Lexington Avenue 14th Floor
New York, NY 10017

Re:  Evatt Tamine
Statutory Immunity - Agreement

Dear Mr. Balber:

In accordance with our prior phone conversations, emails, and attorney proffer conducted by you and members of your firm on Thursday September 27, 2018, the government has agreed to grant your client, Evatt Tamine, statutory immunity pursuant to Title 18 U.S.C. § 6003. It is the government's understanding that pursuant to this grant of immunity, Mr. Tamine has agreed to continued long-term cooperation with the government's investigation of Robert Smith, Robert Brockman, and other related persons and entities. Mr. Tamine's cooperation to include: meeting with investigators and prosecutors as requested; providing truthful statements and testimony regarding relevant facts known to him; being available to appear and testify before the Grand Jury, at trial, and at any other relevant court proceeding in the United States; and providing relevant documents within his custody and control. Mr. Tamine understands that a failure to provide truthful testimony, or to otherwise provide false information to the government, can result in his prosecution for perjury or obstruction of justice, and that his grant of immunity does not prevent any such prosecution.

Sincerely,

*s/COREY J. SMITH*
Senior Litigation Counsel

We have read this letter, and have reviewed it carefully together. We understand the terms of this letter, and we agree to these terms.

Evatt Tamine
Dated: 2 October 2018

Scott S. Balber
Counsel for Evatt Tamine
Dated: October 2, 2018

25

# EXHIBIT F

**Screenshot taken on November 28, 2020 at 11:53 AM ET of the following website:**

https://www.linkedin.com/in/robertfredericksmith/



# EXHIBIT G

**Screenshot taken on November 28, 2020 at 12:08 PM ET of the following website:**

https://www.vistaequitypartners.com/about/



# EXHIBIT H

Case 3:20-cv-00871-WHA   Document 40-1   Filed 11/30/20   Page 24 of 72

Mar 6, 2018, 07:15am EST

# Richer Than Oprah: How The Nation's Wealthiest African-American Conquered Tech And Wall Street



**Nathan Vardi** Forbes Staff

Hedge Funds & Private Equity

*Following the money trail*

🕐 **This article is more than 2 years old.**

This story appears in the March 31, 2018 issue of Forbes. Subscribe



It's a Saturday afternoon, at the height of vacation season, in one of South Beach's hottest hotels, and Robert Smith, the founder of Vista Equity Partners, is dressed like exactly no one within a 100-mile radius of Miami: in a three-piece suit. His signature outfit--today, it's gray plaid, accented by an indigo tie and a pink paisley pocket square--apparently doesn't take a day

Case 3:20-cv-00371-WHA Document 40-1 Filed 11/30/20 Page 25 of 72

off, and Smith isn't taking one now either. He's gathered dozens of CEOs from his portfolio companies, software firms all, for a semiannual weekend off-site to drill them in the ways he expects his companies to operate.

It's not just the suit that's unusual. Private equity firms almost never treat their portfolio companies, transactional chits by design, like an organic cohort. And until recently, PE, a field built on borrowing against cash-generating assets, wouldn't touch software firms, which offer little that's tangible to collateralize. Yet Smith has invested only in software over Vista's 18-year history, as evidenced by the CEOs, like Andre Durand of the security-software maker Ping Identity and Hardeep Gulati of the education-management software company PowerSchool, who have been summoned to Miami Beach, waiting to swap insights about artificial intelligence and other pressing topics. And Smith deploys more than 100 full-time consultants to improve his companies.

"Nobody ever taught these guys the blocking and tackling of running a software company," says Smith, an engineer by training, as he takes a lunch break at South Beach's 1 Hotel to nibble on a plant-based burger. "And we do it better than any other institution on the planet."

Smith includes the likes of Oracle and Microsoft in that boast, and his numbers back up the braggadocio. Since the Austin-based firm's inception in 2000, Vista's private equity funds have returned 22% net of fees annually to limited partners, according to PitchBook data. Smith's annual realized returns, which reflect exits, stand at a staggering 31% net. His funds have already made distributions of $14 billion, including $4 billion in the last year alone.

Not surprisingly given those numbers, Vista has become America's fastest-growing private equity firm, managing $31 billion across a range of buyout, credit and hedge funds. Smith is putting all that money to work at a breakneck pace, with 204 software acquisitions since 2010, more than any tech company or financial firm in the world. After finishing an $11 billion

Case 3:20-cv-00371-WHA   Document 40-1   Filed 11/30/20   Page 26 of 72

fundraising for its latest flagship buyout fund last year, Smith has already deployed more than half of it, focusing as usual on business-to-business software. "They recognize it's a kind of central nervous system," says Michael Milken, whose bond-market innovations basically birthed the modern private equity industry and who has been a co-investor in two Vista deals. Taken together, Vista's portfolio, with 55,000 employees and more than $15 billion in revenue, ranks as the fourth-largest enterprise software company in the world.



Smith deploys quickly for a simple reason: While the rest of private equity basically relies on identifying and rectifying inefficient companies, Vista bets that it can improve the operations of even well-run firms--and claims that it's never lost money on a buyout transaction in its 18-year history. "I am most proud of our system being a loss-prevention mechanism," Smith says.

Perpetual wins translate into mammoth personal gains. With an estimated net worth of $4.4 billion, Smith has now eclipsed Oprah Winfrey as the nation's wealthiest black person. Vista has created another billionaire, Brian Sheth, the firm's 42-year-old president and dealmaker extraordinaire, who has a fortune estimated at $2 billion.

Ever since Forbes outed Smith as a billionaire in 2015, there has been a steady stream of press about him, from the lowest-brow (tabloid interest in his marriage to a former Playboy playmate) to the highest (coverage of his philanthropy, including his Giving Pledge commitment and his stint as the chairman of Carnegie Hall).



But neither Smith nor Sheth has ever before delved into Vista's secret formula, which has as many or more lessons for entrepreneurs and operators as it does for financiers. "We do something no one else does," Smith says.

On paper, Robert Smith's journey was a textbook American success story: A fourth-generation Coloradan, he was the son of two Ph.D.'s who became Denver school principals and put education first at home. "Their father and I stressed the need for both of our sons to persevere once they identified and pursued a goal," say Smith's mother, Sylvia. "Robert understood that preparation, hard work and dedication were key to success in his classes." In 1981 Smith headed to Cornell University to study chemical engineering, spending many nights and weekends in a three-person study group that met in the basement of the engineering school's Olin Hall. During summers, Smith worked at Bell Labs back home in Denver--a college internship he landed as a high school student after persistent cold-calling.

After graduating from Cornell in 1985, Smith took engineering jobs, first at a Goodyear Tire & Rubber chemical plant outside Buffalo, New York, and later at Air Products & Chemicals in Allentown, Pennsylvania. In 1990 Smith moved to Kraft General Foods, where he focused on coffee-machine technology. His efforts won him two patents: one for a stainless-steel filter and another for a brewing process that makes crema, the layer of foam on top of espresso. In 1992 Smith entered Columbia Business School. He was deftly acquiring the kinds of skills that would prove invaluable as the tech revolution exploded.

But Smith's rise was also incredibly abnormal. Even today, as the 155th-richest person in America and the 480th in the world, he faces constant, if often unwitting, racism. At a recent dinner in New York City with a group of senior Wall Street types, including a high-level executive of an investment bank, Smith moved to pick up the check for dinner, but the senior banker stopped him. "I can't have a black guy buy me dinner," he chortled.



The sting of such incidents, whether offhand remarks or doors more overtly shut to him, had an effect on Smith. "It meant we had to work harder," he says. "And that's what we did."

