Jason Varnado (State Bar No. 211067)
jvarnado@jonesday.com
JONES DAY
717 Texas, Suite 3300
Houston, TX  77002
Telephone +1-832-239-3939
Facsimile +1-832-239-3600

Neal J. Stephens (State Bar No. 152071)
nstephens@jonesday.com
Vincent Doctor (State Bar No. 319408)
vdoctor@jonesday.com
JONES DAY
1755 Embarcadero Road
Palo Alto, CA  94303
Telephone:    +1-650-739-3939
Facsimile:    +1-650-739-3900

Kathryn Keneally (appearance *pro hac vice*)
New York State Bar No. 1866250
kkeneally@jonesday.com
JONES DAY
250 Vesey Street
New York, NY 10281-047
Telephone:  +1-212-326-3939
Facsimile:   +1-212-755-7306

Attorneys for Defendant
ROBERT T. BROCKMAN

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ROBERT T. BROCKMAN,<br><br>Defendant. | Case No. 3:20-cr-00371-WHA<br><br>DEFENDANT ROBERT T. BROCKMAN'S NOTICE OF MOTION AND MOTION FOR A HEARING TO DETERMINE WHETHER MR. BROCKMAN IS COMPETENT TO ASSIST IN HIS DEFENSE<br><br>Date:         January 12, 2021<br>Time:        2 p.m.<br>Judge:       Hon. William Alsup<br>Place:        Courtroom 12 |

## **NOTICE OF MOTION AND MOTION**

PLEASE TAKE NOTICE THAT on January 12, 2021, at 2 p.m., in the courtroom of the Honorable William Alsup, located at 450 Golden Gate Avenue, San Francisco, California 94102, Defendant Robert T. Brockman will, and hereby does, respectfully move pursuant to 18 U.S.C. § 4241(a) for a hearing to determine whether Mr. Brockman is competent to assist in his own defense.

1    This Motion is based on the attached memorandum of points and authorities.

2    Dated: December 8, 2020                    Respectfully submitted,

3                                               JONES DAY

4

5                                               *s/ Neal J. Stephens*

6                                               NEAL J. STEPHENS

7                                               Counsel for Defendant
                                                ROBERT T. BROCKMAN

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ............................................................................................... 1

II.  BACKGROUND ................................................................................................ 3

   A.   Mr. Brockman's dementia prevents him from assisting in his defense ................ 5

      1.   The medical diagnoses show deficiencies in Mr. Brockman's critical cognitive abilities ...................................................... 5

      2.   Mr. Brockman's cognitive impairment has been repeatedly confirmed through medical testing............................................. 6

         (a)   Diagnostic testing results ................................................ 8

         (b)   Forensic testing results ................................................... 9

      3.   Mr. Brockman has experienced hallucinations consistent with Lewy body dementia ................................................................ 12

      4.   Mr. Brockman's medical tests measured for and ruled out malingering ................................................................... 12

      5.   Mr. Brockman's dementia causes him to lose insight into his own cognitive impairment ...................................................... 13

      6.   While Mr. Brockman may continue to function in familiar activities and settings, medical evidence establishes that he cannot assist in the defense of this case.................................................... 13

      7.   The medical experts all agree that Mr. Brockman's dementia makes him incapable of assisting in his defense .................................. 14

   B.   Mr. Brockman's retirement.................................................................... 14

   C.   Non-medical evidence ......................................................................... 15

III. ARGUMENT .................................................................................................... 15

   A.   The record far exceeds a showing of "reasonable cause" to require a competency hearing ........................................................................ 15

   B.   The evidence of Mr. Brockman's cognitive challenges is particularly compelling given the stage and nature of this case .............................. 18

IV.  CONCLUSION .................................................................................................. 20

1

## <u>TABLE OF AUTHORITIES</u>

2

3

**Cases**                                                                 **Page**

*Deere v. Woodford,*
  339 F.3d 1084 (9th Cir. 2003) ..................................................................................16

*Drope v. Missouri,*
  420 U.S. 162 (1975) .................................................................................1, 2, 15, 19

*Medina v. California,*
  505 U.S. 437 (1992) ...............................................................................................17

*Moore v. United States,*
  464 F.2d 663 (9th Cir. 1972) ...................................................................................16

*Odle v. Woodford,*
  238 F.3d 1084 (9th Cir. 2001) ............................................................................16, 18

*Smith v. Ylst,*
  862 F.2d 872 (9th Cir. 1987) ...................................................................................16

*Torres v. Prunty,*
  223 F.3d 1103 (9th Cir. 2000) .................................................................................17

*United States v. Bohol,*
  419 Fed. App'x 730 (9th Cir. 2011) .........................................................................17

*United States v. Brugnara,*
  2015 WL 6126781 (N.D. Cal. Oct. 19, 2015) (Alsup, J.), *aff'd,* 856 F.3d 1198
  (9th Cir. 2017) .........................................................................................................18

*United States v. Chandler,*
  2020 WL 2735917 (M.D. Fla. May 5, 2020), adopted by 2020 WL 2735424
  (M.D. Fla. May 26, 2020) ........................................................................................17

*United States v. Chun,*
  2019 WL 6683878 (E.D. Mich. Dec. 6, 2019) ..........................................................17

*United States v. Dreyer,*
  705 F.3d 951 (9th Cir. 2013) ...................................................................................18

*United States v. Duncan,*
  643 F.3d 1242 (9th Cir. 2011) .................................................................................16

*United States v. Garza,*
  751 F.3d 1130 (9th Cir. 2014) ...................................................................................2

Mot. for Hearing to Determine Whether Mr. Brockman is
Competent to Assist in His Defense 3:20-cr-00371-WHA

*United States v. Helmsley*,
    733 F. Supp. 600 (S.D.N.Y. 1989)..............................................................................18

*United States v. Hernandez*,
    2018 WL 2738880 (N.D. Ohio June 7, 2018)..........................................................17

*United States v. Mason*,
    52 F.3d 1286 (4th Cir. 1995)....................................................................................16

**STATUTES**

18 U.S.C. § 4241...............................................................................................................19

18 U.S.C. § 4241(a) ................................................................................................. *passim*

18 U.S.C. § 4241(b)..........................................................................................................19

18 U.S.C. § 4247(b)–(c)....................................................................................................19

Health Insurance Portability and Accountability Act ..............................................4, 11

**OTHER AUTHORITIES**

https://www.mayoclinic.org/diseases-conditions/parkinsons-disease/symptoms-
    causes/syc-20376055....................................................................................................1

https://www.mayoclinic.org/diseases-conditions/parkinsons-disease/expert-
    answers/parkinsonism/faq-20058490...........................................................................1

https://www.mayoclinic.org/diseases-conditions/lewy-body-dementia/symptoms-
    causes/syc-20352025....................................................................................................1

**MOTION FOR A HEARING TO DETERMINE WHETHER
MR. BROCKMAN IS COMPETENT TO ASSIST IN HIS DEFENSE**

To the Honorable United States District Judge William Alsup:

The Defendant Robert T. Brockman moves under 18 U.S.C. § 4241(a) for a hearing to determine his mental competency to stand trial.  Defense counsel met and conferred with government counsel, who oppose the relief sought in this Motion.

