DAVID L. ANDERSON (CABN 149604)
United States Attorney

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

MICHAEL G. PITMAN (DCBN 484164)
Assistant United States Attorney
150 Almaden Boulevard, Suite 900
San Jose, California 95113
Telephone: (408) 535-5040
Facsimile:  (408) 535-5081
michael.pitman@usdoj.gov

COREY J. SMITH (MABN 553615)
Senior Litigation Counsel
LEE F. LANGSTON (NYBN 4910311)
CHRISTOPHER M. MAGNANI (Maryland)
Trial Attorneys
United States Department of Justice, Tax Division

Attorneys for the United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.: 3:20-cr-00371-WHA |
| Plaintiff, | UNITED STATES' RESPONSE TO DEFENDANT'S MOTION FOR A COMPETENCY HEARING |
| v. | |
| ROBERT T. BROCKMAN, | Date:   January 12, 2021<br>Time:   2:00 PM |
| Defendant. | |

The United States respectfully responds to Defendant's motion for a competency hearing (ECF No. 64) (the "Motion"). The government agrees that there must be a competency hearing, but the hearing should not be scheduled in isolation. Instead, the Court should issue a scheduling order that dictates when Defendant must produce competency-related discovery, how long the designated experts will have to review the discovery and evaluate Defendant, when their expert reports will be due and, finally, when the competency hearing will be held. Although the Motion correctly concludes that the Court must hold a competency hearing on its record, it omits significant legal and factual context.

## I. THE COURT MUST GRANT THE MOTION, BUT ESCHEW ITS PROPOSED ORDER

In passing the Insanity Defense Reform Act of 1984, Congress codified the procedures related to competency at 18 U.S.C. §§ 4241 & 4247, and the Court must follow this statutory framework through the adjudication of Defendant's competency claim. Section 4241(a) (and constitutional due process) requires a competency hearing whenever "there is reasonable cause to believe that a defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." As the Motion explained, the threshold for holding a competency hearing is low, and it is satisfied in this case. What the Motion did not explain is that the hearing is hardly the first step of the process. Although Defendant may prefer to hold a prompt hearing based only on the opinions of experts he retained and testimony from his wife and friends, the applicable statutory framework contemplates a more searching review of Defendant's claim. In any criminal case, but especially in a case where the defendant continued to run a multibillion-dollar company, Reynolds & Reynolds ("Reynolds"), for almost two years after his alleged diagnosis, and stepped down only after he was indicted, it would be unwise for a court to rush into a competency hearing with expert evidence from only the criminal defendant.

Section 4241(b) gives the Court discretion to "order that a psychiatric or psychological examination of the defendant be conducted," and Section 4247(b) establishes statutory requirements for such examinations. For example, competency examinations must be conducted by "a licensed or certified psychiatrist or psychologist, or, if the court finds it appropriate, by more than one such examiner." 18 U.S.C. § 4247(b). The statute also vests the Court with discretion to "commit the person to be examined for a reasonable period, but not to exceed thirty days, . . . to the custody of the Attorney General for placement in a suitable facility." *Id.* A custodial placement is appropriate in cases where malingering is a concern, as it allows trained Bureau of Prisons mental health professionals and staff to observe defendants in both clinical and non-clinical settings for a prolonged period of time. As Defendant has already retained and been evaluated by his experts, the government should have the same opportunity for its experts to evaluate Defendant. The Court should also appoint its own expert and/or remand Defendant to one of the BOP facilities that conducts competency evaluations (there is such a

facility at FMC Fort Worth in Texas).  The Court should not schedule any competency hearing until it has determined which experts will have the opportunity to examine Defendant, draft expert reports, and present their finding at the hearing.

The Court as factfinder, as well as every expert that evaluates Defendant and offers a view of his competency, should be afforded the benefit of all relevant evidence in deciding this matter.  Therefore, before scheduling a hearing, the Court will first need to decide associated discovery matters related to the proceedings.  On November 19, 2020, the government requested relevant medical information from Defendant and, on December 10, the defense team indicated that it viewed the attachments to the Motion as the whole of its discovery and does not intend to produce anything further.[1]  If Defendant persists in his insistence of hiding relevant evidence from evaluating experts and the Court, the government will issue a subpoena, and request the Court to order their production under 45 C.F.R. § 164.512(e), which excepts from HIPPA's privacy protections disclosures made in connection with "judicial and administrative proceedings," and Fed. R. Crim. P. 17(c)(1), which will allow early production to ensure evaluating experts have sufficient time to review the records before making their conclusions and writing their expert reports.  Any expert evaluator will need to review the historical medical records requested by the government in order to comply with the statute's requirement of producing an expert report to the Court.  *See* 18 U.S.C. § 4247(c)(1) (requiring the report to include "the person's *history* and present symptoms") (emphasis added).