From his college days, when he joined the nation's preeminent black fraternity, Alpha Phi Alpha, known for its bookish but professionally ambitious members like Thurgood Marshall and Martin Luther King Jr., Smith had support. A crucial mentor: John Utendahl, who founded a pioneering black-run investment bank and happened to speak at Smith's Columbia graduation. Soon after, Utendahl, currently a vice chairman at Bank of America, took Smith to lunch and over tuna sandwiches persuaded him to ditch his M.B.A. focus of marketing to work on Wall Street. "There is a spark, a poise, even a wisdom that you can't teach or learn. Some people are just blessed to have it," Utendahl says. "That's how I felt when I met Robert as a young man."

**SMITH LANDED IN GOLDMAN SACHS'** mergers-and-acquisitions department, eventually moving to San Francisco to advise companies like Microsoft and eBay and becoming cohead of enterprise systems and storage. He was part of the team that helped Apple recruit Steve Jobs back.

For all his prominent clients, it was a little-known Houston company specializing in software for auto dealerships, Universal Computer Systems, that caught Smith's eye. Its margins were higher than any business Smith had advised, and he was stunned to learn the company's owners were plowing its cash into certificates of deposits. Why not acquire other mature software companies, Smith asked, and apply their best business practices there too? Great advice, but the owners insisted that Smith roll up his

sleeves and execute the plan for them. They backed up their offer with a commitment of $1 billion of the company's cash, as the sole investor, if he started a private equity fund. "I had one of those in-the-mirror moments," Smith says. "I looked at myself and asked, 'If I don't do this, how will I feel about it ten years from now?' "

The short answer: regretful. And so in 1999 Smith left Goldman and soon began recruiting cofounders, notably a business-school classmate, Stephen Davis, and a young analyst who worked under him at Goldman, Brian Sheth. The son of an Indian-immigrant father with experience in tech marketing and an Irish-Catholic mother who worked as a reinsurance analyst, Sheth would provide the yang to Smith's yin, focusing on acquisitions and divestitures, so that his boss could concentrate on investors and the companies themselves. Their relationship would become ironclad: "When something is happening with our families we are each other's first call," says Sheth, who vacations with Smith and served as best man at his wedding.

When Smith quit, most of his colleagues thought he'd lost his mind. He was on a partnership track at Goldman, which meant he was set to receive a multimillion-dollar windfall given the firm's impending initial public offering. What's more, banks didn't lend against software companies because they didn't have hard assets. How could Smith run a leveraged-buyout business in software without leverage? The concentration risk also seemed huge--investing in a single industry where a few innovative lines of code from a competitor could make a business obsolete overnight.



Brian N. Sheth, the co-founder and President of Vista Equity Partners.    TIM

But Smith saw things differently. Software was eating the world. Soon every company would become a software company, its business digitized. A portfolio of software companies serving 50 industries would be diversified with a stream of

Case 3:20-cv-00871-WHA Document 40-1 Filed 11/30/20 Page 30 of 72
PANNELL

recurring revenue, given the shift to "software as a service." Smith's bet: Wall Street would soon realize that software companies not only gushed cash but actually had terrific assets to lend against--those ironclad maintenance contracts.

"Software contracts are better than first-lien debt," Smith says. "You realize a company will not pay the interest payment on their first lien until after they pay their software maintenance or subscription fee. We get paid our money first. Who has the better credit? He can't run his business without our software."

In 2000 Smith opened Vista's doors in San Francisco. His first acquisitions were all equity. As the firm went from one profitable deal to another, Smith eventually got lenders to finance Vista's purchase of Applied Systems, an insurance software maker, in 2004, Vista's first leveraged buyout. In 2007 Vista merged software companies serving utilities and created Ventyx, increasing the number of products it sold to existing customers substantially--a subsequent sale to ABB resulted in a profit of nearly $1 billion.

When the dust settled, Smith's first buyout fund returned 29.2% annually net of fees. Smith raised money for a second fund from institutional investors, returning a net 27.7% annually. In 2011, seeking to escape the Silicon Valley bubble, Smith moved Vista's headquarters to Austin, Texas. He could, by this point in his career, do pretty much anything he pleased.

"I still experience racism in my professional life," Smith says. But by being smarter and working harder, Smith proved the American Dream extended to the finance industry, where he became the first self-made Wall Street billionaire who wasn't a white male.

**WHEN VISTA SELLS** a company, Smith reverts to engineer mode, often giving its CEO an expensive Swiss or German watch. "It is not about being generous," Smith says. "It is a function of the process and focusing on the

detail of finding the person who is going to be the best at making that one gear."

To Smith the watch represents that "we created a system." And it's that system that has allowed Vista to gobble up enterprise software companies, confident that it can almost always make them better. When Smith started shopping for software companies, he found that many were run by former programmers and other technologists who were not formally trained in business and grew rapidly by sheer strength of product launches, with little analysis of whether they made sense.

Drawing on his background as an engineer and a Goldman vet, Smith began writing what amounted to user manuals for running enterprise software companies. The manuals weren't just about efficiency but also incorporated cost-cutting measures and fee-generating ideas. Eventually, Smith's playbook became the Vista Standard Operating Procedures--VSOPs. These were later renamed a more generic and user-friendly Vista Best Practices.

"If you are a software executive, how do you build your commission structures or run your go-to-market strategy? How do you find and train talent? Who teaches you those things?" Smith asks.

To implement his playbook, Smith created an in-house McKinsey: Vista Consulting Group. These employees, now 100 strong, help portfolio companies implement the best practices, also 100 strong, most of which run three to ten pages, with reams of attachments and examples. Printed out, they fill binders. They are stored in a password-protected online library, available only to authorized portfolio company managers.

"I just had an employee get a promotion," says Kristin Nimsger, CEO of Social Solutions, a cloud company providing data-management software for nonprofits like the United Way of Metro Chicago. "He was super-excited to get a log-in."

The playbook includes exhaustive details on things like contract administration and steps needed to ensure a company is being paid for all the code or services its customers use. In one case, a company Vista bought charged customers only for inbound support calls, neglecting to charge a minimum amount for ongoing support. Vista canceled all the contracts and got 100% of the customers to enter into new deals with higher minimum support payments.

Another set of playbook commandments revolve around sales, including incentives for salespeople cross-selling and upselling additional products. In one case, a portfolio company was rewarding salespeople the same way whether they brought in one-year contracts or longer-term ones.

In isolation, many of the playbook's best practices seem mundane. But software companies are often rife with eccentricities and legacy processes endemic to startup culture. Things like weekly deal-pipeline meetings, commonplace at B-school-driven corporations like IBM and Procter & Gamble, are often absent. By sticking to the rules in Smith's playbook, his software companies are transformed. Add some modest leverage, and, voilà, Vista got amazing returns.

Smith's playbook is ever evolving, and Vista partners and portfolio companies are welcome to make suggestions. "One of the things I am most proud of is that we are going to add ten new best practices to the group," says Reggie Aggarwal, the CEO of Cvent, a company that makes software for managing events and meetings.

Of course, critics argue that companies swallowed up by Vista are in no way immune to the traditional private equity slash and burn. Lawrence Coburn, CEO of Cvent competitor DoubleDutch, blasted Vista after the purchase, saying, "They eliminate duplication, slash R&D, optimize for financial performance and raise debt."

Smith's playbook goes well beyond corporate to-do lists. When Vista buys a company, all employees and recruits are required to take a personality-and-aptitude test, like one first developed by IBM. The hour-long test assesses technical and social skills, and attempts to gauge analytical and leadership potential. For Smith the test is particularly important because it attempts to bypass inherent biases, such as where people grew up or went to school, not to mention race or gender. Vista says 35% of the employees at its portfolio companies are women. Last year Vista companies administered 850,000 tests to hire 6,000.

"The meritocratic system creates loyalty," Smith says. "People from all over the country from different places all take the test. We all know something about each other, that we came through this meritocratic system."