In support of this Motion, the Defendant states as follows.

## I.      INTRODUCTION

This Court is asked to make one decision on this motion:  whether there is "reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and the consequences of the proceedings against him or to assist properly in his defense." 18 U.S.C. § 4241(a).  Upon a showing of reasonable cause, § 4241(a) mandates that "[t]he court shall grant the motion" for a hearing.

Mr. Brockman has dementia.  The causes and impact of dementia may vary.  In Mr. Brockman's case, his treating and diagnostic doctors have concluded that his current cognitive impairment and other symptoms are consistent with Parkinson's disease,[1] parkinsonism,[2] or Lewy body dementia,[3] or some combination of the three.

Four highly qualified doctors in Houston, Texas, have examined Mr. Brockman on multiple occasions over a twenty-two month timespan, and concluded that his dementia makes him incapable of assisting in his defense.  This alone is more than "reasonable cause" to compel a hearing.  *See Drope v. Missouri*, 420 U.S. 162, 180 (1975).

---

[1] Parkinson's disease is a progressive nervous system disorder that affects movement and may cause dementia.  *See* https://www.mayoclinic.org/diseases-conditions/parkinsons-disease/symptoms-causes/syc-20376055.

[2] Parkinsonism is a term used to describe a condition that causes a combination of the movement abnormalities seen in Parkinson's disease, especially resulting from the loss of dopamine-containing neurons.  *See* https://www.mayoclinic.org/diseases-conditions/parkinsons-disease/expert-answers/parkinsonism/faq-20058490.

[3] Lewy body dementia results from protein deposits, called Lewy bodies, that develop in nerve cells in the brain regions involved in thinking, memory and movement.  Lewy body dementia is incurable, progressive, and terminal, with death resulting on average approximately eight years after the onset of symptoms.  *See* https://www.mayoclinic.org/diseases-conditions/lewy-body-dementia/symptoms-causes/syc-20352025.

Mr. Brockman began to raise concerns about cognitive problems at least as early as 2017, and sought medical attention in mid-2018.  He was examined by three doctors and a neuropsychologist in late 2018 and early 2019, for the purpose of obtaining a diagnosis and course of treatment.  Mr. Brockman did not seek out these doctors as a response to this investigation, and in fact only informed his counsel about their conclusions in July 2019, to explain that he may be having difficulty in understanding questions and information provided to him.

Mr. Brockman's doctors have concluded that his medical condition makes him unable to access information, renders him unable to make connections between questions that he is being asked and his recollection of events, and manifests as significant long- and short-term memory deficiencies.  As detailed below, Mr. Brockman's cognitive limitations go well beyond memory loss or forgetfulness.  The doctors describe the impact of Mr. Brockman's medical condition as characterized by what they refer to as "confabulation":  when asked a question, Mr. Brockman's dementia will cause his brain to fabricate information to fill in for gaps in his memory.  He will believe that the information that he is providing is correct, but it will be the result of distortions in how his brain is functioning.

A defendant who "lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial." *Drope*, 420 U.S. at 171.  The Ninth Circuit has instructed that, when deciding whether to conduct a competency hearing, courts should consider evidence from three broad categories:  "medical history, the defendant's behavior in and out of court, and defense counsel's statements about the defendant's competency." *United States v. Garza*, 751 F.3d 1130, 1134 (9th Cir. 2014) (citing *United States v. Marks*, 530 F.3d 799, 814 (9th Cir. 2008)).  Questions about the defendant's competency in any one of these categories may require a hearing. *Drope*, 420 U.S. at 180.  The conclusions reached by Mr. Brockman's diagnostic and treating doctors more than meet the standard for "reasonable cause" that mandates a hearing pursuant to § 4241(a), *see id.*, and will be supported by witnesses, including counsel, who can describe Mr. Brockman's day-to-day behavior and the experience of counsel.

1    **II.    BACKGROUND**

2            In May 2017, Mr. Brockman sent an email to his friend, Dr. Stuart Yudofsky, stating that

3    his son and wife "are after me to consult with the right doctor regarding my loss of my sense of

4    smell.  They are afraid that it is an early sign of alzheimer's or dementia.  I am feeling good but

5    am having increasing memory problems."  Keneally Decl. Ex. A.[4]  In September 2018,

6    Mr. Brockman had a routine appointment with Seth P. Lerner, M.D., who had been monitoring

7    Mr. Brockman in the years following his treatment for bladder cancer in 2006.  During that

8    examination, Mr. Brockman told Dr. Lerner that he had not been feeling well for several months.

9    Dr. Lerner referred him to James L. Pool, M.D., who like Dr. Lerner is a professor and treating

10   physician with Baylor College of Medicine, for a general physical examination.[5]

11           Dr. Pool examined Mr. Brockman in December 2018, diagnosed him as having dementia,

12   and referred him to three medical experts to determine the cause and a course of treatment:

13   Joseph Jankovic, M.D.,[6] a neurologist and specialist in Parkinson's disease and other movement

14   disorders; Melissa Yu, M.D.,[7] a neurologist and specialist in Alzheimer's Disease and other

15   memory disorders; and Michele K. York, Ph.D.,[8] a neuropsychologist, all with Baylor College of

16   Medicine in Houston, Texas.  Keneally Decl. Ex. G at ¶ 4.[9]

17           These doctors completed their examinations by March 2019.  Dr. Jankovic found that

18   Mr. Brockman presented symptoms that are consistent with Parkinson's disease or vascular

19   parkinsonism.  Keneally Decl. Ex. H at 5.  Dr. York and Dr. Yu agreed that Mr. Brockman's

20   movements are consistent with Parkinson's disease or parkinsonism, but they concluded that his

21   cognitive impairment is more consistent with Lewy body dementia.  Keneally Decl. Ex. I at 4-5,

22

23           [4] "Keneally Decl." refers to the Declaration of Kathryn Keneally, affirmed December 8, 2020, and submitted
     in support of this Motion.