In sum, the government requests that the Court issue a scheduling order for the requested competency hearing which also includes deadlines for discovery, evaluation of the discovery by experts, evaluations and testing of Defendant by government (and Court-appointed) experts, and submission of Section 4241(c) expert reports.

## II.  STATUTORY POST-HEARING PROCEDURES

As discussed above, holding a competency hearing is not the first step in adjudicating competency.  It is also not the last.  The post-hearing procedural landscape will depend on whether the

---

[1] In its letter, the government also noted that it would request an order for production if Defendant did not produce them voluntarily, and recommended Defendant start gathering them in the meantime to avoid subsequent delay. Ex. 1.

Court finds Defendant competent by a preponderance of evidence. If the Court finds Defendant competent, proceedings will commence.[2] If the Court finds Defendant incompetent, under the applicable statute, it must remand him to custody for further evaluation.[3] *See* 18 U.S.C. § 4241(d) ("[T]he court shall commit the defendant to the custody of the Attorney General."). The Attorney General, in turn, "shall hospitalize the defendant for treatment in a suitable facility . . . for such a reasonable period of time, not to exceed four months, as is necessary to determine whether there is a substantial probability that in the foreseeable future he will attain the capacity to permit the proceedings to go forward . . . ." The statute provides for further hospitalization ". . . for an additional reasonable period of time until (A) his mental condition is so improved that trial may proceed, if the court finds that there is a substantial probability that within such additional period of time he will attain the capacity to permit the proceedings to go forward; or (B) the pending charges against him are disposed of according to law; whichever is earlier." *Id.* In sum, § 4241(d) "provides for a mandatory commitment of a defendant, who has been deemed incompetent, for study of the defendant's potential for restorability to competence." *United States v. LKAV*, 712 F.3d 436, 441 (9th Cir. 2013) (comparing § 4241(d) to the permissive commitment, observation and study regime applicable to juveniles).

## III. FACTUAL BACKGROUND

The Motion suggests that Defendant first complained of symptoms before he developed a motive to malinger, that he has been unable to assist his attorneys and alerted them of his symptoms only to aid their working relationship, and that his symptoms are confirmed by a team of esteemed doctors. The Motion also suggests that the government acted in bad faith for declining Defendant's invitation to investigate his claims pre-indictment. Considering the context of Defendant's claims, when compared to other contemporaneous events, and the fact that Defendant remained CEO of Reynolds until after he was indicted, his claims are deserving of healthy skepticism. Only sunlight on Defendant's historical

---

[2] Unless Defendant raises it in time to be considered along with his competency claim, the Court should decline to entertain a future claim of physical incapacity that is brought only after the Court finds him competent. To be clear, the government does not believe Defendant suffers from physical incapacity that would bar prosecution. On the contrary, his record of pre-pandemic leisure travel suggests the opposite is true. Nonetheless, the government raises this issue now to avoid any unexpected surprises after the conclusion of the upcoming competency hearing.

[3] Unlike initial BOP competency evaluations, these competency restoration evaluations are conducted almost entirely at FMC Butner (in North Carolina) and MCFP Springfield (in Missouri).

medical records, combined with the rigors of the adversarial process, will ensure that the Court, as factfinder, will be afforded the fullest picture of the circumstances that bear on whether Defendant is truly incompetent. Although the facts informing the government's skepticism will be further developed throughout these competency proceedings, it is worth orienting the Court to some of them at the outset.

### A. The Timing of Defendant's Claims

Defendant offers only the information he wants the Court to see, and not the information to put those events in proper context. Like the instant Motion, the timeline Defendant shared with the government pre-indictment (and replicated below) omits relevant contemporaneous activities that are probative of his mental capacity and, frankly, cast doubt on Defendant's narrative.