The Vista test also identifies roles that fit personality profiles. A woman who ran a Domino's Pizza franchise in North Carolina was deemed to be a good sales trainer and was promoted to do so for a Vista company. Another from the mailroom, for example, scored high on Vista's test and became a programmer. "To write code you need to be creative," Sheth says. "How much of that is going to happen if you all have the same background?"

After Vista has people where it wants them, there are boot camps that train employees, not just for two weeks but for six to nine months. In the past three years, Vista has put 12,000 new hires through these boot camps. They start by giving employees the big picture: how the Vista company makes money and the way customers use its products. The focus later shifts to specific corporate roles. Vista University provides "nanodegrees," like one now being offered in artificial intelligence. Monthly meetings designed to cross-pollinate best practices among Vista employees from different companies in similar roles--from cybersecurity to HR and product development--are held.

All of this is run by Smith's consulting group, which operates like a seasoned special-forces unit. "Financial performance of a company is just a trail in the

sand of the operational performance," Smith says. "The more standardized the input, the more standardized the output. You have to design your system, and you have to believe in it."

**WITH THE REST OF PRIVATE** equity getting turned on to enterprise software deals, Vista's system is about to get a major test. While bargains are much harder to come by, Vista's goals for each buyout will remain the same: three times its money. Smith expects to hold on to his portfolio companies longer, identifying each acquisition target based on how much the Vista playbook can juice results.

"We don't underwrite to hope. We underwrite based on critical factors for success under our control," Smith says. "What we need to change, we have changed before, so we know how to do it." On average, Vista doubles the Ebitda of its companies within five years.

A lot of the responsibility will fall to Sheth, who has previously made a practice of racing to the exit door. For example, Vista bought Transfirst, a payments-processing software maker, for $1.5 billion in 2014, then sold it for $2.35 billion in just over a year, tripling Vista's money once leverage was factored in. In January, Vista sold its majority stake in Trintech, which makes software for financial professionals, after it doubled revenues in two years. On average Vista's exits tend to occur 4.7 years after purchase, compared with 5.7 for Blackstone.

While it would be easy enough for Smith to fall back on his philanthropy-- recent pledges include $20 million to the new National Museum of African American History & Culture and $50 million from a foundation linked to Vista's first fund to help Cornell boost the representation of women and minorities in scientific research--numbers like that keep Smith feeling upbeat, even cocky, regarding Vista. Nearly two years ago, at the Milken Institute's annual Global Conference, Smith found himself shoulder-to-shoulder onstage with the old-guard billionaires of the buyout business, including David Rubenstein, Leon Black and Jonathan Nelson. Titans he no

doubt read about in B-school and who probably wouldn't have given him a second glance a decade ago.

When Carlyle's Rubenstein said his investors had been conditioned to accept lower returns given the high price of assets, Smith shifted in his chair and parried, "I got to go get some of his [investors]." He then turned to Rubenstein and, with the brio of someone who knows he's arrived, quipped: "Let me know where you are flying next. I will go with you."

---

### Mr. Smith's Software Empire

Move over Larry Ellison. Vista owns 48 enterprise software companies servicing 20 industries ranging from energy to law to higher education and live events.

- **Tibco Software,** which makes business-intelligence software, was purchased by Vista in 2014 for $4.3 billion.

- **Solera Holdings** makes software for auto and home insurers and was purchased by Vista in 2015 in a $6.5 billion deal.

- **Cvent,** which makes software for managing and planning corporate events, was purchased by Vista in 2016 in a $1.7 billion deal.

- **Finastra** makes risk management software for banks and financial firms. It was created by Vista in 2017 through the merger of D+H and Misys.

- **PowerSchool** makes education-management software. It was purchased in 2015 for $350 million. It's spent another $1 billion on add-on acquisitions.

- **Marketo** is a giant in cloud-based marketing automation software. It was purchased by Vista in 2016 for $1.8 billion.

- **Ping Identity** makes identity-security software and was purchased by Vista for $600 million in 2016.

---

## A New Path to Profits

There was a time when buyout firms like KKR and Apollo could be successful simply by piling debt on a company, cutting costs and then letting the magic of leverage and compounding do its work. But what worked in the past may no longer be viable. There is now more than $1 trillion of private equity cash chasing deals and bidding up prices. According to DealLogic, private equity firms did $58 billion of tech transactions in 2016, a third of all U.S. deals.

Even Vista has had to pivot from buying legacy software companies to acquiring higher-growth operations, often at big prices and valuations.

Vista's acquisition of Marketo, a marketing automation software leader based in San Mateo, California, is a good example. After investors became disenchanted with its less than stellar 30% to 40% revenue growth rate, Marketo's share price plummeted by some 50% in early 2016. Then in May 2016, Vista swooped in to buy the company, putting up $1.3 billion in cash in a $1.8 billion deal. It was a generous 64% premium, but Vista knew that before long an operational overhaul, coupled with the small amount of debt it added to its balance sheet, would turn the cloud-based marketing software company into a winner. Recently, Marketo's cash flow (Ebitda) has turned positive. -- N.V.



*Must Read: Little Black Book Of Billionaire Secrets*

## Sophisticated Hedge Fund Analysis & Strategies

Forbes Billionaire's Pro Perspectives discusses how global macro-economic trends impact your investments.

| Enter e-mail address | Sign up |

You may opt any time. Terms and Conditions and Privacy Policy



**Nathan Vardi**

Follow

I am a senior editor at Forbes who likes digging into Wall Street, hedge funds and private equity firms, looking for both the good and the bad. I also focus on the...

**Read More**

Reprints & Permissions

ADVERTISEMENT

# EXHIBIT I

**Screenshot taken on November 28, 2020 at 11:55 AM ET of the following website:**

https://www.linkedin.com/company/vista-equity-partners/



# EXHIBIT J

Log in     Request a free trial



# Vista Equity Partners





## Vista Equity Partners Overview

Update this profile

**Investor Type**

# PE/Buyout

**Status**

# Active

**Professionals**

# 164



**Investments**

# 406

**Portfolio**

# 69

**Exits**

# 63



---

This is a profile preview from the PitchBook Platform.

Request a free trial

### Data on this profile

| Overview |
| Investments |
| Exits |
| Investments Analytics |
| Team |

 **PitchBook also tracks**

Fund Performance

Limited Partners

Lead Partners on Deals

## Vista Equity Partners General Information

### Description

Founded in 2000, Vista Equity Partners is a private equity firm headquartered in Austin, Texas. The firm focuses on investing in software, agriculture, construction, education, energy, financial services, government, healthcare, hospitality, insurance, legal, marketing, media, entertainment, real estate, retail, security, telecom, transportation, and technology-enabled business sectors. The firm employs private equity, permanent capital, credit, and public equity investment strategies. The firm has additional offices in San Francisco, California; Oakland, California; New York, New York, and Chicago, Illinois.