24           [5] Dr. Lerner's and Dr. Pool's biographies are submitted at Keneally Decl. Ex. B and Ex. C, respectively.

25           [6] Dr. Jankovic's biography is submitted at Keneally Decl. Ex. D.

26           [7] Dr. Yu's biography is submitted at Keneally Decl. Ex. E.

             [8] Dr. York's biography is submitted at Keneally Decl. Ex. F.

27           [9] Dr. Pool provided a declaration dated November 25, 2020 in support of Mr. Brockman's Motion to
     Dismiss in Part and Transfer Proceedings to the United States District Court for the Southern District of Texas, which
28   for the Court's convenience is submitted again at Keneally Decl. Ex. G.

Ex. J at 7.  The exact diagnosis can only be confirmed post-mortem.  Keneally Decl. Ex. G at ¶ 5.

Mr. Brockman did not inform his counsel of his health issues until July 2019 – ten months after he first raised the issue with Dr. Lerner and two years after his email to Dr. Yudofsky.  Even then, he did so to ask for understanding that he may need things repeated or explained more simply; he never asked if this would have an impact on the then on-going investigation.  Romatowski Decl. ¶¶ 7-8;[10] Keneally Decl. ¶ 5.  This news was consistent with, and went a long way to explain, counsel's experience with Mr. Brockman.  Romatowski Decl. ¶¶ 10, 13; Keneally Decl. ¶ 6.

Counsel subsequently obtained the medical reports and spoke with each of the doctors.  Keneally Decl. ¶¶ 18-19.  The three medical doctors sent follow-up letters to clarify certain points in response to questions from counsel.  Keneally Decl. ¶¶ 22-25, Ex. L, Ex. M, Ex. N.  Dr.  York, the neuropsychologist who first tested Mr. Brockman in March 2019, advised that she should perform what she described as forensic tests; she has now done so twice, resulting in reports for examinations conducted on December 3, 2019, and October 7, 2020.  Keneally Decl. ¶¶ 26, 33, Ex. O, Ex. R.

Defense counsel provided the doctors' medical reports and letters, and Dr. York's clinical and first forensic reports, to the government on April 9, 2020.  Keneally Decl. ¶ 28.  In a telephone conference on April 23, 2020, defense counsel urged the prosecutors to consider Mr. Brockman's inability to assist in his defense, and to investigate this issue before reaching any decision whether to seek an indictment.  Keneally Decl. ¶ 28.  In particular, the defense asked that the government interview the doctors, with a pledge that the defense would not participate, either by preparation of the witnesses in advance or attendance at the interviews, and provided waivers pursuant to the Health Insurance Portability and Accountability Act ("HIPAA waivers") to allow such interviews.  Keneally Decl. ¶ 28.  We know from the doctors that they were never contacted.  Keneally Decl. ¶ 31.  The government's only response was to seek the Indictment returned by the grand jury on October 1, 2020.  So now this is a matter for the Court.

---

[10] "Romatowski Decl." refers to the Declaration of Peter J. Romatowski, affirmed December 8, 2020, and submitted in support of this Motion.

1    The sole decision before this Court is whether to proceed with a hearing.  Section 4241(a)

2   provides that "[t]he court shall grant the motion [for a competency hearing], or shall order such a

3   hearing on its own motion" upon a showing of "reasonable cause to believe" that the defendant

4   may not be competent "to assist properly in his defense."

5    The conclusions of Mr. Brockman's doctors, as well as the first-hand experiences of

6   Mr. Brockman's wife, friends and colleagues, and counsel, evidence that he is not competent to

7   assist in his defense, easily meet the "reasonable cause" standard, and merit consideration at a

8   hearing.

9    **A.     Mr. Brockman's dementia prevents him from assisting in his defense**

10   **1.     The medical diagnoses show deficiencies in Mr. Brockman's critical cognitive abilities**

11

12    Mr. Brockman's form of dementia has severe cognitive consequences, one aspect of

13   which is an inability to access his memories in a manner that will enable him reliably to respond

14   to questions about past events.

15    In her January 21, 2020 letter to counsel, Dr. Yu specifically distinguished dementia from

16   mere memory loss, noting:  "The impact of dementia includes visual spatial function, language,

17   memory, and executive function—in essence, all aspects of thought and cognitive function."

18   Keneally Decl. Ex. N.

19    Dr. Jankovic's January 14, 2020 letter addressed the manner in which Mr. Brockman's

20   dementia makes him unable to recall information and to respond accurately to inquiries.

21   Dr. Jankovic stated that Mr. Brockman has "trouble accessing information" and "making

22   connections between questions that he is being asked and his recollection of events."  Keneally

23   Decl. Ex. M at 1.

24    Dr. Jankovic also noted that a characteristic of Mr. Brockman's cognitive impairment is a

25   tendency toward confabulation.  Dr. Jankovic described this medical condition as causing

26   someone to "sometimes make up stories or provide information about something that has not

27   occurred."  Keneally Decl. Ex. M at 1.  Dr. Jankovic distinguished this from lying, explaining that

28   confabulation is "a symptom of cognitive impairment, and is not voluntary."  A cognitively

1   impaired person will believe that he is reporting truthfully when nonetheless confabulating.

2   Keneally Decl. Ex. M at 1-2.

3        Dr. Pool's January 14, 2020 letter summarized how Mr. Brockman's cognitive

4   impairments would affect his ability to participate in his defense:

> Quite simply, if information is presented to him, he will be unable to
> comprehend what is being asked of him and to respond appropriately.  In
> addition, his ability to report on past events may be distorted by the high
> risk of confabulation.  When a person has dementia, his memory function
> will attempt to fill in gaps to enable him to respond to questions or to
> report on past events.  While the story may sound logical, it will not be
> based on fact or accurate memory.  The speaker will believe the story to be
> true, but it is not.  In essence, for a person such as Mr. Brockman, dementia
> will render long-term memory inaccessible and defective.  Even if he can
> remember past events, he cannot accurately relate them to the question that
> he is being asked in the present or assimilate the information to report it
> accurately.  If he can compose a response at all, it will likely be the product
> of such confabulation, rather than genuine memory.