Defendant's efforts to thwart his detection, investigation, and prosecution by law enforcement have been long-standing. As early as 2010, he directed Evatt Tamine, his professional nominee, to "[o]perate as much as possible in a paperless manner–such that if someone were to come in your door unannounced everything would be in encrypted digital form." Ex. 2 at 2. He further instructed Tamine that "[a]lthough you have several personal friends in Houston that I am sure you want to maintain, please restrict your contact with the USA generally such that except for these few–you tend to fade into the background." *Id.* at 3. Defendant even gave Tamine detailed instructions on how to smuggle

incriminating electronically stored information into Bermuda. Ex. 3 ("For sure I would expect that you would not be connecting thru the USA."). In 2011, Defendant expressed concern about his collateral exposure if Robert Smith, his business partner, had a "nasty divorce" and, in 2013, he even directed Tamine to get a key deposition transcript from the divorce proceedings. Ex. 4; Ex. 5. The Indictment, at ¶ 194, alleges that Defendant learned of the instant investigation in or about June 2016 and, when Defendant's prior nominee subsequently died, Defendant directed Tamine to make numerous trips to the former nominee's home to destroy records, which is the subject of Counts 38 & 39. Ex. 6 at 2-3.

Evidence of Defendant's early claims of neurocognitive problems cannot be appreciated without considering other events occurring at the time. For example, on September 5, 2018, the Bermuda Police Service raided Tamine's home, invading Defendant's secret offshore world. It was the very next day that Defendant reached out to his urologist, Dr. Seth Lerner, to schedule an appointment. Ex. 7. This is significant because, although Defendant has not disclosed the exact date of the appointment, Defendant claims that Dr. Lerner was the first doctor to witness his symptoms.[4] Although Defendant has thus far refused to fully disclose his historical medical records, he has apparently suffered his share of health problems over the years. It is notable that none of his doctors—not his general practitioners, oncologists, cardiologists, or anyone else—noted dementia symptoms until after the authorities executed a search warrant on Tamine's home. A fuller timeline might look like this:



---

[4] Although counsel has not indicated when they began representing Defendant, a privilege log provided by Defendant's company shows communications between Defendant and his Jones Day attorneys as early as September 9, 2018 and, by September 18, Defendant's attorneys were in touch with his CPA. Ex. 8; Ex. 9.

**B.      Defendant's Financial Ties to Baylor and Relationship with Dr. Stuart Yudofsky**

Defendant has donated tens of millions of dollars to the Baylor College of Medicine.  Ex. 10.  Defendant also approved another million-dollar donation from Reynolds a few days after he was examined by Dr. James Pool, which the Motion cites as the first doctor to diagnose Defendant with dementia and refer him to further specialists.  Ex. 11.  The bulk of Defendant's Baylor donations ($25M) were made between 2011 and 2014 to fund Dr. Stuart Yudofsky, a Baylor psychiatrist and Chairman of the Scientific Advisory Board of the Brockman Medical Research Foundation.  Ex. 12 at 3-5.

Although the Indictment alleges that Defendant was aware of the current investigation in 2016, Defendant offers (and offered to the government prior to indictment) a 2017 email between him and Dr. Yudofsky as supposed evidence that he had symptoms before his motive to feign dementia ripened.  The Motion describes Dr. Yudofsky, who is a neuropsychiatrist, as Defendant's "friend."  However, it declines to note that he is intimately involved in Defendant's personal life, professionally indebted to Defendant, and well acquainted with Tamine.

As alleged in the Indictment, Tamine served as Defendant's professional nominee and wrote annual performance appraisals for Defendant.  Indictment at ¶ 10.  In his 2011 evaluation, Tamine told Defendant that his communications with Dr. Yudofsky and others were "undertaken with the requisite degree of authority, i.e. I do not believe that anyone has any basis to suggest that I am merely carrying out your instructions - whatever they might privately believe," thereby suggesting that Dr. Yudofsky knew Tamine was merely Brockman's nominee.  Ex. 13 at 3.  Tamine also told Defendant that his rapport-building with Dr. Yudofsky "work[s] as a strong barrier against an attack from the IRS."  *Id.*  In his 2016 evaluation, Tamine tells Defendant that he "helped Stuart out of a position he found very difficult and worrying"[5] and noted that his relationship with Dr. Yudofsky was "very strong."  Ex. 6 at 3-4.