Board Members

Service Providers

Investment

Preferences

## Contact Information

**Website**
www.vistaequit...

**Year Founded**
2000

**Investor Status**
Actively Seekin...

**Trade Association**
Principles for R...

**Primary Investor Type**
PE/Buyout

**Other Investor Types**
Growth/Expans...

**Primary Office**
401 Congress Avenue
Suite 3100
Austin, TX 78701
United States
+1 (512) 000-0000

in

---

# Vista Equity Partners Investments & Acquisitions (406)

| Company Name | Deal Date | Deal Type | Deal Size | Industry |
|---|---|---|---|---|
| 000000 | 24-Nov-2020 | 0000000000 | | Business/Productivity Sc |
| 0000000000 | 17-Nov-2020 | 0000000000 | | Business/Productivity Sc |
| 0000 0000000 00000 | 17-Nov-2020 | 0000000000 | | Business/Productivity Sc |
| 00000 00000000 | 12-Nov-2020 | 00000 00000 | 00000 | Network Management S |
| Pipedrive | 12-Nov-2020 | Buyout/LBO | | Business/Productivity Sc |

You're viewing 5 of 406 investments and acquisitions. Get the full list »

Want detailed data on 3M+ companies?
What you see here scratches the surface

Want to dig into this profile?
We'll help you find what you need

## Vista Equity Partners Exits (63)

| Company Name | Exit Date | Exit Type | Exit Size |
|---|---|---|---|
| 0000 | 20-Nov-2020 | 000000000 00000000 | 00000 |
| 0000 0000 00000000 | 23-Oct-2020 | 00 000000000000000 | |
| 00000 | 21-Oct-2020 | 000 | 00000 |
| 00000000 | 08-Sep-2020 | 00 000000000000000 | |
| SecureLink (USA) | 08-Sep-2020 | Buyout/LBO | |

You're viewing 5 of 63 exits. Get the full list »

# Vista Equity Partners Investments by Industry, Year, and Region



### Investments by Industry

### Investments by Year

### Investments by Region

# Vista Equity Partners Team (245)

| Name | Title | | Deals | Funds | E |
|---|---|---|---|---|---|

Case 3:20-cr-00371-WHA    Document 49-1    Filed 11/30/20    Page 45 of 72

| Name | Title | Deals | Funds | E |
|------|-------|-------|-------|---|
| Robert Smith | Co-Founder, Chairman, & Chief Executive Officer | 000 | 00 | ( |
| David Flannery | Senior Managing Director & President | 0 | | |
| Brian Sheth | Senior Managing Director, Co-Founder, & President | 000 | 00 | ( |
| Read Simmons Ph.D | President, Consulting | | | |
| John Warnken-Brill | Senior Managing Director & Chief Financial Officer | | 0 | |

You're viewing 5 of 245 team members. Get the full list »

## PRODUCTS

PitchBook Desktop

PitchBook Mobile

Excel Plugin

Direct Data

CRM Integration

Chrome Extension

Institutional Research Group

Product Releases

## SOLUTIONS

Private Market Intel

Fundraising

Deal Sourcing

Due Diligence

Business Development

Networking

Deal Execution

## DATA

Companies

Investors

Deals

M&A

Limited Partners

Funds

Financials

Advisors

Professionals

Debt and Lenders

Profile Previews

## NEWS & ANALYSIS

Industry Reports

Blog

Subscribe to Newsletter

Advertise with Us

## BLOG

## ABOUT

Partnerships

Careers

Events

Press Inquiries

Video Library

What Sets Us Apart

## FOLLOW US


   



US
HEADQUARTERS

+1 (206) 623.1986
901 Fifth Avenue
Suite 1200
Seattle, WA 98164

EUROPEAN
HEADQUARTERS

+44 020 8037 2308
1st Floor Saffron House
6-10 Kirby Street
London EC1N 8TS
United Kingdom

NEW YORK

+1 (206) 623.1986
315 Park Avenue South
14th Floor
New York, NY 10010

CONTACT US

info@pitchbook.com
Request Research
Request your Profile
Submit your Deal

© 2020 PitchBook Data. All rights reserved. PitchBook is a financial technology company that provides data on the capital markets.

Site Map     Terms of Use     Privacy Policy     California Consumer: Do Not Sell My Info

# EXHIBIT K

Case 3:20-cr-00371-WHA   Document 49-1   Filed 11/30/20   Page 48 of 72

**401 Congress Ave, Austin, TX 78701 to 515 Rusk Street, Houston, Texas**     Drive 163 miles, 2 hr 34 min



Map data ©2020 Google, INEGI    10 mi

---

🚗   **via US-290 E and US-290 E**     **2 hr 34 min**

Fastest route now, avoids road closures on I-10 E due to construction     163 miles

⚠️ This route has tolls.

---

🚗   **via TX-71 E and I-10 E**     **2 hr 38 min**

166 miles

---

🚗   **via US-290 E**     **2 hr 55 min**

169 miles

---

**Explore 515 Rusk St**


Restaurants


Hotels


Gas stations


Parking Lots


More

# EXHIBIT L

Check-Distance.com

## Try other cities

A

B

Let's GO!

# Distance from Austin, TX to Houston, TX

Driving distance from Austin, TX to Houston, TX is **162** miles (**261** km). How far is it from Austin, TX to Houston, TX? It's a **02 hours 44 minutes** drive by car. Flight distance is approximately **146** miles (**235** km) and flight time from Austin, TX to Houston, TX is **17 minutes**. Don't forget to check out our "Gas cost calculator" option. It will calculate cost of driving this particular distance. See the map below for the visual display of the upcoming road trip.

**Driving distance**
**162 Miles** / 261 Km



**Gas consumption**
**6.48 Gallons** 24.80 Litres



**Flight distance**
**146 Miles** / 235 Km



# EXHIBIT M



**U.S. Department of Justice**

Tax Division

*Western Criminal Enforcement Section*
*P.O. Box 972*
*Washington, D.C. 20044*
*202-514-5762 (v)*
*202-514-9623(f)*

REZ:LJW:CJSmith
DJ 5-11-24264
CMN 2019200585

October 9, 2020

Mark Filip
Kirkland & Ellis, LLP
1301 Pennsylvania Avenue, NW
Washington, D.C. 20004

Re:     Robert F. Smith – Non-Prosecution Agreement

Dear Mr. Filip,

As you know, the U.S. Department of Justice Tax Division, the United States Attorney's Office for the Northern District of California, and the Internal Revenue Service-Criminal Investigation ("IRS-CI") have been investigating your client, Robert F. Smith, in regard to suspected criminal violations of the Internal Revenue Code, Title 26, United States Code and related violations of Title 31, Report of Foreign Bank and Financial Accounts ("FBAR"). After careful consideration of Robert F. Smith's conduct and all of the surrounding circumstances, the Tax Division and the United States Attorney's Office for the Northern District of California hereby extends this Non-Prosecution Agreement (the "Agreement") to Robert F. Smith per the following terms and conditions:

1.      **Term of the Agreement.** The term of this Agreement shall be five (5) years, beginning on the date of signing this agreement, unless there is a breach as set forth in paragraph 4 and 5. Obligations hereunder survive the term of this Agreement only where this Agreement expressly so provides.

2.      **Acknowledgment of Facts.** Robert F. Smith acknowledges and agrees that the Statement of Facts as set forth in Attachment A, is truthful and accurate. He acknowledges and agrees that the Statement of Facts accurately describes the tax evasion scheme in which he participated, namely that he used the Excelsior Trust and Flash Holdings entities to willfully conceal taxable income paid to those entities, that he completely and unilaterally controlled said income which he knew was taxable to him, and further, that he affirmatively acted to conceal the income from the Internal Revenue Service ("IRS") (the "Scheme"). In addition, Robert F. Smith acknowledges that as a part of the Scheme, he willfully did not timely and accurately

report to the IRS and the United States his financial interest in, and signatory authority over, the foreign bank accounts described in the Statement of Facts.