13  Keneally Decl. Ex. L at 2.

14       At bottom, Mr. Brockman cannot do the one thing that is most essential to his defense:

15  understand his lawyers' questions about the events at issue and reliably respond.

16       **2.**      **Mr. Brockman's cognitive impairment has been repeatedly confirmed**
17           **through medical testing**

18       Dr. York, a neuropsychologist, conducts clinical tests to assist medical doctors in forming

19  their diagnoses.  Dr. York examined Mr. Brockman three times:  first on March 1, 2019, to

20  conduct cognitive tests to assist Dr. Yu in reaching a diagnosis, Keneally Decl. Ex. I at 1; a

21  second time on December 3, 2019, at the request of counsel for the specific purpose of evaluating

22  Mr. Brockman's ability to assist in his defense, Keneally Decl. ¶ 26, Ex O at 1; and a third time

23  on October 7, 2020, for the purpose of evaluating changes since the December 3, 2019 evaluation.

24  Keneally Decl. ¶ 33, Ex. R.

25       Dr. York's December 3, 2019 and October 7, 2020 forensic reports include a simple,

26  graphic illustration of Mr. Brockman's cognitive impairment:  he cannot draw a clock.  Keneally

27  Decl. Ex. O at 6, Ex. R at 6.

28       Asking a patient to draw a clock is one of the basic tests to determine cognitive

1   impairment.  Dr. York's initial forensic report included the drawing of a clock that Mr. Brockman

2   made during her examinations of him on March 1, 2019, and the result was sufficiently shocking

3   to Mr. Brockman and his family that he practiced drawing various figures, including clocks,

4   following her examination.  Keneally Decl. Ex. J at 2, Ex. O at 3-4.  Nonetheless, when tested

5   again on December 3, 2019, Mr. Brockman again failed at this basic task.

6       During her October 7, 2020 examination, Dr. York gave Mr. Brockman three more

7   chances at drawing a clock.  Her most recent report sets out five clock drawings, done across a

8   period of 19 months, side-by-side in her most recent report:

9

**Clock Drawing "10 after 11"**






03/01/2019                    12/03/2019

10/07/2020          10/07/2020          10/07/2020

23  Keneally Decl. Ex. S at 1.

24       Even on his third try of the day, knowing in advance that he would be asked to draw a

25  clock and having practiced doing so, Mr. Brockman could not draw a clock face showing the

26  requested time, with correctly placed numbers, or even with the numbers written within the circle

27  for the clock.  *See* Keneally Decl. Ex. K at 1 (Dr. Pool's October 1, 2019 medical report with

28  clock drawing with misplaced grid and lines), Ex. Q at 1 (Dr. Pool's October 5, 2020 medical

1  report with clock drawing with three hands).

2  **(a)        Diagnostic testing results**

3       Dr. York's March 1, 2019 clinical report set out her behavioral observations of

4  Mr. Brockman during the testing, noting that he showed a "moderately decreased ability to follow

5  directions," that he "frequently needed repetition of directions and to be reoriented to task," that

6  he "perseverated to previous tasks" (meaning that he repeated prior responses out of context), that

7  "[t]he examiner needed to be concrete for him to understand the task instructions," that his

8  "processing speed was extremely" slow, and that his "handwriting was micrographic."  Keneally

9  Decl. Ex. I at 2.

10       Dr. York's March 1, 2019 report listed the large number of tests that she administered

11  over several hours, followed by a summary of the results in clinical terms, many of which make

12  apparent his cognitive shortcomings.  Keneally Decl. Ex. I at 2-4.  She also reported that

13  Mr. Brockman was unable to complete certain tests "due to cognitive/behavioral problems."

14  Keneally Decl. Ex. I at 2.

15       Dr. York determined that Mr. Brockman – a man who founded and built a highly

16  successful business – "currently operates in the low average range of general intellectual

17  functioning (WIAS-IV FSIQ = 87), which is a decline from his estimated premorbid intellectual

18  functioning in the above average range."  Keneally Decl. Ex. I at 4.  She continued, in somewhat

19  clinical terms:  "Mr. Brockman demonstrated borderline impaired to deficient performances on

20  measures of sustained attention/concentration, learning and recall of prose material and a word

21  list, learning and recall of visual material, semantic fluency, executive functions (set shifting,

22  inhibition, working memory, and problem solving), and visuoconstruction," adding:  "[t]hese

23  impaired performances were found within the low average to average ranges on measures of basic

24  attention, fund of information, verbal and visual abstract reasoning, verbal fluency and naming."

25  Keneally Decl. Ex. I at 4.

26       Dr. York determined that Mr. Brockman's performance on the clinical tests indicated "a

27  dementia of mild to moderate severity."  Keneally Decl. Ex. I at 4.  Based on her battery of tests

28  and clinical observations, Dr. York concluded:  "his pattern of cognitive impairments is consistent

with Dementia with Lewy Bodies." Keneally Decl. Ex. I at 5.

Dr. York's recommendations are themselves jarring indications of Mr. Brockman's impairment. She advised, for example, that he have a large-type calendar in a highly visible location to assist him in "temporal orientation" and a large dry-erase board in a prominent spot to help him keep track of important information such as the location of family members, that information be presented to him in a written format so that he can refer to it over time, and that he exercise caution when operating household appliances. Keneally Decl. Ex. I at 5-6.

Dr. Yu conducted an examination of Mr. Brockman on March 20, 2019, and reviewed Dr. York's clinical findings. Dr. Yu summarized: "Pattern indicates a dementia of mild to moderate severity with deficits in areas of visuospatial functioning, verbal and nonverbal episodic memory and executive functioning, with mild functional declines." Keneally Decl. Ex. J at 6. She concluded that Mr. Brockman's symptoms are "consistent with dementia with Lewy Bodies." Keneally Decl. Ex. J at 6, 7. She recommended that Mr. Brockman stop driving, and she advised him "on diagnosis of a neurodegenerative disorder with cognitive impairment and possible implications on his work and advised he discuss further with his family." Keneally Decl. Ex. J at 7.