The years of rapport-building may have been drawn upon during a 2017 crisis.  On July 30, 2017, Tamine emailed Defendant a memorandum on issues to deal with Bermuda Commercial Bank freezing Defendant's accounts.  Ex. 15.  One of the problems Tamine identified was that he was

---

[5] The issue appears to be related to who would succeed Dr. Yudofsky after he retired.  Ex. 14.

becoming subjected to increased scrutiny and proposed that he no longer travel to the United States with a computer or telephone and, instead, keeping "all I need at Stuart Yudofsky's office including a phone." Ex. 16 at 4-5. Defendant concurred with the proposal. Ex. 15.

It is important to note that despite Dr. Yudofsky's expertise and close relationship with Defendant, he took no action other than the single emailed response to Defendant's email. Defendant has provided no evidence that Dr. Yudofsky examined Defendant, provided a referral, or engaged in any further correspondence on the subject. Indeed, despite Defendant's apparent concern in the May 3, 2017 email, he sought no further medical treatment or evaluation until after the search of Tamine's house in September 2018.

Defendant's and Dr. Yudofsky's inaction raise the question of whether Defendant's email was designed to seek medical advice or create a paper trail. That concern is elevated because Defendant has a significant history of generating fraudulent correspondence for use in future proceedings. For example, on June 12, 2011, Defendant wanted to explore selling Reynolds but needed to justify why he, and not the trust that owned Reynolds on paper, was running the deal. To solve this problem, he used his encrypted email system to order Tamine, the "trustee" of the trust that owns Reynolds on paper, to send Defendant a letter asking Defendant to explore the potential sale. Ex. 17. Defendant even dictated the words Tamine should use in the letter to Defendant. *Id.*

The evidence suggests that on at least one other occasion, Dr. Yudofsky was the recipient of planted correspondence orchestrated by Defendant. On August 1, 2015, Defendant sent Tamine an encrypted email asking Tamine to send Dr. Yudofsky "an open email" that Tamine had been considering the formation of a medical research foundation and inviting Dr. Yudofsky to be the chair. Ex. 18. Tamine sent an unencrypted email to Dr. Yudofsky stating exactly that on August 13, 2015. Ex. 19.

Taking all of this into account—the close personal relationship between Defendant and Dr. Yudofsky, the $25M gift by Defendant to Dr. Yudofsky's employer, the fact that Defendant felt comfortable storing Tamine's communications devices (devices that he was afraid might be seized at the U.S. border) at Dr. Yudofsky's office, and Defendant's history of planting fraudulent correspondence, Defendant's isolated email to Dr. Yudofsky in May 2017 should not be viewed as conclusive of whether Defendant actually suffered symptoms on that date.

### C. Defendant's Contemporaneous Behavior was Inconsistent with Present Claims

One of Defendant's lawyers described Defendant as a man who "has consistently been unable to assist in his defense." Romatowski Decl. (ECF No. 64-3) at ¶ 11.[6] His doctors describe Defendant as a man with an IQ in freefall. Yet, while presenting to his defense attorneys and doctors as a man of rapidly diminishing metal capacity, signs of a more robust mental acuity trail in his wake.

In between his visits with the Baylor team of doctors, Defendant engaged in significant activities related to running Reynolds.[7] The most mentally taxing may have been being deposed in January 2019 as the CEO of a multibillion-dollar company accused of engaging in anticompetitive practices. Ex. 21. In this deposition, Defendant said that he prepared with his civil attorneys for two days in advance, apparently to great effect. *Id*. at 11. In the deposition, Defendant gave cogent answers, often demonstrating a superior knowledge of the documents than the examiners themselves. *Id*.[8] Then, in September 2019, Defendant provided sworn testimony in a separate antitrust matter, again giving long and cogent answers. The attorneys who questioned him in those proceedings observed nothing unusual or out of the ordinary in Defendant's ability to respond to the questions posed, and the lawyers who represented him in those matters did not convey any of the difficulties of which current defense counsel now complains. It is noteworthy that the Defendant's sworn testimony in these antitrust matters, in January and September 2019, were within weeks of medical evaluations by Doctors Jankovic and Pool, and yet Defendant and his civil attorneys never raised Defendant's alleged mental incapacity or decline as an issue during the proceedings. Furthermore, the government does not know if Defendant shared news of his deposition performance with the doctors upon whom he now relies because Defendant has thus far refused to provide the relevant medical discovery.

---

[6] Notwithstanding, between September 2018 and March 2020, Defendant and Romatowski had eleven in-person meetings, each "several hours in length," in addition to "countless meetings . . . by telephone." *Id.* at ¶ 5.