3.     **Cooperation**. It is understood that during and under the terms of this Agreement Robert F. Smith shall continue to cooperate by:

(a) truthfully and completely disclosing all information with respect to the activities of himself, and others, concerning all matters about which the United States including but not limited to the Department of Justice Tax Division, IRS-CI, and the United States Attorney's Office for the Northern District of California inquires of him, which information can be used for any purpose;

(b) truthfully and completely providing full and meaningful cooperation to the United States, including but not limited to the Department of Justice, IRS-CI, and the United States Attorney's Office for the Northern District of California regarding other individuals involved in the Scheme, and other similar schemes of which he has knowledge, and such other matters that the United States may inquire of him. Any assistance Robert F. Smith may provide to federal criminal investigators shall be pursuant to the specific instructions and control of the United States and its designated investigators. Robert F. Smith's cooperation under this Agreement shall continue for a period of five (5) years from the date this Agreement is fully executed, however, he shall cooperate fully with the United States in all matters the United States inquires of him during this Agreement until the conclusion of such matters, whether those matters are concluded within the five-year term of this Agreement;

(c) withdrawing from any and all joint defense agreements previously entered into with other individuals who were involved in the Scheme, or were involved in similar schemes;

(d) attending all meetings at which the United States requests his presence, at a mutually convenient location;

(e) providing to the United States, upon request, any document, record, or other tangible evidence, except for those subject to valid claims of attorney-client privilege, work product protections, or other privileges, if any, other than those expressly waived including those described in Paragraph 3(g), relating to matters about which the United States, or any designated law enforcement agencies, inquire of him;

(f) truthfully testifying before the grand jury, at any trial, and other court proceeding as requested by the United States, except for testimony subject to valid claims of attorney-client privilege, work product protections, or other privileges, if any, other than those expressly waived including those described in Paragraph 3(g);

(g) withdrawing, and otherwise waiving, any and all objections in proceedings involving the review of evidence, both electronic and documentary, seized by IRS-CI including signing and filing in the respective federal district courts at the time of execution of this Agreement, the attached pleadings entitled, "Robert Smith's Withdrawal of Objections and Waiver of Privilege" (Attachments B and C), said pleadings intended to constitute a full waiver of any and all attorney/ client and attorney work product privileges applicable to this evidence, and otherwise abandoning any litigation contesting the United States' requests for this evidence, and waiving attorney-client privilege, work product protection, and other applicable privileges, if any, as to the Scheme, including the creation, operation and concealment of the Excelsior / Flash structure and to any aspect of his  relationship or dealings with Individuals A and B, as defined in

*Robert F. Smith*
*Non-Prosecution Agreement*
*Page - 3 -*

Attachment A – Statement of Facts.  For avoidance of doubt, nothing herein shall be construed as a waiver of attorney-client privilege, work product protection, or other applicable privileges, if any, during the representation of Robert F. Smith by any of the counsel or law firms that have advised him in this criminal investigation;

(h) paying all federal income tax, penalties, and interest owed to the IRS, as determined by the IRS, pursuant to his participation in the Scheme, in the amount of $56,278,125 for calendar years 2000 through 2014, and waiving any objection to the imposition of the civil fraud penalty, under Title 26 U.S.C. § 6663, on the tax due as determined by the IRS. A partial payment to the United States totaling one-half of this amount owed to the IRS shall be made at or before the execution of this Agreement with equal quarterly payments made thereafter to the United States, and payment in full no later than eighteen (18) months after the execution of this Agreement. The amount of tax, penalty, and interest due pursuant to this sub-paragraph shall not be reduced by a carryback, deduction, loss, credit, or other tax benefit of any kind which is, or may become available.  A separate payment of tax associated with the 2015 calendar year will be made by Robert F. Smith to the IRS, together with an Amended Income Tax Return for the 2015 calendar year, reflecting previously unreported income from the Scheme.   Robert F. Smith shall also waive any objection to the imposition of the civil fraud penalty, under Title 26, U.S.C. § 6663, on the additional tax due and paid for the 2015 calendar year as reflected on the Amended Income Tax Return that Robert F. Smith will file.

(i) paying all penalties and interest computed by the IRS, pursuant to Title 31 U.S.C. §§5314 and 5322, in the amount of $82,930,165, related to Robert F. Smith's failure to timely file truthful and accurate Foreign Bank Account Reporting Forms TD F 90-22.1 ("FBARs"), reporting his financial interest in the foreign bank accounts referenced in the Statement of Facts for the calendar years 2012, 2013, and 2014. A partial payment to the United States totaling one-half of this amount of the FBAR penalties and interest shall be made at or before the execution of this Agreement with equal quarterly payments made thereafter to the United States, and payment in full no later than eighteen (18) months after the execution of this Agreement. The amount of tax, penalty, and interest due pursuant to this sub-paragraph shall not be reduced by a carryback, deduction, loss, credit, or other tax benefit of any kind which is, or may become available.

(j) beginning in 2019, fully and accurately reporting to the IRS and United States all of his offshore financial interests, transactions, and income, as required by United States statutes and regulations;

(k) abandoning his protective, or tentative, claims for refund totaling $182,138,000 filed with the IRS consisting of a (i) a protective refund claim submitted to the IRS on May 12, 2017 for amounts paid in connection with the submission pursuant to the Streamlined Domestic Offshore Procedures, and (ii) protective refund claims filed with the IRS for charitable contribution deductions on September 21, 2018, and October 11, 2019, in connection with the contributions to Fund II Foundation, and any other claims related to the disposition of unreported income that was part of the Scheme, and take no further direct or indirect tax benefit from such claims;

(l) cooperating with the IRS, including signing at the time of execution of this Agreement the attached closing agreements with the IRS relating to his tax liabilities and FBAR liabilities (Attachments D and E), and cooperating with the IRS in all audits of Robert F. Smith's federal income tax returns, to ensure Robert F. Smith is in full compliance with all applicable federal income tax statutes;

(m) bringing to the Department of Justice Tax Division's or the United States' attention

all other crimes, in addition to those committed as part of the Scheme, which Robert F. Smith has committed, and all other criminal proceedings, investigations, or prosecutions in which he has been or is a subject, target, party, or witness; and

(n) committing no crimes whatsoever.

4.     **Violation of Agreement**.     It is understood that should the Department of Justice Tax Division or the United States Attorney's Office for the Northern District of California determine in its sole discretion that Robert F. Smith has knowingly given false, incomplete, or misleading testimony or information, or otherwise violated any provision of this Agreement, then:

(a) Robert F. Smith shall thereafter be subject to prosecution for any federal criminal violation of which the United States has knowledge, including crimes relating to the Scheme set forth in the Statement of Facts (Attachment A), perjury, and obstruction of justice; and any such prosecution that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement of such prosecution. It is the intent of this Agreement for Robert F. Smith to waive all defenses based on the statute of limitations and the Speedy Trial Act (18 U.S.C. § 3161) with respect to any prosecution that is not time-barred on the date that this Agreement is signed. Robert F. Smith further agrees to the tolling of any applicable statute of limitations from August 13, 2020 until all the terms of this Agreement are fulfilled.

(b) All statements made by Robert F. Smith to the United States, or other designated law enforcement agents, and any testimony given by Robert F. Smith before a grand jury or other tribunal, whether prior or subsequent to the signing of this Agreement, and any leads from such statements or testimony shall be admissible in evidence in any criminal proceeding brought against Robert F. Smith.

(c) Robert F. Smith shall assert no claim under the United States Constitution, any statute, Rule 410 of the Federal Rules of Evidence, or any other federal rule or regulation that such statements or any leads derived therefrom should be suppressed. It is the intent of this Agreement to waive all rights in the foregoing respects.

(d) Robert F. Smith agrees to be subject to the jurisdiction of, and venue in, the United States District Court for the Northern District of California for any perjury, obstruction of justice, or false statement prosecutions related to any testimony or oral or written statements given in accordance with this Agreement. Robert F. Smith appoints his attorney, Mark Filip, as his agent to accept service of legal process, including subpoenas and summonses, in any proceeding instituted by the United States or IRS, or to which the United States or IRS is a party with respect to the crimes described above.