Dr. Yu was also able to review the results of a DaTscan that had been ordered by Dr. Jankovic. A DaTscan measures the number of dopamine transporters in the brain regions critical for movement and cognition. In Mr. Brockman's case, the critical neurons responsible for producing dopamine are irrevocably damaged. Keneally Decl. Ex. J at 7, Ex. P. In other words, Mr. Brockman has significant, measurable changes to his brain structure that can be seen as the basis for his dementia.

### (b)     Forensic testing results

The diagnostic reports prepared by each of the doctors were written in technical medical terms. Counsel contacted each of the doctors to get a better understanding, in lay terms, of the impact of Mr. Brockman's condition. When counsel contacted Dr. York, she explained that there is a different battery of tests, which she described as forensic testing, that she would perform to enable her to render an opinion in a legal proceeding. Keneally Decl. ¶ 26. She conducted that

examination on December 3, 2019.  Keneally Decl. Ex. O.

Dr. York's forensic report summarized her prior examination, as well as the medical reports prepared by Dr. Jankovic and Dr. Yu.  Keneally Decl. Ex. O at 1–4.  She also provided her behavioral observations of Mr. Brockman during the December 3, 2019 testing.  She noted that Mr. Brockman's "cognition tended to fluctuate throughout the testing session," that he "appeared to be confused at times" and had difficulty completing tasks even after starting out well, and that he "showed mildly decreased ability to follow directions, and he occasionally needed repetition of directions and lost place during set task."  Keneally Decl. Ex. O at 4.

As with her March 1, 2019 clinical evaluation, Dr. York again listed the tests that she administered, as well as the tests that Mr. Brockman was unable to complete "as he was unable to comprehend task instructions and maintain task set independently," and set out her neurological findings in clinical terms.  Keneally Decl. Ex. O at 4–5.

Dr. York found that Mr. Brockman had improved in some areas from the results of her prior testing, while declining in other areas.  Keneally Decl. Ex. O at 7–8.  Dr. York summarized:

> It is noted that Mr. Brockman's cognition fluctuated significantly throughout the evaluation.  He demonstrated improvements on a few measures; however, during several tasks, he became more confused and demonstrated a blank stare expression.  These fluctuations were more apparent during this evaluation as compared to his previous evaluation in March 2019.  Mr. Brockman's pattern of neuropsychological performance indicates a dementia of mild to moderate severity characterized by deficits in the areas of verbal and nonverbal episodic memory, processing speed, executive functioning, and visuospatial functioning with significant functional declines.

Keneally Decl. Ex. O at 8.  Dr. York concluded:  "His dementia falls under the diagnostic category of Lewy Body Dementias."  Keneally Decl. Ex. O at 8.

Dr. York repeated her forensic examination of Mr. Brockman on October 7, 2020.[11]

---

[11] Having had no response since Mr. Brockman's offer in April to allow the government access to the doctors with a commitment that counsel would not take steps to prepare them or participate in any government interviews, counsel spoke with the lead prosecutors on September 30, 2020 to let them know that Mr. Brockman would again be examined by Dr. Pool and Dr. York, and that counsel planned to speak with both doctors about those examinations. Keneally Decl. ¶ 30.  The prosecutors did not inform counsel that they planned to seek an Indictment in this matter on the following day.  The prosecutors next contacted defense counsel to arrange a call for Saturday, October 10, 2020, during which they disclosed that there was a sealed Indictment (which is dated October 1) and asked for assurance that Mr. Brockman would attend an arraignment to be scheduled on the following Thursday, October 15, 2020.  Keneally Decl. ¶ 30.  Mr. Brockman subsequently revoked the HIPAA waivers.  Keneally Decl. ¶ 31.

1   Keneally Decl. ¶ 33, Ex. R.  Dr. York reported that Mr. Brockman stated that he is "unsure of his
2   medication regimen as . . . his wife manages his medication box," "his short-term memory and his
3   working memory have declined and his processing speed is slower," he has experienced "declines
4   in his decision making abilities," he "forgets names of familiar individuals," "is disoriented to
5   month and day of the week," and "repeats himself and asks the same question again without
6   insight."  Keneally Decl. Ex. R at 3.  Dr. York's October 2020 forensic report included detailed
7   behavioral observations, noting that Mr. Brockman's "cognition fluctuated throughout the testing
8   session," that he sometimes became "confused" during "tasks that he originally was completing
9   accurately," and that while his "[c]onversational speech was coherent," his speech was
10  "tangential without insight."  Keneally Decl. Ex. R at 5.  She again listed tests that Mr. Brockman
11  was unable to complete "due to cognitive/behavioral problems."  Keneally Decl. Ex. R at 5.

12      Dr. York found that Mr. Brockman's "cognitive profile demonstrated interim cognitive
13  declines across all domains assessed" relative to her prior evaluations.  Keneally Decl. Ex. R at 8.
14  As examples, she noted that Mr. Brockman's WAIS-IV FSIQ estimate declined to 80 from a prior
15  score of 96, that Mr. Brockman "demonstrated difficulties with set shifting, drawing a cube, and
16  placing the hands on a clock face," and was able to identify only "2/3 pictured animals," that
17  when he was asked to memorize word lists, his "delayed recall was in the deficient range with
18  0.0% retention," and that when presented with basic geographic figures, Mr. Brockman's
19  "[i]mmediate recall . . . was borderline impaired," "[d]elayed recall of the designs was deficient,"
20  and "[r]etention of the initially learned material was 0.0%."  Keneally Decl. Ex. R at 6.

21      In sum, the DaTscan performed in early 2019 showed structural changes in
22  Mr. Brockman's brain sufficient to explain his cognitive impairment, which was confirmed by
23  Dr. York's clinical tests in March 2019 and forensic tests in December 2019.  Now we know from
24  Dr. York's October 7, 2020 report that Mr. Brockman's dementia progressed, and his cognitive
25  abilities declined, in the ten-month period between Dr. York's two sets of forensic testing.  And,
26  based on Dr. York's analyses, it is likely that Mr. Brockman's mental condition has gotten worse
27  in the two months since her last examination.