[7] And significant leisure. Between the medical appointment he now describes, Defendant emailed his yacht captain to reminisce about the excellent tides they had on a trip over 18 months prior, Ex. 21, and arrange future travel logistics. Ex. 22; Ex. 23.

[8] The deposition is replete with examples, but some are on pp. 10-23 (explaining his trust structures); 78-79 & 312-13 (explaining relevant legal requirements); 116 (interpreting contract); 151-53 (explaining software); 160 (explaining why he only retains 6-12 months of his emails); 227-32 (explaining the inefficiency of internal accounting); 315-16 (navigating a privilege issue); 334-39 (explaining "opcodes" in detail); 350 ("As you probably can tell, I'm – I'm into the details, big time.").



Defendant now reports further mental evaluation and a prognosis of marked decline. But the observations of his doctors are inconsistent with his continued ability, at least until he was indicted, to run his company. Throughout 2020, Defendant penned numerous emails suggesting he is still able to function on a higher level than most. In recent emails, Defendant demonstrates a command of his business. *See, e.g.*, Ex. 24 (Defendant identifies risk associated with an acquisition, noting the slowing of new car sales), Ex. 25 (Defendant discusses bid and makes teaching points to Reynolds's President), Ex. 26 (after announcing a new COO, Defendant tells him they need to talk every day about any important decision).

Defendant made it clear to Reynolds associates that he was not leaving and remained an integral part of his company. On May 10, 2020, he drafted a lengthy memo to Vice-Chairman Robert Nalley outlining his plans for the company. Ex. 27. Nalley was the first employee Defendant hired when he started the company and had been a board member and President for decades. In the email, Defendant tells Nalley that he is letting other executives take bigger roles because of "fatigue–plus recognition that I am in the final 20 percent of my life (if I am lucky)" but that he planned on working four to five years "helping teach the next generation everything I know about how to run the company efficiently." *Id.* at 1-2.

The discrepancy between the picture Defendant presented to doctors, the government, and this Court, and the manner in which he lived his life is most starkly revealed by in the June 3, 2020 reorganization of the executive structure of Reynolds. This reorganization took place almost two

months after attorneys for the defendant told the government that he was so impaired that he should not even be indicted.  Evidence of such impairment, however, was entirely absent from the reorganization of Defendant's company.  While other executives were shuffled around, Defendant retained the positions of Chairman and CEO.  Ex. 28 at 2.  While Defendant did say his focus would be on training the new leadership, he informed the new COO that "you and I should be talking every day about any decision of importance that is cooking."  Ex. 26.  Correspondence like this, during a period in time when his lawyers represented that Defendant was so impaired that he could not assist them, raises considerable question about Defendant's claim.

**IV.    THE INAPPROPRIATENESS OF EVALUATING THIS ISSUE PRE-INDICTMENT**

In passing the Insanity Defense Reform Act of 1984, Congress created a statutory framework for the evaluation of competency claims.  It empowered the Courts, not prosecutors, to make competency determinations.  Nevertheless, Defendant now complains that the United States declined his invitation to investigate Defendant's mental state prior to indictment.  Putting aside evidence described herein, such an investigation would have been inappropriate pre-indictment.  Even if the government agreed with Defendant's diagnosis, but disagreed on its forensic import (i.e. whether Defendant was capable of providing effective assistance), a pre-indictment investigation would have served as a delay tactic, as any disagreement could only be settled by the Court, as Congress intended, post-indictment.  The delay would be particularly injurious in the event Defendant truly suffers from degenerative ailments.  For all these reasons, the government appropriately declined.

## V. CONCLUSION

The competency statute and constitutional due process requires the Court hold a competency hearing on this record. That hearing, however, should not occur until Defendant is subjected to further evaluation by independent medical experts who are afforded the full scope of relevant information. Therefore, the Court should decline to schedule a competency hearing until after it has determined a schedule for the events that must precede such a hearing. The United States will soon file a separate motion requesting discovery and medical examinations of Defendant as described herein.

Respectfully submitted this 15th day of December, 2020,

                              DAVID L ANDERSON
                              United States Attorney

                              s/ Corey J. Smith
                              COREY J. SMITH
                              Senior Litigation Counsel
                              Department of Justice
                              Tax Division
                              MICHAEL G. PITMAN
                              Assistant United States Attorney

                              Attorneys for United States of America