5.     **No Repudiation or Contradiction of Statement of Facts**. Robert F. Smith agrees that he shall not, himself or through any agent or representative, make any statement, in litigation or otherwise, repudiating or contradicting the Statement of Facts associated with this Agreement (Attachment A). Any contradictory statement by Robert F. Smith or his agent shall constitute a violation of this Agreement. If such a contradictory statement is determined to constitute a violation of this Agreement, then Robert F. Smith thereafter shall be subject to

Robert F. Smith
Non-Prosecution Agreement
Page - 5 -

prosecution for his participation in the Scheme, as described in the Statement of Facts (Attachment A), and waives his right to contest or object to these facts set forth therein. The decision as to whether any contradictory statement will be imputed to Robert F. Smith for the purpose of determining whether Robert F. Smith has committed a violation of this Agreement shall be at the sole discretion of the United States. Upon the United States reaching a determination that a contradictory statement has been made by Robert F. Smith, the United States shall promptly notify Robert F. Smith in writing, and Robert F. Smith may avoid a violation of this Agreement by repudiating the statement in question both to the recipient of the statement and to the United States within seven (7) days after Robert F. Smith's receipt of notice. Robert F. Smith consents to the public release by the United States, in its sole discretion, of any repudiation.

6.    **Public Record**. Robert F. Smith and the United States agree that upon execution of this Agreement, the Agreement and the associated Statement of Facts (Attachment A) and Closing Agreements with the IRS (Attachments D and E) shall be a matter of public record. Moreover, Robert F. Smith agrees to waive any and all statutory rights afforded to him under Title 26 U.S.C. § 6103 regarding the public disclosure of information contained in the Statement of Facts.

7.    **Agreement Not to Prosecute**. If the Department of Justice Tax Division and the United States Attorney's Office for the Northern District of California determine that Robert F. Smith has fully complied with the terms of this Agreement, then the Department of Justice Tax Division and the United States Attorney's Office for the Northern District of California agree not to criminally prosecute Robert F. Smith for any federal crimes arising from the Scheme, as generally described in the Statement of Facts (Attachment A) to include (i) any attempt to defraud the United States, evade or defeat tax, or any fraud or false statements on any documents subscribed to the Internal Revenue Service ("IRS") for the tax years 2000 through 2015; and (ii) Robert F. Smith's failure to timely file truthful and accurate Foreign Bank Account Reporting Forms TD F 90-22.1 ("FBARs"), reporting his financial interest in the foreign bank accounts for the calendar years 2012 through 2019. This Agreement does not provide any protection against prosecution for any future conduct by Robert F. Smith, or for any misconduct not disclosed by Robert F. Smith during this investigation.

8.    **Limits on this Agreement.**   Other than the Department of Justice Tax Division, the United States Attorney's Office for the Northern District of California, and IRS-CI, this Agreement does not bind any other component of the Department of Justice or any other federal, state, or local law enforcement or regulatory authority.

9.    **Totality of this Agreement**. This Agreement sets forth all of the terms of the Non-Prosecution Agreement between Robert F. Smith and the United States. It constitutes the complete and final agreement between the United States and Robert F. Smith in this matter. There are no other agreements, written or otherwise, modifying the terms, conditions, or obligations of this Agreement. No future modifications or additions of this Agreement, in whole or in part, shall be valid unless they are set forth in writing and signed by the United States, Robert F. Smith, and Robert F. Smith's counsel.

*Robert F. Smith*
*Non-Prosecution Agreement*
*Page - 6 -*


Date   10/10/2020

RICHARD E. ZUCKERMAN
**Principal Deputy Assistant**
**Attorney General**
**Tax Division**


Date   10/13/2020

**DAVID L. ANDERSON**
**United States Attorney**
**Northern District of**
**California**


AGREED AND CONSENTED TO:


Date   OCT 9, 2020

Robert F. Smith


APPROVED:


Date signed   Oct 9, 2020

Mark Filip
Kirkland & Ellis LLP
Attorney for Robert F. Smith


Date signed   Oct 9, 2020

W. Neil Eggleston
Kirkland & Ellis LLP
Attorney for Robert F. Smith


Date signed   October 9, 2020

Emily P. Hughes
Kirkland & Ellis LLP
Attorney for Robert F. Smith

*Robert F. Smith*
*Non-Prosecution Agreement*
*Page - 7 -*

**Mark E. Matthews**
**Caplin & Drysdale, Chartered**
**Attorney for Robert F. Smith**

Date signed ___Oct 9, 2020___

**Scott D. Michel**
**Caplin & Drysdale, Chartered**
**Attorney for Robert F. Smith**

Date signed ___OCTOBER 9, 2020___

**EXHIBIT A TO ROBERT F. SMITH
NON-PROSECUTION AGREEMENT**

**STATEMENT OF FACTS**

1.     Robert F. Smith ("Smith"), age 57, is a resident of Austin, Texas and a citizen of the United States. From 2000 through May 2015, Smith engaged in an illegal scheme to conceal income and evade taxes he owed by using an offshore trust structure with related foreign corporations and offshore bank accounts, and by willfully filing a series of false documents with the Internal Revenue Service ("IRS") and the Treasury Department.

2.     Beginning in or about 1997, while working as an investment banker at a leading global investment bank and securities firm, Smith met and developed a business relationship with Individual A, the CEO of a corporation that produces and markets computer software ("Company A"), located in Houston, Texas. Smith, who received an MBA from Columbia University in 1994, worked extensively with Individual A in 1997 and 1998 regarding the potential sale of Company A. During that process, Smith learned that Company A was purportedly owned by a foreign holding company that, in turn, was purportedly owned by a foreign trust located in Bermuda. Individual A told Smith that the foreign trust was created by Individual A's father in the 1980s. Individual A, and others who worked for Individual A, told Smith that because Company A was owned by the offshore trust, no United States income tax would be owed on the profits gained from the sale of Company A's stock.

3.     The contemplated sale of Company A did not occur. Instead, Individual A approached Smith about the prospect of creating a private equity fund ("Fund 1") in which Individual A would be the sole limited partner investor, through his foreign trust structure. Smith left his employment with the investment bank and in 2000, founded a private equity firm located in San Francisco, California. Smith has been the CEO of the private equity firm since that time. Individual A initially made a $300 million commitment to Fund 1, which was later increased to $1 billion. Although the Fund 1 partnership agreement listed Individual A's foreign trust entity as its sole limited partner, it became apparent to Smith that Individual A completely controlled this foreign trust structure and made all final and substantive decisions regarding its investments in Fund 1.

4.     Individual A personally dictated the terms under which he would invest in Fund 1, including that Fund 1 had to be located in the Cayman Islands and that Smith hold half his carried interest in Fund 1 through a "perfected foreign trust" similar to the one used by Individual A. Specifically, Smith would personally receive an 8 percent general partnership interest in Fund 1, holding 4 percent through his LLC and the other 4 percent through an offshore trust that Smith controlled. All Fund 1 profits Smith earned were to be paid through these entities. Individual A told Smith that a portion of the general partner income and distributions from Fund 1 had to be held offshore because Individual A did not want to bring his foreign trust, and related foreign companies, into United States courts to litigate claims if Fund 1 failed to perform. Smith understood from Individual A, that Individual A did not want the United States Internal Revenue Service ("IRS") to know about his own foreign trust's participation in Fund 1. Individual A presented this unconventional business proposal as a "take-it-or-leave-it" offer, dictating the unique terms and unorthodox structure to the arrangement. Despite any misgivings, Smith

accepted Individual A's offer, viewing it as a unique business opportunity he eagerly wanted to pursue. It became apparent to Smith that despite paperwork that indicated to the contrary, Individual A completely controlled Individual A's foreign trust and related foreign companies, and made all substantive decisions regarding all of its transactions and investments.

5.     For the purpose of forming a similar foreign trust, Individual A referred Smith to Individual B, a lawyer in private practice in Houston, Texas who specialized in foreign trusts and "asset protection" planning. Smith understood that Individual B previously assisted Individual A's father in creating Individual A's trust in the 1980s.