28

### 3. Mr. Brockman has experienced hallucinations consistent with Lewy body dementia

Hallucinations are a hallmark of Lewy body dementia.  Dr. York reported two incidents of hallucination that support her conclusion that this is the correct diagnosis.

In her diagnostic examination of Mr. Brockman in March 2019, she personally observed Mr. Brockman experiencing an hallucination.  As Dr. York reported:  "He saw a bug on the floor of the testing room that was not present."  Keneally Decl. Ex. I at 2, 5.

Then in her October 7, 2020 report following her second set of forensic testing, Dr. York described what she considered to be a "delusional incident" or hallucination:  Mr. Brockman believed that he heard someone leaving his house at about 5 a.m., thought that he saw his son's car driving away, and claimed that his computer was open to sites that Mr. Brockman described as "from the dark web and suicidal information."  Keneally Decl. Ex. R at 3.  In fact, Mr. Brockman's son was not at his parents' home at that hour, there was no sign of a break-in, and pictures that Mr. Brockman took of the computer screens during the incident showed Yahoo answer pages not related to the dark web or suicide.  Keneally Decl. Ex. R at 3.

These incidents are further medical indicia of Mr. Brockman's cognitive impairment.

### 4. Mr. Brockman's medical tests measured for and ruled out malingering

Dr. York's December 3, 2019 examination specifically included tests to determine whether Mr. Brockman was malingering, that is, faking impaired cognition.  As stated in her report:  "He passed several embedded and stand-alone measures of performance validity; therefore, the following results are thought to be an accurate estimation of his current cognitive abilities."  Keneally Decl. Ex. O at 4.  In fact, Mr. Brockman was so startled by his inability to draw a clock, that he practiced before subsequent examinations in an effort to improve.  Keneally Decl. Ex. J at 2, Ex. O at 3-4.  Dr. York concluded:  "It is this examiner's opinion based on the testing conducted and behavioral observations that Mr. Brockman was putting forth full effort and was not exaggerating or embellishing the nature and extent of his cognitive impairment."  Keneally Decl. Ex. O at 7.

1

**5.    Mr. Brockman's dementia causes him to lose insight into his own cognitive impairment**

2

3      Dr. Yu explained in her January 21, 2020 letter that patients with dementia will

4 "experience anosognosia, which means that they will lose insight into the cognitive limitations of

5 their disease."  Keneally Decl. Ex. N.  She continued:  "Individuals with dementia may perceive

6 themselves as functioning normally, even well."  Keneally Decl. Ex. N.

7      Dr. York's March 1, 2019 clinical report observed this in Mr. Brockman:  "He lacked

8 insight into his cognitive problems," noting that he "said he was not doing well, but he appeared

9 very surprised."  Keneally Decl. Ex. I at 2.

10      In other words, to an important degree, Mr. Brockman cannot recognize that his impaired

11 cognition interferes with his ability to assist in his defense.

12

**6.    While Mr. Brockman may continue to function in familiar activities and settings, medical evidence establishes that he cannot assist in the defense of this case**

13

14      Even as Mr. Brockman's illness has progressed, he has made efforts to remain socially

15 active and to continue working.  As Dr. Pool explained in his letter to counsel, while severe

16 dementia will be characterized by a person's inability to know where he is or with whom he is

17 speaking, a person with mild to moderate dementia has some recognition of what is going on

18 around him, and an individual who enjoyed high intelligence and a high level of functioning prior

19 to the onset of dementia may be able to conceal his limitations under certain circumstances.

20 Keneally Decl. Ex. L at 2.

21      Dr. Yu similarly described how others may also fail to perceive someone's cognitive

22 limitations, noting that "[i]ndividuals with dementia, who have good social instincts and

23 expansive vocabulary may appear to function well on a surface level."  Keneally Decl. Ex. N.

24 She referred to this as the ability to retain "social niceties" despite cognitive impairment, and

25 further noted that "individuals who have been in business or professionally active for a long time

26 may be able to speak on business issues in a way that appears functional, but will face difficulties

27 when pressed for decisions or specifics."  Keneally Decl. Ex. N.  Dr. Yu noted that it is a specific

28 characteristic of Lewy body dementia that a person will experience day-to-day and even hour-to-

hour fluctuations in the ability to function.  Keneally Decl. Ex. N.

### 7.   The medical experts all agree that Mr. Brockman's dementia makes him incapable of assisting in his defense

The four doctors' results of examination deserve to be considered in full and in context along with other evidence at a hearing.  Without in any way diminishing the importance of that full context, their expert opinion is clear that Mr. Brockman cannot assist in his defense:

As Dr. Yu has stated, Mr. Brockman's dementia affects "all aspects of thought and cognitive function."  Keneally Decl. Ex. N.

Responding to counsel's inquiry, Dr. Jankovic stated:  "I understand that you are asking whether Mr. Brockman can assist you in preparing a legal defense.  It is my view that his cognitive impairment will prevent him from doing so."  Keneally Decl. Ex. M at 1.

Dr. York stated in her October 7, 2020 forensic report:  "Based on the current cognitive findings, his diagnosis of dementia, and the breadth and severity of his cognitive impairments and fluctuations, it remains my opinion that Mr. Brockman is unable to participate and aid in his own defense."  She continued in detail:  "Due to the neurodegenerative nature of this disease and the lack of effective treatments, his prognosis is for continued cognitive decline.  He is unable to recall and demonstrate a thorough understanding of the relevant elements of the issues surrounding the case and manipulate this information in a logical manner that will allow him to make comparisons and weigh his options."  Keneally Decl. Ex. R at 8.

And Dr. Pool concluded:  "I concur with the medical position that Mr. Brockman cannot assist his attorneys in his defense, if criminal charges were to be brought against him."  Keneally Decl. Ex. L at 2.

### B.   Mr. Brockman's retirement

Mr. Brockman fully retired on November 6, 2020.  Keneally Decl. ¶ 36.

For as long as he could, Mr. Brockman tried to rely on his former high intellect and decades of experience, as well as the support and assistance of his wife and business colleagues, in an effort to continue to lead or at least contribute to the business that he built.  *See* Keneally Decl. Ex. L at 2, Ex. N.  He knows now that he can no longer do so.

## C.     Non-medical evidence

Counsel for Mr. Brockman will present testimony from people who interact with him, sometimes on a near-daily basis, to corroborate the observations made by the doctors.  Keneally Decl. ¶ 35.  In particular, Mr. Brockman's wife of 52 years will attest to the steady progression of his cognitive impairment.  Keneally Decl. ¶ 35.