6.     Individual B told Smith that he could form a foreign trust that could hold assets for Smith, and that Smith could use and benefit from these assets without paying United States income tax. In order to avoid United States income and estate tax, Smith was to have a foreign U.K. relative of his then-spouse ("nominee settlor") appear to fund the creation of the foreign trust with an initial "donation" of $7,500. Individual B told Smith that he and his family could be named beneficiaries of the foreign trust, and that the foreign trust must also include charitable beneficiaries in order to assure the tax-free nature of the trust. Despite representations and paperwork to the contrary, the charitable aspects of the trust were discretionary, not mandatory. Individual B also told Smith that the paperwork he and Smith prepared would make it appear as if the income and assets of the trust were not owned or taxable to Smith. Smith knew that the nominee settlor would not be involved in the creation of this foreign trust, and would neither contribute assets to the trust, nor pay any fees. Despite appearing too good to be true, Smith did not consult with other reputable tax attorneys or legal advisors he knew and trusted to verify the validity, or legal soundness, of what Individual B told him. In fact, Individual A told Smith that aside from Individual B, he should not to discuss his offshore structure with other attorneys.

7.     Smith paid nearly all the costs and fees associated with the trust. In 2000, Smith purported to have the nominee settlor settle his Belizean trust, called Excelsior Trust ("Excelsior"). Smith personally paid nearly half the $7,500 to settle the trust and paid the entire $30,000 in administrative fees required to form and create Excelsior. Smith's foreign relative, the nominee settlor of Excelsior, paid none of the administrative fees. Further, from 2000 through 2014, Smith paid annual fees of approximately $5,000 to maintain Excelsior in Belize. The nominee settlor was not involved in the payment of these fees. From 2000 through 2014, Smith also paid Individual B approximately $800,000 in fees for Individual B's assistance with the creation of a false paper trail, regarding the maintenance and operation of Excelsior and its related entities. Smith falsely told the Belizean nominee trustee that the initial donation of $7,500 came from the nominee settlor to create the false impression that Excelsior was an independent foreign trust being created and formed by someone other than Smith.

8.     Individual B further told Smith that the foreign trust could own foreign corporations to hold various assets in foreign jurisdictions, similar to Individual A's foreign trust. Smith understood from Individual B that although assets would be held and titled under the foreign trust and foreign corporate names, Smith could continue to control the assets and use them for his personal benefit.

9.     With the assistance of Individual B, Smith created a foreign limited liability company named Flash Holdings, LLC ("Flash"), in Nevis. At Individual B's direction, Smith

falsely represented to the Belizean nominee trustee for Excelsior that Flash was formed under the direction of the nominee settlor, using bearer shares, and that Flash was purportedly owned by Excelsior.[1] In reality, Smith paid the fees and costs to form Flash and made all substantive decisions regarding Flash's operations, transactions, income, investments, and assets.

10.     Following the formation of Excelsior and Flash, Smith held a 4% general partnership interest in Fund 1 under his own name and a 4% general partnership interest in the name of Flash. Smith was at all times in control of and the beneficial owner of Flash's 4% general partnership interest in Fund 1. Smith understood from Individual B that he controlled both the investment decisions for Flash and its assets, but he felt obligated to honor any claims Individual A made against Flash's tax-free funds held in a foreign jurisdiction if Fund 1 was not successful. Smith understood that Individual A could assert claims over the assets of Fund 1 if the fund were to lose money. Individual A had the power to remove Smith and the general partners from Fund 1 by forcing a sale of general partner interests to Individual A at Individual A's valuation.

11.     In 2000, when Smith formed Excelsior and Flash, Smith knew that Excelsior and Flash were intended, and would be used, to avoid the payment of United States income tax on income earned from investments in Fund 1 and other private equity funds. Smith knowingly and intentionally used Excelsior and Flash and their associated foreign bank accounts to conceal from the IRS, and the United States Treasury Department, income earned and/or distributed to Flash from Fund 1 and other private equity funds.

12.     At all times from their formation, Smith knowingly and intentionally controlled Excelsior and Flash for his use, benefit, and enjoyment, subject only to a claim Individual A could assert to Fund 1. Although Excelsior had a nominee trustee in Belize, that trustee exercised no independent judgment and made no decisions regarding Excelsior other than those that Smith directed. Similarly, although Flash had a nominee corporate manager and resident agent in Nevis, these managers and agents exercised no independent judgment over Flash, and made no decisions regarding Flash other than those that Smith directed.

13.     Individual B recommended that Smith work through him to create a paper record for purposes of creating a false impression that Excelsior's trustees and Flash's managers made independent decisions for these entities when in fact, Smith made all substantive decisions in their regard. Individual B advised Smith to communicate with the nominee trustees and nominee managers of Excelsior and Flash through Individual B for greater confidentiality, which Individual B knew was intended to, and did, conceal Smith's control and beneficial ownership of the income concealed in bank accounts under Flash's name.

14.     Beginning in approximately 2005, Flash began to earn and receive general partnership carried interest income from Fund 1. Distributions of this income were initially made to Flash's bank account at bank in the British Virgin Islands ("BVI Account"). Although Smith was not a signatory on the BVI Account, Smith was its beneficial owner and controlled all transactions concerning the account through Flash's nominee manager. Smith did not report this

---

[1] A bearer instrument is a document that entitles the holder of the document rights of ownership or title to the underlying property.

income to the IRS.

15.    In 2007, Smith caused an account in Flash's name to be opened at Banque Bonhôte in Switzerland into which additional carried interest income earned by Flash from Fund 1 and later from additional private equity funds were deposited (the "Bonhôte Account"). At all times, Smith was the sole signatory on the Bonhôte Account, fully controlled the Bonhôte Account, and was listed in Banque Bonhôte records as the beneficial owner of the Bonhôte Account. Smith was, in fact, the beneficial owner of the Bonhôte Account.

16.    In 2005, Smith and his then-wife purchased a vacation home in Sonoma, California. Smith titled the property they selected in Flash's name. Smith directed that the purchase price of $2.5 million be paid with untaxed funds from the BVI Account. Smith and his then-wife renovated the Sonoma property and paid for the renovation costs with untaxed funds deposited in the BVI Account and the Bonhôte Account. Smith and his family used the Sonoma property and had unfettered access to it from 2005 to 2014. Smith knowingly and willfully neither timely reported to the IRS nor timely paid income tax on these funds.

17.    In 2010, after Smith and his then-wife moved to Switzerland, they acquired two ski properties in Megève, France and later a Megève commercial property using untaxed funds to make the purchases, and with Individual B's advice, titled the properties in the names of foreign entities. Smith directed the payment of more than 13 million Euros from the Bonhôte Account to purchase and furnish the properties. Smith and his family had control of the Megève ski properties and had priority access to them from 2010 to 2014 unless rented to third parties. Smith knowingly and willfully neither timely reported to the IRS, nor timely paid income tax on these funds.

18.    From 2005 to 2013, Smith withdrew untaxed funds from the BVI Account and the Bonhôte Account for his personal use and benefit. In 2011 and 2012, Smith transferred more than $13 million from the Bonhôte Account to a United States bank account for his benefit. Smith used these funds to build a home and make improvements to property that he owned in Colorado and to fund charitable activities on that property for inner city children and wounded veterans. Smith knowingly and willfully neither timely reported to the IRS, nor timely paid income tax on these funds.

19.    From 2000 until 2014, Smith knowingly and intentionally did not advise his tax return preparer about Excelsior, Flash, and the BVI Account and the Bonhôte Account. Smith knowingly and intentionally did not tell his return preparer that he controlled these entities and bank accounts and that he had placed a portion of his general partnership income from Fund 1 and other private equity funds into those entities and accounts. Smith knowingly and intentionally did not tell his return preparer that he used untaxed income deposited into these foreign accounts for his own personal benefit.

20.    From in or about 2006 through 2015, Smith willfully filed false United States Individual Income Tax Returns, Forms 1040, for the tax years 2005 through 2014 in which he failed to disclose his beneficial interest in, and control over the BVI Account and the Bonhôte Account. In addition, Smith willfully failed to report on these income tax returns the income he earned from Fund 1, and other private equity funds, a portion of which he directed to be deposited into the BVI Account and Bonhôte Account. Smith willfully understated his income on these tax

returns and willfully evaded more than $43,000,000 in U.S. federal income taxes for the tax years 2005 through 2014.