Mr. Brockman's counsel can also directly confirm what the experts predicted: Mr. Brockman's cognitive impairment makes him incapable of assisting in his defense. Romatowski Decl. ¶¶ 9-15; Keneally Decl. ¶¶ 4, 6, 20-21.  Counsel's interactions with Mr. Brockman have been consistent with the medical findings described above.  Romatowski Decl. ¶ 13; Keneally Decl. ¶¶ 6, 20. Mr. Brockman has been unable to relate important information from the past, to review and evaluate documents, or to retain information that counsel tells him.  Romatowski Decl. ¶ 11; Keneally Decl. ¶ 6.  He repeatedly provides the same information, regardless of relevance.  Romatowski Decl. ¶¶ 11-14; Keneally Decl. ¶ 6.  When counsel provides him with information, he will sometimes report it back in his next discussion with counsel as if it is news that he thinks he should provide to counsel or something that he has recently remembered, in effect confabulating what he once may have known and what he has recently been told.  Romatowski Decl. ¶ 11; Keneally Decl. ¶ 6.

## III.    ARGUMENT

Due process guarantees "a defendant's right not to be tried or convicted while incompetent to stand trial."  *Drope*, 420 U.S. at 172.  This principle is embodied in 18 U.S.C. § 4241(a), which requires a competency hearing upon a showing of reasonable cause to believe that a defendant is unable to assist properly in his defense.

### A.     The record far exceeds a showing of "reasonable cause" to require a competency hearing

The present record requires a § 4241(a) hearing on Mr. Brockman's competency.

Because the narrow question at this stage is only whether to hold a competency hearing, and not whether the defendant is competent, courts do not weigh the reliability of the evidence in this phase.  Instead, "the trial court must look at the record as a whole and accept as true all

1   evidence of possible incompetence" when deciding whether to hold a hearing.  *Smith v. Ylst*,

2   862 F.2d 872, 877 (9th Cir. 1987) (citing *Chavez v. United States*,

3   641 F.2d 1253, 1258 (9th Cir. 1981)).  Nor may the court refuse a hearing on the basis of

4   conflicting evidence.  If substantial evidence of incompetence exists "from *any source*, there is a

5   doubt that cannot be dispelled by resort to conflicting evidence."  *Moore v. United States*,

6   464 F.2d 663, 666 (9th Cir. 1972) (emphasis added).

7        Based on multiple examinations conducted over a nearly two-year period, the medical

8   professionals are unequivocal in their assessment that Mr. Brockman has progressive dementia

9   that will prevent him from assisting in his defense.  Keneally Decl. Ex. L at 2, Ex. M at 1, Ex. N,

10  Ex. O at 8, Ex. R. at 7-8.  "Medical opinions are 'usually persuasive evidence on the question of

11  whether a sufficient doubt exists' as to the defendant's competence."  *United States v. Mason*,

12  52 F.3d 1286, 1290 (4th Cir. 1995) (quoting *Griffin v. Lockhart*, 935 F.2d 926, 930 (8th Cir.

13  1991)).  Medical evidence can mandate a hearing even when the defendant has "appeared calm in

14  the courtroom" and has not had his competence previously questioned by his counsel.  *Odle v.

15  Woodford*, 238 F.3d 1084, 1088 (9th Cir. 2001); *see also Deere v. Woodford*,

16  339 F.3d 1084, 1086-87 (9th Cir. 2003) (holding that hearing was required when two medical

17  experts opined that defendant was incompetent).

18       In *United States v. Duncan*, 643 F.3d 1242 (9th Cir. 2011), the Ninth Circuit held that the

19  district court erred by failing to hold a full competency hearing prior to sentencing based on

20  medical evidence of incompetence in that case that is comparable to the evidence available here:

21  reports from three experts, all well established and highly regarded in the field of

22  neuropsychiatry, "who had examined Defendant personally and . . . formed the same opinion

23  that . . . Defendant's 'mental diseases and defects render him . . . incompetent,'" which were

24  supported by brain scans establishing that the defendant had "'an unusual brain structure'

25  consistent with [his] behavioral deficits in 'the ability to make rational plans and modulate

26  emotions.'"  *Id.* at 1249.  Contrary medical opinions were not a reason to refuse a hearing; "[w]e

27  express no opinion on which of the experts has the better of the argument . . . .  We hold only the

28  evidence [was] such that § 4241(a) required a full competency hearing before the district court

1    could reach a decision." *Id.* at 1250.

2         The medical evidence here is at least as compelling.  Mr. Brockman's cognitive decline

3    has been apparent to his family, and ultimately to him, for several years.  Keneally Decl. Ex. H. at

4    1-2, Ex. I at 1, Ex. J at 1-2, Ex. L at 1, Ex. O at 2-3.  He did not seek medical evaluations for the

5    purpose of this case, but to be diagnosed and treated.  He did not even tell his lawyers that he was

6    struggling with cognitive issues until four months after these medical examinations were

7    concluded.  Keneally Decl. ¶¶ 5-6.  Brain scans have revealed structural abnormalities that

8    explain his dementia symptoms.  Keneally Decl. Ex. P.  He has twice submitted to a battery of

9    forensic testing, which Dr. York recommended to enable her to answer the exact question as to

10   whether he can assist in his defense, and also whether he was participating in the examination in

11   good faith or malingering to obtain a desired result.  Keneally Decl. Ex. R at 4-5.[12]

12        Moreover, as the Supreme Court has noted, "defense counsel will often have the best-

13   informed view of the defendant's ability to participate in his defense."  *Medina v. California*,

14   505 U.S. 437, 450 (1992) (citations omitted); *see also Torres v. Prunty*,

15   223 F.3d 1103, 1109 (9th Cir. 2000) (recommendations by defense counsel "should [be]

16   considered seriously by the court" (citing *Medina*, 505 U.S. at 540)).  Counsel's experience

17   directly aligns with the medical findings:  Mr. Brockman has been unable to relate important

18   information from the past or to review and evaluate documents.  Romatowski Decl. ¶ 11.  And he

19   has confabulated information told to him by counsel, recalling it later as if he just remembered

20   rather than was recently told.  Romatowski Decl. ¶ 11; Keneally Decl. ¶ 6.