21.     Smith knew that United States laws and regulations require United States citizens who have signatory authority over, or a financial interest in, a foreign bank account[s] to annually file a Foreign Bank Account Reporting Form TD F 90-22.1 ("FBAR"), with the United States government reporting either this signatory authority and/or financial interest. Prior to 2011, Smith knowingly and intentionally did not file an FBAR as required by law. In or around September 2011, Smith filed an FBAR for the 2010 calendar year that willfully failed to report his financial interest in the BVI Account and the Bonhôte Account Smith also willfully failed to file an FBAR for 2011 as required by law. In or around June 2013, Smith filed an FBAR for 2012 calendar year that willfully failed to report his financial interest in the BVI Account and the Bonhôte Account for purposes of concealing his ownership and control of these accounts.

22.     In or around November 2013 and January 2014, Smith received letters from Banque Bonhôte regarding the bank's intended participation in the United States Department of Justice "Swiss Bank Program" which required participant banks to report all United States-related accounts to the United States government (the "Bank Program Letters"). Smith received these letters relating to the Bonhôte Account. The Bank Program Letters noted that the Bonhôte Account was held by a United States person, and requested Smith to waive Swiss bank secrecy related to it. It further recommended that Smith consider applying to the IRS's Offshore Voluntary Disclosure Program ("OVDP") to report his non-compliance. The Bank Program Letters also informed Smith that if he failed to take one of these actions that Banque Bonhôte would close the Bonhôte Account. In March 2014, Smith filed a preclearance request with the IRS seeking entry into OVDP. In April 2014, the IRS denied Smith's preclearance application into OVDP.

23.     In or around June 2014, after receiving the OVDP preclearance denial, Smith willfully filed a false 2013 FBAR. Smith listed both the BVI Account and the Bonhôte Account on the 2013 FBAR, but only reported signature authority over these accounts while willfully omitting both his financial and beneficial interest in the accounts as well. Smith willfully omitted these disclosures to further conceal his taxable income deposited into these accounts.

24.     In or around October 15, 2014, Smith willfully filed a false United States Individual Income Tax Return, Form 1040, for the tax year 2013, with the IRS, which misrepresented and willfully failed to disclose his income from, beneficial interest in, and control over Excelsior and Flash. Smith's 2013 federal income tax return also willfully failed to disclose Smith's financial interest in the BVI Account and Bonhôte Account. In addition, Smith willfully filed a false Form 8275, attached to his income tax return, in which he represented that the Excelsior / Flash structure had corporate trustees and managers and willfully concealed his control over those entities. Smith attempted to conceal from the IRS that he controlled and beneficially owned the offshore entities Excelsior and Flash. Smith also willfully failed to disclose on the Form 8275 his beneficial ownership of the BVI Account and Bonhôte Account and falsely claimed that income distributed to Flash from Fund 1, and other private equity funds, was required to be donated to charity.

25.     In December 2014, Smith directed Excelsior to contribute all of the shares of Flash, and all of its assets, to a U.S. 501(c)(3) charitable organization. Smith knowingly and intentionally falsely claimed that this charitable contribution was required as part of an agreement with Individual A, the limited partner investor in Fund 1.

26.     In or around May 2015, Smith willfully filed false FBARs for the calendar years 2008 through 2013 ("Streamlined FBARs") and false amended United States Individual Income Tax Returns, Forms 1040X, for tax years 2010 through 2013 ("Streamlined Tax Returns") as part of the Streamlined Domestic Offshore Procedures. Smith's Streamlined FBARs continued to represent that Smith only had signatory authority over the BVI Account and Bonhôte Account, while willfully omitting Smith's true beneficial ownership of these accounts.

27.     Smith's Streamlined Tax Returns continued to willfully include a false Form 8275 which concealed his true beneficial ownership and control of Excelsior and Flash. Smith's Streamlined Tax Returns falsely reported that only small portions of income distributed to him in the United States from Flash's foreign bank accounts, were taxable to him. Smith willfully failed to report on his Streamlined Tax Returns over $200 million of partnership income distributed to Flash from Fund 1 and other private equity funds, over which Smith had beneficial ownership during the calendar years 2005 through 2014. Smith knew that the earned income attributed to Flash was in fact taxable to him when he filed the Streamlined Tax Returns.

28.     The acts taken by Smith, including acts described above, were done willfully and knowingly with the specific intent to violate United States law. Smith acknowledges that the foregoing statement of facts does not describe all of his conduct relating to the offenses stated herein and does not identify all of the persons with whom he may have engaged in unlawful conduct.

29.     The foregoing is a summary of relevant facts and is not a complete recitation of every relevant fact known.


AGREED AND CONSENTED TO:


_____

Robert F. Smith


Date signed   _OCT 9, 2020_____


_____

Mark Filip
Kirkland & Ellis LLP
Attorney for Robert F. Smith


Date signed   _OCT. 9, 2020_____


_____

W. Neil Eggleston
Kirkland & Ellis LLP
Attorney for Robert F. Smith


Date signed   _Oct 9, 2020_____

Date signed    _October 9, 2020_

**Emily P. Hughes**
**Kirkland & Ellis LLP**
**Attorney for Robert F. Smith**

Date signed    _Oct 9, 2020_

**Mark E. Matthews**
**Caplin & Drysdale, Chartered**
**Attorney for Robert F. Smith**

Date signed    _october 9, 2020_

**Scott D. Michel**
**Caplin & Drysdale, Chartered**
**Attorney for Robert F. Smith**

Date signed    _10/10/2020_

**Richard E. Zuckerman,**
**Principal Deputy Assistant Attorney General**
**Department of Justice**
**Tax Division**

# EXHIBIT N

**Screenshots taken on November 29, 2020 at 7 AM ET of the following website:**

http://www.kepkelaw.com



## About Kepke Law

The Law Office of Carlos E. Kepke began operations in 1992. It is a boutique law firm engaged in only one practice area--the use of foreign structures for United States ("U.S.") tax savings and/or asset protection. It only accepts clients who are U. S. citizens who have as objectives the mitigation of U. S. income and/or estate taxes and/or asset protection.

The principal in the firm is Carlos E. Kepke who for many years was a partner in and the head of the international tax section of a major law firm in Houston, Texas. After leaving the Houston firm, Mr. Kepke opened his own law office. Mr. Kepke has been specializing in this area of the law for over thirty (30) years. Mr. Kepke has published numerous articles related to his specialty and is a frequent speaker at seminars around the world.

To see Mr. Kepke's resume please send an e-mail to CEK4334@sbcglobal.net or call 713-626-0612

(713) 626-0612
149 Sage Road Houston, TX 77056-1417





Home    About Us    Offshore Trust Planning for Asset Protection    Offshore Structures for Tax Savings    Contact Us

KepkeLaw.com

Offshore Structures
for U.S. Income and
Estate Tax Savings

## Contact Kepke Law

| Law Office of Carlos E. Kepke | |
|---|---|
| Address: | 149 Sage Road<br>Houston, Texas 77056-1417 |
| Phone: | (713) 626-0612 {voice} |
| | (713) 626-0613 {fax} |
| Email: | CEK4334@sbcglobal.net |

# EXHIBIT O

**Screenshot taken on November 29, 2020 at 7:17 AM ET of the following website:**

https://www.linkedin.com/in/carlos-kepke-4aaab91a/



# EXHIBIT P

**Screenshot taken on November 29, 2020 at 7:13 AM ET of the following website:**

https://www.texasbar.com/AM/Template.cfm?Section=Find_A_Lawyer&template=/Customsource/MemberDirectory/MemberDirectoryDetail.cfm&ContactID=213481