21        Mr. Brockman's cognitive impairment, as detailed by his doctors, goes directly to what is

22   required to assist in his defense:  he cannot reliably access memories, meaningfully process new

23   information, or to compare the two.  Keneally Decl. Ex. L at 2, Ex. R. at 7-8.  He has only partial

---

25   [12] *See also United States v. Bohol*, 419 Fed. App'x 730, 731 (9th Cir. 2011) (affirming decision that
     defendant was mentally incompetent where based on report and testimony provided by forensic psychologist); *United*
26   *States v. Chandler*, 2020 WL 2735917, *16 (M.D. Fla. May 5, 2020) (noting the propriety of giving "somewhat more
     weight to the testimony of a forensic psychologist" in competency determinations), adopted by
27   2020 WL 2735424 (M.D. Fla. May 26, 2020); *United States v. Chun*, 2019 WL 6683878, *9
     (E.D. Mich. Dec. 6, 2019) (noting importance of testing for malingering to ensure the validity of test results); *United*
28   *States v. Hernandez*, 2018 WL 2738880, *8–15 (N.D. Ohio June 7, 2018) (relying on forensic testing to conclude
     defendant was incompetent to stand trial and not malingering).

1   insight into his limitations, and may respond to questions by "confabulating" erroneous

2   information that he genuinely believes to be true.  Keneally Decl. Ex. L at 2, Ex. M at 1-2.

3          Taken together, the medical opinions and counsel's experience more than sufficiently

4   establishes reasonable cause for this Court to hear from these and other witnesses, and consider

5   all the evidence on the issue of whether Mr. Brockman may fairly be put to trial.

6      **B.     The evidence of Mr. Brockman's cognitive challenges is particularly
               compelling given the stage and nature of this case**

7

8          "Although the level of competency mandated by due process does not vary based on the

9   specific stage of the criminal proceeding, the defendant's ability to participate or assist his

10  counsel must be evaluated in light of the type of participation required."  *United States v. Dreyer*,

11  705 F.3d 951, 961 (9th Cir. 2013) (citation omitted), applied in *United States v. Brugnara*,

12  2015 WL 6126781, at *2 (N.D. Cal. Oct. 19, 2015) (Alsup, J.), *aff'd*,

13  856 F.3d 1198 (9th Cir. 2017).  This motion is being filed less than two months after arraignment.

14  We are at the very beginning of a criminal prosecution.  The charges sweep broadly and span

15  decades of numerous alleged financial transactions and structures across multiple countries.  The

16  government has estimated that it will produce what may amount to tens of millions of documents.

17  Keneally Decl. ¶ 37.  Mr. Brockman cannot help counsel to understand the charges or the

18  evidence.  Romatowski Decl. ¶¶ 11-15; Keneally Decl. ¶¶ 4, 6, 20-21.

19         Nor would Mr. Brockman's impairment become less problematic at trial.  "After all,

20  competence to stand trial does not consist merely of passively observing the proceedings.  Rather,

21  it requires the mental acuity to see, hear and digest the evidence, and the ability to communicate

22  with counsel in helping prepare an effective defense."  *Odle*, 238 F.3d at 1089 (citing *Dusky v.*

23  *United States*, 362 U.S. 402, 402 (1960)); *see also United States v. Helmsley*,

24  733 F. Supp. 600, 604 (S.D.N.Y. 1989) (emphasizing importance of defendant's competence in a

25  complex, lengthy trial).  To assist counsel at trial, Mr. Brockman would need to be able to retain

26  newly presented information, compare it to his own recollections, and process all this so as to

27  provide "assistance in counsel's cross-examination of witnesses, in the selection and preparation

28  of defense witnesses, and in the decision whether the defendant should take the stand."  *Helmsley*,

1    733 F. Supp. at 605.  The medical reports, forensic reports, and letters from his diagnostic and

2    treating doctors make clear that, specifically, Mr. Brockman cannot retain new information,

3    compare it to remembered information, and thereby assist his counsel in his defense.  Keneally

4    Decl. Ex. L at 2, Ex. M at 1, Ex. N, Ex. O at 8, Ex. R. at 7-8.  Counsel has confirmed based on his

5    experience of Mr. Brockman, as compared to his career experience with witnesses and defendants

6    who can effectively assist in the defense of a complex case, that Mr. Brockman cannot do so.

7    Romatowski Decl. ¶¶ 2-4, 8-15.

8           Again, the Court is not asked at this stage to decide the ultimate question of competence

9    based on the current proffer, which we nonetheless submit is compelling.  The question before the

10   Court is merely whether a hearing should occur—and it should.  Prior to any hearing, "the court

11   may order that a psychiatric or psychological examination of the defendant be conducted" by an

12   independent expert.  18 U.S.C. § 4241(b); *see also* 18 U.S.C. § 4247(b)–(c) (describing how the

13   examination is to be conducted and information to be included in any psychiatric or psychological

14   report).  Prior to the return of the Indictment, defense counsel offered the government the

15   opportunity to have Mr. Brockman examined independently, and certainly will agree to an

16   independent expert selected by the court, asking only that the examination take place proximate to

17   Mr. Brockman's home in Houston.[13]  To the extent the government questions the defense's

18   showing concerning Mr. Brockman's competency, it may cross-examine the doctors and other

19   witnesses, and present its evidence.

20          The only issue for today is whether Mr. Brockman has a right to a hearing, so that the

21   Court may hear from the witnesses and consider the evidence.  The express language of

22   18 U.S.C. § 4241 and core right to due process answers this question in the affirmative.  *Drope*,

23   420 U.S. at 172.

24   / / /

25   / / /

26

27

28
_____
[13] Mr. Brockman has also filed a motion seeking to transfer this matter to the Southern District of Texas
based on several reasons, including that the required hearing on his competency should take place in the district
where he resides and his doctors are located.  ECF No. 49.

1

## IV.    CONCLUSION

Mr. Brockman therefore respectfully asks that the Court hold a hearing under

18 U.S.C. § 4241 to determine whether he lacks the capacity to assist in his defense.

Dated:  December 8, 2020                          Respectfully submitted,

Jones Day


*s/ Neal J. Stephens*
NEAL J. STEPHENS

Counsel for Defendant
ROBERT T. BROCKMAN