Page 1

1          IN THE UNITED STATES DISTRICT COURT

           FOR THE NORTHERN DISTRICT OF ILLINOIS

2                   EASTERN DIVISION

3                              )

    IN RE: DEALER MANAGEMENT    ) MDL NO. 2817

4   SYSTEMS ANTITRUST           )

    LITIGATION,                 ) CASE NO. 18 C 864

5                              )

6

7

8      ORAL AND VIDEOTAPED DEPOSITION OF ROBERT BROCKMAN

9        Highly Confidential - Attorneys' Eyes Only

10                  January 16, 2019

11                     VOLUME 1

12

13      ORAL AND VIDEOTAPED DEPOSITION OF ROBERT BROCKMAN,

14   produced as a witness at the instance of the

15   PLAINTIFF(S), and duly sworn, was taken in the

16   above-styled and numbered cause on the 16th day of

17   January, 2019, from 9:30 a.m. to 2:56 p.m., via

18   telephone, before Shauna L. Beach, RDR, CRR, CSR in and

19   for the State of Texas, reported by machine shorthand,

20   at the law offices of Gibbs & Bruns, LLP, 1100

21   Louisiana, Suite 5300, Houston, Texas 77002, pursuant to

22   the Federal Rules of Civil Procedure and the provisions

23   stated on the record or attached hereto.

24

25

```
                                                  Page 2

 1                   A P P E A R A N C E S
 2    FOR THE REYNOLDS AND REYNOLDS COMPANY AND THE WITNESS:
 3         AUNDREA K. GULLEY
           BRICE WILKINSON
 4         Gibbs & Bruns, LLP
           1100 Louisiana
 5         Suite 5300
           Houston, Texas  77002
 6         agulley@gibbsbruns.com
           bwilkinson@gibbsbruns.com
 7
      FOR THE REYNOLDS AND REYNOLDS COMPANY AND THE WITNESS:
 8
           MICHAEL P.A. COHEN
 9         Sheppard Mullin
           2099 Pennsylvania Avenue
10         Suite 100
           Washington, D.C. 20006-6801
11         mcohen@sheppardmullin.com
12    FOR AUTHENTICOM, COX AUTOMOTIVE AND ITS NAMED PLAINTIFF
      SUBSIDIARIES, MDSC, AUTOLOOP AS A REPRESENTATIVE OF THE
13    VENDOR CLASS:
14         MICHAEL N. NEMELKA
           Kellogg Hansen Todd Figel & Frederick
15         Sumner Square
           1615 M Street, N.W., Suite 400
16         Washington, D.C. 20036
           mnemelka@kellogghansen.com
17         jlong@kellogghansen.com
18    FOR THE DEALERSHIP CLASS PLAINTIFFS:
19         PEGGY J. WEDGWORTH
           ROBERT WALLNER (appearing telephonically)
20         JOHN HUGHES
           Milberg Tadler Phillips Grossman, LLP
21         One Pennsylvania Plaza
           19th Floor
22         New York, New York  10119
           pwedgworth@milberg.com
23         rwallner@milberg.com
24
25
```

HIGHLY CONFIDENTIAL

Page 3

```
 1                A P P E A R A N C E S
 2    FOR CDK GLOBAL:
 3         MARK RYAN
           Mayer Brown
 4         1999 K Street, N.W.
           Washington, DC 20006-1101
 5         mryan@mayerbrown.com
 6    ALSO PRESENT:
 7         SCOTT CHERRY
           Vice President - General Counsel at The Reynolds
 8         and Reynolds Company
 9         Joseph Long
           Kellogg Hansen Todd Figel & Frederick
10
           Ben Harwood, Videographer
11
12
13
14
15
16
17
18
19
20
21              Veritext Legal Solutions
                   Mid-Atlantic Region
                1250 Eye Street NW - Suite 350
22               Washington, D.C.  20005
23
24
25
```

HIGHLY CONFIDENTIAL

Page 4

1                              INDEX

                                                        PAGE

2

   Appearances                                             2

3

4  ROBERT BROCKMAN

5  Examination by Mr. Nemelka                              9

6

   Signature and Changes                                 164

7

   Reporter's Certificate                                165

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

HIGHLY CONFIDENTIAL

Page 5

1                    PLAINTIFF EXHIBITS
    NO.            DESCRIPTION                    PAGE
2
    Exhibit 636 Brockman On the Record publication    25
3
    Exhibit 637 Website screenshot Fuel Ideas to      27
4               Drive
5   Exhibit 638 Article Automotive News dated         32
                February 19, 2007
6
    Exhibit 639 Data Agreement                        44
7               REYMDL00716766 - REYMDL00716767
8   Exhibit 640 Email chain ending with email to      57
                Ronald Lamb from Bob Brockman dated
9               September 20, 2013
                REYMDL00200760 - REYMDL00200761
10              Highly Confidential - Attorneys'
                Eyes Only
11
    Exhibit 641 Email chain ending with email to      63
12              Howard Gardner from Robert Schaefer
                dated 11/25/2013
13              CDK_CID_00569545 - CDK_CID_00569547
                Confidential
14              Highly Confidential
15  Exhibit 642 Notes                                 74
                Long Standing issues around
16              security
                REYMDL00260942 - REYMDL00260943
17              Highly Confidential - Attorneys'
                Eyes Only
18
    Exhibit 643 Email to Bob Brockman from Steve      82
19              Anenen dated 7/2/2014
                CDK_CID_01535307 - CDK_CID_01535308
20              Confidential
                Highly Confidential
21
    Exhibit 644 Notes - Sales Meeting - July 14,      92
22              2014
                REYMDL00261631 - REYMDL 00261635
23              Highly Confidential - Attorneys'
                Eyes Only
24

25

```
 1                      PLAINTIFF EXHIBITS
          NO.         DESCRIPTION                      PAGE
 2
          Exhibit 645 Email chain ending with email to   106
 3                    Ron Workman from Robert Schaefer
                      dated 1/6/2015
 4                    CDK_CID_00242098 - CDK_CID_00242099
                      Confidential
 5                    Highly Confidential
 6        Exhibit 646 Email chain ending with email to   107
                      Bob Brockman from Robert Schaefer
 7                    dated January 11, 2015
                      REYMDL00565070 - REYMDL00565071
 8                    Highly Confidential -
                      Attorneys' Eyes Only
 9
          Exhibit 647 Data Exchange Agreement            111
10                    REYMDL00014384 - REYMDL00014396
                      Confidential
11
          Exhibit 648 Email chain ending with email to   123
12                    Craig Moss from Dan Agan dated May
                      12, 2015
13                    REYMDL00652128 - REYMDL00652133
                      Highly Confidential - Attorneys'
14                    Eyes Only
15        Exhibit 649 Email chain ending with email to   126
                      Tommy Barras from Bob Brockman
16                    dated August 22, 2015
                      REYMDL00044042 - REYMDL00044043
17                    Highly Confidential - Attorneys'
                      Eyes Only
18
          Exhibit 650 Email to Bob Brockman from Tommy   129
19                    Barras dated July 7, 2017
                      REYMDL00226199 - REYMDL00226200.002
20                    Highly Confidential - Attorneys'
                      Eyes Only
21
          Exhibit 651 Email to Bob Brockman from Craig   134
22                    Moss dated August 25, 2017
                      REYMDL00720415 - REYMDL00720511
23                    Highly Confidential - Attorneys'
                      Eyes Only
24
25
```

Page 7

```
 1              PLAINTIFF EXHIBITS
    NO.          DESCRIPTION              PAGE
 2
    Exhibit 652 Email to Robert Schaefer from Bob   141
 3              Brockman dated April 14, 2016
                REYMDL00238133
 4              Highly Confidential - Attorneys'
                Eyes Only
 5
    Exhibit 653 Email chain ending with email to    143
 6              Schaefer from Bob Brockman dated
                April 19, 2017
 7              REYMDL00138479
                Highly Confidential - Attorneys'
 8              Eyes Only
 9  Exhibit 654 Email to Bob Brockman from Robert    144
                Schaefer dated November 10, 2015
10              REYMDL00044241 - REYMDL00044242
                Highly Confidential - Attorneys'
11              Eyes Only
12  Exhibit 655 Email chain ending with email to    153
                Tommy Barras from Bob Brockman
13              dated August 15, 2017
                REYMDL00263558
14              Highly Confidential - Attorneys'
                Eyes Only
15
    Exhibit 656 Email chain ending with email to    158
16              Keith Hill from Bob Brockman dated
                November 28, 2017
17              REYMDL00263619
                Highly Confidential - Attorneys'
18              Eyes Only
19
20
21
22
23
24
25
```

HIGHLY CONFIDENTIAL

Page 8

1                    P R O C E E D I N G S

2              THE VIDEOGRAPHER:  Good morning.  We are on

3    the record at 9:30 a.m. on January 16th, 2019.  This is

4    the video recorded deposition of Mr. Robert Brockman in

5    the matter of In Re: Dealer Management Systems Antitrust

6    Litigation in the United States District Court for the

7    Northern District of Illinois in the Eastern Division.

8    This deposition is being held at Gibbs & Bruns, LLP,

9    located at 1100 Louisiana Street, Suite 5300, in

10   Houston, Texas 77002.

11              My name is Ben Harwood, and I'm the

12   videographer present on behalf of Veritext.  The court

13   reporter is Shauna Beach, also present on behalf of

14   Veritext.

15              Will counsel please state their appearance

16   and firm affiliation for the record.

17              MR. NEMELKA:  My name is Mike Nemelka with

18   the law firm of Kellogg Hansen Todd Figel & Frederick.

19   I'm here on behalf of Authenticom, Cox Automotive and

20   its named plaintiff subsidiaries, MDSC, Autoloop as a

21   representative of the vendor class.  And with me today

22   is my colleague, Joe Long.

23              MS. WEDGWORTH:  Peggy Wedgworth, Milberg

24   Tadler Phillips Grossman, on behalf of the dealership

25   class plaintiffs.

HIGHLY CONFIDENTIAL

Page 9

 1              MR. HUGHES:  John Hughes, Milberg Tadler

 2    Phillips Grossman on behalf of dealership class

 3    plaintiffs.

 4              MS. GULLEY:  Andi Gulley, Gibbs & Bruns,

 5    for the witness.

 6              MR. WILKINSON:  Brice Wilkinson, Gibbs &

 7    Bruns.

 8              MR. CHERRY:  Scott Cherry, general counsel

 9    for Reynolds and Reynolds.

10              MR. COHEN:  Michael Cohen, Sheppard Mullin,

11    for defendant the Reynolds and Reynolds Company and the

12    witness, Mr. Brockman.

13              MR. RYAN:  Mark Ryan from Mayer Brown on

14    behalf of CDK Global.

15              THE VIDEOGRAPHER:  Will the court reporter

16    please swear in the witness and we may proceed.

17                    ROBERT BROCKMAN,

18       having been first duly sworn, testified as follows:

19                      EXAMINATION

20    BY MR. NEMELKA:

21       Q.  Good morning, Mr. Brockman.  My name is Mike

22    Nemelka.  And it's my opportunity to ask you some

23    questions today.  Could you please state your full name

24    for the record.

25       A.  It's Robert Theron Brockman.

HIGHLY CONFIDENTIAL

Page 10

1      Q.  And where do you live?

2      A.  Houston.

3      Q.  And what is your address?

4      A.  333 West Friar Tuck Lane, Houston 77024.

5      Q.  Do you own property anywhere else?

6              MS. GULLEY:  Objection; form.

7      A.  My wife and I own a townhouse that our son

8   lives in.  It's 1731 Sunset.

9      Q.  (By Mr. Nemelka)  Do you own property in any

10  other states besides Texas?

11             MS. GULLEY:  Objection; form.

12     A.  No.

13     Q.  (By Mr. Nemelka)  Does any entity that you have

14  control over own property anywhere else?

15             MS. GULLEY:  Objection; form.

16     A.  Reynolds and Reynolds owns two locations in

17  Ohio.  One is the Reynolds and Reynolds main

18  headquarters, and the other one is a forms manufacturing

19  plant.

20     Q.  (By Mr. Nemelka)  Do you own property in Aspen,

21  Colorado?

22             MS. GULLEY:  Objection; form.

23     A.  No.

24     Q.  (By Mr. Nemelka)  Do you have -- is there

25  property there that you visit from time to time?

HIGHLY CONFIDENTIAL

Page 11

1           MS. GULLEY:  Objection; form.

2      A.  Yes.  There's property that I lease.

3      Q.  (By Mr. Nemelka)  That you lease.  And who do

4  you lease it from?

5           MS. GULLEY:  Objection; form.

6      A.  It's called Mountain Queen, Inc.

7      Q.  (By Mr. Nemelka)  Do you have any ownership

8  interest in Mountain Queen, Inc.?

9      A.  No.

10      Q.  Okay.  Did you prepare for your deposition

11  today?

12      A.  Yes.  I talked to my attorneys and reviewed

13  exhibits.

14           MS. GULLEY:  Stop.  Don't reveal the

15  subject of -- of attorney-client communication.

16      Q.  (By Mr. Nemelka)  And when did you prepare for

17  your deposition today?

18      A.  Yesterday and the day before.

19      Q.  And how long each day did you meet?

20      A.  I'm sorry, I didn't keep track of the time.

21      Q.  Was it a full day or half day?

22      A.  It was probably in between.

23      Q.  So three-fourths of the day, each day?

24           MS. GULLEY:  Objection; form.

25      A.  Yes.

HIGHLY CONFIDENTIAL

Page 12

1        Q.  (By Mr. Nemelka)  And with whom did you meet?
2    With whom did you meet?

3        A.  Andi Gulley, Bryce, Scott Cherry, Michael.

4        Q.  Were any attorneys for CDK present?

5        A.  No.

6        Q.  Was there anybody else from Reynolds present?

7        A.  Yes.  We had a -- one other attorney from

8    Reynolds.

9        Q.  And who was that?

10       A.  John -- I'm blanking on his last name.  He

11   works for Scott Cherry.

12       Q.  Okay.  Any businesspeople from Reynolds present

13   when you prepared for the deposition?

14       A.  No.

15       Q.  Did you talk to anybody at Reynolds about your

16   deposition?

17       A.  No.  Other than the fact they know that I'm

18   here.

19       Q.  Correct.  Have you ever been deposed before?

20       A.  Yes.

21       Q.  How many times?

22       A.  I don't recall the last time.  Some time ago.

23       Q.  Uh-huh.  Well, so this isn't your first --

24   first rodeo, but just a few -- few ground rules to help

25   us get through the day efficiently.  I'm going to do my

HIGHLY CONFIDENTIAL

Page 13

1    best not to talk over you, and if you will just let me

2    finish my question, and then I'll give you time to

3    answer it.  So let's try not to talk over each other,

4    okay?

5        A.  Yes.

6        Q.  And please let me know if you don't understand

7    a question.  If you answer, then we'll consider that you

8    understood the question.  Okay?

9        A.  Yes.

10       Q.  Your counsel may object, but you still have to

11   answer the question unless your counsel instructs you

12   not to.  And so even though your counsel may object,

13   unless he instructs you not to answer, please still

14   answer my questions, okay?

15       A.  Yes.

16       Q.  I understand that you may have been having

17   some -- you've had some health issues, and this is -- so

18   this is not an endurance test.  If you need a break, you

19   can take one.  Okay?

20       A.  Yes.

21       Q.  I would just ask that, before taking a break,

22   if you would -- if you would just finish answering a

23   question if a question is pending.  Is that okay?

24       A.  Yes.

25       Q.  And -- but I'll still plan on trying to take a

Page 14

1    break about every hour, for me as well as for you.  But

2    if you need one in shorter intervals, that's fine.

3    Okay?

4        A.  Thank you.

5        Q.  Is there any reason that you can't provide

6    truthful testimony today?

7        A.  No.

8        Q.  Okay.  You graduated from the University of

9    Florida, College of Business; correct?

10       A.  Yes.

11       Q.  Class of 1963?

12       A.  Yes.

13       Q.  And after graduating from the University of

14   Florida, you worked at the Ford Motor Company for about

15   two years; is that right?

16       A.  Yes, a little short of two years.

17       Q.  And then after Ford you joined IBM; is that

18   right?

19       A.  Yes.

20       Q.  And you were a successful salesperson there;

21   correct?

22       A.  Yes.

23       Q.  And I -- I think I understand that you sold

24   data processing services, in part; is that right?

25       A.  Yes.

HIGHLY CONFIDENTIAL

Page 15

1     Q.  And you were at IBM until about 1970, at which

2  point you left IBM and founded Universal Computer

3  Services, Inc.; is that right?

4     A.  Yes.

5     Q.  And you -- impressively -- taught yourself

6  computer programming around this time as well; is that

7  right?

8     A.  Yes.

9     Q.  And eventually, UCS developed and provided

10  dealership management system software to car

11  dealerships; is that right?

12     A.  Yes.

13     Q.  And, in fact, you were personally involved in

14  the programming of some of the dealership management

15  software that was sold -- licensed to dealers; is that

16  right?

17     A.  Yes.

18     Q.  And over the 1980s, 1990s and 2000s, you

19  continued to run UCS, right?

20     A.  Yes.

21     Q.  UCS served, primarily, large dealerships; is

22  that right?

23     A.  Yes.

24     Q.  And was the DNS that UCS marketed -- was it

25  called the PowerDNS?

HIGHLY CONFIDENTIAL

Page 16

1        A.  Not originally, but later in its existence, it

2    was called Power.

3        Q.  And then in August 2006, UCS acquired the

4    Reynolds and Reynolds Company; is that right?

5        A.  It was a different date.

6        Q.  Different date?  It was -- oh, it was in 2006,

7    though?

8        A.  Yes.

9        Q.  What -- what was the month?

10       A.  October.

11       Q.  October.  Thank you.  And UCS paid 2.8 billion

12   in cash; is that right?

13       A.  Yes.

14       Q.  And prior to the deal, Reynolds was a public

15   company, right?

16       A.  Yes.

17       Q.  But with the acquisition, Reynolds became a

18   wholly-owned subsidiary of UCS; correct?

19       A.  It's -- that's not the correct company.  It's

20   called Dealer Computer Services.

21       Q.  And Dealer Computer Services was the -- was the

22   holding company that owned Reynolds?

23       A.  Yes.

24       Q.  Okay.  And the top-level holding company of --

25   of Reynolds is Universal Computer Systems Holdings,

```
                                                    Page 17
```

 1   Inc.; is that right?

 2        A.  Yes.

 3        Q.  And the A. Eugene Brockman Charitable Trust

 4   owns about 96 percent of that holding company; is that

 5   right?

 6                  MS. GULLEY:  Form.

 7        A.  No.  That's not correct.  The -- the ownership

 8   structure is different than that.

 9        Q.  (By Mr. Nemelka)  Okay.  And what is the

10   ownership structure?

11                  MS. GULLEY:  Objection; form.

12        A.  The Universal Computer Systems Holding, Inc.,

13   is owned by Spanish Steps.

14        Q.  (By Mr. Nemelka)  Okay.  When was Spanish Steps

15   formed?

16        A.  I'm sorry.  I -- I don't know the answer to

17   that.

18        Q.  And who owns Spanish Steps?

19        A.  The A. Eugene Brockman Charitable Trust.

20        Q.  And what percentage of Spanish Steps does the

21   charitable trust own?

22                  MS. GULLEY:  Form.

23        A.  Again, I don't know the answer to that.  I

24   believe it's, substantially, all.

25        Q.  (By Mr. Nemelka)  Substan- -- does 96 percent

HIGHLY CONFIDENTIAL

1  sound about right to you?

2          MS. GULLEY:  Objection; form.

3      A.  Yeah, I -- I can't guess at that.

4      Q.  (By Mr. Nemelka)  Is it between -- is it -- is

5  it in the 90s, the percentage?

6          MS. GULLEY:  Objection; form.

7      A.  I believe so.

8      Q.  (By Mr. Nemelka)  Are there any other owners of

9  Spanish Steps besides the Eugene Brockman Charitable

10  Trust?

11          MS. GULLEY:  Objection; form.

12      A.  Yes.

13      Q.  (By Mr. Nemelka)  And who are they?

14          MS. GULLEY:  Form.

15      A.  Norman Thomas Barras and Terry Jones.  That's

16  all.

17      Q.  (By Mr. Nemelka)  That's all?  And do they --

18  their ownership interest is about .8 -- is it 0.08

19  percent?  Is that right?

20          MS. GULLEY:  Form.

21      Q.  (By Mr. Nemelka)  Or 0.008 percent; is that

22  right?

23      A.  It's 8/10ths of a percent.

24          MS. GULLEY:  Form.

25      Q.  (By Mr. Nemelka)  8/10ths of a percent,

HIGHLY CONFIDENTIAL

Page 19

1    correct.  And there are no other owners besides those

2    two and the charitable trust; is that right?

3                    MS. GULLEY:  Form.

4         A.  That's correct.

5         Q.  (By Mr. Nemelka)  So 8/10ths of a percent -- so

6    times that by -- by two, and then the rest of it is

7    owned by the charitable trust; is that right?

8                    MS. GULLEY:  Form.

9         A.  I believe that's correct.

10        Q.  (By Mr. Nemelka)  So we're talking upwards of

11   98 -- 98 percent of the -- of the company, right?

12                   MS. GULLEY:  Form.

13        A.  That's correct.

14        Q.  (By Mr. Nemelka)  Okay.  And this is an

15   offshore trust; correct?

16        A.  That's correct.

17        Q.  Where is it based?

18        A.  Bermuda.

19        Q.  And when was the trust created?

20                   MS. GULLEY:  Objection; form.

21        A.  1981.

22        Q.  (By Mr. Nemelka)  Who were the trustees of the

23   trust?

24                   MS. GULLEY:  Objection; form.

25        A.  There's a trust company called St. Johns Trust

HIGHLY CONFIDENTIAL

Page 20

1    Company.

2         Q.  (By Mr. Nemelka)  Are they the only trustees of

3    the trust?

4         A.  Yes.

5         Q.  And who appointed them as trustees of the

6    trust?

7                   MS. GULLEY:  Objection; form.

8         A.  They were not the original trust company.

9    There's been a -- there's -- it was -- the original

10   trust company was Bank of Bermuda.

11        Q.  (By Mr. Nemelka)  And who appointed the Bank of

12   Bermuda as trustee?

13                  MS. GULLEY:  Objection; form.

14        A.  I'm sorry.  I can't give you an answer on that.

15   I'm not familiar with how trusts -- trusts get set up.

16        Q.  (By Mr. Nemelka)  Could St. Johns Trust Company

17   be removed as the trustee?

18                  MS. GULLEY:  Objection; form.

19        A.  Yes.

20        Q.  (By Mr. Nemelka)  And who -- who has that

21   authority to remove them as trustee?

22                  MS. GULLEY:  Objection; form.

23        A.  I -- I don't know the name of the person, but

24   there is the -- there is a trust protector.

25        Q.  (By Mr. Nemelka)  And who is the trust

HIGHLY CONFIDENTIAL

```
                                               Page 21
 1   protector?
 2        A.  I'm sorry.  It's an individual.  I don't know
 3   the person's name.
 4        Q.  And who appointed the trust protector?
 5              MS. GULLEY:  Objection; form.
 6        A.  I'm sorry.  I -- I don't know.
 7        Q.  (By Mr. Nemelka)  And can the trust protector
 8   be removed?
 9              MS. GULLEY:  Objection; form.
10        A.  Again, this is an area of law that I'm -- I'm
11   not familiar with.
12        Q.  (By Mr. Nemelka)  And who are the beneficiaries
13   of the trust?
14              MS. GULLEY:  Objection; form.
15        A.  There is myself, my wife, my brother, his wife
16   and all the charities of Bermuda, United States, United
17   Kingdom.
18        Q.  (By Mr. Nemelka)  Excuse me.  What was that
19   last one?  All charities?
20        A.  All -- all charities in the United States and
21   all charities in the United Kingdom.
22        Q.  What does that mean, "all charities"?  Every --
23   every 501c3 organization?
24        A.  Every one of them is -- is a potential
25   beneficiary.
```

HIGHLY CONFIDENTIAL

Page 22

1      Q.  I see.  Does the -- does the trust distribute

2   income to the beneficiaries?

3              MS. GULLEY:  Objection; form.

4      A.  Yes.

5      Q.  (By Mr. Nemelka)  How often?

6              MS. GULLEY:  Objection; form.

7      A.  It depends upon what charitable project that

8   is -- is -- is underway.  You know, the only -- the only

9   distributions have been to charitable entities.

10     Q.  (By Mr. Nemelka)  Those have been the only

11  distributions?  To charitable entities?

12     A.  Yes, sir.

13     Q.  Have you -- have you received any charitable --

14  I mean -- excuse me -- have you received any

15  distributions from the trust?

16     A.  No.

17     Q.  And how much cash does the trust have?

18              MS. GULLEY:  Objection; form.

19     A.  I'm sorry.  I don't know.

20     Q.  (By Mr. Nemelka)  Does the trust have any

21  day-to-day oversight responsibilities of the running of

22  the Reynolds and Reynolds Company?

23              MS. GULLEY:  Objection; form.

24     A.  No.

25     Q.  (By Mr. Nemelka)  You're the chairman and CEO

Page 23

1    of Reynolds; correct?

2         A.  Correct.

3         Q.  And as -- your role as chairman and CEO of

4    Reynolds, you have ultimate decision-making authority

5    with respect to the company's practices and policies; is

6    that right?

7                   MS. GULLEY:  Objection; form.

8         A.  Yes.

9         Q.  (By Mr. Nemelka)  Let's talk a little bit about

10   Reynolds, Mr. Brockman.  Reynolds offers dealer

11   management system software to automotive dealers;

12   correct?

13        A.  Yes.

14        Q.  And it offers two different type of DMSs:

15   ERA-IGNITE and Power; correct?

16        A.  Yes.

17        Q.  And in the DMS market, CDK is your largest

18   competitor, right?

19        A.  Yes.

20        Q.  It's fair to say that CDK is Reynolds' chief

21   rival in the DMS market, right?

22        A.  Yes.

23                   MS. GULLEY:  Form.

24        Q.  (By Mr. Nemelka)  And together you control

25   approximately 75 percent of the DS market for franchised

HIGHLY CONFIDENTIAL

Page 24

1    dealerships; isn't that right?

2              MS. GULLEY:  Objection; form.

3         A.  I -- I don't know -- or know how to keep track

4    of exactly what the percentages are, but -- but I would

5    say in that general area.

6         Q.  (By Mr. Nemelka)  At Reynolds, the DMS has a

7    database component where dealers store their data,

8    right?

9              MS. GULLEY:  Objection; form.

10        A.  Yes.

11        Q.  (By Mr. Nemelka)  And dealers generate a lot of

12   data in the course of operating their business; correct?

13        A.  Yes.

14        Q.  Sales transactions, right?

15             MS. GULLEY:  Objection; form.

16        A.  Yes.

17        Q.  (By Mr. Nemelka)  Vehicle inventory?

18        A.  Yes.

19             MS. GULLEY:  Objection; form.

20        Q.  (By Mr. Nemelka)  Parts inventory?

21             MS. GULLEY:  Objection; form.

22        A.  Yes.

23        Q.  (By Mr. Nemelka)  Information about the

24   dealership's customers, right?

25             MS. GULLEY:  Objection; form.

Page 25

1        A.   Yes.

2        Q.   (By Mr. Nemelka)   And data from their service

3    departments; correct?

4                 MS. GULLEY:   Objection; form.

5        A.   Yes.

6        Q.   (By Mr. Nemelka)   And you agree that the data

7    that dealers generate in running their business is the

8    dealer's, right?

9                 MS. GULLEY:   Objection; form.

10       A.   Yes.

11       Q.   (By Mr. Nemelka)   You've publicly stated the

12   dealers own their data, right?

13                 MS. GULLEY:   Objection; form.

14       A.   Yes.

15       Q.   (By Mr. Nemelka)   And you agree that dealers

16   should choose who has access to their data, right?

17                 MS. GULLEY:   Objection; form.

18       A.   Yes.

19       Q.   (By Mr. Nemelka)   You've publicly told dealers

20   you own your data and choose who you allow access to it,

21   right?

22                 MS. GULLEY:   Objection; form.

23       A.   I'm sorry.   I don't remember saying that

24   specific statement.

25                 (Exhibit 636 was marked for

HIGHLY CONFIDENTIAL

Page 26

1           identification.)

2      Q.  (By Mr. Nemelka)  I've marked Plaintiff's

3  Exhibit 636, which I will hand you.  Mr. Brockman, do

4  you recognize this document?

5      A.  Yes.

6      Q.  Was this an -- a public advertisement that

7  you -- that Reynolds issued to the public?

8      A.  This was done approximately 12 years ago.

9      Q.  And was it issued to the public?

10     A.  Yes.

11     Q.  And if you look at the first bullet point

12 there, you say, "You own your data and choose who you

13 allow access to it," right?

14     A.  Yes.

15     Q.  You also told dealers with respect to their

16 data, quote, "You're the boss."  If you look above that;

17 correct?

18     A.  Yes.

19     Q.  And that's a picture of you, there, on that

20 advertisement?

21     A.  Yes.  Good picture, I might add.

22     Q.  Very nice one.

23          And that's your signature at the end?

24     A.  Yes.

25     Q.  Identifying you as the chairman and CEO of

HIGHLY CONFIDENTIAL

Page 27

1   Reynolds?

2        A.   Correct.

3        Q.   You can put that aside.

4             Reynolds also made similar representations

5   on its website; correct?

6             MS. GULLEY:  Objection; form.

7        A.   Sorry.  I'm not familiar with that.

8             (Exhibit 637 was marked for

9              identification.)

10       Q.  (By Mr. Nemelka)  I've handed you a document

11  I've marked as Exhibit -- Plaintiff's Exhibit 637.

12  Mr. Brockman, this is a printout from the Reynolds

13  website.  Does that look familiar to you?

14            MS. GULLEY:  Objection; form.

15       A.   It says it's Reynolds.  I'm -- I'm personally

16  not familiar with what goes on our website.  That's not

17  something I pay attention to.

18       Q.  (By Mr. Nemelka)  And if you look at the

19  first -- at the top of the -- of the text of this -- of

20  this webpage, it says, "Your Data, Your Way."  Do you

21  see that?

22       A.   Yes.

23       Q.   And then it says, "You own your data.  Reynolds

24  recognizes that you need to share that data outside your

25  dealership."  Do you see that?

HIGHLY CONFIDENTIAL

Page 28

1          MS. GULLEY:  Objection; form.

2      A.  Yes, I see that.

3      Q.  (By Mr. Nemelka)  So this is consistent with

4  your public statement that -- that business -- excuse

5  me -- strike that.

6          This is consistent with your public

7  statement that we just looked at, that -- that data that

8  dealers generate in operating their business belongs to

9  the dealers, right?

10         MS. GULLEY:  Form.

11     A.  Yes.  It -- you know, where it says, "You own

12  your data.  Reynolds recognizes" -- I see that

13  statement.

14     Q.  (By Mr. Nemelka)  Thank you.  You can put that

15  aside.

16         You're familiar with -- that Reynolds has a

17  standard DMS contract with its dealers; correct?

18     A.  Yes.

19     Q.  And the Reynolds standard DMS contract also

20  recognizes that the dealers own their data; correct?

21     A.  Yes.

22     Q.  It says, quote, Reynolds acknowledges that your

23  business data belongs to you," end quote; correct?

24         MS. GULLEY:  Objection; form.

25     A.  Yes.

HIGHLY CONFIDENTIAL

Page 29

1      Q.  (By Mr. Nemelka)  Dealers use a lot of software

2   applications besides DMS; correct?

3      A.  I wouldn't characterize it as "a lot."  They

4   certainly use some.

5      Q.  Applications like customer relationship

6   management software, right?

7              MS. GULLEY:  Form.

8      A.  Yes.

9      Q.  (By Mr. Nemelka)  Inventory management;

10  correct?

11             MS. GULLEY:  Form.

12     A.  Umm, are you referring to parts inventory or

13  vehicle inventory?

14             MS. GULLEY:  Form.

15     Q.  (By Mr. Nemelka)  Both.  Vehic- -- let's do

16  vehicle inventory first.

17             MS. GULLEY:  Form.

18     A.  Yes.

19     Q.  (By Mr. Nemelka)  They use software to help

20  them in their service lane; correct?

21             MS. GULLEY:  Form.

22     A.  Yes.

23     Q.  (By Mr. Nemelka)  And their marketing efforts;

24  correct?

25     A.  Yes.

Page 30

1        MS. GULLEY:  Form.

2    Q.  (By Mr. Nemelka)  And these applications need

3  access to dealer data to work, right?

4        MS. GULLEY:  Form.

5    A.  Correct.

6    Q.  (By Mr. Nemelka)  And above, we saw that you

7  publicly told dealers, "You own your data and choose who

8  you allow access to it."  Remember that?

9    A.  Yes.

10   Q.  But that's not quite true, is it, Mr. Brockman?

11       MS. GULLEY:  Objection; form.

12   A.  I disagree.

13   Q.  (By Mr. Nemelka)  You don't let dealers choose

14  who has access to their data, do you?

15       MS. GULLEY:  Objection; form.

16   A.  They -- the dealers have access to their data,

17  you know, on their own.  They can access it through

18  porting facilities that we have.

19   Q.  (By Mr. Nemelka)  But Reynolds, although it's

20  made a lot of exceptions, has taken the position that

21  dealer -- dealers can't grant access to their data to,

22  for example, independent integrators; is that right?

23       MS. GULLEY:  Objection; form.

24   A.  We have a program which is called the Reynolds

25  Certified Interface, which is entered into -- whoever

Page 31

1    they want to share data with, that covers protections of

2    data from a security standpoint.

3        Q.  (By Mr. Nemelka)  You don't let independent

4    integrators, like Authenticom, into the RCI program, do

5    you?

6        A.  We do not.

7        Q.  And so if a dealer wanted to grant access to

8    their data to Authenticom, you don't allow that, do you?

9        A.  They're perfectly free to run reports and --

10   and send those reports in electronic form to

11   Authenticom.

12       Q.  But in terms of access to their data in an

13   automated way, you don't allow that, do you?

14               MS. GULLEY:  Objection; form.

15       A.  As far as unattended access, that's correct.

16   We do not allow that.

17       Q.  (By Mr. Nemelka)  And that's different from

18   what CDK's position once was; correct?

19               MS. GULLEY:  Objection; form.

20       A.  I'm not familiar with what CDK's historical

21   positions have been on this issue.

22       Q.  (By Mr. Nemelka)  You don't know what CDK's

23   practices were?

24       A.  They have lots of different practices.  I'm

25   not -- I'm not an expert in their -- their practices.

Page 32

1      Q.  You knew that CDK did let dealers use

2   independent integrators, right?

3            MS. GULLEY:  Objection; form.

4      A.  Again, I'm -- I'm not knowledgeable about what

5   CDK does or doesn't do in this regard.

6      Q.  (By Mr. Nemelka)  In fact, back in 2007, you

7   said that, from a business standpoint, you -- you

8   couldn't imagine that that was truly CDK's position,

9   right?

10     A.  I'm sorry.  I don't -- I don't remember or

11  recall -- can you give me more information?

12            (Exhibit 638 was marked for

13              identification.)

14     Q.  (By Mr. Nemelka)  I've marked this Exhibit

15  638 -- Plaintiff's 638, which I've handed you.  It's --

16  Automotive News article entitled "Question & Answer:

17  Deal puts Brockman in the spotlight," dated February

18  9th -- 19th, 2007.  Mr. Brockman, do you recognize this

19  Automotive News article?

20            MS. GULLEY:  Objection; form.

21     A.  Not specifically.

22            MS. GULLEY:  You can take a second to

23  review it.

24     Q.  (By Mr. Nemelka)  Did you grant an interview to

25  Automotive News around this time, Mr. Brockman?

Page 33

1          MS. GULLEY:  Objection; form.

2      A.  I believe so.

3      Q.  (By Mr. Nemelka)  And this is an article

4  reflecting the contents of that interview; correct?

5          MS. GULLEY:  Objection; form.

6          You haven't offered him the opportunity to

7  review it.

8          MR. NEMELKA:  Andi, please comply with the

9  deposition protocol order.

10     A.  I would like to have a little bit of time to

11  read it.

12     Q.  (By Mr. Nemelka)  Sure.  Do you recognize,

13  though, this is -- reflects an interview that you gave

14  to Automotive News, Mr. Brockman?

15          MS. GULLEY:  Objection; form.

16     A.  If you let me finish reading this back page,

17  it's got a lot of information on it.

18     Q.  (By Mr. Nemelka)  Sure.  I'm -- I'm only going

19  to ask you about one -- about one -- one question and

20  answer.

21          MS. GULLEY:  Objection; form.

22     A.  Okay.  What is your question?

23     Q.  (By Mr. Nemelka)  This reflects an interview --

24  the contents of an interview that you gave to Automotive

25  News; correct?

HIGHLY CONFIDENTIAL

Page 34

```
 1              MS. GULLEY:  Objection; form.
 2       A.  Yes.  That was approximately a month and a half
 3   after the acquisition.
 4       Q.  (By Mr. Nemelka)  Correct.  And if you turn to
 5   the second page, the question that -- that Automotive
 6   asked you, "ADP Dealer Services" -- now, ADP is now CDK;
 7   correct?
 8       A.  Yes.
 9              MS. GULLEY:  Objection; form.
10              MR. RYAN:  Object to form.
11       Q.  (By Mr. Nemelka)  "ADP Dealer Services will
12   not" -- excuse me, the ADP that's referred to here was
13   -- the dealer services was spun off and became CDK;
14   correct?
15              MR. RYAN:  Objection.
16       A.  That's my understanding.
17       Q.  (By Mr. Nemelka)  Right.  So it says, "ADP
18   Dealer Services will not prohibit dealers from providing
19   their vendors with a user ID and password to extract
20   data."  What are your thoughts about that?
21              Do you see that question?
22       A.  Yes.
23       Q.  And you gave an answer.  "I don't understand
24   ADP's position.  Other than to be obstinate, than to be
25   opposite, I can't imagine from a business standpoint
```

Page 35

1    that that's truly their position.  And frankly it would

2    be my opinion that after awhile they probably change

3    that position."  Do you see that?

4         A.  Yes.

5         Q.  And that accurately reflects what you said?

6              MS. GULLEY:  Objection; form.

7         A.  Yes.

8         Q.  (By Mr. Nemelka)  And so you knew that CDK's

9    position was that they did not stop dealers from

10   allowing -- they did not stop dealers from using

11   independent integrator's automated access to their data;

12   correct?

13             MS. GULLEY:  Objection; form.

14        A.  No.  I don't agree with that.  And that's

15   certainly not what I said.  What I said is, "I don't

16   understand ADP's position.  Other than to be obstinate,

17   than to be opposite, I can't imagine from a business

18   standpoint that that's truly their position.  And

19   frankly it would be my opinion that after awhile they

20   probably change that position."

21        Q.  (By Mr. Nemelka)  And CDK did change their

22   position on that, didn't they?

23             MS. GULLEY:  Objection; form.

24        A.  It's my understanding that -- that they have

25   made changes.  Now, exactly what changes they've made,

HIGHLY CONFIDENTIAL

Page 36

1    I'm not familiar with.

2        Q.  (By Mr. Nemelka)  CDK didn't change that

3    position, though, until years later, right?

4                MS. GULLEY:  Objection; form.

5                UNIDENTIFIED SPEAKER:  Mike, one objection

6    is good for both defendants, right?

7                MR. NEMELKA:  Yes.

8                UNIDENTIFIED SPEAKER:  Okay, thank you.

9                THE WITNESS:  I'm sorry.  Could you repeat

10   the question?

11       Q.  (By Mr. Nemelka)  Sure.  And CDK didn't change

12   that position until years later, though; correct?

13               MS. GULLEY:  Objection; form.

14       A.  Again, I've not tracked what ADP has done in

15   this regard.  My guess is -- and that's there's been a

16   series of changes.

17       Q.  (By Mr. Nemelka)  But in the meantime, before

18   CDK changed, CDK Reynolds engaged in what you called,

19   Mr. Brockman, "the data wars"; isn't that right?

20               MS. GULLEY:  Objection; form.

21       A.  I've not ever used that term, so I don't know

22   who has.

23       Q.  (By Mr. Nemelka)  You've never used the term,

24   "data wars"?

25               MS. GULLEY:  Objection; form.

Page 37

1          A.  No.  (Inaudible.)

2          Q.  (By Mr. Nemelka)  Now, CDK not only had an open

3     system in the sense that it let dealers use independent

4     integrators, but it also had its own independent

5     integrators, like DMI and Integra Link!; correct?

6                    MS. GULLEY:  Objection; form.

7          A.  Correct.

8          Q.  (By Mr. Nemelka)  And DMI and Integra

9     Link! provided access to the data belonging to Reynolds'

10    dealers; correct?

11                   MS. GULLEY:  Objection; form.

12         A.  Yes.  They -- they hacked our systems

13    extensively.

14         Q.  (By Mr. Nemelka)  And Reynolds' dealers would

15    grant DMI and Integra Link! access to their data by

16    creating log-in credentials for them, right?

17                   MS. GULLEY:  Objection; form.

18         A.  Yes.

19         Q.  (By Mr. Nemelka)  And then DMI and Integra

20    Link! would then provide the dealer data to third-party

21    vendors; correct?

22         A.  Yes.

23         Q.  Including OEMs, right?

24                   MS. GULLEY:  Form.

25         A.  Yes.

HIGHLY CONFIDENTIAL

Page 38

1      Q.  (By Mr. Nemelka)  And when I say "OEMs," I mean

2  the car manufacturers, like Ford, Chevy, Toyota, right?

3              MS. GULLEY:  Form.

4      A.  That's correct.

5      Q.  (By Mr. Nemelka)  You understand that's what I

6  mean, right?

7      A.  Yes.

8      Q.  Mr. Brockman, I've handed you what has been

9  previously marked as Plaintiff's Exhibit 442.  I'll

10  describe it and then you can look at it.  This is an

11  email from you, Bob Brockman, to Ron Workman and Steve

12  Anenen, dated Sunday, June 10th, 2007.  Do you see that?

13              MS. GULLEY:  Objection; form.

14      A.  Yes.

15      Q.  (By Mr. Nemelka)  And to this email, you

16  attach -- you made an attachment; correct?

17              MS. GULLEY:  Form.

18      Q.  (By Mr. Nemelka)  Have you finished reading it,

19  Mr. Brockman?

20      A.  Yes.

21      Q.  Thank you.  So if you look at the email that

22  you -- you sent this email to Mr. Workman and

23  Mr. Anenen; correct?

24      A.  Yes.

25      Q.  Steve Anenen was the CEO of CDK?

HIGHLY CONFIDENTIAL

Page 39

1      A.   That's correct.

2      Q.   And Ron Workman was a senior vice-president

3   there?

4      A.   Yes.

5      Q.   And in the third -- third line down, you write,

6   "Please see the attached thoughts regarding our mutual

7   opportunities."  Do you see that?

8      A.   Yes.

9      Q.   And then you said -- then you write, "As I said

10  at our initial meeting on the subject at NADA" -- what

11  is NADA?

12     A.   It's the National Auto Dealers Association.

13     Q.   And what does that mean, "at NADA"?

14     A.   There's an annual convention and trade show.

15     Q.   Is it once a year?

16     A.   Yes.

17     Q.   And at this convention, you -- you met with

18  Mr. Workman?

19     A.   Yes.

20     Q.   And at these annual conventions, you frequently

21  meet -- meet with executives from CDK; correct?

22              MS. GULLEY:  Objection; form.

23     A.   No.

24     Q.   (By Mr. Nemelka)  Is this the only time you

25  ever met with a CDK executive at NADA?

HIGHLY CONFIDENTIAL

Page 40

1      A.  No.  It's not the only time, but it -- it is --

2   to characterize it as something that happens a lot, it's

3   not.  It's rare.  And this is certainly the first time

4   that I had ever met Steve Anenen.

5      Q.  And then you write -- well, you said, "As I

6   said in our initial meeting on the subject at NADA, I

7   believe that there some attractive opportunities here

8   that in the longer term can be quite significant."  Do

9   you see that?

10             MS. GULLEY:  Objection; form.

11      A.  Yes.

12      Q.  (By Mr. Nemelka)  So let's turn the page to

13   the document that you attached.  If you could go to the

14   last section on Data Services, on the second page.  And

15   you have -- having read this -- this attachment, this

16   was proposing a joint venture between CDK and Reynolds

17   for the service of extracting data from dealership

18   systems; correct?

19             MS. GULLEY:  Objection; form.

20      Q.  (By Mr. Nemelka)  Mr. Brockman?

21      A.  Yes.

22      Q.  And ADP, meaning CDK, would contribute the DMI

23   business that we just discussed; correct?

24             MS. GULLEY:  Form.

25      A.  Yes.

Page 41

1    Q.  (By Mr. Nemelka)  And then Reynolds would

2    contribute its technology for accessing the Reynolds DMS

3    systems; correct?

4               MS. GULLEY:  Form.

5    A.  That's what was under consideration, but it --

6    I think it's -- it's correct to add that -- that this

7    was a proposed process that never occurred.  And

8    further -- on further examination, subsequent to this, I

9    decided that it would be a wrong thing to do.

10   Q.  (By Mr. Nemelka)  Why would it be a wrong thing

11   to do?

12   A.  I don't believe that accessing dealership

13   systems to extract data in the manner that DMI and that

14   their other entities were doing it to be proper.

15   Q.  But at least here, you had proposed talking

16   about forming a joint venture to do that; correct?

17              MS. GULLEY:  Objection; form.

18   A.  What I'm doing is -- is I'm -- I'm commenting

19   on -- on their proposals.

20   Q.  (By Mr. Nemelka)  You described it as

21   an attractive opportunity that could be quite

22   significant in your email, didn't you?

23              MS. GULLEY:  Objection; form.

24   A.  On further examination, you know, that was not

25   the case.

HIGHLY CONFIDENTIAL

Page 42

1      Q.  (By Mr. Nemelka)  And would other competitors

2   to this data services joint venture be allowed to access

3   the data for Reynolds and -- and CDK dealers, or only

4   this joint venture?

5              MS. GULLEY:  Objection; form.

6      A.  Again, this was an early-on idea which was not

7   followed up on.  Specifically, we did not do anything in

8   this regard.

9      Q.  (By Mr. Nemelka)  The thought was, though, that

10  only the Reynolds and CDK joint venture would be able to

11  provide data access to Reynolds and CDK, not others;

12  correct?

13             MS. GULLEY:  Objection; form.

14     A.  That -- that was the -- the original proposal

15  from CDK.

16     Q.  (By Mr. Nemelka)  So competitors like

17  Authenticom would not be able to compete with this joint

18  venture, right?

19             MS. GULLEY:  Objection; form.

20     A.  From a thought standpoint, this -- this project

21  never got that far.

22     Q.  (By Mr. Nemelka)  But you said that was the

23  original conception that CDK --

24             MS. GULLEY:  Objection --

25             MR. NEMELKA:  Let me finish my question,

Page 43

1    Andi.

2         Q.  (By Mr. Nemelka)  You said that was the

3    original proposal from CDK, though, right?

4                   MS. GULLEY:  Objection; form.

5         A.  Again, there was -- there was another document,

6    which I don't have and I don't know whether it exists,

7    but it's -- it certainly did exist, where what ADP was

8    proposing was -- was laid out.  And this was an initial

9    response.  Again -- I'll repeat again, this project did

10   not go anywhere.  It did not happen.

11        Q.  (By Mr. Nemelka)  At this time, were you --

12   when you were considering this joint venture, DMI was

13   extracting data for vendors from Reynolds' DMS; correct?

14                  MS. GULLEY:  Objection; form.

15        A.  At this particular point in time, this -- this

16   was approximately seven months after the acquisition

17   of -- of a very, very large company.  It was extremely

18   busy in all kinds of operational details, and for me to

19   know what was going on with Reynolds systems and outside

20   third parties at that point in time was impossible.  The

21   best I could have would be, you know, hazy knowledge,

22   but not, you know, absolute knowledge.

23        Q.  (By Mr. Nemelka)  Well, here you wrote that CDK

24   would contribute the DMI business to this new co-entity

25   along with the technology for accessing DMS systems,

HIGHLY CONFIDENTIAL

Page 44

1    right?

2              MS. GULLEY:  Objection; form.

3         A.  Again, that was in response to their proposal.

4    And again -- I repeat again, this project went nowhere.

5              (Exhibit 639 was marked for

6               identification.)

7         Q.  (By Mr. Nemelka)  I've handed you Plaintiff's

8    Exhibit 639.  And, Mr. Brockman, I'll represent to you

9    that the metadata for this document states that, as

10   produced by -- by your counsel, that this came from your

11   custodial file and that it was -- date last modified was

12   July 29th, 2012.  And the file name is "ADP Data

13   Agreement Talking Points."  Okay?

14             MS. GULLEY:  Objection; form.

15        Q.  (By Mr. Nemelka)  Did you hear that,

16   Mr. Brockman?

17        A.  Yes.

18        Q.  Okay.  Do you recognize these as talking points

19   that you created for ADP Data Agreement?

20             MS. GULLEY:  Objection; form.

21        A.  Yes.  These were talking points that would take

22   place between myself and ADP.

23        Q.  (By Mr. Nemelka)  And who at ADP?

24        A.  Steve Anenen.

25        Q.  Is this a phone call?

HIGHLY CONFIDENTIAL

Page 45

1          MS. GULLEY:  Objection; form.

2      A.  Yes.

3      Q.  (By Mr. Nemelka)  And was it a phone call

4  around the time of July 29th, 2012?

5          MS. GULLEY:  Form.

6      A.  I don't know what date -- I remember creating

7  this document, thinking that a phone call was going to

8  be imminent.  It was not imminent.  It was at some

9  considerable length of time afterwards.

10     Q.  (By Mr. Nemelka)  "Considerable length of

11  time," meaning a few weeks or months?

12     A.  Months.

13     Q.  A few months?  And these are the talking points

14  that you prepared for that phone conversation with

15  Mr. Anenen?

16     A.  Yes.

17     Q.  And did you deliver these talking points?

18         MS. GULLEY:  Form.

19     A.  I'm not sure what all points were actually

20  covered.  These were the points that I wanted to cover.

21  Whether I got them all done or not, I -- I don't think I

22  got them quite done.

23     Q.  (By Mr. Nemelka)  I just want to ask you about

24  a few of the bullet points here, Mr. Brockman.  The

25  first one you say, "Unattended remote access to Reynolds

Page 46

1    systems is going to cease."  Do you see that?

2        A.  Yes.

3        Q.  So 2012, unattended remote access was still

4    happening on the Reynolds system, right?

5        A.  That's correct.

6        Q.  Including by CDK; correct?

7        A.  That's right.  CDK -- or CDK subsidiaries were

8    identified as some of the most, you know -- they were

9    the worst hackers out there.  And -- and this first

10   line, "Unattended remote access to Reynolds systems is

11   going to cease," that was not a pleasant statement.

12   That was a -- a statement of fact.  The fact was pretty

13   ugly.

14       Q.  And -- and the data agreement, the document is

15   titled "Data Agreement."  And what was the data

16   agreement that you envisioned entering into with CDK?

17               MS. GULLEY:  Objection; form.

18       A.  The -- the data agreement involved a -- a

19   phased shutdown, as opposed to an abrupt stop.

20               MS. GULLEY:  Objection; form.

21       Q.  (By Mr. Nemelka)  And is this a call that was

22   initiated by you, or Mr. Anenen?

23       A.  I -- I had requested a call.  Whether he called

24   me or I called him, I don't recall.

25       Q.  You requested the call?

Page 47

1          MS. GULLEY:   Objection; form.

2      A.  Yes.

3      Q.  (By Mr. Nemelka)  And this is the first time

4  that you had discussed with Mr. Anenen having CDK stop

5  accessing the Reynolds systems?

6          MS. GULLEY:   Objection; form.

7      A.  I don't recall whether or not it was the first

8  time or not.

9      Q.  (By Mr. Nemelka)  And what did Mr. Anenen say

10  in response?

11      A.  It was a rather unusual call.  There was

12  about -- it was an hour-long call, and there was about

13  15 minutes' worth of this active discussion and then 45

14  minutes of -- of just unproductive conversation.

15      Q.  What does that -- what -- why was it

16  unproductive?

17      A.  Mr. Anenen did not want to address the issues.

18  He wanted to talk about other things.

19      Q.  So on these topics, the call lasted about 15

20  minutes?

21      A.  Uh-huh.  (Witness answers affirmatively.)

22      Q.  And what -- what did he respond -- how did he

23  respond when you told him that unattended remote access

24  to Reynolds systems is going to cease?

25      A.  He didn't make a specific reply to that

HIGHLY CONFIDENTIAL

Page 48

1   statement.

2       Q.  And what was his general response to your

3   proposal here?

4           MS. GULLEY:  Objection; form.

5       A.  I would say it was -- it didn't make a lot of

6   progress.  You know, Steve Anenen is a very, very nice

7   guy, and he's a person that is unlikely to say no, you

8   know.  He's just -- he's not that kind of person.  But

9   he did not make a positive response.

10      Q.  (By Mr. Nemelka)  Meaning he said that CDK

11  would continue to access the Reynolds system?

12          MS. GULLEY:  Objection; form.

13      A.  No.  He did not answer that specific issue.

14  Again, he's a very nice guy.

15      Q.  (By Mr. Nemelka)  Did he give you any

16  indication one way or the other whether he was

17  interested in engaging in the discussions further, after

18  this phone call?

19          MS. GULLEY:  Objection; form.

20      A.  At -- at that point, he did not.

21      Q.  (By Mr. Nemelka)  At this time, Reynolds was

22  using Authenticom for -- strike that.

23          Reynolds has its own software application,

24  separate from the DMS; correct?

25      A.  I wouldn't say separate from the DMS, but

Page 49

1    there's some things that we do that are not totally

2    related to our own DMS.

3         Q.  Right.  Software solutions that you -- that

4    dealers use, separate from the DMS; correct?

5              MS. GULLEY:  Objection; form.

6         A.  It's a very, very small, you know, part of our

7    business.

8         Q.  (By Mr. Nemelka)  And at this time, Reynolds

9    was using Authenticom for the data needs for those

10   applications; correct?

11             MS. GULLEY:  Objection; form.

12        A.  Yes.  Again, the particular data that we're

13   talking about has to do with service reminder cards,

14   principally, and it's a very small thing.  And we use

15   Authenticom from an expediency standpoint to, you know,

16   get us the data.

17        Q.  (By Mr. Nemelka)  And this was data from CDK

18   DMS; correct?

19        A.  Yes.

20        Q.  And if you go to the next page, you have a --

21   you have a -- a bullet point here where it starts with

22   "batch type data."  Do you see that?

23        A.  Yes.

24        Q.  It says, "Batch type data that Authenticom (or

25   some other Reynolds agent)" -- so let me stop there.  So

Page 50

1   you considered Authenticom a Reynolds agent in

2   collecting the data; is that right?

3        A.  I don't --

4            MS. GULLEY:  Objection; form.

5        A.  I don't know if we would consider Authenticom

6   an agent.  They -- they provided a service.

7        Q.  (By Mr. Nemelka)  You say, "Batch type data

8   that Authenticom (or some other Reynolds agent) collects

9   from ADP sites for Reynolds to use in marketing programs

10  that it sells to the dealer would require that this data

11  is used for no other purpose."  Do you see that?

12           MS. GULLEY:  Objection; form.

13       A.  Yes.

14       Q.  (By Mr. Nemelka)  So you envisioned that

15  Reynolds would continue to use Authenticom even after

16  this proposed data agreement with CDK; is that right?

17           MS. GULLEY:  Objection; form.

18       A.  I don't think that, you know, I would

19  characterize this paragraph in that way.  There's no

20  suggestion here it's long term.  Anytime that you have a

21  process set up for a collection of data, to tear it up,

22  you know, involves some effort.  And what we're talking

23  about that's described in this document here, there's

24  things to be done short term.  There is no implication

25  here that long term -- you know, longer than what the

Page 51

1    immediate, you know, time frame would be -- that we

2    would continue to use Authenticom.

3         Q.  (By Mr. Nemelka)  This is 2012, right?

4              MS. GULLEY:  Objection; form.

5         A.  Yeah.

6         Q.  (By Mr. Nemelka)  Reynolds continued to use

7    Authenticom clear to -- through 2017, right?

8              MS. GULLEY:  Objection; form.

9         A.  I'm not aware of -- of how long that -- that

10   occurred.

11        Q.  (By Mr. Nemelka)  Certainly, you know, for

12   years after this, Reynolds continued to use Authenticom,

13   right?

14             MS. GULLEY:  Objection; form.

15        A.  Again, I'm not aware of what's going on.

16        Q.  (By Mr. Nemelka)  All right, well --

17        A.  In -- in the -- in that particular regard.

18        Q.  We have some documents on that.

19             MS. GULLEY:  Objection; to the sidebar.

20        Q.  (By Mr. Nemelka)  You said "agents."  You say

21   here, "The use of a 3rd-party acting under contract as

22   an agent of ADP or Reynolds is not an issue as long as

23   the specific RCI agreement is directly between us."  Do

24   you see that?

25             MS. GULLEY:  Objection; form.

Page 52

1      A.  Yes.

2      Q.  (By Mr. Nemelka)  What did you mean by that?

3           MS. GULLEY:  Objection; form.

4      A.  What the focus in this particular passage is --

5  and that's that we'd want to have a contract directly

6  with the -- the owner of the data.

7      Q.  (By Mr. Nemelka)  Well, the contract with the

8  owner of data?  That would be the dealer, right?

9           MS. GULLEY:  Objection; form.

10     A.  Correct.

11     Q.  (By Mr. Nemelka)  And so you would consider

12  those who go and collect the data on your behalf as your

13  agents; correct?

14           MS. GULLEY:  Objection; form.

15     A.  I think what -- what we're talking about here

16  is -- and that's that, you know, we don't use agents.

17  What we want to do is we want to have direct contracts

18  with the collector of the data and also the owner of the

19  data.

20     Q.  (By Mr. Nemelka)  Well, what you write here is

21  that "The use of a 3rd party acting under contract as an

22  agent of ADP or Reynolds is not an issue as long as the

23  specific RCI agreement is directly between us."  Do you

24  see that?

25           MS. GULLEY:  Objection; form.

Page 53

1        A.  Well, I -- I think that's -- that states

2    clearly that we -- the agreement we want is -- we want

3    one directly between us and -- and not, you know,

4    with any use of an agent.

5        Q.  (By Mr. Nemelka)  And "an agent" being those

6    that go and collect data on your behalf; correct?

7                    MS. GULLEY:  No.

8                    Objection; form.  I'm sorry.  It was -- I'm

9    sorry.

10                    MR. NEMELKA:  That's improper to answer the

11    question.  I asked the witness.

12                    MS. GULLEY:  I'm so sorry, Mike.

13                    MR. NEMELKA:  It's okay.

14                    MS. GULLEY:  It was not -- not intentional.

15                    UNIDENTIFIED:  Same objection.

16                    MR. NEMELKA:  We'll just leave the record

17    like that.

18                    MS. GULLEY:  Well, he can answer the

19    question.

20                    MR. NEMELKA:  Sure.

21        Q.  (By Mr. Nemelka)  Do you need me to repeat the

22    question, Mr. Brockman?

23        A.  I need to reread this.

24        Q.  My simple question was -- is that you have here

25    a section called "Use of Agents."  You say, "The use of

HIGHLY CONFIDENTIAL

Page 54

1    a 3rd party acting under contract as an agent of ADP or

2    Reynolds is not an issue as long as the specific RCI

3    agreement is directly between us -- either of us would

4    take responsibility for their agents."  Do you see that?

5              MS. GULLEY:  Form.

6        A.  Yes.

7        Q.  (By Mr. Nemelka)  And my question is that the

8    agents that you're referring to are those that would go

9    and collect the data on your behalf; correct?

10       A.  I think I'm referring to DMI, Integra.

11       Q.  Okay.  Did you know how Authenticom accessed

12   data on a CDK system?

13             MS. GULLEY:  Objection; form.

14       A.  No.

15       Q.  (By Mr. Nemelka)  Did you know that they were

16   issued log-in credentials, just like DMI and Integra

17   Link! were for Reynolds?

18             MS. GULLEY:  Objection; form.

19       A.  I'm not aware of that.

20             MS. GULLEY:  Are you at a stopping point,

21   Mike?

22             MR. NEMELKA:  Sure.

23             MS. GULLEY:  Let's take a break.

24             THE VIDEOGRAPHER:  The time is 10:25 a.m.,

25   and we're off the record.

Page 55

1              (Short recess 10:25 to 10:50 a.m.)

2              THE VIDEOGRAPHER:  The time is 10:50 a.m.

3    We're back on the record.

4                   EXAMINATION (Continuing)

5    BY MR. NEMELKA:

6       Q.  Mr. Brockman, have you heard of the phrase

7    "whitelisting"?

8              MS. GULLEY:  Objection; form.

9       A.  In -- in recent years, yes.

10      Q.  (By Mr. Nemelka)  The -- where -- as I think of

11   the term "whitelisting," that's where Reynolds issues a

12   protected user ID that will be exempt from Reynolds'

13   security processes.

14             MS. GULLEY:  Object- -- hold on.  Let him

15   finish.

16      Q.  (By Mr. Nemelka)  Is that -- is that how you

17   associate the term?

18             MS. GULLEY:  Objection; form.

19      A.  No.

20      Q.  (By Mr. Nemelka)  Reynolds did allow the

21   feeding of data through protected user IDs that were

22   exempt from the secur- -- Reynolds' security processes,

23   right?

24             MS. GULLEY:  Objection; form.

25      A.  I would say the answer to that is -- is

1    qualified as -- as temporary access.  I think it's

2    important that, from a transitional standpoint, that's

3    where that's been used.

4        Q.  (By Mr. Nemelka)  And it was used with CDK's

5    access to the Reynolds system; correct?

6                MS. GULLEY:  Objection; form.

7        A.  The answer to that is no.  The -- the only time

8    that that was used is -- or that process was used was in

9    the situation where everybody's agreed that they're

10   going to stop hacking.  They're going to stop being

11   bandits.  They're going to get straight.  And, you know,

12   we've seen fit to facilitate an orderly stand-down, in

13   which case, you know, we issued user IDs that were

14   temporary in nature.

15       Q.  (By Mr. Nemelka)  That was in 2000 --

16               MS. GULLEY:  Are you finished Mr. Brockman?

17               THE WITNESS:  No.

18       A.  That's completely different than, you know,

19   what my connotation of whitelist is.  Whitelist, in my

20   terminology, has to do with email.

21               I have a lot of problems with spam email.

22   And one of the ways that you deal with spam email is --

23   is you decide what select group of people you'll accept

24   email addresses from, and you -- you create a list.  And

25   that's what's called a "whitelist."  You know, that's --

Page 57

1    that's my knowledge of the use of the term.

2         Q.  (By Mr. Nemelka)  So where Reynolds issued

3    these protected user IDs for CDK, that was -- that you

4    were referring to, was that in connection with the 2015

5    wind-down agreement?

6                   MS. GULLEY:  Form.

7         A.  That was one of the factors in that wind-down

8    agreement.  It was -- again, first and foremost, that

9    they're -- they're going to stop hacking.  They're going

10   to stop being bandits.  And this is a temporary

11   situation, you know, where it's a wind-down.

12        Q.  (By Mr. Nemelka)  Reynolds did it for CDK long

13   before 2015, didn't it?

14                  MS. GULLEY:  Objection; form.

15        A.  Not to my knowledge.

16        Q.  (By Mr. Nemelka)  Okay.  I've handed you

17   Exhibit -- Plaintiff's Exhibit 640.

18                  (Exhibit 640 was marked for

19                    identification.)

20        Q.  (By Mr. Nemelka)  And I'll describe it and then

21   you can read it.  It's an email from you, Mr. Brockman,

22   dated Friday, February 20, 2013, to Ron Lamb.  I'll give

23   you a minute to read it.

24        A.  I'm familiar with this issue here.

25        Q.  Are you finished reading --

Page 58

1        A.  Let -- let me finish.

2             We have been -- you know, the war with the

3    bandits and the hackers, it's been going on for a long

4    time.  And what we've done over the years is -- and

5    that's that we've created barriers.  And what happens

6    is, in this, is sometimes the barrier blocks somebody

7    that is -- is causing them a great deal of problem.  And

8    what we'll do is -- and that's on a temporary basis

9    while we get the -- you know, the issue -- specific

10   issue sorted out, we will issue a user ID temporarily.

11            And I think that that's reflected in -- it

12   reads, "Obviously it is not getting communicated

13   correctly -- or the dealership person is not listening

14   to the description of the circumstances around the

15   situation -- which is that a formal agreement has been

16   reached whereby entrance into the RCI world by the OEM

17   [involved] will begin.

18            "Part of this [that] agreement is to allow

19   the feeding of data by 'bandit procedures' to continue

20   to exist in [during] the transition period."  And that's

21   what it's all about.

22        Q.  Will you continue to read that last sentence of

23   your email?

24            MS. GULLEY:  Objection; form.

25        A.  "The new USER-ID is a special one that we know

Page 59

1    about -- and there will be exempt from the security

2    processes."

3              What's not, clearly, part of that sentence

4    is "This is a temporary transition."

5         Q.  (By Mr. Nemelka)  Mr. Brockman, this was user

6    IDs that were for both Integra Link! and DMI; correct?

7              MS. GULLEY:  Objection; form.

8         A.  Yes.  I believe -- I believe, in this

9    particular situation, they were the folks that were

10   described -- which they're our -- our worst hackers.

11        Q.  (By Mr. Nemelka)  And this is in 2013; correct?

12             MS. GULLEY:  Objection; form.

13        A.  Yes.  That's -- that's the date.

14        Q.  (By Mr. Nemelka)  And the bottom email is an

15   email from a dealership to Reynolds, right?

16             MS. GULLEY:  Objection; form.

17        A.  Yes.

18        Q.  (By Mr. Nemelka)  Sunset -- excuse me.  Sorry.

19        A.  That's correct.  The email is to Reynolds, from

20   a customer of Reynolds.

21        Q.  And the customer says, "I have now received

22   three calls from the TAC" -- what is the TAC?

23        A.  That stands for Technical Assistance Center.

24        Q.  Of Reynolds?

25        A.  Yes.

Page 60

1      Q.  -- "about setting up user IDs for both

2  Integralink and DMI to allow non-regulated access to our

3  Reynolds system."

4          Then he goes on, "I find it extremely

5  hypocritical that for the better part of 3-4 years

6  Reynolds has pretty much pissed off a large majority of

7  your customer with 'security' enhancements that locked

8  out these companies in one way or another.  Now all of a

9  sudden, Reynolds is calling me to set up exactly what we

10  were told was a security problem.  So my questions is

11  how is this still not a security problem."

12          Do you see that?

13          MS. GULLEY:  Form.

14      Q.  My question is:  Do you see that?

15          MS. GULLEY:  Form.

16      A.  I see, you know, what you have read.

17      Q.  (By Mr. Nemelka)  Did you -- do you agree with

18  the dealer that it's hypocritical for Reynolds to be

19  creating these protected user IDs that are exempt from

20  its security processes?

21          MS. GULLEY:  Form.

22      A.  No.  I -- I disagree with that statement.

23          MS. GULLEY:  Are you --

24      A.  And the characterization that this particular

25  writer, this Christopher K. Upright, that we have,

Page 61

1    quote, angered a number of our customers over the last

2    three or four years, you know, that's way too strong of

3    a characterization.  There's no question there's been

4    inconveniences as we have, you know, ratcheted down, you

5    know, hackers' access.  And that's exactly what happened

6    here, and we -- we obviously dealt with it.

7        Q.  Dealers left Reynolds over this issue of data

8    access, didn't they?

9        A.  There has been some, but a very small minority.

10       Q.  And they transitioned, during this time period,

11   to CDK over those issues; correct?

12                MS. GULLEY:  Objection; form.

13       A.  I don't have any, you know -- you know,

14   knowledge of -- of the -- you know, that correlates

15   security issues to, you know, number of dealerships that

16   departed.  I just don't have that information, if it

17   exists.

18       Q.  (By Mr. Nemelka)  Reynolds keeps track of

19   reasons that dealers leave it, don't -- doesn't it?

20       A.  To the extent that we can ascertain, you know,

21   why, we do.  You know, in many, many cases, we can't.

22       Q.  And you're aware that, in tracking, that there

23   were many instances -- there were instances where

24   dealers said they were leaving Reynolds for CDK because

25   of the data access policies, right?

Page 62

1              MS. GULLEY:  Objection; form.

2         A.  I would say that there -- there are some

3    dealers that have left us over data access, but -- but,

4    this is, you know, a very tiny minority.

5         Q.  (By Mr. Nemelka)  In your email about the user

6    IDs being exempt from security processes, what does

7    "exempt" mean?

8              MS. GULLEY:  Objection; form.

9         A.  I'm sorry.  I'm not understanding.

10        Q.  (By Mr. Nemelka)  You wrote, "The new USER-ID

11   is a special one that we know about -- and they" -- "and

12   there will exempt from the security processes."  What

13   does that "exempt" mean?

14             MS. GULLEY:  Objection; form.

15        A.  I think it means what it says.

16        Q.  (By Mr. Nemelka)  Security processes will not

17   apply to those protected user IDs, right?

18             MS. GULLEY:  Objection; form.

19        A.  The -- the specific security issue that is

20   causing this particular customer unhappiness, that's

21   what the new user ID will -- will exempt them from.

22   Until such time as -- as we have our -- our piece of

23   code -- which is actually, you know, performing the

24   security check a little too aggressively -- until that's

25   corrected.

Page 63

1      Q.  (By Mr. Nemelka)  You can set that aside.  Oh,
2   one -- real quick.  The access that DMI and Integra
3   Link! had to the Reynolds system was automated access;
4   correct?
5              MS. GULLEY:  Objection; form.
6      Q.  (By Mr. Nemelka)  That was protected?
7              MS. GULLEY:  Objection; form.
8      A.  Again, the -- the user ID, you know, gave the
9   ability to -- for, you know, a person to log on to the
10  system.  Exactly, you know, what they did with that, I
11  can't tell from this.
12     Q.  (By Mr. Nemelka)  You weren't -- you're not
13  aware that -- that -- that protected user IDs for CDK
14  were for data access in an automated way?
15             MS. GULLEY:  Objection; form.
16     A.  I'm not aware of that.
17     Q.  (By Mr. Nemelka)  Okay.  You can set that
18  aside.
19             (Exhibit 641 was marked for
20              identification.)
21     Q.  (By Mr. Nemelka)  I've handed you Plaintiff's
22  Exhibit 641, which is an email -- the top email is an
23  email from Bob Schaefer to Howard Gardner at CDK
24  forwarding an email from you, Mr. Brockman, to Robert
25  Schaefer on November 25th, 2013.  Do you see your email

1    to Mr. Schaefer where you write on November 25th, 2013?

2              MS. GULLEY:  Objection; form.

3        A.   Sorry.  If you will give me a moment to --

4        Q.   (By Mr. Nemelka)  Let me -- I'll let you review

5    the document.  I just want -- I just want to point out

6    your email to Mr. Schaefer, if I could.

7        A.   Please, let me read the document.

8        Q.   Okay.

9        A.   Again, I --

10       Q.   Have you finished reading them?

11       A.   Yes.

12       Q.   Okay, thank you.

13       A.   Please repeat the question.

14       Q.   Yes.  So you sent an email -- it's the second

15   from the top -- you sent an email dated November 25,

16   2013 to Robert Schaefer where you write, "Bob, you have

17   authority to pursue discussions with ADP on these

18   subjects as per our conversation."  Do you see that?

19       A.   Yes.

20       Q.   So this is you giving Mr. Schaefer -- who is a

21   Reynolds executive; correct?

22              MS. GULLEY:  Objection; form.

23       A.   That is correct.

24       Q.   (By Mr. Nemelka)  -- authority to talk to CDK

25   on the topics outlined in the email below.  Right?

Page 65

1          MS. GULLEY:  Objection; form.

2      A.  Yes.  That -- that is correct.

3      Q.  (By Mr. Nemelka)  And in the email that -- it's

4  an email that Howard Gardner sent to Mr. Schaefer.  Now,

5  Howard Gardner is the CDK executive, right?

6      A.  I'm aware of the fact that he works for CDK.

7  Whether or not he's considered an executive, I'm not --

8  I'm not familiar.

9      Q.  And here -- the first bullet point he says,

10  "Bob Brockman would like to work toward an agreement

11  with ADP, and he has granted you the authority to pursue

12  discussions on a general framework with ADP."  Do you

13  see that?

14          MS. GULLEY:  Objection; form.

15      A.  Yes, I do.

16      Q.  (By Mr. Nemelka)  And that's the authority that

17  you have been granting Mr. -- that you granted

18  Mr. Schaefer, right?

19          MS. GULLEY:  Objection; form.

20      A.  Yes.  I gave him authority to discuss with ADP.

21  He does not have -- this does not give him permission to

22  actually do anything.  It's permission to talk about

23  things.

24      Q.  (By Mr. Nemelka)  Right.  And one of the -- if

25  you turn to the next page -- one of the things that --

Page 66

1    permission to talk about is for OEMs -- if you will

2    look, "Reynolds & Reynolds and DMI will formalize and

3    extend our collaborative approach to helping OEMs

4    transition to a 'protected program' to prevent future

5    disruption of data access."  Do you see that?

6                    MS. GULLEY:  Form.

7        A.  Yes.  And I think it's important to point out

8    that what's happening here is -- and that's that ADP's

9    two subsidiaries are the worst of the hackers and

10   bandits --

11       Q.  Right.

12       A.  -- that we face.  And the efforts that we're --

13   we're pursuing here is -- and that's a continued

14   improvement of security by -- by, you know -- you know,

15   planned stand-downs.

16       Q.  The next one, you say -- or here is "Non-OEM

17   Third Parties."  So that would be, not car

18   manufacturers, but the other applications you referred

19   to, like, customer relationship management and so forth,

20   right?

21                    MS. GULLEY:  Form.

22       Q.  (By Mr. Nemelka)  For the non- -- No. 2,

23   "Non-OEM Third Parties"?

24                    MS. GULLEY:  Form.

25       A.  Okay.  We're now down to No. 2?

Page 67

1      Q.  (By Mr. Nemelka)  "Non-OEM Third Parties."  Do

2   you see that?

3           Mr. Brockman, do you see No. 2, "Non-OEM

4   Third Parties"?

5      A.  Yes.  I'm -- I'm trying to reabsorb that

6   paragraph.  That's a very -- that's kind of a long

7   run-on paragraph.

8      Q.  Well -- if I could just -- that's one reason

9   why you're -- you know -- I'd give you the opportunity

10  to read the whole document, but I ask you about specific

11  sections.  It's more efficient if I could point you to

12  the sections, then I give you a chance to read the

13  whole -- whole thing.  Now -- you know, reading the

14  whole thing really does eat up time -- of our limited

15  time here.

16           MS. GULLEY:  I object to the form and

17  to the sidebar --

18           MR. NEMELKA:  That's fine.

19           MS. GULLEY:  -- and to the instruction as

20  improper.

21           MR. NEMELKA:  Okay.

22      Q.  (By Mr. Nemelka)  So No. 2.  "Non-OEM Third

23  Parties."  Non-OEM third parties would be non-car

24  manufacturers.  They're parties, right?

25           MS. GULLEY:  Objection; form.

Page 68

1      A.  Yes.  That would be a proper characterization.

2      Q.  (By Mr. Nemelka)  And it says here, R&I --

3   "R&R" -- Reynolds -- "and DMI will jointly create and

4   launch a 'protected program' that DMI will offer to its

5   existing and prospective non-OEM clients."  Do you see

6   that?

7           MS. GULLEY:  Objection; form.

8      A.  Yes.  I see that.

9      Q.  (By Mr. Nemelka)  So that -- DMI would have

10  protected access to data that Reynolds' dealers have,

11  not just for OEMs, but for non-OEM third parties, too;

12  correct?

13          MS. GULLEY:  Objection; form.

14     A.  This is -- this is what ADP was asking for, and

15  I -- I think that, probably after this first

16  conversation, that they were brought to understand that

17  we were -- that -- that we were only going to allow

18  access for collection of data to go to specific

19  customers, not for Reynolds and DMI to, basically,

20  continue business as usual.

21     Q.  (By Mr. Nemelka)  And then Point 4,

22  "Exclusivity."  Here there's a sentence that says,

23  Reynolds is -- "R&R is open to the R&R 'protected

24  programs' becoming an exclusive offering by DMI."  Do

25  you see that?

Page 69

1               MS. GULLEY:  Objection; form.

2          A.  Again, the -- this is Howard Gardner's wish

3     list.

4          Q.  (By Mr. Nemelka)  You gave Mr. Schaefer

5     authority to pursue these discussions, right, on these

6     topics?

7               MS. GULLEY:  Objection; form.

8          A.  Yeah.  And "discussions" does not mean yes to

9     everything that -- that is being requested by Howard

10    Gardner.  From a background standpoint, you need to

11    understand who Howard Gardner is.

12              Howard Gardner's baby is Digital Motor

13    Works, DMI.  Again, one of the worst hackers and bandits

14    out there.  There's no question what -- you know,

15    there's items in this list of things that he would like

16    to have continue.  But we have no intention of -- of

17    allowing that to continue to happen.

18         Q.  (By Mr. Nemelka)  One of the topics that you

19    gave Mr. Schaefer authority to pursue discussions with

20    ADP on had to do with market message about -- market

21    messaging about data security, right?

22              MS. GULLEY:  Objection; form.

23         A.  I disagree.  I -- I don't -- I don't think

24    that -- that that's the case.

25         Q.  (By Mr. Nemelka)  If you look at the last

HIGHLY CONFIDENTIAL

Page 70

1    section here, "Market Messaging -- Data Security."  Do

2    you see that?

3                    MS. GULLEY:  Objection; form.

4        A.  Again, this is -- this is Howard Gardner's wish

5    list.

6        Q.  (By Mr. Nemelka)  I'm simply reading your

7    email, Mr. Brockman.  You just wrote to Mr. Schaefer,

8    "You have authority to pursue discussions with ADP on

9    these subjects."

10                   MS. GULLEY:  Objection.

11       Q.  (By Mr. Nemelka)  You wrote that to

12   Mr. Schaefer, right?  You saw that?

13                   MS. GULLEY:  Objection to the question and

14   the instruction.

15       A.  The instructions that I gave to Mr. Schaefer is

16   on a general basis.  He could -- he could discuss these

17   general areas.  It did not have anything to do with what

18   we were going to agree to.

19       Q.  (By Mr. Nemelka)  And one of those topics was

20   market messaging on data security; correct?

21                   MS. GULLEY:  Objection; form.

22       A.  That -- that was one of the items on Howard

23   Gardner's wish list.

24       Q.  (By Mr. Nemelka)  And you authorized

25   Mr. Schaefer to talk to CDK about that, right?

HIGHLY CONFIDENTIAL

Page 71

1              MS. GULLEY:  Objection; form.

2       A.  What I authorized Mr. Schaefer to do was --

3    that he could discuss in general terms, generally, this

4    list.  Not every specific item.

5       Q.  (By Mr. Nemelka)  Now, as you're having -- as

6    Reynolds is having these -- you can set that aside.  As

7    Reynolds is having these discussions with CDK, you were

8    holding off on security enhancements that would -- that

9    you wanted to release, right?

10             MS. GULLEY:  Objection; form.

11      A.  There were a series of security enhancements

12   which were much improved in their capabilities, and we

13   wanted to deploy these -- these security enhancements.

14   But we did not want to do it that it would cause, kind

15   of, Armageddon kind of situation, where all of a sudden

16   ADP's customers would not get what their contracts

17   called for.

18      Q.  (By Mr. Nemelka)  You said that these security

19   enhancements were much improved in their capabilities.

20   Is that in their capabilities in blocking this access by

21   independent integrators?

22             MS. GULLEY:  Objection; form.

23      A.  Again, I -- I, first of all, take issue with,

24   you know, the characterization of independent

25   integrators.  You know, if you mean hackers and bandits,

HIGHLY CONFIDENTIAL

Page 72

1    yes, that's what they're intended to do.

2         Q.  (By Mr. Nemelka)  Mr. Brockman, you used

3    Authenticom for your own products, didn't you?

4              MS. GULLEY:  Objection; form.

5              (By Mr. Nemelka)  We already established

6    that, right?

7              MS. GULLEY:  Form.

8         A.  Yes.  But on a temporary basis and very, very

9    minor.

10        Q.  (By Mr. Nemelka)  So you used a hacker and a

11   bandit for your own products?

12             MS. GULLEY:  Objection; form.

13        A.  I used Authenticom to do a specific process,

14   with the knowledge of the dealer and with our knowledge.

15        Q.  (By Mr. Nemelka)  All right.  So these security

16   enhancements that were much improved, much improved in

17   what?

18             MS. GULLEY:  Objection; form.

19        A.  In their ability to detect unauthorized use --

20   use of our software.

21        Q.  (By Mr. Nemelka)  Unauthorized use of the --

22   meaning by integrators to access dealer data?

23             MS. GULLEY:  Objection; form.

24        A.  What we're talking about is -- and that's we're

25   talking about, you know, very, very high-level, you

HIGHLY CONFIDENTIAL

Page 73

1  know, software enhancements to detect, you know, people

2  coming into the -- the system that -- who we know

3  nothing about.  They're, you know, completely

4  unauthorized.  That's what we're talking about.

5      Q.  (By Mr. Nemelka)  And you held off on releasing

6  those until you concluded your negotiations with CDK,

7  right?

8          MS. GULLEY:  Objection; form.

9      A.  The exact timing of -- of that, you know, when

10  we released the -- those enhancements -- I might add

11  that it's -- it's clear that the enhancements are not

12  necessarily released all at once.  They're -- they're

13  not a single thing.

14          You know, there -- there's a series of what

15  we call "fixes" or "enhancements," and probably some of

16  them we turned loose earlier than others.  They

17  weren't -- it's not a simultaneous, you know,

18  distribution of software enhancements.

19      Q.  (By Mr. Nemelka)  Reynolds held up on a large

20  release of security enhancements during the negotiations

21  with CDK; correct?

22          MS. GULLEY:  Objection; form.

23      A.  Again, I don't know that it was all the

24  security enhancements that we had prepared.  Certainly,

25  there were a number of them.

HIGHLY CONFIDENTIAL

Page 74

1      Q.  (By Mr. Nemelka)  I'm going to hand you

2   Plaintiff's Exhibit 642.

3               (Exhibit 642 was marked for

4                identification.)

5      Q.  (By Mr. Nemelka)  And, Mr. Brockman, I'll

6   represent to you that your counsel produced this.  And

7   the metadata as produced says this came from your file.

8   And it's dated June 23rd, 2014.  I'll give you a chance

9   to review it.  There's a back page as well.

10     A.  Oh, okay.

11     Q.  Mr. Brockman, these are your notes; correct?

12     A.  Yes.

13     Q.  And you prepared these notes -- sorry.

14     A.  This is a -- what I would refer to as a

15  "talking paper."  It is a -- a series of points that I

16  want to make in a conversation with Steve Anenen.

17     Q.  And one thing that you told him at the very

18  back, if you turn over to the second page, is that "We

19  have held up on a large release of security enhancements

20  for over 2 months to see if there was a deal to be

21  worked out."  Do you see that?

22     A.  Yes.  I -- I see that.  And that was a very

23  important point of -- of a call, that we had a number of

24  security enhancements that would -- would basically

25  block the kind of access that -- that they -- they had

Page 75

1    been using to get into our systems.

2         Q.  And you had been holding that up?

3         A.  Yes.

4              MS. GULLEY:  Objection; form.

5         Q.  (By Mr. Nemelka)  And -- and that would -- the

6    security enhancement would block, not just DMI and

7    Integra Link!, but other integrators; correct?

8              MS. GULLEY:  Objection; form.

9         A.  That's an interesting issue.  When we see

10   things happening where people are breaking into our

11   system, we have no idea who they are in most cases.

12   There's no -- they don't have a signature on everything

13   that says who they are when they come in.  We just know

14   that, you know, they're hacking their way in, and we're

15   going to block it.  In some cases, that would cover

16   things that the ADP subsidiaries were doing.  And in

17   some cases, it might uncover people that we had no idea

18   were -- were hacking into our systems.

19        Q.  (By Mr. Nemelka)  You understand for DMI and

20   Integra Link! and Authenticom, it was the Reynolds

21   dealers that were providing them that access; correct?

22             MS. GULLEY:  Objection; form.

23        A.  From -- when you say "providing that access,"

24   you know, what -- what the Reynolds dealer would do is

25   -- and that's that they would give them a user ID to get

1    in, which is completely contrary to the terms of their

2    contracts.  Our contracts with our dealers specifically

3    say, you know, no authorized -- or, no use or access to

4    our software other than employees, you know, is -- is

5    permitted.  Unfortunately, dealers are, you know,

6    somewhat cavalier about following that particular term

7    of their contract.

8         Q.  (By Mr. Nemelka)  And -- and they granted that

9    access so that they could -- they granted that --

10   that -- those user IDs to be used to access the dealer

11   data; correct?

12             MS. GULLEY:  Objection; form.

13        A.  That's effectively what -- what would happen.

14   You know, the dealer has, you know, very powerful

15   reporting tools where they could do that themselves.

16   But this is for remote unattended access.

17        Q.  (By Mr. Nemelka)  All right.  Let's go to the

18   first page.  You have -- let's go to where you say, "The

19   second point is very much a personal one."  Do you see

20   that, about midway through the -- down -- down through

21   the page?  Midway, halfway, it says, "The second point

22   is very much a personal one."  Do you see that?

23        A.  Yes.

24        Q.  Okay.  Right under there, you say, "ADP has

25   been extracting data out of Reynolds systems for over a

Page 77

1    decade."  Do you see that?

2        A.  Yes.  I do.

3        Q.  And you knew that ADP was in the business of

4    providing that data to a host of other third parties,

5    right?

6                MS. GULLEY:  Objection; form.

7        A.  That -- that's my assumption.  I -- I don't

8    have direct knowledge of that.

9        Q.  (By Mr. Nemelka)  And then you say, "ADP has

10   wrongly taken advantage of Reynolds in the marketplace

11   over the issue of data security -- that has cost us in

12   the millions."  Do you see that?

13       A.  Yes, I do.

14       Q.  How was CDK taking advantage of Reynolds in the

15   marketplace on the issue of data security?

16                MS. GULLEY:  Objection; form.

17       A.  ADP's posture in the marketplace was that our

18   approach and our -- our -- you know, our belief that

19   data security is necessary because of the fact that we

20   have nonpublic personal information that -- that exists

21   inside of the Reynolds system, that that manner of

22   access, we think, is the right way to do things.  We

23   think that's what's required by law.

24                ADP, from a sales standpoint, their

25   salespeople, would say that we're taking the wrong

1    position on the data security standpoint.  And we

2    believed that that was harmful to us in the marketplace.

3         Q.  (By Mr. Nemelka)  And it cost you in the

4    millions because you lost DMS customers as a result?

5              MS. GULLEY:  Objection; form.

6         A.  That -- that is correct.  And to -- to lose a

7    customer over data security when we're doing things the

8    right way, the way that's required by law, you know, for

9    them to decide to switch their business to ADP, that's

10   obviously hurt.

11        Q.  (By Mr. Nemelka)  You know that other DMSs,

12   besides Reynolds and CDK, do not take the same view that

13   you do; correct?

14             MS. GULLEY:  Objection; form.

15             UNIDENTIFIED SPEAKER:  Objection; form.

16        A.  I believe that they take views that are -- that

17   are different than ours.

18        Q.  (By Mr. Nemelka)  Are you saying that they are

19   in violation of the law?

20        A.  I believe that the -- what's required by

21   Gramm-Leach-Bliley Act and also the Safeguards Rules --

22   I believe that they're not following those, you know,

23   laws correctly.

24        Q.  So you say it cost you -- the CDK wrongly

25   taking advantage of Reynolds in the marketplace over the

HIGHLY CONFIDENTIAL

Page 79

1    issue of data security cost you millions because you

2    lost DMS customers.  Any other way that it cost Reynolds

3    millions, besides losing DMS customers?

4                    MS. GULLEY:  Objection; form.

5         A.   I would say that the -- that it wouldn't

6    necessarily be just the loss of customers, it would also

7    have to do with our ability to acquire new customers.

8    And it is -- you have to understand, we've been -- I

9    personally have been, you know, bitter competitors, you

10   know, with ADP for a very, very, very long time, in

11   excess of 40 years.  And this was one of the things that

12   irritated me specifically.

13                    The software that I helped create, the

14   Power system in Houston, is extremely, you know, strong

15   in its data security.  And from the time that I, you

16   know, came aboard at Reynolds and Reynolds, we've been

17   working to improve our data security.  And it is vastly

18   improved from when I first -- you know, first arrived 12

19   years ago.

20                    It's still not perfect, because people

21   think that -- you know, more, you know, inventive ways

22   of doing it.  And it's very much a cat-and-mouse

23   situation in that the hackers figure out a new way and

24   then we figure out a way to block it.  And then they

25   figure out another new way and we figure out a way to

Page 80

1   block it.

2       Q.  (By Mr. Nemelka)  Now, you say at the -- here,

3   "Therefore, I want" -- "I want a no-charge access to ADP

4   systems for the next 20 years."  So you wanted free

5   access for the Reynolds applications for the next 20

6   years, but not to extract data for other third parties,

7   like DMI and Integra Link!, right?  You made that clear.

8   And that was a difference?

9              MS. GULLEY:  Objection; form.

10             UNIDENTIFIED SPEAKER:  Objection; form.

11      A.  There -- I think this particular passage

12  indicates the level of differences between -- when I say

13  "differences" -- you know, points of contention between

14  us and ADP.  And it is specific in that -- we have

15  applications, for instance, like reminder cards for

16  service, that an ADP dealership, they would like to buy

17  that product from us, and we would have specific

18  certified access into the ADP system to get just the

19  data that it takes to do reminder cards.

20      Q.  (By Mr. Nemelka)  So you wanted 20 free years

21  of that type of access to this CDK dealer data; correct?

22             MS. GULLEY:  Objection; form.

23      A.  Well, it says "no-charge access."  That means

24  no charge by ADP.  That we would basically -- as long as

25  we used it strictly for a product that we offered, like

Page 81

1    service reminders, that we would have free access for 20

2    years.

3        Q.  (By Mr. Nemelka)  And what did you mean when

4    you told him here that "not to be used to extract data

5    for other 3rd parties"?

6              MS. GULLEY:  Objection; form.

7        A.  We are not -- never have been -- and have no

8    intention of being in the process of extracting data

9    from other dealership systems for the purposes of

10   reselling.  We don't do that.

11       Q.  (By Mr. Nemelka)  Like DMI and Integra

12   Link! did?

13       A.  We don't do that.

14       Q.  You were considering entering into a joint

15   venture with CDK on that, though, as we saw earlier.

16   Correct?

17             MS. GULLEY:  Objection; form.

18       A.  No.  That's not true.  That -- that's not true.

19   Our -- our whole discussion with ADP was about an

20   orderly stand-down transition, to avoid creating

21   hardships for what is our mutual customers.

22       Q.  (By Mr. Nemelka)  And here -- did you tell

23   Mr. Anenen that you had no intention of ever entering

24   into the business like DMI and Integra Link!?

25             MS. GULLEY:  Objection; form.

Page 82

1      A.  I don't think I made a -- a general statement

2    of that.  I think it's pretty clear, it says, "like

3    service reminders -- not to be used to extract data for

4    other 3rd parties."  So that comment was directly in

5    relationship to the access that we would be granted by

6    ADP.

7      Q.  (By Mr. Nemelka)  I've handed you Plaintiff's

8    Exhibit 643.

9              (Exhibit 643 was marked for

10                identification.)

11     Q.  (By Mr. Nemelka)  The top email is an email

12   from Steve Anenen to you, dated July 2nd, 2015.  I'll

13   give you a chance to read it.  But again, Steve Anenen

14   is CDK's CEO, right?

15     A.  That's correct.

16     Q.  And this is an email to you, July 2nd, 2014.

17   I'll give you a chance to -- to review it.

18             MS. GULLEY:  It starts on the back.

19     Q.  (By Mr. Nemelka)  Right.  It starts off with an

20   email from you on June 30th, to Mr. Anenen; correct?

21   Mr. Brockman?

22     A.  Just -- just a moment.  Let me -- let me read

23   it.  Yes, I've read it.  Can you repeat your question?

24     Q.  All right.  So this starts off with an email

25   from you to Mr. Anenen, dated June 30, 2014, right?

Page 83

1        A.   That's correct.

2        Q.   And this follows up a conversation that you had

3    with him; correct?

4             MS. GULLEY:   Form.

5        A.   Yes.   That is correct.

6        Q.   (By Mr. Nemelka)   And those were the -- the

7    talking points for that conversation is the document

8    that we just -- just looked at; correct?

9             MS. GULLEY:   Objection; form.

10       A.   Yes.   That -- that's correct.   And as you can

11   tell by the tone of this email, I'm getting a little

12   impatient.

13       Q.   Right.

14       A.   More than a little impatient.

15       Q.   Right.   You write here at the end, "My data

16   security projects have been delayed another week."

17   Right?

18       A.   Yes.   That's what it says.

19       Q.   You're still delaying the -- the data security

20   projects since June 30th, 2014, right?

21             MS. GULLEY:   Objection; form.

22       A.   That's the date of this email.   What's

23   happening is -- and that's that Steve Anenen is

24   employing delay tactics.   And I'm impatient to get this

25   situation of, you know, data hacking, bandits, going on

Page 84

1    as far as our system is concerned.  It's time for it to

2    be over.

3        Q.  (By Mr. Nemelka)  And you write to him, also --

4    still your email, Mr. Brockman.  "However given that ADP

5    has accessed our systems for a couple of decades, my

6    request is for more than just data access than for

7    maintenance reminders -- both in content and duration."

8              So you -- here, you're saying, because CDK

9    accessed your systems for a long time, your request here

10   for free access is more than just for maintenance

11   reminders, right?

12             MS. GULLEY:  Objection; form.

13       A.  It is for other software products that -- that

14   we might offer to the marketplace.  But still under the

15   certified interface process --

16       Q.  (By Mr. Nemelka)  Right.

17       A.  -- where it's clearly spelled out by contract,

18   you know, what data that we -- we get and nothing else.

19       Q.  And then I want to ask you about what

20   Mr. Anenen says to that statement in particular, if you

21   go to his email.

22             MS. GULLEY:  I don't -- I don't think he

23   read this first page.

24             MR. NEMELKA:  I'm not going to ask about

25   anything but this one email -- but this one paragraph.

Page 85

1       Q.  (By Mr. Nemelka)  He says --

2                MS. GULLEY:  I object to that.

3                MR. NEMELKA:  Okay.  I just want to point

4       you to this one -- one paragraph that Mr. Anenen writes

5       in response to that statement.

6                MS. GULLEY:  I object to that.

7                THE WITNESS:  I would like to read the

8       email, please.

9                MR. NEMELKA:  Okay.

10               MR. RYAN:  So my -- my complaint is that

11      the procedure is that if the witness wants to read the

12      document, the witness can, right?  That's certainly been

13      the case in depositions of the witnesses that you

14      represented.  I just want to know what the ground rules

15      are.

16               MR. NEMELKA:  If it's going to be

17      obstructionist, then we'll do it document by document.

18      I will let him read this email.

19               MS. GULLEY:  I object to that comment as

20      well.

21               MR. NEMELKA:  While he's reading, I'll just

22      state for the record, we've been given limited time,

23      here.  I think it's fair to direct him to particular

24      points in a -- in a document.  I'm giving him a chance

25      to read them.  If they are longer documents, I think

Page 86

1    it's fair for us to direct him, for efficiency purposes.

2    If you want to take your time and ask him about other

3    parts of the document, you're free to.

4              MS. GULLEY:  Mr. Nemelka, you have called

5    opposing counsel inappropriate for making statements on

6    the record like the one that you just made.  I

7    completely object to your statement.

8              I also ask -- direct you to look into the

9    depositions that you have defended and that your

10   partner, Mr. Ho, has defended, in which he hasn't even

11   allowed counsel to use the time that they have on the

12   record.  Everyone has the same amount of time, and

13   this -- this -- the desire to read documents is one that

14   you instructed your clients, repeatedly, on the record.

15             And if Mr. Brockman suggests that he would

16   like to read the document -- you're asking him to opine

17   on statements by Mr. Anenen -- he should at least be

18   allowed to read those statements, given that they were

19   more than four years ago.

20             MR. NEMELKA:  You've gone beyond what's

21   appropriate, Andi, but I'll get back to questioning.

22        Q.  (By Mr. Nemelka)  All right, Mr. Brockman, I'd

23   like to ask you about --

24             THE WITNESS:  Excuse me.  I didn't finish

25   reading.  The amount of conversation that's been going

Page 87

1    on across the table, I haven't had a chance to read.

2              MR. NEMELKA:  Okay.

3              MS. WEDGWORTH:  Can we go off the record a

4    minute?  Mr. Wallner has informed us the phone is not --

5    has been disconnected.  Can we go off the record?

6              THE VIDEOGRAPHER:  The time is 11:37 a.m.

7    We are off the record.

8              (Short recess 11:37 to 11:50 a.m.)

9              THE VIDEOGRAPHER:  This is the beginning of

10   Media 2.  The time is 11:50 a.m.  We are back on the

11   record.

12                  EXAMINATION (Continuing)

13   BY MR. NEMELKA:

14        Q.  Mr. Brockman, I'd like to point you to the

15   email that you received from Mr. Anenen on July 2nd,

16   2014.  Do you have that in front of you?

17        A.  I do.

18        Q.  And he wrote to you -- in the paragraph after

19   his bullet points, he said, "I should point out that we

20   have not been 'accessing R&R systems for decades' as you

21   said.  Our businesses that access R&R systems came to us

22   through an acquisition."  Do you see that?

23              MS. GULLEY:  Form.

24        A.  Yes, I do.

25        Q.  (By Mr. Nemelka)  And then he says, "In any

Page 88

1   case, controlling data access has become a priority for

2   R&R only within the last several years.  I would be

3   remiss not pointing out that R&R is accessing the ADP

4   system through a contract with Authenticom, and has been

5   doing so for quite some time without an agreement from

6   ADP."

7                   Is Mr. Anenen correct in that, that -- that

8   Reynolds was accessing the ADP system through a contract

9   with Authenticom?

10                  MS. GULLEY:  Objection; form.

11       A.  Well, there are some things that I -- I

12  disagree with in -- in this paragraph, starting with the

13  first sentence.  I believe that when you acquire a

14  company and you make it part of your organization, that,

15  you know, the history of that company kind of goes with

16  it and becomes part of your history.  And for him to,

17  you know, basically say that because DMI and Integra

18  Link! are organizations they acquired, you know, that

19  doesn't count.  I believe it does count.

20       Q.  (By Mr. Nemelka)  That wasn't my question,

21  Mr. Brockman.  My question was:  Is he correct in

22  pointing out that R&R is accessing that CDK system

23  through a contract with Authenticom?

24                  MS. GULLEY:  Objection; form.

25       A.  Yes.  I'm -- I concur with that -- comma --

Page 89

1   however, there is an issue of degree here.  What's been

2   going on -- what ADP has been doing as far as, you know,

3   hacking our systems has been on -- on a giant scale,

4   whereas the -- the agreement with Authenticom for

5   information from CDK's systems, specifically around

6   reminder cards, is -- is min- -- minuscule.  And what

7   he's doing is -- and that's, you know, this -- this is a

8   negotiation -- a pretty heated negotiation, frankly --

9   or at least kind of heated on my part -- and that he's

10  endeavoring to dodge around.

11      Q.  (By Mr. Nemelka)  You wouldn't have used

12  Authenticom if they were insecure, would you have?

13          MS. GULLEY:  Objection; form.

14      A.  For reminder cards, you know, there's no

15  nonpublic personal information.  There's no accounting

16  information.  It -- again, it is -- it's not an

17  application that's sensitive.

18      Q.  (By Mr. Nemelka)  Reynolds used Authenticom for

19  more than just those reminders, right?

20          MS. GULLEY:  Objection; form.

21      A.  I think that they started to do some work for

22  the -- the ad agency.

23      Q.  (By Mr. Nemelka)  Right.  Naked Line Marketing,

24  right?

25          MS. GULLEY:  Objection; form.

Page 90

1      A.  Yes.  That's the name of our ad agency.

2      Q.  And Naked Line does have information -- does

3  get information on customers; correct?

4           MS. GULLEY:  Objection; form.

5      A.  Again, the usage of -- that usage is -- has

6  been extremely minor.

7      Q.  (By Mr. Nemelka)  Again, you would not have

8  used Authenticom if they were insecure, right?

9           MS. GULLEY:  Objection; form.

10     A.  As far as I know, there's been -- there was no

11 inquiry made with regards to their internal security

12 procedures.

13     Q.  (By Mr. Nemelka)  You're not aware of any data

14 breaches that they've had, right?

15          MS. GULLEY:  Objection; form.

16     A.  Not that I'm aware of.

17     Q.  (By Mr. Nemelka)  They provided a reliable

18 service; correct?

19          MS. GULLEY:  Objection; form.

20     A.  And I'm not involved in -- in that part of our

21 business.  It's -- I'm not in -- in a position to say

22 whether it's reliable or not.

23     Q.  (By Mr. Nemelka)  It's cost-effective for

24 Reynolds to use Authenticom, right?

25          MS. GULLEY:  Objection; form.

Page 91

1      A.  Again, I'm -- I'm not sufficiently involved in

2  that part of the business to be able to comment on that.

3      Q.  (By Mr. Nemelka)  And then he writes at the end

4  of that paragraph, "We need to clean this up as well."

5  And you understood that to mean that Reynolds needed to

6  stop using Authenticom, right?

7          MS. GULLEY:  Objection; form.

8      A.  Frankly, I don't recall that I've ever focused

9  on that -- on that sentence.  It's a little short one,

10  kind of down at the end of the whole thing.  And so --

11      Q.  (By Mr. Nemelka)  What do you understand him to

12  mean by saying, "We need to clean this up as well"?

13          MS. GULLEY:  Objection; form.  Please let

14  him finish his answers.

15      A.  It is -- it is not clear to me what that means

16  and, frankly, when I received this, I didn't pay much

17  attention to that, you know, little short sentence in

18  the next-to-the-last paragraph.

19      Q.  (By Mr. Nemelka)  Reynolds ultimately did agree

20  to stop using Authenticom as part of its agreements with

21  CDK, right?

22          MS. GULLEY:  Objection; form.

23      A.  I -- I know that -- that we stopped using

24  Authenticom.  Whether it was part of the -- of the

25  stand-down agreement, I'm not sure.

Page 92

1                (By Mr. Nemelka)  I've handed you an

2     exhibit marked Plaintiff's Exhibit 644.

3                (Exhibit 644 was marked for

4                 identification.)

5       Q.  (By Mr. Nemelka)  And I will represent to you

6     that this was produced to us by your counsel from your

7     custodial files, with a date of July 14th, 2014.  And

8     the file name was "Aspen Meeting 2014 State of the

9     Union."  And I'm only going to ask you about two

10    sections.

11               So it's a multipage state of the union

12    notes.  So do you -- do you recognize these as your --

13    your notes for a state of the union meeting?

14               MS. GULLEY:  Form.

15      A.  The context of this is -- and that's we have an

16    annual meeting of sales -- you know -- vice-presidents,

17    and we discuss a number of issues of general interest.

18      Q.  (By Mr. Nemelka)  Okay.  If I could just point

19    you to the section on "Security," on the next page.

20               MS. GULLEY:  Objection.

21      A.  Well, I think that this -- this is a big

22    document.  I think I would prefer to, you know, spend a

23    little more time on it than that.  I -- I hesitate to,

24    essentially, take things out of context.

25      Q.  (By Mr. Nemelka)  All right.  I don't intend on

HIGHLY CONFIDENTIAL

Page 93

1    taking anything out of context.  I'm just going to ask

2    you about the sections on security.  But -- you know, it

3    is a long document.  And I don't intend on asking you

4    about most of it.

5               I guess, can I just ask you, first of

6    all -- maybe I'll just do it this way.  Do you recognize

7    these as your -- your speaking notes for that -- for

8    that address?

9               MS. GULLEY:  Form.

10   A.  These were, you know, talking points.  They

11   covered a number of issues of interest, a lot of which

12   are related.

13   Q.  (By Mr. Nemelka)  I'll -- maybe if I could just

14   ask you the questions on security, and if you feel like

15   you need to review the rest of it to answer them,

16   then -- then I'll give you the chance.  But if I could

17   just try to -- you know, make this more efficient by

18   pointing you to the security section?

19               MS. GULLEY:  Objection; form.

20   A.  I think to make -- to make an intelligent

21   decision as of what to do, I need to read it first.

22               MR. NEMELKA:  All right.  Well, while you

23   do that, let's go off the record.

24               MS. GULLEY:  Objection.  We are staying on

25   the record.  That's just the procedure that's been

Page 94

1    followed by Kellogg, so I'm just trying to make it, you

2    know, sort of goose/gander.

3                     MR. NEMELKA:  All right.  We have a jury

4    that's going to be watching this.  And I would just like

5    to state for the record, I've asked him to -- only asked

6    him for a few questions to make this efficient.  But he

7    wants to review the whole -- whole documents.  He's

8    recognized that -- he's acknowledged that these are

9    speaking notes for -- for that meeting.  And with that

10   statement, Mr. Brockman, you can review the document.

11                    MS. GULLEY:  I object.

12                    MR. RYAN:  I object as well.

13                    THE WITNESS:  I'd like to speak to my

14   attorney about this document.

15                    MR. NEMELKA:  Okay.

16                    MS. GULLEY:  Does it relate to a matter of

17   privilege -- potential privilege?

18                    THE WITNESS:  This is very, very sensitive

19   information.  You know --

20                    MS. GULLEY:  Is there a question pending

21   right now?  So we can go off the record?  There is not.

22   There is not a question pending.

23                    MR. RYAN:  There is no question.

24                    MS. GULLEY:  Okay.  Thanks.  Let's go off

25   the record.

HIGHLY CONFIDENTIAL

Page 95

1                    THE VIDEOGRAPHER:  The time is 12:01 p.m.

2      We're off the record.

3                    (Short recess 12:01 to 12:02 p.m.)

4                    THE VIDEOGRAPHER:  Back on the record at

5      12:02 p.m.

6                    MS. GULLEY:  Thank you for that short

7      break.  Mr. Brockman had a question about the protective

8      order.  And in light of the sensitive nature of this

9      document, we ask that I remind everyone that this has

10     been marked "Attorneys' Eyes Only," that this entire

11     deposition is "Attorneys' Eyes Only."  In particular, to

12     remind Mr. Ryan that executives within his company and

13     all the parties are not to know about or be told about

14     any of this document or the subject of this testimony.

15     Thank you.

16                    EXAMINATION (Continuing)

17     BY MR. NEMELKA:

18          Q.  Can I ask you some questions now, Mr. Brockman?

19          A.  I'm almost done reading it.

20          Q.  Okay.

21          A.  Yes.

22          Q.  If you can go to the section on "Security,"

23     which is on the -- after the first page, on the back of

24     the first page.  Do you see that bottom-of-the-page

25     section on Security?

HIGHLY CONFIDENTIAL

Page 96

1      A.  Yes.

2      Q.  I want to ask you about a few bullet points

3   that start with "ADP" -- and CDK -- "has approached us

4   about doing the same -- we are in the early stages of

5   negotiating a similar agreement."  Do you see that?

6      A.  Yes.  I see that.

7      Q.  So is it CDK that approached Reynolds about

8   entering into an agreement with respect to its -- its

9   data access on Reynolds system?

10              MS. GULLEY:  Form.

11      A.  It's hard for me to -- to recall exactly how

12   that, you know, came about, because I was not the first

13   person to actually talk, you know, to CDK.  And whether

14   or not one of their people talked to one of our people,

15   or one of our people talked to one of their people, I --

16   I don't know the answer to that.

17      Q.  (By Mr. Nemelka)  At least -- these notes,

18   though, you -- you seem to indicate that ADP has

19   approached "us," meaning CDK approached Reynolds, right?

20              MS. GULLEY:  Form.

21      A.  Yes.  The -- that's what it says, but -- you

22   know, as far as my, you know, hard knowledge, you know,

23   behind that -- that statement, I don't have hard

24   knowledge as to what actually -- and frankly, I don't

25   think that's important.

Page 97

1        Q.  (By Mr. Nemelka)  And then you write here,

2    fourth bullet point, "This could put the security wars

3    very much behind us."  Do you see that?

4                    MS. GULLEY:  Form.

5        A.  Certainly, those two entities that belong to

6    ADP are by far the worst and, matter of fact,

7    probably -- in total, probably the amount of data

8    hacking that goes on, they equal everybody else combined

9    and more.

10       Q.  (By Mr. Nemelka)  That wasn't my question.  The

11   question here is:  Do you see that you wrote that "This

12   could put the security wars very much behind us"?  Do

13   you see that?

14                   MS. GULLEY:  Objection; form.

15       A.  Yeah.  What I'm talking about there is -- and

16   that's that, you know, the volume of hacking would be

17   substantially reduced.

18       Q.  (By Mr. Nemelka)  So you -- earlier this

19   morning, you said that you never used the phrase

20   "security wars."  Does this refresh your recollection

21   that you actually do -- did?

22                   MS. GULLEY:  Objection; form.

23       A.  Well, it -- it looks like that -- that I

24   actually have used it once.  I will admit, it's in lower

25   case.  And when I write documents like this, it's just

1    very much kind of stream of consciousness, because I'm

2    trying to give the best picture to the people that are

3    listening to it.  Because they're my top people, and

4    also the most expensive people.

5         Q.  (By Mr. Nemelka)  And you felt that you had

6    been in a security war with CDK, right?

7              MS. GULLEY:  Objection; form.

8         A.  I definitely had been in -- I had long-term

9    issues with CDK over -- over, you know, just ban- --

10   plain old banditry as far as our system is concerned.

11        Q.  (By Mr. Nemelka)  This wasn't just about the

12   access of your system, though, this was also about CDK's

13   own policies, right?

14             MS. GULLEY:  Objection; form.

15        A.  It also included, you know, the fact that they

16   had outright lied to manufacturers about what data they

17   were extracting from our systems.  And particularly,

18   General Motors.  We discovered that they were fulfilling

19   a request by General Motors for data, and they were

20   talking to dealers saying, "This needs to be done

21   because it's General Motors."  Well, the fact of the

22   matter is, they were collecting way more than what

23   General Motors ever asked for.

24             MS. GULLEY:  Wait.  Let him finish.

25        A.  And so that is kind of -- the whole general

HIGHLY CONFIDENTIAL

Page 99

1    area is what I'm referring to.

2        Q.  (By Mr. Nemelka)  That's not what I asked.

3    What I'm saying is, this was not just about CDK's access

4    on the Reynolds system.  It was also about CDK's own

5    policies with respect to access on the CDK system,

6    right?

7               MS. GULLEY:  Objection to the form.

8        A.  No.  It was -- it was -- it refers to

9    situations where they were accessing dealership systems

10   on behalf of OEMs.

11       Q.  (By Mr. Nemelka)  The next bullet point, you

12   write, "Since we have no idea of how ADP is going to

13   charge 3rd parties for their version of RCI -- we will

14   likely continue to have the issue of customers

15   complaining that their costs from 3rd party vendors are

16   more expensive with a DMS from Reynolds than ADP."

17               I wanted to ask you:  How did you know that

18   CDK would have a version of RCI, like you did?

19               MS. GULLEY:  Objection; form.

20       A.  I think at that point in time, it -- it

21   looked -- it had become apparent -- it wasn't done, but

22   it had become apparent that there was going to be a --

23   an orderly stand-down agreement with ADP.  That's --

24   that's what I'm saying here.

25       Q.  (By Mr. Nemelka)  All right.  I'm not talking

HIGHLY CONFIDENTIAL

Page 100

1    about the wind-down agreement.  What you write is,

2    "Since we have no idea of how ADP is going to charge 3rd

3    parties for their version of RCI."

4              And my question is:  How did you know that

5    CDK was going to have their version of an RCI?

6              MS. GULLEY:  Objection; form.

7        A.  I think at that point, we were also

8    understanding that we were going to be able to have RCI

9    access into ADP dealership customers, not for the

10   purposes of being a redistributor, but for the purposes

11   of using it within one of our product offerings.  And

12   there was going to be a charge associated with that.

13       Q.  (By Mr. Nemelka)  Reynolds was going to be

14   getting five free years of access, no -- no charge to --

15   to Reynolds, right?

16             MS. GULLEY:  Objection; form.

17             MR. RYAN:  Objection; form.

18       A.  That -- that was -- that was what ended up

19   being -- being part of the agreement.  However, we had

20   no, you know, specific idea that our usage would be

21   limited to 600 dealerships.  It -- it would be -- it

22   would be other products.  You know, their -- this

23   marketplace is -- is constantly, you know, building more

24   products.

25             And actually, in, you know, looking back,

HIGHLY CONFIDENTIAL

Page 101

1   it's fortunate that we were able to achieve this kind of

2   access as part of the agreement, because we bought an

3   organization called Reverse Risk, which is a business

4   intelligence system that has over 1,000 dealerships that

5   are CDK dealerships, that through an RCI type agreement,

6   you know, with CDK, you know, we -- you know -- we

7   downloaded accounting information for the purposes of

8   making comparisons.

9       Q.  (By Mr. Nemelka)  That wasn't my question,

10  Mr. Brockman.

11          I'm asking you why, after you say it's

12  going to be an end to the security wars, you list that

13  ADP is going to have their own version of RCI?  What is

14  the connection?

15          MS. GULLEY:  Objection; form.

16      A.  Again, I -- their -- their own version of RCI

17  is -- is part of what the stand-down agreement is all

18  about.

19      Q.  (By Mr. Nemelka)  You don't talk about -- in

20  that bullet point, you don't talk about the stand-down

21  agreement.  You talk about third parties for their

22  version of RCI, right?

23          MS. GULLEY:  Objection; form.

24      A.  Well, again, I'm trying to tell you what I was

25  thinking about when I wrote this thing and what I was

HIGHLY CONFIDENTIAL

Page 102

1    trying to communicate.

2        Q.  (By Mr. Nemelka)  And I'm just saying I'm just

3    reading your words, "charge 3rd parties" -- not "charge

4    Reynolds" -- "charge 3rd parties for their version of

5    RCI."

6                MS. GULLEY:  Objection; form.

7        Q.  (By Mr. Nemelka)  And so my question is --

8                MS. GULLEY:  Let him finish his question.

9                THE WITNESS:  Yeah.

10       Q.  (By Mr. Nemelka)  Go ahead and answer.

11               MS. GULLEY:  Answer what?

12       Q.  (By Mr. Nemelka)  Mr. Brockman wants to talk.

13               MS. GULLEY:  Just wait for a question.

14               MR. RYAN:  Wait for a question.

15       Q.  (By Mr. Nemelka)  My question is -- is:  You're

16   not talking about what -- what CDK is going to charge

17   Reynolds.  You're talking about what CDK is going to

18   charge third parties for their version of RCI; correct?

19               MS. GULLEY:  Objection; form.

20       A.  In -- in that context, I believe that I'm, you

21   know, characterizing Reynolds as a third party.

22       Q.  (By Mr. Nemelka)  You're not talking about all

23   of the other vendors?

24       A.  I -- I don't think that I'm -- I know,

25   specifically, that I'm talking about, at least,

Page 103

1    Reynolds.

2        Q.  Well, you go on, Mr. Brockman, "We will likely

3    continue to have the issue of customers complaining that

4    their costs from 3rd party vendors are more expensive

5    with a DMS from Reynolds than ADP."  Are you referring

6    only to the Reynolds applications?

7                MS. GULLEY:  Objection; form.

8        A.  What I'm referring to is, in this, that, you

9    know, we get beat up in the marketplace over, you know,

10   third parties having to pay for a Reynolds-certified

11   interface, and it looks like -- it looks like the way

12   it's going is -- and that's that CDK is going to do it

13   the same way.

14       Q.  (By Mr. Nemelka)  All right.  Let's go to the

15   first page.  I want to ask you about a bullet point

16   here.

17                MS. GULLEY:  I'm sorry.  So we're on 644.

18   You're talking about something other than the "Security"

19   section?

20                MR. NEMELKA:  Andi, make your objections.

21   I'm on the first --

22                MS. GULLEY:  I'm trying to figure out --

23                MR. NEMELKA:  I'm on the first page.  I'm

24   on the first page.  That's not what you're doing.

25                MS. GULLEY:  Mr. Nemelka, I'm asking:

HIGHLY CONFIDENTIAL

Page 104

1   Are -- we're on the first page of what document?

2            MR. NEMELKA:  The document that's right in

3   front of him, Andi.

4            MS. GULLEY:  Could you identify the exhibit

5   for the record, please.

6            MR. NEMELKA:  This is Exhibit 644.

7            MS. GULLEY:  Thank you.

8        Q.  (By Mr. Nemelka)  Under the section on

9   "Acquisitions" -- since you read the whole document -- I

10  wanted to ask you about a sentence here where you write,

11  "We need to quit talking about DMS systems and focus on

12  RMS and the massive financial advantages of our

13  offering."

14            And my first question is:  "RMS" stands for

15  Retail Management Ser- -- is that Retail Management

16  Services or Retail Management System?

17            MS. GULLEY:  Objection; form.

18       A.  Retail Management System.

19       Q.  (By Mr. Nemelka)  Okay.  And you said you need

20  to -- and this is a speech to your salespeople; is that

21  right?

22            MS. GULLEY:  Objection; form.

23       A.  That's correct.

24       Q.  (By Mr. Nemelka)  And you say they -- they need

25  to quit talking about DMS systems and focus instead on

HIGHLY CONFIDENTIAL

1    RMS.  What did you mean by that?

2               MS. GULLEY:  Form.

3        A.  What I mean by that is -- and that's the DMS

4    systems are the -- the traditional, you know,

5    applications of -- of accounting, payroll, parts, you

6    know, service, finance, vehicle inventory, factory

7    communications.  That is a suite of applications which

8    has been under long development and, frankly, it's

9    gotten to the point where it's so good that there's

10   nothing much more we can do to it.  I know that sounds a

11   little strange but, I mean, that's the truth.  The level

12   of requests we have for software enhancement in those

13   application areas is, you know, been kind of like this

14   (indicating) for a long time.

15              The retail management system takes into

16   consideration all of the other applications that

17   surround the DMS, which is under active development.

18   For instance, our docuPAD application and our imaging

19   systems, our advanced service products have been under,

20   you know, steady improvement.  And we have considerable

21   competitive advantage in those areas.  And so what I'm

22   encouraging them to do is -- and that's to not focus on,

23   you know, the older applications where we -- where

24   everybody is kind of caught up.  To be focused -- to

25   focus, instead, on the retail management system, which

Page 106

1   includes all of the other applications that integrate to

2   the central core applications.

3       Q.  Thank you for that explanation.

4           (Exhibit 645 was marked for

5            identification.)

6       Q.  (By Mr. Nemelka)  I've handed you Plaintiff's

7   Exhibit 645.  And if you recognize -- the top email is

8   an email from Mr. Schaefer to Ron Workman, dated January

9   6, 2015.  But the chain starts with an email from you to

10  Mr. Brockman, also dated January 6, 2015.  So do you

11  recognize this document?

12      A.  I've got to -- I've got to read it.  Okay.

13      Q.  So I need to ask you about your email where you

14  write to Mr. Anenen -- this is now January 2015 -- "We

15  have held off on a series of major security enhancements

16  to our DMS systems at your request."  So are these the

17  same security enhancements that we saw from 2014 that

18  Reynolds had been holding off on?

19          MS. GULLEY:  Objection; form.

20      A.  I'm sorry.  I don't know what specific ones are

21  involved.  I don't -- I'm not a programmer.

22      Q.  (By Mr. Nemelka)  But still -- Reynolds is

23  still holding off on security enhancements, though,

24  right?

25          MS. GULLEY:  Objection; form.

HIGHLY CONFIDENTIAL

Page 107

1      A.  They're -- that's what I was saying to Steve

2  Anenen in this -- in this email.  There's no question --

3  you can tell my -- my frustration is increasing and, you

4  know, this is -- this is an or-else kind of email.

5      Q.  (By Mr. Nemelka)  Right.  And you say, "We must

6  proceed with the release of our security enhancements."

7  You say that at the end, right?

8      A.  That's correct.

9      Q.  And these have been pending for a long time,

10  given the documents we've been looking at, right?

11          MS. GULLEY:  Form.

12      A.  That's correct.  It's been a very frustrating,

13  you know, process.

14      Q.  (By Mr. Nemelka)  And the security enhancements

15  that you are going to release -- strike that.

16          MS. GULLEY:  For the room, the lunch is

17  here.

18          MR. NEMELKA:  I want to ask him about one

19  more document.  It might be more than one.

20          (Exhibit 646 was marked for

21           identification.)

22      Q.  (By Mr. Nemelka)  I've handed you Plaintiff's

23  Exhibit 646, which is an email from Bob Schaefer to you,

24  Mr. Brockman, dated January 11, 2015.  Do you recognize

25  receiving this email from Mr. Schaefer?

HIGHLY CONFIDENTIAL

Page 108

1           MS. GULLEY:  Form.

2      A.  Give me a chance to -- to read it.  I'll be

3  with you shortly.

4      Q.  (By Mr. Nemelka)  Okay.

5      A.  Okay.

6      Q.  Okay, I want to ask you just about one issue

7  here that he references.  First of all, do you recall

8  getting this email from Mr. Schaefer, Mr. Brockman?

9      A.  Yes.

10      Q.  And the -- an issue -- and it's about the

11  continuing negotiations between CDK and Reynolds;

12  correct?

13           MS. GULLEY:  Form.

14      A.  Yes.

15      Q.  (By Mr. Nemelka)  And an issue that -- I mean,

16  I've identified is -- I'm quoting -- "CDK committing to

17  NEVER accessing the Reynolds DMS again."  Do you see

18  that at the bottom of the first page?

19           MS. GULLEY:  Form.

20      Q.  (By Mr. Nemelka)  At bottom of the first page,

21  the very last line.

22           MS. GULLEY:  Objection; form.

23      Q.  (By Mr. Nemelka)  Are you there with me,

24  Mr. Brockman?

25      A.  I see that, and I'm -- and I'm looking at --

Page 109

1    what the reply was.

2          Q.   And --

3                MS. GULLEY:   Objection; form.

4          Q.   (By Mr. Nemelka)   What Mr. Schaefer explains to

5    you is, is that -- and I want to ask you, Mr. Brockman,

6    about the next page, Mr. -- what Mr. Schaefer writes to

7    you about that issue.   Second-to-last sentence of

8    that first paragraph up top, he says, "We have added" --

9    meaning Reynolds -- "have added after the 5 years they

10   cannot access the system on behalf of any 3rd party

11   forever."  Do you see that?

12               MS. GULLEY:   Form.

13         A.   Yes.

14         Q.   (By Mr. Nemelka)   And that's what Reynolds

15   wanted, is for CDK to agree to never access the Reynolds

16   system again on behalf of any third party, right?

17               MS. GULLEY:   Form.

18         A.   That's certainly what we wanted to happen.

19         Q.   (By Mr. Nemelka)   And CDK said, at least --

20   current state of the negotiation was for five years.

21   We'll have this wind-down period, but after that, we

22   don't want to agree to the forever, right?

23               MS. GULLEY:   Objection; form.

24         A.   That -- that was my understanding.  And this

25   whole -- I've not been involved at this level of detail

Page 110

1    in this negotiation, which is basically formalizing what

2    the stand-down agreement consists of.  And I know what

3    we asked for and -- and they're -- they're not agreeing.

4         Q.  (By Mr. Nemelka)  Okay.  Reynolds was insisting

5    on forever never accessing.  And CDK, at least, wanted

6    to keep that to five years, right?

7                   MS. GULLEY:  Objection; form.

8         Q.  (By Mr. Nemelka)  Right?  What was that -- what

9    was the answer?

10                  MS. GULLEY:  Objection; form.

11        A.  That's my understanding.  That's what this is

12   all about.

13        Q.  (By Mr. Nemelka)  And in fact, in the wind-down

14   agreement, it is forever, right?

15                  MS. GULLEY:  Objection --

16                  MR. NEMELKA:  Let me finish answering my

17   question -- asking my question.

18        Q.  (By Mr. Nemelka)  In fact, it is forever,

19   correct, that CDK agreed to never access the Reynolds

20   system, right?

21                  MS. GULLEY:  Objection; form.  This is

22   improper.

23        A.  I would want to go look at that document, but I

24   don't believe it says that.

25                  MR. NEMELKA:  All right.  Let's pull it

HIGHLY CONFIDENTIAL

Page 111

1    out.

2              (Exhibit 647 marked for identification.)

3         Q.  (By Mr. Nemelka)  Mr. Brockman, I've handed you

4    Plaintiff's Exhibit 647, which is the data exchange

5    agreement between CDK and Reynolds.  And the first thing

6    I'm going to do is point you to where you -- you --

7    first of all, you signed this agreement, right, on

8    behalf of Reynolds?

9              MS. GULLEY:  Objection; form.

10        A.  Yes, I did.

11        Q.  (By Mr. Nemelka)  So let's go there.  This is

12   on Page -- on Page 11 of 13.  11 of 13, do you see that,

13   Mr. Brockman, your signature there?

14        A.  Yes.

15        Q.  Dated February 18, 2015?

16        A.  That's correct.

17        Q.  And do you typically read contracts before you

18   sign them?

19              MS. GULLEY:  Objection; form.

20        A.  Umm, it depends.  In this particular case, I

21   did not read this one extensively.  I felt that the --

22   you know, this particular issue had -- or, you know, a

23   stand-down had -- had been, you know, worked on,

24   negotiated at length.  And this one, I was ready to get

25   done.  And so I was -- I had already made up my mind not

HIGHLY CONFIDENTIAL

Page 112

1    to go ask for any further changes and to agree to, you

2    know, what CDK wanted, just to get it off the table so I

3    could get on with the next project.

4        Q.  (By Mr. Nemelka)  Did you read this before you

5    signed it?

6                MS. GULLEY:  Form.

7        A.  I did not read it.  I -- I -- I skimmed it.

8        Q.  (By Mr. Nemelka)  Okay.  So let's go to Section

9    4.5.  And the Section 4.5 is "Prohibition on Knowledge

10   Transfer and DMS Access."  Do you see that?

11               MS. GULLEY:  Form.

12       A.  Yes, I see that paragraph.

13       Q.  (By Mr. Nemelka)  All right.  And in this

14   paragraph, CDK and Reynolds agreed to two things.

15               MS. GULLEY:  Form.

16       Q.  (By Mr. Nemelka)  Let's look at the first.

17   "Each of Reynolds and CDK further covenants and agrees

18   not to sell, transfer, or assign to any affiliate or

19   third party any technology, business process, or other

20   such knowledge regarding integration with the other

21   party's DMS or take any other steps to assist any person

22   that it reasonably believes to have plans to access or

23   integrate with the other party's DMS without other

24   party's written consent."  Do you see that?

25               MS. GULLEY:  Form.

Page 113

1        A.  Yes, I see that.  And that -- that's a very

2    important provision.

3        Q.  (By Mr. Nemelka)  And -- and what --

4             MS. GULLEY:  Objection.

5        Q.  (By Mr. Nemelka)  What did you agree to there?

6             MS. GULLEY:  I'm sorry.  Were you finished

7    answering the last question?

8             THE WITNESS:  Would you please repeat the

9    last question?

10       Q.  (By Mr. Nemelka)  My question is -- is --

11   was -- was:  Did you see that?  You said, "Yes."  So my

12   que- -- my pending question is:  What did you agree to

13   there with CDK?

14            MS. GULLEY:  Objection; form.  He was not

15   done answering the last question before that.

16       A.  Okay.  What -- what's at work here is -- and

17   that's that as a result of the, you know, the

18   stand-down, you know, that -- to accomplish that, would

19   require, you know, knowledge of how access is gained

20   to a dealership system.  And so what we're doing is --

21   and that's we're -- we're jointly agreeing with each

22   other that we will not turn loose any kind of knowledge

23   or technology that enables somebody to do that.

24       Q.  All right.  And then the next sentence is, "For

25   the avoidance of doubt, this Section 4.5 is not intended

HIGHLY CONFIDENTIAL

Page 114

1   as a 'covenant not to compete,' but rather as a

2   contractual restriction of access and attempted access

3   intended to protect the operational and data security

4   integrity of the Reynolds DMS and the CDK DMS and

5   protection of intellectual property."

6           And so my question is:  It was a

7   contractual restriction of access that CDK and Reynolds

8   agreed to, right?

9           MS. GULLEY:  Objection; form.

10      A.  Well, okay.  I'm not -- I'm not -- I'm not

11  seeing that here.  What -- what's intended here is --

12  and that's that -- you know, what's happening is -- and

13  that's that, you know, we're going to gain knowledge

14  about how to get -- how to get into our systems, and

15  they're going to get some knowledge about how to get

16  into ours, okay?  We're agreeing not to disseminate that

17  knowledge, okay?

18          And what we're further saying is -- is

19  look, you know, this is an IP protection provision.  It

20  is not intended as a covenant not to compete, you know.

21  We're going to compete.  But we're not going to -- we're

22  not going to share, you know, the IP to other third

23  parties or fourth parties, you know, as a result of --

24  of this agreement.

25      Q.  (By Mr. Nemelka)  Now, you just saw a document

HIGHLY CONFIDENTIAL

Page 115

1  where Mr. Schaefer said to you that -- and you testified

2  that Reynolds wanted CDK to agree to never access the

3  Reynolds DMS again, right?

4            MS. GULLEY:  Objection; form.

5            MR. RYAN:  Do you have an exhibit number?

6     A.  There -- there -- that provision did not make

7  it into the final agreement, I don't believe.

8     Q.  (By Mr. Nemelka)  So what is this contractual

9  restriction of access that we're looking at here in 4.5?

10            MS. GULLEY:  Objection; form.

11    A.  It is not restriction of access.  It's

12  restriction of the -- not to disseminate knowledge about

13  how to access.

14    Q.  (By Mr. Nemelka)  Mr. Brockman, it says --

15    A.  It was --

16    Q.  -- "contractual restriction of access and

17  attempted access."  Correct?

18            MS. GULLEY:  Objection; form.

19    A.  But -- but if you look at the heading for 4.5,

20  it's "Provision on Knowledge Transfer" --

21    Q.  Finish reading the -- the --

22            MS. GULLEY:  Objection; form.

23    A.  -- "and DMS Access."

24            MR. NEMELKA:  Let -- let me finish my

25  question.

HIGHLY CONFIDENTIAL

Page 116

1      Q.  (By Mr. Nemelka)  Please finish reading the

2   entire title of 4.5, Mr. Brockman.

3                MS. GULLEY:  Objection; form.  Just give me

4   a chance to object, Mr. Brockman.

5      A.  It says "Prohibition on Knowledge Transfer and

6   DMS Access."

7      Q.  (By Mr. Nemelka)  All right.

8      A.  And -- and you know, what -- what it's intended

9   to mean is -- and that's that each party is going to

10  have access to intellectual property of the other and

11  that we're both jointly, you know, agreeing not to

12  disclose that.  But, you know, it's not intended to be a

13  covenant not to compete.  It's -- it's simply an issue

14  of intellectual property.

15     Q.  After covenant not to pete -- compete, it

16  doesn't say it's simply an issue of intellectual

17  property, does it?

18                MS. GULLEY:  Objection; form.

19     A.  Yeah, I -- I think the 4.5 heading, you know,

20  goes a long ways towards accomplishing that.

21     Q.  (By Mr. Nemelka)  4.5 heading says "Prohibition

22  of Knowledge Transfer and DMS Access"; correct?

23                MS. GULLEY:  Objection; form.

24     A.  I believe that -- I believe that that's all one

25  issue.  It's not two separate issues.

HIGHLY CONFIDENTIAL

Page 117

1    Q.  (By Mr. Nemelka)  Prohibition on DMS access?

2        MS. GULLEY:  Objection; form.

3    A.  I believe it's prohibition on knowledge

4    transfer.  Yeah, that's what it's all about.

5    Q.  (By Mr. Nemelka)  But there's an "and" there,

6    isn't there?

7        MS. GULLEY:  Objection; form.

8    A.  I'm sorry.  I have to plead a little bit that

9    I'm not a lawyer like you are, and -- and, you know,

10   this document has got lots of words in it.  And I do not

11   believe that that was the intent of the drafter.

12   Q.  (By Mr. Nemelka)  Even though -- well, if we go

13   back to the document where -- well, this is -- what you

14   testified is that CDK agreed not to access for five

15   years.  It was just the "forever" part that they didn't

16   agree to, right?

17       MS. GULLEY:  Objection; form.  What's the

18   exhibit, as Mr. Ryan asked a while back.

19       MR. NEMELKA:  646.

20   Q.  (By Mr. Nemelka)  I'm reminding Mr. Brockman of

21   his testimony.

22       MS. GULLEY:  Objection.  That is not

23   correct.  Objection to that statement.

24   Q.  (By Mr. Nemelka)  It says here, that we just

25   saw, "We have added" -- as we've -- as we've already

HIGHLY CONFIDENTIAL

Page 118

1    done, "We have added after the 5 years they cannot

2    access the system on behalf of any 3rd party forever."

3    Do you recall that?

4              MS. GULLEY:  Objection; form.

5        A.  That -- that's what it says.  That's what we're

6    asking for.  We did not get that provision.

7        Q.  (By Mr. Nemelka)  Are you aware of how long

8    Section 4.5 lasts?

9              MS. GULLEY:  Objection; form.

10       A.  Again, I'll confess that I'm not an attorney

11   and I -- you know, as far as the duration of provisions,

12   I don't know what it says.

13       Q.  (By Mr. Nemelka)  All right.  Let's go to

14   Section 6.1 of the agreement.  Are you there with me?

15   6.1?

16       A.  I'm sorry.  I thought I was.

17       Q.  Are you there with me?

18       A.  Yes.

19       Q.  "With the exception of the obligations set

20   forth in Sections 4.5" -- that was the section we were

21   just looking at, right, Mr. Brockman?

22             MS. GULLEY:  Objection; form.

23       Q.  (By Mr. Nemelka)  4.5 is the section we were

24   just looking at; correct?

25             MS. GULLEY:  Form.

HIGHLY CONFIDENTIAL

Page 119

1      A.   Yes.  "Prohibition of Knowledge Transfer."

2      Q.   (By Mr. Nemelka)  "And DMS Access."  I know you

3   want to leave off the last part.  But it says "and DMS

4   access"; correct?

5                MS. GULLEY:  Objection; form.

6                MR. RYAN:  Object to form.

7                MS. GULLEY:  And move to strike the

8   instruction.

9      Q.   (By Mr. Nemelka)  "With the exception of the

10  obligations set forth in Sections 4.5" -- and it even

11  identifies it as "[Prohibition on Knowledge Transfer and

12  DMS Access]...this Agreement shall terminate at the end

13  of the Wind Down Period."

14                MS. GULLEY:  Objection.

15     Q.   (By Mr. Nemelka)  So --

16     A.   I see what you're saying, but I've got to

17  reiterate again, okay?  It's been a long war with ADP.

18  The long war is -- has finally settled, okay?  I heave a

19  sigh of relief.  My guys, their guys, our attorneys,

20  their attorneys, they build this document.  It comes to

21  me for signature.  And I said, "My God, I'm -- I'm

22  happy -- I'm happy to sign this damn thing and have it

23  off the list."  You know, I did not read it, certainly

24  not at the level of detail that you're talking about.

25                You know, I would further support that the

HIGHLY CONFIDENTIAL

Page 120

1   stand-down worked.  You know, they, in fact, you know,

2   got out of our systems.  They quit -- they quit hacking

3   them, you know.  They quit -- quit being bandits.  They

4   got out.

5              And we accomplished the transition such

6   that none of -- none of our mutual customers -- the

7   dealerships that are our mutual customers, where we got

8   the DMS but, you know, they've got a third party that's

9   been doing something else -- nobody got mad.  Nobody

10  got -- I didn't get any letters.  I didn't get any angry

11  phone calls.  So, you know, whatever this document is

12  and whatever shortcomings it might have, it worked.

13              MR. NEMELKA:  We can take lunch.

14              MS. GULLEY:  Let's go off the record.

15              THE VIDEOGRAPHER:  The time is 12:38 p.m.

16  We're off the record.

17              (Short recess 12:38 to 1:42 p.m.)

18              THE VIDEOGRAPHER:  The time is 1:42 p.m.

19  We're back from lunch and we're back on the record.

20              EXAMINATION (Continuing)

21  BY MR. NEMELKA:

22       Q.  Good afternoon, Mr. Brockman.

23       A.  I'm sorry we don't have a prettier day for

24  you-all.

25       Q.  It's still beautiful views.

HIGHLY CONFIDENTIAL

Page 121

1      A.   It has been really pretty.

2      Q.   So after Reynolds and CDK concluded the -- the

3  wind-down agreement, Reynolds then did release those

4  security enhancements that it had been holding off on;

5  correct?

6              MS. GULLEY:   Form.

7      A.   I'm not personally aware, but that's my --

8  that's my belief.

9      Q.   (By Mr. Nemelka)   And after the agreement,

10  Reynolds protected the user IDs that CDK was using to

11  access the Reynolds system; is that right?

12              MS. GULLEY:   Objection; form.

13      A.   That was part of the stand-down agreement, and

14  it's my understanding that's now all over.

15      Q.   (By Mr. Nemelka)   So the security enhancements

16  did not affect CDK's access to the sys- -- to the

17  Reynolds system, right?

18              MS. GULLEY:   Form.

19      A.   That's correct.   The whole goal of -- of the

20  stand-down agreement was to provide for an orderly

21  stand-down, and that -- and that meant enabling their

22  customers to operate without issue during the stand-down

23  period.

24      Q.   (By Mr. Nemelka)   But those security

25  enhancements did affect Authenticom, right?

HIGHLY CONFIDENTIAL

Page 122

1           MS. GULLEY:  Objection; form.

2      A.  I -- I'm not aware.

3      Q.  (By Mr. Nemelka)  They were intended to, right?

4           MS. GULLEY:  Objection; form.

5      A.  No.  Again, our security enhancements are --

6  are not specifically aimed at any individual entity.

7  The problem is, we can't, because when we see things

8  happening, people coming into our system, we don't know

9  who they are and -- and we can't track who they are.

10 And therefore, unless they have put in their user ID,

11 something that identifies them, we don't know who they

12 are.

13     Q.  (By Mr. Nemelka)  After you entered into this

14 agreement with CDK, you started to approve some --

15 strike that.

16          After you entered into the agreement with

17 CDK, you believed that the logic had shifted somewhat

18 with respect to pricing that you offered dealers who

19 were coming on board, right?

20          MS. GULLEY:  Objection; form.

21     A.  I -- I disagree with that.  I think that our --

22 our position, as far as negotiating the discounts and

23 whatever raised all the time.  And it depends a lot on

24 the overall macroeconomic situation that we're facing

25 nationwide or, specifically, what the -- the certain

Page 123

1   states, certain market areas go through periods of

2   tougher times, discounting various -- all over the

3   point.

4       Q.  (By Mr. Nemelka)  The logic had shifted

5   somewhat due to you getting the CDK RCI business, right?

6               MS. GULLEY:  Form.

7       A.  I don't believe that's the case at all.  I

8   think that -- since I'm the one that's personally in

9   charge of -- of approving this percentage discounts,

10  they're part of the market conditions.  The -- our

11  competitors go through cycles.  If you can watch, for

12  instance, CDK -- CDK in the month or two before their

13  year-end -- their fiscal year-end, they'll be much more

14  aggressive in discounting.

15              Other competitors have other, you know,

16  closing of sales quota deadlines.  And they get really

17  aggressive just before the deadline, because they're

18  trying to, you know, meet their quotas so they get their

19  bonuses.  And that's the drivers behind percentage

20  discounts.

21              (Exhibit 648 marked for identification?)

22      Q.  Mr. Schaefer, I've handed you Plaintiff's

23  Exhibit 648 --

24              MS. GULLEY:  Brockman.

25              MR. NEMELKA:  Sorry.  Mr. Brockman.  What

HIGHLY CONFIDENTIAL

Page 124

1    did I say?  Schaefer?

2        Q.  (By Mr. Nemelka)  Mr. Brockman, I've handed you

3    Plaintiff's Exhibit 648.  And the email I'm focusing on

4    is your email dated Thursday, May 7th, 2015 to Agan,

5    where you write, "The logic has shifted somewhat due to

6    us getting the CDK RCI business (and soon to get

7    Authenticomas [sic] well)."  Do you see where you wrote

8    that?

9                MS. GULLEY:  Form.

10       A.  Yes, I do.

11       Q.  (By Mr. Nemelka)  And then you wrote, "A deal

12   with numbers of dealerships will have a number of

13   additional RCI 3rd parties where we get that revenue if

14   we have those dealership's DMS systems."  Do you see

15   that?

16               MS. GULLEY:  Form.

17       A.  Yes, I do.

18       Q.  (By Mr. Nemelka)  So the logic had shifted a

19   little bit, because now you're going to be getting the

20   additional RCI revenue if the dealers are using your

21   DMS, right?

22               MS. GULLEY:  Objection; form.

23       A.  I don't think this has anything to do with the

24   percentage discounts on deals.  This is obviously

25   talking about customers.

HIGHLY CONFIDENTIAL

Page 125

1        Q.  (By Mr. Nemelka)  Right.  DMS customers;

2    correct?

3        A.  Yes.

4        Q.  If you turn to the next page, I believe that

5    Mr. Agan is asking you for your approval at the bottom.

6    "Are you okay with a 55.38% discount?"

7                MS. GULLEY:  Form.

8        Q.  (By Mr. Nemelka)  Do you see where he says

9    that?

10       A.  I see that --

11               MS. GULLEY:  Objection; form.

12       A.  -- but I'm -- I'm reading the rest of it to see

13   what, in context, that's all about.  Could you repeat

14   your question, please?

15       Q.  (By Mr. Nemelka)  Sure.  Mr. Agan asked you if

16   you would approve of 55.38 percent discount for this

17   dealer that you were trying to sign; correct?

18               MS. GULLEY:  Form.

19       A.  That's correct.

20       Q.  (By Mr. Nemelka)  You approved it, because the

21   logic had shifted somewhat, due to you getting the CDK

22   RCI business and Authenticom's as well, right?

23               MS. GULLEY:  Objection; form.

24       A.  I think I've already, you know, said that those

25   two sentences you said, that I see them.

Page 126

1      Q.  (By Mr. Nemelka)  Okay.  Your contract with

2   CDK -- you can set that aside Mr. Brockman -- your

3   contract with CDK required Reynolds to take over all of

4   CDK's existing third-party relationships, regardless of

5   size; isn't that right?

6               MS. GULLEY:  Form.

7      A.  Third-party relationships where they were, you

8   know, hacking our systems, that's when I was talking

9   about.

10     Q.  (By Mr. Nemelka)  "Third parties," meaning the

11  vendors to whom CDK was providing Reynolds dealer data,

12  right?

13              MS. GULLEY:  Form.

14     A.  Yes, that's correct.

15     Q.  (By Mr. Nemelka)  You also wanted to take every

16  Authenticom customer that came to you, regardless of

17  size; correct?

18              MS. GULLEY:  Objection; form.

19     A.  I -- I don't think that's correct.

20              (Exhibit 649 was marked for

21               identification.)

22     Q.  (By Mr. Nemelka)  I've handed you what I've

23  marked as Plaintiff's Exhibit 649, which is an email

24  chain between you and Tommy Barras and Bob Schaefer.

25  And the email I want to focus on, Mr. Brockman, is the

HIGHLY CONFIDENTIAL

Page 127

1   one that you sent on Friday, August 21st, 2015, at the

2   bottom, to Tommy Barras, where you write, "We also want

3   to take every Authenticom customer that comes to us,

4   regardless of size."  It's at the bottom of that page.

5   Do you see that?

6              MS. GULLEY:  Objection; form.

7        A.  I think what's going on here is in -- as the --

8   our agreement with CDK requires us to take over all

9   their existing third-party relationships.  That's an

10  integral part of this stand-down.

11             Generally speaking, you know, we're not

12  interested in just anything, as far as size is

13  concerned.  You know, small dealers are not, you know,

14  what our target market is.  You know, we're -- we live

15  more in the larger dealer -- or larger group

16  marketplace.  And so therefore, you know, the comments

17  as far as Authenticom is concerned, you know, they all

18  relate to size more than anything else.

19       Q.  (By Mr. Nemelka)  You wrote here, "We also want

20  to take every Authenticom customer that comes to us,

21  regardless of size"; correct?

22             MS. GULLEY:  Objection; form.

23       Q.  (By Mr. Nemelka)  Very bottom, last -- the last

24  thing on the page.

25             MS. GULLEY:  Objection; form.

Page 128

1       Q.  (By Mr. Nemelka)  You wrote that; correct?

2               MS. GULLEY:  Form.

3       A.  Yes, I did.  But I think that that was at -- at

4   a point in time that that's not been our policy ongoing,

5   regardless of size -- to take people -- take customers

6   that are -- regardless of size.  You can look at our --

7   our customer base, you know, we're predominantly larger

8   dealerships.

9       Q.  (By Mr. Nemelka)  Authenticom customers are

10  the -- are not dealerships.  They're -- they're ven- --

11  they're vendors, right?

12              MS. GULLEY:  Form.

13      Q.  (By Mr. Nemelka)  Well, they're both, but the

14  customers you're talking about here are the vendors that

15  need access to dealer data, right?

16              MS. GULLEY:  Form.

17      A.  Yeah, but I think the -- certainly, you know,

18  those types of customers vary greatly in size as well.

19      Q.  (By Mr. Nemelka)  And so if -- if a vendor is

20  small and doesn't serve that many dealers, you're not

21  interested in -- in serving them, then?

22              MS. GULLEY:  Form.

23      A.  It's a matter of priority.  We have, you know,

24  great development resources, but all development

25  resources are not without limit.  And therefore, from

Page 129

1   time to time, we get really busy and we get really

2   behind.  And therefore, our -- our appetite for, you

3   know, small situations, you know, varies.

4        Q.  (By Mr. Nemelka)  In fact, after this agreement

5   with CDK, you had a lot of -- a lot of work to bring on

6   all of the former CDK customers into the RCI program,

7   right?

8             MS. GULLEY:  Objection; form.

9        A.  That's correct.

10       Q.  (By Mr. Nemelka)  You wrote that you had a

11  mountain of work ahead of you, with over 100 RCI

12  customers to convert, right?

13            MS. GULLEY:  Form.

14       A.  I believe at one point in time, that I -- I

15  made that statement because that was the case.

16       Q.  (By Mr. Nemelka)  And by mid-2017, two years

17  later, Reynolds had successfully converted many of those

18  former CDK vendors into the RCI program, right?

19            MS. GULLEY:  Form.

20       A.  I'm not sure about that specific date.  But I

21  do know we made steady progress and... (Pause.)

22            (Exhibit 650 was marked for

23  identification.)

24       Q.  (By Mr. Nemelka)  I've handed you Plaintiff's

25  Exhibit 650, which is an email from Tommy Barras to you,

HIGHLY CONFIDENTIAL

Page 130

1    dated Friday, July 7th, 2017.  Who is Tommy Barras?

2              MS. GULLEY:  Form.

3         A.  Tommy Barras is head of our -- our software

4    group.

5         Q.  (By Mr. Nemelka)  And he wrote to you about CDK

6    vendors that moved into the RCI program, right?

7         A.  That's correct.

8         Q.  And he writes, "Bob, In 2015 you challenged

9    DEV" -- what is DEV, a development?

10        A.  Development.

11        Q.  Software development?

12        A.  Yes.

13        Q.  -- "and DSV" -- is that data services?

14        A.  That's correct.

15        Q.  -- "(Schaefer) with absorbing 157 CDK vendors

16   into the RCI program."  Do you see that?

17        A.  That's correct.

18        Q.  Now, these are not vendors that CDK owned.

19   These are former CDK customers, right?

20              MS. GULLEY:  Form.

21        A.  That's correct.  These -- these are companies

22   that had been employing CDK to enter our system as, you

23   know, hackers.

24        Q.  (By Mr. Nemelka)  And as part of the wind-down,

25   CDK worked with you to transition those customers to

Page 131

1   Reynolds so that they could join the RCI program;

2   correct?

3               MS. GULLEY:  Objection; form.

4       A.  That's correct.

5       Q.  (By Mr. Nemelka)  And it was CDK's access to

6   the Reynolds system on behalf of those customers that

7   you protected during that five-year wind-down period,

8   correct?

9               MS. GULLEY:  Objection; form.

10      A.  That's correct.

11      Q.  (By Mr. Nemelka)  You asked Mr. Schaefer to

12  calculate the amount of revenue that Reynolds was

13  supposed to realize out of this agreement with CDK,

14  right?

15              MS. GULLEY:  Objection; form.

16      A.  I don't know that I asked that specifically of

17  Bob Schaefer.

18      Q.  (By Mr. Nemelka)  You asked -- you asked

19  somebody on -- on your team to calculate the amount of

20  revenue that Reynolds was supposed to realize out of the

21  CDK deal, right?

22              MS. GULLEY:  Objection; form.

23      A.  I don't recall who that was, but it may well

24  have -- it may well have occurred.

25      Q.  (By Mr. Nemelka)  Regardless of who it was, you

HIGHLY CONFIDENTIAL

Page 132

1    made that request.  You wanted to know how much

2    Reynolds -- how much -- the amount of revenue that

3    Reynolds was supposed to realize out of the deal, right?

4              MS. GULLEY:  Objection; form.

5        A.  That's correct.  We -- we had -- as I think

6    we've -- before lunch, I talked about the fact that we

7    had -- CDK had cost us a lot of -- a lot.  And, you

8    know, we were hoping to make back these, you know,

9    third-party vendors coming directly to us through the

10   RCI program as opposed to going through CDK.  That was

11   our way to ultimately dig out of the hole, you know,

12   from a -- a money standpoint that we had been put

13   through by CDK.

14       Q.  (By Mr. Nemelka)  You testified earlier they

15   cost you millions in this form of -- market -- market

16   messaging about data security and losing dealer

17   customers, right?

18       A.  It's cust- --

19             MS. GULLEY:  Objection; form.

20             You just have to let him finish his

21   question and then you can answer.

22       A.  That consists of the revenue we lost by

23   customers that we should have been able to sell but

24   couldn't sell, or customers -- which was the -- the more

25   minor group, customers that actually left us because

HIGHLY CONFIDENTIAL

Page 133

1   of -- because of security.

2       Q.  (By Mr. Nemelka)  And those customers you're

3   referring to are the dealers, not --

4       A.  That's right.

5               MS. GULLEY:  Objection; form.

6               Just -- just -- for the court reporter and

7   for the record, he'll ask his question and then you

8   answer.

9               MR. NEMELKA:  We're doing okay, but --

10      Q.  (By Mr. Nemelka)  And -- excuse me -- your team

11  did calculate the val- -- the amount of revenue that

12  Reynolds was supposed to realize out of the CDK deal,

13  right?

14              MS. GULLEY:  Form.

15      A.  I see that you're referring to documents that

16  I'm not -- I'm not having the opportunity to look at.

17      Q.  (By Mr. Nemelka)  Well, I'm just wondering --

18  you remember if you made this request, and your team did

19  actually make that calculation; correct?

20              MS. GULLEY:  Objection; form.

21      A.  Yes, I believe they did.  It looks like -- if

22  that's what you're looking at.  It's not being shared

23  with me, which -- which I find, you know, a little

24  unusual.

25      Q.  (By Mr. Nemelka)  All right.  I'm just trying

HIGHLY CONFIDENTIAL

Page 134

1    to get -- get through this efficiently.  I'm not trying

2    to do anything else.

3              MS. GULLEY:  Objection to the statement.

4       Q.  (By Mr. Nemelka)  Okay.  Well, then, let's do

5    --

6              MR. NEMELKA:  69.

7              (Exhibit 651 was marked for

8               identification.)

9       Q.  (By Mr. Nemelka)  I truly am only going to show

10   you that one part about the -- this is a big, long

11   document -- I'm only going to show you -- or ask you

12   about the part that we just talked about, which is the

13   team calculating the value of the CDK deal with you.  If

14   you intend on reading this whole thing, then I'll just

15   skip.  So I'm --

16             THE WITNESS:  What's that about?

17             MS. GULLEY:  I object to everything you

18   just said: Statements, instructions, et cetera.  But

19   first of all, can you at least hand it to him?

20      Q.  (By Mr. Nemelka)  I'd like to mark Exhibit --

21   Plaintiff's Exhibit 651, which is an email from Craig

22   Moss to you, Mr. Brockman, dated Friday, August 25th,

23   2017, the subject being "July 2017 Financials."  Do you

24   see that that's the subject, at least, of this?

25             MS. GULLEY:  Form.

HIGHLY CONFIDENTIAL

Page 135

1      Q.  (By Mr. Nemelka)  Mr. Brockman?

2            MS. GULLEY:  Form.

3      A.  If I can just kind of leaf through what -- what

4   this... (Pause.)

5            This appears to be part of our confidential

6   internal financial information.  And so, therefore, it's

7   okay that I don't have to read every page of it.

8      Q.  (By Mr. Nemelka)  Thank you.  So you received

9   monthly financials like this from Mr. Moss?

10            MS. GULLEY:  Form.

11      A.  They're not financial statements.  They're

12   management reports concerning the finances.  That's the

13   technically accurate description.

14      Q.  (By Mr. Nemelka)  And this is one from July

15   2017, that you received?

16            MS. GULLEY:  Form.

17      A.  Yes.

18      Q.  (By Mr. Nemelka)  And if you could turn with me

19   to Page 17.  There you are.  On the bottom-highlighted

20   part, which is how it was produced to us -- you see the

21   bottom-highlighted part that says, "We are expecting an

22   annual revenue of approximately $30 million (original

23   $21M, plus additional dealers, added interfaces and

24   price increases, etc) generated from the CDK Deal."

25      A.  Yeah, that means that --

HIGHLY CONFIDENTIAL

Page 136

1            MS. GULLEY:  Objection; form.

2       A.  -- in 10 to 12 years, we might break out.

3       Q.  (By Mr. Nemelka)  What do you mean by that?

4            MS. GULLEY:  Form.

5       A.  Well, as -- as I've stated before, CDK's

6   position, as far as hacking our customers, has cost us

7   millions.  And, you know, based upon this amount of

8   money, we got a ways to go.

9       Q.  (By Mr. Nemelka)  The annual revenue, though,

10  is 30 million, that they calculated, correct?

11           MS. GULLEY:  Objection; form.

12      A.  That's what it says.

13      Q.  (By Mr. Nemelka)  And that includes added

14  interfaces, which means additional RCI customers, right?

15           MS. GULLEY:  Form.

16      A.  No.  I don't think that -- "additional

17  interfaces" means additional datasets that third parties

18  would want out of Reynolds systems.

19      Q.  (By Mr. Nemelka)  That they were getting from

20  CDK before?

21           MS. GULLEY:  Form.

22      A.  No.  It's kind of like pitter-patter, like the

23  rain.  Either OEMs or various third parties want more

24  data or different types of data, and it's not related to

25  the -- the stand-down agreement at all.  It's just part

Page 137

1    of their, you know, their desire for more data.

2         Q.  (By Mr. Nemelka)  And now that they're

3    customers of Reynolds, you get the financial benefit of

4    that; correct?

5                   MS. GULLEY:  Form.

6         A.  That's correct.

7         Q.  (By Mr. Nemelka)  I skipped one.  "Plus

8    additional dealers," meaning -- what -- what does that

9    mean?

10                  MS. GULLEY:  Objection; form.

11        A.  Well, what I believe that means is -- and

12   that's that there's constant movement as far as

13   ownership of dealerships.  And if we have a group that

14   has dealerships in it and they're all on Reynolds, if

15   that dealer buys another dealer, so they -- he now has

16   11, what's going to happen is -- and that's if that

17   dealer is not already on Reynolds -- he's going to

18   convert to Reynolds, likely, and vice versa.

19                  If there's a group of -- of ten

20   dealerships, all of which are on CDK, and they buy

21   another dealership that's on Reynolds, you know, the

22   odds are very, very, very high that that dealership will

23   be converted to CDK.  And all that has some impact on

24   what's going on in the world.

25        Q.  (By Mr. Nemelka)  And then you list price,

HIGHLY CONFIDENTIAL

Page 138

1    here -- what is listed here is price increases.  So

2    price increases for -- for DMS and RCI?

3                   MS. GULLEY:  Objection; form.

4        A.  It's just -- it's part of our standard

5    pricing-based process.

6        Q.  (By Mr. Nemelka)  But the price increases here

7    would have referred to price increases for DMS, right?

8                   MS. GULLEY:  Objection; form.

9        A.  Our price increase policy covers all -- all

10   products, you know, all services.

11       Q.  (By Mr. Nemelka)  What is your price increase

12   policy?

13                  MS. GULLEY:  Objection; form.

14       A.  It is -- you know, typically CPI plus 2, which

15   represents the normal rate of CPI plus those things that

16   cost us extra, because we're in the high tech business.

17   Principally, salaries.

18       Q.  (By Mr. Nemelka)  So you -- so for your DMS

19   business, your standard price increases every year is

20   CPI plus 2 percent?

21       A.  That's correct.

22                  MS. GULLEY:  Form.

23       Q.  (By Mr. Nemelka)  And for -- okay.

24                  And this 30 million is an annual number,

25   it's not -- you said over 10 to 12 years.  That -- that

HIGHLY CONFIDENTIAL

Page 139

1    30 million is not over 10 to 12 years.  That 30 million

2    is an annual number, right?

3         A.  That's not what I meant at all.  When I say

4    that CDK has cost us in the millions, I'm not talking

5    about the 30 or 40 or 50 million, I'm talking in the

6    hundreds of millions, over time.  And, you know, so it

7    takes a while before $30 million worth of revenue out of

8    this particular situation even begins to make up for

9    what they've done.

10        Q.  You said 10 to 12 years, so 30 times 10, about

11   300 to $360 million?

12        A.  Absolutely.

13             MS. GULLEY:  Objection; form.

14        A.  Absolutely.

15        Q.  (By Mr. Nemelka)  Is what CDK cost you as a

16   result of them -- their data access on the Reynolds

17   system?

18        A.  Yeah, and the fact that they badmouthed, you

19   know, our process, I think, unjustifiably.  And they --

20   and they did that, you know, high and wide, you know, in

21   the -- in the market.

22        Q.  Badmouthing your data access policies in the

23   market; is that right?

24             MS. GULLEY:  Objection; form.

25        A.  That's correct.

HIGHLY CONFIDENTIAL

Page 140

1      Q.  (By Mr. Nemelka)  CDK doesn't badmouth your

2   data access policies anymore, does it?

3              MS. GULLEY:  Objection; form.

4      A.  It's not been as prevalent as it was before.

5      Q.  (By Mr. Nemelka)  That badmouthing large- --

6   largely stopped after you entered into this agreement

7   with them, right?

8              MS. GULLEY:  Objection; form.

9      A.  Again, I have no way of measuring that.

10     Q.  (By Mr. Nemelka)  It wasn't just CDK and

11  Authenticom that you wanted to get -- get rid of.  You

12  wanted to get rid of all independent data integrators

13  that dealers were using for automated access to the

14  Reynolds -- Reynolds system; correct?

15             MR. RYAN:  Object to form.

16     A.  I -- I definitely want to eliminate, you know,

17  completely, you know, all automated access to Reynolds

18  systems.  It's -- it is a classic security breach.

19     Q.  (By Mr. Nemelka)  Could Reynolds -- could CDK

20  access your system today with their independent

21  integrators?

22             MS. GULLEY:  Objection; form.

23             MR. RYAN:  Objection; form.

24     A.  When you say "independent integrators," I don't

25  recognize that term.

HIGHLY CONFIDENTIAL

Page 141

1      Q.  (By Mr. Nemelka)  Meaning DMI and Integra

2   Link!.

3                  MS. GULLEY:  Objection; form.

4      A.  The people -- the guys that are in the hacking

5   business, the bandits?

6      Q.  (By Mr. Nemelka)  Yeah.

7      A.  Yeah, I don't know.  As I've said before, you

8   know, security is a cat-and-mouse game, and it could

9   well be that they, you know, figured out some new way,

10  and it's -- where I -- it's not discernible to us who it

11  actually is.  It could be in there today and --

12  because that's the nature of it, of -- of the situation.

13                  You know, somebody on the outside figures

14  out a new way to come in.  We don't know who it is.  You

15  know, we figure out how to block it.  You know, the only

16  way we know for sure, you know, was when somebody

17  squawks.

18     Q.  One of the independent integrators was

19  StoneEagle; correct?

20                  MS. GULLEY:  Objection; form.

21     A.  Yes.

22     Q.  (By Mr. Nemelka)  I've handed you Plaintiff's

23  Exhibit 652.

24                  (Exhibit 652 was marked for

25                   identification.)

HIGHLY CONFIDENTIAL

Page 142

1       Q.  (By Mr. Nemelka)  This is an email from you to

2  Mr. Schaefer, dated April 14, 2016.  And your question

3  is:  "Bob, When do we get rid of StoneEagle?"  And

4  that's referring to not allowing them to access dealer

5  data on the Reynolds DMS anymore, right?

6                 MS. GULLEY:  Objection; form.

7       A.  That -- that's correct.  We are -- we are now,

8  finally -- you know, StoneEagle has joined the RCI

9  program, and they had to make a -- a number of changes

10  in their software, and all that's been accomplished.

11  And they're now a -- in a peaceful situation as far as

12  we're concerned.  They're -- they're in the RCI program.

13  They're getting their data.  They're getting their

14  business done.

15      Q.  (By Mr. Nemelka)  For a while, Reynolds had

16  been protecting their access to the -- to -- to the

17  system; correct?

18                 MS. GULLEY:  Objection; form.

19      A.  It -- it is -- it is typical in the situation

20  where we have a -- a -- a party, which is doing like

21  StoneEagle was, which is, basically, hacking in.  And

22  they say, "Oh, well, we're sorry.  We'll do better.

23  We'll sign up for RCI."  And they do, but they don't get

24  it done.  They -- they don't -- they don't make the

25  changes in on their side that's necessary for them to

HIGHLY CONFIDENTIAL

Page 143

1   access through the RCI program, and so they linger in

2   this, you know, this -- this in-between mode.  And, you

3   know, of all the -- the one's where that issue came up,

4   StoneEagle was the worst.  And it is with a sigh of

5   relief that that's fixed, done, over with.

6               (Exhibit 653 was marked for

7                 identification.)

8       Q.  (By Mr. Nemelka)  I've handed you Plaintiff's

9   Exhibit 653, which is an email from you to Mr. Schaefer,

10  dated Wednesday, April 19, 2017, where you write to

11  Mr. Schaefer, "Bob, Give them written notice that we

12  will shut down their current method of access for

13  security reasons on June 1, 2017."  And that referred to

14  StoneEagle; correct?

15      A.  That first email doesn't say that it's

16  StoneEagle, but I believe in context with the second

17  email, it does indicate that it is StoneEagle.

18      Q.  And up to the time, and for -- for several

19  years, their method of access had been protected while

20  they were applying for the RCI program, right?

21              MS. GULLEY:  Objection; form.

22      A.  That's correct.

23      Q.  (By Mr. Nemelka)  And their method of access

24  was -- I'm sorry, Mr. Brockman.

25      A.  I don't understand their method of access.  It

HIGHLY CONFIDENTIAL

Page 144

1   was their method.  They -- they were doing it all on

2   their own.  You know, this indicates, you know, what

3   I've been saying all along.  We were very, very

4   frustrated by these people.  And I think this one line

5   here, which says, "I think its 2 years now we've been

6   strung out......." -- we were not happy.

7        Q.  Mr. Brockman, in 2015, you asked Mr. Schaefer

8   about -- questions about the state of affairs before

9   Authenticom got cut -- got shut off.  You wanted to know

10  how many DMS providers' data does Authenticom provide

11  Reynolds.  Two, and how many dealerships for each DMS

12  providers was Authenticom serving Reynolds apps with?

13  Do you recall asking Mr. Schaefer to compile that

14  information?

15                 MS. GULLEY:  Objection; form.

16       A.  Not specifically, but I would -- not be unusual

17  for me to ask that.

18                 (Exhibit 654 was marked for

19                  identification.)

20       Q.  (By Mr. Nemelka)  Mr. Brockman, I've handed you

21  Plaintiff's Exhibit 654, which is an email from

22  Mr. Schaefer to you, dated Friday, November 20th, 2015.

23  I will give you a chance to look at it, but your email

24  to him starts the chain on the back page.

25       A.  I'm looking on the back page.  If you recall,

HIGHLY CONFIDENTIAL

Page 145

1   earlier today, I mentioned the term "ReminderTrax."

2       Q.  Mm-hmm.

3       A.  It's a -- it's a service reminder program for

4   dealerships, to remind their -- their customers to come

5   back in and have oil changed or other routine

6   preventative maintenance.  And I said that, you know,

7   that was a very minor thing that was going on, and it

8   talks -- right here, it says, "16 CDK dealers," which,

9   in the scope of things, is -- is a very, very small

10  situation.

11      Q.  Mr. Sch- -- Brockman, if you look at the first

12  page, though, it's identified "ReminderTrax."  There's

13  199 CDK connections that Authenticom provides.  Do you

14  see that?

15              MS. GULLEY:  Objection; form.

16      A.  Can you point that one out to me?

17      Q.  (By Mr. Nemelka)  Sure.

18      A.  I'm not --

19      Q.  Right there (indicating).

20      A.  Okay.

21              MS. GULLEY:  Objection; form.

22      A.  Okay, I stand corrected.

23      Q.  (By Mr. Nemelka)  And what's listed here

24  are the various Reynolds applications -- are the -- are

25  the columns, MMS, AIMDATA, ReminderTrax, IMN and so

HIGHLY CONFIDENTIAL

Page 146

1    forth, right?

2              MS. GULLEY:  Form.

3         Q.  (By Mr. Nemelka)  Those are the columns?

4              MS. GULLEY:  Form.

5         Q.  (By Mr. Nemelka)  Is that right?

6              MS. GULLEY:  Form.

7         A.  Okay.  Would you repeat that again?

8         Q.  (By Mr. Nemelka)  Sure.  These datas

9    along these -- companies along the top, MMS, AIMDATA,

10   ReminderTrax, IMN, Xtream, OnlineD and KeyTrack, those

11   are Reynolds applications; correct?

12        A.  Correct.

13        Q.  And on the left are the DMSs that dealers use;

14   correct?

15        A.  Yes.  Okay.  I -- I understand that now.

16        Q.  And what this is showing is the connections

17   that Authenticom provides to the dealers using these

18   DMSs; correct?

19              MS. GULLEY:  Objection; form.

20        Q.  (By Mr. Nemelka) For -- for these various

21   applications?

22              MS. GULLEY:  Objection; form.

23        Q.  (By Mr. Nemelka)  Is that correct?

24              MS. GULLEY:  Form.

25        A.  For instance, if he looks at the CDK line,

HIGHLY CONFIDENTIAL

Page 147

1    that's where the 199 number is.  And I -- I'm afraid I'm

2    not getting what you're trying to get at as far as

3    this -- this chart is concerned.

4         Q.  (By Mr. Nemelka)  All right.  Well, just --

5    what Mr. Schaefer is reflecting here are the number

6    of -- he's answering your question, which is: "What DMS

7    provider's data does Authenticom provide to us?  How

8    many dealerships are there from each DMS provider?"

9    Those are the questions that you asked on the email that

10   we looked at, right?

11                MS. GULLEY:  Form.

12        A.  You -- you keep referring to the CDK line.

13   What's that got to do with Authenticom?

14        Q.  (By Mr. Nemelka)  These are the CDK -- numbers

15   of -- that the dealers that use CDK for whom Authenticom

16   is providing access to that data for these Reynolds

17   applications.

18                MS. GULLEY:  Objection; form.  Is that a

19   question?

20                Form.

21        Q.  (By Mr. Nemelka)  If you look back at your

22   que- -- at your email, you say, "Bob, Questions on the

23   state of affairs before Authenticom got shutoff....."

24   Do you see that?  Your email to Mr. Schaefer?

25        A.  Yes.

HIGHLY CONFIDENTIAL

Page 148

1      Q.  And you say, "What DMS provider's data does

2   Authenticom provide to us?"  Do you see that?

3      A.  Yeah, but, you know, you keep referring to the

4   CDK line, and that's not the Authenticom line.

5      Q.  Right.  But -- but your question was:  How many

6   dealerships are there from each DMS provider that

7   Authenticom provides you with access?

8      A.  Okay.  But --

9          MS. GULLEY:  Objection; form.

10     A.  Okay.  But the point that I'm -- I'm not -- I'm

11  not getting is -- is what does Authenticom have to do

12  with the CDK line on -- on this -- on this chart?  These

13  are -- it appears to me, that these are dealership's

14  data that CDK is providing to ReminderTrax.  For

15  instance, that 199 number.  ReminderTrax is -- is the

16  Reynolds application, and the 199 is -- is the

17  dealerships that -- where CDK has been -- has been

18  serving up -- up to that application.  Authenticom is --

19  is not related to that line.

20     Q.  (By Mr. Nemelka)  Well, we can ask Mr. Schaefer

21  what he did here.  My understanding was that he is

22  providing with you the number -- he's answering your

23  questions, which is:  "The state of affairs before

24  Authenticom got cut off," "What DMS provider's data does

25  Authenticom provide to us?" and "How many dealerships

Page 149

1    are there from each DMS provider" for that?

2              MS. GULLEY:  Objection to that.

3        A.  Okay.

4              MS. GULLEY:  There's no question.

5        A.  I -- I understand the question.  I just don't

6    see where that answer is -- the CDK line on the first

7    page.

8        Q.  (By Mr. Nemelka)  Okay.  We'll ask Mr. Schaefer

9    about that.  You can put that aside.

10              Mr. Schaefer, are you aware --

11              MS. GULLEY:  Mr. Brockman.

12              MR. NEMELKA:  I'm sorry.  Strike that.

13        Q.  (By Mr. Nemelka)  Mr. Brockman, are you aware

14    that -- that Reynolds has an ERA DMS expiration

15    opportunity close date list with respect to dealer

16    customers?

17              MS. GULLEY:  Objection; form.

18        A.  An ERA EXT?

19        Q.  An ERA DMS expirations and opportunity close

20    dates.

21              MS. GULLEY:  Objection; form.

22        A.  I'm -- I'm not familiar with any kind of

23    list with that kind of nomenclature.  We've got lots of

24    lists, but...

25        Q.  (By Mr. Nemelka)  All right.  A list of those

HIGHLY CONFIDENTIAL

Page 150

1    dealers that have DMS contracts coming up for renewal

2    within the next six months?

3         A.  Okay.  You're talking about, you know, contract

4    expiration.

5         Q.  Yes.

6         A.  Okay.  Okay, I understand that term.

7         Q.  And Reynolds keeps a list of those dealers that

8    are coming up for renewal in six months, right?

9         A.  That's right.

10        Q.  And Reynolds has protected those dealers who

11   use independent integrators like Authenticom from any

12   type of interference with that during that six-month

13   window; correct?

14             MS. GULLEY:  Form.

15        A.  I -- I think we have done some of that.  I

16   don't know that policy is still in place, but I know as

17   part of the -- the process of unwinding hacker-type kind

18   of relationships, that what we've done is, is we've --

19   we've taken measures to keep the things quiet from a

20   customer's standpoint while we're in -- you know,

21   contract renewal negotiation process.

22        Q.  (By Mr. Nemelka)  And then once you close on

23   that contract, then you stop that dealer from using the

24   independent integrators, right?

25             MS. GULLEY:  Objection; form.

HIGHLY CONFIDENTIAL

Page 151

1    A.  I think at that point in time, we -- we

2  recommend more -- more strongly that they -- that they

3  look at their -- their data security policies.

4    Q.  (By Mr. Nemelka)  After closing of the

5  contract?

6            MS. GULLEY:  Objection; form.

7    A.  It's an opportune time for that discussion to

8  occur.

9    Q.  (By Mr. Nemelka)  And if they want to continue

10  to use independent integrators after the closing of the

11  contract, did you -- did you let them?

12            MS. GULLEY:  Objection; form.

13    A.  Not over a long period.

14    Q.  (By Mr. Nemelka)  Mr. Brockman, what is

15  syscheck?  Syscheck, s-y-s-c-h-e-c-k?

16            MS. GULLEY:  Form.

17    A.  I understand about this one.  The -- the

18  operating system that we use on the computers that

19  operate the Arrow system -- it's Linux -- and Linux has

20  an interesting attribute in that -- let's say you have a

21  30-user system.  Linux will allow you to start running

22  30 -- what we call "batch jobs."  This will be, like,

23  end-of-month, general ledger, schedules, parts ordering,

24  that sort of thing.

25            What's happens is -- and that's that the

HIGHLY CONFIDENTIAL

Page 152

1    customer is -- is allowed to, unknowingly, kind of step

2    off into a hole where response time is going to be

3    terrible throughout the whole system because they let

4    too many things get going.

5                And what -- what this is -- is this

6    typically is a battle between the accounting department

7    and the parts and service departments.  Because the

8    accounting department's end-of-month, they have all

9    manner of big, long, huge reports they want to run, and

10   they can basically gobble the capacity of the -- of the

11   server completely so that the people in the parts

12   department, when they're doing -- they're selling parts,

13   printing invoices, whatnot, service advisors are writing

14   repair orders and printing service invoices -- their

15   response time is terrible.

16               So there is a -- a place inside the Linux

17   operating system where you can go and interrogate and

18   see how busy the whole system is.  And syscheck, what it

19   does is in essence that it goes and checks that area,

20   you know, meter -- think of it as a meter -- checks that

21   meter to see how busy things are.  Things are too busy,

22   it will not let somebody -- a user start a batch job,

23   because if they do, they're going to destroy, you know,

24   response times for the parts department and the service

25   department.  That's what syscheck is all about.  It

HIGHLY CONFIDENTIAL

Page 153

1    works really good.

2        Q.  (By Mr. Nemelka)  And you wrote that syscheck

3    would be a way that we randomly cause Authenticom some

4    grief.  How would you cause Authenticom grief through

5    syscheck?

6                  MS. GULLEY:  Objection; form.

7        A.  Because the -- they run batch jobs in order to,

8    you know, get their -- get their business done, and

9    syscheck does not know that it's -- it's -- it's

10   Authenticom doing things.  All they know is that

11   somebody is asking for a batch job and the system is

12   already too busy.

13                  (Exhibit 655 was marked for

14                   identification.)

15       Q.  (By Mr. Nemelka)  I've handed you Plaintiff's

16   Exhibit 655, which is an email from you to Tommy Barras,

17   dated August 15, 2017.  And the subject of the email is

18   "Great day," and he's giving you an update on exemption

19   numbers; correct?

20       A.  That's correct.

21       Q.  And these exemptions are user IDs that Reynolds

22   had exempted for various data access points; correct?

23                  MS. GULLEY:  Form.

24       A.  That's correct.

25       Q.  (By Mr. Nemelka)  And what he says is, "Today

HIGHLY CONFIDENTIAL

Page 154

1    is a good day from the security standpoint.  Number of

2    exemption dropped from 932 to 526 in one week."  So

3    as -- in August 14, 2017, you still had 932 exempt user

4    IDs, but that dropped to 527 in one week?  Is that what

5    he's saying here?

6              MS. GULLEY:  Form.

7         A.  That's correct.

8         Q.  (By Mr. Nemelka)  And then, at the end he

9    writes, "Been a long road but we went from 12,000[+]

10   exemptions at the beginning to just over 500 ten years

11   later."  Do you see that?

12             MS. GULLEY:  Form.

13        A.  Yes, I do.

14        Q.  (By Mr. Nemelka)  And then you respond, "I

15   agree - it has been a long pull - good to get there."

16   Right?

17             MS. GULLEY:  Form.

18        A.  Umm... (Pause.)

19        Q.  (By Mr. Nemelka)  Your email at the very top?

20        A.  Okay.  Yes.  That -- that's what it says.  It

21   has been a very long haul.

22        Q.  All right.

23        A.  A long haul.  And frankly, by now -- it's now

24   down -- I think it's 300 or less.

25        Q.  Today?

Page 155

1      A.   Today, uh-huh.  I will not be completely happy

2   until it's zero.

3      Q.   And these exemptions are the protected user

4   IDs, right?

5             MS. GULLEY:   Objection; form.

6      A.   That's correct.

7      Q.   (By Mr. Nemelka)  Mr. Brockman, you believed

8   that for vendors to truly make their apps work, they're

9   going to require RCI interface forever from Reynolds,

10   and the equivalent from CDK as well, right?

11             MS. GULLEY:   Form.

12      A.   I -- I think that would depend entirely on the

13   type of interface.  And by that, there is -- there are

14   certain interfaces that are what we call "batch jobs."

15   And -- you know, these are situations where our

16   reporting software will, you know, with ease, you know,

17   create the data extracts that the dealer's looking for

18   for these types of -- of batch jobs, where they can --

19   they can run that batch job, you know, themselves and

20   send it off themselves to whoev- -- you know, we --

21   there's no restriction on that.

22             But if they want it to be done conveniently

23   and happen every day with hands off, or whatever, that's

24   where RCI interface takes place.

25             Now, there's -- there's a second type of

HIGHLY CONFIDENTIAL

Page 156

1   interface which is where the third party is -- is asking

2   something to be done within our software.  And the

3   classic example of that is Xtime.  You know, Xtime, in

4   order for their software to work, they have to be able

5   to create reservation records.  And they have to be able

6   to look at, you know, service history.

7           Those types of applications, since they're

8   actually part of our software, in order -- you know, for

9   their application to -- to work, you know, their RCI to

10  work, they got to keep doing it forever.  As long as

11  Xtime does what Xtime does, you know, they have to do it

12  within our system.

13      Q.  (By Mr. Nemelka)  And what if they were to get

14  cut off by Reynolds?  What -- what -- how would they --

15  how would they operate?

16          MS. GULLEY:  Objection; form.

17      A.  Well, since their -- their -- their stuff

18  actually runs inside our software, you know, they would

19  basically be unable to use our software to accomplish,

20  you know, what they do today.

21      Q.  (By Mr. Nemelka)  You believe that the Reynolds

22  DMS product is -- is a sticky product, right?

23          MS. GULLEY:  Objection; form.

24      A.  I don't think I've ever used that term in

25  relationship to the DMS.  I've used that -- that term in

HIGHLY CONFIDENTIAL

Page 157

1    relationship to specific products.  By "stickiness,"

2    what I mean is -- is they're so advantageous to the

3    dealership from a financial standpoint that they would

4    be -- they would have to think hard about changing to

5    another DMS provider.

6         Q.  (By Mr. Nemelka)  And what you're referring to

7    is the collection of the DMS, along with docuPAD and the

8    other applications, as you were describing, that form

9    the -- the retail management system; correct?

10             MS. GULLEY:  Objection; form.

11        A.  That's -- that's close.  Okay?  That's not

12   exactly correct, but it's pretty close.

13        Q.  (By Mr. Nemelka)  Okay.  So finish it for me.

14   What did I miss?

15             MS. GULLEY:  Form.

16        A.  Well, we talk about stickiness in regards to

17   specific products, like docuPAD, for instance.  You

18   know, we don't refer to the RMS itself as being -- which

19   is the collection of everything -- as being sticky.  We

20   talk about specific products.

21             MS. GULLEY:  Were you done with your

22   answer?

23             THE WITNESS:  Yeah.

24             MS. GULLEY:  Okay.

25             MR. NEMELKA:  I wasn't starting to ask a

Page 158

1    question.

2        Q.  (By Mr. Nemelka)  And you believe that the

3    value in your sticky products is so huge as to overcome

4    any economic advantage offered by CDK and Cox in their

5    offerings; correct?

6                MS. GULLEY:  Objection to the form.

7        A.  I believe that statement to be correct.

8        Q.  (By Mr. Nemelka)  Let's go off the record.

9                THE VIDEOGRAPHER:  This is the end of Media

10   2.  The time is 2:34 -- I'm sorry, 2:35 p.m.  We're off

11   the record.

12               (Short recess 2:35 to 2:50 p.m.)

13               THE VIDEOGRAPHER:  This is the beginning of

14   Media 3.  The time is 2:50 p.m.  We're back on the

15   record.

16               (Exhibit 656 was marked for

17                identification.)

18       Q.  (By Mr. Nemelka)  Mr. Brockman, I just wanted

19   to show you the document where you made that statement

20   about stickiness.  It's Plaintiff's Exhibit 656.

21               MS. GULLEY:  I object to the statement.

22       Q.  (By Mr. Nemelka)  This is an email that you

23   sent to Keith Hill, Tuesday, November 28, 2017.  Do you

24   see that?

25               MS. GULLEY:  Objection; form.

Page 159

1       A.   Yeah, November 28th, 2017?

2       Q.   (By Mr. Nemelka)   Yes.

3       A.   Yes.

4       Q.   And the second sentence says you -- or third

5    sentence -- whatever -- second line of your email is,

6    "The value in our sticky products is so huge as to

7    overcome any economic advantage offered by CDK and Cox."

8    Do you see that?

9            MS. GULLEY:   Objection; form.

10      A.   And what I'm talking about is -- and that's you

11   take, for instance, docuPAD.  Average increase in gross

12   profit per sale -- per new unit sold, docuPAD, is right

13   at $200.  If you take a -- a typical finance manager

14   will do 70-plus transactions a month.  That's $14,000 a

15   month worth of additional gross.  Now, if you got -- if

16   you got five finance managers, that's 14,000 times 5.

17   The numbers are crazy.

18            And that's -- the -- the stickiness issue

19   is -- we're not, you know -- no, we're not putting

20   sticky stuff on people.  It's -- it's the additional

21   gross profit to the dealership is -- is compelling.

22            And -- and, you know, you perhaps have

23   seen, you know, in Automotive News, where we run ads.

24   These are direct quotes from people that you can call on

25   the phone where they say, you know, "Reynolds product,

Page 160

1    docuPAD, pays my entire bill."

2         Q.   (By Mr. Nemelka)   And they have to have the

3    Reynolds DMS in order to use docuPAD; correct?

4         A.   That's correct.

5         Q.   So that helps with the stickiness of the

6    Reynolds DMS; correct?

7                   MS. GULLEY:   Objection; form.

8         A.   That's correct.

9         Q.   (By Mr. Nemelka)   Okay.   You can set that

10   aside.

11                  Mr. Brockman, my last few questions are

12   just about your -- your email accounts.   You -- you've

13   seen that we have an email account for -- for your

14   Reynolds business, right?

15        A.   I only have one email account, period.

16        Q.   You don't have -- do you have any other -- do

17   you have, like, a Gmail account?

18        A.   No.

19        Q.   The only email account you use is the -- is the

20   single Reynolds?

21        A.   That has all of my personal data in it.

22        Q.   And -- so all of your personal emails go

23   through your -- your Reynolds email account as well?

24        A.   Yeah, I'm -- I've been planning now for several

25   months to change that, but it is -- you know, the

Page 161

1    notification of senders is a big issue.  And I haven't

2    been able to find the time to bite down and get that

3    done.

4        Q.  And so do you have a doc- -- do your emails get

5    preserved -- that -- for your Reynolds email account?

6              MS. GULLEY:  Objection; form.

7        A.  They are all being preserved, at this point.

8        Q.  (By Mr. Nemelka)  And were they preserved back

9    in 2016, 2015?

10             MS. GULLEY:  Objection; form.

11       A.  My retention was somewhere between six -- six

12   months and a year.  Now, based upon how full my

13   Outlook.pst file was getting -- and I get mountains of

14   email.  I mean, I spend half my life looking at email.

15   And I don't smile at this, because I'm not intending it

16   to be a joke, it's real.

17             In our organization, there's a lot of

18   hunting, and a lot fishing goes on.  And, you know, in

19   my organization, almost all my friends are inside the

20   organization, and we're hunting and fishing buddies, and

21   we swap fish pictures and hunting pictures.  And they're

22   10 meg, and they're high res, and a good fish picture

23   deserves a really high res picture, and all that takes

24   up space.  And so therefore, I -- I find that I have to

25   go back and delete --

HIGHLY CONFIDENTIAL

Page 162

1        Q.  (By Mr. Nemelka)  Do you have a laptop that you

2    use for business-related matters?

3                MS. GULLEY:  Form.

4        A.  I just have one computer.

5        Q.  (By Mr. Nemelka)  And is that a -- is that a

6    laptop?

7        A.  Yes.

8        Q.  And do you download your email on to the

9    laptop?

10        A.  Correct.

11        Q.  And did you do that back in 2016, 2015?

12        A.  I've always done it that way.

13        Q.  And do you have your emails backed up -- your

14    historical emails backed up, then, on that laptop?

15        A.  No.  I don't.  When -- when the things get

16    purged, I'm -- I'm a -- still the old school.  I -- I

17    confess, it's perhaps my age; I like paper.  And so

18    anything that's -- that's worth keeping long term is

19    printed and put in a file.

20        Q.  So you print out your emails and documents that

21    are worth preserving and they're put in files?

22        A.  Yes.

23        Q.  Okay.  Has Reynolds ever issued any external

24    backup drive to either back up your -- your laptop?

25        A.  No.  They did not.

HIGHLY CONFIDENTIAL

Page 163

1      Q.  Apart from printing them out, do you print them

2    out yourself or do you have your assistant print them

3    out?

4      A.  I do it myself.

5      Q.  Are those files kept at your home or in your

6    office at Reynolds?

7      A.  At home.

8      Q.  Do you use any other method, besides that

9    printout, to back up your emails or documents?

10     A.  No.

11     Q.  Do you use any tablets or mobile phones?

12     A.  I have a mobile phone.

13     Q.  Mobile phone.  Any tablets?

14     A.  No.

15     Q.  And did your attorneys provide you with a

16   litigation hold notice?

17              MS. GULLEY:  Objection; form.

18     A.  Yes, they did.

19              MR. NEMELKA:  All right.  I have no further

20   questions today.

21              MS. GULLEY:  Okay.  Let's go off.

22              THE VIDEOGRAPHER:  This concludes today's

23   proceeding for Mr. Robert Brockman.  The time is 2:56

24   p.m., and we're off the record.

25              (Deposition adjourned at 2:56 p.m.)

HIGHLY CONFIDENTIAL

Page 164

1          IN THE UNITED STATES DISTRICT COURT

           FOR THE NORTHERN DISTRICT OF ILLINOIS

2                    EASTERN DIVISION

3                              )

    IN RE: DEALER MANAGEMENT   ) MDL NO. 2817

4   SYSTEMS ANTITRUST          )

    LITIGATION,                ) CASE NO. 18 C 864

5                              )

6

7

8               REPORTER'S CERTIFICATION

9    ORAL AND VIDEOTAPED DEPOSITION OF ROBERT BROCKMAN

10                 January 16, 2019

11                     Volume 1

12

13          I, SHAUNA L. BEACH, Certified Shorthand

14   Reporter in and for the State of Texas, do hereby

15   certify to the following:

16          That the witness, ROBERT BROCKMAN, was duly

17   sworn by the officer and that the transcript of the oral

18   deposition is a true record of the testimony given by

19   the witness;

20          I further certify that pursuant to FRCP Rule

21   30(e)(1) that the signature of the deponent:

22          _X_ was requested by the deponent or a party

23   before the completion of the deposition and is to be

24   returned within 30 days from the date of receipt of the

25   transcript.  If returned, the attached Changes and

HIGHLY CONFIDENTIAL

Page 165

1    Signature Page contains any changes and the reasons

2    therefor;

3              ___ was not requested by the deponent or a

4    party before the completion of the deposition.

5              I further certify that I am neither counsel

6    for, related to, nor employed by any of the parties or

7    attorneys to the action in which this proceeding was

8    taken.  Further, I am not a relative or employee of any

9    attorney of record in this cause, nor am I financially

10   or otherwise interested in the outcome of the action.

11             Subscribed and sworn to on this

12             25th of January, 2019.

13

14

15

16   _____

17             SHAUNA L. BEACH, RDR, CRR, CSR #8408

              Expiration Date:  12/31/2019

18

19

20

21

22

23

24

25

HIGHLY CONFIDENTIAL

Page 166

1      In Re: Dealer Management Systems Antitrust Litigation v.

2                          Robert Brockman

3       INSTRUCTIONS TO THE WITNESS

4            Please read your deposition over

5      carefully and make any necessary corrections.

6      You should state the reason in the

7      appropriate space on the errata sheet for any

8      corrections that are made.

9            After doing so, please sign the errata

10     sheet and date it.

11           You are signing same subject to the

12     changes you have noted on the errata sheet,

13     which will be attached to your deposition.

14           It is imperative that you return the

15     original errata sheet to the deposing

16     attorney within thirty (30) days of receipt

17     of the deposition transcript by you.  If you

18     fail to do so, the deposition transcript may

19     be deemed to be accurate and may be used in

20     court.

21

22

23

24     3185059

25

Page 167

1        In Re: Dealer Management Systems Antitrust Litigation v.

2                    Robert Brockman

3                    E  R  R  A  T  A

4                    -  -  -  -  -

5      PAGE    LINE    CHANGE

6      _ _ _  _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

7      Reason:_____

8      _ _ _  _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

9      Reason:_____

10     _ _ _  _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

11     Reason:_____

12     _ _ _  _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

13     Reason:_____

14     _ _ _  _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

15     Reason:_____

16     _ _ _  _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

17     Reason:_____

18     _ _ _  _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

19     Reason:_____

20     _ _ _  _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

21     Reason:_____

22     _ _ _  _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

23     Reason:_____

24     3185059

25

HIGHLY CONFIDENTIAL

Page 168

1      In Re: Dealer Management Systems Antitrust Litigation v.

2                  Robert Brockman

3             ACKNOWLEDGMENT OF DEPONENT

4             I, _____, do

5      hereby certify that I have read the foregoing

6      pages and that the same is a correct

7      transcription of the answers given by

8      me to the questions therein propounded,

9      except for the corrections or changes in form

10     or substance, if any, noted in the attached

11     Errata Sheet.

12

13     _____          _____

14     DATE                SIGNATURE

15

16

17

18

19

20

21

22

23

24     3185059

25

**[& - 3185059]**                                                                 Page 1

| **&** |
| --- |

**&**   1:20 2:4,14 3:9
  8:8,18 9:4,6 32:16
  66:2

| **0** |
| --- |

**0.008**   18:21
**0.08**   18:18
**00242098**   6:4
**00242099**   6:4
**00261635**   5:22
**00569545**   5:13
**00569547**   5:13
**01535307**   5:19
**01535308**   5:19

| **1** |
| --- |

**1**   1:11 143:13
  164:11,21
**1,000**   101:4
**1/6/2015**   6:3
**10**   7:9 136:2
  138:25 139:1,10
  139:10 161:22
**100**   2:10 129:11
**10119**   2:22
**106**   6:2
**107**   6:6
**10:25**   54:24 55:1
**10:50**   55:1,2
**10th**   38:12
**11**   6:7 107:24
  111:12,12 137:16
**11/25/2013**   5:12
**1100**   1:20 2:4 8:9
**111**   6:9
**11:37**   87:6,8
**11:50**   87:8,10
**12**   6:12 26:8 79:18
  136:2 138:25
  139:1,10

**12,000**   154:9
**12/31/2019**   165:17
**123**   6:11
**1250**   3:21
**126**   6:15
**129**   6:18
**12:01**   95:1,3
**12:02**   95:3,5
**12:38**   120:15,17
**13**   111:12,12
**134**   6:21
**14**   5:21 7:3 142:2
  154:3
**14,000**   159:14,16
**141**   7:2
**143**   7:5
**144**   7:9
**14th**   92:7
**15**   7:13 47:13,19
  153:17
**153**   7:12
**157**   130:15
**158**   7:15
**16**   1:10 145:8
  164:10
**1615**   2:15
**164**   4:6
**165**   4:7
**16953**   165:15
**16th**   1:16 8:3
**17**   135:19
**1731**   10:8
**18**   1:4 111:15
  164:4
**19**   5:5 7:6 143:10
**1963**   14:11
**1970**   15:1
**1980s**   15:18
**1981**   19:21
**199**   145:13 147:1
  148:15,16

**1990s**   15:18
**1999**   3:4
**19th**   2:21 32:18
**1:42**   120:17,18

| **2** |
| --- |

**2**   4:2 66:22,25
  67:3,22 74:20
  87:10 138:14,20
  144:5 158:10
**2.8**   16:11
**20**   5:9 57:22 80:4
  80:5,20 81:1
**200**   159:13
**2000**   56:15
**20005**   3:22
**20006-1101**   3:4
**20006-6801**   2:10
**2000s**   15:18
**20036**   2:16
**2006**   16:3,6
**2007**   5:5 32:6,18
  38:12
**2012**   44:12 45:4
  46:3 51:3
**2013**   5:9 57:22
  59:11 63:25 64:1
  64:16
**2014**   5:22 74:8
  82:16,25 83:20
  87:16 92:7,8
  106:17
**2015**   6:7,12,16 7:9
  57:4,13 82:12
  106:9,10,14
  107:24 111:15
  124:4 127:1 130:8
  144:7,22 161:9
  162:11
**2016**   7:3 142:2
  161:9 162:11

**2017**   6:19,22 7:6
  7:13,16 51:7
  129:16 130:1
  134:23,23 135:15
  143:10,13 153:17
  154:3 158:23
  159:1
**2019**   1:10,17 8:3
  164:10 165:12
**2099**   2:9
**20th**   144:22
**21m**   135:23
**21st**   127:1
**22**   6:16
**23rd**   74:8
**25**   5:2 6:22 64:15
**25th**   63:25 64:1
  134:22 165:12
**27**   5:3
**28**   7:16 158:23
**2817**   1:3 164:3
**28th**   159:1
**29th**   44:12 45:4
**2:34**   158:10
**2:35**   158:10,12
**2:50**   158:12,14
**2nd**   82:12,16
  87:15

| **3** |
| --- |

**3**   158:14
**3-4**   60:5
**30**   82:25 135:22
  136:10 138:24
  139:1,1,5,7,10
  151:21,22 164:21
  164:24 166:16
**300**   139:11 154:24
**30th**   82:20 83:20
**3185059**   166:24
  167:24 168:24

**[32 - accounts]**                                                    Page 2

| | | | |
|---|---|---|---|
| **32**   5:5 | **637**   5:3 27:8,11 | **82**   5:18 | 74:25 75:21,23 |
| **333**   10:4 | **638**   5:5 32:12,15 | **8408**   165:17 | 76:3,9,10,16 77:22 |
| **350**   3:21 | 32:15 | **864**   1:4 164:4 | 80:3,5,18,21,23 |
| **360**   139:11 | **639**   5:6 44:5,8 | **9** | 81:1 82:5 84:6,10 |
| **3rd**   51:21 52:21 | **640**   5:8 57:17,18 | | 87:21 88:1 96:9 |
| 54:1 81:5 82:4 | **641**   5:11 63:19,22 | **9**   4:5 | 98:12 99:3,5 |
| 99:13,15 100:2 | **642**   5:15 74:2,3 | **90s**   18:5 | 100:9,14 101:2 |
| 102:3,4 103:4 | **643**   5:18 82:8,9 | **92**   5:21 | 109:10,15 110:19 |
| 109:10 118:2 | **644**   5:21 92:2,3 | **932**   154:2,3 | 112:10,22 113:19 |
| 124:13 | 103:17 104:6 | **96**   17:4,25 | 114:2,2,7 115:2,9 |
| **4** | **645**   6:2 106:4,7 | **98**   19:11,11 | 115:11,13,16,17 |
| **4**   68:21 | **646**   6:6 107:20,23 | **9:30**   1:17 8:3 | 115:23 116:6,10 |
| **4.5**   112:9 113:25 | 117:19 | **9th**   32:18 | 116:22 117:1,14 |
| 115:9,19 116:2,19 | **647**   6:9 111:2,4 | **a** | 118:2 119:2,4,12 |
| 116:21 118:8,20 | **648**   6:11 123:21,23 | | 121:11,16 128:15 |
| 118:23 119:10 | 124:3 | **a.m.**   1:17 8:3 | 131:5 139:16,22 |
| **4.5.**   112:9 | **649**   6:15 126:20,23 | 54:24 55:1,2 87:6 | 140:2,13,17,20 |
| **40**   79:11 139:5 | **650**   6:18 129:22,25 | 87:8,10 | 142:4,16 143:1,12 |
| **400**   2:15 | **651**   6:21 134:7,21 | **ability**   63:9 72:19 | 143:19,23,25 |
| **44**   5:6 | **652**   7:2 141:23,24 | 79:7 | 147:16 148:7 |
| **442**   38:9 | **653**   7:5 143:6,9 | **able**   42:10,17 91:2 | 153:22 |
| **45**   47:13 | **654**   7:9 144:18,21 | 100:8 101:1 | **accessed**   54:11 |
| **5** | **655**   7:12 153:13,16 | 132:23 156:4,5 | 84:5,9 |
| **5**   109:9 118:1 | **656**   7:15 158:16,20 | 161:2 | **accessing**   41:2,12 |
| 159:16 | **69**   134:6 | **aboard**   79:16 | 43:25 47:5 87:20 |
| **50**   139:5 | **7** | **abrupt**   46:19 | 88:3,8,22 99:9 |
| **500**   154:10 | | **absolute**   43:22 | 108:17 110:5 |
| **501c3**   21:23 | **7**   6:19 | **absolutely**   139:12 | **accomplish**   113:18 |
| **526**   154:2 | **7/2/2014**   5:19 | 139:14 | 156:19 |
| **527**   154:4 | **70**   159:14 | **absorbing**   130:15 | **accomplished** |
| **5300**   1:21 2:5 8:9 | **74**   5:15 | **accept**   56:23 | 120:5 142:10 |
| **55.38**   125:6,16 | **75**   23:25 | **access**   25:16,20 | **accomplishing** |
| **57**   5:8 | **77002**   1:21 2:5 | 26:13 30:3,8,14,16 | 116:20 |
| **6** | 8:10 | 30:17,21 31:7,12 | **account**   160:13,15 |
| **6**   106:9,10 | **77024**   10:4 | 31:15 35:11 37:9 | 160:17,19,23 |
| **6.1**   118:14,15 | **7th**   124:4 130:1 | 37:15 42:2,11 | 161:5 |
| **600**   100:21 | **8** | 45:25 46:3,10 | **accounting**   89:15 |
| **63**   5:11 | **8**   18:18 | 47:23 48:11 56:1 | 101:7 105:5 152:6 |
| **636**   5:2 25:25 26:3 | **8/10ths**   18:23,25 | 56:5 60:2 61:5,8 | 152:8 |
| | 19:5 | 61:25 62:3 63:2,3 | **accounts**   160:12 |
| | | 63:14 66:5 68:10 | |
| | | 68:18 71:20 72:22 | |

[accurate - answer]                                                    Page 3

accurate   135:13
   166:19
accurately   35:5
achieve   101:1
acknowledged
   94:8
acknowledges
   28:22
acknowledgment
   168:3
acquire   79:7 88:13
acquired   16:3
   88:18
acquisition   16:17
   34:3 43:16 87:22
acquisitions   104:9
act   78:21
acting   51:21 52:21
   54:1
action   165:7,10
active   47:13
   105:17
ad   89:22 90:1
add   26:21 41:6
   73:10
added   109:8,9
   117:25 118:1
   135:23 136:13
additional   124:13
   124:20 135:23
   136:14,16,17
   137:8 159:15,20
address   10:3
   47:17 93:8
addresses   56:24
adjourned   163:25
admit   97:24
adp   34:6,6,11,12
   34:17 36:14 40:22
   43:7 44:12,19,22
   44:23 50:9 51:22

52:22 54:1 64:17
65:11,12,20 68:14
69:20 70:8 75:16
76:24 77:3,9,24
78:9 79:10 80:3
80:14,16,18,24
81:19 82:6 84:4
88:3,6,8 89:2 96:3
96:18 97:6 99:12
99:16,23 100:2,9
101:13 103:5
119:17
adp's   34:24 35:16
   66:8 71:16 77:17
ads   159:23
advanced   105:19
advantage   77:10
   77:14 78:25
   105:21 158:4
   159:7
advantageous
   157:2
advantages   104:12
advertisement
   26:6,20
advisors   152:13
affairs   144:8
   147:23 148:23
affect   121:16,25
affiliate   112:18
affiliation   8:16
affirmatively
   47:21
afraid   147:1
afternoon   120:22
agan   6:12 124:4
   125:5,15
age   162:17
agency   89:22 90:1
agent   49:25 50:1,6
   50:8 51:22 52:22

53:4,5 54:1
agents   51:20 52:13
   52:16 53:25 54:4
   54:8
aggressive   123:14
   123:17
aggressively   62:24
ago   12:22 26:8
   79:19 86:19
agree   25:6,15
   35:14 60:17 70:18
   91:19 109:15,22
   112:1 113:5,12
   115:2 117:16
   154:15
agreed   56:9
   110:19 112:14
   114:8 117:14
agreeing   110:3
   113:21 114:16
   116:11
agreement   5:6 6:9
   44:13,19 46:14,15
   46:16,18 50:16
   51:23 52:23 53:2
   54:3 57:5,8 58:15
   58:18 65:10 88:5
   89:4 91:25 96:5,8
   99:23 100:1,19
   101:2,5,17,21
   110:2,14 111:5,7
   114:24 115:7
   118:14 119:12
   121:3,9,13,20
   122:14,16 127:8
   129:4 131:13
   136:25 140:6
agreements   91:20
agrees   112:17
agulley   2:6

ahead   102:10
   129:11
aimdata   145:25
   146:9
aimed   122:6
allow   25:20 26:13
   30:8 31:8,13,16
   55:20 58:18 60:2
   68:17 151:21
allowed   42:2
   86:11,18 152:1
allowing   35:10
   69:17 142:4
amount   86:12,25
   97:7 131:12,19
   132:2 133:11
   136:7
andi   9:4 12:3 33:8
   43:1 86:21 103:20
   104:3
anenen   5:19 38:12
   38:23,25 40:4
   44:24 45:15 46:22
   47:4,9,17 48:6
   74:16 81:23 82:12
   82:13,20,25 83:23
   84:20 85:4 86:17
   87:15 88:7 106:14
   107:2
angered   61:1
angry   120:10
annual   39:14,20
   92:16 135:22
   136:9 138:24
   139:2
answer   13:3,7,11
   13:13,14 17:16,23
   20:14 32:16 33:20
   34:23 48:13 53:10
   53:18 55:25 56:7
   93:15 96:16

**[answer - aware]**

102:10,11 110:9
132:21 133:8
149:6 157:22
**answering** 13:22
110:16 113:7,15
147:6 148:22
**answers** 47:21
91:14 168:7
**antitrust** 1:4 8:5
164:4 166:1 167:1
168:1
**anybody** 12:6,15
**anymore** 140:2
142:5
**anytime** 50:20
**apart** 163:1
**apparent** 99:21,22
**appearance** 8:15
**appearances** 4:2
**appearing** 2:19
**appears** 135:5
148:13
**appetite** 129:2
**application** 48:23
89:17 105:13,18
148:16,18 156:9
**applications** 29:2
29:5 30:2 49:10
66:18 80:5,15
103:6 105:5,7,16
105:23 106:1,2
145:24 146:11,21
147:17 156:7
157:8
**apply** 62:17
**applying** 143:20
**appointed** 20:5,11
21:4
**approach** 66:3
77:18

**approached** 96:3
96:7,19,19
**appropriate** 86:21
166:7
**approval** 125:5
**approve** 122:14
125:16
**approved** 125:20
**approving** 123:9
**approximately**
23:25 26:8 34:2
43:16 135:22
**apps** 144:12 155:8
**april** 7:3,6 142:2
143:10
**area** 21:10 24:5
99:1 152:19
**areas** 70:17
105:13,21 123:1
**armageddon**
71:15
**arrived** 79:18
**arrow** 151:19
**article** 5:5 32:16
32:19 33:3
**ascertain** 61:20
**aside** 27:3 28:15
63:1,18 71:6
126:2 149:9
160:10
**asked** 34:6 53:11
94:5,5 98:23 99:2
110:3 117:18
125:15 131:11,16
131:18,18 144:7
147:9
**asking** 68:14
86:16 93:3 101:11
103:25 110:17
118:6 125:5
144:13 153:11

156:1
**aspen** 10:20 92:8
**assign** 112:18
**assist** 112:21
**assistance** 59:23
**assistant** 163:2
**associate** 55:17
**associated** 100:12
**association** 39:12
**assumption** 77:7
**atlantic** 3:21
**attach** 38:16
**attached** 1:23 39:6
40:13 164:25
166:13 168:10
**attachment** 38:16
40:15
**attempted** 114:2
115:17
**attention** 27:17
91:17
**attorney** 11:15
12:7 94:14 118:10
165:9 166:16
**attorneys** 1:9 5:10
5:17,23 6:8,13,17
6:20,23 7:4,7,10
7:14,17 11:12
12:4 95:10,11
119:19,20 163:15
165:7
**attractive** 40:7
41:21
**attribute** 151:20
**august** 6:16,22
7:13 16:3 127:1
134:22 153:17
154:3
**aundrea** 2:3
**authenticom** 2:12
8:19 31:4,8,11

42:17 48:22 49:9
49:15,24 50:1,5,8
50:15 51:2,7,12
54:11 72:3,13
75:20 88:4,9,23
89:4,12,18 90:8,24
91:6,20,24 121:25
126:16 127:3,17
127:20 128:9
140:11 144:9,10
144:12 145:13
146:17 147:7,13
147:15,23 148:2,4
148:7,11,18,24,25
150:11 153:3,4,10
**authenticom's**
125:22
**authenticomas**
124:7
**authority** 20:21
23:4 64:17,24
65:11,16,20 69:5
69:19 70:8
**authorized** 70:24
71:2 76:3
**auto** 39:12
**autoloop** 2:12 8:20
**automated** 31:13
35:11 63:3,14
140:13,17
**automotive** 2:12
5:5 8:19 23:11
32:16,19,25 33:14
33:24 34:5 159:23
**avenue** 2:9
**average** 159:11
**avoid** 81:20
**avoidance** 113:25
**aware** 51:9,15
54:19 61:22 63:13
63:16 65:6 90:13

**[aware - brockman]**                                                                 Page 5

90:16 118:7 121:7
122:2 149:10,13
**awhile**   35:2,19

**b**

**baby**   69:12
**back**   32:6 33:16
55:3 74:9,18
82:18 86:21 87:10
95:4,23 100:25
117:13,18 120:19
120:19 132:8
144:24,25 145:5
147:21 158:14
161:8,25 162:11
162:24 163:9
**backed**   162:13,14
**background**   69:10
**backup**   162:24
**badmouth**   140:1
**badmouthed**
139:18
**badmouthing**
139:22 140:5
**ban**   98:9
**bandit**   58:19
72:11
**banditry**   98:10
**bandits**   56:11
57:10 58:3 66:10
69:13 71:25 83:25
120:3 141:5
**bank**   20:10,11
**barras**   6:15,19
7:12 18:15 126:24
127:2 129:25
130:1,3 153:16
**barrier**   58:6
**barriers**   58:5
**base**   128:7
**based**   19:17 136:7
138:5 161:12

**basically**   68:19
74:24 80:24 88:17
110:1 142:21
152:10 156:19
**basis**   58:8 70:16
72:8
**batch**   49:22,24
50:7 151:22
152:22 153:7,11
155:14,18,19
**battle**   152:6
**beach**   1:18 8:13
164:13 165:17
**beat**   103:9
**beautiful**   120:25
**becoming**   68:24
**beginning**   87:9
154:10 158:13
**begins**   139:8
**behalf**   8:12,13,19
8:24 9:2,14 52:12
53:6 54:9 99:10
109:10,16 111:8
118:2 131:6
**belief**   77:18 121:8
**believe**   17:24 18:7
19:9 33:2 40:7
41:12 59:8,8
78:16,20,22 88:13
88:19 102:20
110:24 115:7
116:24,24 117:3
117:11 123:7
125:4 129:14
133:21 137:11
143:16 156:21
158:2,7
**believed**   78:2
122:17 155:7
**believes**   112:22

**belong**   97:5
**belonging**   37:9
**belongs**   28:8,23
**ben**   3:10 8:11
**beneficiaries**
21:12 22:2
**beneficiary**   21:25
**benefit**   137:3
**bermuda**   19:18
20:10,12 21:16
**best**   13:1 43:21
98:2
**better**   60:5 142:22
**beyond**   86:20
**big**   92:21 134:10
152:9 161:1
**bill**   160:1
**billion**   16:11
**bit**   23:9 33:10
117:8 124:19
**bite**   161:2
**bitter**   79:9
**blanking**   12:10
**bliley**   78:21
**block**   74:25 75:6
75:15 79:24 80:1
141:15
**blocking**   71:20
**blocks**   58:6
**board**   122:19
**bob**   5:8,18 6:6,15
6:18,21 7:2,6,9,12
7:16 38:11 63:23
64:16 65:10
107:23 126:24
130:8 131:17
142:3 143:11
147:22
**bonuses**   123:19
**boss**   26:16

**bottom**   59:14
95:24 108:18,20
125:5 127:2,4,23
135:19,21
**bought**   101:2
**breach**   140:18
**breaches**   90:14
**break**   13:18,21
14:1 54:23 95:7
136:2
**breaking**   75:10
**brice**   2:3 9:6
**bring**   129:5
**brockman**   1:8,13
4:4 5:2,8,18 6:6
6:15,18,21 7:3,6,9
7:12,16 8:4 9:12
9:17,21,25 17:3,19
18:9 23:10 26:3
27:12 30:10 32:17
32:18,25 33:14
36:19 38:8,11,19
40:20 44:8,16
45:24 53:22 55:6
56:16 57:21 59:5
63:24 65:10 67:3
70:7 72:2 74:5,11
82:21 84:4 86:15
86:22 87:14 88:21
94:10 95:7,18
101:10 102:12
103:2 106:10
107:24 108:8,24
109:5 111:3,13
115:14 116:2,4
117:20 118:21
120:22 123:24,25
124:2 126:2,25
134:22 135:1
143:24 144:7,20
145:11 149:11,13

[brockman - chance]                                                              Page 6

| c | | | |
|---|---|---|---|

151:14 155:7
158:18 160:11
163:23 164:9,16
166:2 167:2 168:2
**brother** 21:15
**brought** 68:16
**brown** 3:3 9:13
**bruns** 1:20 2:4 8:8
9:4,7
**bryce** 12:3
**buddies** 161:20
**build** 119:20
**building** 100:23
**bullet** 26:11 45:24
49:21 65:9 87:19
96:2 97:2 99:11
101:20 103:15
**business** 14:9
24:12 25:7 28:4,8
28:23 32:7 34:25
35:17 40:23 43:24
49:7 68:20 77:3
78:9 81:24 90:21
91:2 101:3 112:19
123:5 124:6
125:22 138:16,19
141:5 142:14
153:8 160:14
162:2
**businesses** 87:21
**businesspeople**
12:12
**busy** 43:18 129:1
152:18,21,21
153:12
**buy** 80:16 137:20
**buys** 137:15
**bwilkinson** 2:6

**c**

**c** 1:4 2:1 3:1 8:1
151:15,15 164:4
**calculate** 131:12
131:19 133:11
**calculated** 136:10
**calculating** 134:13
**calculation** 133:19
**call** 44:25 45:3,7
46:21,23,25 47:11
47:12,19 48:18
73:15 74:23
151:22 155:14
159:24
**called** 11:6 15:25
16:2,20 19:25
30:24 36:18 46:23
46:24 53:25 56:25
71:17 86:4 101:3
**calling** 60:9
**calls** 59:22 120:11
**capabilities** 71:12
71:19,20
**capacity** 152:10
**car** 15:10 38:2
66:17 67:23
**cards** 49:13 80:15
80:19 89:6,14
**carefully** 166:5
**case** 1:4 41:25
56:13 69:24 85:13
88:1 97:25 111:20
123:7 129:15
164:4
**cases** 61:21 75:11
75:15,17
**cash** 16:12 22:17
**cat** 79:22 141:8
**caught** 105:24
**cause** 1:16 71:14
153:3,4 165:9

**causing** 58:7 62:20
**cavalier** 76:6
**cdk** 3:2 5:13,13,19
5:19 6:4,4 9:14
12:4 23:17,20
32:1,5 34:6,13
35:21 36:2,11,18
36:18 37:2 38:25
39:21,25 40:16,22
42:3,10,11,15,23
43:3,23 46:6,7,7
46:16 47:4 48:10
49:17 50:16 54:12
57:3,12 61:11,24
63:13,23 64:24
65:5,6 70:25 71:7
73:6,21 77:14
78:12,24 80:21
81:15 84:8 88:22
91:21 96:3,7,13,19
98:6,9 99:5,18
100:5 101:5,6
102:16,17 103:12
108:11,16 109:15
109:19 110:5,19
111:5 112:2,14,17
113:13 114:4,7
115:2 117:14
121:2,10 122:14
122:17 123:5,12
123:12 124:6
125:21 126:2,3,11
127:8 129:5,6,18
130:5,15,18,19,22
130:25 131:13,21
132:7,10,13
133:12 134:13
135:24 136:20
137:20,23 139:4
139:15 140:1,10
140:19 145:8,13

146:25 147:12,14
147:15 148:4,12
148:14,17 149:6
155:10 158:4
159:7
**cdk's** 31:18,20,22
32:8 35:8 56:4
82:14 89:5 98:12
99:3,4 121:16
126:4 131:5 136:5
**cease** 46:1,11
47:24
**center** 59:23
**central** 106:2
**ceo** 22:25 23:3
26:25 38:25 82:14
**certain** 122:25
123:1 155:14
**certainly** 29:4
35:15 40:3 43:7
51:11 73:24 85:12
97:5 109:18
119:23 128:17
**certificate** 4:7
**certification** 164:8
**certified** 30:25
80:18 84:15
103:10 164:13
**certify** 164:15,20
165:5 168:5
**cetera** 134:18
**chain** 5:8,11 6:2,6
6:11,15 7:5,12,15
106:9 126:24
144:24
**chairman** 22:25
23:3 26:25
**challenged** 130:8
**chance** 67:12 74:8
82:13,17 85:24
87:1 93:16 108:2

116:4 144:23
**change**  35:2,20,21
  36:2,11 160:25
  167:5
**changed**  36:18
  145:5
**changes**  4:6 35:25
  35:25 36:16 112:1
  142:9,25 164:25
  165:1 166:12
  168:9
**changing**  157:4
**characterization**
  60:24 61:3 68:1
  71:24
**characterize**  29:3
  40:2 50:19
**characterizing**
  102:21
**charge**  80:3,23,24
  99:13 100:2,12,14
  102:3,3,4,16,18
  123:9
**charitable**  17:3,19
  17:21 18:9 19:2,7
  22:7,9,11,13
**charities**  21:16,19
  21:20,21,22
**chart**  147:3
  148:12
**check**  62:24
**checks**  152:19,20
**cherry**  3:7 9:8,8
  12:3,11
**chevy**  38:2
**chief**  23:20
**choose**  25:16,20
  26:12 30:7,13
**christopher**  60:25
**cid**  5:13,13,19,19
  6:4,4

**circumstances**
  58:14
**civil**  1:22
**class**  2:13,18 8:21
  8:25 9:2 14:11
**classic**  140:18
  156:3
**clean**  91:4,12
**clear**  51:7 73:11
  80:7 82:2 91:15
**clearly**  53:2 59:3
  84:17
**client**  11:15
**clients**  68:5 86:14
**close**  149:15,19
  150:22 157:11,12
**closing**  123:16
  151:4,10
**code**  62:23
**cohen**  2:8 9:10,10
**collaborative**  66:3
**colleague**  8:22
**collect**  52:12 53:6
  54:9
**collecting**  50:2
  98:22
**collection**  50:21
  68:18 157:7,19
**collector**  52:18
**collects**  50:8
**college**  14:9
**colorado**  10:21
**columns**  145:25
  146:3
**combined**  97:8
**come**  75:13 141:14
  145:4
**comes**  119:20
  127:3,20
**coming**  73:2 122:8
  122:19 132:9

150:1,8
**comma**  88:25
**comment**  82:4
  85:19 91:2
**commenting**  41:18
**comments**  127:16
**committing**
  108:16
**communicate**
  102:1
**communicated**
  58:12
**communication**
  11:15
**communications**
  105:7
**companies**  60:8
  130:21 146:9
**company**  2:2,7 3:8
  9:11 14:14 16:4
  16:15,19,22,24
  17:4 19:11,25
  20:1,8,10,16 22:22
  43:17 88:14,15
  95:12
**company's**  23:5
**comparisons**
  101:1
**compelling**  159:21
**compete**  42:17
  114:1,20,21
  116:13,15
**competitive**
  105:21
**competitor**  23:18
**competitors**  42:1
  42:16 79:9 123:11
  123:15
**compile**  144:13
**complaining**  99:15
  103:3

**complaint**  85:10
**completely**  56:18
  73:3 76:1 86:7
  140:17 152:11
  155:1
**completion**  164:23
  165:4
**comply**  33:8
**component**  24:7
**computer**  15:2,6
  16:20,21,25 17:12
  162:4
**computers**  151:18
**conception**  42:23
**concerned**  84:1
  98:10 127:13,17
  142:12 147:3
**concerning**  135:12
**concluded**  73:6
  121:2
**concludes**  163:22
**concur**  88:25
**conditions**  123:10
**confess**  118:10
  162:17
**confidential**  1:9
  5:10,13,14,17,20
  5:20,23 6:4,5,8,10
  6:13,17,20,23 7:4
  7:7,10,14,17 135:5
**connection**  57:4
  101:14
**connections**
  145:13 146:16
**connotation**  56:19
**consciousness**
  98:1
**consent**  112:24
**consider**  13:7 50:5
  52:11

[considerable - customer]                                               Page 8

**considerable**  45:9
  45:10 105:20
**consideration**  41:5
  105:16
**considered**  50:1
  65:7
**considering**  43:12
  81:14
**consistent**  28:3,6
**consists**  110:2
  132:22
**constant**  137:12
**constantly**  100:23
**contains**  165:1
**content**  84:7
**contention**  80:13
**contents**  33:4,24
**context**  92:15,24
  93:1 102:20
  125:13 143:16
**continue**  48:11
  50:15 51:2 58:19
  58:22 68:20 69:16
  69:17 99:14 103:3
  151:9
**continued**  15:19
  51:6,12 66:13
**continuing**  55:4
  87:12 95:16
  108:11 120:20
**contract**  28:17,19
  51:21 52:5,7,21
  54:1 76:7 84:17
  88:4,8,23 126:1,3
  150:3,21,23 151:5
  151:11
**contracts**  52:17
  71:16 76:2,2
  111:17 150:1
**contractual**  114:2
  114:7 115:8,16

**contrary**  76:1
**contribute**  40:22
  41:2 43:24
**control**  10:14
  23:24
**controlling**  88:1
**conveniently**
  155:22
**convention**  39:14
  39:17
**conventions**  39:20
**conversation**
  45:14 47:14 64:18
  68:16 74:16 83:2
  83:7 86:25
**convert**  129:12
  137:18
**converted**  129:17
  137:23
**core**  106:2
**correct**  12:19 14:9
  14:21 16:18,19
  17:7 19:1,4,9,13
  19:15,16 23:1,2,12
  23:15 24:12 25:3
  26:17 27:2,5
  28:17,20,23 29:2
  29:10,20,24 30:5
  31:15,18 33:4,25
  34:4,7,14 35:12
  36:12 37:5,7,10,21
  38:4,16,23 39:1,21
  40:18,23 41:3,6,16
  42:12 43:13 46:5
  46:6 48:24 49:4
  49:10,18 52:10,13
  53:6 54:9 56:5
  59:6,11,19 61:11
  63:4 64:21,23
  65:2 68:12 70:20
  73:21 74:11 75:7

  75:21 76:11 78:6
  78:13 80:21 81:16
  82:15,20 83:1,3,5
  83:8,10 88:7,21
  90:3,18 102:18
  104:23 107:8,12
  108:12 110:19
  111:16 115:17
  116:22 117:23
  118:24 119:4
  121:5,19 125:2,17
  125:19 126:14,17
  126:19 127:21
  128:1 129:9 130:7
  130:14,17,21
  131:2,4,8,10 132:5
  133:19 136:10
  137:4,6 138:21
  139:25 140:14
  141:19 142:7,17
  143:14,22 146:11
  146:12,14,18,23
  150:13 153:19,20
  153:22,24 154:7
  155:6 157:9,12
  158:5,7 160:3,4,6
  160:8 162:10
  168:6
**corrected**  62:25
  145:22
**corrections**  166:5
  166:8 168:9
**correctly**  58:13
  78:23
**correlates**  61:14
**cost**  77:11 78:3,24
  79:1,2 90:23
  132:7,15 136:6
  138:16 139:4,15
**costs**  99:15 103:4

**counsel**  3:7 8:15
  9:8 13:10,11,12
  44:10 74:6 86:5
  86:11 92:6 165:5
**count**  88:19,19
**couple**  84:5
**course**  24:12
**court**  1:1 8:6,12
  9:15 133:6 164:1
  166:20
**covenant**  114:1,20
  116:13,15
**covenants**  112:17
**cover**  45:20 75:15
**covered**  45:20
  93:11
**covers**  31:1 138:9
**cox**  2:12 8:19
  158:4 159:7
**cpi**  138:14,15,20
**craig**  6:12,21
  134:21
**crazy**  159:17
**create**  56:24 68:3
  79:13 155:17
  156:5
**created**  19:19
  44:19 58:5
**creating**  37:16
  45:6 60:19 81:20
**credentials**  37:16
  54:16
**crr**  1:18 165:17
**csr**  1:18 165:17
**current**  109:20
  143:12
**cust**  132:18
**custodial**  44:11
  92:7
**customer**  29:5
  59:20,21 60:7

[customer - defended]                                                                Page 9

62:20 66:19 78:7
126:16 127:3,20
128:7 152:1
**customer's** 150:20
**customers** 24:24
61:1 68:19 71:16
78:4 79:2,3,6,7
81:21 90:3 99:14
100:9 103:3 120:6
120:7 121:22
124:25 125:1
128:5,9,14,18
129:6,12 130:19
130:25 131:6
132:17,23,24,25
133:2 136:6,14
137:3 145:4
149:16
**cut** 144:9 148:24
156:14
**cycles** 123:11

**d**

**d** 8:1
**d.c.** 2:10,16 3:22
**damn** 119:22
**dan** 6:12
**data** 5:6 6:9 14:24
24:7,12 25:2,6,12
25:16,20 26:12,16
27:20,23,24 28:7
28:12,20,23 30:3,7
30:14,16,21 31:1,2
31:8,12 34:20
35:11 36:19,24
37:9,15,20 40:14
40:17 41:13 42:2
42:3,11 43:13
44:12,19 46:14,15
46:15,18 49:9,12
49:16,17,22,24
50:2,7,10,16,21

52:6,8,12,18,19
53:6 54:9,12
55:21 58:19 61:7
61:25 62:3 63:14
66:5 68:10,18
69:21 70:1,20
72:22 76:11,25
77:4,11,15,19 78:1
78:7 79:1,15,17
80:6,19,21 81:4,8
82:3 83:15,19,25
84:6,18 88:1
90:13 96:9 97:7
98:16,19 111:4
114:3 126:11
128:15 130:13
132:16 136:24,24
137:1 139:16,22
140:2,12 142:5,13
144:10 147:7,16
148:1,14,24 151:3
153:22 155:17
160:21
**database** 24:7
**datas** 146:8
**datasets** 136:17
**date** 16:5,6 44:11
45:6 59:13 83:22
92:7 129:20
149:15 164:24
165:17 166:10
168:14
**dated** 5:5,8,12,19
6:3,7,12,16,19,22
7:3,6,9,13,16
32:17 38:12 57:22
64:15 74:8 82:12
82:25 106:8,10
107:24 111:15
124:4 130:1
134:22 142:2

143:10 144:22
153:17
**dates** 149:20
**day** 1:16 11:18,19
11:21,21,23,23
12:25 22:21,21
120:23 153:18
154:1 155:23
**days** 164:24
166:16
**dc** 3:4
**deadline** 123:17
**deadlines** 123:16
**deal** 16:14 32:17
56:22 58:7 74:20
124:11 131:21
132:3 133:12
134:13 135:24
**dealer** 1:3 8:5
16:20,21 23:10
30:3,21 31:7 34:6
34:11,13,18 37:20
50:10 52:8 60:18
72:14,22 75:24
76:10,14 80:21
125:17 126:11
127:15 128:15
132:16 137:15,15
137:17 142:4
149:15 150:23
164:3 166:1 167:1
168:1
**dealer's** 25:8
155:17
**dealers** 15:15
23:11 24:7,11
25:7,12,15,19
26:15 28:8,9,17,20
29:1 30:7,13,16,21
32:1 34:18 35:9
35:10 37:3,10,14

39:12 42:3 49:4
61:7,19,24 62:3
68:10 75:21 76:2
76:5 98:20 122:18
124:20 127:13
128:20 133:3
135:23 137:8
140:13 145:8
146:13,17 147:15
150:1,7,10
**dealership** 2:18
8:24 9:2 15:10,14
27:25 40:17 41:12
58:13 59:15 80:16
81:9 99:9 100:9
113:20 137:21,22
157:3 159:21
**dealership's** 24:24
124:14 148:13
**dealerships** 15:11
15:21 24:1 61:15
100:21 101:4,5
120:7 124:12
128:8,10 137:13
137:14,20 144:11
145:4 147:8 148:6
148:17,25
**deals** 124:24
**dealt** 61:6
**decade** 77:1
**decades** 84:5
87:20
**decide** 56:23 78:9
**decided** 41:9
**decision** 23:4
93:21
**deemed** 166:19
**defendant** 9:11
**defendants** 36:6
**defended** 86:9,10

**[definitely - doubt]**                                                                                            Page 10

**definitely** 98:8
  140:16
**degree** 89:1
**delay** 83:24
**delayed** 83:16
**delaying** 83:19
**delete** 161:25
**deliver** 45:17
**departed** 61:16
**department** 152:6
  152:12,24,25
**department's**
  152:8
**departments** 25:3
  152:7
**depend** 155:12
**depends** 22:7
  111:20 122:23
**deploy** 71:13
**deponent** 164:21
  164:22 165:3
  168:3
**deposed** 12:19
**deposing** 166:15
**deposition** 1:8,13
  8:4,8 11:10,17
  12:13,16 33:9
  95:11 163:25
  164:9,18,23 165:4
  166:4,13,17,18
**depositions** 85:13
  86:9
**describe** 38:10
  57:20
**described** 41:20
  50:23 59:10
**describing** 157:8
**description** 5:1
  6:1 7:1 58:14
  135:13

**deserves** 161:23
**desire** 86:13 137:1
**destroy** 152:23
**detail** 109:25
  119:24
**details** 43:18
**detect** 72:19 73:1
**dev** 130:9,9
**developed** 15:9
**development**
  105:8,17 128:24
  128:24 130:9,10
  130:11
**difference** 80:8
**differences** 80:12
  80:13
**different** 16:5,6
  17:8 23:14 31:17
  31:24 56:18 78:17
  136:24
**dig** 132:11
**digital** 69:12
**direct** 52:17 77:8
  85:23 86:1,8
  159:24
**directly** 51:23
  52:5,23 53:3 54:3
  82:4 132:9
**disagree** 30:12
  60:22 69:23 88:12
  122:21
**discernible** 141:10
**disclose** 116:12
**disconnected** 87:5
**discount** 125:6,16
**discounting** 123:2
  123:14
**discounts** 122:22
  123:9,20 124:24
**discovered** 98:18

**discuss** 65:20
  70:16 71:3 92:17
**discussed** 40:23
  47:4
**discussion** 47:13
  81:19 151:7
**discussions** 48:17
  64:17 65:12 69:5
  69:8,19 70:8 71:7
**disruption** 66:5
**disseminate**
  114:16 115:12
**distribute** 22:1
**distribution** 73:18
**distributions** 22:9
  22:11,15
**district** 1:1,1 8:6,7
  164:1,1
**division** 1:2 8:7
  164:2
**dmi** 37:5,8,15,19
  40:22 41:13 43:12
  43:24 54:10,16
  59:6 60:2 63:2
  66:2 68:3,4,9,19
  68:24 69:13 75:6
  75:19 80:7 81:11
  81:24 88:17 141:1
**dms** 23:17,21 24:6
  28:17,19 29:2
  41:2 43:13,25
  48:24,25 49:2,4,18
  78:4 79:2,3 99:16
  103:5 104:11,25
  105:3,17 106:16
  108:17 112:10,21
  112:23 114:4,4
  115:3,23 116:6,22
  117:1 119:2,3,12
  120:8 124:14,21
  125:1 138:2,7,18

142:5 144:10,11
  147:6,8 148:1,6,24
  149:1,14,19 150:1
  156:22,25 157:5,7
  160:3,6
**dmss** 23:14 78:11
  146:13,18
**dns** 15:24
**doc** 161:4
**document** 26:4
  27:10 40:13 43:5
  44:9 45:7 46:14
  50:23 64:5,7
  67:10 83:7 85:12
  85:17,17,24 86:3
  86:16 92:22 93:3
  94:10,14 95:9,14
  104:1,2,9 106:11
  107:19 110:23
  114:25 117:10,13
  119:20 120:11
  134:11 158:19
**documents** 51:18
  85:25 86:13 94:7
  97:25 107:10
  133:15 162:20
  163:9
**docupad** 105:18
  157:7,17 159:11
  159:12 160:1,3
**dodge** 89:10
**doing** 41:14,18
  75:16 78:7 79:22
  88:5 89:2,7 96:4
  103:24 113:20
  120:9 133:9
  142:20 144:1
  152:12 153:10
  156:10 166:9
**doubt** 113:25

download  162:8
downloaded  101:7
downs  66:15
drafter  117:11
drive  5:4 162:24
drivers  123:19
dropped  154:2,4
ds  23:25
dsv  130:13
due  123:5 124:5
 125:21
duly  1:15 9:18
 164:16
duration  84:7
 118:11

**e**

e  2:1,1 3:1,1 8:1,1
 151:15 164:21
 167:3
earlier  73:16
 81:15 97:18
 132:14 145:1
early  42:6 96:4
ease  155:16
eastern  1:2 8:7
 164:2
eat  67:14
economic  158:4
 159:7
effective  90:23
effectively  76:13
efficiency  86:1
efficient  67:11
 93:17 94:6
efficiently  12:25
 134:1
effort  50:22
efforts  29:23
 66:12
either  54:3 136:23
 162:24

electronic  31:10
eliminate  140:16
email  5:8,8,11,11
 5:18 6:2,2,6,6,11
 6:11,15,15,18,21
 7:2,5,5,9,12,12,15
 7:15 38:11,15,21
 38:22 41:22 56:20
 56:21,22,24 57:21
 58:23 59:14,15,19
 62:5 63:22,22,23
 63:24,25 64:6,14
 64:15,25 65:3,4
 70:7 82:11,11,16
 82:20,24 83:11,22
 84:4,21,25 85:8,18
 87:15 106:7,8,9,13
 107:2,4,23,25
 108:8 124:3,4
 126:23,25 129:25
 134:21 142:1
 143:9,15,17
 144:21,23 147:9
 147:22,24 153:16
 153:17 154:19
 158:22 159:5
 160:12,13,15,19
 160:23 161:5,14
 161:14 162:8
emails  160:22
 161:4 162:13,14
 162:20 163:9
employed  165:6
employee  165:8
employees  76:4
employing  83:24
 130:22
enables  113:23
enabling  121:21
encouraging
 105:22

endeavoring  89:10
ended  100:18
endurance  13:18
engaged  36:18
engaging  48:17
enhancement  75:6
 105:12
enhancements
 60:7 71:8,11,13,19
 72:16 73:1,10,11
 73:15,18,20,24
 74:19,24 106:15
 106:17,23 107:6
 107:14 121:4,15
 121:25 122:5
enter  130:22
entered  30:25
 122:13,16 140:6
entering  46:16
 81:14,23 96:8
entire  95:10 116:2
 160:1
entirely  155:12
entities  22:9,11
 41:14 97:5
entitled  32:16
entity  10:13 43:24
 122:6
entrance  58:16
envisioned  46:16
 50:14
equal  97:8
equivalent  155:10
era  23:15 149:14
 149:18,19
errata  166:7,9,12
 166:15 168:11
essence  152:19
essentially  92:24
established  72:5

et  134:18
eugene  17:3,19
 18:9
eventually  15:9
everybody  97:8
 105:24
everybody's  56:9
exact  73:9
exactly  24:4 35:25
 60:9 61:5 63:10
 96:11 157:12
examination  4:5
 9:19 41:8,24 55:4
 87:12 95:16
 120:20
example  30:22
 156:3
exception  118:19
 119:9
exceptions  30:20
excess  79:11
exchange  6:9
 111:4
exclusive  68:24
exclusivity  68:22
excuse  21:18
 22:14 28:4 34:12
 59:18 86:24
 133:10
executive  39:25
 64:21 65:5,7
executives  39:21
 95:12
exempt  55:12,22
 59:1 60:19 62:6,7
 62:12,13,21 154:3
exempted  153:22
exemption  153:18
 154:2
exemptions
 153:21 154:10

**[exemptions - focus]**                                    Page 12

155:3
**exhibit**   5:2,3,5,6,8
  5:11,15,18,21 6:2
  6:6,9,11,15,18,21
  7:2,5,9,12,15
  25:25 26:3 27:8
  27:11,11 32:12,14
  38:9 44:5,8 57:17
  57:17,18 63:19,22
  74:2,3 82:8,9 92:2
  92:2,3 104:4,6
  106:4,7 107:20,23
  111:2,4 115:5
  117:18 123:21,23
  124:3 126:20,23
  129:22,25 134:7
  134:20,21 141:23
  141:24 143:6,9
  144:18,21 153:13
  153:16 158:16,20
**exhibits**   5:1 6:1
  7:1 11:13
**exist**   43:7 58:20
**existence**   16:1
**existing**   68:5
  126:4 127:9
**exists**   43:6 61:17
  77:20
**expecting**   135:21
**expediency**   49:15
**expensive**   98:4
  99:16 103:4
**expert**   31:25
**expiration**   149:14
  150:4 165:17
**expirations**
  149:19
**explains**   109:4
**explanation**   106:3
**ext**   149:18

**extend**   66:3
**extensively**   37:13
  111:21
**extent**   61:20
**external**   162:23
**extra**   138:16
**extract**   34:19
  41:13 80:6 81:4
  82:3
**extracting**   40:17
  43:13 76:25 81:8
  98:17
**extracts**   155:17
**extremely**   43:17
  60:4 79:14 90:6
**eye**   3:21
**eyes**   1:9 5:10,17
  5:23 6:8,14,17,20
  6:23 7:4,8,11,14
  7:18 95:10,11

### f

**face**   66:12
**facilitate**   56:12
**facilities**   30:18
**facing**   122:24
**fact**   12:17 15:13
  32:6 46:12,12
  65:6 77:19 97:6
  98:15,21 110:13
  110:18 120:1
  129:4 132:6
  139:18
**factors**   57:7
**factory**   105:6
**fail**   166:18
**fair**   23:20 85:23
  86:1
**familiar**   20:15
  21:11 27:7,13,16
  28:16 31:20 36:1
  57:24 65:8 149:22

**far**   31:15 42:21
  84:1 89:2 90:10
  96:22 97:6 98:10
  118:11 122:22
  127:12,17 136:6
  137:12 142:11
  147:2
**february**   5:5
  32:17 57:22
  111:15
**federal**   1:22
**feeding**   55:21
  58:19
**feel**   93:14
**felt**   98:5 111:21
**figel**   2:14 3:9 8:18
**figure**   79:23,24,25
  79:25 103:22
  141:15
**figured**   141:9
**figures**   141:13
**file**   44:11,12 74:7
  92:8 161:13
  162:19
**files**   92:7 162:21
  163:5
**final**   115:7
**finally**   119:18
  142:8
**finance**   105:6
  159:13,16
**finances**   135:12
**financial**   104:12
  135:6,11 137:3
  157:3
**financially**   165:9
**financials**   134:23
  135:9
**find**   60:4 133:23
  161:2,24

**fine**   14:2 67:18
**finish**   13:2,22
  33:16 42:25 55:15
  58:1 86:24 91:14
  98:24 102:8
  110:16 115:21,24
  116:1 132:20
  157:13
**finished**   38:18
  56:16 57:25 64:10
  113:6
**firm**   8:16,18
**first**   9:18 12:23,24
  26:11 27:19 29:16
  40:3 45:25 46:9
  47:3,7 57:8 65:9
  68:15 71:23 76:18
  79:18,18 84:23
  88:13 93:5,21
  95:23,24 96:12
  103:15,21,23,24
  104:1,14 108:7,18
  108:20 109:8
  111:5,7 112:16
  134:19 143:15
  145:11 149:6
**fiscal**   123:13
**fish**   161:21,22
**fishing**   161:18,20
**fit**   56:12
**five**   100:14 109:20
  110:6 117:14
  131:7 159:16
**fixed**   143:5
**fixes**   73:15
**floor**   2:21
**florida**   14:9,14
**focus**   52:4 104:11
  104:25 105:22,25
  126:25

**[focused - further]**                                                                 Page 13

**focused**   91:8
 105:24
**focusing**   124:3
**folks**   59:9
**followed**   42:7 94:1
**following**   76:6
 78:22 164:15
**follows**   9:18 83:2
**ford**   14:14,17 38:2
**foregoing**   168:5
**foremost**   57:8
**forever**   109:11,22
 110:5,14,18
 117:15 118:2
 155:9 156:10
**form**   10:6,11,15
 10:22 11:1,5,24
 17:6,11,22 18:2,6
 18:11,14,20,24
 19:3,8,12,20,24
 20:7,13,18,22 21:5
 21:9,14 22:3,6,18
 22:23 23:7,23
 24:2,9,15,19,21,25
 25:4,9,13,17,22
 27:6,14 28:1,10,24
 29:7,11,14,17,21
 30:1,4,11,15,23
 31:10,14,19 32:3
 32:20 33:1,5,15,21
 34:1,9,10 35:6,13
 35:23 36:4,13,20
 36:25 37:6,11,17
 37:24 38:3,13,17
 39:22 40:10,19,24
 41:4,17,23 42:5,13
 42:19 43:4,14
 44:2,14,20 45:1,5
 45:18 46:17,20
 47:1,6 48:4,12,19
 49:5,11 50:4,12,17

 51:4,8,14,25 52:3
 52:9,14,25 53:8
 54:5,13,18 55:8,18
 55:24 56:6 57:6
 57:14 58:24 59:7
 59:12,16 60:13,15
 60:21 61:12 62:1
 62:8,14,18 63:5,7
 63:15 64:2,22
 65:1,14,19 66:6,21
 66:24 67:16,25
 68:7,13 69:1,7,22
 70:3,21 71:1,10,22
 72:4,7,12,18,23
 73:8,22 75:4,8,22
 76:12 77:6,16
 78:5,14,15 79:4
 80:9,10,22 81:6,17
 81:25 83:4,9,21
 84:12 87:23 88:10
 88:24 89:13,20,25
 90:4,9,15,19,25
 91:7,13,22 92:14
 93:9,19 96:10,20
 97:4,14,22 98:7,14
 99:7,19 100:6,16
 100:17 101:15,23
 102:6,19 103:7
 104:17,22 105:2
 106:19,25 107:11
 108:1,13,19,22
 109:3,12,17,23
 110:7,10,21 111:9
 111:19 112:6,11
 112:15,25 113:14
 114:9 115:4,10,18
 115:22 116:3,18
 116:23 117:2,7,17
 118:4,9,22,25
 119:5,6 121:6,12
 121:18 122:1,4,20

 123:6 124:9,16,22
 125:7,11,18,23
 126:6,13,18 127:6
 127:22,25 128:2
 128:12,16,22
 129:8,13,19 130:2
 130:20 131:3,9,15
 131:22 132:4,15
 132:19 133:5,14
 133:20 134:25
 135:2,10,16 136:1
 136:4,11,15,21
 137:5,10 138:3,8
 138:13,22 139:13
 139:24 140:3,8,15
 140:22,23 141:3
 141:20 142:6,18
 143:21 144:15
 145:15,21 146:2,4
 146:6,19,22,24
 147:11,18,20
 148:9 149:17,21
 150:14,25 151:6
 151:12,16 153:6
 153:23 154:6,12
 154:17 155:5,11
 156:16,23 157:8
 157:10,15 158:6
 158:25 159:9
 160:7 161:6,10
 162:3 163:17
 168:9
**formal**   58:15
**formalize**   66:2
**formalizing**   110:1
**formed**   17:15
**former**   129:6,18
 130:19
**forming**   41:16
**forms**   10:18

**forth**   66:19 118:20
 119:10 146:1
**fortunate**   101:1
**forwarding**   63:24
**founded**   15:2
**four**   61:2 86:19
**fourth**   97:2 114:23
**fourths**   11:23
**frame**   51:1
**framework**   65:12
**franchised**   23:25
**frankly**   35:1,19
 89:8 91:8,16
 96:24 105:8
 154:23
**frcp**   164:20
**frederick**   2:14 3:9
 8:18
**free**   31:9 80:4,20
 81:1 84:10 86:3
 100:14
**frequently**   39:20
**friar**   10:4
**friday**   57:22 127:1
 130:1 134:22
 144:22
**friends**   161:19
**front**   87:16 104:3
**frustrated**   144:4
**frustrating**   107:12
**frustration**   107:3
**fuel**   5:3
**fulfilling**   98:18
**full**   9:23 11:21
 161:12
**further**   41:8,8,24
 48:17 112:1,17
 114:18 119:25
 163:19 164:20
 165:5,8

**future**  66:4

**g**

**g**  8:1
**gain**  114:13
**gained**  113:19
**game**  141:8
**gander**  94:2
**gardner**  5:12
   63:23 65:4,5
   69:10,11
**gardner's**  69:2,12
   70:4,23
**general**  3:7 9:8
   24:5 48:2 65:12
   70:16,17 71:3
   82:1 92:17 98:18
   98:19,21,23,25
   151:23
**generally**  71:3
   127:11
**generate**  24:11
   25:7 28:8
**generated**  135:24
**getting**  58:12
   83:11 100:14
   108:8 123:5 124:6
   124:19 125:21
   136:19 142:13,13
   147:2 148:11
   161:13
**giant**  89:3
**gibbs**  1:20 2:4 8:8
   9:4,6
**gibbsbruns.com**
   2:6,6
**give**  13:2 20:14
   32:11 48:15 57:22
   64:3 65:21 67:9
   67:12 74:8 75:25
   82:13,17 93:16
   98:2 108:2 116:3

143:11 144:23
**given**  84:4 85:22
   86:18 107:10
   164:18 168:7
**giving**  64:20 85:24
   153:18
**global**  3:2 9:14
**gmail**  160:17
**go**  40:13 43:10
   49:20 52:12 53:6
   54:8 68:18 76:17
   76:18 84:21 87:3
   87:5 93:23 94:21
   94:24 95:22
   102:10 103:2,14
   110:23 111:11
   112:1,8 117:12
   118:13 120:14
   123:1,11 136:8
   152:17 158:8
   160:22 161:25
   163:21
**goal**  121:19
**gobble**  152:10
**god**  119:21
**goes**  27:16 60:4
   88:15 97:8 116:20
   152:19 161:18
**going**  12:25 33:18
   43:19 45:7 46:1
   46:11 47:24 51:15
   56:10,10,11 57:9,9
   58:3 68:17 70:18
   74:1 75:15 83:25
   84:24 85:16 86:25
   89:2 92:9 93:1
   94:4 99:12,22
   100:2,5,8,12,13
   101:12,13 102:16
   102:17 103:12,12
   107:15 111:6

114:13,15,21,21
   114:22 116:9
   124:19 127:7
   132:10 134:9,11
   137:16,17,24
   145:7 152:2,4,23
   155:9
**good**  8:2 9:21
   26:21 36:6 105:9
   120:22 153:1
   154:1,15 161:22
**goose**  94:2
**gotten**  105:9
**graduated**  14:8
**graduating**  14:13
**gramm**  78:21
**grant**  30:21 31:7
   32:24 37:15
**granted**  65:11,17
   76:8,9 82:5
**granting**  65:17
**great**  58:7 128:24
   153:18
**greatly**  128:18
**grief**  153:4,4
**gross**  159:11,15,21
**grossman**  2:20
   8:24 9:2
**ground**  12:24
   85:14
**group**  56:23
   127:15 130:4
   132:25 137:13,19
**guess**  18:3 36:15
   93:5
**gulley**  2:3 9:4,4
   10:6,11,15,22 11:1
   11:5,14,24 12:3
   17:6,11,22 18:2,6
   18:11,14,20,24
   19:3,8,12,20,24

20:7,13,18,22 21:5
   21:9,14 22:3,6,18
   22:23 23:7,23
   24:2,9,15,19,21,25
   25:4,9,13,17,22
   27:6,14 28:1,10,24
   29:7,11,14,17,21
   30:1,4,11,15,23
   31:14,19 32:3,20
   32:22 33:1,5,15,21
   34:1,9 35:6,13,23
   36:4,13,20,25 37:6
   37:11,17,24 38:3
   38:13,17 39:22
   40:10,19,24 41:4
   41:17,23 42:5,13
   42:19,24 43:4,14
   44:2,14,20 45:1,5
   45:18 46:17,20
   47:1,6 48:4,12,19
   49:5,11 50:4,12,17
   51:4,8,14,19,25
   52:3,9,14,25 53:7
   53:12,14,18 54:5
   54:13,18,20,23
   55:8,14,18,24 56:6
   56:16 57:6,14
   58:24 59:7,12,16
   60:13,15,21,23
   61:12 62:1,8,14,18
   63:5,7,15 64:2,22
   65:1,14,19 66:6,21
   66:24 67:16,19,25
   68:7,13 69:1,7,22
   70:3,10,13,21 71:1
   71:10,22 72:4,7,12
   72:18,23 73:8,22
   75:4,8,22 76:12
   77:6,16 78:5,14
   79:4 80:9,22 81:6
   81:17,25 82:18

**[gulley - houston]**                                                              Page 15

83:4,9,21 84:12,22
85:2,6,19 86:4
87:23 88:10,24
89:13,20,25 90:4,9
90:15,19,25 91:7
91:13,22 92:14,20
93:9,19,24 94:11
94:16,20,24 95:6
96:10,20 97:4,14
97:22 98:7,14,24
99:7,19 100:6,16
101:15,23 102:6,8
102:11,13,19
103:7,17,22,25
104:4,7,17,22
105:2 106:19,25
107:11,16 108:1
108:13,19,22
109:3,12,17,23
110:7,10,15,21
111:9,19 112:6,11
112:15,25 113:4,6
113:14 114:9
115:4,10,18,22
116:3,18,23 117:2
117:7,17,22 118:4
118:9,22,25 119:5
119:7,14 120:14
121:6,12,18 122:1
122:4,20 123:6,24
124:9,16,22 125:7
125:11,18,23
126:6,13,18 127:6
127:22,25 128:2
128:12,16,22
129:8,13,19 130:2
130:20 131:3,9,15
131:22 132:4,19
133:5,14,20 134:3
134:17,25 135:2
135:10,16 136:1,4

136:11,15,21
137:5,10 138:3,8
138:13,22 139:13
139:24 140:3,8,22
141:3,20 142:6,18
143:21 144:15
145:15,21 146:2,4
146:6,19,22,24
147:11,18 148:9
149:2,4,11,17,21
150:14,25 151:6
151:12,16 153:6
153:23 154:6,12
154:17 155:5,11
156:16,23 157:10
157:15,21,24
158:6,21,25 159:9
160:7 161:6,10
162:3 163:17,21
**guy** 48:7,14
**guys** 119:19,19
141:4

**h**

**h** 151:15
**hacked** 37:12
**hacker** 72:10
150:17
**hackers** 46:9 58:3
59:10 61:5 66:9
69:13 71:25 79:23
130:23
**hacking** 56:10
57:9 75:14,18
83:25 89:3 97:8
97:16 120:2 126:8
136:6 141:4
142:21
**half** 11:21 34:2
161:14
**halfway** 76:21

**hand** 26:3 74:1
134:19
**handed** 27:10
32:15 38:8 44:7
57:16 63:21 82:7
92:1 106:6 107:22
111:3 123:22
124:2 126:22
129:24 141:22
143:8 144:20
153:15
**hands** 155:23
**hansen** 2:14 3:9
8:18
**happen** 43:10
69:17 76:13
109:18 137:16
155:23
**happened** 61:5
**happening** 46:4
66:8 75:10 83:23
114:12 122:8
**happens** 40:2 58:5
151:25
**happy** 119:22,22
144:6 155:1
**hard** 96:11,22,23
157:4
**hardships** 81:21
**harmful** 78:2
**harwood** 3:10
8:11
**haul** 154:21,23
**hazy** 43:21
**he'll** 133:7
**head** 130:3
**heading** 115:19
116:19,21
**headquarters**
10:18

**health** 13:17
**hear** 44:15
**heard** 55:6
**heated** 89:8,9
**heave** 119:18
**held** 8:8 73:5,19
74:19 106:15
**help** 12:24 29:19
**helped** 79:13
**helping** 66:3
**helps** 160:5
**hereto** 1:23
**hesitate** 92:23
**high** 72:25 137:22
138:16 139:20
161:22,23
**highlighted**
135:19,21
**highly** 1:9 5:10,14
5:17,20,23 6:5,8
6:13,17,20,23 7:4
7:7,10,14,17
**hill** 7:16 158:23
**historical** 31:20
162:14
**history** 88:15,16
156:6
**hmm** 145:2
**ho** 86:10
**hold** 55:14 163:16
**holding** 16:22,24
17:4,12 71:8 75:2
106:18,23 121:4
**holdings** 16:25
**hole** 132:11 152:2
**home** 163:5,7
**hoping** 132:8
**host** 77:4
**hour** 14:1 47:12
**houston** 1:21 2:5
8:10 10:2,4 79:14

**howard** 5:12
63:23 65:4,5 69:2
69:9,11,12 70:4,22
**huge** 152:9 158:3
159:6
**hughes** 2:20 9:1,1
**huh** 12:23 47:21
155:1
**hundreds** 139:6
**hunting** 161:18,20
161:21
**hurt** 78:10
**hypocritical** 60:5
60:18

**i**

**ibm** 14:17 15:1,2
**idea** 42:6 75:11,17
99:12 100:2,20
**ideas** 5:3
**identification** 26:1
27:9 32:13 44:6
57:19 63:20 74:4
82:10 92:4 106:5
107:21 111:2
123:21 126:21
129:23 134:8
141:25 143:7
144:19 153:14
158:17
**identified** 46:8
108:16 145:12
**identifies** 119:11
122:11
**identify** 104:4
**identifying** 26:25
**ids** 55:21 56:13
57:3 59:6 60:1,19
62:6,17 63:13
76:10 121:10
153:21 154:4
155:4

**ignite** 23:15
**illinois** 1:1 8:7
164:1
**imagine** 32:8
34:25 35:17
**imaging** 105:18
**immediate** 51:1
**imminent** 45:8,8
**imn** 145:25 146:10
**impact** 137:23
**impatient** 83:12
83:14,24
**imperative** 166:14
**implication** 50:24
**important** 56:2
66:7 74:23 96:25
113:2
**impossible** 43:20
**impressively** 15:5
**improper** 53:10
67:20 110:22
**improve** 79:17
**improved** 71:12
71:19 72:16,16
79:18
**improvement**
66:14 105:20
**inappropriate**
86:5
**inaudible** 37:1
**included** 98:15
**includes** 106:1
136:13
**including** 37:23
46:6
**income** 22:2
**inconveniences**
61:4
**increase** 138:9,11
159:11

**increases** 135:24
138:1,2,6,7,19
**increasing** 107:3
**independent** 30:22
31:3 32:2 35:11
37:3,4 71:21,24
140:12,20,24
141:18 150:11,24
151:10
**index** 4:1
**indicate** 96:18
143:17
**indicates** 80:12
144:2
**indicating** 105:14
145:19
**indication** 48:16
**individual** 21:2
122:6
**information** 24:23
32:11 33:17 61:16
77:20 89:5,15,16
90:2,3 94:19
101:7 135:6
144:14
**informed** 87:4
**initial** 39:10 40:6
43:8
**initiated** 46:22
**inquiry** 90:11
**insecure** 89:12
90:8
**inside** 77:21
152:16 156:18
161:19
**insisting** 110:4
**instance** 1:14
80:15 105:18
123:12 146:25
148:15 157:17
159:11

**instances** 61:23,23
**instructed** 86:14
**instruction** 67:19
70:14 119:8
**instructions** 70:15
134:18 166:3
**instructs** 13:11,13
**integra** 37:5,8,15
37:19 54:10,16
59:6 63:2 75:7,20
80:7 81:11,24
88:17 141:1
**integral** 127:10
**integralink** 60:2
**integrate** 106:1
112:23
**integration** 112:20
**integrator's** 35:11
**integrators** 30:22
31:4 32:2 37:4,5
71:21,25 72:22
75:7 140:12,21,24
141:18 150:11,24
151:10
**integrity** 114:4
**intellectual** 114:5
116:10,14,16
**intelligence** 101:4
**intelligent** 93:20
**intend** 92:25 93:3
134:14
**intended** 72:1
113:25 114:3,11
114:20 116:8,12
122:3
**intending** 161:15
**intent** 117:11
**intention** 69:16
81:8,23
**intentional** 53:14

**interest**  11:8 18:18
  92:17 93:11
**interested**  48:17
  127:12 128:21
  165:10
**interesting**  75:9
  151:10
**interface**  30:25
  84:15 103:11
  155:9,13,24 156:1
**interfaces**  135:23
  136:14,17 155:14
**interference**
  150:12
**internal**  90:11
  135:6
**interrogate**  152:17
**intervals**  14:2
**interview**  32:24
  33:4,13,23,24
**inventive**  79:21
**inventory**  24:17
  24:20 29:9,12,13
  29:16 105:6
**invoices**  152:13,14
**involved**  15:13
  46:18 58:17 90:20
  91:1 106:21
  109:25
**involves**  50:22
**ip**  114:19,22
**irritated**  79:12
**issue**  31:21 48:13
  51:22 52:22 54:2
  57:24 58:9,10,10
  61:7 62:19 71:23
  75:9 77:11,15
  79:1 89:1 99:14
  103:3 108:6,10,15
  109:7 111:22
  116:13,16,25

121:22 143:3
  159:18 161:1
**issued**  26:7,9
  54:16 56:13 57:2
  162:23
**issues**  5:15 13:17
  47:17 55:11 61:11
  61:15 92:17 93:11
  98:9 116:25
**item**  71:4
**items**  69:15 70:22

## j

**j**  2:19
**january**  1:10,17
  6:7 8:3 106:8,10
  106:14 107:24
  164:10 165:12
**jlong**  2:17
**job**  152:22 153:11
  155:19
**jobs**  151:22 153:7
  155:14,18
**joe**  8:22
**john**  2:20 9:1
  12:10
**johns**  19:25 20:16
**join**  131:1
**joined**  14:17 142:8
**joint**  40:16 41:16
  42:2,4,10,17 43:12
  81:14
**jointly**  68:3
  113:21 116:11
**joke**  161:16
**jones**  18:15
**joseph**  3:9
**july**  5:21 6:19
  44:12 45:4 82:12
  82:16 87:15 92:7
  130:1 134:23
  135:14

**june**  38:12 74:8
  82:20,25 83:20
  143:13
**jury**  94:3

## k

**k**  2:3 3:4 60:25
  151:15
**keep**  11:20 24:3
  110:6 147:12
  148:3 150:19
  156:10
**keeping**  162:18
**keeps**  61:18 150:7
**keith**  7:16 158:23
**kellogg**  2:14 3:9
  8:18 94:1
**kellogghansen.c...**
  2:16,17
**kept**  163:5
**keytrack**  146:10
**kind**  48:8 67:6
  71:14,15 74:25
  88:15 89:9 91:10
  98:1,25 101:1
  105:13,24 107:4
  113:22 135:3
  136:22 149:22,23
  150:17 152:1
**kinds**  43:18
**kingdom**  21:17,21
**knew**  32:1 35:8
  77:3
**know**  12:17 13:6
  17:16,23 20:23
  21:2,6 22:8,19
  24:3,3 28:11
  30:17 31:22 36:21
  41:24 43:6,19,21
  43:22 45:6 46:8
  48:6,8 49:6,15
  50:5,18,22,25 51:1

51:11 52:16 53:3
  54:11,15 56:11,13
  56:18,25 57:11
  58:2,9,25 60:16
  61:2,4,5,13,13,14
  61:15,20,21 62:4
  62:11,23 63:8,9,10
  66:14,14 67:9,13
  69:14 71:24,25
  72:25 73:1,1,2,3,9
  73:14,17,23 75:13
  75:14,24 76:3,4,5
  76:14,14 77:18
  78:8,11,22 79:9,10
  79:14,16,18,21,21
  80:13 83:25 84:18
  85:14 88:15,17,18
  89:2,7,14 90:10
  91:17,23 92:16,22
  93:2,10,17 94:2,19
  95:13 96:12,13,16
  96:22,22,22 97:16
  98:9,15 99:17
  100:4,20,22,23,25
  101:6,6,6 102:21
  102:24 103:9,9
  105:4,6,10,13,20
  105:23 106:20
  107:4,13 110:2
  111:22,22,23
  112:2 113:17,18
  113:19 114:12,13
  114:19,20,22,23
  116:8,11,12,19
  117:9 118:11,12
  119:2,23,25 120:1
  120:1,3,8,11 122:8
  122:11 123:15,18
  125:24 126:8
  127:11,13,13,14
  127:16,17 128:7

**[know - lot]**

128:17,23 129:3,3
129:21 130:23
131:16 132:1,8,8
132:11 133:23
136:7 137:1,21
138:10,14 139:6
139:19,20,20
140:16,17 141:7,8
141:9,13,14,15,15
141:16,16 142:8
143:2,3 144:2,2,9
145:6 148:3 150:3
150:16,16,20
152:20,23 153:8,9
153:10 155:15,16
155:16,19,20
156:3,6,8,9,11,18
156:20 157:18
159:19,22,23,25
160:25 161:18
**knowledge** 43:21
43:22 57:1,15
61:14 72:14,14
77:8 96:22,24
112:9,20 113:19
113:22 114:13,15
114:17 115:12,20
116:5,22 117:3
119:1,11
**knowledgeable**
32:4

**l**

**l** 1:18 164:13
165:17
**laid** 43:8
**lamb** 5:8 57:22
**lane** 10:4 29:20
**laptop** 162:1,6,9
162:14,24
**large** 15:21 43:17
60:6 73:19 74:19

140:5
**largely** 140:6
**larger** 127:15,15
128:7
**largest** 23:17
**lasted** 47:19
**lasts** 118:8
**launch** 68:4
**law** 1:20 8:18
21:10 77:23 78:8
78:19
**laws** 78:23
**lawyer** 117:9
**leach** 78:21
**leaf** 135:3
**lease** 11:2,3,4
**leave** 53:16 61:19
119:3
**leaving** 61:24
**ledger** 151:23
**left** 15:2 61:7 62:3
132:25 146:13
**legal** 3:21
**length** 45:9,10
111:24
**letters** 120:10
**level** 16:24 72:25
80:12 105:11
109:25 119:24
**licensed** 15:15
**lied** 98:16
**life** 161:14
**light** 95:8
**limit** 128:25
**limited** 67:14
85:22 100:21
**line** 39:5 46:10
89:23 90:2 108:21
144:4 146:25
147:12 148:4,4,12
148:19 149:6

159:5 167:5
**linger** 143:1
**link** 37:5,9,15,20
54:17 59:6 63:3
75:7,20 80:7
81:12,24 88:18
141:2
**linux** 151:19,19,21
152:16
**list** 56:24 69:3,15
70:5,23 71:4
101:12 119:23
137:25 149:15,23
149:25 150:7
**listed** 138:1
145:23
**listening** 58:13
98:3
**lists** 149:24
**litigation** 1:4 8:6
163:16 164:4
166:1 167:1 168:1
**little** 14:16 23:9
33:10 62:24 83:11
83:14 91:9,17
92:23 105:11
117:8 124:19
133:23
**live** 10:1 127:14
**lives** 10:8
**llp** 1:20 2:4,20 8:8
**located** 8:9
**locations** 10:16
**locked** 60:7
**log** 37:16 54:16
63:9
**logic** 122:17 123:4
124:5,18 125:21
**long** 3:9 5:15 8:22
11:19 47:12 50:20
50:25 51:9,22

52:22 54:2 57:12
58:3 67:6 79:10
80:24 84:9 93:3
98:8 105:8,14
107:9 116:20
118:7 119:17,18
134:10 151:13
152:9 154:9,15,21
154:23 156:10
162:18
**longer** 40:8 50:25
85:25
**look** 26:11,16
27:13,18 38:10,21
66:2 69:25 86:8
110:23 112:16
114:19 115:19
128:6 133:16
144:23 145:11
147:21 151:3
156:6
**looked** 28:7 83:8
99:21 147:10
**looking** 100:25
107:10 108:25
115:9 118:21,24
133:22 144:25
155:17 161:14
**looks** 97:23 103:11
103:11 133:21
146:25
**loose** 73:16 113:22
**lose** 78:6
**losing** 79:3 132:16
**loss** 79:6
**lost** 78:4 79:2
132:22
**lot** 24:11 29:1,3
30:20 33:17 40:2
48:5 56:21 93:11
122:23 129:5,5

**[lot - months]**                                                                                    Page 19

132:7,7 161:17,18
**lots**   31:24 117:10
149:23
**louisiana**   1:21 2:4
8:9
**lower**   97:24
**lunch**   107:16
120:13,19 132:6

**m**

**m**   2:15
**machine**   1:19
**macroeconomic**
122:24
**mad**   120:9
**main**   10:17
**maintenance**   84:7
84:10 145:6
**major**   106:15
**majority**   60:6
**making**   23:4 86:5
101:8
**management**   1:3
8:5 15:10,14
23:11 29:6,9
66:19 104:15,15
104:16,18 105:15
105:25 135:12
157:9 164:3 166:1
167:1 168:1
**manager**   159:13
**managers**   159:16
**manner**   41:13
77:21 152:9
**manufacturers**
38:2 66:18 67:24
98:16
**manufacturing**
10:18
**mark**   3:3 9:13
134:20

**marked**   25:25
26:2 27:8,11
32:12,14 38:9
44:5 57:18 63:19
74:3 82:9 92:2,3
95:10 106:4
107:20 111:2
123:21 126:20,23
129:22 134:7
141:24 143:6
144:18 153:13
158:16
**market**   23:17,21
23:25 69:20,20
70:1,20 123:1,10
127:14 132:15,15
139:21,23
**marketed**   15:24
**marketing**   29:23
50:9 89:23
**marketplace**
77:10,15,17 78:2
78:25 84:14
100:23 103:9
127:16
**massive**   104:12
**matter**   8:5 94:16
97:6 98:22 128:23
**matters**   162:2
**mayer**   3:3 9:13
**mayerbrown.com**
3:5
**mcohen**   2:11
**mdl**   1:3 164:3
**mdsc**   2:12 8:20
**mean**   21:22 22:14
38:1,6 39:13 52:2
62:7,13 69:8
71:25 81:3 91:5
91:12 105:1,3,11
108:15 116:9

136:3 137:9 157:2
161:14
**meaning**   40:22
45:11 48:10 72:22
96:19 109:9
126:10 137:8
141:1
**means**   62:15 80:23
91:15 135:25
136:14,17 137:11
**meant**   121:21
139:3
**measures**   150:19
**measuring**   140:9
**media**   87:10 158:9
158:14
**meet**   11:19 12:1,2
39:21,21 123:18
**meeting**   5:21
39:10 40:6 92:8
92:13,16 94:9
**meg**   161:22
**mentioned**   145:1
**message**   69:20
**messaging**   69:21
70:1,20 132:16
**met**   39:17,25 40:4
**metadata**   44:9
74:7
**meter**   152:20,20
152:21
**method**   143:12,19
143:23,25 144:1
163:8
**michael**   2:8,14
9:10 12:3
**mid**   3:21 129:16
**midway**   76:20,21
**mike**   8:17 9:21
36:5 53:12 54:21

**milberg**   2:20 8:23
9:1
**milberg.com**   2:22
2:23
**million**   135:22
136:10 138:24
139:1,1,5,7,11
**millions**   77:12
78:4 79:1,3
132:15 136:7
139:4,6
**min**   89:6
**mind**   111:25
**minor**   72:9 90:6
132:25 145:7
**minority**   61:9 62:4
**minuscule**   89:6
**minute**   57:23 87:4
**minutes**   47:13,14
47:20
**mm**   145:2
**mms**   145:25 146:9
**mnemelka**   2:16
**mobile**   163:11,12
163:13
**mode**   143:2
**modified**   44:11
**moment**   64:3
82:22
**money**   132:12
136:8
**month**   16:9 34:2
123:12 150:12
151:23 152:8
159:14,15
**monthly**   135:9
**months**   43:16
45:11,12,13 74:20
150:2,8 160:25
161:12

**morning** 8:2 9:21
  97:19
**moss** 6:12,22
  134:22 135:9
**motor** 14:14 69:12
**motors** 98:18,19
  98:21,23
**mountain** 11:6,8
  129:11
**mountains** 161:13
**mouse** 79:22 141:8
**move** 119:7
**moved** 130:6
**movement** 137:12
**mryan** 3:5
**mullin** 2:9 9:10
**multipage** 92:11
**mutual** 39:6 81:21
  120:6,7

**n**

**n** 2:1,14 3:1 8:1
**n.w.** 2:15 3:4
**nada** 39:10,11,13
  39:25 40:6
**naked** 89:23 90:2
**name** 8:11,17 9:21
  9:23 12:10 20:23
  21:3 44:12 90:1
  92:8
**named** 2:12 8:20
**national** 39:12
**nationwide** 122:25
**nature** 56:14 95:8
  141:12
**necessarily** 73:12
  79:6
**necessary** 77:19
  142:25 166:5
**need** 13:18 14:2
  27:24 30:2 53:21
  53:23 69:10 91:4

91:12 93:15,21
  104:11,19,24
  106:13 128:15
**needed** 91:5
**needs** 49:9 98:20
**negotiated** 111:24
**negotiating** 96:5
  122:22
**negotiation** 89:8,8
  109:20 110:1
  150:21
**negotiations** 73:6
  73:20 108:11
**neither** 165:5
**nemelka** 2:14 4:5
  8:17,17 9:20,22
  10:9,13,20,24 11:3
  11:7,16 12:1 17:9
  17:14,25 18:4,8,13
  18:17,21,25 19:5
  19:10,14,22 20:2
  20:11,16,20,25
  21:7,12,18 22:5,10
  22:20,25 23:9,24
  24:6,11,17,20,23
  25:2,6,11,15,19
  26:2 27:10,18
  28:3,14 29:1,9,15
  29:19,23 30:2,6,13
  30:19 31:3,17,22
  32:6,14,24 33:3,8
  33:12,18,23 34:4
  34:11,17 35:8,21
  36:2,7,11,17,23
  37:2,8,14,19 38:1
  38:5,15,18 39:24
  40:12,20 41:1,10
  41:20 42:1,9,16,22
  42:25 43:2,11,23
  44:7,15,23 45:3,10
  45:23 46:21 47:3

47:9 48:10,15,21
  49:8,17 50:7,14
  51:3,6,11,16,20
  52:2,7,11,20 53:5
  53:10,13,16,20,21
  54:7,15,22 55:5,10
  55:16,20 56:4,15
  57:2,12,16,20 59:5
  59:11,14,18 60:17
  61:18 62:5,10,16
  63:1,6,12,17,21
  64:4,24 65:3,16,24
  66:22 67:1,18,21
  67:22 68:2,9,21
  69:4,18,25 70:6,11
  70:19,24 71:5,18
  72:2,5,10,15,21
  73:5,19 74:1,5
  75:5,19 76:8,17
  77:9 78:3,11,18
  80:2,20 81:3,11,22
  82:7,11,19 83:6
  84:3,16,24 85:1,3
  85:9,16,21 86:4,20
  86:22 87:2,13,25
  88:20 89:11,18,23
  90:7,13,17,23 91:3
  91:11,19 92:1,5,18
  92:25 93:13,22
  94:3,15 95:17
  96:17 97:1,10,18
  98:5,11 99:2,11,25
  100:13 101:9,19
  102:2,7,10,12,15
  102:22 103:14,20
  103:23,25 104:2,6
  104:8,19,24 106:6
  106:22 107:5,14
  107:18,22 108:4
  108:15,20,23
  109:4,14,19 110:4

110:8,13,16,18,25
  111:3,11 112:4,8
  112:13,16 113:3,5
  113:10 114:25
  115:8,14,24 116:1
  116:7,21 117:1,5
  117:12,19,20,24
  118:7,13,23 119:2
  119:9,15 120:13
  120:21 121:9,15
  121:24 122:3,13
  123:4,25 124:2,11
  124:18 125:1,8,15
  125:20 126:1,10
  126:15,22 127:19
  127:23 128:1,9,13
  128:19 129:4,10
  129:16,24 130:5
  130:24 131:5,11
  131:18,25 132:14
  133:2,9,10,17,25
  134:4,6,9,20 135:1
  135:8,14,18 136:3
  136:9,13,19 137:2
  137:7,25 138:6,11
  138:18,23 139:15
  140:1,5,10,19
  141:1,6,22 142:1
  142:15 143:8,23
  144:20 145:17,23
  146:3,5,8,20,23
  147:4,14,21
  148:20 149:8,12
  149:13,25 150:22
  151:4,9,14 153:2
  153:15,25 154:8
  154:14,19 155:7
  156:13,21 157:6
  157:13,25 158:2,8
  158:18,22 159:2
  160:2,9 161:8

162:1,5 163:19
**never**  36:23 41:7
  42:21 81:7 97:19
  108:17 109:15
  110:5,19 115:2
**new**  2:22,22 43:24
  58:25 62:10,21
  79:7,23,25 141:9
  141:14 159:12
**news**  5:5 32:16,19
  32:25 33:14,25
  159:23
**nice**  26:22 48:6,14
**nomenclature**
  149:23
**non**  60:2 66:16,22
  66:23 67:1,3,22,23
  67:23 68:5,11
**nonpublic**  77:20
  89:15
**normal**  138:15
**norman**  18:15
**northern**  1:1 8:7
  164:1
**noted**  166:12
  168:10
**notes**  5:15,21
  74:11,13 92:12,13
  93:7 94:9 96:17
**notice**  143:11
  163:16
**notification**  161:1
**november**  7:9,16
  63:25 64:1,15
  144:22 158:23
  159:1
**number**  61:1,15
  73:25 74:23 92:17
  93:11 115:5
  124:12 138:24
  139:2 142:9 147:1

147:5 148:15,22
  154:1
**numbered**  1:16
**numbers**  124:12
  147:14 153:19
  159:17
**nw**  3:21

---

**o**

**o**  8:1
**object**  13:10,12
  34:10 55:14 67:16
  85:2,6,19 86:7
  94:11,12 116:4
  119:6 134:17
  140:15 158:21
**objection**  10:6,11
  10:15,22 11:1,5,24
  17:11 18:2,6,11
  19:20,24 20:7,13
  20:18,22 21:5,9,14
  22:3,6,18,23 23:7
  24:2,9,15,19,21,25
  25:4,9,13,17,22
  27:6,14 28:1,24
  30:11,15,23 31:14
  31:19 32:3,20
  33:1,5,15,21 34:1
  34:9,15 35:6,13,23
  36:4,5,13,20,25
  37:6,11,17 38:13
  39:22 40:10,19
  41:17,23 42:5,13
  42:19,24 43:4,14
  44:2,14,20 45:1
  46:17,20 47:1,6
  48:4,12,19 49:5,11
  50:4,12,17 51:4,8
  51:14,19,25 52:3,9
  52:14,25 53:8,15
  54:13,18 55:8,18
  55:24 56:6 57:14

58:24 59:7,12,16
  61:12 62:1,8,14,18
  63:5,7,15 64:2,22
  65:1,14,19 67:25
  68:7,13 69:1,7,22
  70:3,10,13,21 71:1
  71:10,22 72:4,12
  72:18,23 73:8,22
  75:4,8,22 76:12
  77:6,16 78:5,14,15
  79:4 80:9,10,22
  81:6,17,25 83:9,21
  84:12 88:10,24
  89:13,20,25 90:4,9
  90:15,19,25 91:7
  91:13,22 92:20
  93:19,24 97:14,22
  98:7,14 99:7,19
  100:6,16,17
  101:15,23 102:6
  102:19 103:7
  104:17,22 106:19
  106:25 108:22
  109:3,23 110:7,10
  110:15,21 111:9
  111:19 113:4,14
  114:9 115:4,10,18
  115:22 116:3,18
  116:23 117:2,7,17
  117:22,23 118:4,9
  118:22 119:5,14
  121:12 122:1,4,20
  124:22 125:11,23
  126:18 127:6,22
  127:25 129:8
  131:3,9,15,22
  132:4,19 133:5,20
  134:3 136:1,11
  137:10 138:3,8,13
  139:13,24 140:3,8
  140:22,23 141:3

141:20 142:6,18
  143:21 144:15
  145:15,21 146:19
  146:22 147:18
  148:9 149:2,17,21
  150:25 151:6,12
  153:6 155:5
  156:16,23 157:10
  158:6,25 159:9
  160:7 161:6,10
  163:17
**objections**  103:20
**obligations**  118:19
  119:10
**obstinate**  34:24
  35:16
**obstructionist**
  85:17
**obviously**  58:12
  61:6 78:10 124:24
**occur**  151:8
**occurred**  41:7
  51:10 131:24
**october**  16:10,11
**odds**  137:22
**oem**  58:16 66:16
  66:23 67:1,3,22,23
  68:5,11
**oems**  37:23 38:1
  66:1,3 68:11
  99:10 136:23
**offer**  68:4 84:14
**offered**  33:6 80:25
  122:18 158:4
  159:7
**offering**  68:24
  104:13
**offerings**  100:11
  158:5
**offers**  23:10,14

**office**   163:6
**officer**   164:17
**offices**   1:20
**offshore**   19:15
**oh**   16:6 63:1 74:10
  142:22
**ohio**   10:17
**oil**   145:5
**okay**   11:10 12:12
  13:4,8,14,19,23
  14:3,8 16:24 17:9
  17:14 19:14 33:22
  36:8 44:13,18
  53:13 54:11 57:16
  63:17 64:8,12
  66:25 67:21 74:10
  76:24 85:3,9 87:2
  92:18 94:15,24
  95:20 104:19
  106:12 108:4,5,6
  110:4 112:8
  113:16 114:10,16
  114:17 119:17,18
  125:6 126:1 133:9
  134:4 135:7
  138:23 145:20,22
  146:7,15 148:8,10
  149:3,8 150:3,6,6
  154:20 157:11,13
  157:24 160:9
  162:23 163:21
**old**   98:10 162:16
**older**   105:23
**once**   31:18 39:15
  73:12 97:24
  150:22
**one's**   143:3
**ones**   106:20
**ongoing**   128:4
**onlined**   146:10

**open**   37:2 68:23
**operate**   121:22
  151:19 156:15
**operating**   24:12
  28:8 151:18
  152:17
**operational**   43:18
  114:3
**opine**   86:16
**opinion**   35:2,19
**opportune**   151:7
**opportunities**   39:7
  40:7
**opportunity**   9:22
  33:6 41:21 67:9
  133:16 149:15,19
**opposed**   46:19
  132:10
**opposing**   86:5
**opposite**   34:25
  35:17
**oral**   1:8,13 164:9
  164:17
**order**   33:9 95:8
  153:7 156:4,8
  160:3
**ordering**   151:23
**orderly**   56:12
  81:20 99:23
  121:20
**orders**   152:14
**organization**
  21:23 88:14 101:3
  161:17,19,20
**organizations**
  88:18
**original**   20:8,9
  42:14,23 43:3
  135:22 166:15
**originally**   16:1

**outcome**   165:10
**outlined**   64:25
**outlook.pst**   161:13
**outright**   98:16
**outside**   27:24
  43:19 141:13
**overall**   122:24
**overcome**   158:3
  159:7
**oversight**   22:21
**owned**   16:18,22
  17:13 19:7 130:18
**owner**   52:6,8,18
**owners**   18:8 19:1
**ownership**   11:7
  17:7,10 18:18
  137:13
**owns**   10:16 17:4
  17:18

**p**

**p**   2:1,1 3:1,1 8:1
**p.a.**   2:8
**p.m.**   1:17 95:1,3,5
  120:15,17,18
  158:10,12,14
  163:24,25
**page**   4:1 5:1 6:1
  7:1 33:16 34:5
  40:12,14 49:20
  65:25 74:9,18
  76:18,21 84:23
  92:19 95:23,24,24
  103:15,23,24
  104:1 108:18,20
  109:6 111:12,12
  125:4 127:4,24
  135:7,19 144:24
  144:25 145:12
  149:7 165:1 167:5
**pages**   168:6

**paid**   16:11
**paper**   74:15
  162:17
**paragraph**   50:19
  67:6,7 84:25 85:4
  87:18 88:12 91:4
  91:18 109:8
  112:12,14
**part**   14:24 49:6
  58:18 59:3 60:5
  88:14,16 89:9
  90:20 91:2,20,24
  100:19 101:2,17
  117:15 119:3
  121:13 123:10
  127:10 130:24
  134:10,12 135:5
  135:20,21 136:25
  138:4 150:17
  156:8
**particular**   43:15
  49:12 51:17 52:4
  59:9 60:24 62:20
  76:6 80:11 84:20
  85:23 95:11
  111:20,22 139:8
**particularly**   98:17
**parties**   43:20
  66:17,23 67:1,4,23
  67:23,24 68:11
  77:4 80:6 81:5
  82:4 95:13 99:13
  100:3 101:21
  102:3,4,18 103:10
  114:23,23 124:13
  126:10 136:17,23
  165:6
**partner**   86:10
**parts**   24:20 29:12
  86:3 105:5 151:23
  152:7,11,12,24

**[party - prepared]** Page 23

**party** 37:20 51:21
52:21 54:1 99:15
102:21 103:4
109:10,16 112:19
116:9 118:2 120:8
126:4,7 127:9
132:9 142:20
156:1 164:22
165:4
**party's** 112:21,23
112:24
**passage** 52:4
80:11
**password** 34:19
**patter** 136:22
**pause** 129:21
135:4 154:18
**pay** 27:17 91:16
103:10
**payroll** 105:5
**pays** 160:1
**peaceful** 142:11
**peggy** 2:19 8:23
**pending** 13:23
94:20,22 107:9
113:12
**pennsylvania** 2:9
2:21
**people** 56:23 73:1
75:10,17 79:20
96:14,14,15,15
98:2,3,4 122:8
128:5 141:4 144:4
152:11 159:20,24
**percent** 17:4,25
18:19,21,23,25
19:5,11 23:25
125:16 138:20
**percentage** 17:20
18:5 123:9,19
124:24

**percentages** 24:4
**perfect** 79:20
**perfectly** 31:9
**performing** 62:23
**period** 58:20
61:10 109:21
119:13 121:23
131:7 151:13
160:15
**periods** 123:1
**permission** 65:21
65:22 66:1
**permitted** 76:5
**person** 20:23 48:7
48:8 58:13 63:9
96:13 112:21
**person's** 21:3
**personal** 76:19,22
77:20 89:15
160:21,22
**personally** 15:13
27:15 79:9 121:7
123:8
**pete** 116:15
**phased** 46:19
**phillips** 2:20 8:24
9:2
**phone** 44:25 45:3
45:7,14 48:18
87:4 120:11
159:25 163:12,13
**phones** 163:11
**phrase** 55:6 97:19
**picture** 26:19,21
98:2 161:22,23
**pictures** 161:21,21
**piece** 62:22
**pissed** 60:6
**pitter** 136:22
**place** 44:22 150:16
152:16 155:24

**plain** 98:10
**plaintiff** 1:15 2:12
5:1 6:1 7:1 8:20
**plaintiff's** 26:2
27:11 32:15 38:9
44:7 57:17 63:21
74:2 82:7 92:2
106:6 107:22
111:4 123:22
124:3 126:23
129:24 134:21
141:22 143:8
144:21 153:15
158:20
**plaintiffs** 2:18
8:25 9:3
**plan** 13:25
**planned** 66:15
**planning** 160:24
**plans** 112:22
**plant** 10:19
**plaza** 2:21
**plead** 117:8
**pleasant** 46:11
**please** 8:15 9:16
9:23 13:6,13 33:8
39:6 64:7,13 85:8
91:13 104:5 113:8
116:1 125:14
166:4,9
**plus** 135:23 137:7
138:14,15,20
159:14
**point** 15:2 26:11
43:15,20 48:20
49:21 54:20 64:5
65:9 66:7 67:11
68:21 74:23 76:19
76:21 85:3 87:14
87:19 92:18 97:2
99:11,20 100:7

101:20 103:15
105:9 111:6 123:3
128:4 129:14
145:16 148:10
151:1 161:7
**pointing** 88:3,22
93:18
**points** 44:13,18,21
45:13,17,19,20,24
74:15 80:13 83:7
85:24 87:19 93:10
96:2 153:22
**policies** 23:5 61:25
98:13 99:5 139:22
140:2 151:3
**policy** 128:4 138:9
138:12 150:16
**porting** 30:18
**position** 30:20
31:18 32:8 34:24
35:1,3,9,16,18,20
35:22 36:3,12
78:1 90:21 122:22
136:6
**positions** 31:21
**positive** 48:9
**posture** 77:17
**potential** 21:24
94:17
**power** 16:2 23:15
79:14
**powerdns** 15:25
**powerful** 76:14
**practices** 23:5
31:23,24,25
**predominantly**
128:7
**prefer** 92:22
**prepare** 11:10,16
**prepared** 12:13
45:14 73:24 74:13

**present** 3:6 8:12
8:13 12:4,6,12
**preserved** 161:5,7
161:8
**preserving** 162:21
**president** 3:7 39:2
**presidents** 92:16
**prettier** 120:23
**pretty** 46:12 60:6
82:2 89:8 121:1
157:12
**prevalent** 140:4
**prevent** 66:4
**preventative**
145:6
**previously** 38:9
**price** 135:24
137:25 138:1,2,6,7
138:9,11,19
**pricing** 122:18
138:5
**primarily** 15:21
**principally** 49:14
138:17
**print** 162:20 163:1
163:2
**printed** 162:19
**printing** 152:13,14
163:1
**printout** 27:12
163:9
**prior** 16:14
**priority** 88:1
128:23
**privilege** 94:17,17
**probably** 11:22
35:2,20 68:15
73:15 97:7,7
**problem** 58:7
60:10,11 122:7

**problems** 56:21
**procedure** 1:22
85:11 93:25
**procedures** 58:19
90:12
**proceed** 9:16
107:6
**proceeding** 163:23
165:7
**process** 41:7 50:21
56:8 72:13 81:8
84:15 107:13
112:19 138:5
139:19 150:17,21
**processes** 55:13,22
59:2 60:20 62:6
62:12,16
**processing** 14:24
**produced** 1:14
44:10 74:6,7 92:6
135:20
**product** 80:17,25
100:11 156:22,22
159:25
**products** 72:3,11
84:13 100:22,24
105:19 138:10
157:1,17,20 158:3
159:6
**profit** 159:12,21
**program** 30:24
31:4 66:4 68:4
129:6,18 130:6,16
131:1 132:10
142:9,12 143:1,20
145:3
**programmer**
106:21
**programming**
15:6,14

**programs** 50:9
68:24
**progress** 48:6
129:21
**prohibit** 34:18
**prohibition** 112:9
116:5,21 117:1,3
119:1,11
**project** 22:7 42:20
43:9 44:4 112:3
**projects** 83:16,20
**proper** 41:14 68:1
**property** 10:5,9
10:14,20,25 11:2
114:5 116:10,14
116:17
**proposal** 42:14
43:3 44:3 48:3
**proposals** 41:19
**proposed** 41:7,15
50:16
**proposing** 40:16
43:8
**propounded** 168:8
**prospective** 68:5
**protect** 114:3
**protected** 55:12
55:21 57:3 60:19
62:17 63:6,13
66:4 68:4,10,23
121:10 131:7
143:19 150:10
155:3
**protecting** 142:16
**protection** 114:5
114:19
**protections** 31:1
**protective** 95:7
**protector** 20:24
21:1,4,7

**protocol** 33:9
**provide** 14:5
37:20 42:11
121:20 144:10
147:7 148:2,25
163:15
**provided** 15:9
37:9 50:6 90:17
**provider** 147:8
148:6 149:1 157:5
**provider's** 147:7
148:1,24
**providers** 144:10
144:12
**provides** 145:13
146:17 148:7
**providing** 34:18
75:21,23 77:4
126:11 147:16
148:14,22
**provision** 113:2
114:19 115:6,20
118:6
**provisions** 1:22
118:11
**public** 16:14 26:6
26:7,9 28:4,6
**publication** 5:2
**publicly** 25:11,19
30:7
**pull** 110:25 154:15
**purged** 162:16
**purpose** 50:11
**purposes** 81:9
86:1 100:10,10
101:7
**pursuant** 1:21
164:20
**pursue** 64:17
65:11 69:5,19
70:8

**[pursuing - reflecting]**                                                                 Page 25

**pursuing**  66:13
**put**  27:3 28:14
    97:2,12 122:10
    132:12 149:9
    162:19,21
**puts**  32:17
**putting**  159:19
**pwedgworth**  2:22

**q**

**qualified**  56:1
**que**  113:12 147:22
**queen**  11:6,8
**question**  13:2,7,8
    13:11,23,23 32:16
    33:19,22 34:5,21
    36:10 42:25 53:11
    53:19,22,24 54:7
    60:14 61:3 64:13
    69:14 70:13 82:23
    88:20,21 94:20,22
    94:23 95:7 97:10
    97:11 100:4 101:9
    102:7,8,13,14,15
    104:14 107:2
    110:17,17 113:7,9
    113:10,12,15
    114:6 115:25
    125:14 132:21
    133:7 142:2 147:6
    147:19 148:5
    149:4,5 158:1
**questioning**  86:21
**questions**  9:23
    13:14 60:10 93:14
    94:6 95:18 144:8
    147:9,22 148:23
    160:11 163:20
    168:8
**quick**  63:2
**quiet**  150:19

**quit**  104:11,25
    120:2,2,3,3
**quite**  30:10 40:8
    41:21 45:22 88:5
**quota**  123:16
**quotas**  123:18
**quote**  26:16 28:22
    28:23 61:1
**quotes**  159:24
**quoting**  108:16

**r**

**r**  2:1 3:1 8:1 167:3
    167:3
**r&i**  68:2
**r&r**  68:3,23,23
    87:20,21 88:2,3,22
**rain**  136:23
**raised**  122:23
**randomly**  153:3
**rare**  40:3
**ratcheted**  61:4
**rate**  138:15
**rci**  31:4 51:23
    52:23 54:2 58:16
    99:13,18 100:3,5,8
    101:5,13,16,22
    102:5,18 123:5
    124:6,13,20
    125:22 129:6,11
    129:18 130:6,16
    131:1 132:10
    136:14 138:2
    142:8,12,23 143:1
    143:20 155:9,24
    156:9
**rdr**  1:18 165:17
**reabsorb**  67:5
**reached**  58:16
**read**  33:11 40:15
    57:21,23 58:22
    60:16 64:7 67:10

67:12 82:13,22,23
    84:23 85:7,11,18
    85:25 86:13,16,18
    87:1 93:21 104:9
    106:12 108:2
    111:17,21 112:4,7
    119:23 135:7
    166:4 168:5
**reading**  33:16
    38:18 57:25 64:10
    67:13 70:6 85:21
    86:25 95:19 102:3
    115:21 116:1
    125:12 134:14
**reads**  58:12
**ready**  111:24
**real**  63:2 161:16
**realize**  131:13,20
    132:3 133:12
**really**  67:14 121:1
    123:16 129:1,1
    153:1 161:23
**reason**  14:5 67:8
    166:6 167:7,9,11
    167:13,15,17,19
    167:21,23
**reasonably**  112:22
**reasons**  61:19
    143:13 165:1
**recall**  12:22 32:11
    46:24 47:7 91:8
    96:11 108:7 118:3
    131:23 144:13,25
**receipt**  164:24
    166:16
**received**  22:13,14
    59:21 87:15 91:16
    135:8,15
**receiving**  107:25
**recess**  55:1 87:8
    95:3 120:17

158:12
**recognize**  26:4
    32:18 33:12 44:18
    92:12 93:6 106:7
    106:11 107:24
    140:25
**recognized**  94:8
**recognizes**  27:24
    28:12,20
**recollection**  97:20
**recommend**  151:2
**record**  1:23 5:2
    8:3,16 9:24 53:16
    54:25 55:3 85:22
    86:6,12,14 87:3,5
    87:7,11 93:23,25
    94:5,21,25 95:2,4
    104:5 120:14,16
    120:19 133:7
    158:8,11,15
    163:24 164:18
    165:9
**recorded**  8:4
**records**  156:5
**redistributor**
    100:10
**reduced**  97:17
**refer**  74:14 157:18
**references**  108:7
**referred**  34:12
    66:18 138:7
    143:13
**referring**  29:12
    54:8,10 57:4 99:1
    103:5,8 133:3,15
    142:4 147:12
    148:3 157:6
**refers**  99:8
**reflected**  58:11
**reflecting**  33:4
    147:5

**reflects** 33:13,23
35:5
**refresh** 97:20
**regard** 32:5 36:15
42:8 51:17
**regarding** 39:6
112:20
**regardless** 126:4
126:16 127:4,21
128:5,6 131:25
**regards** 90:11
157:16
**region** 3:21
**regulated** 60:2
**reiterate** 119:17
**relate** 94:16
127:18
**related** 49:2 93:12
136:24 148:19
162:2 165:6
**relationship** 29:5
66:19 82:5 156:25
157:1
**relationships**
126:4,7 127:9
150:18
**relative** 165:8
**release** 71:9 73:20
74:19 107:6,15
121:3
**released** 73:10,12
**releasing** 73:5
**reliable** 90:17,22
**relief** 119:19 143:5
**remember** 25:23
30:8 32:10 45:6
133:18
**remind** 95:9,12
145:4
**reminder** 49:13
80:15,19 89:6,14

145:3
**reminders** 81:1
82:3 84:7,11
89:19
**remindertrax**
145:1,12,25
146:10 148:14,15
**reminding** 117:20
**remiss** 88:3
**remote** 45:25 46:3
46:10 47:23 76:16
**remove** 20:21
**removed** 20:17
21:8
**renewal** 150:1,8
150:21
**repair** 152:14
**repeat** 36:9 43:9
44:4 53:21 64:13
82:23 113:8
125:13 146:7
**repeatedly** 86:14
**reply** 47:25 109:1
**reported** 1:19
**reporter** 8:13 9:15
133:6 164:14
**reporter's** 4:7
164:8
**reporting** 76:15
155:16
**reports** 31:9,10
135:12 152:9
**represent** 44:8
74:6 92:5
**representations**
27:4
**representative**
2:12 8:21
**represented** 85:14
**represents** 138:15

**request** 84:6,9
98:19 106:16
132:1 133:18
**requested** 46:23
46:25 69:9 164:22
165:3
**requests** 105:12
**require** 50:10
113:19 155:9
**required** 77:23
78:8,20 126:3
**requires** 127:8
**reread** 53:23
**res** 161:22,23
**reselling** 81:10
**reservation** 156:5
**resources** 128:24
128:25
**respect** 23:5 26:15
96:8 99:5 122:18
149:15
**respond** 47:22,23
154:14
**response** 43:9 44:3
47:10 48:2,9 85:5
152:2,15,24
**responsibilities**
22:21
**responsibility**
54:4
**rest** 19:6 93:15
125:12
**restriction** 114:2,7
115:9,11,12,16
155:21
**result** 78:4 113:17
114:23 139:16
**retail** 104:15,15,16
104:18 105:15,25
157:9

**retention** 161:11
**return** 166:14
**returned** 164:24
164:25
**reveal** 11:14
**revenue** 124:13,20
131:12,20 132:2
132:22 133:11
135:22 136:9
139:7
**reverse** 101:3
**review** 32:23 33:7
64:4 74:9 82:17
93:15 94:7,10
**reviewed** 11:12
**reymdl** 5:22
**reymdl00014384**
6:10
**reymdl00014396**
6:10
**reymdl00044042**
6:16
**reymdl00044043**
6:16
**reymdl00044241**
7:10
**reymdl00044242**
7:10
**reymdl00138479**
7:7
**reymdl00200760**
5:9
**reymdl00200761**
5:9
**reymdl00226199**
6:19
**reymdl0022620...**
6:19
**reymdl00238133**
7:3

| | | | |
|---|---|---|---|
| **reymdl00260942** | 48:23 49:8,25 | **rid** 140:11,12 | 122:3,19 123:5 |
| 5:16 | 50:1,8,9,15 51:6 | 142:3 | 124:21 125:1,22 |
| **reymdl00260943** | 51:12,22 52:22 | **right** 14:15,18,24 | 126:5,12 128:11 |
| 5:16 | 54:2,17 55:11,12 | 15:3,7,11,16,19,22 | 128:15 129:7,12 |
| **reymdl00261631** | 55:20,22 56:5 | 16:4,12,15 17:1,5 | 129:18 130:6,19 |
| 5:22 | 57:2,12 59:15,19 | 18:1,19,22 19:2,7 | 131:14,21 132:3 |
| **reymdl00263558** | 59:20,24 60:3,6,9 | 19:11 23:6,18,21 | 132:17 133:4,13 |
| 7:13 | 60:18 61:7,18,24 | 24:1,8,14,24 25:8 | 133:25 136:14 |
| **reymdl00263619** | 63:3 64:21 66:2,2 | 25:12,16,21 26:13 | 138:7 139:2,23 |
| 7:17 | 68:3,10,19,23 71:6 | 28:9 29:6 30:3,22 | 140:7 142:5 |
| **reymdl00565070** | 71:7 73:19 75:20 | 32:2,9 34:17 36:3 | 143:20 145:8,19 |
| 6:7 | 75:24 76:25 77:10 | 36:6,19 37:16,23 | 146:1,5 147:4,10 |
| **reymdl00565071** | 77:14,21 78:12,25 | 38:2,6 42:18 43:3 | 148:5 149:25 |
| 6:7 | 79:2,16,16 80:5 | 44:1 46:4,7 49:3 | 150:8,9,24 154:16 |
| **reymdl00652128** | 88:8 89:18 90:24 | 50:2,16 51:3,7,13 | 154:22 155:4,10 |
| 6:13 | 91:5,19 96:7,9,19 | 51:16 52:8 55:23 | 156:22 159:12 |
| **reymdl00652133** | 99:4,16 100:13,15 | 59:15 61:25 62:17 | 160:14 163:19 |
| 6:13 | 102:4,17,21 103:1 | 64:25 65:5,18,24 | **risk** 101:3 |
| **reymdl00716766** | 103:5,6,10 106:18 | 66:11,20 67:24 | **rival** 23:21 |
| 5:7 | 106:22 108:11,17 | 69:5,21 70:12,25 | **rms** 104:12,14 |
| **reymdl00716767** | 109:9,14,15 110:4 | 71:9 72:6,15 73:7 | 105:1 157:18 |
| 5:7 | 110:19 111:5,8 | 76:17,24 77:5,22 | **road** 154:9 |
| **reymdl00720415** | 112:14,17 114:4,7 | 78:8 80:7 82:14 | **robert** 1:8,13 2:19 |
| 6:22 | 115:2,3 121:2,3,10 | 82:19,24,25 83:13 | 4:4 5:12 6:3,6 7:2 |
| **reymdl00720511** | 121:11,17 126:3 | 83:15,17,20 84:11 | 7:9 8:4 9:17,25 |
| 6:22 | 126:11 129:17 | 84:16 85:12 86:22 | 63:24 64:16 |
| **reynolds** 2:2,2,7,7 | 131:1,6,12,20 | 89:19,23,24 90:8 | 163:23 164:9,16 |
| 3:7,8 9:9,9,11,11 | 132:2,3 133:12 | 90:14,24 91:6,21 | 166:2 167:2 168:2 |
| 10:16,16,17,17 | 136:18 137:3,14 | 92:25 93:22 94:3 | **rodeo** 12:24 |
| 12:6,8,12,15 16:4 | 137:17,18,21 | 94:21 96:19 98:6 | **role** 23:3 |
| 16:4,14,17,22,25 | 139:16 140:14,14 | 98:13 99:6,25 | **ron** 6:3 38:11 39:2 |
| 22:22,22 23:1,4,10 | 140:17,19 142:5 | 100:15 101:22 | 57:22 106:8 |
| 23:10,20 24:6 | 142:15 144:11,12 | 103:14 104:2,21 | **ronald** 5:8 |
| 26:7 27:1,4,12,15 | 145:24 146:11 | 106:24 107:5,7,10 | **room** 107:16 |
| 27:23 28:12,16,19 | 147:16 148:16 | 109:16,22 110:6,8 | **routine** 145:5 |
| 28:22 30:19,24 | 149:14 150:7,10 | 110:14,20,25 | **rule** 164:20 |
| 36:18 37:9,14 | 153:21 155:9 | 111:7 112:13 | **rules** 1:22 12:24 |
| 40:16 41:1,2 42:3 | 156:14,21 159:25 | 113:24 114:8 | 78:21 85:14 |
| 42:10,11 43:13,19 | 160:3,6,14,20,23 | 115:3 116:7 | **run** 15:19 31:9 |
| 45:25 46:4,10 | 161:5 162:23 | 117:16 118:13,21 | 67:7 152:9 153:7 |
| 47:5,24 48:11,21 | 163:6 | 121:11,17,25 | 155:19 159:23 |

[running - server]                                                          Page 28

**running**  22:21
  25:7 151:21
**runs**  156:18
**rwallner**  2:23
**ryan**  3:3 9:13,13
  34:10,15 85:10
  94:12,23 95:12
  100:17 102:14
  115:5 117:18
  119:6 140:15,23

**s**

**s**  1:15 2:1 3:1 8:1
  151:15,15
**safeguards**  78:21
**salaries**  138:17
**sale**  159:12
**sales**  5:21 24:14
  77:24 92:16
  123:16
**salespeople**  77:25
  104:20
**salesperson**  14:20
**saw**  30:6 70:12
  81:15 106:17
  114:25 117:25
**saying**  25:23 78:18
  84:8 91:12 98:20
  99:3,24 102:2
  107:1 114:18
  119:16 144:3
  154:5
**says**  27:15,20,23
  28:11,22 34:17
  49:24 59:21 62:15
  65:9 68:2,22 74:7
  75:13 76:21 80:23
  82:2 83:18 84:20
  85:1 87:25 96:21
  109:8 110:24
  115:14 116:5,21
  117:24 118:5,12

119:3 125:8
  135:21 136:12
  144:5 145:8
  153:25 154:20
  159:4
**scale**  89:3
**sch**  145:11
**schaefer**  5:12 6:3
  6:6 7:2,6,9 63:23
  63:25 64:1,6,16,20
  65:4,18 69:4,19
  70:7,12,15,25 71:2
  106:8 107:23,25
  108:8 109:4,6
  115:1 123:22
  124:1 126:24
  130:15 131:11,17
  142:2 143:9,11
  144:7,13,22 147:5
  147:24 148:20
  149:8,10
**schedules**  151:23
**school**  162:16
**scope**  145:9
**scott**  3:7 9:8 12:3
  12:11
**screenshot**  5:3
**second**  32:22 34:5
  40:14 64:14 74:18
  76:19,21 109:7
  143:16 155:25
  159:4,5
**section**  40:14
  53:25 70:1 92:19
  93:18 95:22,25
  103:19 104:8
  112:8,9 113:25
  118:8,14,20,23
**sections**  67:11,12
  92:10 93:2 118:20
  119:10

**secur**  55:22
**security**  5:16 31:2
  55:13,22 59:1
  60:7,10,11,20
  61:15 62:6,12,16
  62:19,24 66:14
  69:21 70:1,20
  71:8,11,13,18
  72:15 73:20,24
  74:19,24 75:6
  77:11,15,19 78:1,7
  79:1,15,17 83:16
  83:19 90:11 92:19
  93:2,14,18 95:22
  95:25 97:2,12,20
  98:6 101:12
  103:18 106:15,17
  106:23 107:6,14
  114:3 121:4,15,24
  122:5 132:16
  133:1 140:18
  141:8 143:13
  151:3 154:1
**see**  22:1 27:21,25
  28:2,12 34:21
  35:3 38:12 39:6,7
  40:9 46:1 49:22
  50:11 51:24 52:24
  54:4 60:12,14,16
  63:25 64:18 65:13
  66:5 67:2,3 68:5,8
  68:25 70:2 74:20
  74:21,22 75:9
  76:19,22 77:1,12
  87:22 95:24 96:5
  96:6 97:3,11,13
  108:17,25 109:11
  111:12 112:10,12
  112:24 113:1,11
  119:16 122:7
  124:7,14 125:8,10

125:12,25 127:5
  130:16 133:15
  134:24 135:20
  145:14 147:24
  148:2 149:6
  152:18,21 154:11
  158:24 159:8
**seeing**  114:11
**seen**  56:12 159:23
  160:13
**select**  56:23
**sell**  112:18 132:23
  132:24
**selling**  152:12
**sells**  50:10
**send**  31:10 155:20
**senders**  161:1
**senior**  39:2
**sense**  37:3
**sensitive**  89:17
  94:18 95:8
**sent**  38:22 64:14
  64:15 65:4 127:1
  158:23
**sentence**  58:22
  59:3 68:22 88:13
  91:9,17 104:10
  109:7 113:24
  159:4,5
**sentences**  125:25
**separate**  48:24,25
  49:4 116:25
**september**  5:9
**ser**  104:15
**series**  36:16 71:11
  73:14 74:15
  106:15
**serve**  128:20
**served**  15:21
**server**  152:11

[service - spotlight]                                                                        Page 29

**service**  25:2 29:20
  40:17 49:13 50:6
  80:16 81:1 82:3
  90:18 105:6,19
  145:3 152:7,13,14
  152:24 156:6
**services**  14:24
  15:3 16:20,21
  34:6,11,13,18
  40:14 42:2 104:16
  130:13 138:10
**serving**  128:21
  144:12 148:18
**set**  20:15 50:21
  60:9 63:1,17 71:6
  118:19 119:10
  126:2 160:9
**setting**  60:1
**settled**  119:18
**seven**  43:16
**share**  27:24 31:1
  114:22
**shared**  133:22
**shauna**  1:18 8:13
  164:13 165:17
**sheet**  166:7,10,12
  166:15 168:11
**sheppard**  2:9 9:10
**sheppardmullin....**
  2:11
**shifted**  122:17
  123:4 124:5,18
  125:21
**short**  14:16 50:24
  55:1 87:8 91:9,17
  95:3,6 120:17
  158:12
**shortcomings**
  120:12
**shorter**  14:2

**shorthand**  1:19
  164:13
**shortly**  108:3
**show**  39:14 134:9
  134:11 158:19
**showing**  146:16
**shut**  143:12 144:9
**shutdown**  46:19
**shutoff**  147:23
**sic**  124:7
**side**  142:25
**sidebar**  51:19
  67:17
**sigh**  119:19 143:4
**sign**  111:18 119:22
  125:17 142:23
  166:9
**signature**  4:6
  26:23 75:12
  111:13 119:21
  164:21 165:1,15
  168:14
**signed**  111:7 112:5
**significant**  40:8
  41:22
**signing**  166:11
**similar**  27:4 96:5
**simple**  53:24
**simply**  70:6
  116:13,16
**simultaneous**
  73:17
**single**  73:13
  160:20
**sir**  22:12
**sites**  50:9
**situation**  56:9
  57:11 58:15 59:9
  71:15 79:23 83:25
  122:24 139:8
  141:12 142:11,19

  145:10
**situations**  99:9
  129:3 155:15
**six**  150:2,8,12
  161:11,11
**size**  126:5,17
  127:4,12,18,21
  128:5,6,18
**skimmed**  112:7
**skip**  134:15
**skipped**  137:7
**small**  49:6,14 61:9
  127:13 128:20
  129:3 145:9
**smile**  161:15
**software**  15:10,15
  23:11 29:1,6,19
  48:23 49:3 72:20
  73:1,18 76:4
  79:13 84:13
  105:12 130:3,11
  142:10 155:16
  156:2,4,8,18,19
**sold**  14:23 15:15
  159:12
**solutions**  3:21
  49:3
**somebody**  58:6
  113:23 131:19
  141:13,16 152:22
  153:11
**somewhat**  76:6
  122:17 123:5
  124:5 125:21
**son**  10:7
**soon**  124:6
**sorry**  11:20 17:16
  20:14 21:2,6
  22:19 25:23 27:7
  32:10 36:9 53:8,9
  53:12 59:18 62:9

  64:3 74:13 103:17
  106:20 113:6
  117:8 118:16
  120:23 123:25
  142:22 143:24
  149:12 158:10
**sort**  94:2 151:24
**sorted**  58:10
**sound**  18:1
**sounds**  105:10
**space**  161:24
  166:7
**spam**  56:21,22
**spanish**  17:13,14
  17:18,20 18:9
**speak**  94:13
**speaker**  36:5,8
  78:15 80:10
**speaking**  93:7
  94:9 127:11
**special**  58:25
  62:11
**specific**  25:24
  47:25 48:13 51:23
  52:23 54:2 58:9
  62:19 67:10 68:18
  71:4 72:13 80:14
  80:17 100:20
  106:20 129:20
  157:1,17,20
**specifically**  32:21
  42:7 76:2 79:12
  89:5 102:25 122:6
  122:25 131:16
  144:16
**speech**  104:20
**spelled**  84:17
**spend**  92:22
  161:14
**spotlight**  32:17

**spun** 34:13
**square** 2:15
**squawks** 141:17
**st** 19:25 20:16
**stages** 96:4
**stand** 56:12 66:15
  81:20 91:25 99:23
  101:17,20 110:2
  111:23 113:18
  120:1 121:13,20
  121:21,22 127:10
  136:25 145:22
**standard** 28:17,19
  138:4,19
**standing** 5:15
**standpoint** 31:2
  32:7 34:25 35:18
  42:20 49:15 56:2
  69:10 77:24 78:1
  132:12 150:20
  154:1 157:3
**stands** 59:23
  104:14
**start** 96:3 151:21
  152:22
**started** 89:21
  122:14
**starting** 88:12
  157:25
**starts** 49:21 82:18
  82:19,24 106:9
  144:24
**state** 1:19 8:15
  9:23 85:22 92:8
  92:11,13 94:5
  109:20 144:8
  147:23 148:23
  164:14 166:6
**stated** 1:23 25:11
  136:5

**statement** 25:24
  28:4,7,13 46:11,12
  48:1 60:22 82:1
  84:20 85:5 86:7
  94:10 96:23
  117:23 129:15
  134:3 158:7,19,21
**statements** 86:5
  86:17,18 134:18
  135:11
**states** 1:1 8:6
  10:10 21:16,20
  44:9 53:1 123:1
  164:1
**staying** 93:24
**steady** 105:20
  129:21
**step** 152:1
**steps** 17:13,14,18
  17:20 18:9 112:21
**steve** 5:18 38:11
  38:25 40:4 44:24
  48:6 74:16 82:12
  82:13 83:23 107:1
**stickiness** 157:1
  157:16 158:20
  159:18 160:5
**sticky** 156:22
  157:19 158:3
  159:6,20
**stoneeagle** 141:19
  142:3,8,21 143:4
  143:14,16,17
**stop** 11:14 35:9,10
  46:19 47:4 49:25
  56:10,10 57:9,10
  91:6,20 150:23
**stopped** 91:23
  140:6
**stopping** 54:20

**store** 24:7
**straight** 56:11
**strange** 105:11
**stream** 98:1
**street** 2:15 3:4,21
  8:9
**strictly** 80:25
**strike** 28:5 48:22
  107:15 119:7
  122:15 149:12
**strong** 61:2 79:14
**strongly** 151:2
**structure** 17:8,10
**strung** 144:6
**stuff** 156:17
  159:20
**styled** 1:16
**subject** 11:15
  39:10 40:6 95:14
  134:23,24 153:17
  166:11
**subjects** 64:18
  70:9
**subscribed** 165:11
**subsequent** 41:8
**subsidiaries** 2:12
  8:20 46:7 66:9
  75:16
**subsidiary** 16:18
**substan** 17:25
**substance** 168:10
**substantially**
  17:24 97:17
**successful** 14:20
**successfully**
  129:17
**sudden** 60:9 71:15
**sufficiently** 91:1
**suggestion** 50:20
**suggests** 86:15

**suite** 1:21 2:5,10
  2:15 3:21 8:9
  105:7
**sumner** 2:15
**sunday** 38:12
**sunset** 10:8 59:18
**support** 119:25
**supposed** 131:13
  131:20 132:3
  133:12
**sure** 33:12,18
  36:11 45:19 53:20
  54:22 91:25
  125:15 129:20
  141:16 145:17
  146:8
**surround** 105:17
**swap** 161:21
**swear** 9:16
**switch** 78:9
**sworn** 1:15 9:18
  164:17 165:11
**sys** 121:16
**syscheck** 151:15
  151:15 152:18,25
  153:2,5,9
**system** 15:10
  23:11 37:3 46:4
  48:11 54:12 56:5
  60:3 63:3,10 73:2
  75:11 77:21 79:14
  80:18 84:1 88:4,8
  88:22 96:9 98:10
  98:12 99:4,5
  101:4 104:16,18
  105:15,25 109:10
  109:16 110:20
  113:20 118:2
  121:11,17 122:8
  130:22 131:6
  139:17 140:14,20

142:17 151:18,19
151:21 152:3,17
152:18 153:11
156:12 157:9
**systems**  1:4 8:5
16:25 17:12 37:12
40:18 41:3,13
43:19,25 46:1,10
47:5,24 75:1,18
76:25 80:4 81:9
84:5,9 87:20,21
89:3,5 98:17 99:9
104:11,25 105:4
105:19 106:16
114:14 120:2
124:14 126:8
136:18 140:18
164:4 166:1 167:1
168:1

**t**

**t**  167:3
**table**  87:1 112:2
**tablets**  163:11,13
**tac**  59:22,22
**tactics**  83:24
**tadler**  2:20 8:24
9:1
**take**  13:19,25
32:22 44:21 54:4
54:23 71:23 78:12
78:16 86:2 92:24
112:21 120:13
126:3,15 127:3,8
127:20 128:5,5
159:11,13
**taken**  1:15 30:20
77:10 150:19
165:8
**takes**  80:19 105:15
139:7 155:24
161:23

**talk**  12:15 13:1,3
23:9 47:18 64:24
65:22 66:1 70:25
96:13 101:19,20
101:21 102:12
157:16,20
**talked**  11:12 96:14
96:15 132:6
134:12
**talking**  19:10
41:15 44:13,18,21
45:13,17 49:13
50:22 52:15 72:24
72:25 73:4 74:15
83:7 93:10 97:15
98:20 99:25
102:16,17,22,25
103:18 104:11,25
119:24 124:25
126:8 128:14
139:4,5 150:3
159:10
**talks**  145:8
**target**  127:14
**taught**  15:5
**team**  131:19
133:10,18 134:13
**tear**  50:21
**tech**  138:16
**technical**  59:23
**technically**  135:13
**technology**  41:2
43:25 112:19
113:23
**telephone**  1:18
**telephonically**
2:19
**tell**  63:11 81:22
83:11 101:24
107:3

**temporarily**  58:10
**temporary**  56:1
56:14 57:10 58:8
59:4 72:8
**ten**  137:19 154:10
**term**  36:21,23
40:8 50:20,24,25
55:11,17 57:1
76:6 98:8 140:25
145:1 150:6
156:24,25 162:18
**terminate**  119:12
**terminology**  56:20
**terms**  31:12 71:3
76:1
**terrible**  152:3,15
**terry**  18:15
**test**  13:18
**testified**  9:18
115:1 117:14
132:14
**testimony**  14:6
95:14 117:21
164:18
**texas**  1:19,21 2:5
8:10 10:10 164:14
**text**  27:19
**thank**  14:4 16:11
28:14 36:8 38:21
64:12 95:6,15
104:7 106:3 135:8
**thanks**  94:24
**therefor**  165:2
**theron**  9:25
**thing**  41:9,10
49:14 67:13,14
73:13 74:17 91:10
101:25 111:5
119:22 127:24
134:14 145:7
151:24

**things**  47:18 49:1
50:24 65:23,25
69:15 75:10,16
77:22 78:7 79:11
88:11 92:24
112:14 122:7
138:15 145:9
150:19 152:4,21
152:21 153:10
162:15
**think**  14:23 41:6
45:21 50:18 52:15
53:1 54:10 55:10
56:1 58:11 62:15
66:7 68:15 69:23
77:22,23 79:21
80:11 82:1,2
84:22 85:23,25
89:21 92:21,22
93:20 96:25 99:20
100:7 102:24
116:19 122:21
123:8 124:23
125:24 126:19
127:7 128:3,17
132:5 136:16
139:19 144:4,5
150:15 151:1
152:20 154:24
155:12 156:24
157:4
**thinking**  45:7
101:25
**third**  37:20 39:5,5
43:20 66:17,23
67:1,4,22,23 68:11
77:4 80:6 101:21
102:18,21 103:10
109:16 112:19
114:22 120:8
126:4,7,10 127:9

**[third - understanding]**

132:9 136:17,23
156:1 159:4
**thirty**   166:16
**thomas**   18:15
**thought**   42:9,20
118:16
**thoughts**   34:20
39:6
**three**   11:23 59:22
61:2
**thursday**   124:4
**time**   10:25,25
11:20 12:22,22
13:2 15:6 32:25
33:10 39:24 40:1
40:3 43:11,15,20
45:4,9,11 47:3,8
48:21 49:8 51:1
54:24 55:2 56:7
58:4 61:10 62:22
67:14,15 79:10,15
84:1,9 85:22 86:2
86:11,12 87:6,10
88:5 92:23 95:1
99:20 105:14
107:9 120:15,18
122:23 128:4
129:1,1,14 139:6
143:18 151:1,7
152:2,15 158:10
158:14 161:2
163:23
**times**   12:21 19:6
123:2 139:10
152:24 159:16
**timing**   73:9
**tiny**   62:4
**title**   116:2
**titled**   46:15
**today**   8:21 9:23
11:11,17 14:6

140:20 141:11
145:1 153:25
154:25 155:1
156:20 163:20
**today's**   163:22
**todd**   2:14 3:9 8:18
**told**   25:19 26:15
30:7 47:23 60:10
74:17 81:4 95:13
**tommy**   6:15,18
7:12 126:24 127:2
129:25 130:1,3
153:16
**tone**   83:11
**tools**   76:15
**top**   16:24 27:19
63:22 64:15 82:11
98:3 106:7 109:8
146:9 154:19
**topics**   47:19 64:25
69:6,18 70:19
**total**   97:7
**totally**   49:1
**tougher**   123:2
**townhouse**   10:7
**toyota**   38:2
**track**   11:20 24:3
61:18 122:9
**tracked**   36:14
**tracking**   61:22
**trade**   39:14
**traditional**   105:4
**transactions**   24:14
159:14
**transcript**   164:17
164:25 166:17,18
**transcription**
168:7
**transfer**   112:10,18
115:20 116:5,22
117:4 119:1,11

**transition**   58:20
59:4 66:4 81:20
120:5 130:25
**transitional**   56:2
**transitioned**   61:10
**true**   30:10 81:18
81:18 164:18
**truly**   32:8 35:1,18
134:9 155:8
**trust**   17:3,19,21
18:10 19:2,7,15,19
19:23,25,25 20:3,6
20:8,10,16,24,25
21:4,7,13 22:1,15
22:17,20
**trustee**   20:12,17
20:21
**trustees**   19:22
20:2,5
**trusts**   20:15,15
**truth**   105:11
**truthful**   14:6
**try**   13:3 93:17
**trying**   13:25 67:5
94:1 98:2 101:24
102:1 103:22
123:18 125:17
133:25 134:1
147:2
**tuck**   10:4
**tuesday**   158:23
**turn**   34:4 40:12
65:25 74:18
113:22 125:4
135:18
**turned**   73:16
**two**   10:16 14:15
14:16 19:2,6
23:14 66:9 92:9
97:5 112:14
116:25 123:12

125:25 129:16
144:11
**type**   23:14 49:22
49:24 50:7 80:21
101:5 150:12,17
155:13,25
**types**   128:18
136:24 155:18
156:7
**typical**   142:19
159:13
**typically**   111:17
138:14 152:6

**u**

**ucs**   15:9,19,21,24
16:3,11,18
**ugly**   46:13
**uh**   12:23 47:21
155:1
**ultimate**   23:4
**ultimately**   91:19
132:11
**umm**   29:12 111:20
154:18
**unable**   156:19
**unattended**   31:15
45:25 46:3,10
47:23 76:16
**unauthorized**
72:19,21 73:4
**uncover**   75:17
**understand**   13:6
13:16 14:23 34:23
35:16 38:5 68:16
69:11 75:19 79:8
91:11 143:25
146:15 149:5
150:6 151:17
**understanding**
34:16 35:24 62:9
100:8 109:24

**[understanding - website]** Page 33

110:11 121:14
148:21
**understood** 13:8
91:5
**underway** 22:8
**unfortunately**
76:5
**unhappiness**
62:20
**unidentified** 36:5
36:8 53:15 78:15
80:10
**union** 92:9,11,13
**unit** 159:12
**united** 1:1 8:6
21:16,16,20,21
164:1
**universal** 15:2
16:25 17:12
**university** 14:8,13
**unjustifiably**
139:19
**unknowingly**
152:1
**unproductive**
47:14,16
**unusual** 47:11
133:24 144:16
**unwinding** 150:17
**update** 153:18
**upright** 60:25
**upwards** 19:10
**usage** 90:5,5
100:20
**use** 29:1,4,19 32:1
37:3 49:4,14 50:9
50:15 51:2,6,12,21
52:16,21 53:4,25
53:25 57:1 72:19
72:20,21 76:3
86:11 90:24

146:13 147:15
150:11 151:10,18
156:19 160:3,19
162:2 163:8,11
**user** 34:19 55:12
55:21 56:13 57:3
58:10,25 59:5
60:1,19 62:5,10,17
62:21 63:8,13
75:25 76:10
121:10 122:10
151:21 152:22
153:21 154:3
155:3
**usual** 68:20

**v**

**v** 166:1 167:1
168:1
**val** 133:11
**value** 134:13
158:3 159:6
**varies** 129:3
**various** 123:2
136:23 145:24
146:20 153:22
**vary** 128:18
**vastly** 79:17
**vehic** 29:15
**vehicle** 24:17
29:13,16 105:6
**ven** 128:10
**vendor** 2:13 8:21
128:19
**vendors** 34:19
37:21 43:13 99:15
102:23 103:4
126:11 128:11,14
129:18 130:6,15
130:18 132:9
155:8

**venture** 40:16
41:16 42:2,4,10,18
43:12 81:15
**veritext** 3:21 8:12
8:14
**versa** 137:18
**version** 99:13,18
100:3,5 101:13,16
101:22 102:4,18
**vice** 3:7 39:2 92:16
137:18
**video** 8:4
**videographer** 3:10
8:2,12 9:15 54:24
55:2 87:6,9 95:1,4
120:15,18 158:9
158:13 163:22
**videotaped** 1:8,13
164:9
**view** 78:12
**views** 78:16
120:25
**violation** 78:19
**visit** 10:25
**volume** 1:11 97:16
164:11

**w**

**wait** 98:24 102:13
102:14
**wallner** 2:19 87:4
**want** 31:1 45:23
47:17 52:5,17,17
53:2,2 64:5,5
71:14 74:16 80:3
80:3 84:19 85:3
85:14 86:2 96:2
103:15 107:18
108:6 109:5,22
110:23 119:3
126:25 127:2,19
136:18,23 140:16

151:9 152:9
155:22
**wanted** 31:7 45:20
47:18 71:9,13
80:4,20 99:17
104:10 109:15,18
110:5 112:2 115:2
126:15 132:1
140:11,12 144:9
158:18
**wants** 85:11 94:7
102:12
**war** 58:2 98:6
119:17,18
**wars** 36:19,24
97:2,12,20 101:12
**washington** 2:10
2:16 3:4,22
**watch** 123:11
**watching** 94:4
**way** 27:20 31:13
48:16 50:19 60:8
61:2 63:14 75:14
77:22 78:8,8 79:2
79:23,24,25,25
93:6 98:22 103:11
103:13 132:11
140:9 141:9,14,16
153:3 162:12
**ways** 56:22 79:21
116:20 136:8
**we've** 56:12 58:4,5
79:8,16 85:22
107:10 117:25,25
132:6 144:5
149:23 150:18,18
150:19
**webpage** 27:20
**website** 5:3 27:5
27:13,16

[wedgworth - zero]                                                        Page 34

| | | x |
|---|---|---|

**wedgworth** 2:19
  8:23,23 87:3
**wednesday** 143:10
**week** 83:16 154:2
  154:4
**weeks** 45:11
**went** 44:4 154:9
**west** 10:4
**whatnot** 152:13
**whitelist** 56:19,19
  56:25
**whitelisting** 55:7
  55:11
**whoev** 155:20
**wholly** 16:18
**wide** 139:20
**wife** 10:7 21:15,15
**wilkinson** 2:3 9:6
  9:6
**wind** 57:5,7,11
  100:1 109:21
  110:13 119:13
  121:3 130:24
  131:7
**window** 150:13
**wish** 69:2 70:4,23
**witness** 1:14 2:2,7
  9:5,12,16 36:9
  47:21 53:11 56:17
  85:7,11,12 86:24
  94:13,18 102:9
  113:8 134:16
  157:23 164:16,19
  166:3
**witnesses** 85:13
**wondering** 133:17
**words** 102:3
  117:10
**work** 30:3 65:10
  89:21 113:16
  129:5,11 155:8

  156:4,9,10
**worked** 14:14
  74:21 111:23
  120:1,12 130:25
**working** 79:17
**workman** 6:3
  38:11,22 39:2,18
  106:8
**works** 12:11 65:6
  69:13 153:1
**world** 58:16
  137:24
**worst** 46:9 59:10
  66:9 69:13 97:6
  143:4
**worth** 47:13 139:7
  159:15 162:18,21
**write** 39:5,9 40:5
  52:20 64:1,16
  83:15 84:3 97:1
  97:25 99:12 100:1
  104:10 106:14
  124:5 127:2
  143:10
**writer** 60:25
**writes** 85:4 91:3
  109:6 130:8 154:9
**writing** 152:13
**written** 112:24
  143:11
**wrong** 41:9,10
  77:25
**wrongly** 77:10
  78:24
**wrote** 43:23 62:10
  70:7,11 87:18
  97:11 101:25
  124:7,11 127:19
  128:1 129:10
  130:5 153:2

**x** 164:22
**xtime** 156:3,3,11
  156:11
**xtream** 146:10

| | | y |
|---|---|---|

**y** 151:15
**yeah** 18:3 51:5
  69:8 97:15 102:9
  116:19 117:4
  128:17 135:25
  139:18 141:6,7
  148:3 157:23
  159:1 160:24
**year** 39:15 123:13
  123:13 131:7
  138:19 161:12
**years** 14:15,16
  26:8 36:3,12
  51:12 55:9 58:4
  60:5 61:2 79:11
  79:19 80:4,6,20
  81:2 86:19 88:2
  100:14 109:9,20
  110:6 117:15
  118:1 129:16
  136:2 138:25
  139:1,10 143:19
  144:5 154:10
**yesterday** 11:18
**york** 2:22,22

| | | z |
|---|---|---|

**zero** 155:2

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

Page 167

1                  IN THE UNITED STATES DISTRICT COURT

                 FOR THE NORTHERN DISTRICT OF ILLINOIS

2                         EASTERN DIVISION

3                                  )

     IN RE: DEALER MANAGEMENT    ) MDL NO. 2817

4    SYSTEMS ANTITRUST           )

     LITIGATION,                 ) CASE NO. 18 C 864

5                                  )

6

7

8    ORAL AND VIDEOTAPED DEPOSITION OF ROBERT BROCKMAN, VOL 2

9          Highly Confidential - Attorneys' Eyes Only

10                     January 17, 2019

11

12       ORAL AND VIDEOTAPED DEPOSITION OF ROBERT BROCKMAN,

13   VOLUME 2, produced as a witness at the instance of the

14   PLAINTIFF(S), and duly sworn, was taken in the

15   above-styled and numbered cause on the 17th day of

16   January, 2019, from 9:07 a.m. to 4:43 p.m., via

17   telephone, before Shauna L. Beach, RDR, CRR, CSR in and

18   for the State of Texas, reported by machine shorthand,

19   at the law offices of Gibbs & Bruns, LLP, 1100

20   Louisiana, Suite 5300, Houston Texas  77002, pursuant to

21   the Federal Rules of Civil Procedure and the provisions

22   stated on the record or attached hereto.

23

24

25

HIGHLY CONFIDENTIAL

```
 1              A P P E A R A N C E S
 2   FOR THE WITNESS:
 3        AUNDREA K. GULLEY
          BRICE WILKINSON
 4        Gibbs & Bruns, LLP
          1100 Louisiana
 5        Suite 5300
          Houston, Texas  77002
 6        agulley@gibbsbruns.com
          bwilkinson@gibbsbruns.com
 7
     FOR AUTHENTICOM, COX AUTOMOTIVE AND IT'S NAMED PLAINTIFF
 8   SUBSIDIARIES, MDSC, AUTOLOOP AS A REPRESENTATIVE OF THE
     VENDOR CLASS:
 9
          MICHAEL N. NEMELKA
10        JOSEPH LONG
          Kellogg Hansen Todd Figel & Frederick
11        Sumner Square
          1615 M Street, N.W., Suite 400
12        Washington, D.C. 20036
          mnemelka@kellogghansen.com
13        jlong@kellogghansen.com
14   FOR THE DEALERSHIP CLASS PLAINTIFFS:
15        PEGGY J. WEDGWORTH
          ROBERT WALLNER (appearing telephonically)
16        JOHN HUGHES
          Milberg Tadler Phillips Grossman, LLP
17        One Pennsylvania Plaza
          19th Floor
18        New York, New York  10119
          pwedgworth@milberg.com
19        rwallner@milberg.com
20   FOR CDK GLOBAL:
21        MARK RYAN
          Mayer Brown
22        1999 K Street, N.W.
          Washington, DC 20006-1101
23        mryan@mayerbrown.com
24
25
```

HIGHLY CONFIDENTIAL

Page 169

1                    A P P E A R A N C E S
2    FOR THE WITNESS:
3          MICHAEL P.A. COHEN
           Sheppard Mullin
4          2099 Pennsylvania Avenue
           Suite 100
5          Washington, D.C. 20006-6801
           mcohen@sheppardmullin.com
6
     ALSO PRESENT:
7

           SCOTT CHERRY
8          Vice President - General Counsel at The Reynolds
           and Reynolds Company
9

           Ben Harwood, Videographer
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

HIGHLY CONFIDENTIAL

Page 170

1    1                          INDEX

                                           PAGE
2    2
        Appearances                        176
3    3
4    4  ROBERT BROCKMAN
5    5  Examination by Ms. Wedgworth       176
        Examination by Mr. Nemelka         289
6    6  Examination by Ms. Gulley          300
        Further Examination by Mr. Nemelka 354
7    7  Further Examination by Ms. Wedgworth 357
8    8
        Signature and Changes              369
9    9
        Reporter's Certificate             370
10   10
11   11
12   12
13   13
14   14
15   15
16   16 It came to our attention earlier today that there was an
        inadvertent mis-numbering of exhibits at the deposition of Ronald
17   17 Lamb, causing a duplication of exhibits
18   18 "Plaintiffs'-670" through "Plaintiffs'-679." Accordingly,
19   19 Veritext will be adjusting the numbering of the duplicate
20   20  exhibits to reflect the deponent
21   21
22   22
23   23
24   24
25   25

Page 171

```
 1                    EXHIBITS
    NO.          DESCRIPTION                    PAGE
 2
    Exhibit 274 Email chain ending with email to    318
 3              Robert Theron Brockman, II from Bob
                Brockman dated November 9, 2016
 4              REYMDL00263304
                Highly Confidential - Attorneys'
 5              Eyes Only
 6  Exhibit 275 Email chain ending with email to    321
                Christopher Rulon from Bob Brockman
 7              dated September 17, 2013
                REYMDL00611282 - REYMDL00611284
 8              Highly Confidential - Attorneys'
                Eyes Only
 9
    Exhibit 657 Email chain ending with email to    184
10              Bob Brockman from Ronald Lamb dated
                September 2, 2015
11              REYMDL00244021 - REYMDL00244025
                Highly Confidential - Attorneys'
12              Eyes Only
13  Exhibit 658 Email chain ending with email to    201
                Robert Schaefer from Bob Brockman
14              dated April 30, 2015
                REYMDL00045348
15              Highly Confidential - Attorneys'
                Eyes Only
16
    Exhibit 659 Email chain ending with email to    213
17              Bob Brockman from Ron Workman dated
                December 24, 2015
18              CDK-CID-00963942
                Confidential
19              Highly Confidential
20  Exhibit 660 Reynolds and Reynolds January 2016  221
                Financial Package
21              REYMDL00719700 - REYMDL00719787
                Highly Confidential - Attorneys'
22              Eyes Only
23  Exhibit 661 Email chain ending with email to    229
                Bob Brockman from Robert Schaefer
24              dated January 5, 2016
                REYMDL00045556
25          Highly Confidential - Attorneys'Eyes Only
```

Page 172

```
 1                        EXHIBITS
     NO.        DESCRIPTION                     PAGE
 2
     Exhibit 662 Email chain ending with email to   234
 3               Robert Schaefer from Craig Moss
                 dated October 7, 2016
 4               REYMDL00590725 - REYMDL00590727
                 Highly Confidential - Attorneys'
 5               Eyes Only
 6   Exhibit 663 Email chain ending with email to   237
                 Keith Hill from Bob Brockman dated
 7               November 28, 2017
                 REYMDL00661495 - REYMDL00661497
 8               Highly Confidential - Attorneys'
                 Eyes Only
 9
     Exhibit 664 Email chain ending with email to   240
10               Dan Agan from Jonathan Strawsburg
                 dated April 21, 2016
11               REYMDL00333091 - REYMDL00333092
                 Highly Confidential - Attorneys'
12               Eyes Only
13   Exhibit 665 Email chain ending with email to   244
                 Bob Brockman from Robert Schaefer
14               dated May 8, 2016
                 REYMDL00050127
15               Highly Confidential - Attorneys'
                 Eyes Only
16
     Exhibit 666 Email chain ending with email to   247
17               Robert Schaefer from Bob Brockman
                 dated May 31, 2016
18               REYMDL00045445
                 Highly Confidential - Attorneys'
19               Eyes Only
20   Exhibit 667 Email chain ending with email to   252
                 Chris H. Hellyer from Robert
21               Schaefer dated June 1, 2016
                 REYMDL00068321 - REYMDL00068325
22               Highly Confidential - Attorneys'
                 Eyes Only
23

24

25
```

HIGHLY CONFIDENTIAL

```
                                                Page 173

 1                       EXHIBITS
      NO.          DESCRIPTION                    PAGE
 2
      Exhibit 668 Email chain ending with email to   256
 3                Robert Schaefer from Bob Brockman
                  dated June 2, 2016
 4                REYMDL00071272 - REYMDL00071273
                  Highly Confidential - Attorneys'
 5                Eyes Only
 6    Exhibit 669 Email chain ending with email to   256
                  Robert Schaefer from Bob Brockman
 7                dated August 12, 2016
                  REYMDL00238490 - REYMDL00238491
 8                Highly Confidential - Attorneys'
                  Eyes Only
 9
      Exhibit 670 Email chain ending with email to   259
10    Brockman    Robert Schafer from Bob Brockman
                  dated August 12, 201
11                REYMDL00238492 - REYMDL00238493
                  Highly Confidential - Attorneys'
12                Eyes Only
13    Exhibit 671 Email chain ending with email to   262
      Brockman    Bob Brockman from Jonathan
14                Strawsburg dated June 20, 2017
                  REYMDL00263065 - REYMDL00263066
15                Highly Confidential - Attorneys'
                  Eyes Only
16
      Exhibit 672 Email chain ending with email to   268
17    Brockman    Robert Schaefer from Bob Brockman
                  dated July 4, 2016
18                REYCID0074420 - REYCID0074422
                  Highly Confidential - Attorneys'
19                Eyes Only
20    Exhibit 673 Email chain ending with email to   271
      Brockman    Jon Martin from Robert Schaefer
21                dated May 9, 2017
                  REYMDL00470609
22                Highly Confidential - Attorneys'
                  Eyes Only
23
24
25
```

Page 174

| | | EXHIBITS | |
|---|---|---|---|
| | | NO.          DESCRIPTION | PAGE |

1  1

2  2

Exhibit 674 Email chain ending with email to      276
3  3    Brockman    Tommy Barras from Jonathan
                    Strawsburg dated July 19, 2017
4  4                REYMDL00503332 - REYMDL00503335
                    Highly Confidential - Attorneys'
5  5                Eyes Only

6  6    Exhibit 675 Reynolds and Reynolds July 2018      284
                    Financial Analysis Package
7       Brockman    REYMDL00723521 - REYMDL00723612
                    Highly Confidential - Attorneys'
8  8                Eyes Only

9  9    Exhibit 676 Reynolds and Reynolds December YTD   288
        Brockman    2017 Financial Analysis Package
10 10               REYMDL00722459 - REYMDL00722550
                    Highly Confidential - Attorneys'
11 11               Eyes Only

12 12   Exhibit 677 Email chain ending with email to      289
        Brockman    Robert Schafer from Bob Brockman
13 13               dated February 7, 2015
                    REYMDL00061987 - REYMDL00061988
14 14               Highly Confidential - Attorneys'
                    Eyes Only
15 15

        Exhibit 678 Email chain ending with email to      292
16 16   Brockman    Ron Lamb from Bob Brockman dated
                    June 30, 2015
17 17               REYMDL00583889 - REYMDL00583890
                    Highly Confidential - Attorneys'
18 18               Eyes Only

19 19   Exhibit 679 Email chain ending with email to      296
        Brockman    Robert Schaefer from Bob Brockman
20 20               dated July 1, 2017
                    REYMDL00045179
21 21               Highly Confidential - Attorneys'
                    Eyes Only

22 22

23 23

24 24

25 25

Page 175

1                 P R O C E E D I N G S

2                 THE VIDEOGRAPHER:  Good morning.  Today is

3       January 17th, 2019.  We're on the record at 9:07 a.m.

4       This is the continued recorded deposition of Mr. Robert

5       Brockman in the matter of In Re: Dealer Management

6       Systems Antitrust Litigation in the United States

7       District Court for the Northern District of Illinois in

8       the Eastern Division.

9                 My name is Ben Harwood, and I'm the

10      videographer present on behalf of Veritext.  The court

11      reporter is Shauna Beach, also present on behalf of

12      Veritext.  This deposition is being held at Gibbs &

13      Bruns, LLP, located at 1100 Louisiana Street, Suite

14      5300, in Houston, Texas, ZIP Code 77002.

15                Will counsel please state their appearance

16      and firm affiliation for the record.

17                MS. WEDGWORTH:  Peggy Wedgworth, from

18      Milberg Tadler Phillips Grossman, on behalf of

19      Dealership Class Plaintiffs.

20                MR. HUGHES:  John Hughes, Milberg Tadler

21      Phillips Grossman, representing Dealership Class

22      Plaintiffs.

23                MR. NEMELKA:  Mike Nemelka from Kellogg

24      Hansen, representing the Individual and Dealership Class

25      Plaintiffs, and with my colleague, Joe Long.

HIGHLY CONFIDENTIAL

Page 176

1          MS. GULLEY:  Andi Gulley, from Gibbs &

2    Bruns, representing Mr. Brockman and the Reynolds and

3    Reynolds Company.

4          MR. WILKINSON:  Brice Wilkinson, also with

5    Gibbs & Bruns.

6          MR. COHEN:  Michael Cohen, with Sheppard

7    Mullin, representing the defendant, the Reynolds and

8    Reynolds Company and the witness, Mr. Brockman.

9          MR. RYAN:  Mark Ryan, from Mayer Brown, on

10   behalf of CDK Global.

11         THE VIDEOGRAPHER:  Will the court reporter

12   please swear in the witness and we may proceed.

13              ROBERT THERON BROCKMAN,

14   having been first duly sworn, testified as follows:

15                   EXAMINATION

16   BY MS. WEDGWORTH:

17     Q.  Good morning, Mr. Brockman.  As we started

18   yesterday, I'll just ask you -- all of the rules we put

19   in place yesterday, are you okay with continuing those

20   same rules today?

21     A.  Yes, ma'am.

22     Q.  So if you answer a question, I'll assume you

23   understand the question.  Is that fair?

24     A.  Yes, ma'am.

25     Q.  And if you don't understand, please, let me

HIGHLY CONFIDENTIAL

Page 177

1    know and I'll restate the question.  And if you need to

2    take a break at any time, please, let me know.  I'm

3    happy to take a break as long as there's a question not

4    pending.  I'll ask that you answer the question before

5    we take a break, if that -- can you agree to that?

6        A.  Yes, ma'am.

7        Q.  Okay.  I wanted to start today on a different

8    topic of converting dealerships.  When they convert

9    DMSs, does Reynolds track all dealerships who convert

10   DMSs -- or switch DMSs?

11               MS. GULLEY:  Form.

12       A.  I'm sorry.  I don't understand.

13       Q.  (By Ms. Wedgworth)  Well, when a dealership

14   switches, say, from a Reynolds DMS to a CDK DMS, does

15   Reynolds track that conversion?

16               MS. GULLEY:  Form.

17       A.  That's not -- we consider that a -- a lost

18   customer.  The concept of conversion is not part of

19   anything that we keep track of.

20       Q.  (By Ms. Wedgworth)  So Reynolds --

21       A.  When you lose a customer, I mean, it's implied

22   that there's a -- obviously, there has to be a

23   conversion involved, I suppose, so we don't think about

24   it -- it in those terms.  And therefore, I can't say

25   that -- that we track conversions.  We track lost

Page 178

1    customers.

2         Q.  When a dealership -- do you call it "converts"

3    or "switches"?

4         A.  We use either term.

5         Q.  So when a dealership converts DMS, there are

6    risks, correct, to the dealership?

7                   MS. GULLEY:  Objection; form.

8         A.  A risk?

9         Q.  (By Ms. Wedgworth)  Risk, yes.  Risk in loss of

10   sales, loss of customers, loss of employees, are there

11   risks when a DMS switches -- when a dealership switches

12   DMS?

13                  MS. GULLEY:  Objection; form.

14        A.  I don't know that I would characterize it as

15   risk.  There's certain overhead that is involved,

16   because the dealership's employees have to learn new

17   software.  And I'm sure you've been through situations

18   where you had to change from one software package to

19   another software package.

20                  You know, you've got to learn how -- it's

21   kind of like I have a new iPhone, and I -- I've never

22   had iPhones before.  I've always had Androids.  And

23   it's, you know, quite different.  And so therefore,

24   there's overhead.  I wouldn't call that "risk."

25        Q.  (By Ms. Wedgworth)  Is it fair to say that in

Page 179

1    the first year or two after a DMS conversion by a

2    dealership, there is employee turnover at the dealership

3    in nearly all cases?

4              MS. GULLEY:  Objection; form.

5         A.  I would not agree that that has anything to do

6    with conversions.  Turnover in dealerships is

7    astronomical.  For instance, in the sales department in

8    the dealership, 100 percent turnover a year is quite

9    common.  It's not that high a percentage in other parts

10   of the dealership, but as an industry, the turnover by

11   -- by my standards is horrible.

12        Q.  (By Ms. Wedgworth)  And is some of that

13   turnover for some dealerships a factor of a DMS

14   conversion?

15             MS. GULLEY:  Objection; form.

16        A.  Ma'am, I -- I don't know that I can say that.

17   You know, certainly a conversion that -- that goes

18   poorly -- frankly, the principal reason for a conversion

19   going poorly is the people refuse to learn the new

20   software.

21        Q.  (By Ms. Wedgworth)  And that's a cost for the

22   dealership; correct?

23             MS. GULLEY:  Form.

24        A.  Certainly if the dealership personnel will not

25   learn the new software, which causes the conversion to

Page 180

1    not go as smoothly as it should, certainly that's a cost

2    to the dealership.

3         Q.  (By Ms. Wedgworth)  Is it fair to say that for

4    some dealerships, switching DMS can take years to

5    recover from?

6              MS. GULLEY:  Objection; form.

7         A.  I think that that would be not a fair

8    statement.  There's certainly -- that has happened, you

9    know -- you know, several times in my experience in the

10   business, but it's not -- it does not generally happen.

11        Q.  (By Ms. Wedgworth)  Is it fair to say that

12   there is employee turnover after a dealership switches

13   DMS?

14             MS. GULLEY:  Objection; form.

15        A.  I personally don't believe that, any more than

16   usual, which is horrible.  The turnover by itself,

17   absent anything, is -- is unsatisfactory, in my opinion.

18        Q.  (By Ms. Wedgworth)  Is it fair to say there's

19   customer disruption after a dealership switches DMS?

20             MS. GULLEY:  Objection; form.

21        A.  Again, I think the source of disruption

22   would -- would occur not because the conversion itself,

23   but because of the -- the poor attention that dealership

24   employees pay to learning the new system.  It is -- it's

25   one of our -- our chief problems in the business.

Page 181

1       Q.  (By Ms. Wedgworth)  So when a dealership is

2   considering switching DMS, they have to consider whether

3   or not their employees can efficiently integrate into

4   the new system; is that correct?

5              MS. GULLEY:  Objection; form.

6       A.  That is a correct statement.

7       Q.  (By Ms. Wedgworth)  Is it fair to say that if a

8   dealership does choose to convert, that that conversion

9   cannot be done quickly?

10             MS. GULLEY:  Objection; form.

11      A.  No, I don't agree with that.  The -- the

12  conversion process, you know, properly done, where the

13  dealership personnel do what they're supposed to do as

14  far as learning the new system, that -- that conversion

15  can go very quickly.  And again, I'll repeat again, if

16  they're not diligent in learning the new software,

17  conversion process can drag on until they finally, you

18  know, give up and decide to accept the new system and to

19  learn it.

20      Q.  (By Ms. Wedgworth)  And when you say "drag on,"

21  sometimes that can be up to two years; correct?

22             MS. GULLEY:  Objection; form.

23      A.  No, I think that would be more -- more -- more

24  on the line of two to three months.

25      Q.  (By Ms. Wedgworth)  So when you say "drag on,"

HIGHLY CONFIDENTIAL

Page 182

1   you don't mean longer than two or three months?

2          MS. GULLEY:   Objection; form.

3      A.   That's correct, ma'am.

4      Q.   (By Ms. Wedgworth)   If a dealership changes

5   DMS, they may have to acquire new servers; correct?

6      A.   That's correct.

7      Q.   And they may have to acquire new printers;

8   correct?

9      A.   Typically not new printers.   Printers are

10  pretty much universal pieces of equipment and,

11  especially since everything is laser printers now, laser

12  printers are very standard.

13     Q.   So it's not typical when you change DMS that

14  you would have to, as a dealer, acquire new printers?

15     A.   That's correct.

16     Q.   And are -- is there other equipment that

17  dealers would have to acquire when they change DMSs?

18          MR. RYAN:   Object to the form.

19     A.   No.   PCs are, again, you know, very much

20  standardized, and whatever PCs they've got, work.   I

21  personally think that it's very advantageous to acquire

22  a second monitor for users -- second monitors are $200.

23  We don't even sell them.   Efficiency goes way up when

24  you go from, you know, one monitor to two monitors.   And

25  that happens a lot in our installations, but it's just

HIGHLY CONFIDENTIAL

Page 183

1    because we -- we -- you know, tell the dealer, look, if

2    you want to have 20 percent more productivity, give

3    people a second monitor.  But that's not a requirement.

4        Q.  (By Ms. Wedgworth)  If a dealership changes

5    DMS, they also have to get their data transferred from

6    the old DMS to the new DMS; correct?

7        A.  That's correct.

8        Q.  And it can take months for the staff at a

9    dealership to get comfortable with that new DMS once the

10   data is transferred over; correct?

11               MS. GULLEY:  Form.

12       A.  Again, I -- I think that varies greatly by

13   individual.  But in -- from a general statement,

14   dealership personnel don't stand up and cheer -- jump up

15   and down about having to learn a new system any more

16   than you would.  It -- it's something that you -- you

17   got to concentrate on, you got to pay attention and you

18   got to do it.

19       Q.  (By Ms. Wedgworth)  It's a complicated process;

20   is that fair?

21               MS. GULLEY:  Form.

22       A.  It's not a complicated process.  The complexity

23   isn't -- people just are sitting in a chair and doing

24   it.

25       Q.  (By Ms. Wedgworth)  Mr. Brockman, I'll show you

Page 184

1   what's been marked as Plaintiff's Exhibit 657.

2                    (Exhibit 657 was marked for

3                     identification.)

4                    MS. WEDGWORTH:  And for the record, it's a

5   document Bates-stamped REYMDL00244021 through 025.  Have

6   you had a chance to review the document?

7        A.  Yes, ma'am.

8        Q.  (By Ms. Wedgworth)  Is -- is this an email you

9   wrote to Mr. Lamb around September 1st, 2015?

10       A.  Yes, ma'am.

11       Q.  And in this email, did you try to be truthful

12  and accurate?

13       A.  Yes, ma'am.

14       Q.  So the attachment to the email is a letter

15  dated November 24, 2014, addressed to Mr. Rick Hendrick

16  and is signed by Ron Lamb.  Do you remember reviewing

17  this letter?

18       A.  Yes, ma'am.

19       Q.  And is Mr. Hendrick an owner of the largest

20  automotive group -- I'm sorry -- the largest client of

21  Reynolds?

22       A.  I'm not sure it's the largest client.  It, for

23  sure, is the largest privately owned group in the

24  country.

25       Q.  Are you aware of any client for Reynolds that's

Page 185

1    larger than Hendrick?

2         A.  I believe at that point in time, the Penske

3    organization is -- and still is, because they're the

4    second largest publicly owned group in the country.

5         Q.  And if we look at your email at the 1st to

6    Mr. Lamb, you write, "Ron, the first half of this letter

7    is brilliant.  I made just a slight addition."  Do you

8    see that, at the email you wrote to Mr. Lamb?  First

9    sentence?

10                  "The first half of this letter is

11   brilliant.  I made just a slight addition."  Do you see

12   that?

13        A.  I saw it.  But now I'm trying to --

14        Q.  On the first page, right under the --

15        A.  Okay.  Yes, I found -- I found it.

16        Q.  And -- and you say, "The first half of the

17   letter is brilliant.  I made just a slight addition."

18   And then you say, "However starting with 'Upgrade and

19   Grow', it loses fire."  Do you see that?

20        A.  Yes, ma'am.

21        Q.  So if we go to the letter, the first page of

22   the letter, under the heading -- this is a letter that

23   Mr. Lamb wrote to Mr. Hendrick at a time when Hendrick

24   was considering moving from Reynolds to CDK; is that

25   correct?

Page 186

1            MS. GULLEY:  Objection; form.

2       A.  Yes, ma'am.

3       Q.  (By Ms. Wedgworth)  And, in trying to keep the

4   business, Mr. Lamb sends this letter to Mr. Hendrick; is

5   that correct?

6       A.  Yes, ma'am.  I think it was primarily intended

7   for Mr. Brown.  Mr. Hendrick, at that point in time, was

8   not actively involved in -- in this process.  He was

9   the -- the titular head.

10           But as you may or may not be aware, he's

11   very involved in stock car racing and, at this point in

12   time, he was fully consumed in running the stock car

13   racing operation, not the dealership management

14   operation.  Mr. Brown was in -- in charge of that.

15       Q.  And Mr. Brown's title at Hendrick is -- do you

16   know?

17       A.  He was president of the automotive group.

18       Q.  And in trying to keep the business of the

19   Hendrick automotive group, Mr. Lamb writes this letter

20   to Mr. -- I'm sorry -- Mr. Lamb writes the letter to

21   Mr. Hendrick and Mr. Brown; correct?

22       A.  Yes.

23       Q.  And in this letter, on the first page, halfway

24   down the page, there are "Convert with Risks" where

25   Mr. Lamb writes, "Converting 95 dealerships and 29

HIGHLY CONFIDENTIAL

Page 187

1   collision centers is a major project with serious

2   risks."  Do you agree with that statement?

3              MS. GULLEY:  Objection; form.

4       A.  Yes, ma'am.  The sheer size of it is -- is what

5   makes it, you know, challenging.  It's one thing to

6   convert one dealer or two dealers or four dealers or a

7   dozen dealers, whatever, but to convert 95 and 29

8   collision centers, the sheer scale, you know, causes it

9   to be a -- a very serious project and with risks.

10      Q.  (By Ms. Wedgworth)  One of those risks is it

11  would take -- likely take years to recover?

12              MS. GULLEY:  Form.

13      A.  Well, again, the issue is -- as I've -- as I've

14  previously stated, is that the training and education of

15  personnel is -- is the biggest problem, by far, in

16  conversions.  And if you have, you know, 95 sets of

17  personnel, with each dealership has its own personnel

18  structure that has to be, you know, taught, they have

19  to, you know, accept the fact that change is going to

20  happen.  Get serious about learning the new software.

21  Again, if you take that project for one dealer or two

22  dealers or five dealers -- it's just way greater if it's

23  95.  And that -- that causes, you know, the risk

24  quotient to go up.

25      Q.  (By Ms. Wedgworth)  Even at one dealer, though,

Page 188

1    you have the same issue of training the personnel;

2    correct?

3         A.  Yes.  But it's much smaller.  It could be, for

4    instance, the number of people around this table.

5         Q.  Well, it also depends on the size of that

6    dealership originally as well; correct?

7         A.  That's correct.

8         Q.  But here, Mr. Lamb says, "It will likely take

9    years to recover."  You agree with that, right?

10                   MS. GULLEY:  Form.

11        A.  In this particular situation, the level of risk

12   was such that, because of the number of people that have

13   to be trained, it could take -- assuming it went wrong,

14   it could take quite a while.

15        Q.  (By Ms. Wedgworth)  The last sentence on this

16   page says -- Mr. Lamb writes, "Reynolds tracks all

17   dealerships who convert using publicly available data."

18   Do you see that?

19        A.  Yes, I do.

20        Q.  Do you agree with that statement?

21        A.  I think that -- that the statement is -- is

22   somewhat less than complete, because publicly available

23   data -- I think that the -- the number of dealerships

24   that are public is less than ten.  I think the number is

25   actually, like, seven.  And so while "Reynolds tracks

HIGHLY CONFIDENTIAL

Page 189

1    all dealerships who convert using publicly available

2    data" -- it sounds like a lot of dealers, but it's not.

3    It's -- it's really only seven or eight.

4        Q.   So in this letter that Mr. Lamb writes to the

5    Hendrick Automotive, he's less than complete on this

6    statement?

7                MS. GULLEY:   Objection; form.

8        A.   No.   I think the -- the state- -- the statement

9    as written is true, okay?

10       Q.   (By Ms. Wedgworth)   And complete?

11               MS. GULLEY:   Objection; form.

12       A.   Well, when you say "complete," as a sentence,

13   it certainly is complete.   Is it -- is it a paragraph,

14   or is it a page that describes everything that go --

15   goes into this statement?   No, it's not.

16       Q.   (By Ms. Wedgworth)   Well, you commented that

17   the first half of this letter was brilliant.   Do you

18   still stand by that?

19               MS. GULLEY:   Objection; form.

20       A.   Well, first of all, I didn't detect any

21   spelling errors and, you know, that pleased me a lot.

22   Salespeople are not necessarily the greatest as far as

23   grammar and, you know, punctuation and spelling and that

24   sort of thing.

25               I thought it was brilliant in that it

Page 190

1    identified the key issues, specifically, the fact that

2    we had a windows-based DMS.  And even more specifically,

3    that it talks about the products that we have that are

4    extremely profitable for the dealer, which are --

5    docuPAD is, perhaps, the leading one.

6         Q.  (By Ms. Wedgworth)  If we go to the next page

7    of the letter, at the top, it says, "Here are examples

8    of when a group converts from Reynolds."  Do you see the

9    chart at the top of the page?

10              And then underneath -- and it lists

11   Herb's -- Herb Chambers, Prestige Management Services

12   and Ed Morse and other auto dealerships.  Do you see

13   that?

14        A.  Yes, I do.

15        Q.  And then Mr. Lamb writes, "In nearly all cases,

16   there is a significant drop in sales, which is expected

17   the first year or two of a conversion given all the

18   employee turnover and customer disruption."  Do you see

19   that?

20        A.  Yes, I do.

21        Q.  Do you agree with that statement?

22        A.  I think, certainly, you can pick out cases

23   where, you know, that -- that has been a -- a true

24   statement.  And certainly in these cases here -- I know

25   some of these customers.  Their problem was -- and

Page 191

1    that's they had, you know, turnover at the top, change

2    in -- in dealership, you know, leaders.  I don't know

3    that that's the case in all of them, but I believe from

4    a statistical standpoint, you know, the stats that are

5    shown here are true.  But to say that they're -- they're

6    completely the result of -- of a conversion, it could be

7    true; it could not be true.

8        Q.  Well, you stand by the statement Mr. Lamb wrote

9    in this letter, don't you?

10            MS. GULLEY:  Objection; form.

11       A.  Yes, I do.  These -- these statistics -- or

12   these particular dealerships are a matter of public

13   record.

14       Q.  (By Ms. Wedgworth)  So is it fair to say, in

15   nearly all cases, there is a significant drop in sales,

16   which is expected the first year or two of a conversion,

17   given all the employee turnover and customer disruption?

18            MS. GULLEY:  Objection; form.

19       A.  I -- I think that -- that there's no question

20   that the statistics that are shown for these dealerships

21   are true.  I don't agree that one can necessarily infer

22   that all situations, that, you know, that's what's

23   happening.

24       Q.  (By Ms. Wedgworth)  Well, you approved this

25   letter in this statement going to Hendrick Automotive

HIGHLY CONFIDENTIAL

Page 192

1    Group; correct?

2              MS. GULLEY:   Objection; form.

3         A.  Yes, I did.

4         Q.  (By Ms. Wedgworth)   The next sentence says,

5    "What is really surprising is these groups have not

6    recovered."  Do you see that?

7         A.  Yes.

8         Q.  And do you recall that these groups listed

9    above, where they drop in sales from one year over the

10   next, have yet to recover?

11        A.  That, I -- I don't have knowledge of.

12        Q.  So the last one on the chart, Gordon Auto

13   Group, it had a conversion year in 2009.  Do you see

14   that?

15        A.  Yes, I do.

16        Q.  And then last year Aut- -- Automotive News

17   ranked them as 110.  And in 2014, which is -- appears to

18   be the most recent data for this letter -- they're at

19   142 with a change, according to this chart, of going

20   down 32 places.  Do you see that?

21        A.  Yes, I do.

22        Q.  Okay.  And in this chart, Mr. Lamb is

23   representing to Hendrick Automotive Group that the

24   conversion had something to do with their lowering in

25   rank of sales; correct?

HIGHLY CONFIDENTIAL

Page 193

1      A.  That's what it's saying.  I have a little bit

2   different belief as far as changes in Automotive News

3   ranking.  Dealerships are inherently very competitive

4   people.  And the -- the standard of measurement between

5   dealerships is typically number of cars sold, number of

6   vehicles sold.

7             It happens continuously in this industry

8   where a dealer will want to have his name in lights as

9   far as his ranking is concerned, and so he'll do

10  whatever it takes to sell more cars, which means he cuts

11  price.  And he gets his name in lights, and he gets his

12  Automotive News ranking up, and then he decides he's not

13  making enough money.  And then he decides to tighten up

14  on discounting and not to try to sell everybody every

15  car.

16            But his -- so the sales numbers go down,

17  but his profit -- his internal profit numbers -- go way

18  up.  And then they kind of -- like this (indicating).

19      Q.  And in spite of all that, Mr. Lamb -- with your

20  approval, saying it was "brilliant" -- quotes Automotive

21  News ranking with regard to sales in order to convince

22  Hendrick to not convert; is that correct?

23            MS. GULLEY:  Form.

24      A.  What I'm saying is -- and that's that,

25  certainly, conversion issues, particularly with -- with

HIGHLY CONFIDENTIAL

Page 194

1   big conversions, are a problem.  But what I'm saying is

2   there's -- there's other factors that have to do with

3   Automotive News ranking, and other motivations, other

4   reasons.

5         Q.  (By Ms. Wedgworth)  Is it fair to say that, for

6   some dealerships who convert, it takes at least one to

7   two years to recover?

8         A.  Certainly if they don't educate their people

9   properly.  If they don't force their people to learn the

10  new software promptly, you know, that can occur.

11        Q.  You mentioned docuPAD in your previous answer

12  and some yesterday.  If a dealership buys a docuPAD, is

13  it -- is the price for that purchase and installation

14  somewhere around $10,000 per unit?

15              MS. GULLEY:  Form.

16        A.  Yes, it is.

17        Q.  (By Ms. Wedgworth)  And is there a monthly

18  maintenance fee per docuPAD of $1,000 a month?

19        A.  Yes, ma'am.

20        Q.  And as to any change on any form used on the

21  docuPAD, is there a cost of -- of around $300 for any

22  change?

23        A.  I disagree that that's for any change.  A whole

24  brand-new document, like, for instance, a new finance

25  contract, the charge would be in that area.  But to say

Page 195

1    that any change is in that area, that would not be

2    correct.

3         Q.  Can any change with regard to any docuPAD

4    document be made for free at Reynolds?

5         A.  To the best of my knowledge, unless we have

6    done something in error, in which case we would adjust,

7    or if -- if the entity that produced the contract in the

8    first place, if it was not working, you know, correctly

9    after installation, we would fix that at no charge.  But

10   other than those kind of situations, it would be a

11   charge.

12        Q.  Is the average charge for any change on any

13   document or form with regard to docuPAD roughly $300?

14        A.  I -- I don't know that there is an average.  We

15   don't keep that.  You know, there's not a stat that --

16   you know, that I know of or ever seen.

17        Q.  Well, would it surprise you to say that -- I've

18   heard dealers say that, for any change, when you use the

19   docuPAD, everything is $300?

20        A.  Ma'am, dealers will say most anything on any

21   given day.

22        Q.  Well, does it surprise you they say any change

23   is $300 on a docuPAD form or document?

24             MS. GULLEY:  Objection.  I'm sorry.

25             Objection; form.

HIGHLY CONFIDENTIAL

Page 196

1             DEFENSE COUNSEL:  Objection.  (Inaudible.)

2        A.  Again, ma'am, you know, dealers are prone day

3    to day to say almost anything.  And I -- I have been in

4    this business now -- the 10th of January this year, I've

5    been at it 53 years.  And I -- I haven't seen it all,

6    but I've seen a lot.  And one of the things is -- is

7    dealers will say most anything.

8        Q.  (By Ms. Wedgworth)  If a dealership has

9    Reynolds DMS and switches out of Reynolds, can they

10   return the docuPAD and get a credit on an account?

11       A.  No, ma'am.

12       Q.  Can they sell the docuPAD?

13       A.  Yes, ma'am.

14       Q.  To -- can they sell it to another dealership

15   who could then use it?

16       A.  Yes, ma'am.

17       Q.  And are you aware of any -- any incidences like

18   that?

19       A.  I think I've been exposed to just one.  You

20   know, docuPAD is a -- an amazing profit producer.  I

21   don't know whether you've ever bought a car, you know,

22   and been through the docuPAD experience and contrast

23   that with a typical, you know, finance and information

24   manager's, you know, closing techniques.

25             You know, docuPAD takes that all away.  It

HIGHLY CONFIDENTIAL

Page 197

1   is completely user driven in that you interact with --

2   you know, the screen, with the stylus.  And you make

3   your choices with no pressure, you know, from the

4   finance manager.  And customers love it.  The reason why

5   dealerships love it is -- and that's because customers

6   have a chance to choose.  And a miracle occurs; they buy

7   more.

8           And that's the reason why docuPAD produces,

9   you know, profits on the average of $200 per trans- --

10  per vehicle sales transaction.  And if you have a -- a

11  typical finance manager will handle on the order of 70

12  transactions a month.  At $200 additional profit, that's

13  $14,000 a month, which means that you recover the

14  initial cost of docuPAD very, very quickly.  And then

15  from that point on, it is a massive generator of

16  profits.

17          We have dealers that are willing to, you

18  know, have their picture in Automotive News and

19  advertisements and say, "docuPAD paid for my entire

20  Reynolds bill," which is --

21          You know, I didn't invent docuPAD, but I

22  saw it and bought it.  And the results of -- are nigh on

23  miraculous.

24          MS. WEDGWORTH:  Move to strike.

25      Q.  (By Ms. Wedgworth)  Mr. Brockman, my question

HIGHLY CONFIDENTIAL

Page 198

1   was simply:  Are you aware of any incidents like that,

2   where a dealership can sell their docuPAD?  That was my

3   question.  It was -- it was straightforward.  "Yes" or

4   "no"?

5              MS. GULLEY:  Form.

6        A.   Yes.

7        Q.   (By Ms. Wedgworth)  And you said there was one

8   occasion; is that right?

9              MS. GULLEY:  Form.

10       A.   Well, there's one that I know of.

11       Q.   (By Ms. Wedgworth)  Now, you've had a chance to

12  review this letter that was sent by Mr. Lamb to Hendrick

13  Automotive Group.  Is there anything in the letter that

14  you're aware of that's inaccurate?

15             MS. GULLEY:  Objection; form.

16       A.   I would want to read it again.

17       Q.   (By Ms. Wedgworth)  Well, I'm not asking you to

18  read it again.  As you reviewed it, did -- did anything

19  stick out as being inaccurate to you?

20             MS. GULLEY:  Objection to the form and

21  instruction.

22       A.   Ma'am, I would really like to read it one more

23  time.

24       Q.   (By Ms. Wedgworth)  Well, then let's put it

25  aside and we can go on to the next document.

HIGHLY CONFIDENTIAL

Page 199

1           With regard to the Reynolds DMS contract,

2     do you know the average length of the -- the DMS

3     contract that a dealer signs today?

4           A.  We don't keep an average number.  That's not a

5     stat that I keep or have kept.  What we see is -- and

6     this is just a general, you know, observation, it's not

7     at all a scientific average.  Typically, you know, five

8     years to seven years.  It is rarely less than that.

9           Q.  Does Reynolds offer a contract -- DMS contract

10    to dealers less than five years?

11          A.  We don't offer one.  In some cases, you know,

12    we end up negotiating the one that -- where the length

13    of contract relates to the whole process of -- of buying

14    a DMS system is -- and that's the -- the level of

15    discount that the dealership will achieve, it will be

16    based upon the length of the contract.  And that

17    short-term contracts -- we'll say a 36-month contract --

18    of the discount is appreciably less.  And the dealer has

19    a choice.  They can go for a short-term contract, or

20    they can go for a long-term contract; they get a better

21    discount.

22          Q.  Are there any DMS contracts at Reynolds longer

23    than seven years?

24          A.  Yes, ma'am.

25          Q.  What's the longest contract that Reynolds has

HIGHLY CONFIDENTIAL

Page 200

1   with the dealership concerning DMS?

2          MS. GULLEY:  Objection; form.

3      A.  I -- I can't speak to what's the longest.  I

4   have seen them ten years and, in some cases, a little

5   over ten years.  But that's not a -- that's not a

6   complete statement, because I don't see every contract.

7   I just see some.

8      Q.  (By Ms. Wedgworth)  Does Reynolds track the

9   tenure that a dealership stays with Reynolds?

10     A.  No.  We have no process for doing that.  The

11  only way to know is -- and that's to go to the contract

12  file and see what prior contracts are in the contract

13  file.  We don't -- we don't produce any reports in -- in

14  that regard.

15     Q.  And have you ever tried to determine

16  the average tenure of a Reynolds dealership?

17     A.  No, ma'am, I have not.

18     Q.  Anyone at Reynolds tried that?

19          MS. GULLEY:  Objection; form.

20     A.  Again, no way of knowing.

21     Q.  (By Ms. Wedgworth)  Well, you said you could

22  look at the contracts and make that determination?

23          MS. GULLEY:  Objection; form.

24     A.  Yes, ma'am.

25     Q.  (By Ms. Wedgworth)  And no one at Reynolds has

HIGHLY CONFIDENTIAL

Page 201

1    done that?

2         A.   There's not been any --

3              MS. GULLEY:   Objection; form.

4         A.   -- any, you know, orchestrated plan or project

5    to go determine, you know, what the tenure is.   On an

6    individual basis, at contract renewal time, it may come

7    up that this customer has been a customer for 22 years.

8         Q.   (By Ms. Wedgworth)   Mr. Brockman, I'll show you

9    what's been marked as Plaintiff's Exhibit 658.

10             (Exhibit 658 was marked for

11              identification.)

12             MS. WEDGWORTH:   Which is Bates-stamped

13    REYMDL00045348.

14         Q.   (By Ms. Wedgworth)   Have you had a chance to

15    review the document?

16         A.   Yes, ma'am.

17         Q.   Is GuesTraq a third party here?

18         A.   Yes, I believe they are a third party.

19         Q.   And does this email reflect -- is this an email

20    you wrote to Mr. Schaefer in response to an email he

21    sent you on or about April 23rd, 2015 and April 30th,

22    2015?

23         A.   It appears to -- that to be correct.   Frankly,

24    I don't remember this particular situation.

25         Q.   So GuesTraq doesn't ring a bell to you as you

Page 202

1    sit here?

2        A.  No, ma'am.

3        Q.  Do you have any reason to believe this -- that

4    you didn't receive and write this email?

5            MS. GULLEY:  Objection; form.

6        A.  No, ma'am.  I -- I presume it is.  It's not a

7    forgery.  I -- I have no reason to -- to believe that

8    it's not accurate.  But I -- I don't remember anything

9    about -- GuesTraq is -- must be some very minor entity,

10   because I sure don't remember anything about it.  I

11   don't know what it does.

12       Q.  (By Ms. Wedgworth)  Is this an example of you

13   granting exemption -- an exemption to a third party?

14           MS. GULLEY:  Objection; form.

15       A.  I'd say, based on -- on what's in bold -- what

16   I'm saying here -- and that's that I don't want to

17   invest the time and trouble right now which, I would

18   presume, that applies to an RCI interface.

19       Q.  (By Ms. Wedgworth)  So it's fair to say that

20   you are granting an exemption to GuesTraq here?

21           MS. GULLEY:  Objection; form.

22       A.  Well, there's -- there's -- to discuss that,

23   you've got to look at this next-to-the-last sentence,

24   where it talks about Query Builder.  Query Builder is

25   a -- a piece of software.  It is -- it's a reporting

Page 203

1    software.  It's not really very good.  It's been around

2    for quite a while.  And we're -- we've created a much

3    better set of reporting software, and we're endeavoring

4    to, you know, get Query Builder phased out.

5            And in that kind of situation, there's --

6    there's always times when it arises when somebody is

7    using Query Builder and we'd rather they not use Query

8    Builder because we want to get rid of all Query Builder

9    usage.  We want to delete that software, because we have

10   better software.  We don't want to continue to maintain,

11   you know, very, very old and obsolete-type -- type

12   software.

13           And so the question is, typically:  Do

14   these people convert to an RCI?  And that's what it

15   looks like is the case here.  And what I'm saying is --

16   in this -- I don't want to put them through RCI, you

17   know, because that's -- that's a development effort.

18   Instead, for the time being, let them continue operating

19   the way they're operating.

20       Q.  (By Ms. Wedgworth)  So you approve the ongoing

21   exemption for GuesTraq; correct?

22       A.  Yeah.  Temporarily.

23       Q.  And do you limit the time of the exemption in

24   this email?

25       A.  Not in this email.  I worked very closely with

HIGHLY CONFIDENTIAL

Page 204

1   Mr. Schaefer, and he understands what I'm doing is --

2   and that's that I -- I'm being forced into a situation

3   of expediency due to development processes.

4        Q.  You can set that aside.  I want to talk a

5   little bit about ODE, Open Dealer Exchange.  Are you

6   familiar with that organization?

7        A.  Yes, ma'am.

8        Q.  And it's a joint venture between Reynolds and

9   CDK; is that correct?

10       A.  That's correct.

11       Q.  Do Reynolds and CDK each own 50 percent of ODE?

12       A.  That's correct.

13       Q.  How did that come about, ODE?

14            MS. GULLEY:  Objection; form.

15       Q.  (By Ms. Wedgworth)  How did ODE come about?

16            MS. GULLEY:  Objection; form.

17       A.  I think it came about by the fact that there's

18   a -- a process in the -- in the dealership world.  It's

19   like this:  You have a prospect that comes into the

20   dealership.  They're looking for a certain kind of

21   vehicle.  You have some of those type that they're

22   looking for: different colors, different trim levels,

23   different options.  You go out and you -- you walk the

24   inventory.  And they get to visit the green one and the

25   red one and the blue one and the silver one.  And

HIGHLY CONFIDENTIAL

Page 205

1   they -- they have different types of interiors, you

2   know, more leather and less leather.

3              But any rate, the prospect finally decides,

4   "I like this one here."  And the car salesman's heart

5   kind of takes a leap for the good.  They go back inside

6   to see if they can work out a deal.  Well, an inherent

7   part of -- you know, a giant percentage of car sales

8   involves financing.  I don't know what the number is,

9   but I wouldn't be surprised by an 80 or 90 percent car

10  sales transactions that involve financing where the

11  dealership has -- has to help get done.

12             So what happens is -- and that's the car

13  salesperson gets an authorization form signed by the

14  prospect to pull their credit.  They pull their credit

15  and get their FICO score.  And then they go shopping for

16  financing.  And Dealertrack has built up a -- a nifty

17  application, and it's enjoyed very considerable success

18  with it.  And what it does is -- and that's that you

19  enter the -- you know, the information about this

20  potential transaction, what kind of vehicle it is --

21       Q.  (By Ms. Wedgworth)  I'm focusing on ODE, not

22  Dealertrack.

23             MS. GULLEY:  Just let him finish his

24  answer.

25       A.  But you're asking me why ODE got started.

HIGHLY CONFIDENTIAL

Page 206

1        Q.   (By Ms. Wedgworth)  How ODE got started.

2               MS. GULLEY:  Just let him finish his

3    previous answer.

4               Just go ahead and finish the answer.

5        A.   The how, the first part about it is -- implies

6    the why.  Okay?

7        Q.   (By Ms. Wedgworth)  Actually, it doesn't.  It's

8    a how.

9               MS. GULLEY:  Just let him finish.

10              MR. RYAN:  Let me -- let me just -- I know

11   my object- -- her objections are good for me, but I

12   believe the question was:  How did it come about?  And I

13   think he's answering that question.

14              MS. GULLEY:  Correct.

15       A.   That's certainly what I'm trying to do.

16              MS. GULLEY:  Go ahead and continue your

17   response.

18       A.   In any rate, at this point, the salesperson

19   inputs the -- you know, the facts of the -- of the

20   transaction, which is the -- you know, the type of car,

21   what the sales price is, you know, what the down payment

22   is, what -- what the consumer's FICO score is.  And they

23   can, with a -- not much more than a press of a button,

24   send that package of information to a potential lender.

25   And the lender can look at it and say "Yes" or "No" or

Page 207

1    "Maybe," or "Maybe with a little more down payment, it

2    will work."  Or "We need to have some more proof of

3    employment."

4              And it facilitates, you know, the whole

5    financing process.  And Dealertrack has done a very good

6    job of -- of building that -- that product and has,

7    basically, a near monopoly on that process.  And so

8    ODE's goal was, was to be able to replicate that process

9    and become successful in that marketplace.

10        Q.   (By Ms. Wedgworth)  Were you the decision maker

11   to enter ODE as a joint venture with CDK?

12        A.   I was responsible for the Reynolds side.

13        Q.   Did you contact CDK or did CDK contact you,

14   initially?

15        A.   I don't specifically recall that, but I --

16   my -- my belief is -- and that's they contacted us.

17        Q.   Who contacted you at CDK?

18        A.   I don't think that the contact was directly

19   with me.  It was -- it -- it was somebody else in our

20   organization.

21        Q.   Who did you speak with about the joint venture

22   from CDK, initially?

23              MS. GULLEY:  Objection; form.

24        A.   I -- I would say that the -- the first

25   conversation, again, was not between me and CDK.  It

HIGHLY CONFIDENTIAL

Page 208

1     was with other people in our organization, principally

2     over in the product planning area.  And it was only

3     after that, that I had conversation.  And the name that

4     I recall I had a conversation with was Ron Workman.  He

5     was a senior vice-president.

6          Q.  (By Ms. Wedgworth)  Who at Reynolds, in product

7     planning, spoke to CDK concerning forming ODE?

8          A.  Certainly one of the people that would have

9     been involved was Jon Strawsburg.

10         Q.  Anyone other than Mr. Strawsburg?

11         A.  I'm sure there was, but I can't remember

12    specifically.

13         Q.  You -- you said yesterday that CDK is your

14    largest competitor; is that a fair statement?

15         A.  That's correct.

16         Q.  Why did Reynolds en- -- enter into a joint

17    venture with its largest competitor?

18         A.  Well, it wasn't because they were our largest

19    competitor, I can assure you that.  But in the situation

20    like this, one has to decide, is the opportunity, you

21    know, worth it?  In this particular case, it appeared to

22    be worth it.

23              The other principal factor is -- and that's

24    that if you don't do it, what else might, you know, CDK

25    do.  Who might they partner up with?  Might they partner

HIGHLY CONFIDENTIAL

Page 209

1    up with somebody else, which would mean that we would be

2    forever locked out of this very attractive business that

3    Dealertrack has.  And so the decision was -- and that's

4    we ought to proceed, but proceed carefully,

5    investigating, you know, the potential with ADP.

6         Q.  Was ODE founded around 2009?

7         A.  I don't remember the exact date, but it's been

8    a while.

9         Q.  And the decision to proceed with CDK was made

10   by you?

11        A.  Yes.

12        Q.  And in making that decision, you said you spoke

13   to Mr. Workman at CDK?

14             MS. GULLEY:  Objection; form.

15        A.  That was one of the people that -- that I

16   talked to.

17        Q.  (By Ms. Wedgworth)  Who else at CDK did you

18   speak to?

19             MS. GULLEY:  Objection; form.

20        A.  I'm sorry.  I -- I don't remember the names.

21   You know, I think that there's -- you know, there's

22   been -- I know there's been turnover in that

23   organization, but Ron Workman was the consistent person

24   throughout.

25             MS. GULLEY:  Is this a good time for a

HIGHLY CONFIDENTIAL

Page 210

1    break?

2                    MS. WEDGWORTH:  Yes.  Let's take a break.

3                    THE VIDEOGRAPHER:  The time is 9:57 a.m.,

4    and we're off the record.

5                    (Short recess 9:57 to 10:17 a.m.)

6                    THE VIDEOGRAPHER:  The time is 10:17 a.m.,

7    and we're back on the record.

8                    EXAMINATION (Continuing)

9    BY MS. WEDGWORTH:

10       Q.  Mr. Brockman, focusing you back on ODE, have

11   CDK and Reynolds had meetings in person regarding ODE?

12       A.  Yes, ma'am.

13       Q.  How many?

14       A.  Well, I -- I think in order to give the correct

15   answer on that -- are -- are we talking about meetings

16   where everybody that's involved are all together?  Or

17   where some of the folks that are involved are all

18   together and some are on the phone?  You know, which

19   definition of -- of "meeting," you know, would you like

20   me to answer?

21       Q.  Well, ODE has board of directors' meetings;

22   correct?

23       A.  That's correct.

24       Q.  And are those board of directors' meetings in

25   person or by phone?

HIGHLY CONFIDENTIAL

Page 211

1      A.  Typically, by phone.

2      Q.  And are those -- how often do those board of

3   directors' meetings occur?

4      A.  There -- there's not a -- a fixed schedule, but

5   my -- my guess is -- and that would be probably on -- on

6   a quarterly basis, you know, three or four times a year.

7      Q.  So on a quarterly basis, ODE holds telephonic

8   board of directors' meetings; is this correct?

9      A.  Not -- generally on a quarterly basis.  It's

10   not a fixed, you know, first quarter, second quarter,

11   third quarter, you know.

12      Q.  And have you participated in meetings with CDK

13   concerning ODE in person?

14      A.  I have, but rarely.

15      Q.  Approximately how many times?

16          MS. GULLEY:  Form.

17      A.  No more than once a year, if that.  It -- it

18   typically revolves around NADA, because we are -- we

19   tend to all parties be present at NADA, and so we'll sit

20   down and talk for half an hour.

21      Q.  (By Ms. Wedgworth)  So at the NADA meetings,

22   which are -- that's an annual conference?

23      A.  Yes, ma'am.

24      Q.  Held in, usually, late January, coming up?

25      A.  Coming up.  I understand it's going to be Super

HIGHLY CONFIDENTIAL

Page 212

1   Bowl Weekend.  It's going to be in San Francisco.

2       Q.  So normally, at the NADA meetings, you meet

3   with CDK people con- -- to discuss ODE?

4                   MS. GULLEY:  Form.

5       A.  Yes.  And that meeting tends to be a very

6   informal meeting, because we're -- there's not --

7   there's no fixed agenda, there's no, you know, special

8   place or whatever.  We just find time to, you know, get

9   together, you know, for a half hour or so.

10      Q.  (By Ms. Wedgworth)  And when you -- the last

11  time you met with CDK, who did you meet with?

12                  MS. GULLEY:  Objection; form.

13      A.  The only person whose name I -- there's two

14  people:  It was Steve Anenen and Ron Workman.

15      Q.  (By Ms. Wedgworth)  And other than you meeting

16  in person with CDK, do Reynolds people meet with CDK

17  people regarding ODE in person?

18      A.  Yes.  Yes.

19      Q.  How often?

20      A.  Again, there's no fixed schedule.  It depends

21  on, you know, what projects are at hand.  You know, so

22  it could be once or twice a year.  It could be five,

23  six, seven times a year.

24      Q.  Have you met with anyone from ODE at places

25  other than the NADA convention?

HIGHLY CONFIDENTIAL

Page 213

1      A.  I think that I have, but I can't recall a

2   specific, you know, time or place.  Steve Lloyds is

3   the -- is the, you know, the CEO of ODE.  I talk to him

4   mostly on the phone or, you know, over Skype.  But as

5   far as other people, I think I've -- I've been on

6   telephone calls with their head of software development,

7   Tom -- and I can't remember his last name right now.

8   That -- you know, maybe once a year.

9                   (Exhibit 659 was marked for

10                   identification.)

11      Q.  (By Ms. Wedgworth)  I'd like to show you what's

12   been marked as Plaintiff's Exhibit 659.  My initial

13   question is:  Have you seen this document before?

14      A.  No, ma'am.

15      Q.  You have not?

16      A.  Not this specific document, I don't believe.

17      Q.  The cover email says that Mr. Workman sent it

18   to you on December 24th, 2015.  The cover email.  Is

19   this an email you received from Mr. Workman on or about

20   December 24th, 2015?

21              MS. GULLEY:  Objection; form.

22      A.  Again, you know, this -- this cover email

23   with -- would tend to indicate that, but I honestly

24   don't recall, yeah, this specific email.

25      Q.  (By Ms. Wedgworth)  Do you have any reason to

HIGHLY CONFIDENTIAL

Page 214

1   believe that this is not the board meeting minutes

2   of ODE for December 2015?

3              MS. GULLEY:  Form.

4       A.  Ma'am, I don't have, you know -- you know,

5   clear enough memory of -- of that particular time, you

6   know, several years back.  That's three years back.

7   This -- these are exactly what went on at -- it looks

8   like it, but... (Pause.)

9       Q.  (By Ms. Wedgworth)  There's someone here you

10  haven't mentioned for CDK: Bihner -- Bihner,

11  B-i-h-n-e-r.  Do you know Mr. Bihner?

12      A.  I have been on telephone conversations with

13  him, but I don't know.  I think his first name is Joe.

14  But I've -- I've -- and I may have met him at NADA and

15  shaken hands with him, but I -- I couldn't pick him out

16  of a crowed.

17      Q.  And Mr. Bihner is a CDK person?

18      A.  Yes.

19      Q.  Manager?

20      A.  I would think, maybe, perhaps he might even be

21  an officer.

22      Q.  And for R&R, on these board meeting minutes has

23  Mr. Pontis listed.  Is he also someone from Reynolds who

24  interacts with CDK concerning ODE?

25      A.  Yes.  He works for Jon Strawsburg.

HIGHLY CONFIDENTIAL

Page 215

1      Q.  You can put that aside.

2             Is there any reason to believe that these

3    minutes are inaccurate?

4             MS. GULLEY:  Objection; form.

5      A.  No, ma'am.

6      Q.  (By Ms. Wedgworth)  Now, Reynolds also has a

7    relationship with CDK concerning CDR; correct?

8             MS. GULLEY:  Form.

9      A.  Yes, ma'am.

10     Q.  (By Ms. Wedgworth)  And that relationship is,

11   again, a joint venture between Reynolds and CDK?

12     A.  That's my understanding.  I -- I'm not --

13   generally much less familiar with CVR, because that

14   is something that was entered into considerably before

15   my time at Reynolds.  And it is, you know, completely

16   controlled by CDK, because they have the -- the dominant

17   ownership interest.

18     Q.  And CVR is 80 percent owned by CDK and 20

19   percent owned by Reynolds; is that correct?

20     A.  That's my understanding.  Although I'm not in a

21   position where I can say for sure that's exactly how it

22   is, because I was not there when it was -- when it was

23   founded.

24     Q.  So other than ODE and CVR, does Reynolds have

25   any other formal relationships with CDK?

HIGHLY CONFIDENTIAL

Page 216

1              MR. RYAN:  Objection.

2        A.  I don't think so.

3        Q.  (By Ms. Wedgworth)  Does Reynolds have any

4   informal relationships with CDK currently?

5              MS. GULLEY:  Objection; form.

6        A.  Yes.  Probably one.

7        Q.  (By Ms. Wedgworth)  What is that?

8        A.  It is a -- again, this is something that, you

9   know, began considerably before my time.  But I came --

10  became aware of its existence, you know, after we

11  acquired Reynolds.  It has to do with -- when a customer

12  decides to leave, you know, one of us, as long as that

13  customer pays all their bills, honors all of their

14  contractual obligations, we will turn over to the

15  assuming company copies of data files for that

16  dealership.

17       Q.  And that relationship, you have with CDK?

18       A.  Yes, ma'am.

19       Q.  And --

20       A.  And I might add that it is unwritten, informal.

21  And I wouldn't go so far as to characterize it as a

22  relationship.  What it is -- it is a practice.  And

23  it -- it has no specified duration.  It's something

24  that, you know, either one of us could, you know, quit

25  tomorrow.

HIGHLY CONFIDENTIAL

Page 217

1        Q.  So you would not call it an informal

2   relationship?

3        A.  No, ma'am.  I would call it a practice.

4        Q.  Is the inform- -- the practice reciprocal?

5             MS. GULLEY:  Objection; form.

6        A.  Yes, ma'am.

7        Q.  (By Ms. Wedgworth)  Who for CDK -- who for

8   Reynolds implements this reciprocal practice?

9             MS. GULLEY:  Form.

10       Q.  (By Ms. Wedgworth)  Between CDK and Reynolds?

11            MS. GULLEY:  Form.

12       A.  I honestly don't know which department actually

13   handles it.  It's my belief that it gets done but, you

14   know, exactly where in the organization it occurs, I --

15   I can't tell you.

16       Q.  (By Ms. Wedgworth)  Would it be under

17   Mr. Schaefer's role?  His team?

18       A.  It could be.  But for some reason, I think

19   that -- that that's not where it happens.  I think it --

20   it's more likely to happen over in part of the

21   operations department of the organization.

22       Q.  Do you have a similar reciprocal relationship

23   with any other DMS providers?

24       A.  Do not.

25       Q.  So the only reciprocal relationship you have

HIGHLY CONFIDENTIAL

Page 218

1    regarding this DMS agreement is with CDK?

2              MS. GULLEY:  Objection; form.

3         A.  That -- that's correct.

4         Q.  (By Ms. Wedgworth)  I'd like to show you what's

5    been previously marked as Exhibit 504.  I don't think we

6    have to mark it again.

7              MS. GULLEY:  You don't.

8         Q.  (By Ms. Wedgworth)  Previously marked Exhibit

9    504, Mr. Brockman.  Document Bates-stamped

10   REYMDL00263055.  Have you had time to review the

11   document, Mr. Brockman?

12        A.  I've never seen this before.  Could you give me

13   just a moment more?

14        Q.  Yes.

15        A.  Yes.

16        Q.  Is this an email you received and responded to

17   on or around May 30, 2017?

18        A.  Yes, ma'am, it appears to be that.

19        Q.  And was it your intent to be truthful and

20   accurate in writing the email?

21              MR. RYAN:  Objection.

22        A.  Yes, ma'am.

23        Q.  (By Ms. Wedgworth)  And here you're responding

24   to a question from Mr. Strawsburg; correct?

25        A.  That's correct.

HIGHLY CONFIDENTIAL

Page 219

1      Q.  And in the email you write, "Other than our

2   informal relationship with CDK, we provide no assistance

3   to any third party."  Do you see that?

4      A.  Yes.

5      Q.  Is this the informal relationship with CDK you

6   just testified about?

7      A.  Yes, ma'am.

8      Q.  So in -- in the response to Mr. Strawsburg, you

9   referred to it as an informal relationship?

10     A.  Yes, ma'am, in that case, I did.

11     Q.  And did this informal relationship with CDK

12  allow CDK to access Reynolds software in May 2017?

13          MS. GULLEY:  Objection; form.

14     A.  The answer to that is "not correct."

15     Q.  (By Ms. Wedgworth)  Did this informal

16  relationship with CDK allow CDK to -- to work with

17  Reynolds regarding the -- both DMS systems?

18          MS. GULLEY:  Objection; form.

19     A.  There -- we need to talk some more about, you

20  know, what, you know, the informal relationship -- or

21  this involves.  We receive notification, typically

22  from the customer, that they're -- that they're

23  converting to CDK.  And our first question is -- is:

24  "Well, have you decided when?"  And with that

25  information, we also ask them to -- to notify CDK --

HIGHLY CONFIDENTIAL

Page 220

1   actually, CDK is notifying them as to when their

2   conversion is going to take place.

3          And there's a scheduling process that takes

4   place where -- when the conversion data is going to be

5   outputted on to a tape, and that tape is -- can then --

6   then be given, you know, to CDK.  They don't actually

7   access our systems at all.

8          There -- there's an inter- -- intermediate

9   step in there where the accounts receivable position

10  of -- of the customer is verified by our accounting

11  department.  And it's not just, you know, what

12  they might be currently due, but also what's going to be

13  due by the time the conversion occurs.  And so

14  there's -- there then -- there's then a dollar amount

15  which represents the total remaining obligation of the

16  customer, and that's from a financial standpoint.  And

17  before the tape is actually cut, we get a check for

18  their remaining financial obligation.

19     Q.  (By Ms. Wedgworth)  And then CDK and Reynolds

20  have a conversation; is that correct?

21     A.  No.  There -- there's been a conversation prior

22  to that, but it will be a -- a subsequent conversation.

23  It -- it's a multistep, and I -- I'm not in a position,

24  from a knowledge standpoint, to describe that with

25  perfect accuracy.  But generally, that's what happens.

HIGHLY CONFIDENTIAL

Page 221

1          Q.  And Reynolds does not have that relationship

2     with any other DMS provider; is that correct?

3                    MS. GULLEY:  Objection; form.

4          A.  That's correct.  What the other -- other

5     providers have to do is -- and that's they have to ask

6     the customer to, you know, run reports of things like

7     parts inventory and vehicle inventory and general ledger

8     balances, for the -- for the customer to copy those

9     reports out to a -- a thumb drive or a small hard disk

10    and -- and give that to the vendor that they're going

11    to, that they're converting to.  And then those reports

12    are run through data conversion programs to accomplish

13    the same thing.

14                    MS. WEDGWORTH:  Move to strike everything

15    after "That's correct."

16         Q.  (By Ms. Wedgworth)  You can set that document

17    aside, Mr. Brockman.  Mr. Brockman, I'll show you what's

18    been marked as Plaintiff's Exhibit 660.

19                    (Exhibit 660 was marked for

20                     identification.)

21         Q.  (By Ms. Wedgworth)  I believe yesterday you

22    testified this type of document is a management report

23    concerning finances at Reynolds; is that correct?

24         A.  That -- that's correct.

25         Q.  And do you receive these reports on a monthly

HIGHLY CONFIDENTIAL

Page 222

1    basis?

2         A.   Yes, ma'am.

3         Q.   And the purpose of this report is for Reynolds

4    to understand the financial analysis going on, overall,

5    at the company; is that correct?

6         A.   That's correct.  It's prepared for senior level

7    vice-presidents.  And it -- it's not financial

8    statements, but it's financial information.  And to say

9    that it's used to run the company is probably a

10   mischaracterization.

11              I get this report once a month.  I probably

12   spend 30 minutes on it.  And the reason why I only spend

13   30 minutes on it is because it's historical information.

14   It is -- has been -- very little bearing as what I

15   should be doing on a day-to-day.  Reynolds is the type

16   of company where what happened five years ago has way

17   more impact on what we see in here than what happened --

18   than what's happened in the last month.

19        Q.   And these reports show that -- whether or not

20   Reynolds is -- what their sales are; is that correct?

21              MS. GULLEY:   Form.

22        A.   Yes.  That -- that is one of the sta- --

23   statistics that it provides.  But, again, from an

24   important standpoint, as far as running the company,

25   this report is very little used by me.  I'm much more

Page 223

1    interested in who we've hired, the customers we've sold,

2    what projects we're accomplishing as far as new product

3    development.  Those are all way more -- way more

4    important for the success of the organization.

5         Q.  (By Ms. Wedgworth)  Well, these are prepared by

6    Reynolds at least on a monthly basis; correct?

7         A.  That's correct.

8         Q.  And they are sent to you at least on a monthly

9    basis?

10        A.  That's correct.

11        Q.  And it's -- there is a team at Reynolds who

12   prepares these financials; is that correct?

13        A.  That's correct.

14        Q.  If we go to Page 12 of this document, which has

15   a Bates ending 712.  And this document, at the top, is

16   "NA DMS Product Solution Data Services P&L."  Do you see

17   that at the top?

18        A.  Yes, ma'am.

19        Q.  Under the "One Time Revenue" for RCI, you'll

20   see that there's a variance of 354 percent here.  Do you

21   see that?

22        A.  I'm sorry that I'm not quite -- could you --

23        Q.  So it would be the third line of numbers down.

24        A.  Okay.  Yes.  Okay.  I see the third line of

25   numbers down.

Page 224

1      Q.  Where it looks like in January of 2015 there

2   were 150 RCI customers.  And then for 2016, there's 681

3   customers.  Do you see that?  Or sales?

4             MS. GULLEY:  Objection; form.

5      A.  I'm seeing that.  I'm not sure that it says

6   that's customers.

7      Q.  (By Ms. Wedgworth)  Or sales -- of 150 sales

8   versus 681 in 2016?

9             MS. GULLEY:  Objection; form.

10      A.  What my issue is -- and that's -- it's just I'm

11   not really familiar with this report.  I don't know

12   whether that means -- whether that's a sales number or

13   whether that's a customer number.

14      Q.  (By Ms. Wedgworth)  In either event, it's

15   increased 354 percent; you would agree?

16             MS. GULLEY:  Objection; form.

17      A.  Whatever it is, it's got "354%" beside it.

18      Q.  So the heading on the left-hand side says, "One

19   Time Revenue."  Do you see the heading?

20             MS. GULLEY:  Objection; form.

21      A.  Yes, I see that.

22      Q.  (By Ms. Wedgworth)  And so for RCI, for January

23   2016, it's 681 versus 150 in the month a year earlier.

24             MS. GULLEY:  Form.

25      A.  Yes, that's what it looks like.  You're

Page 225

1    obviously more familiar with this report than I am.

2         Q.  (By Ms. Wedgworth)  Well --

3              MS. GULLEY:  Move to strike.  It's a joke.

4    I'm sorry.

5         Q.  (By Ms. Wedgworth)  Going -- going down to the

6    recurring revenue, for the RCI number, it's -- appears

7    to be $5,910,000 for 2016, whereas the previous year,

8    for 2015, was $3,104,000.  Do you see that?

9              MS. GULLEY:  Form.

10        A.  I wonder if somebody has a straightedge.  I'm

11   77 years old, and my vision is not as good as it used to

12   be.

13             MS. WEDGWORTH:  Well, even at my age, which

14   I won't put it on the record -- I highlighted.  To keep

15   my -- I'm mean, that's how I read it.  But -- but you

16   didn't have the highlight.  So I -- what I'm saying is,

17   I need aid, too.

18             MS. GULLEY:  Which line are we, I'm sorry.

19             MS. WEDGWORTH:  So RCI, "Recurring

20   Revenue."

21             MS. GULLEY:  Got it.

22        Q.  (By Ms. Wedgworth)  Of $5,910,000 versus

23   $3,104,000 the previous year.  Do you see that?

24        A.  Thanks to the straightedge, yes, I do.

25        Q.  And that's an increase of 90 percent?  Do you

HIGHLY CONFIDENTIAL

Page 226

1   see that?

2       A.  Yes, I see that.

3       Q.  Okay.  So is it fair to say that, after the

4   February 2015 agreements, that revenue for RCI jumped

5   dramatically?

6               MS. GULLEY:  Objection; form.

7       A.  Well, when you referred to agreements, I'm --

8   I'm -- can you describe which agreement that you're

9   talking about?

10      Q.  (By Ms. Wedgworth)  Well, the data exchange

11  agreements and the other two agreements in February of

12  2015.  We looked at the exhibit yesterday that you

13  signed.

14      A.  Okay.  The --

15              MS. GULLEY:  Objection; form.

16      A.  -- this -- this is the stand-down agreement,

17  you know, with CDK.

18      Q.  (By Ms. Wedgworth)  Okay.  So after the

19  stand-down agreement, is it fair to say that RCI

20  revenues jumped?

21              MS. GULLEY:  Objection; form.

22              MR. RYAN:  Objection.

23      A.  Again, I -- I would not think that a percentage

24  basis -- that they jumped that much.  So I would be

25  surprised if there's not some other, you know,

HIGHLY CONFIDENTIAL

Page 227

1   customers, you know, third parties that -- that have

2   come under RCI contracts.  I don't think it's just those

3   ones that came to us as a result of the stand-down

4   agreement.  Again, looking at this, I can't tell.

5        Q.  (By Ms. Wedgworth)  Has RCI been profitable in

6   2016?

7            MS. GULLEY:  Objection; form.

8        A.  We -- we don't have profit numbers on RCI.  And

9   I need to explain some about -- we don't have any

10  internal cost accounting.

11       Q.  (By Ms. Wedgworth)  So you don't know if RCI is

12  profitable?

13           MS. GULLEY:  Wait a minute.  He's going to

14  finish his answer.

15       A.  What I'm saying is -- and that's that if RCI is

16  profitable, I have no way of knowing, you know, if it is

17  or how much.  The reason why is because we don't have

18  internal cost accounting.  And organizationally -- and I

19  realize for somebody that's used to dealing with larger

20  corporations, you know, that sounds kind of crazy.

21           But you have to remember that I came from a

22  very small organization, and I'm very sensitive to, you

23  know, the use -- efficient use of personnel, of

24  overhead.  And the cost accounting imposes an

25  overhead -- much like in a law firm, you know, you have

Page 228

1    to keep time accounting records, you know, billing

2    records and that sort of thing.  That takes probably 5

3    or 6 percent.  Well, if we were to have cost accounting,

4    it would do the same thing to us.  And I, frankly, would

5    rather have the productivity, you know, than the

6    information.

7              And that's the reason why that -- I -- I

8    don't have a number as far as profitability for RCI.

9    It's part of the overall, you know, organizational

10   numbers, because you don't have, you know, one

11   piece that operates as a whole entity.  We keep track of

12   sales numbers but not profit numbers, because we don't

13   have any profit numbers.

14        Q.  (By Ms. Wedgworth)  I'd like to show you what

15   was marked yesterday as Plaintiff's Exhibit 651, on Page

16   17.  And yesterday, I think we looked at the footnote on

17   Page 17 that says, "We are expecting an annual revenue

18   of approximately $30 million from" -- "generated from

19   the CDK Deal."  Do you see that?

20        A.  Yes, ma'am.

21        Q.  Is that a number that you asked to be tracked?

22        A.  I did not.

23        Q.  Were you interested in the annual revenue

24   concerning the CDK deal?

25        A.  Revenue-wise, yes.

HIGHLY CONFIDENTIAL

Page 229

1      Q.  And when you say "CDK Deal," what do you refer
2   to?
3      A.  That is the -- the stand-down agreement where
4   they agreed to cease and desist hacking our systems.
5      Q.  So due to the CDK deal, Reynolds expects annual
6   revenue of approximately $30 million; is that correct?
7              MS. GULLEY:  Objection; form.
8      A.  That's what this says --
9      Q.  Is there any reason to --
10             MS. GULLEY:  Let him finish his answer.
11     A.  That -- that is not -- not my expectation,
12  though, this is something our chief financial officer,
13  you know, decided he would throw in.  But it's -- again,
14  it's not a number that I would routinely track.
15     Q.  (By Ms. Wedgworth)  Was that a number you were
16  interested in?
17     A.  Yes, ma'am.
18     Q.  Is that a number that you -- you asked your CFO
19  and/or Mr. Schaefer to analyze and come up with?
20     A.  No --
21             MS. GULLEY:  Objection; form.
22     A.  -- I did not.  I thought -- I just said that
23  I -- I didn't ask, for instance, for this footnote to be
24  inserted.
25             (Exhibit 661 was marked for

HIGHLY CONFIDENTIAL

Page 230

1              identification.)

2        Q.  (By Ms. Wedgworth)  I'd like to show you what's

3    been marked as Plaintiff's Exhibit 661, a one-paged

4    document, Bates-stamped REYMDL00045556.

5              Mr. Brockman, have you had time to review

6    the document?

7        A.  Yes, ma'am.

8        Q.  Have you seen it before?

9        A.  Yes, ma'am.

10       Q.  Did you write this email to Mr. Schaefer on or

11   about January 5th, 2016?

12       A.  Yes, I did.

13       Q.  The subject line, when you write the email, is

14   blank.  And then you write, "Bob, From a policy

15   standpoint, the term 'profitability' (and any of its

16   variants) in relation to RCI are never to be uttered in

17   front of anyone inside or outside the company.  Your

18   people need to understand this as well.  Bob."

19              Is that an accurate statement of what you

20   wrote to Mr. Schaefer and Mr. Lamb?

21       A.  Yes, ma'am.  And the reason why that I -- I

22   wrote it is because we don't track profitability,

23   because we don't have cost accounting.  Without cost

24   accounting, it's impossible to accurately track

25   profitability.

HIGHLY CONFIDENTIAL

Page 231

1          Secondly, you know, from a policy

2     standpoint, Reynolds is run very, very much like a small

3     company where, you know, the CEO, which is me, and a

4     handful of other people actually understand how

5     profitable the company is.  We keep that information

6     very closely held.  It's nobody's business.

7               It -- which is completely different than

8     the way Reynolds used to be operated.  Of course, as a

9     public company, everybody had access to the -- to the

10    financials, because they were -- they were publicly --

11    published.

12               I believe that, from an operating

13    standpoint, that that is very deleterious to the

14    successful operation of the business.  And the reason

15    why I feel that way is because everything we do, you

16    know, is involved in long-term success.  For example,

17    a -- a software package, you know, may take five years

18    to develop, get into the marketplace and have -- become

19    accepted in the marketplace.  You know, that -- that's a

20    direct expense to profit.  You know, if you don't

21    understand, you know, how the company operates, you're

22    liable to think that things aren't doing well.  Well,

23    the reality is, we're developing a lot of software,

24    which costs a lot.

25               So I think that, you know, having profit

HIGHLY CONFIDENTIAL

Page 232

1    numbers being thrown around the company -- and

2    particularly in this case, where we don't have any cost

3    accounting to support what profit might be, is -- is

4    dangerous for morale, for the whole organization.  I

5    have followed that policy religiously.  And as a result,

6    you know, Reynolds is a -- a -- a very profitable

7    company.

8        Q.  Is there any reason you limited this email

9    concerning your prohibition on discussing profitability

10   to RCI?

11       A.  That -- that's where I saw the most recent

12   violation.

13       Q.  What violation did you see?

14       A.  I saw someone in Bob Schaefer's organization

15   mumbling about profitability when they're in no position

16   to do so because -- since we have no cost accounting,

17   they don't know how profitable it is -- or unprofitable,

18   for that matter.

19       Q.  Who was the person commenting on profitability

20   concerning RCI in Mr. Schaefer's organization?

21       A.  I'm sorry.  I don't remember the name of the

22   person.

23       Q.  And what was the comment?

24       A.  The comment was something in regard to RCI

25   being, you know, very, very profitable.  Well, there's

HIGHLY CONFIDENTIAL

Page 233

1   no way to know, in the first place.  And secondly, the

2   discussion of profits openly at that level is -- you

3   know, we don't do that.

4       Q.  But you're certainly interested in RCI revenue;

5   correct?

6               MS. GULLEY:  Objection; form.

7       A.  Yes, ma'am.  And the reason why I'm interested

8   in RCI revenue, particularly in regards to the CDK

9   stand-down agreement, is because CDK's attitude and, you

10  know, talk and discussion in the marketplace regarding

11  data security, and specifically our data security

12  procedures, has been very hurtful over the years.  And

13  I'm looking forward to, you know, recovering from some

14  of the hurt that we endured over a number of years.

15      Q.  (By Ms. Wedgworth)  So you specifically do want

16  to track revenue at RCI as it relates to the stand-down

17  agreement with CDK?

18              MS. GULLEY:  Objection; form.

19      A.  Yes, ma'am.  I made inquiries about that.

20  Since that's over with now, it's of less importance, you

21  know, currently.  I -- I really don't follow it that

22  much anymore.  But during this time period, I was.

23      Q.  (By Ms. Wedgworth)  Well, Reynolds currently

24  follows that; correct?

25              MS. GULLEY:  Objection; form.

HIGHLY CONFIDENTIAL

Page 234

1      Q.  (By Ms. Wedgworth)  In the financial

2   statements?

3                MS. GULLEY:  Form.

4      A.  They do not follow any financial statements,

5   you know, incomes, to that level of detail.  You know,

6   there is a -- a gross, you know, revenue number that

7   goes in the audits -- goes in -- which is where the

8   financial statements are.

9      Q.  (By Ms. Wedgworth)  You said the comment that

10  someone made in Mr. Schaefer's organization was that RCI

11  is very, very profitable; is that correct?

12                MS. GULLEY:  Objection; form.

13     A.  That -- that's what gave rise to this

14  particular email.

15     Q.  (By Ms. Wedgworth)  And you don't recall who

16  that person is?

17                MS. GULLEY:  Objection; form.

18     A.  No, ma'am.

19     Q.  (By Ms. Wedgworth)  I'd like to show you what's

20  been marked as Plaintiff's Exhibit 662.

21                (Exhibit 662 was marked for

22                 identification.)

23                MS. WEDGWORTH:  Can I have one back?

24     Q.  (By Ms. Wedgworth)  Mr. Brockman, as you read,

25  I'm going to let you know that I'm going to reference

HIGHLY CONFIDENTIAL

Page 235

1    questions to the second page of the document where --
2    where you write in it.
3              Mr. Brockman, have you had a chance to
4    review the document?
5         A.  I'm almost there.  Yes, ma'am.
6         Q.  And on the second page, where you wrote an
7    email in response to Mr. Schaefer and Mr. Schaefer wrote
8    you back, did you write this email in ordinary course of
9    your business around August 9th, 2016?
10        A.  Okay.  Is this -- can you point out
11   specifically --
12        Q.  Your email, kind of in the middle of the page.
13        A.  Okay.  It's the one in bold print?
14        Q.  Yes.
15        A.  Okay.
16        Q.  And you wrote it to Mr. Schaefer on about
17   August 9, 2016?
18        A.  Yes, ma'am.  That's -- that's what the email
19   says.  I don't remember specifically but, you know,
20   that's what it says.
21        Q.  And the email says, "I am still needing an
22   answer as to where we stand on the amount of revenue
23   that we were supposed to realize out of the CDK deal."
24   Do you see that?
25        A.  Yes.

HIGHLY CONFIDENTIAL

Page 236

1      Q.  And the CDK deal you're referring to there is

2  what you call the "stand-down agreement"?

3      A.  That's correct.

4      Q.  And you're asking Mr. Schaefer, here, to answer

5  a question you -- you're waiting on concerning the

6  revenue realized from that stand-down deal; is that

7  correct?

8              MS. GULLEY:  Objection; form.

9      A.  That's correct.  And as I pointed out

10  previously, the reason why I'm interested in that is

11  because I believe that we suffered greatly from ADP's

12  actions over the years.  And one of -- one of the

13  reasons why I'm concerned about this revenue is because

14  this is a recompense for the things that they did to us.

15  And I'm -- I'm curious as to this coming out at -- as

16  the way that it was planned to come out.

17      Q.  (By Ms. Wedgworth)  Meaning it was planned to

18  come out to -- to generate revenue?

19              MS. GULLEY:  Objection; form.

20      A.  That's -- that's correct.  That was one of

21  our -- our motivations for, you know, the whole

22  stand-down agreement in the first place.  It was to

23  stop, you know, ADP from hacking in, banditing our

24  systems and to, you know, recompense us for the damage

25  they've done to us over the years on the subject of data

HIGHLY CONFIDENTIAL

Page 237

1    security.

2                    MS. GULLEY:  Thank you.  Robert emailed me

3    and said he was disconnected.  Just letting you know.

4                    MS. WEDGWORTH:  Can we go off the record?

5                    THE VIDEOGRAPHER:  This is the end of Media

6    1.  The time is 11:02 a.m., and we are off the record.

7                    (Short recess 11:02 to 11:09 a.m.)

8                    THE VIDEOGRAPHER:  This is the beginning of

9    Media 2.  The time is 11:09 a.m.  We're back on the

10   record.

11                    EXAMINATION (Continuing)

12                    (Exhibit 663 was marked for

13                     identification.)

14   BY MS. WEDGWORTH:

15       Q.  Mr. Brockman, I'll show you what's been marked

16   as Plaintiff's Exhibit 663.  Have you had an opportunity

17   to review it?

18       A.  I'm almost done.  Yes.

19       Q.  Are there any awards at Reynolds that are given

20   to reward high-performing teams?

21       A.  Yes, there are.

22       Q.  What are those awards?

23       A.  The rewards are numerically, you know,

24   principally, individual awards.

25       Q.  I asked just for teams, team awards.

HIGHLY CONFIDENTIAL

Page 238

1       A.  Teams?  There's really only one team award

2  that's been in place for quite a while, which is a

3  department of the year.  And we give that out twice.  We

4  give it once in Dayton and we give it once in Houston.

5       Q.  Dayton is toward the end of the year?

6       A.  No, they're both -- one of them is on a

7  Wednesday in November and on a Friday, the following

8  Friday.

9       Q.  And is there any monetary compensation for the

10  team with -- that goes with that award?

11       A.  No.

12       Q.  Is there any trip or -- or benefit to that

13  award for the team?

14       A.  There -- there's no direct prize or -- you

15  know, as there are with some of our awards, individual

16  awards.  This particular award, there's no prize.

17  There's a plaque.  You know, there's no trip.  However,

18  people that are in that department, especially our key

19  people in that department are -- in due course, and --

20  and because it's the right thing to do, they will

21  inevitably, you know, receive better salary increases

22  than -- than they otherwise might.  It's a very

23  prestigious award to get, the department of the year.

24       Q.  In Plaintiff's Exhibit 663, is this an email

25  you received from Mr. Schaefer around November 10, 2016

HIGHLY CONFIDENTIAL

Page 239

1    where he writes to you to make a pitch that his team win

2    that 2016 team -- team award.

3         A.  Yes.  That's what it is.

4         Q.  And did you receive this email?

5         A.  Yes, ma'am.

6         Q.  The second paragraph of this email that

7    Mr. Schaefer writes to you says, "This organiza-" --

8    well, the first paragraph says, "Several years ago

9    (about 9) you met with the Data Services team" -- which

10   is also known as DSV; correct?

11        A.  That's correct.

12        Q.  -- "you met with the Data Services team and we

13   discussed our role with[in] the company.  At this [the]

14   time, we were just starting the security enhancements,

15   RCI was just in it's infancy in the new company.  We

16   discussed our role and at the time you quoted the

17   following to the team:

18             "'This organization is like the CIA, I

19   (meaning you) understand what this organization is and

20   will be doing but we cannot communicate to the rest of

21   organization what specifically is being done, how it is

22   being done and any the successes that are accomplished.

23   You will receive[d] medals behind the scenes.  Someday,

24   we will be able to communicate and celebrate your

25   successes.  I can assure you of that!'"

HIGHLY CONFIDENTIAL

Page 240

1          Did you say that?

2      A.  Yes, I did.

3      Q.  You can put that document aside.  Did

4  Mr. Schaefer's team win the 2016 team award?

5      A.  I honestly can't remember.  I don't -- I don't

6  think they did.

7      Q.  Has Mr. Schaefer's DSV team ever won the award?

8      A.  I don't remember clearly yes or no, but -- I --

9  my belief would be, no.

10     Q.  Mr. Schaefer would know for sure, I presume?

11     A.  I know for sure he would.  And I might add, I

12  get a number of letters like this from all corners of

13  the company.

14          MS. WEDGWORTH:  Why don't we take a break

15  now.  Can we take a 10-minute break?

16          MS. GULLEY:  That's fine.

17          THE VIDEOGRAPHER:  The time is 11:15 a.m.,

18  and we're off the record.

19          (Short recess 11:15 to 11:31 a.m.)

20          THE VIDEOGRAPHER:  Back on the record at

21  11:31 a.m.

22          EXAMINATION (Continuing)

23          (Exhibit 664 was marked for

24           identification.)

25  BY MS. WEDGWORTH:

Page 241

1          Q.  Mr. Brockman, I'll show you what's been marked

2     as Plaintiff's Exhibit 664.

3          A.  May I tell you the news first?

4          Q.  Yes.  Well, off the record, then.

5               MS. GULLEY:  Let's just stay on the record.

6     We'll do this in a little bit.  Let's proceed with --

7               MS. WEDGWORTH:  Sadly, we're on the record.

8     So if you will take a look at the exhibit.

9               (Brief discussion.)

10         A.  664 is the one we're supposed to be looking at

11    it?

12         Q.  (By Ms. Wedgworth)  Yes.

13              MS. GULLEY:  Thank you.

14         Q.  (By Ms. Wedgworth)  A document Bates-stamped

15    REYMDL00333091 through 092.  And Mr. Brockman, as you

16    review the document, I'll let you know my questions

17    relate to the second page of the document.

18              Mr. Brockman, have you had a chance to

19    review --

20         A.  Yes, ma'am.

21         Q.  -- Exhibit 664?  Did you receive and write this

22    email on or about April 19, 2016?

23         A.  Yes, that -- I believe that's what it says.

24         Q.  And if we start on the second page of the email

25    where Mr. Bauer writes to you and some others.  The

HIGHLY CONFIDENTIAL

Page 242

1   subject is:  "Draft ASB: New Features for MMS Data

2   Synchronization (Sync) - Review Due by April 26."  Do

3   you recognize this email?

4        A.  Yes, ma'am.  But I -- I -- I'm sitting here

5   searching my mind, and I -- I don't recall, frankly,

6   what I was talking about.  It was talking about

7   something having to do with Data Sync, but what it's

8   talking about, I don't remember.

9        Q.  Well, Mr. Bauer writes to you and others,

10  "Please review the attached draft ASB announcing New

11  Features for MMS Data Synchronization (Sync).  Forward

12  any edits/comments to my attention."

13            And then you respond, "Tom, This is

14  absolutely not to be released.  I have no idea why it

15  was ever built.  The policy all along has been to not

16  make further enhancements to MMS that make the dealer's

17  DMS data more valuable - so it is easier to leave us and

18  not feel the pain.  Notify all of those concerned.

19  Bob."

20            Did you write that?

21        A.  Yes, ma'am, I did.  But the point I'm trying to

22  make is -- is whatever the feature was, I can't tell

23  you.  I don't remember.

24        Q.  Is it fair to say that you did not approve of

25  further MMS enhancements to the dealer's DMS data?

HIGHLY CONFIDENTIAL

Page 243

1            MS. GULLEY:  Objection; form.

2       A.  What -- that's correct.  What -- what's

3    happening here is --

4       Q.  (By Ms. Wedgworth)  Actually, there's no

5    question pending.

6            Is it fair to say that the policy at

7    Reynolds was to not make further enhancements to the MMS

8    to make the dealer's data more valuable?

9            MS. GULLEY:  Objection; form.

10      A.  That's what I'm -- I'm endeavoring to explain.

11      Q.  (By Ms. Wedgworth)  And I just asked a

12   yes-or-no question.

13           MS. GULLEY:  You can answer the question.

14           MR. RYAN:  I object to cutting the witness

15   off.

16           MS. GULLEY:  Go ahead and answer.

17      A.  Well, okay.  There -- there's two databases.

18   There's -- there's the DMS database, which every

19   dealership has.  MMS is -- is a marketing database,

20   which we sell under the Naked Lime Marketing MS tag, and

21   these databases are -- are different in -- in the amount

22   of data that they contain.

23           As we, you know, make investments

24   to improve the product offering for Naked Lime

25   Marketing, which is the MMS database, we want to do that

Page 244

1    so that product will sell more.  That's -- that's what

2    our investment is -- is, you know, based upon.

3              What's happened here appears -- and that's

4    we have done something that's an enhancement to MMS.

5    And for some reason, you know, we have, in the

6    synchronization process, you know, made that -- made

7    that information, which we're buying and building on our

8    own, we're moving that over to the dealership's DMS.

9    And we don't intend to do that.  So what's happened

10   is -- is the development is going to stray from what is

11   logical from a business standpoint.

12        Q.  (By Ms. Wedgworth)  You -- so the developer --

13   did you say "developer" or "development"?

14        A.  Somebody in the development area.

15        Q.  And this is your email reining that

16   development -- or developer back in?

17              MS. GULLEY:   Form.

18        A.  That's correct.  It says, "This is absolutely

19   not to be released."

20        Q.  (By Ms. Wedgworth)  Mr. Brockman, I'd like to

21   show you what's been marked as Plaintiff's Exhibit 665.

22              (Exhibit 665 was marked for

23               identification.)

24        Q.  (By Ms. Wedgworth)  Have you had a chance to

25   review Plaintiff's Exhibit 665?

Page 245

1        A.   I'm just about there.  Yes, ma'am.

2        Q.   Did you write this email on or -- and its

3   attachment on or about May 8, 2016?

4        A.   I -- I'm sorry.  I'm not seeing where -- where

5   I -- I wrote it.  Unless it's this little short email

6   down at the bottom of Page 1 that you're talking about.

7        Q.   Yes.  Yes.

8        A.   Yes, I understand and I -- I did write that.

9        Q.   Page 2 of the document, did you write this as

10   well, dated May 9, 2019, entitled "Security

11   Improvements"?

12        A.   I don't think I actually wrote that.  I think

13   that it was written by somebody else, and I attached it

14   on to my email.

15        Q.   And in your email that has no subject, you

16   write, "This is what needs to be done"; is that correct?

17        A.   That's correct.

18        Q.   And in the attachment, which is entitled

19   "Security Improvements," are these security improvements

20   that you wanted Reynolds to implement in the May 2016

21   time frame?

22        A.   Yes, ma'am.  Specifically, what -- what's

23   involved here is -- and that's that we're endeavoring,

24   as part of our research, to figure out what third-party

25   hackers, bandits, look like.  And one of the things they

Page 246

1    look like is -- and that's they come in in the middle of

2    the night.  And we're -- we're very suspicious about

3    people coming in in the middle of the night.  That's

4    just doesn't look like ordinary business use of the

5    software.  It looks like something foreign.

6            And what they're saying is -- and that's

7    that we want them to enter CAPTCHA individually, which

8    has been a -- a pretty successful way to turn back, you

9    know, interlopers.  They even have gone so far -- and

10   this is hard to believe -- they'll have the software --

11   their software, when they come across CAPTCHA, which

12   they can't fix with their software -- they can't detect.

13           You know, when you look at a CAPTCHA, a

14   series of pictures.  You know, humans can pick them out

15   pretty well, so what they'll do is -- and that's they'll

16   send a quickie message to some place in India.  And some

17   place in India, somebody is staying up all night or all

18   day and, you know, they'll look at the CAPTCHA on their

19   screen and they can answer it.  And then they -- they

20   send that back to -- where all of this is occurring in

21   the U.S.  And they get in.  I mean, it's -- it's --

22   they've gone to that extreme to try and dig their way

23   in.

24       Q.  So in these security improvements that

25   you've -- want Reynolds to implement, one of those

HIGHLY CONFIDENTIAL

Page 247

1    security improvements is CAPTCHA would have to be

2    entered individually for each report to be exported;

3    correct?

4        A.  That's correct.

5        Q.  And the other security improvement would be

6    that no exports could be done from 7 p.m. Saturday until

7    8 a.m. Monday; correct?

8        A.  Correct.  And it says, you know, "Bulk export

9    functionality has been removed for data security

10   reasons."  That's the error message.

11       Q.  And the additional time limit, also, was that

12   no exports could be done, of any kind, from 7 p.m. to 8

13   a.m.; correct?

14       A.  That's correct.

15       Q.  And Reynolds implemented these security

16   improvements at the end of May; correct?

17       A.  I'm not sure, you know, what got done when.

18   I'm not -- I'm not in the loop at that part.

19       Q.  Is it fair to say, when these security

20   improvements were implemented, your main concern was

21   security?

22       A.  Absolutely.

23              (Exhibit 666 was marked for

24                 identification.)

25       Q.  (By Ms. Wedgworth)  I'd like to show you what's

Page 248

1   been marked as Plaintiff's Exhibit 666.

2          Mr. Brockman, have you had a chance to

3   review Plaintiff's Exhibit 666?

4       A.  Yes.

5       Q.  And is this an email you received and wrote in

6   May 31, 2016?

7       A.  Yes.

8       Q.  And this email concerns security enhancements;

9   correct?

10      A.  What it concerns is -- and that's that, as I've

11  testified, you know, previously -- yesterday, that the

12  detection of the techniques that, you know, bandits use

13  to get in our system is not a perfect process.  In other

14  words, we can't look at what they're doing and say,

15  "Okay, that's a bad guy and, you know, what's happening

16  is wrong."

17          We -- in the course of continuing to

18  improve our -- our security controls, we make them a

19  little too tight, and it's because there's things

20  happening that we don't -- we had not anticipated.  For

21  instance, here it talks about the fact that, you know,

22  people come in early to run reports.  And I never

23  perceived that that would actually be happening.

24      Q.  You never understood that?

25      A.  No.  I did not understand in the -- in the

HIGHLY CONFIDENTIAL

Page 249

1    dealership world, that people would come in at 5 a.m. in

2    the morning and run reports.  I just didn't perceive

3    that.  And sure enough, that was a little too tight.

4    And so what we're doing here is -- and that's where

5    we're -- we're issuing, you know, temporary rollbacks

6    for specific dealers of -- of that particular security

7    change until such time as we can, you know, make it an

8    overall change to -- to the -- to the security process.

9        Q.  And you gave temporary exemptions to all of

10   these major accounts listed in Exhibit 666 with regard

11   to your security improvements; correct?

12               MS. GULLEY:  Objection; form.

13       A.  These are -- these are the people that -- you

14   know, that call our support center and -- and register,

15   you know, what we consider to be a valid complaint.  And

16   therefore, these people, we issued a -- a temporary

17   bypass to this particular security change.

18       Q.  (By Ms. Wedgworth)  And the groups listed here

19   are major accounts; is that a fair statement?

20       A.  I've not looked at each specific one.

21       Q.  Well, you don't have any reason to believe that

22   Mr. Bates is inaccurate when he says, "Terry and Willie,

23   Below is a list of Major Accounts who have expressed

24   frustration and disappointment with the changes that

25   have occurred."  Do you see that?

HIGHLY CONFIDENTIAL

Page 250

1      A.  Yeah.  Mr. Bates is a -- a -- a credible

2  person.

3      Q.  So it's fair to say this list below is of major

4  accounts at Reynolds?

5      A.  Yeah, based on Dave Bates' opinion, yeah, I

6  would agree.  His opinion would be a good opinion.

7      Q.  And so the major accounts at Reynolds were

8  given exemptions for the new security enhancements; is

9  that correct?

10              MR. RYAN:  Object to form.

11     A.  No.  Just these specific ones.

12     Q.  (By Ms. Wedgworth)  The major accounts listed

13  in Exhibit 666 --

14     A.  Yes.

15              MS. GULLEY:  Objection.

16     Q.  (By Ms. Wedgworth) -- are the ones who received

17  exemptions to the security enhancements?

18              MS. GULLEY:  Objection; form.

19     A.  Just the people on this list.

20     Q.  (By Ms. Wedgworth)  Do you recall, when the

21  security enhancement was put into place, it was done

22  over the weekend?

23              MS. GULLEY:  Objection; form.

24     A.  I'm sorry.  I -- I don't recall and I -- I

25  would not know.

HIGHLY CONFIDENTIAL

Page 251

1      Q.  (By Ms. Wedgworth)  Do -- do you recall that

2   dealers were not informed of these security enhancements

3   in advance?

4              MS. GULLEY:  Objection; form.

5      A.  I would say it's our general policy not to

6   announce security enhancements in advance.

7      Q.  (By Ms. Wedgworth)  With regard to these

8   security enhancements that were put in place at the end

9   of May 2016, they were ultimately withdrawn, weren't

10  they?

11             MS. GULLEY:  Form.

12     A.  I'm not in a position to be able to say.  I --

13  I don't know.

14     Q.  (By Ms. Wedgworth)  Do you recall during this

15  time period that Reynolds received a lot of complaints

16  from dealerships concerning the -- the security

17  enhancements that Reynolds released at this time?

18     A.  Ma'am, I'm not aware of -- you know, of what

19  went on in that period of time, other than if I would be

20  notified, such as this email right here.

21     Q.  You would be notified?

22     A.  I would only be notified of situations like

23  this one here.

24     Q.  Would Mr. Schaefer be notified on a -- on a

25  normal basis concerning this?

Page 252

1      A.   Yeah, he would be more likely to than I.

2              (Exhibit 667 was marked for

3                identification.)

4      Q.  (By Ms. Wedgworth)  Mr. Schaefer, I'll show you

5    what's been marked as Plaintiff's Exhibit 667.

6      A.   You mean me?

7      Q.   Mr. Brockman.

8      A.   Okay.

9      Q.   I'm trying to see if I can outdo Mr. Nemelka.

10            Mr. Brockman, have you reviewed Plaintiff's

11   Exhibit 667?

12     A.   Not quite.  It's five pages.

13     Q.   The good news is the last two are screenshots,

14   I think.

15     A.   You're right.

16     Q.   Have you had a chance to review Exhibit 667?

17     A.   Yes, ma'am.

18     Q.   And did you receive and write this email on or

19   about May 31st, 2016?

20            MS. GULLEY:  Form.

21     A.   Yes, ma'am.

22     Q.  (By Ms. Wedgworth)  And in all your emails that

23   you wrote, do you try to be truthful and accurate?

24     A.   Yes, ma'am.

25     Q.   On the first page, where the subject is "Data

Page 253

1    Security impact," and the earlier emails are May 31st,

2    with your email being May 31st.  And then Mr. Schaefer

3    ultimately responding on June 1st, where you -- where

4    the email from Mr. Agan, before yours, says, "Bob, I'm

5    hearing from several AVPs that whatever action we took

6    recently has got a number of customers quite upset.

7    There is an email from the IT Support Director for John

8    Eagle dealerships below.  Dan."  Are you familiar with

9    John Eagle dealerships?

10        A.  Not very much beforehand but, certainly, this

11   one here -- this dear lady -- and I'll refer to her as a

12   "dear lady" -- "I leave my house before 5am to get to

13   the store before 6am."  And -- and she's coming in to be

14   there at 6 a.m., and the list of reports that she's

15   running manually is remarkable.  She's clearly a very

16   dedicated person.

17        Q.  Referring to your email, on the front page,

18   about her remarkable abilities, you write, "Bob, This"

19   is one -- "This one is worthy of an exception even

20   considering the CarFax 3rd party usage."  Do you see

21   that?

22        A.  Yes.

23        Q.  Do you know what the CarFax third-party usage

24   reference is?

25               MS. GULLEY:  Objection; form.

HIGHLY CONFIDENTIAL

Page 254

1      A.  I don't know specifically what's going on

2   there, but my decision was based on what takes up most

3   of the second page.  It's -- this one was clearly worthy

4   of an exception, period.

5      Q.  (By Ms. Wedgworth)  So you granted this

6   exception; is that correct?

7                  MS. GULLEY:  Form.

8      A.  Yes, ma'am.  And I -- the -- I don't know --

9   this happened back in 2016, two -- two and a half years

10  ago.  I don't know exactly what the state of affairs is

11  regarding data security in this particular area, but I

12  do know that, you know, this has quieted down and is no

13  longer an issue.  And Ms. Lisa Wood continues to be our

14  friend and good customer.

15     Q.  (By Ms. Wedgworth)  Well, on the "quieted down

16  and no longer an issue," let me show you what we're

17  marking as Plaintiff's Exhibit 668.

18                  (Exhibit 668 was marked for

19                   identification.)

20     Q.  (By Ms. Wedgworth)  Have you reviewed

21  Plaintiff's Exhibit 668?

22     A.  Not quite through, but so far I'm really

23  enjoying it.  I'm serious.  Yes, ma'am.

24     Q.  Did you receive and write this email on or

25  about June 2nd, 2016?

HIGHLY CONFIDENTIAL

Page 255

1      A.  Yes, I did.

2      Q.  And you write to Mr. Schaefer, "Please see

3   changes that I have made."  And this attachment is

4   "DRAFT - CAPTCHA Suspension Talk Track."

5           If we go to the second page of the

6   document, "Sales Breaking News," it says, "We have

7   suspended the CAPTCHA and time restriction updates

8   released earlier this week.  Read below for the

9   authorized talk track to discuss with customers."

10          Does this refresh your recollection that in

11  early June 2016, Reynolds suspended the security

12  enhancements they had put in place late May?

13          MS. GULLEY:  Objection; form.

14     A.  Yes.  That -- that is correct.  And certainly,

15  you know, the whole rest of what I wrote here is -- is

16  worth going through.

17     Q.  (By Ms. Wedgworth)  I just want to focus on the

18  last bullet point to get to the end of the story.

19  "Effective immediately the two enhancements regarding

20  restricted hours and CAPTCHA have been suspended."  Were

21  both suspended on or around June 1, 2016?

22          MS. GULLEY:  Object to the form and the

23  instruction.

24     A.  I'm not aware of the exact date that that was

25  done, but I would presume sometime in that time frame.

HIGHLY CONFIDENTIAL

Page 256

1      Q.  (By Ms. Wedgworth)  And in that bullet

2   referencing two enhancements, that references the

3   security enhancements; correct?

4      A.  I think it represents two of the security --

5   security enhancements and, probably, it's not likely all

6   of them because, you know, we do them in batches.  We

7   don't do them individually.  So there -- there's more

8   than likely others which, you know, stayed in place.

9      Q.  This does not reference any, does it?

10              MS. GULLEY:  Form.

11      A.  No, it does not.

12      Q.  (By Ms. Wedgworth)  So this "Sales Breaking

13   News" talking points references two data security

14   enhancements that were being suspended; correct?

15              MS. GULLEY:  Objection; form.

16      A.  Yeah, but it primarily references the reasons

17   why that we do what we do and the reasons why we operate

18   the way we do.

19              (Exhibit 669 was marked for

20               identification.)

21      Q.  (By Ms. Wedgworth)  I'd like to show you what

22   we've marked as Plaintiff's Exhibit 669.  Mr. Brockman,

23   have you had a chance to review Plaintiff's Exhibit 669?

24      A.  I'm just about there.  Yes.

25      Q.  Did you receive and write this email on or

 1    about August 12th, 2016 that is Plaintiff's Exhibit 669?

 2        A.  Yes, ma'am.

 3        Q.  I take it you are familiar with AutoAlert as a

 4    third-party vendor?

 5        A.  In name only.  I've never been to their place.

 6    Never talked to them.

 7        Q.  Does the Reynolds contract with vendors prevent

 8    the vendor from disclosing data integration fees to the

 9    dealerships?

10            MS. GULLEY:  Objection; form.

11        A.  That -- that contract specifies that they --

12    they cannot specifically, you know, cite what our

13    monthly fee is to them, which is what appears to have

14    occurred in this particular case.

15        Q.  (By Ms. Wedgworth)  And you have --

16    Mr. Strawsburg writes to you about this particular case

17    of AutoAlert?

18        A.  Yes.

19            MS. GULLEY:  Objection; form.

20        A.  And I'd like to point out as well, this is not

21    an ordinary RCI, you know, application.  It was a very

22    special one where it actually, you know, requires us to,

23    you know, insert into our mainline software the

24    functionality that they're asking here.

25            Because they -- they cite "Repair orders

HIGHLY CONFIDENTIAL

Page 258

1    will now be in real-time, which will enable the system

2    to identify upgrade opportunities in the timeliest

3    fashion," which makes the AutoAlert product a whale of a

4    lot better.  And so we're doing a lot more than just

5    providing data to them.  We're actually inserting

6    functionality into our operating software that makes

7    their product better.

8        Q.  (By Ms. Wedgworth)  In the top email, you

9    write, "They are clearly over the line.  Exercise our

10   termination for convenience."  Is this you request- --

11   ordering that AutoAlert's contract be terminated?

12       A.  That's correct.

13       Q.  And are you ordering that their contract be

14   terminated due to the fact that they're informing

15   dealerships of their monthly data integration fee that

16   they are passing along to the dealers?

17               MS. GULLEY:  Objection; form.

18       A.  That's correct.  That is clearly prohibited in

19   our contract.  Now, they are perfectly within their

20   rights to disclose the cost of their -- of their

21   product, you know, the price that they charge the

22   dealer.  You know, they are not permitted, underneath

23   our contract, to -- you know, publish the price that we

24   charge them.

25       Q.  (By Ms. Wedgworth)  You would agree with me

Page 259

1    that the vendor market is compet- -- is a competitive

2    market; correct?

3         A.  When it comes to car sales, yes, that's

4    necessarily true.

5         Q.  I'd like to show you what's been marked as

6    Plaintiff's Exhibit 670.

7                   (Exhibit 670 Brockman was marked for

8                    identification.)

9         Q.  (By Ms. Wedgworth)  Mr. Brockman, have you

10   reviewed Exhibit 670 Brockman?

11        A.  Yes, ma'am.

12        Q.  And did you receive and write this email around

13   August 12th, 2016?

14        A.  Yes, ma'am.

15        Q.  And -- and if you will note the previous

16   Exhibit, 669, was on the same day as well.

17        A.  That -- that's correct.  And since there's

18   reference to that -- that's important -- is the reason I

19   just pulled it back out of the pile, so I can open it up

20   and look at it again.

21        Q.  So at this time, meaning August 12th, 2016, did

22   AutoAlert have a "real-time service drive lead feature"?

23        A.  No, they did not.  They were not even

24   certified.  They were not even part of RCI at that

25   point.

Page 260

1      Q.  Your email at the top says, "Take away the

2  RO's" -- RO's means repair orders?

3      A.  Yes.  That's what it means, but what -- what's

4  important is -- is the paragraph just below that, in

5  bold, where it says, "They're not even certified???"

6  Good God.  And now yet in -- in their June 27th, you

7  know, notification, you know, they're -- they're

8  bragging about the fact they're now associated with --

9  we've "completed the process to become RCI certified

10  with your DMS provider, Reynolds & Reynolds.  As you

11  know, the RCI certification program was designed to

12  ensure the highest level of data security for you and

13  your customers, and our certification has been a request

14  by many of our dealers."

15           But they haven't got it.

16      Q.  Well, they do have -- real time has been opened

17  for them, right?

18           MS. GULLEY:  Objection; form.

19      A.  No.

20      Q.  (By Ms. Wedgworth)  Well, you -- you say, "Take

21  away the RO's opened real time," so something must be in

22  place for AutoAlert; correct?

23           MS. GULLEY:  Objection; form.

24      A.  What's happening is -- certainly appears, you

25  know, from -- from the documents in front of me --

HIGHLY CONFIDENTIAL

Page 261

1    that they are using it from a sales standpoint the fact

2    that they are certified -- RCI certified.  And they're

3    not RCI certified.  They haven't achieved certification

4    yet.

5              And so therefore, I'm saying that, going

6    forward, for a third-party to do this means that -- that

7    they're not really quite straightforward-kind-of folks.

8    And therefore, what we're going to do is -- and that's

9    we're not going to give them their real-time repair

10   order opening, because that is a special thing that's

11   over and above what a normal RCI -- normal RCI would be

12   just for data movement.

13             The real-time opening of repair orders

14   means that they're now into our mainline software, and

15   they're writing on our software to -- to feed to them

16   the repair order has just been opened, real time.  And

17   what's happening is -- and that's that I'm -- I'm

18   directing Bob Schaefer:  When somebody is -- is

19   basically being dishonest with us, there's no way we're

20   going to let them into our main software.

21        Q.  (By Ms. Wedgworth)  When you write, "Take away

22   the ROs opened real time from them," you've already

23   given them something; is that correct?

24             MS. GULLEY:  Objection; form.

25        A.  The contract which has obviously not been done

HIGHLY CONFIDENTIAL

Page 262

1   yet -- it it's not finished, they're not RCI certified.

2   We have decided rather than to go forward as we had

3   planned, based upon their actions, we're not.

4        Q.  (By Ms. Wedgworth)  Did AutoAlert become RCI

5   certified?

6        A.  I'm not aware of whether they have or not.

7   I -- I would presume they did, but I don't know.

8        Q.  Mr. Brockman, have any data breaches of dealer

9   DMS occurred in the past three years?

10            MS. GULLEY:  Objection; form.

11       A.  I believe so.  There's -- there's one that I

12   recall involving DealerBuilt that was pretty

13   substantial.

14       Q.  (By Ms. Wedgworth)  Is that the only one you

15   recall?

16            MS. GULLEY:  Objection; form.

17       A.  Of size, you know, that's the only one that,

18   you know, that was a very, very good-sized one.  It was

19   huge.

20            (Exhibit 671 Brockman was marked for

21             identification.)

22       Q.  (By Ms. Wedgworth)  Mr. Brockman, I'll show you

23   what's been marked as Plaintiff's Exhibit 671.

24   Mr. Brockman, have you had time to review Plaintiff's

25   Exhibit 671?

HIGHLY CONFIDENTIAL

Page 263

1      A.   Not quite yet, ma'am, but very close.  Yes,

2   ma'am.

3      Q.   Did you receive this email on or about June

4   20th, 2017?

5      A.   Yes.

6      Q.   Do you recall if you approved this deal?

7      A.   I don't have any direct recollection of that.

8   As I read it, it's probably likely that I did, because

9   the ShowroomMagnet actually is -- is a -- is part of the

10   company that we acquired.  It's a product.  And so

11   therefore, doing something for that particular product

12   area would be something that I would likely approve.

13      Q.   Naked Lime -- ShowroomMagnet is part of the

14   Naked Lime entity?

15           MS. GULLEY:  Objection; form.

16      A.   Yes.  What ShowroomMagnet is, as I recall,

17   it -- it is a marketing system which is employed to

18   motivate people that come in and get a test drive.  And

19   to basically show up in the showroom and talk to a

20   salesperson and take a test drive for which they get

21   a -- a small, you know, cash payment.  And it's -- it

22   has been found to be fairly decently and effective way

23   to get people to come into the dealership and take a

24   test drive.

25      Q.   (By Ms. Wedgworth)  And the situation described

HIGHLY CONFIDENTIAL

Page 264

1    at the top, "ShowroomMagnet has been utilizing a data

2    broker for the extraction of DMS transactional data for

3    clients.  The purpose of this data is for market area

4    evaluations."

5                    Did Reynolds, with regard to

6    ShowroomMagnet, agree to eliminate the use of a data

7    broker to access CDK DMS?

8                    MS. GULLEY:  Objection; form.

9        A.  I -- I don't recall, you know, that specific

10   action.  But I know it was our intention to, where

11   possible, use -- get -- get data feeds directly from

12   CDK.  And my reason for doing that is -- and that's

13   that, as I think is -- is readily apparent, there's some

14   substantial potential liabilities involved.  Anytime

15   that you start, you know, moving data around, that

16   potentially has personal- -- personally identifiable

17   information.  I want to be doing business with people

18   that, if there is some kind of lawsuit, they can -- if

19   they're found liable, you know, that they can pay the

20   judgment.

21       Q.  Do you know that the data broker mentioned here

22   was Authenticom?

23                   MS. GULLEY:  Objection; form.

24       A.  I'm not aware of that.  This is a general

25   policy decision.

HIGHLY CONFIDENTIAL

Page 265

1      Q.  (By Ms. Wedgworth)  Where does it say that?

2              MS. GULLEY:  Objection; form.

3      A.  That's my belief.

4              MS. GULLEY:  Peggy, if you're between

5   documents, lunch has been here about 30 minutes.

6              MS. WEDGWORTH:  It's here?

7              MS. GULLEY:  Yeah, it is.

8              MS. WEDGWORTH:  Yeah, let's break for

9   lunch.  Thank you.

10              THE VIDEOGRAPHER:  This is the end of Media

11   2.  The time is 12:17 p.m.  We're off the record.

12              (Lunch recess 12:17 to 1:36 p.m.)

13              THE VIDEOGRAPHER:  We're back from lunch.

14   This is the beginning of Media 3.  The time is 1:36 p.m.

15   We're back on the record.

16                  EXAMINATION (Continuing)

17   BY MS. WEDGWORTH:

18      Q.  Good afternoon, Mr. Brockman.  Does Reynolds'

19   service product have real-time repair order

20   functionality?

21              MS. GULLEY:  Objection; form.

22      A.  Does Reynolds' service product have

23   real-time --

24      Q.  (By Ms. Wedgworth)  Repair order functionality?

25      A.  Yes.  And that's an integral part of it.

Page 266

1           MS. GULLEY:  Objection.

2      Q.  (By Ms. Wedgworth)  I'm sorry?

3      A.  That's an integral part of it.

4      Q.  Does Reynolds currently allow third part- --

5  any third party to have real-time repair order

6  functionality?

7           MS. GULLEY:  Objection; form.

8      A.  When you talk about functionality, I know we

9  have some interfaces that allow look-only repair work.

10  But there is -- you know, there's no, outside of our

11  application software, actually creating repair orders or

12  updating repair orders.

13      Q.  (By Ms. Wedgworth)  So is that a "no" to the

14  question?

15           MS. GULLEY:  Objection; form.

16      A.  No.  I think my answer is my answer.  And I

17  understand that's a little bit long but, I mean, I can't

18  say it yes or no.

19      Q.  (By Ms. Wedgworth)  So does -- does any third

20  party have the same ability with regard to real-time

21  repair order in the Reynolds system as Reynolds does?

22           MS. GULLEY:  Objection; form.

23      A.  That's a much better restatement.

24      Q.  (By Ms. Wedgworth)  Thank you.

25      A.  And -- yeah.  And the answer is, no.  There's

Page 267

1   no outside third party that has identical access or has

2   identical functionality.  We do -- because remember, you

3   know, repair order -- you know, functionality, that's an

4   integral part.  That's what the service system does, is

5   it creates repair orders.  And, you know, uses them to,

6   you know, process the information and help run the shop.

7   It's not an interface at all.  That's -- that's it.

8       Q.  Has any third party other than AutoAlert had

9   real-time repair order functionality?

10          MS. GULLEY:  Objection; form.

11      A.  Again, you know, repair order functionality, as

12  you're using it, is a very broad statement, okay?  There

13  is certainly some functionality that, you know, other

14  third parties have in terms of, you know, looked-at kind

15  of access.  But to actually start a repair order -- you

16  know, make a repair order -- what you call "repair order

17  functionality," that's the integral part of -- of the

18  service system.  And no other third party has that.

19      Q.  (By Ms. Wedgworth)  The functionality you're

20  speaking about is to create and edit a repair order?

21          MS. GULLEY:  Objection; form.

22      A.  There is the -- the way that I describe it

23  is -- and that's there's -- there's repair order

24  functionality, using a broad word like -- like you --

25  like you stated.  Only, you know, Reynolds software has

Page 268

1    that, because that is the integral part, you know.

2    That's the center functions of Reynolds service

3    software, okay?  Any other access to repair order

4    functions is -- is much more limited.  It's limited to

5    look only, that type of access.  That's the kind of

6    access the third party had -- have.  None of them have,

7    you know, the first type of access, which is the guts of

8    Reynolds service system.

9         Q.  (By Ms. Wedgworth)  With regard to pricing in

10   June of 2016, did Reynolds implement a transaction fee

11   with regard to RCI to their vendors?

12                  MS. GULLEY:  Objection; form.

13        A.  The time frame was when?

14        Q.  (By Ms. Wedgworth)  Mid-2016.

15                  MS. GULLEY:  Form.

16        A.  Is that around the date of -- of the Xtime

17   issue?

18        Q.  (By Ms. Wedgworth)  You'd know that better than

19   me, so I don't know the answer to the question.  But I

20   will show you a document that will be Plaintiff's

21   Exhibit 672.

22                  (Exhibit 672 Brockman was marked for

23                   identification.)

24        Q.  (By Ms. Wedgworth)  I'll show you what's been

25   marked as Plaintiff's Exhibit 672.

HIGHLY CONFIDENTIAL

Page 269

1              Mr. Brockman, have you reviewed Plaintiff's

2      Exhibit 672?

3          A.  Yes.  And which is very helpful, as a matter of

4      fact, because it does, you know, allow correct focus

5      on -- on the timelines in that, you know -- this

6      particular document is partially in reference to exactly

7      what I thought, which is around the Xtime incident --

8      subsequent to the Xtime incident.

9          Q.  So is it fair to say that in mid-2016, Reynolds

10     raised RCI pricing?

11              MS. GULLEY:  Objection; form.

12         A.  No.  That's not correct.

13         Q.  (By Ms. Wedgworth)  Is it fair to say that they

14     implemented a transaction fee?

15              MS. GULLEY:  Objection; form.

16         A.  No.  That's not correct.  You know, what

17     happened was -- and that's that -- and this affects only

18     a very small number of RCI, you know, customers.  Again,

19     it also -- it only affects those that actually try to

20     have update capability that could cause the kind of

21     problem that occurred with Xtime.

22         Q.  (By Ms. Wedgworth)  So with regard to those

23     vendors who were subject to the transaction fee, is that

24     something sometimes called a "ping fee"?

25              MS. GULLEY:  Objection; form.

HIGHLY CONFIDENTIAL

Page 270

1          A.   No.  It -- it is called -- and I don't even

2     know that we call it a "transaction fee."  It is -- it

3     is a fee for each time a record is -- is added, changed

4     or deleted.  And it's only where they have write-back

5     access.  You know, in order to talk about this, it's

6     important to talk about what happened to Xtime and --

7          Q.  (By Ms. Wedgworth)  Actually, I didn't ask that

8     question.  I'm just simply asking if there was a

9     transaction fee implemented in mid-2016.

10         A.   The answer to that is -- and that's no.  That's

11    not the case.

12         Q.   A transaction fee was not implemented to

13    vendors with write-back interface?

14              MS. GULLEY:  Objection; form.

15         A.   It's a transaction fee only if they did an add,

16    change or delete.

17         Q.  (By Ms. Wedgworth)  And was that fee five cents

18    per transaction?

19         A.   That's correct.

20         Q.   And a year later, was that

21    five-cent-per-transaction fee increased?

22         A.   Yes, it was increased as part of our -- our

23    normal, you know, annual price increase.

24         Q.   Are you the ultimate decision maker on that

25    price increase?

HIGHLY CONFIDENTIAL

Page 271

1            MR. RYAN:  Object to the form.

2        A.  Yes and no.  The answer is general -- in

3    general terms, yes.  I do not actually, you know -- I'm

4    not involved in the actual price increase of each

5    individual, you know, item number that we sell.  My

6    involvement has only to do with, you know, what the

7    general percentage is going to be, which is CPI plus 2.

8    And, you know, this year it's -- CPI plus 2 is 4.1

9    percent.

10       Q.  (By Ms. Wedgworth)  Did you receive and write

11   this email, 672, on or about July 4, 2016?

12       A.  Yes, I did.

13               (Exhibit 673 Brockman was marked for

14                identification.)

15       Q.  (By Ms. Wedgworth)  Mr. Brockman, I'll show you

16   what's been marked as Plaintiff's Exhibit 673.

17       A.  Yes.

18       Q.  Did you receive and write this email in 673 on

19   or about May 9, 2017?

20       A.  Yes, that's correct.

21       Q.  And does this document reflect your approval of

22   a price increase with regard to the transaction fee?

23               MS. GULLEY:  Objection; form.

24       A.  I don't see that it -- okay.  It does address

25   the per transaction price increase.

HIGHLY CONFIDENTIAL

Page 272

1        Q.  (By Ms. Wedgworth)  And you approved that price

2    increase?

3        A.  Yes, I did.

4        Q.  Do you know how the price increase of a quarter

5    of a cent was determined?

6                 MS. GULLEY:  Objection; form.

7        A.  It looks to me like -- it says here, it

8    was a -- a 5 percent -- which was CPI plus 2 -- for that

9    year.

10       Q.  (By Ms. Wedgworth)  Does Reynolds track RCI

11   cost in any way?

12                MS. GULLEY:  Objection; form.

13       A.  We do not.

14       Q.  (By Ms. Wedgworth)  I'm sorry?

15       A.  We do not.

16       Q.  With regard to RCI cost, do those -- do the

17   costs include the developing of interfaces?

18       A.  Yes, that would be one of the costs.

19       Q.  Is another cost server maintenance?

20       A.  Server maintenance, server heat, light, power,

21   server amortization, server repair, replacement, you

22   know, the -- the manpower it takes to supervise all

23   that.  I'm sure that there's more factors than that, but

24   those are the ones that come right off the top of my

25   head.

HIGHLY CONFIDENTIAL

Page 273

1    Q.  Is one of the costs of RCI the DSV personnel

2  compensation?

3    A.  Yes.

4    Q.  Is Bob Schaefer's salary part of RCI costs?

5    A.  I would imagine so.  But, again, I repeat which

6  I talked about several times, we do not have cost

7  accounting.

8    Q.  I understand.

9    A.  But -- but from a theoretical standpoint, yes,

10  you know, his compensation would -- would be something

11  that would -- it would be -- would be included, you

12  know, if we had cost accounting, which we don't.

13    Q.  Are there any other RCI costs you're aware of,

14  other than the developing of interfaces, the service --

15  server maintenance costs, the DSV personnel comp, such

16  as Mr. Schaefer's salary?  Anything else for RCI costs?

17          MS. GULLEY:  Form.

18    A.  I think it's a considerable more number of

19  things.  Because, you know, for instance, Internet

20  bandwidth is -- would be an important, you know,

21  component, because all these transactions flow through

22  what we refer to as "the hub."  And it -- in itself is a

23  completely separate system.  It's designed for -- for

24  moving packets of data between servers.

25          We have the issue of -- of fire

Page 274

1    insurance -- there's probably -- if I had an opportunity

2    to sit down and think about it for a while, I -- I could

3    build a much longer list.  But it's -- it's much more in

4    terms of numbers of the things to be considered than

5    what you have there.

6          Q.  (By Ms. Wedgworth)  And no one at Reynolds has

7    done this list of costs with regard to RCI?

8               MS. GULLEY:  Objection; form.

9          A.  That's correct.  We do not have cost

10   accounting.

11         Q.  (By Ms. Wedgworth)  Do dealers, as part of

12   their Reynolds contracts, pay Reynolds for storage of

13   their data?

14         A.  Only in -- in certain situations.  We have a --

15   a product offering, which is called -- the acronym for

16   it is RBDR.  And what it does is -- and that's that it

17   provides for backup of -- of dealership's data on a

18   remote automatic basis.  This -- if -- if the customer

19   has their own server, they have to have an employee

20   which is charged with running the backups every night

21   and filing the tape away in a fireproof vault.

22              The RBDR product, you know, takes the

23   responsibility of remotely accessing the dealership's

24   server and backing up its data files into our Dayton,

25   Ohio research park office.  And that -- that service

Page 275

1   also provides for -- in the event of disaster recovery,

2   will air freight them a -- a new server and load it with

3   their most recent backup data so they can get back in

4   business.

5       Q.  So if the dealership has their own server for

6   storage of their data, is there any cost to the

7   dealership from Reyn- -- that they must pay to Reynolds?

8               MS. GULLEY:  Objection; form.

9       A.  I'm not -- not quite understanding.  Could

10  you --

11      Q.  (By Ms. Wedgworth)  So -- so if the dealership

12  stores their own data and doesn't use RBDR, is there a

13  cost to the dealership that Reynolds charges?

14              MS. GULLEY:  Object to form.

15      A.  There -- there's a maintenance charge for --

16  for that server.  And what that covers is -- that covers

17  onsite maintenance repair and replacement.

18      Q.  (By Ms. Wedgworth)  So that's a monthly charge?

19              MS. GULLEY:  Form.

20      A.  Yes.

21      Q.  (By Ms. Wedgworth)  To the dealership?

22      A.  Yes, that's correct.

23      Q.  And that monthly charge to the dealership is

24  for dealer storage of their own data on their own

25  server; is that correct?

HIGHLY CONFIDENTIAL

Page 276

1            MS. GULLEY:  Objection; form.

2       A.  No.  It's not a charge for dealership -- it's

3   charged for hardware maintenance for -- for that server.

4       Q.  (By Ms. Wedgworth)  If a dealership doesn't use

5   the RBDR program you described, is there any cost to the

6   dealership to -- to store the data?

7            MS. GULLEY:  Objection; form.

8       A.  Again, the -- the charge for the server is for

9   hardware maintenance.  There are software monthly fees,

10  which are under contract.  Each element of software

11  generally has some requirement to store data, but

12  there's no, you know, fee that is identified as -- as

13  data storage.

14            (Exhibit 674 Brockman was marked for

15             identification.)

16       Q.  (By Ms. Wedgworth)  Mr. Brockman, I'll show you

17  what's been marked as Plaintiff's Exhibit 674.  It's

18  Bates number:  REYMDL00503332 through 35.

19            Mr. Brockman have you had a chance to

20  review Plaintiff's Exhibit 674?

21       A.  Yes, ma'am.  My comment to this one is really

22  getting down to the weeds.  It's going to take a while

23  to talk about this one.

24       Q.  I'm going to try to stay high-level on this

25  one.

HIGHLY CONFIDENTIAL

Page 277

1      A.   I don't know that's going to be possible.

2      Q.   Well, we'll give it a whirl.

3           So did you write and receive this email on

4  or about July 19th, 2017?

5           MS. GULLEY:   Objection; form.

6      Q.  (By Ms. Wedgworth)  Let me try it again.

7           Did you write and receive this email on

8  about the time period of July 16 through July 19, 2017?

9           MS. GULLEY:   Form.

10     A.   Well, there's -- I've got to go back.  There --

11 there's lots of emails on this string.  And if you give

12 me a moment, I'll try and count the ones that -- that --

13 I actually sent.

14     Q.  (By Ms. Wedgworth)  I think the one you sent

15 was on the first page.

16          MS. GULLEY:   Form.

17     Q.  (By Ms. Wedgworth)  And my question -- we'll

18 just limit it to that -- the email on the first page,

19 July 18, 2017.  Did you write this?

20     A.   Is this July 18th?

21     Q.   Yes.

22     A.   Yes.  That -- That's correct.  What's saying

23 here is -- and that's that we're concerned about -- you

24 know, caps.  Daily caps, monthly caps.  What -- what

25 this relates to is -- and that's that we have a -- a

Page 278

1    product called "Consumer Reach."  That's what you see

2    abbreviated as CR.

3        Q.  Mr. Brockman, there's no question pending right

4    now.

5        A.  Well, I -- I guess if you're interested in

6    knowing what's going on --

7        Q.  I --  I'm definitely interested in some things,

8    but -- but the way it works is I ask the question and

9    you answer.  It's just the way the process works.

10           So my question is:  Is this part of

11   Reynolds' suite of products to allow email blasts on the

12   part of dealers to customers?

13           MS. GULLEY:  Objection; form.  And to the

14   prior thing.

15       A.  It relates to a -- a Reynolds product, which is

16   being misused by the customer, which is resulting in

17   great dislocation, both to Reynolds and to the customer.

18   Their email traffic is blacklisted, which means it falls

19   in a black hole.  They don't know if it's transmitted or

20   not.  It's a very serious issue.

21       Q.  (By Ms. Wedgworth)  Has Reynolds ever attempted

22   to limit or reduce the number of recipients of a

23   dealer's email blast?

24           MS. GULLEY:  Objection; form.

25       A.  Yeah, prior to this, we had not.  Okay?  But

Page 279

1    what's happened is -- and that's they're buying outside

2    direct mail lists that have bad email addresses in them.

3    And then they send out an email blast.  And the email,

4    you know, provider gets upset about that, and they

5    blacklist the address.  They blacklist the -- you know,

6    the -- the dealership's address.  And in this case, what

7    they're doing is they're getting ours blacklisted, which

8    means that we have a whole bunch of customers that get

9    disabled, you know, because one dealer has done

10   something stupid.

11        Q.  (By Ms. Wedgworth)  And is it fair to say

12   somebody at Reynolds says the problem can be solved by

13   contacting a Reynolds product called Naked Lime?

14             MS. GULLEY:  Objection; form.

15        A.  If you will point that out to me.

16        Q.  (By Ms. Wedgworth)  The first paragraph at the

17   bottom, Mr. Barras writes to you.

18             MS. GULLEY:  Objection; form.

19        A.  That's correct.  That's what it says.  The

20   Naked Lime product has a more sophisticated way of

21   handling emails than the consumer reach product.  The

22   consumer reach product is a very old product.  And

23   the -- the Naked Lime product, it has license built into

24   it that since -- when email service provider is throwing

25   away emails and -- to stop the whole process before

Page 280

1  blacklisting occurs.

2       Q.  (By Ms. Wedgworth)  So you respond to

3  Mr. Barras by saying, "I think there should be daily

4  caps as well as monthly caps"; is that correct?

5            MS. GULLEY:  Objection; form.

6       A.  Yes.  And that -- that's a -- again, this is --

7  in an effort to stop sending junk to the email service

8  provider, to avoid getting blacklisted.

9       Q.  (By Ms. Wedgworth)  So Reynolds did limit the

10  number of recipients of a dealer's email blast; correct?

11            MS. GULLEY:  Objection; form.

12       A.  I'm not sure, you know, what the final

13  disposition was of this problem.  I know that -- I do

14  know that now it's no longer the issue it was when this

15  happened.  When this happened it was a disaster.

16       Q.  (By Ms. Wedgworth)  Was the quota done to both

17  legacy and new customers?

18            MS. GULLEY:  Objection; form.

19       A.  I -- I don't know exactly, you know, what

20  the -- what the final resolution was.  You know, these

21  emails relate to a moment in time when the product was,

22  you know -- or when the problem was at its worse.

23       Q.  (By Ms. Wedgworth)  Well, there was no

24  recommendation to put a quota on Naked Lime; correct?

25            MS. GULLEY:  Objection; form.

HIGHLY CONFIDENTIAL

Page 281

1      A.  It's my understanding that Naked Lime did not

2   suffer from the problem.

3      Q.  (By Ms. Wedgworth)  So there was no quota put

4   on Naked Lime?

5            MS. GULLEY:  Objection; form.

6      A.  Again, I don't know, you know, what was done,

7   you know, subsequent to this email.  I'm -- it is a --

8   it is -- it's one of, you know, of the issues that goes

9   on in the company with 5,000 employees and tens of

10  thousands of customers.  And I -- I see moments in time,

11  but I -- I don't know everything that's going on.

12     Q.  (By Ms. Wedgworth)  Mr. Brockman, I'll show you

13  what has been previously marked as Plaintiff's Exhibit

14  226.  I'm going to focus you on the last page to ask you

15  if it's your handwriting.

16     A.  You said the last -- the last, last page?

17     Q.  Yes.

18            MS. GULLEY:  Objection; form.

19     Q.  (By Ms. Wedgworth)  Is this your handwriting,

20  Mr. Brockman?

21     A.  Yes, it is.

22     Q.  And at the top of the page, it says, "AutoAlert

23  Irvine California."  And then the handwriting you have

24  in the middle of the page, "per dealer installation

25  fee," the typewritten is "150."  It -- it's scratched

HIGHLY CONFIDENTIAL

Page 282

1    out to "300."  Is that you scratching out "150" and

2    inserting "300"?

3              MS. GULLEY:  Objection; form.

4         A.  Yes, ma'am.

5         Q.  (By Ms. Wedgworth)  Is that true for all the

6    other numbers that are handwritten?

7         A.  Yes, ma'am.

8              MS. GULLEY:  Form.

9         Q.  (By Ms. Wedgworth)  And then handwritten, "For

10   installation of monthly support fees for Canadian

11   dealers," it's -- "20%" is crossed out.  "30%" -- is

12   that your handwriting?

13        A.  Yes, it is.

14        Q.  And then "Per dealer install fee is per the

15   table," your handwriting again?

16        A.  Yes, that's correct.

17        Q.  How did you determine to raise the per dealer

18   installation fee for package going from $150 to $300?

19              MS. GULLEY:  Objection; form.

20        A.  This particular customer has a number of -- of

21   real-time interfaces, which means they're very heavily

22   dependent upon, you know, our software functionality to,

23   you know, get done what they want to have done.  Every

24   time that we do one of these, we run into the issue of

25   increasing the complexity in our application software.

HIGHLY CONFIDENTIAL

Page 283

1    And part of -- part of my decision-making responsibility

2    is -- and that's that there is all kinds of requests

3    for, you know, this and that to be done to our

4    application software.

5              Now, if I say yes to them all, in the last

6    act, everybody goes crazy, because it's become too big

7    and too complex.  It's my job to actually think about

8    all the time, you know, what is it that we're doing

9    that's going to increase complexity in our application

10   software?  In this particular case, I believe that

11   the -- the complexity load that this particular customer

12   was going to put on us, you know, really required a

13   little bit higher price.

14             And -- you know, that's just, you know, the

15   sum and substance of it.  You know, we cannot do, you

16   know, everything that everybody likes -- would like to

17   have without cost, which means we've got to increase the

18   prices a little bit.

19        Q.  (By Ms. Wedgworth)  Was one of the real-time

20   interfaces for AutoAlert the repair order?

21             MS. GULLEY:  Objection; form.

22        A.  It is the -- it is the publish repair order,

23   which is taking the -- the -- it's notifying the third

24   party that there's been activity on a repair order.

25   It's either been opened or closed.  And they want to --

HIGHLY CONFIDENTIAL

Page 284

1    they want to know that, really, right at the instant

2    that it occurs, it's real time.

3        Q.  (By Ms. Wedgworth)  Did you consult any

4    particular documents, or specific information, when you

5    made these changes?

6        A.  No.

7        Q.  Did you speak to anyone, specifically, about

8    making these changes?

9        A.  Not that I recall.

10       Q.  Mr. Brockman, I'll show you what's been marked

11   as Plaintiff's Exhibit 675.

12            (Exhibit 675 Brockman was marked for

13             identification.)

14       Q.  (By Ms. Wedgworth)  Which is the July 2018

15   financial page -- package.  And I'm going to ask you to

16   turn to Page 16 of the document which is, again, going

17   down under the RCI numbers for July through 2000- --

18   2018, there's a "14%" on "Recurring Revenue" for RCI?

19            MS. GULLEY:  Objection.

20       Q.  (By Ms. Wedgworth)  From the previous year?

21            MS. GULLEY:  Objection; form.

22       A.  Thank you very much.

23       Q.  (By Ms. Wedgworth)  It's about six lines down

24   from the top.  RCI "Recurring" -- "Recurring Revenue" --

25   further up.

HIGHLY CONFIDENTIAL

Page 285

1          MS. GULLEY:  Is there a question?

2     Q.  (By Ms. Wedgworth)  Do you see the "14%"?

3          MS. GULLEY:  Objection; form.

4     A.  I'm not seeing a -- a percentage on the line

5     that I'm looking at anywhere.

6     Q.  (By Ms. Wedgworth)  If you start at the top of

7     the page and go six lines down.

8     A.  Oh, the top of the page?

9     Q.  Yes.

10    A.  I'm sorry, I was distracted by the highlighting

11    that you have.  It's further down towards the bottom of

12    the page.

13    Q.  So there's "One Time Revenue," and beneath it

14    is "Recurring Revenue."  Keep going down to RCI, under

15    "Recurring Revenue."  Not "One Time," but "Recurring."

16    A.  Okay.  I -- I found --

17    Q.  Do you see the "14%"?

18         MS. GULLEY:  Objection; form.

19    A.  Yes.

20    Q.  (By Ms. Wedgworth)  And does that -- is this a

21    number that you would look at on a monthly basis?

22    A.  Not really.  As I've stated before, I spend, on

23    this particular package that comes out once a month,

24    half-hour or less.  Because this is not where the action

25    is as far as I'm concerned.  I'm much more interested in

HIGHLY CONFIDENTIAL

Page 286

1    new projects, new software, new hires, new customer

2    relationships.  Those are much more important to me than

3    these detailed numbers.

4         Q.  At the bottom of this page where there are

5    three asterisks, at the very bottom, beneath the

6    highlighted numbers that you looked at earlier, there's

7    a note with three asterisks.  "Legal Fees for Data

8    Services are $1,034k in July, $10,690k YTD or $18.3M

9    annualized.  Case to date (Aug 2017-current) costs total

10   $16.3M."  Do you see that?

11              MS. GULLEY:  Objection; form.

12        A.  Yes, I do.

13        Q.  (By Ms. Wedgworth)  Have you looked at that

14   before?

15        A.  I think I've actually -- probably as a thumbed

16   through, I probably noticed that one.

17        Q.  Are those -- are those costs with regard to the

18   current litigation we're in now?

19              MS. GULLEY:  Objection; form.

20        A.  I believe that to be the case.  Though it

21   doesn't specifically say that, but that -- I would think

22   that would probably be true.

23        Q.  (By Ms. Wedgworth)  Is this a -- a figure

24   you've requested to be put in the data?

25              MS. GULLEY:  Objection; form.

HIGHLY CONFIDENTIAL

Page 287

1          A.   No, it is not.

2                    MS. WEDGWORTH:   If we just a very short

3     break, I want to confer with co-counsel for just a

4     minute.   Off the record.

5                    MS. GULLEY:   Off the record.

6                    THE VIDEOGRAPHER:   Off the record at 2:15

7     p.m.

8                    (Short recess 2:15 to 2:21 p.m.)

9                    THE VIDEOGRAPHER:   Time is 2:21 p.m.   We're

10    back on the record.

11                    EXAMINATION (Continuing)

12    BY MS. WEDGWORTH:

13        Q.   Mr. Brockman, other than the ODE relationship,

14    the CBR relationship and the informal relationship you

15    spoke about earlier today, does Reynolds have any other

16    relationships with CDK?

17                    MS. GULLEY:   Objection; form.

18        A.   If you could repeat that list?   It's OD

19    relationship...

20        Q.   (By Ms. Wedgworth)   CBR.

21        A.   CBR.

22        Q.   And the informal relationship you discussed

23    today.

24                    MS. GULLEY:   Objection; form.

25        A.   That's all that I'm aware of.

HIGHLY CONFIDENTIAL

Page 288

1      Q.  (By Ms. Wedgworth)  Are you aware of any other

2   relationships before -- that existed with CDK that no

3   longer exist?

4              MS. GULLEY:  Objection; form.

5      A.  Not that I'm aware of.

6      Q.  (By Ms. Wedgworth)  I want to show you

7   Plaintiff's Exhibit 676, which is the last financial

8   statement we'll look at.  And it's "December YTD 2017."

9   And I just have a simple question:  Is -- this -- did

10  you receive this document in the ordinary course of your

11  job after December 2017?

12             MS. GULLEY:  Objection; form.

13             (Exhibit 676 Brockman was marked for

14              identification.)

15     A.  I -- I don't know what the legal definition is

16  of "in the ordinary course of my job."

17     Q.  (By Ms. Wedgworth)  Well, as part of your job,

18  did you -- it -- was this the document you would receive

19  on a regular basis?

20     A.  Yeah.  Stated that way --

21             MS. GULLEY:  Form.

22     A.  -- yes, I agree.

23             MS. WEDGWORTH:  At this point, I'm going to

24  reserve my remaining time.  And I think Mr. Nemelka has

25  a couple of questions.

HIGHLY CONFIDENTIAL

Page 289

1                    MS. GULLEY:  Could I just ask you a

2       question?  When you say you reserve you're remaining

3       time, do you -- you mean reserve whatever remaining time

4       there is after Mr. Nemelka, right?

5                    MR. NEMELKA:  Right.

6                    MS. WEDGWORTH:  Yes.

7                    MS. GULLEY:  Just to clarify.

8                         EXAMINATION

9       BY MR. NEMELKA:

10          Q.  Good afternoon, Mr. Brockman.  Mike Nemelka.

11          A.  Good morning.  (Inaudible.)

12          Q.  I just have a few questions for you about just

13      a few documents here at the end of the day.  I'd hand

14      you Plaintiff's Exhibit 677, which is an email from you

15      to Mr. Schaefer, forwarding a correspondence that you

16      had with Mr. Anenen in February of 2013.  I'll give you

17      a moment to read it.

18                    (Exhibit 677 Brockman was marked for

19                     identification.)

20          A.  Yes.

21          Q.  (By Mr. Nemelka)  Thank you.  So the bottom

22      email is an email from you to Mr. Steve Anenen dated

23      February 5th [sic], 2015; correct?

24          A.  Yes.

25          Q.  And this was around the time when CDK and

HIGHLY CONFIDENTIAL

Page 290

1    Reynolds were negotiating the wind-down agreement; is

2    that right?

3                    MS. GULLEY:  Objection; form.

4         A.  I believe that's correct.

5         Q.  (By Mr. Nemelka)  And here, the second sentence

6    that you write is, "We need to conclude our deal -- or

7    not -- as I have issues that can no longer wait to be

8    dealt with."  Are those issues the security enhancements

9    that you've been holding off on?

10        A.  That's correct.

11        Q.  And then you relate to him that some "bright,

12   mostly young Harvard MBA-types" have been wanting to

13   talk to you about CDK, right?

14        A.  They really -- they start out, they want to be

15   taught about the industry.

16        Q.  But then they turned and wanted to talk to you

17   about CDK?

18                    MS. GULLEY:  Objection; form.

19        A.  Yes.  That -- That's what it says and that's --

20   that's exactly what was happening.

21        Q.  (By Mr. Nemelka)  And what they wanted to know

22   is -- and as you write, "What they really want to know

23   about is CDK -- how you operate -- and not very

24   subtly -- what could be done to improve things."  That's

25   what they wanted to talk to you about, right?

Page 291

1           MS. GULLEY:  Form.

2      A.  These are unsolicited calls.  You know, the

3  phone rang, as I pick it up and, you know, there's

4  somebody that wants to talk to me.  And this is what was

5  happening.

6      Q.  (By Mr. Nemelka)  And you told them, as you

7  write here, "I am exactly the right person that you want

8  to talk to -- but I am very busy -- and am not talking."

9  Is that what you told them?

10          MS. GULLEY:  Form.

11     A.  That's correct.

12     Q.  (By Mr. Nemelka)  When you say you were exactly

13 the right person that they wanted to talk to about CDK

14 and how they could improve things, what did you mean?

15          MS. GULLEY:  Form.

16     A.  No question, I -- I've not been in this

17 business for the number of years I have and not learned

18 things about how to run this type of business.  I don't

19 know about other business, but I know about this kind of

20 business.

21     Q.  (By Mr. Nemelka)  And then you conclude in your

22 email to Mr. Anenen, "Just so you know when someone is

23 throwing darts at you -- it isn't me providing them the

24 ammunition."

25     A.  Yes.

HIGHLY CONFIDENTIAL

Page 292

1       Q.  So what did you mean by that?

2              MS. GULLEY:  Form.

3       A.  Well, I think exactly that.  I mean, you know,

4   I think Steve Anenen was under a lot of pressure from,

5   you know -- you know, dissident stockholders who were

6   mostly hedge fund-type kind of folks.  And Steve is a

7   very nice person.  I personally like the guy.  He always

8   has been polite, gentlemanly with me, and I've tried to

9   be so with him.  And I wouldn't be in a hurry to see him

10  be ambushed.  And so I couldn't help him other than say,

11  "Look, it ain't me, but somebody is gunning at you."

12      Q.  (By Mr. Nemelka)  Okay.  You can put that

13  aside.

14              (Exhibit 678 Brockman was marked for

15                 identification.)

16      Q.  (By Mr. Nemelka) I've handed you a document --

17  first of all, before I do -- yesterday we talked about

18  how certain applications would need RCI and 3PA

19  interfaces forever from you and CDK.  Do you recall when

20  we talked about -- talked about that?

21              MS. GULLEY:  Objection; form.

22      A.  I think I -- I referred to the fact that, as

23  certain applications -- like, for instance, ReverseRisk,

24  which has a -- a substantial number of, you know, ADP or

25  CDK DMS systems.  In order to provide that particular

HIGHLY CONFIDENTIAL

Page 293

1    product to them, it would require, on a long -- because

2    as long as they use that product, you know, in order for

3    it to work, it has to have accounting data.

4        Q.  (By Mr. Nemelka) And there is some Cox

5    Automotive applications that you believe would need RCI

6    and 3PA interfaces forever from Reynolds and CDK, right?

7            MS. GULLEY:  Objection; form.

8        A.  There -- there are -- again, using the

9    ReverseRisk example, a dealership that uses the

10   Dealertrack accounting system in order to be able to,

11   you know, have and utilize a ReverseRisk business

12   intelligence system would need to have some manner of --

13   of data access or accounting data.

14       Q.  (By Mr. Nemelka) I've handed you Plaintiff's

15   Exhibit 678.  Which is an email from you to Ron Lamb,

16   dated June 30, 2015, the subject being "Cox/DT Merger."

17   And I will give you a moment to review it.

18       A.  Yes.

19       Q.  So this email chain between you and Mr. Lamb

20   relates to Cox Automotive's acquisition of Dealertrack;

21   correct?

22       A.  That's correct.

23       Q.  And the combining of certain applications

24   already owned by Cox Automotive and those who are owned

25   by Dealertrack; correct?

Page 294

1            MS. GULLEY:  Form.

2       A.  I don't know --

3       Q.  (By Mr. Nemelka)  Strike that.  I think that

4    was a bad question.

5       A.  Would you like to s- -- have another question?

6       Q.  Yes, I do have another question.

7       A.  Okay.

8       Q.  And you recognized that there were some

9    benefits to Cox Automotive and its ac- -- acquisition of

10   Dealertrack in -- in combining those assets; correct?

11           MS. GULLEY:  Objection; form.

12      A.  I think as a -- as just a matter of normal

13   course, when there's a major transaction happen amongst

14   other companies that are in the same industry that we're

15   in, I kind of -- I read those articles.  And certainly,

16   you know, any good size acquisition, such as this one

17   was -- at the heart of it -- it had to be some manner of

18   synergies.  And that's what I said.

19      Q.  (By Mr. Nemelka)  And what you write here is

20   that -- to Mr. Lamb -- "I think [that] there is no

21   question that they will achieve some more market power

22   by combining VAuto and AAX.  However to make these apps

23   really work right, they will require RCI interfaces

24   forever from us and CDK."  You wrote that, right?

25           MS. GULLEY:  Form.

Page 295

1      A.   Yes, that's correct.

2      Q.   (By Mr. Nemelka)  And when you say "RCI

3  interfaces," what you mean is RCI interface from

4  Reynolds and a 3PA interface from CDK, right?

5            MS. GULLEY:   Form.

6      A.   That's correct.  And -- and this -- and there

7  is an opinion statement here when I say, "However to

8  make these apps really work right."  That's my opinion.

9      Q.   (By Mr. Nemelka)  Right.

10     A.   That's not necessarily a decided fact.  And --

11  and the fact these products continue to work as they are

12  today -- but they could also work a little better.

13     Q.   And it's because they have -- but in your

14  opinion, is that they would need interfaces with RCI and

15  3PA forever in order to work properly; correct?

16            MS. GULLEY:   Objection; form.

17     A.   That's my opinion.  It would be very much like

18  the ReverseRisk product that we have today, which

19  is an -- an accounting business intelligence software.

20  In order to work, it relies on a continuing source of,

21  you know, accounting data.

22     Q.   (By Mr. Nemelka) Does VAuto need -- need

23  accounting data in order --

24            MS. GULLEY:   Form.

25     A.   No.  It doesn't, but -- well, I say it doesn't

HIGHLY CONFIDENTIAL

Page 296

1    need it, but it's nice.

2        Q.  (By Mr. Nemelka)  All right.

3        A.   It -- it would be -- you know, you can keep

4    track of what your accounting basis is from a tax

5    standpoint, from a -- a gap accounting standpoint.  You

6    can do that by hand in the VAuto system.  But it'd be a

7    little nicer if it automatically went over and sniffed

8    the accounting system and came back with a number and

9    put it in VAuto system.

10       Q.  All right.  You can set that aside.

11              I've handed you what I've marked as Exhibit

12   679, which is an email from you to Bob -- to Bob

13   Schaefer, dated July 1, 2017, with the subject being

14   "Data Access Direction."  I'll give you a moment to

15   review.

16              (Exhibit 679 Brockman was marked for

17                identification.)

18       Q.  (By Mr. Nemelka)  Finished, Mr. Brockman?

19       A.  Yes.

20       Q.  So Mr. Schaef- -- this -- July 1st, 2017, this

21   was after Authenticom had filed the lawsuit against

22   Reynolds and CDK; correct?

23       A.  Yes, that's correct.

24       Q.  This is after, also, the preliminary injunction

25   hearing involving that lawsuit; correct?

Page 297

1      A.  Yes, that's correct.

2      Q.  And Mr. Schaefer is writing you to say that

3   Reynolds should terminate any of its relationships with

4   Authenticom services; correct?

5      A.  That -- that's what he's recommending.

6      Q.  And what he says here in the first sentence is

7   that Reynolds is still using Authenticom for MMS.  And

8   that's a Reynolds application; correct?

9          MS. GULLEY:  Objection; form.

10     A.  It is a Reynolds application.  It's sold to a

11  fairly small number of -- of dealers that use CDK

12  systems.

13     Q.  (By Mr. Nemelka)  All right.  And IDS

14  ReminderTrax, that's a Reynolds application; correct?

15         MS. GULLEY:  Objection; form.

16     A.  That's -- that's a service reminder card.  It's

17  an application that we sell to service departments.  And

18  in some cases, those service departments are -- use CDK

19  software.

20     Q.  (By Mr. Nemelka)  RepMan, that's also a

21  Reynolds application; correct?

22         MS. GULLEY:  Objection; form.

23     A.  RepMan is really a General Motors application.

24  It's not -- not really ours.  It's reputation

25  management.

HIGHLY CONFIDENTIAL

Page 298

1       Q.  (By Mr. Nemelka)  And ShowroomMagnet -- and

2   that's a Reynolds application; correct?

3               MS. GULLEY:  Objection; form.

4       A.  And that's a Reynolds application.  It is a --

5   it's a very small one.  It's the one that provides a

6   cash voucher, a motivation, to get prospective car

7   buyers to come in and take a -- a test drive.

8       Q.  (By Mr. Nemelka)  And he says for that one,

9   Authenticom was currently pulling data from Reynolds

10  DMSs, right?

11              MS. GULLEY:  Objection; form.

12      Q.  (By Mr. Nemelka)  Do you see that?  After -- at

13  Showroom Management -- or ShowroomMagnet?

14              MS. GULLEY:  Form.

15      Q.  (By Mr. Nemelka)  He writes, "Currently pulling

16  from Reynolds DMS."  Do you see that?

17              MS. GULLEY:  Objection; form.

18      A.  I see that.

19      Q.  (By Mr. Nemelka)  So Reynolds was using

20  Authenticom to pull data from Reynolds dealers; correct?

21              MS. GULLEY:  Objection; form.

22      A.  I think what's happening there is -- and that's

23  this was a -- a result of an acquisition of a --

24  evidently, fairly recent acquisition.  And it, you

25  know -- it had, prior to us acquiring this little

Page 299

1    product, this little company, that they had been -- they

2    were doing business, obviously, independently with us.

3    And so therefore, they -- since they weren't RCI

4    certified, they were going to a third party to -- to

5    acquire data for them.  Which -- this is something I'm

6    not ever happy to see happening.  But whenever you have

7    an acquisition, things are not operated in the most

8    efficient manner, and there are stupid things going on.

9    And that would be classified as a stupid thing going on.

10        Q.   (By Mr. Nemelka)  And you -- and in -- in

11   response to Mr. Schaefer's recommendation to terminate

12   all relationships with Authenticom after they had

13   initiated this litigation, you wrote, "I agree -- do

14   what needs to be done."  That's what you wrote; correct?

15             MS. GULLEY:   Objection; form.

16        A.   Yes.  And I might add on that, I obviously

17   wasn't happy about the fact that we've been -- we were

18   sued, in my opinion, without good reason.  But it --

19   it's also important, I think, to do business with

20   people, or with entities, that have substance.  I don't

21   think Authenticom has much in the way of substance.  And

22   I prefer to do business with some folks, particularly

23   when it comes to data.  If there's a lawsuit that goes

24   on and there's a big judgement, I'm not the only one

25   standing there.

HIGHLY CONFIDENTIAL

Page 300

1          MR. NEMELKA:  I have no further questions.

2     I'll reserve the remainder of our time.

3          MS. GULLEY:  Thanks.  I have some questions

4     before I get started.  By my count, you have six

5     minutes.

6          All right.  Thank you, Mr. Brockman.

7          Peggy, can you tell me where the exhibits

8     are from yesterday?  Are they sort of that sea of

9     information?

10          MS. WEDGWORTH:  I think in this area.

11          (Brief discussion.)

12                    EXAMINATION

13     BY MS. GULLEY:

14     Q.  Let's stick with the document Mr. Nemelka was

15     asking you about.  That would be Plaintiff's Exhibit

16     679.  All right.  Do you have Plaintiff's Exhibit 679 in

17     front of you, sir?

18     A.  Yes.

19     Q.  One of Mr. Schaefer's statements to you related

20     to having relationships directly with the DMS

21     provider -- do you see it in parentheses?  He's list DMS

22     providers CDK, Dealertrack, Automate and Autosoft?

23     A.  Uh-huh.  (Witness answers affirmatively.)

24     That's correct.

25     Q.  And you -- you agreed that he should do what

HIGHLY CONFIDENTIAL

Page 301

1   needs -- you agreed that he should do what needs to be

2   done in terms of entering into relationships with those

3   DMS providers; correct?

4              MS. WEDGWORTH:  Objection.

5              MR. NEMELKA:  Objection.

6        A.   That's correct.

7        Q.   (By Ms. Gulley)  And you did, in fact, ent- --

8   you did, in fact, direct others to enter into

9   relationships with the other DMS providers; correct?

10              MS. WEDGWORTH:  Objection.

11        A.   That's correct.

12        Q.   (By Ms. Gulley)  Now, did the other -- did

13   Dealertrack sue Reynolds?  Did -- has anybody sued

14   Reynolds over their relationship with Dealertrack?

15              MS. WEDGWORTH:  Objection.

16              MR. NEMELKA:  Objection.

17        A.   Not that I'm aware of.

18        Q.   (By Ms. Gulley)  Do you know who Dealertrack's

19   lawyer is?

20              MR. NEMELKA:  Objection.

21        A.   No.  Am I supposed to?

22        Q.   (By Ms. Gulley)  Not necessarily.  All right.

23   You were asked some questions about the financial

24   information that you received.  Do you recall those

25   questions, in general terms?

Page 302

1     A.  In general terms, they seem to be clustered

2  around RCI.

3     Q.  Okay.  And one of the things that you have

4  testified about in the last couple of days is that

5  Reynolds does not have cost accounting; correct?

6          MS. WEDGWORTH:  Objection.

7     A.  That's correct.

8     Q.  (By Ms. Gulley)  And Ms. Wedgworth was asking

9  you questions about some of the costs of RCI.  There are

10  costs associated with RCI; correct?

11          MS. WEDGWORTH:  Objection.

12     A.  Absolutely.

13     Q.  (By Ms. Gulley)  What -- what about Reynolds'

14  efforts to secure its enterprise system?  What are the

15  costs associated with Reynolds' efforts to secure its

16  enterprise system, in general terms?

17          MS. WEDGWORTH:  Objection.

18          MR. NEMELKA:  Objection.

19     A.  Well, probably the first category has to do

20  with it takes a whole bunch of executive attention, mine

21  included, to focus on the issue of data security.  And

22  deciding, you know, what needs to be done, how -- how to

23  get it done, how to react in the marketplace to data

24  security issues, certainly requires us to spend some

25  more money on advertising, you know, to -- to counteract

HIGHLY CONFIDENTIAL

Page 303

1    some of the effects of what we've been -- what's been

2    necessary to do from a data security standpoint.

3              You know, that's kind of, you know, the top

4    level.  And -- and to go down and enumerate a list of

5    things, it would take -- take a little while.  But

6    that's one of the categories that we didn't talk very

7    much about in -- in the previous, you know, questions

8    this afternoon.

9        Q.  (By Ms. Gulley)  Have you made a conscious

10   choice to invest in system security since the merger by

11   acquisition with the Reynolds and Reynolds company?

12              MS. WEDGWORTH:  Objection.

13       A.  Yes.  I come, originally, from IBM.  And the

14   IBM philosophy was very, very much oriented towards

15   security.  And in all the software design and

16   development, you know, that I was a part of in the UCS

17   company, data security was extremely important.  And I'm

18   very, very pleased to state that, so far as I know --

19   because we never know what we don't know -- that system

20   is totally tight and enjoys that reputation in the

21   marketplace, that it's, from a security standpoint, way

22   ahead of everybody else.

23              When I got to Reynolds, it's kind of like I

24   had been spending my life, you know, mopping and

25   polishing the floor.  And I inherited this house, and it

HIGHLY CONFIDENTIAL

Page 304

1    has two inches of water on the floor.  And we don't need

2    to think about mops and brushes, we need pumps, because

3    that was the situation from a data security standpoint.

4    It was just terrible.

5                And it's been my goal, you know, since that

6    day that -- to get it into the right kind of shape.  And

7    it's -- it's vastly improved.  Still not there, you

8    know, there's still more work to do.  And that's caused

9    by the fact that there are people on the outside, and

10   more of them every day, you know, that want to invade

11   your systems.  Starting from PCs up.

12       Q.  (By Ms. Gulley)  Did you keep that goal a

13   secret in 2006 when UCS acquired the Reynolds and

14   Reynolds company?

15               MS. WEDGWORTH:  Objection.

16               MR. NEMELKA:  Objection.

17       A.  Absolutely not.  It's been -- it's known, you

18   know, that that was going to be one of the goals.

19       Q.  (By Ms. Gulley)  Reporters ever ask you about

20   it?

21               MS. WEDGWORTH:  Objection.

22       A.  Yes.

23       Q.  (By Ms. Gulley)  What did you tell them?

24               MS. WEDGWORTH:  Objection.

25       A.  I told them we were going to improve security.

HIGHLY CONFIDENTIAL

Page 305

1      Q.  (By Ms. Gulley)  Since that time, late Oct- --

2   late 2006, when the acquisition occurred, how much would

3   you estimate you have invested in data security at the

4   Reynolds and Reynolds company?

5              MS. WEDGWORTH:  Objection.

6      A.  Probably, counting everything, which would

7   include, you know, my time, other executives' time, you

8   know, load on the technical support center answering

9   questions and issues, sales -- salemen's time dealing

10  with customers over the issue of data security,

11  additional advertising, you know, that we felt compelled

12  to -- to do simply from a -- to keep our image up in the

13  public, you know, marketplace, I wouldn't be surprised

14  if the total number, if we ever sat down to figure it

15  out, would be half a million dollars.

16     Q.  (By Ms. Gulley)  In response to some of the

17  questions you had begun explaining about the cost of

18  some issues related to Xtime, and you were unable to

19  finish your answer and were told that you'd be able to

20  finish it later -- so here is your chance -- what were

21  you -- what were you talking about with respect to

22  Xtime?

23              MS. WEDGWORTH:  Objection.

24              MR. NEMELKA:  Objection.

25     A.  Well, the issue started on -- came up on a

Page 306

1    Monday afternoon.  And we started receiving complaints

2    from some customers saying, "What have you done?" and

3    "Why is our system running so slowly?" and "We're" --

4    "We've checked around and we're not running any specific

5    batch jobs," you know, "What is" -- "What on earth is

6    going on?"

7                    And, you know, we started, you know,

8    accessing some of those systems, and we discovered there

9    was something going on, that there was a piece of

10   software in -- in the Reynolds server.  It wasn't -- it

11   was running, actually, in -- in the -- in the -- in

12   the -- the outside part of the server.  But what it was

13   doing, it was -- it was adding records at a high rate to

14   the Reynolds server in the customer's location.  And we

15   discovered what was happening was -- and that's that

16   Xtime was -- "abusing" would be the right word -- they

17   were just trampling their -- their permission to have

18   access to add, change and delete records.  And they were

19   adding, you know, dummy, bo- -- bogus customer records

20   at a high rate.  And they added some 700,000.  You know,

21   just trashed customer records.

22                    And that was what was slowing down the

23   servers who had called and complained.  Fortunately, we

24   were able to get it shut off before it went any further.

25                    Then came the cleanup problem, or the

HIGHLY CONFIDENTIAL

Page 307

1    cleanup issue.  We found that -- that some of the --

2    that there were some pieces of -- of junk in -- in

3    the -- these customer records that was consistent across

4    all of them.  And, you know, we found that it took us

5    several days to figure this out, that we could write

6    software and we could go read the entire customer file

7    on those servers and find bad records and throw them

8    out.

9            The problem was -- and that's that, in the

10   meantime, the customers continued to operate.  And as

11   the customers continued to operate, they would actually

12   transact business on some of these, you know, bogus, you

13   know, customer records.  And so we were faced with the

14   issue of it wasn't just a matter of -- of going back

15   and -- and deleting customer records that we could

16   identify, we also had to identify whether or not they

17   had had any business transacted on them.  Because if we

18   did, then we would lose that -- lose that data

19   completely.

20           So we ended up having a situation where

21   once we got done doing everything we could from the

22   programming standpoint, the customers had to go back and

23   find the duplicates.  Because there would be a

24   duplicate, you know, customer record that was bad, but

25   yet it was still good, because it had some -- some --

Page 308

1    tracking some business transactions involved.

2              And then in the last act, the customers

3    were actually responsible for cleaning all of that up by

4    hand.  Now, what that's like -- it's like, you know,

5    somebody that lives next door who's about half crazy and

6    likes to shoot, and all they did is kill your dog, but

7    they didn't hit you.  I mean, so you could be happy

8    about that.  Well, but as somebody that's, you know, in

9    charge of -- I'm kind of the executive in charge of loss

10   prevention -- I'm saying, "Well, good God, what could

11   have happened?"

12             Because that same kind of logic could have

13   occurred where they deleted all of our stuff instead of

14   adding.  They could have just as well been deleting,

15   because they had write-back access, and if they had sat

16   and deleted, you know, they could have destroyed God

17   knows how much, you know, information.  Why did they

18   only get at 400 or so dealerships?  I don't know.  You

19   know -- you know, the grace of God.  You know, it could

20   have been thousands.

21             And so that's the reason why -- that I sat

22   and thought, "How the hell can we put -- you know, we

23   can't prevent this, because we can't stop them.  But how

24   can we fix it?"  What we did was -- is we went into the

25   software that we allowed them, you know,

HIGHLY CONFIDENTIAL

Page 309

1    delete/add/change access to, and we created journalling.

2    And what "journalling" means is -- is we take -- let's

3    say you've got a change, you know, function going to

4    happen.  What we do is we take a snapshot of the record

5    before they change it, log it off, and then we take a

6    snapshot of it after -- after -- after change and log it

7    off.  And that means that we can go back and we can tell

8    what happened.  And in many cases, probably be able to

9    restore.

10            Unfortunately, we run into the situation

11   where what happens in the time interval from when the

12   incident occurs versus when we discovered they want to

13   fix it -- which is business transactions happen on

14   records in between.

15            Now, the -- the logging -- you know, we can

16   tell you which ones they stepped on, but we can't fix

17   it.  We can't do an automatic fix, because there's been

18   business transactions that happened that, you know, we

19   don't know about.

20            So that's all part and parcel of -- of the

21   Xtime story.  It was a -- a rude awakening to us that --

22   that third-party programmers could be so -- so lax and

23   so stupid as to let something like that happen.

24       Q.  (By Ms. Gulley)  How much did it cost you to

25   build out this new protection?

Page 310

```
 1              MS. WEDGWORTH:  Objection.

 2              MR. NEMELKA:  Objection.

 3        A.  I don't know, because we had to go back in to

 4    every application program that we allowed read/write

 5    access to and build it in.  And then we also had to

 6    build the -- the database for these log transactions.

 7    And then, of course, the -- the interesting part of

 8    these log transactions -- how long do you have to keep

 9    them?

10        Q.  (By Ms. Gulley)  So it's an ongoing expense?

11              MS. WEDGWORTH:  Objection.

12        A.  It's an ongoing expense, and we don't know how

13    long we have to keep them because, in some cases that --

14    they could have a bust where, you know, the -- the loss

15    was minor.  But yet you could have a situation, you

16    know, where they decided -- or not decided, but where

17    they -- through lack of programming skill, they could --

18    they could walk on email addresses.

19              Well, you know, you might not notice that

20    for a couple of months.  And then you'd have to go and

21    try and fix it, which means that -- we keep a lot -- lot

22    of file stuff, I think, for retention, seven years.  I

23    hope to God we never have to go that far back to fix

24    anything, but somebody had to make a decision as to how

25    long we were going to keep it, so I said seven years.
```

HIGHLY CONFIDENTIAL

Page 311

1      Q.  (By Ms. Gulley)  In terms of what you've had to

2  spend already in building the log-in functionality and

3  the service base so far, are we talking thousands,

4  millions?

5                 MS. WEDGWORTH:  Objection.

6                 MR. NEMELKA:  Objection.

7      A.  I would say not -- not as much as a million,

8  but probably -- probably made a pretty good hole in

9  700,000 or 800,000.

10     Q.  (By Ms. Gulley)  Earlier, I had asked you --

11     A.  And then there's the ongoing cost.  I mean,

12  there's -- you know, the stuff that you vaulted, you've

13  got to keep it.  You've got to sell on it, you've got --

14  you've got to spin it.

15     Q.  Earlier, I had asked you what you -- you

16  estimated the investment in system security, and

17  the rec- -- the -- and we just saw the transcript looked

18  like you had said half a million.  I wanted to make sure

19  I got that right.

20     A.  No.  It's half a billion.

21                 MS. WEDGWORTH:  Objection.

22     Q.  (By Ms. Gulley)  Say it again.

23                 MS. WEDGWORTH:  Objection.

24     A.  Our total investment for data security forever

25  and a day probably is in the order of half a billion.

HIGHLY CONFIDENTIAL

Page 312

1       Q.  (By Ms. Gulley)  How do you feel about data

2    brokers?

3                    MS. WEDGWORTH:  Objection.

4                    MR. NEMELKA:  Objection.

5       A.  The same way I feel about the unprintable --

6    but, you know, certainly, in polite company --

7       Q.  (By Ms. Gulley)  "The elevator speech"?

8                    MS. WEDGWORTH:  Objection.

9       A.  You know, the problem with data brokers is --

10   is -- you know, it starts off from a legal standpoint.

11   You know, according to Gramm-Leach-Bliley, you know,

12   dealerships are considered financial institutions.  And

13   as such, they have certain responsibilities.

14                    There's also another act that -- that

15   applies directly.  And what it says in -- in short order

16   is -- and that's that a dealership is considered a

17   financial institution.  And they're responsible for the

18   security of the data that they accumulate in their

19   process of arranging financing.  If they are to use a

20   third-party service provider, they must have a contract

21   with that service provider, you know, that specifies

22   who's responsible for what, who indemnifies who and what

23   the liabilities are and so forth.

24                    A data broker, in the -- in the simplest

25   sense, what they're doing is they're extracting data out

Page 313

1    of a dealership system.  It's got to be a contract

2    there.  And then, you know, whoever that they send the

3    data to, there's got to be another contract there.  So

4    there -- there's this, you know, myriad of -- of

5    contracts that are required in order to be legal.

6            Data brokers is -- you know, they're --

7    they're little, small companies for the most part,

8    and they don't have the resources to do that.  They, in

9    many cases, are kind of oblivious to -- to the fact

10   that, you know, they are required to do all of these --

11   these things according to the law.

12           And so therefore, in my opinion, they're

13   absolute outliers.  Secondly, there's called a -- it's

14   called a Computer Fraud and Abuse Act.  Computer Fraud

15   and Abuse Act is very, very clear that if you enter into

16   a computer system, and the software on a computer

17   system, if you're not you authorized to do so, you're in

18   violation of that law.

19           Well, people don't pay a lot of attention

20   to the fact that -- that Reynolds owns the software

21   that's on every dealership system.  If they license that

22   software to the dealer and the license is not an

23   unlimited license, it's very much a limited license that

24   says that you cannot, you know, allow a third party to

25   access or to use that software because you have no

HIGHLY CONFIDENTIAL

Page 314

1    license to do that, your license covers only your

2    employees and direct agents.

3         Q.  (By Ms. Gulley)  How long have you had those

4    restrictions against the use of third-party data

5    brokers?

6              MS. WEDGWORTH:  Objection.

7         A.  I think in the case of UCS software, it's been

8    at least 25 or 30 years.  As far as Reynolds is

9    concerned, when I got there 12 years ago, they were

10   already there, and had been around for a while.  But I

11   don't know how long.

12        Q.  (By Ms. Gulley)  If -- during this deposition,

13   we've heard you, on numerous occasion, call data

14   brokers, like, Authenticom "hackers and bandits"; is

15   that correct?

16             MS. WEDGWORTH:  Objection.

17             MR. NEMELKA:  Objection.

18        A.  That's correct.

19        Q.  (By Ms. Gulley)  Why do you feel -- what --

20   what are the risks to Reynolds system such that you

21   would give them those names, "hackers and bandits"?

22             MS. WEDGWORTH:  Objection.

23             MR. NEMELKA:  Objection.

24        A.  Well, first of all, what they're doing is --

25   and that's that they have used -- and Steve Cottrell has

HIGHLY CONFIDENTIAL

Page 315

1    admitted in open court how often that he had worked, you

2    know, gaining entrance, you know, getting passed the

3    security barriers, to access Reynolds software.  And I

4    think that qualifies him for the name "hacker."

5              You know, what the big worry is -- and

6    that's that to the extent that a third-party hacker is

7    involved, there's a security breach and that there's

8    going to be all hell to pay.  And, you know, we've been

9    through this.  You know -- this is -- was my first --

10   matter of fact, that's how I met Michael.  It was a

11   Chevrolet dealership by the name of Franklin, and I

12   don't know where they were in the company -- in the

13   country, but the general manager of that dealership had

14   access to a master password.  And he could run any kind

15   of reports or any kind of listings that -- that he

16   wanted.  Which, that's not unusual for, you know -- he

17   was the onsite person in charge.  He was the general

18   manager.

19             Well, he used that -- that password

20   authority to download the entire customer files of that

21   customer -- of that dealership onto his laptop.  And

22   when he left -- and I don't know under what

23   circumstances he left, but it kind of sounds like maybe

24   not nice circumstances -- he saw fit to post the

25   customer database in its entirety on the Internet.

Page 316

1          And there were, you know, people whose

2    names and information was posted that were not happy,

3    and they called the FDC.  And the FDC came down on that

4    dealer and said, you know -- I don't know whether they

5    had their guns drawn or not, but I mean, they -- they

6    were -- it was -- it was very shocking -- and asked the

7    dealer what on earth he had done.  The dealer was, like,

8    completely unknowledgeable of what all happened.  And as

9    they talked to him some more, he said, "Look, I

10   understand what you're talking about.  You need to talk

11   to Reynolds.  They're our computer guys, they'll know

12   everything."

13          So the next thing we know, we have FTC on

14   our door, and we don't know much about dealing with the

15   FTC.  Matter of fact, never been around them at all.

16   And -- but fortunately -- fortunately, we got a good

17   piece of advice from one of -- one of our outside

18   attorneys --

19          MS. GULLEY:  Okay.  So you can't talk about

20   privileged information.  I'm sorry, sir.

21          THE WITNESS:  Oh, okay.

22      Q.  (By Ms. Gulley)  But -- but you're talking

23   about the FTC.  You're not talking about antitrust,

24   you're talking about the privacy people; is that right?

25      A.  I'm talking about the privacy people.  Can I

Page 317

1    talk about that?

2         Q.   No.

3         A.   No?

4         Q.   You cannot reveal privileged information.

5                   MS. WEDGWORTH:  Objection.

6         Q.   (By Ms. Gulley)  But --

7         A.   I can say, you know, what -- what the effect

8    was on us.

9         Q.   What was the effect on you of the FTC's

10   investigation into --

11        A.   Well, we obviously --

12        Q.   -- Franklin?

13                  MS. WEDGWORTH:  Objection.

14                  MR. NEMELKA:  Objection.

15        A.   We obviously started spending a bunch of money,

16   a whole pile, simply to convince the FTC that we did

17   nothing wrong.  The computer system was not in any way

18   at fault or involved.

19                  But it doesn't take much of a leap in my

20   mind to think about, "Well, what if the computer system

21   was involved?  What -- what if something happened that

22   caused a breach?  We better be prepared for all hell to

23   break loose and then it would be really expensive."  And

24   so the idea of having any kind of data broker involved

25   in any of that kind of process to me is not smart --

Page 318

1          (Brief discussion.)

2          (Exhibit 274 was marked for

3           identification.)

4     Q.  (By Ms. Gulley)  I'm marking and handing to you

5  Defendant's Exhibit 274.  Less you think the plaintiff's

6  and defendants' numbers are widely disparate, the

7  plaintiff's skipped numbers.  Ours -- we did not.

8  Here's Defendant's 274.

9          (Brief discussion.)

10    Q.  (By Ms. Gulley)  Take a minute to review

11 Defendant's 274.

12    A.  I'm -- I'm familiar with this.

13    Q.  Who's Robert T. Brockman, II?

14    A.  He's my son.

15    Q.  We were discussing a moment ago the Franklin

16 incident.  What is -- what is this about, the --

17 Defendant's Exhibit 274?

18          MS. WEDGWORTH:  Objection.

19    A.  This one here is -- is -- I believe is

20 DealerBuilt.  DealerBuilt, if I can recall what happened

21 on that one, they had a lot of very sizeable customers.

22 And they were sending backups of the local server in the

23 dealership back to a central point.  And when they

24 transmitted the data, it wasn't encrypted.  And it

25 caused the exposure of -- I want to say, like, 400,000

HIGHLY CONFIDENTIAL

Page 319

1    or so, that they know of, you know, individual customer

2    records were exposed.

3              And that meant that -- in any kind of data

4    exposure, you know, the first -- the first cost is $2

5    apiece it costs you per name to send a registered letter

6    to the person whose data was exposed and to tell them

7    that their data has been exposed and they should be

8    cautious about, you know, what's happening.  Because

9    their -- you know, their personal information may have

10   gotten into the wrong hands of some bad people.

11             And then, after that, you start dealing

12   with the FTC, which I -- I don't have any knowledge to

13   what that cost in this particular situation, but I bet

14   it was a bunch.  And I think this was one of the first

15   wake-up calls of a really large data breach in the

16   automotive business that we know about.

17             Because we always have to remember -- it's

18   kind of like in -- in the banks where they have worries

19   about bad people stealing money from the banks

20   internally.  You never hear about those.  Now, maybe

21   that's because none of them ever happen.  I don't think

22   that's the case.  I think they're concerned about the

23   publicity.  I think they're concerned about bad guys

24   getting ideas.  And, you know, that's certainly what

25   could be happening here.

HIGHLY CONFIDENTIAL

Page 320

1 Q. (By Ms. Gulley) Would you read what you sent

2 to your son, for the record?

3 A. Yeah. It's short. Three words. "It finally

4 happened. Love, Dad."

5 Q. What did you mean when you said that?

6    MS. WEDGWORTH: Objection.

7 A. Well, he and I have had conversations about

8 this a lot. You know, my son has a degree in computer

9 science from Rice University, along with a master's in

10 electrical engineering and an MBA. And he's -- he's

11 interested in these kind of things, so we talk about

12 them. He's 44 years old. I don't know if he's quite

13 grown yet, but he's getting there.

14 Q. (By Ms. Gulley) What do you mean by "finally"?

15 A. Well, I -- I've been predicting it for a long

16 time, and so it -- it was -- while it was an unhappy

17 situation, at least it serves the fact that I've not

18 been worrying in vain. We have -- we have -- in terms

19 of numbers of dealerships, you know, numbers of customer

20 records and whatever, we obviously has vastly more than

21 DealerBuilt did.

22 Q. Have you been criticized for that?

23 A. I've been criticized a lot for -- for data

24 security, which is incredible. But I think what really

25 happens in -- in the dealership world is -- and that's

HIGHLY CONFIDENTIAL

Page 321

1    that it's not the dealer.  It is the -- it is the

2    department head who, short term, you know, wants to get

3    his -- what he wants to get done, what he wants to get

4    done.  He doesn't care about security.  He may not even

5    be around that dealership next year.  He has a very

6    short-term outlook.

7                He is completely -- from a liability

8    standpoint, it's not going to be his personal liability.

9    He's worried about getting done whatever he can get done

10   so his bonuses at the end of the month is -- is good

11   at -- as good as it could be.  He's a very short-term

12   thinker.  And those are the people that make the most

13   noise, you know, when -- when security enhancements take

14   place.

15               Inevitably, when you -- when you get to the

16   dealer and explain to him the liabilities that are

17   floating around and -- and what -- what -- what's going

18   on, what we're trying to prevent, you know, the dealer

19   says, "Okay, we understand."

20       Q.  I'm going to hand you Defendant's 275.  Take a

21   moment to look at that.

22               (Exhibit 275 was marked for

23                identification.)

24       Q.  (By Ms. Gulley)  Have you had a chance to look

25   at that?

HIGHLY CONFIDENTIAL

Page 322

1      A.  Yes.

2      Q.  All right.  This is a series of emails and a

3   report relating to the Randall Reed dealership.  Do you

4   recall this exchange?

5              MS. WEDGWORTH:  Objection.

6      A.  Yes, I do.

7      Q.  (By Ms. Gulley)  In the very top email, sent

8   September 17, 2013, from you, you say, "Chris, the

9   attached report shows the scheduled unattached

10  automatically run reports being run on Randolph Reed's

11  345 server."  Do you see that?

12             MR. NEMELKA:  Objection.

13     A.  Yes, I do.

14     Q.  (By Ms. Gulley)  And then what did you say?

15             MS. WEDGWORTH:  Objection.

16     A.  It says, "It's a wonder that this box runs at

17  all, much less running docuPAD with acceptable response

18  times."

19     Q.  (By Ms. Gulley)  What does that mean?

20             MS. WEDGWORTH:  Objection.

21     A.  Well, what's happened here in this -- the

22  customer, this Randall Reed company has called up, you

23  know, very, very, very unhappy that their 345 server --

24  and this is an older server.  This is a server that

25  probably -- the last one was manufactured 15 years ago.

HIGHLY CONFIDENTIAL

Page 323

1    It's that old.  And it is overrun with batch jobs such

2    that docuPAD response time is not as good as it ought to

3    be.  Of course, when you run this report --

4         Q.  (By Ms. Gulley)  And just for the record,

5    you're looking at the attachment?

6              MR. NEMELKA:  Objection.

7         A.  These are a list of -- of -- of what we call

8    "scheduled batch jobs."  And it -- it shows the user ID

9    that set it up in the first place, and then a

10   description of what it is, and then how many stores it's

11   located -- not how many -- which store numbers -- which

12   store number -- this first one is in Store No. 9.

13             And then it shows whether it's a report

14   generator or query builder or a download.  And then how

15   many hours a day did that -- did it run?  It runs every

16   1 and 1/2 minutes, 13 and 1/2 hours a day.

17             So what's happened is -- and that's -- and

18   this reports an available report on -- on every system.

19   The customer has completely dumb-assed themselves.

20   And -- and what they've done is they've completely

21   ignored the fact that all computers have finite

22   resources, and you cannot load on them, you know,

23   immense amounts of work.  And this is probably the worst

24   example I've ever seen about this.

25             And it's -- typically, a lot of these --

HIGHLY CONFIDENTIAL

Page 324

1   these automatically scheduled reports, that is a sure

2   sign of a hacker.  Because what they're doing is -- and

3   that's they want the report run at a specific time where

4   they can go back and get it and -- and pull it off to,

5   you know, their computer in the sky.

6              So I found this one interesting.  I mean,

7   it, you know -- this one's so bad, you got to laugh.

8   Just -- it's -- it's, you know, just beyond the pale.  I

9   mean, this one here, when we have a -- a place on the

10  wall of our computer history where we have an example of

11  the worst use ever of remotely unattended batch jobs,

12  this is it right here.

13     Q.  (By Ms. Gulley)  Look at the -- the -- you see

14  that the rows are numbered -- Row 9?  Maybe yours aren't

15  numbered.  So going down nine spots -- guys, I've just

16  put an arrow -- so one, two, three, four, five -- and

17  for the record, I've put an arrow at "Superior."  That's

18  where I want you to look.

19     A.  Okay.

20     Q.  Who is that?  What is that?  What do you think

21  that is?

22     A.  I think that's Phil Bautista.

23     Q.  So is Superior Solutions a hostile data broker?

24              MS. WEDGWORTH:  Objection.

25              MR. NEMELKA:  Objection.

HIGHLY CONFIDENTIAL

Page 325

1      A.  They are.  Of the worst kind.

2      Q.  (By Ms. Gulley)  Are they -- are they in the

3  same space as Authenticom?

4            MR. NEMELKA:  Objection.

5      A.  Yes.

6      Q.  (By Ms. Gulley)  All right.  And so how

7  frequently was SIS accessing this Reynolds system at

8  this time?

9            MS. WEDGWORTH:  Objection.

10      A.  Every two and a half minutes.  And accumulating

11  four and a half hours a day worth of compute time.

12      Q.  (By Ms. Gulley)  What impact can that have on

13  Reynolds technology?

14            MS. WEDGWORTH:  Objection.

15            MR. NEMELKA:  Objection.

16      A.  It -- it overloads it.  Even a really good

17  server, you know, shouldn't have anything like that

18  running.  And you're pretty good.  I didn't catch that.

19            MS. GULLEY:  Let's go off the record and

20  take a break.  We've been going a while without a good

21  break.  I'm going to still be on when I -- when we come

22  back.

23            THE VIDEOGRAPHER:  This is the end of Media

24  3.  The time is 3:16 p.m.  We're off the record.

25            (Short recess 3:16 to 3:31 p.m.)

Page 326

1               THE VIDEOGRAPHER:  This is the beginning of

2       Media 4.  We're back on the record at 3:31 p.m.

3                       EXAMINATION (Continuing)

4       BY MS. GULLEY:

5           Q.  When we were talking about Xtime earlier, I

6       don't think I circled around to this question.  The

7       Xtime situation that you described, how does that relate

8       to the transaction fee issue that Ms. Wedgworth was

9       asking you about?

10          A.  The -- the process of -- of somebody -- some

11      entity like Xtime doing add/change/delete write-back

12      information, what that does is that generates a bunch of

13      extra work we've got to do.  Plus, we've got to save the

14      before-and-after images.  And we did it on a

15      per-transaction basis simply because we believed that it

16      would always be a number of RCI customers that don't

17      need that, because they're not doing add/change/delete

18      write-back.

19                      And therefore, it would be unfair just to

20      have a cover-blanket increase to cover the cost of doing

21      that.  We put it on -- on the third parties that are

22      actually using that -- that facility.

23          Q.  Do you know what the impact of that transaction

24      fee has been on the number of write-back transactions?

25                      MS. WEDGWORTH:  Objection.

HIGHLY CONFIDENTIAL

Page 327

1      A.  I -- I'm sure that it has been reduced, because

2   I think before that, there were -- there was no -- no

3   charge for write-back transactions.  And so once there

4   became a charge, they came back and changed how they --

5   how they did things.  Some cases, you know, for

6   instance, they would want to update a repair order or

7   update a service reservation, you know, frequently.  You

8   didn't really need to do that.

9      Q.  (By Ms. Gulley)  So what's the impact on the

10  system load now?

11               MS. WEDGWORTH:  Objection.

12               MR. NEMELKA:  Objection.

13     A.  It -- it improved the situation from the system

14  load but, you know, the -- there's still the logging.

15  You know, it is a fair amount of overhead.

16     Q.  (By Ms. Gulley)  Another topic you talked about

17  over the last couple of days is the automated access to

18  the Reynolds system.  Does Reynolds allow its customers

19  to provide automated access to third parties?

20               MS. WEDGWORTH:  Objection.

21     Q.  (By Ms. Gulley)  Themselves?

22               MS. WEDGWORTH:  Objection.

23     A.  No.  They're -- they're not allowed to do that

24  and the security changes won't -- won't let that happen.

25     Q.  (By Ms. Gulley)  But what if an automated third

Page 328

1   party says, "Oh, no, we're the agent of the dealer."

2   Does Reynolds allow that?

3                  MS. WEDGWORTH:   Objection.

4        A.   No.

5        Q.   (By Ms. Gulley)   You also mentioned, several

6   times, Reynolds reporting functionality.   Can dealers

7   give their operational data out to third parties?

8                  MS. WEDGWORTH:   Objection.

9        A.   Yes.

10       Q.   (By Ms. Gulley)   And so on the one hand, we

11   talked about system access, no automated access, but

12   they can provide their data.   How can they do that?

13                  MS. WEDGWORTH:   Objection.

14       A.   We have a -- a data reporting facility.   And

15   what they can do is -- and that's they can -- say, for

16   instance, run a print job that's not ever printed.

17   Instead, it's sent to disk and then they -- they

18   transmit that data in that dataset outside in -- as far

19   as we're concerned, you know, once they do it

20   themselves, we're out of the track.

21       Q.   (By Ms. Gulley)   So if Authenticom was the

22   recipient of that data from the dealer, is that

23   permitted?

24                  MS. WEDGWORTH:   Objection.

25                  MR. NEMELKA:   Objection.

Page 329

1     A.  Yes.

2     Q.  (By Ms. Gulley)  I'm sorry?

3     A.  Yes.  I think there was one -- one of the, you

4  know, big users of -- I can't remember.  It's -- it's

5  not a good example.

6     Q.  What -- what about CarFax?  If the dealer

7  wanted to download its information and send it to

8  CarFax --

9     A.  That's what I was thinking about.

10            MS. WEDGWORTH:  Objection.

11            MR. NEMELKA:  Objections.

12     A.  And they do.

13     Q.  (By Ms. Gulley)  I did not know you were

14  thinking that, by the way.

15     A.  Yeah.  They do.  They use -- they use a

16  reporting mechanism and download their data to CarFax

17  and, as a result, CarFax is -- never became an RCI

18  customer.  And that's fine.

19     Q.  (By Ms. Gulley)  As well?

20            MS. WEDGWORTH:  Objection.

21     A.  Yes.  (Inaudible.)

22     Q.  (By Ms. Gulley)  Is the wind-down agreement

23  between Reynolds and CDK from 2015 still in effect?

24            MS. WEDGWORTH:  Objection.

25     A.  No.

HIGHLY CONFIDENTIAL

Page 330

1      Q.  (By Ms. Gulley)  Ms. Wedgworth had said -- or,

2  no, I'm sorry, it was Mr. Nemelka had called it a

3  "five-year agreement."  The agreement was 2015, five

4  years is 2020.  Was it a five-year agreement?

5              MR. NEMELKA:  Objection.

6              MS. WEDGWORTH:  Objection.

7      A.  No.  It was an agreement until the -- the

8  stand-down process had been -- had been completed, which

9  it was completed, satisfactorily.

10     Q.  (By Ms. Gulley)  Ms. Wedgworth asked you about

11  exempted user IDs in various contexts.  Are exempted IDs

12  exempted from all Reynolds security policies?

13             MS. WEDGWORTH:  Objection.

14     A.  No.  Only for specific security policy issues.

15     Q.  (By Ms. Gulley)  Who's knowledgeable on that --

16  those issues?

17             MS. WEDGWORTH:  Objection.

18     A.  Maybe Kelly Hall.

19     Q.  (By Ms. Gulley)  All right.  We've also talked

20  about DMS competition.  Do dealers change DMS providers?

21     A.  Yes, they do.

22     Q.  Do dealers switch away from Reynolds?

23     A.  Yes, they do.

24     Q.  Do dealers switch away from CDK?

25             MR. NEMELKA:  Objection.

HIGHLY CONFIDENTIAL

Page 331

1      A.  Yes, they do.

2      Q.  (By Ms. Gulley)  Do they switch away from Cox

3   Automotive Dealertrak?

4             MS. WEDGWORTH:  Objection.

5             MR. NEMELKA:  Objection.

6      A.  Yes, they do.

7      Q.  (By Ms. Gulley)  Now, you had mentioned there,

8   you do not have an agreement between Reynolds and Cox

9   Automotive Dealertrack with respect to conversions; is

10   that right?

11             MS. WEDGWORTH:  Objection.

12      A.  Correct.

13      Q.  (By Ms. Gulley)  But dealers, nevertheless,

14   leave Cox Aut- -- are able to switch between Reynolds

15   and Cox; correct?

16             MS. WEDGWORTH:  Objection.

17      A.  That's correct.  That process is -- is really,

18   you know, relatively simple.  What you do is -- and

19   that's that you -- you print off a bunch of reports --

20   and I say "print off" -- you run a bunch of print jobs,

21   but don't print them off.  Instead, you send them to

22   disk.  And then that disk or thumb drive goes to the

23   assuming, you know, competitive system, and then they

24   run a series of software programs that parse the printed

25   information and put it into data records.  And that

Page 332

1    is -- that's how we convert any non-CDK, you know,

2    customer.  For instance, if we convert a Dealertrack

3    customer, we do it all with print jobs, and are very

4    familiar with it doing it.  It's really very simple

5    programming.  It's Tab A, Slot B.  You know, it's very,

6    very simple programming.

7         Q.  (By Ms. Gulley)  Let me hand you what

8    Ms. Wedgworth marked Plaintiff's 657.  This is the draft

9    letter to Hendrick discussed between you and Mr. Lamb.

10   Do you recall that area of questioning?

11        A.  Yes.

12        Q.  So just now, you gave an example of a dealer --

13   how -- how you would convert a dealer other than a CDK

14   dealer; is that accurate?

15                  MS. WEDGWORTH:  Objection.

16        A.  That's right.  (Inaudible.)

17        Q.  (By Ms. Gulley)  Now, in this draft letter that

18   Mr. Lamb wrote, he discusses a -- a drop in sales and

19   other costs of a conversion away from Reynolds.  Do you

20   remember that?  And I'm looking at this -- this page

21   with the chart ending in 023.

22                  MS. WEDGWORTH:  Objection.

23        A.  Yes.

24        Q.  (By Ms. Gulley)  Now, would you expect a dealer

25   that was switching away from a different DMS provider

HIGHLY CONFIDENTIAL

Page 333

1    into Reynolds to have the same sort of costs?

2              MS. WEDGWORTH:  Objection.

3         A.  Yes.  You know, if we were converting them off

4    of Dealertrack, you know, we would go through the same

5    process.  And I -- I've tried to make the point that the

6    greatest variable in any kind of conversion is whether

7    or not, you know, the dealership personnel are motivated

8    and actually take their courses, pass their tests and

9    learn how to new -- use the new software.  And that's

10   key.  And it's more important than anything else.

11        Q.  (By Ms. Gulley)  Does Reynolds help customers

12   do that?

13             MS. WEDGWORTH:  Objection.

14        A.  Yes.  We have an education department and we

15   have onsite installers, and we have remote install

16   support people as well.

17        Q.  (By Ms. Gulley)  Would you consider yours

18   superior or inferior to CDK's?

19             MS. WEDGWORTH:  Objection.

20        A.  Well, I think that without question.  We're

21   superior.  But that's -- you know, that -- that's the

22   nature of -- of our business model.  What we try to do

23   is -- is -- we're not the cheapest.  Don't want to be

24   the cheapest.  We want to be the best.

25        Q.  (By Ms. Gulley)  Turn back to that first page.

HIGHLY CONFIDENTIAL

Page 334

1    So the date of this email exchange is in early September

2    2015.  What does Hendrick do after September 2015, after

3    this pitch was made?

4              MS. WEDGWORTH:  Objection.

5              MR. NEMELKA:  Objection.

6         A.  Really, really, you know, unhappy thing.

7    They -- they issued termination notices to us and

8    announced that they're going to CDK.  And I was very

9    disappointed.

10        Q.  (By Ms. Gulley)  Did they sign a contract with

11   CDK?

12             MS. WEDGWORTH:  Objection.

13        A.  Yes, they did.

14        Q.  (By Ms. Gulley)  So they switched to CDK?

15             MS. GULLEY:  Objection.

16        A.  They didn't.  They didn't switch yet.

17        Q.  (By Ms. Gulley)  They decided to switch?

18             MS. WEDGWORTH:  Objection.

19        A.  They decided to switch.  They contracted to

20   switch.  And then -- which is a further, you know,

21   longer story -- they decided to switch.  And then, as

22   the switch began, it began first with a very small

23   dealership that was, basically, a new start.  And they

24   had all new people and it was -- you know, therefore

25   pretty easy, pretty simple conversion job, which went

HIGHLY CONFIDENTIAL

Page 335

1    okay.

2              The second dealership that they converted

3    was a monster Toyota dealer, which is within eyesight of

4    Hendrick's headquarters.  And it was a -- an absolute

5    disaster from the conversion standpoint.  But not

6    because of the software, not because of the systems, not

7    because of the data conversion, not because of anything

8    like that.

9              There is a process that is very, very

10   important in the service department, which it's called

11   "opcodes."  And opcodes are -- they're unique to each

12   dealership.  Each dealership has kind of built their own

13   opcode structure.  And typically, it's a two-digit or a

14   three-digit number.  And its whole purpose is -- is to

15   save time in typing.  When you're opening up a repair

16   order, there's a tremendous amount of keystroke-kind of

17   work that has to be done.  And the opcodes shorten that

18   dramatically.

19             Well, there had been an initiative inside

20   Hendrick, which had not been accomplished or even

21   attempted, which was to standardize opcodes amongst all

22   105 dealerships.  And the goal -- or the reason to do

23   that was, that way you could move a service advisor from

24   one dealership to another dealership, and he would not

25   have to relearn the opcodes.  Because if you put a

Page 336

1    service adviser into an environment where there's all

2    new opcodes, he's crippled, because he has to look up

3    whatever opcode it is.  And -- and he has to keep doing

4    that until he's finally memorized, you know, whatever

5    the new set of opcodes are from the place he's been

6    transferred to.

7              They wanted to avoid that forever and all

8    time.  Unfortunately -- and I don't know the exact --

9    who talked to who about what, but the upshot was -- and

10   that's that Hendrick decided -- and -- and CDK let them

11   change the opcodes on the day of conversion to the new

12   system.

13             And the result was -- and that's that, you

14   know -- it's always been on Monday mornings, people

15   always bring their cars in, and they've kind of made

16   their to-do list over the weekend and -- you know, day

17   one is, you know, you bring your car into do this or do

18   that.  So there's a lot of -- right -- typical Monday

19   morning.

20             The process of opening a repair order was

21   absolutely crippled, because it was all new opcodes and,

22   you know, the service advisors had to look up every

23   opcode, which just, you know, really made it proceed at

24   a snail's pace.  Which meant that the -- the technicians

25   who were paid on incentive programs, they did not get

Page 337

1    work to do until almost noon.  And they were not happy

2    about that.  They lost half a day's pay.

3              But everybody, I think, had a little bit

4    of, you know, forgiveness built in, because, after all,

5    they were converted to the new system and it was --

6    they -- they expected some things not to go right.

7              The second day, it didn't get any better.

8    And by noontime, you know, the techs were absolutely up

9    in arms.  It was an absolute up rising.  And they were

10   saying -- which is absolutely true -- they were top

11   technicians, some of them had been with Hendrick 25

12   years or more, and they were just wailing.  And so the

13   call for help went out to -- Mr. Hendrick needed to come

14   and address the group, which he did.  And he did a smart

15   thing.  He said, "Guys, I promise you, you're going to

16   make 10 percent more this month than you've ever this

17   year.  Be patient with us."

18             The techs said, "Okay, we understand."

19             And then another interesting thing

20   happened.  Success of data conversions has a lot to do

21   with the quality of personnel, experienced personnel,

22   really.  Obviously, there was -- there was some real

23   lack of experience, because the CDK conversion group

24   should have resisted this idea -- this crazy idea of

25   changing opcodes on the first day of installation.  So

HIGHLY CONFIDENTIAL

Page 338

1   "Mr. H.," as he's called -- he's very low-key kind of

2   guy.  And he -- he went around and just kind of talked

3   to folks, you know, after, you know, the initial fire

4   had been quenched.  And he walked up to a -- a CDK

5   installer and, you know, talked to him, you know, "Well,

6   how are you?  My name is Rick Hendrick."  Shook his

7   hand.  Rick's -- you know, Rick's a hero figure in -- in

8   car racing.  He's one of "the" guys.  And he was talking

9   to this one young person and, you know, in the course of

10  the conversation, he's -- he asked, well, "How long have

11  you been with CDK?"

12          And the person answers, "Well, I'm not with

13  CDK.  I'm -- I'm a contractor."

14          "Oh, really?  Okay.  How long have you been

15  a contractor?" and so forth.  And he talked to several

16  others, you know, kind of got the same answer.  And he

17  realized that he had been promised the best install team

18  and he had not gotten it.  And Rick Hendrick's the kind

19  of person -- he's a very simple person.  You only get to

20  lie to him once.

21          And the next day he called us up and said,

22  "Bob," you know, "we've got problems.  If you won't

23  punish us, we'd like to come back."

24          And the answer is, obviously, "Whatever our

25  last proposal is, that's it."

HIGHLY CONFIDENTIAL

Page 339

1           And so they came back.  And, you know,
2    that's probably one of the most amazing, you know,
3    conversion stories that I've ever heard and -- and the
4    software, our software, had nothing to do with it.  You
5    know, CDK's software had nothing to do with it.  There
6    was nothing wrong with the hardware.  Probably not that
7    much wrong with the people.  If they had just not
8    changed opcodes.
9        Q.  (By Ms. Gulley)  Why did you lose Hendrick in
10   the first place?
11           MS. WEDGWORTH:  Objection.
12       A.  Well, that's a very pertinent question.  Mr. Ed
13   Brown is, nominally, the president, is a required
14   banker.  He was with Bank of America there in Charlotte
15   for 30 some-odd years.  He retired.  And he had banked
16   Rick over the years and knew him well.
17           And Rick decided that he wanted to spend
18   more time racing, and he hired Ed Brown.  And Ed Brown
19   knows nothing about computers.  He probably -- by now,
20   he knows a little bit about dealerships but, you know,
21   that's not been -- he's definitely not what you would
22   call a -- an experienced automotive executive.  And I
23   think what he wanted to do is he wanted to go do
24   business with CDK because they were a big public company
25   and we're not.

Page 340

1      Q.  (By Ms. Gulley)  So he just decided to switch?

2            MS. WEDGWORTH:  Objection.

3      A.  So he decided to switch.  And, you know, Mr. H.

4   had promised me -- he said, "Bob, I promise you that I

5   will never, ever let the decision of this magnitude go

6   by without me personally being involved."

7            And I said, "Rick, you really need to do

8   that."

9      Q.  (By Ms. Gulley)  Did he promise he'll stay with

10  you?

11           MS. WEDGWORTH:  Objection.

12     A.  Well, he signed a five-year contract, and he

13  has almost doubled their billing with additional stuff

14  that they bought.  They bought over 400 docuPADs.

15     Q.  (By Ms. Gulley)  Let's talk about docuPAD for a

16  minute.  Does every Reynolds dealer have a docuPAD?

17           MS. WEDGWORTH:  Objection.

18           MR. NEMELKA:  Objection.

19     A.  No.  That -- That's our goal, but I mean --

20  we've not yet achieved that.

21     Q.  (By Ms. Gulley)  Now, if dealer -- if a dealer

22  wanted to use docuPAD with another DMS, would you

23  consider that?

24           MS. WEDGWORTH:  Objection.

25     A.  There -- there's technical issues that just

Page 341

1    prohibit that.  You know, there's -- one of the -- one

2    of the magic screens in -- in docuPAD is a screen

3    where -- will be displayed of some add-on.

4                You know, for instance, like an extended

5    warning for, you know, repair.  There will be a

6    good/better/best -- that kind of choice and -- and the

7    consumer, with their -- with their stylus on their side

8    of the table actually checks which one they want, and

9    they will instantly display what their payment is in the

10   corner.

11               And then they can -- they can tap on the

12   "Better Policy," and it will change the payment for

13   them.  And then it will check -- they'll tap on the

14   "Best Policy" and it will give them what the payment is.

15   And they can choose which one they want or none.

16               They can -- they -- go back and click on

17   the "None" button, and it will (verbally indicating) --

18   it will keep on changing, you know, the payment.

19               Well, how does he get that done?  What it

20   does is -- is it -- it is built right into the Reynolds

21   F&I system.  And, you know, therefore, we can't -- we'd

22   like to consider selling it to, you know, non-Reynolds

23   customers, but we can't from a technical standpoint.  It

24   would just -- the rework would be just huge.

25          Q.  (By Ms. Gulley)  Also in talking about docuPAD

Page 342

1    with Ms. Wedgworth, you used a number of terms like

2    "profit producer" or "revenue generator."  Do you

3    remember that discussion?

4        A.  Yes.

5              MS. WEDGWORTH:  Objection.

6        Q.  (By Ms. Gulley)  You called it "sticky," right?

7              MS. WEDGWORTH:  Objection.

8        A.  Yeah, it is -- it is so compelling from a money

9    standpoint that we think that dealers will stick with it

10   simply because it would make economic -- you know, it

11   wouldn't be sensible to change.

12       Q.  (By Ms. Gulley)  So I think the -- so the

13   record is clear -- it's not entirely clear in the

14   record, who you're talking about.  Who is making all of

15   this revenue?  Who is generating all of this -- who's

16   producing all of this profit?

17             MS. WEDGWORTH:  Objection.

18       A.  The dealer is.  And -- and it's occurring

19   because of what, you know, what I think is nigh onto a

20   miracle.  Because I -- I -- in the original conception,

21   I never dreamed it would do it.

22             What happens is -- and that's that the

23   finance and insurance part of the business is typically

24   called a "business office."  And, you know, the part of

25   the sales process of buying a car -- where it occurs is

HIGHLY CONFIDENTIAL

Page 343

1    after you've decided what car that you want.  It's after

2    you've decided what kind of financing, it's after you've

3    decided on what trade-in value you're going to have.

4    All that's done and everybody kind of shakes hands on

5    the deal.

6           And then, after a little bit, you're sent

7    to the business office to finalize the paperwork.  Okay?

8    That's where there's this final attempt to sell you

9    things.  And it's all kinds of things.  It's extended

10   warranties.  It is tire and wheel protection.  It's, you

11   know, electronic key, locks.  It's -- it's windshield

12   cracks.  It is what they call "rust and dust," which is,

13   you know -- it's fabric protectant inside.  It used to

14   be undercoating, but nobody undercoats anymore.

15          But it -- it's a very, very essential

16   profit center for the dealership.  Unfortunately, it is

17   ranked very, very high in customer dissatisfaction.  And

18   people who have been through the process are warned that

19   what you do is you cross your arms like this

20   (indicating) when you go in there, and the answer to

21   everything they say is, "No."  "No."  "No."  "No."  And

22   you do that long enough, they'll finally let you loose

23   and you can go away with your new car.

24          What happens in the docuPAD situation is we

25   completely changed that whole process.  Instead, you

HIGHLY CONFIDENTIAL

Page 344

1  know, the consumer comes in, they sit on their side of

2  the table, and there's this big flat screen that's about

3  so high (indicating) and the whole transaction is --

4  takes place there.  And the customer is given a stylus,

5  and they basically -- it's a menu system.  They get to

6  pick the stuff off the menu that they want.

7              And the miracle is that they buy more

8  because they don't hate the process.  They're -- they're

9  so completely disarmed, you know, they -- they go from

10  this posture here, saying -- telling them, "No."  "No."

11  "No."  Instead, they get handed a stylus, and say --

12  "You" -- "You run the system.  You make your choices."

13              And that amounts to, typically, 200 bucks

14  per transaction more gross profit to the dealer.  So if

15  you have a -- a typical finance manager who will handle

16  70 transactions a month at 200 bucks apiece, that's

17  $14,000 a month in additional gross profit -- per F&I

18  managers.  If you've got five, then it's five times that

19  a month.

20     Q.  (By Ms. Gulley)  Is that more than the -- what

21  they're paying to license the DMS, the whole DMS?

22     A.  Correct.

23              MR. NEMELKA:  Objection.

24     A.  We have customers that will stand up and swear,

25  and take calls, you know, and go visit -- that that's

Page 345

1    what it does.  It's that good.  It's one of those

2    situations where -- I've been in this business a long

3    time, and my daily prayer is, "Oh, Lord, please give me

4    one more killer ap."  And he gave it to me.  I -- I

5    didn't -- I didn't invent it.  I can't take credit for

6    that.  But I saw it, and I said, "God, we've got to have

7    this."

8        Q.  (By Ms. Gulley)  All right.  Let's switch gears

9    a little bit.  Mr. Nemelka just shortly -- this

10   afternoon, put in front of you an email between you and

11   Mr. Anenen.  Do you remember that?

12       A.  Uh-huh.  (Witness answers affirmatively.)

13       Q.  How do you feel about CDK/ADP?

14              MS. WEDGWORTH:  Objection.

15              MR. NEMELKA:  Objection.

16       A.  Well, that is -- that is a -- a complex

17   question.  There's individual people inside CDK that are

18   decent people.  Ron Workman was a decent person.  I

19   mean, Steve Anenen is a decent person.  Corporately,

20   they're -- I don't have good feelings about them at all,

21   and it goes back to many, many, many years ago.  I've

22   been competing against them directly in the marketplace

23   for well in excess of 40 years.  And, you know, they did

24   some things, you know, back early on that I'm still mad

25   about.

Page 346

1      Q.  (By Ms. Gulley)  Are we talking '70s, the

2   1970s?

3              MS. WEDGWORTH:  Objection.

4      A.  1970s.  1970s.  I have very, very bad

5   experience with them, and I'm, you know, still bent out

6   of shape about that.

7                 And then about -- about 20 years ago, there

8   was a small company in Houston that, you know, copied

9   our system and built a new one based upon -- they --

10  they stole our -- our screen layouts, our report

11  layouts, our -- our field -- our field layouts, our data

12  fields inside the field -- inside the -- inside the

13  records, and sold it to, you know, ADP for $67 million.

14  And for some reason -- or a reason we don't know, ADP

15  decided to hold back $27 million out of that

16  transaction.  For some reason.

17                 We sued ADP as a result, and I wasted a

18  year in depositions, arbitration and whatnot.  You know,

19  finally lost.  I'm still amazed that I did.  But in

20  my -- I was dispirited about that.  But the Lord decided

21  that he will help me.

22                 And it went like this:  After ADP won, they

23  put in -- they ran a whole floor in a big office

24  building out of Westmark in Houston.  And they hired

25  about 150 programmers.  This was going to be the next

HIGHLY CONFIDENTIAL

Page 347

1    generation system.  They told their sales force all

2    about the next generation system.  And they worked at it

3    and they worked at it and they worked at it, and it all

4    looked great, and it would run four terminals well.

5    Four.  You put 20 on it, it wouldn't work at all.  And

6    they could not scale it up.

7               But they worked -- they didn't stop

8    working.  They said, "Well, we can fix this.  We can do

9    this."  And they worked and they worked and they worked

10   and they worked, and finally, five years after their --

11   their, quote, "victory" over Bob Brockman, they scrapped

12   the whole thing.

13              And as close as I can estimate that cost

14   them, including the original purchase price, plus the

15   legal fees for fighting me off, it cost them $250

16   million and cost them five years in market, because all

17   of a sudden, they had to start over on what their next

18   generation piece of software was going to be.

19              So obviously, I have a lot of very, very

20   strong feelings about it -- about ADP or CDK.  I don't

21   like them, and I don't like them a lot.

22        Q.   (By Ms. Gulley)  Do you want help them make

23   more profits?

24              MS. WEDGWORTH:  Objection.

25              MR. NEMELKA:  Objection.

HIGHLY CONFIDENTIAL

Page 348

1    A.   Only if -- if I make more profit, you know,

2    right alongside them.

3    Q.   (By Ms. Gulley)  Well, in this case, the

4    plaintiffs have alleged that you and CDK have gotten

5    together in some sort of conspiracy.  I want to kind of

6    talk through some of that.  Are you the leader of

7    Reynolds and Reynolds?

8         MS. WEDGWORTH:  Objection.

9    A.   Unequivocally.

10   Q.   (By Ms. Gulley)  When did you learn that CDK

11   was going to require vendors to access its system

12   through the 3PA program rather than any other method?

13        MS. WEDGWORTH:  Objection.

14   A.   I don't know the exact day, but it was

15   substantially after the stand-down agreement.

16   Q.   (By Ms. Gulley)  So it was after February 2015?

17   A.   Yes.

18        MS. WEDGWORTH:  Objection.

19   Q.   (By Ms. Gulley)  Did you personally agree with

20   anyone at CDK that you would get together to block

21   Authenticom?

22        MS. WEDGWORTH:  Objection.

23        MR. NEMELKA:  Objection.

24   A.   Did not.

25   Q.   (By Ms. Gulley)  That you would get together to

HIGHLY CONFIDENTIAL

Page 349

1    block anyone in Authenticom's business line?

2            MS. WEDGWORTH:  Objection.

3        A.  No.  Did not.

4        Q.  (By Ms. Gulley)  Did you personally agree with

5    anyone at CDK that you would destroy Authenticom

6    together?

7            MS. WEDGWORTH:  Objection.

8        A.  Absolutely not.

9        Q.  (By Ms. Gulley)  Have you ever discussed CDK's

10   policies about system access to their DMS with CDK?

11           MS. WEDGWORTH:  Objection.

12       A.  I have not.

13       Q.  (By Ms. Gulley)  Are you aware of any agreement

14   between anyone at Reynolds and CDK to eliminate

15   third-party data brokers, like Authenticom?

16           MS. WEDGWORTH:  Objection.

17       A.  I have not.

18       Q.  (By Ms. Gulley)  Did you and CDK ever meet to

19   even discuss the two firm's data access policies?

20           MS. WEDGWORTH:  Objection.

21       A.  We have not.

22       Q.  (By Ms. Gulley)  Are you aware of anyone having

23   those kind of conversations with CDK?

24       A.  No.

25           MS. WEDGWORTH:  Objection.

HIGHLY CONFIDENTIAL

Page 350

1      A.  I -- I didn't come to understand their data

2   access policy, really, until we bought ReverseRisk,

3   which is -- which was a customer.  They -- they acquired

4   data downloads for accounting data from CDK, and it

5   wasn't until that time that I understood, even, how it

6   all worked.

7      Q.  (By Ms. Gulley)  These -- in terms of an

8   agreement between Reynolds and CDK related to companies

9   like Authenticom, if there was any such agreement about

10  how the two firms were going to jointly treat somebody

11  like Authenticom, would you know about it?

12             MS. WEDGWORTH:  Objection.

13     A.  Absolutely.  As you probably can tell, I'm --

14  I'm into the details, big time.  And there's no way in

15  the world anything like that would happen without my --

16  without my knowledge.

17     Q.  (By Ms. Gulley)  What about any agreement

18  between Reynolds and CDK related to the two firms' data

19  access policies?  If there were any agreement like that,

20  would you know about it?

21     A.  Absolutely.

22             MS. WEDGWORTH:  Objection.

23     A.  Absolutely.

24     Q.  (By Ms. Gulley)  Did you enter into an

25  agreement with CDK to create a market where Reynolds

HIGHLY CONFIDENTIAL

Page 351

1  controlled all of the access to data stored on a

2  Reynolds DMS and CDK would control all of the access to

3  data stored on CDK's DMS?

4          MS. WEDGWORTH:  Objection.

5      A.  I did not.

6      Q.  (By Ms. Gulley)  Are you aware of any such

7  agreement?

8          MS. WEDGWORTH:  Objection.

9      A.  There is no -- there is no such agreement.

10     Q.  (By Ms. Gulley)  As soon as we find it, I'll

11  hand you Exhibit 644, from plaintiffs, earlier marked.

12  It's notes from a sales meeting in Aspen.  Ms. Wedgworth

13  had asked you some questions about this.  I'd like to

14  direct you to the page ending 632.  I -- I don't

15  actually know if it was Ms. Wedgworth or Mr. Nemelka as

16  I sit here, but do you recall looking at this document

17  before?

18     A.  Yes, I do.

19     Q.  And again, these are -- I believe you

20  testified, in sum and substance, that these are your

21  notes in preparation of speaking to the top salespersons

22  at Reynolds in --

23          MS. WEDGWORTH:  Objection.

24     Q.  (By Ms. Gulley) -- July 2014.

25          MS. WEDGWORTH:  Objection.

Page 352

1      A.  Yes, it would be the sales VPs.

2      Q.  (By Ms. Gulley)  And how many sales VPs are

3   there?

4             MS. WEDGWORTH:  Objection.

5      A.  All total, like, 12.

6      Q.  (By Ms. Gulley)  All right.  There's a line

7   here -- Bullet 1, 2, 3, 4 -- Bullet 4, "This could put

8   the security wars very much behind us."  Do you see

9   that?

10             MS. WEDGWORTH:  Objection.

11      A.  Is this 632?

12      Q.  (By Ms. Gulley)  632.  Do you see where it says

13   "Security" at the bottom?

14      A.  Okay.

15      Q.  And then there's a number of bullet points.

16   I'm looking at the penultimate -- the second from the

17   bottom.  "This could put the security wars very much

18   behind us."  Do you see where I am?

19             MS. WEDGWORTH:  Objection.

20      A.  Yes.

21      Q.  (By Ms. Gulley)  You were asked a lot about

22   this section in earlier questioning.  I'd like you to

23   explain what you meant by "security wars" in this

24   document.

25             MS. WEDGWORTH:  Objection.

HIGHLY CONFIDENTIAL

Page 353

1           MR. NEMELKA:  Objection.

2        A.   The subject of data security, when it comes to

3    third-party data brokers, hackers, whatever you want to

4    call them, has been, over the years, very much a

5    cat-and-mouse kind of situation where we will detect a

6    method by which somebody is getting into the system.

7    And we will devise a countermeasure.  And that will

8    cause them to be unable to get into the system for a

9    while.

10           And then they -- they're -- they're not --

11   you know, dummies.  What they'll do is they'll figure

12   out a different way.  And that will work for a while,

13   and we will, ultimately, observe that one, and we'll

14   then go about employing countermeasures.

15           Now, what that is -- is that -- that's --

16   that's kind of a seesaw, you know, kind of back and

17   forth like a war.  And that's where the inference comes

18   from.  There's not a -- a -- we don't have a declaration

19   of war per se.  You know, we don't have a -- a, quote,

20   "War room" with a capital W, that sort of thing.  It --

21   it's a figure of speech.  And it applies to this, you

22   know, back and forth nature of -- of data security

23   and -- and its countermeasures.

24        Q.   (By Ms. Gulley)  So -- so the security war was

25   with DMI and Integra Link!! and Authenticom and SIS,

HIGHLY CONFIDENTIAL

Page 354

1   those folks?  Or something else?

2               MS. WEDGWORTH:  Objection.

3               MR. NEMELKA:  Objection.

4       A.  Probably, you know, Phil Bautista was -- was

5   one of the early and one of the worst ones.  And is

6   still -- he's still regrowing his fangs.

7               MS. GULLEY:  I thank you for your time.  I

8   have nothing further.  I believe the plaintiffs have a

9   few minutes left.

10                      FURTHER EXAMINATION

11  BY MR. NEMELKA:

12      Q.  Mr. Brockman, you testified about an -- an

13  Xtime incident, and I have a question about that.  The

14  Xtime incident happened through the RCI interface, not

15  because of any data integrator; correct?

16              MS. GULLEY:  Form.

17      A.  That's correct.

18      Q.  (By Mr. Nemelka)  So your answers with respect

19  to the Xtime incident have nothing to do with use of

20  data innovators, right?

21              MS. GULLEY:  Form.

22      A.  That particular situation, yeah, did not

23  involve data integrator.  Come, however, any data

24  integrator that employed any kind of write-back

25  strategy, you know, could, potentially, the same thing

Page 355

1    happen.

2        Q.  (By Mr. Nemelka)  All right.  And then

3    Ms. Gulley put a document in front of you with your son

4    about the DealerBuilt situation.  The DealerBuilt

5    situation also had nothing to do with dealers using data

6    integrators, right?

7        A.  That's correct.

8        Q.  And so you wrote your son, "It finally

9    happened."  It had nothing -- but that had nothing to do

10   with Data Integrators, right?

11               MS. GULLEY:  Objection; form.

12       A.  It has to do with a data breach situation,

13   which is a very distinct possibility with a data

14   integrator.

15       Q.  (By Mr. Nemelka)  But that incident with

16   DealerBuilt had nothing to do with a data integrator,

17   right?

18               MS. GULLEY:  Objection; form.

19       A.  That particular incident did not have anything

20   to do with a data integrator.

21       Q.  (By Mr. Nemelka)  And still today, you haven't

22   -- you're not aware of any data breach caused by

23   Authenticom; correct?

24               MS. GULLEY:  Objection; form.

25       A.  That's come to my attention.

Page 356

1      Q.  (By Mr. Nemelka)  You also testified about --
2  you estimated that you wouldn't be surprised -- I wrote
3  it down -- you wouldn't be surprised, you said, if the
4  number was 500 million with respect to what Reynolds had
5  spent with respect to security.  Do you recall that
6  testimony?
7              MS. GULLEY:  Billion.  Not millions.  He
8  said billion, not million.
9              MR. NEMELKA:  500 billion?
10             MS. GULLEY:  Oh, I'm sorry.  Half a
11  billion.  I'm sorry, Counselor, it's late.  I'm sorry,
12  Mike.
13     Q.  (By Mr. Nemelka)  You never actually calculated
14  that number, did you?
15     A.  That's correct.
16     Q.  Nobody in Reynolds actually calculated that
17  number, have they?
18             MS. GULLEY:  Objection; form.
19     A.  That's correct.
20     Q.  (By Mr. Nemelka)  There are no documents
21  reflecting that calculation, are there?
22     A.  No.
23             MS. GULLEY:  Form.
24     A.  That's -- that's correct.  I -- I'm making
25  that, you know, guesstimate based on my knowledge and

HIGHLY CONFIDENTIAL

Page 357

1   experience in the business.

2        Q.   (By Mr. Nemelka)  All right.  That number is

3   just a guesstimate, right?

4             MS. GULLEY:  Objection; form.

5        A.   That's correct.  But I think it's a pretty good

6   one.

7        Q.   (By Mr. Nemelka)  But it's still speculative,

8   right?

9             MS. GULLEY:  Objection; form.

10       A.   It's still speculative.  But I would -- I would

11   add that I'm, you know, probably uniquely qualified to

12   be able to make that kind of guesstimate.

13             MR. NEMELKA:  All right.

14                  FURTHER EXAMINATION

15   BY MS. WEDGWORTH:

16       Q.   Mr. Brockman, you stated earlier that the

17   exemptions are only for specific security policy.  Do

18   you remember saying that when Ms. Gulley was asking you

19   questions?

20       A.   Yes, I did.

21       Q.   If you could look at -- at Exhibit 665 of

22   Plaintiff's.  Here's 665.  Mr. Brockman, this document,

23   halfway down the page, the top email, if you'll note, is

24   from Mr. Schaefer to you.  Do you see that?

25       A.   Yes.

HIGHLY CONFIDENTIAL

Page 358

1        Q.  And the email which is dated May 8, 2016, you

2    might recall that dealt with security enhancements that

3    you wanted to implement and did implement that month.

4    Do you recall that?

5                MS. GULLEY:  Form.

6        A.  Excuse me.  Let me read this again.  Yes, I --

7    I've read this.  I'm not sure that I understand it

8    completely, but --

9        Q.  (By Ms. Wedgworth)  So here, Mr. Schaefer asked

10   you, toward the bottom of the email, talking about the

11   new security enhancements to be implemented by Reynolds.

12   It states, "I am trying to understand if there will be

13   any exceptions?  Which we have always had?  For example,

14   PAG, Hendrick, AMSI, Rahal, Wyler, etc."

15               PAG and Hendrick, AMSI, Rahal and Wyler,

16   those are all dealerships; correct?

17               MS. GULLEY:  Objection; form.

18       A.  That's correct.

19       Q.  (By Ms. Wedgworth)  And they are large

20   dealerships, right?

21       A.  Yes.  They are some of the largest.

22       Q.  And here, Mr. Schaefer says that those

23   dealerships have always had exemptions; is that correct?

24               MS. GULLEY:  Form.

25       A.  For certain, you know, PAG, Hendrick, AMSI, I'm

Page 359

1    personally aware of always had some exceptions.  These

2    are very large organizations, amongst the largest, and

3    have very extensive IT staffs of their own.  And they're

4    what I would call quite sophisticated.

5                    Rahal and Wyler are a little smaller, but

6    they still have -- not a large number of individuals,

7    but they have a small number of individuals that are

8    really, really savvy and know what they're doing.

9                    And in those particular cases, we've always

10   allowed them, you know, some specific exceptions as far

11   as, you know, downloading of data and that sort of

12   thing.

13                    MS. GULLEY:  That's -- that's the end of

14   your time.

15        A.  And what -- what --

16        Q.  (By Ms. Wedgworth)  Well --

17        A.  What Bob Schaefer is doing and that's he wants

18   to know, you know, what kind of exception is -- is going

19   to be.  And he's asking, he's saying, "Please advise."

20        Q.  And he's saying, We have always had these

21   exceptions for these dealerships, correct?

22        A.  The -- the --

23                    MS. GULLEY:  Objection; form.

24        A.  -- for these, five dealerships, there's always

25   been some kind of exception.  Without going back in to

HIGHLY CONFIDENTIAL

Page 360

1    the details, I can't tell you exactly what.

2         Q.  (By Ms. Wedgworth)  And in addition to --

3              MS. GULLEY:  Peggy, that's the end of your

4    time.

5              MS. WEDGWORTH:  I'm going to continue.  You

6    took a long time, you went over a lot of topics.  You

7    covered lots of -- a lot of topics.

8              MS. GULLEY:  You had to reserve your time

9    for that.  I'm sorry, Peggy.  We're not going to

10   continue.  I told you that there was a limit to how long

11   you could go.  I just didn't cut him off when he was

12   answering.

13             MS. WEDGWORTH:  Nor did I when I was

14   questioning him.  So I -- I'm going to continue my

15   questioning.

16             MR. NEMELKA:  We have two more minutes.

17   You're wrong about your calculation anyway, Andi.

18        Q.  (By Ms. Wedgworth)  So -- so other than the

19   five dealerships, there's also an "etc." at the end,

20   Mr. Brockman.  Do you see that?

21             MS. GULLEY:  Objection; form.

22        A.  Yes, ma'am, I do.

23        Q.  (By Ms. Wedgworth)  And so that doesn't limit

24   it to just the five dealerships who always have

25   exemptions; is that correct?

Page 361

1          MS. GULLEY:  Objection; form.

2      A.  Ma'am, I -- I don't know, you know, if there's

3  one more, or no more, or multiple that more.  I can't

4  tell from looking at this.  And, again, we -- I think

5  we've also talked about in the last two days about the

6  total number of exceptions that are out there and how

7  that number keeps coming down, down, down, down, down.

8  And we're not all the way there yet.

9      Q.  (By Ms. Wedgworth)  And the biggest drop of

10  those exemptions coming down --

11          MS. GULLEY:  Objection.

12      Q.  (By Ms. Wedgworth)  -- came after the

13  stand-down agreement; correct?

14      A.  That's correct.

15      Q.  So if we now go to the first exhibit that you

16  -- that I used with you today -- and let's see if I can

17  find it.

18          MR. NEMELKA:  I can try to find it for you.

19          MS. WEDGWORTH:  Okay.  It's the Ron Lamb

20  exhibit.  But I -- I'll try to do it without looking for

21  the exhibit.  It was the very first one today, which

22  would be 657.

23      Q.  (By Ms. Wedgworth)  But it's -- it's the letter

24  that Ms. Gulley referred you to that you reviewed, where

25  you said Mr. Lamb has written the letter and the first

HIGHLY CONFIDENTIAL

Page 362

1   half of it was brilliant?

2             MS. GULLEY:  Object to everything you just

3   said.

4             MS. WEDGWORTH:  Here's a copy of it for

5   you.  677.

6             MR. NEMELKA:  I found it.

7             MS. WEDGWORTH:  657.  There we go.

8        Q.  (By Ms. Wedgworth)  Mr. Brockman, do you recall

9   this document?

10       A.  Yes, ma'am.

11       Q.  So on the second page, those dealerships that

12   are listed there, those are all privately held

13   dealerships, correct --

14            MS. GULLEY:  Objection; form.

15       Q.  (By Ms. Wedgworth)  -- in that box, in the

16   chart?

17            MS. GULLEY:  Form.

18       Q.  (By Ms. Wedgworth)  Second page.

19            MS. GULLEY:  Form.

20       A.  And what -- what is your question again,

21   please, ma'am?

22       Q.  (By Ms. Wedgworth)  The dealerships listed in

23   the chart are all privately held dealerships; is that

24   right?

25            MS. GULLEY:  Form.

Page 363

1      A.  Ma'am, I -- I don't know that.  I -- I --

2    there's some of them -- Herb Chambers, I'm -- I'm

3    familiar with.  And I'm pretty sure that one is

4    privately owned.  The status of the rest of them, I --

5    I'm unaware.

6      Q.  (By Ms. Wedgworth)  Well, do you have -- do you

7    have any knowledge that any of those others are publicly

8    held companies?

9      A.  Ma'am, I'm -- I'm sorry.  I -- I just don't

10   know.

11     Q.  Okay.  With regard to this letter, I think you

12   answered some questions from Ms. Gulley.  You -- do you

13   stand by this letter as Mr. Ron Lamb wrote it and you

14   edited it?

15             MS. GULLEY:  Objection; form.

16     A.  Yeah, I acknowledge the fact that he wrote it.

17   This is a sales letter.  And I looked at it from a

18   topical standpoint.  As I think I remember stating, I

19   was very pleased that there were no misspellings, and

20   punctuation also looked pretty good.  But as far as

21   the -- the exact, you know, last, you know, comment in

22   the paragraph, I did not read it for that -- that level

23   of content.

24     Q.  (By Ms. Wedgworth)  Well, when you say it's a

25   sales letter --

HIGHLY CONFIDENTIAL

Page 364

1              MS. GULLEY:  Ms. Wedgworth, we're way

2     beyond your time.  You can finish the -- you are way

3     beyond your time.  For the record, we have asked

4     questions of all of our witnesses.  You just did not

5     reserve enough.

6              MS. WEDGWORTH:  Well, I'm going to -- I'm

7     going to keep this deposition open for many reasons.

8     The least of which is that we -- we let him answer every

9     single question.  We let him take as long as we want.

10    You've asked a lot of questions.  He's given very long

11    answers and we're entitled to respond to all of that.

12    In addition, you produced over 2,000 -- 200,000

13    documents --

14              MR. NEMELKA:  Pages of documents.

15              MS. WEDGWORTH:  -- pages of documents over

16    the weekend.  And for all those reasons, we are going

17    to --

18              MS. GULLEY:  You knew that those documents

19    were coming in advance, because we --

20              MS. WEDGWORTH:  Actually, we did not.  And

21    we certainly didn't see them coming in on Friday night.

22              MS. GULLEY:  You compelled them and the

23    court ruled that they would be produced after the motion

24    to compel.  As you know, we're all still producing

25    documents in response to the Court's ruling on the

Page 365

1    motion to compel.  You put these depositions on the

2    docket in -- in any event.  That's our entire point, is

3    why plaintiffs are so far ahead of us on the number of

4    depositions, because plaintiffs do not produce

5    documents.  And we understand that we can only take

6    depositions once.

7               We are not holding the deposition open

8    longer.  You have used the entire seven hours.  We split

9    this over two days, not to give you a one-and-a-half day

10   deposition, but rather because of health -- of attorney

11   eyes only -- as we said before -- health considerations

12   that mean Mr. Brockman really cannot be here any longer.

13              And therefore, this deposition is not going

14   to stay here open.  I was actually going to tell you we

15   were out of time; if you would like to finish this

16   series of questions for the next two or three minutes,

17   that's fine, until you jumped down my throat and said

18   you're not going to close it at all.  That's nonsense.

19   That's -- we have an agreed protocol order.

20              MS. WEDGWORTH:  Well, I am not agreeing to

21   it, and I will be making a motion to the court to finish

22   this deposition.

23              MS. GULLEY:  How much longer do you need,

24   Ms. Wedgworth?

25              MS. WEDGWORTH:  I'm not sure.  It's

HIGHLY CONFIDENTIAL

Page 366

1    depending on his answers.

2              MS. GULLEY:  What are you going to ask the

3    court for, an unlimited deposition?

4              MS. WEDGWORTH:  Nope.  Not unlimited at

5    all.  I would think at least an hour could cover all of

6    this.

7              MS. GULLEY:  Well, I believe that we need

8    to go off the record.  You're asking me before we go off

9    the record for an extension of one hour.  Otherwise,

10   you're filing a motion to just to be clear on the

11   record, for the future.

12             MS. WEDGWORTH:  Correct.  Correct.

13             MS. GULLEY:  And you'll be asking the Court

14   for one hour, additional?

15             MS. WEDGWORTH:  Certainly one hour, yes.

16             MS. GULLEY:  Okay.  Off the record.

17             THE VIDEOGRAPHER:  Off the record at 4:20

18   p.m.

19             (Short recess 4:20 to 4:42 p.m.)

20             THE VIDEOGRAPHER:  Back on the record at

21   4:42 p.m.

22             MS. GULLEY:  While we were off the record,

23   there was discussion back and forth among counsel about

24   next steps.  Counsel for plaintiffs approached me and

25   said, you know, if we could go ten more minutes, they

Page 367

1   would, you know, withdraw their objection to keep the

2   deposition open.  We were agreeable to that extra ten

3   minutes, and we're willing to put Mr. Brockman on the

4   stand for an extra ten minutes.

5            However, during that time period, he

6   suffered an incident with his health, verified by a

7   test.  And unfortunately, he's unable to come back into

8   the room to proceed for those ten minutes.  My

9   understanding is that plaintiffs are okay closing the

10  deposition for today, subject to your statements.

11           MS. WEDGWORTH:  We just reserve our rights

12  to pursue whatever we may need in the future.  And we

13  certainly appreciate that his health is paramount and

14  don't feel it appropriate.  If the -- if he can't

15  testify today, it wouldn't be appropriate to do it

16  today, due to his health.

17           MR. NEMELKA:  And I have no further

18  questions.

19           MS. GULLEY:  No, just in response to

20  Ms. Wedgworth, obviously, Mr. Brockman is the chairman

21  of the company, and he made himself available for the

22  entire seven hours.  We would object to keeping the

23  deposition open in any way.  I understand we've agreed

24  to disagree on that point.

25           MS. WEDGWORTH:  Off the record.

HIGHLY CONFIDENTIAL

Page 368

1              THE VIDEOGRAPHER:  This will conclude

2    today's deposition for Mr. Robert Brockman.  We are off

3    the record at 4:43 p.m.

4                   (Deposition concluded at 4:43 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

HIGHLY CONFIDENTIAL

```
                                              Page 369

1                    CHANGES AND SIGNATURE
2    WITNESS NAME: ROBERT BROCKMAN    DATE: January 17, 2019
3    PAGE      LINE    CHANGE              REASON
4    _____
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12
         I, ROBERT BROCKMAN, have read the foregoing
13   deposition and hereby affix my signature that same is
     true and correct, except as noted above.
14                 _____
                   ROBERT BROCKMAN
15
     THE STATE OF              )
16   COUNTY OF                 )
17         BEFORE ME, _____ , on this
     day personally appeared ROBERT BROCKMAN, known to me (or
18   proved to me under oath or through
     _____ ) (description of identity
19   card or other document) to be the person whose name is
     subscribed to the foregoing instrument and acknowledged
20   to me that they executed the same for the purposes and
     consideration therein expressed.
21         Given under my hand and seal of office this
     _____ day of _____ ,_____ .
22

23                 _____
                   NOTARY PUBLIC IN AND FOR
                   THE STATE OF _____
24                 COMMISSION EXPIRES: _____
25
```

HIGHLY CONFIDENTIAL

Page 370

1                   IN THE UNITED STATES DISTRICT COURT

                   FOR THE NORTHERN DISTRICT OF ILLINOIS

2                        EASTERN DIVISION

3                                  )

     IN RE: DEALER MANAGEMENT   ) MDL NO. 2817

4    SYSTEMS ANTITRUST          )

     LITIGATION,                ) CASE NO. 18 C 864

5                                  )

6

7

8                   REPORTER'S CERTIFICATION

9      ORAL AND VIDEOTAPED DEPOSITION OF ROBERT BROCKMAN

10                     January 17, 2019

11                        Volume 2

12

13            I, SHAUNA L. BEACH, Certified Shorthand

14   Reporter in and for the State of Texas, do hereby

15   certify to the following:

16            That the witness, ROBERT BROCKMAN, was duly

17   sworn by the officer and that the transcript of the oral

18   deposition is a true record of the testimony given by

19   the witness;

20            I further certify that pursuant to FRCP Rule

21   30(e)(1) that the signature of the deponent:

22            _X_ was requested by the deponent or a party

23   before the completion of the deposition and is to be

24   returned within 30 days from the date of receipt of the

25   transcript.  If returned, the attached Changes and

HIGHLY CONFIDENTIAL

Page 371

1   Signature Page contains any changes and the reasons

2   therefor;

3              ___ was not requested by the deponent or a

4   party before the completion of the deposition.

5              I further certify that I am neither counsel

6   for, related to, nor employed by any of the parties or

7   attorneys to the action in which this proceeding was

8   taken.  Further, I am not a relative or employee of any

9   attorney of record in this cause, nor am I financially

10  or otherwise interested in the outcome of the action.

11              Subscribed and sworn to on this

12          30th Day of  January , 2019.

13

14

15

16  _____

17          SHAUNA L. BEACH, RDR, CRR, CSR #8408

            Expiration Date:  12/31/2019

18

19

20

21

22

23

24

25

[& - 24]                                                                                     Page 1

| & |
|---|
| **&**   167:19 168:4,10 175:12 176:1,5 260:10 |

| 0 |
|---|
| **00963942**   171:18
**023**   332:21
**025**   184:5
**092**   241:15 |

| 1 |
|---|
| **1**   170:1 172:21 174:1,20 237:6 245:6 255:21 296:13 323:16 352:7 370:21
**1,000**   194:18
**1,034k**   286:8
**1/2**   323:16,16
**10**   170:10 174:10 238:25 240:15 337:16
**10,000**   194:14
**10,690k**   286:8
**100**   169:4 179:8
**10119**   168:18
**105**   335:22
**10:17**   210:5,6
**10th**   196:4
**11**   170:11 174:11
**110**   192:17
**1100**   167:19 168:4 175:13
**11:02**   237:6,7
**11:09**   237:7,9
**11:15**   240:17,19
**11:31**   240:19,21
**12**   170:12 173:7,10 174:12 223:14 314:9 352:5 |

**12/31/2019**   371:17
**12:17**   265:11,12
**12th**   257:1 259:13 259:21
**13**   170:13 174:13 323:16
**14**   170:14 174:14 284:18 285:2,17
**14,000**   197:13 344:17
**142**   192:19
**15**   170:15 174:15 322:25
**150**   224:2,7,23 281:25 282:1,18 346:25
**16**   170:16 174:16 277:8 284:16
**16.3m.**   286:10
**1615**   168:11
**16953**   371:15
**17**   167:10 170:17 171:7 174:17 228:16,17 322:8 369:2 370:10
**176**   170:2,5
**17th**   167:15 175:3
**18**   167:4 170:18 174:18 277:19 370:4
**18.3m**   286:8
**184**   171:9
**18th**   277:20
**19**   170:19 174:3,19 241:22 277:8
**1970s**   346:2,4,4
**1999**   168:22
**19th**   168:17 277:4
**1:36**   265:12,14
**1st**   184:9 185:5 253:3 296:20

| 2 |
|---|
| **2**   167:8,13 170:2 171:10 173:3 174:2 237:9 245:9 265:11 271:7,8 272:8 319:4 352:7 370:11
**2,000**   364:12
**20**   170:20 173:14 174:20 183:2 215:18 282:11 346:7 347:5
**200**   182:22 197:9 197:12 344:13,16
**200,000**   364:12
**2000**   284:17
**20006-1101** 168:22
**20006-6801**   169:5
**20036**   168:12
**2006**   304:13 305:2
**2009**   192:13 209:6
**201**   171:13 173:10
**2013**   171:7 289:16 322:8
**2014**   184:15 192:17 351:24
**2015**   171:10,14,17 174:13,16 184:9 201:21,22 213:18 213:20 214:2 224:1 225:8 226:4 226:12 289:23 293:16 329:23 330:3 334:2,2 348:16
**2016**   171:3,20,24 172:3,10,14,17,21 173:3,7,17 224:2,8 224:23 225:7 227:6 230:11 |

235:9,17 238:25 239:2 240:4 241:22 245:3,20 248:6 251:9 252:19 254:9,25 255:11,21 257:1 259:13,21 268:10 268:14 269:9 270:9 271:11 358:1
**2017**   172:7 173:14 173:21 174:3,9,20 218:17 219:12 263:4 271:19 277:4,8,19 286:9 288:8,11 296:13 296:20
**2018**   174:6 284:14 284:18
**2019**   167:10,16 175:3 245:10 369:2 370:10 371:12
**2020**   330:4
**2099**   169:4
**20th**   263:4
**21**   170:21 172:10 174:21
**213**   171:16
**22**   170:22 174:22 201:7
**221**   171:20
**226**   281:14
**229**   171:23
**23**   170:23 174:23
**234**   172:2
**237**   172:6
**23rd**   201:21
**24**   170:24 171:17 174:24 184:15

HIGHLY CONFIDENTIAL

**[240 - 700,000]**

Page 2

| | | | |
|---|---|---|---|

**240**   172:9
**244**   172:13
**247**   172:16
**24th**   213:18,20
**25**   170:25 174:25
   314:8 337:11
**250**   347:15
**252**   172:20
**256**   173:2,6
**259**   173:9
**26**   242:2
**262**   173:13
**268**   173:16
**27**   346:15
**271**   173:20
**274**   171:2 318:2,5
   318:8,11,17
**275**   171:6 321:20
   321:22
**276**   174:2
**27th**   260:6
**28**   172:7
**2817**   167:3 370:3
**284**   174:6
**288**   174:9
**289**   170:5 174:12
**29**   186:25 187:7
**292**   174:15
**296**   174:19
**2:21**   287:8,9
**2nd**   254:25

**3**

**3**   170:3 174:3
   265:14 325:24
   352:7
**3,104,000**   225:8,23
**30**   171:14 174:16
   218:17 222:12,13
   228:18 229:6
   265:5 282:11
   293:16 314:8

**339:15 370:21,24**
**300**   170:6 194:21
   195:13,19,23
   282:1,2,18
**30th**   201:21
   371:12
**31**   172:17 248:6
**318**   171:2
**31st**   252:19 253:1
   253:2
**32**   192:20
**321**   171:6
**345**   322:11,23
**35**   276:18
**354**   170:6 223:20
   224:15,17
**357**   170:7
**36**   199:17
**369**   170:8
**370**   170:9
**3:16**   325:24,25
**3:31**   325:25 326:2
**3pa**   292:18 293:6
   295:4,15 348:12
**3rd**   253:20

**4**

**4**   170:4 173:17
   174:4 271:11
   326:2 352:7,7
**4.1**   271:8
**40**   345:23
**400**   168:11 308:18
   340:14
**400,000**   318:25
**44**   320:12
**4:42**   366:19,21
**4:43**   167:16 368:3
   368:4

**5**

**5**   170:5 171:24
   174:5 228:2 249:1
   272:8
**5,000**   281:9
**5,910,000**   225:7,22
**50**   204:11
**500**   356:4,9
**504**   218:5,9
**53**   196:5
**5300**   167:20 168:5
   175:14
**5am**   253:12
**5th**   230:11 289:23

**6**

**6**   170:6 174:6
   228:3 253:14
**632**   351:14 352:11
   352:12
**644**   351:11
**651**   228:15
**657**   171:9 184:1,2
   332:8 361:22
   362:7
**658**   171:13 201:9
   201:10
**659**   171:16 213:9
   213:12
**660**   171:20 221:18
   221:19
**661**   171:23 229:25
   230:3
**662**   172:2 234:20
   234:21
**663**   172:6 237:12
   237:16 238:24
**664**   172:9 240:23
   241:2,10,21
**665**   172:13 244:21
   244:22,25 357:21

**357:22**
**666**   172:16 247:23
   248:1,3 249:10
   250:13
**667**   172:20 252:2,5
   252:11,16
**668**   173:2 254:17
   254:18,21
**669**   173:6 256:19
   256:22,23 257:1
   259:16
**67**   346:13
**670**   170:18 173:9
   259:6,7,10
**671**   173:13 262:20
   262:23,25
**672**   173:16 268:21
   268:22,25 269:2
   271:11
**673**   173:20 271:13
   271:16,18
**674**   174:2 276:14
   276:17,20
**675**   174:6 284:11
   284:12
**676**   174:9 288:7,13
**677**   174:12 289:14
   289:18 362:5
**678**   174:15 292:14
   293:15
**679**   170:18 174:19
   296:12,16 300:16
   300:16
**681**   224:2,8,23
**6am**   253:13

**7**

**7**   170:7 172:3
   174:13 247:6,12
**70**   197:11 344:16
**700,000**   306:20
   311:9

**[70s - advertisements]** Page 3

**70s** 346:1
**712** 223:15
**77** 225:11
**77002** 167:20
168:5 175:14

**8**

**8** 170:8 172:14
174:8 245:3 247:7
247:12 358:1
**80** 205:9 215:18
**800,000** 311:9
**8408** 371:17
**864** 167:4 370:4

**9**

**9** 170:9 171:3
173:21 174:9
235:17 239:9
245:10 271:19
323:12 324:14
**90** 205:9 225:25
**95** 186:25 187:7,16
187:23
**9:07** 167:16 175:3
**9:57** 210:3,5
**9th** 235:9

**a**

**a.m.** 167:16 175:3
210:3,5,6 237:6,7
237:9 240:17,19
240:21 247:7,13
249:1 253:14
**aax** 294:22
**abbreviated** 278:2
**abilities** 253:18
**ability** 266:20
**able** 207:8 239:24
251:12 293:10
305:19 306:24
309:8 331:14
357:12

**absent** 180:17
**absolute** 313:13
335:4 337:9
**absolutely** 242:14
244:18 247:22
302:12 304:17
336:21 337:8,10
349:8 350:13,21
350:23
**abuse** 313:14,15
**abusing** 306:16
**ac** 294:9
**accept** 181:18
187:19
**acceptable** 322:17
**accepted** 231:19
**access** 219:12
220:7 231:9 264:7
267:1,15 268:3,5,6
268:7 270:5
293:13 296:14
306:18 308:15
309:1 310:5
313:25 315:3,14
327:17,19 328:11
328:11 348:11
349:10,19 350:2
350:19 351:1,2
**accessing** 274:23
306:8 325:7
**accomplish** 221:12
**accomplished**
239:22 335:20
**accomplishing**
223:2
**account** 196:10
**accounting** 220:10
227:10,18,24
228:1,3 230:23,24
232:3,16 273:7,12
274:10 293:3,10

293:13 295:19,21
295:23 296:4,5,8
302:5 350:4
**accounts** 220:9
249:10,19,23
250:4,7,12
**accumulate**
312:18
**accumulating**
325:10
**accuracy** 220:25
**accurate** 184:12
202:8 218:20
230:19 252:23
332:14
**accurately** 230:24
**achieve** 199:15
294:21
**achieved** 261:3
340:20
**acknowledge**
363:16
**acknowledged**
369:19
**acquire** 182:5,7,14
182:17,21 299:5
**acquired** 216:11
263:10 304:13
350:3
**acquiring** 298:25
**acquisition** 293:20
294:9,16 298:23
298:24 299:7
303:11 305:2
**acronym** 274:15
**act** 283:6 308:2
312:14 313:14,15
**action** 253:5
264:10 285:24
371:7,10

**actions** 236:12
262:3
**actively** 186:8
**activity** 283:24
**actual** 271:4
**add** 216:20 240:11
270:15 299:16
306:18 309:1
326:11,17 341:3
357:11
**added** 270:3
306:20
**adding** 306:13,19
308:14
**addition** 185:7,11
185:17 360:2
364:12
**additional** 197:12
247:11 305:11
340:13 344:17
366:14
**address** 271:24
279:5,6 337:14
**addressed** 184:15
**addresses** 279:2
310:18
**adjust** 195:6
**adjusting** 170:19
**admitted** 315:1
**adp** 209:5 236:23
292:24 345:13
346:13,14,17,22
347:20
**adp's** 236:11
**advance** 251:3,6
364:19
**advantageous**
182:21
**advertisements**
197:19

[advertising - approved]                                                      Page 4

advertising  302:25
  305:11
advice  316:17
advise  359:19
adviser  336:1
advisor  335:23
advisors  336:22
affairs  254:10
affiliation  175:16
affirmatively
  300:23 345:12
affix  369:13
afternoon  265:18
  289:10 303:8
  306:1 345:10
agan  172:10 253:4
age  225:13
agenda  212:7
agent  328:1
agents  314:2
ago  222:16 239:8
  254:10 314:9
  318:15 322:25
  345:21 346:7
agree  177:5 179:5
  181:11 187:2
  188:9,20 190:21
  191:21 224:15
  250:6 258:25
  264:6 288:22
  299:13 348:19
  349:4
agreeable  367:2
agreed  229:4
  300:25 301:1
  365:19 367:23
agreeing  365:20
agreement  218:1
  226:8,16,19 227:4
  229:3 233:9,17
  236:2,22 290:1

329:22 330:3,3,4,7
  331:8 348:15
  349:13 350:8,9,17
  350:19,25 351:7,9
  361:13
agreements  226:4
  226:7,11,11
agulley  168:6
ahead  206:4,16
  243:16 303:22
  365:3
aid  225:17
ain't  292:11
air  275:2
alleged  348:4
allow  219:12,16
  266:4,9 269:4
  278:11 313:24
  327:18 328:2
allowed  308:25
  310:4 327:23
  359:10
alongside  348:2
amazed  346:19
amazing  196:20
  339:2
ambushed  292:10
america  339:14
ammunition
  291:24
amortization
  272:21
amount  220:14
  235:22 243:21
  327:15 335:16
amounts  323:23
  344:13
amsi  358:14,15,25
analysis  174:6,9
  222:4

analyze  229:19
andi  176:1 360:17
androids  178:22
anenen  212:14
  289:16,22 291:22
  292:4 345:11,19
announce  251:6
announced  334:8
announcing
  242:10
annual  211:22
  228:17,23 229:5
  270:23
annualized  286:9
answer  176:22
  177:4 194:11
  205:24 206:3,4
  210:15,20 219:14
  227:14 229:10
  235:22 236:4
  243:13,16 246:19
  266:16,16,25
  268:19 270:10
  271:2 278:9
  305:19 338:16,24
  343:20 364:8
answered  363:12
answering  206:13
  305:8 360:12
answers  300:23
  338:12 345:12
  354:18 364:11
  366:1
anticipated  248:20
antitrust  167:4
  175:6 316:23
  370:4
anybody  301:13
anymore  233:22
  343:14

anytime  264:14
anyway  360:17
ap  345:4
apiece  319:5
  344:16
apparent  264:13
appearance
  175:15
appearances
  170:2
appeared  208:21
  369:17
appearing  168:15
appears  192:17
  201:23 218:18
  225:6 244:3
  257:13 260:24
application  205:17
  257:21 266:11
  282:25 283:4,9
  297:8,10,14,17,21
  297:23 298:2,4
  310:4
applications
  292:18,23 293:5
  293:23
applies  202:18
  312:15 353:21
appreciably
  199:18
appreciate  367:13
approached
  366:24
appropriate
  367:14,15
approval  193:20
  271:21
approve  203:20
  242:24 263:12
approved  191:24
  263:6 272:1

**[approximately - back]**                                                   Page 5

**approximately**
211:15 228:18
229:6
**apps** 294:22 295:8
**april** 171:14
172:10 201:21,21
241:22 242:2
**arbitration** 346:18
**area** 194:25 195:1
208:2 244:14
254:11 263:12
264:3 300:10
332:10
**arises** 203:6
**arms** 337:9 343:19
**arranging** 312:19
**arrow** 324:16,17
**articles** 294:15
**asb** 242:1,10
**aside** 198:25 204:4
215:1 221:17
240:3 292:13
296:10
**asked** 228:21
229:18 237:25
243:11 301:23
311:10,15 316:6
330:10 338:10
351:13 352:21
358:9 364:3,10
**asking** 198:17
205:25 236:4
257:24 270:8
300:15 302:8
326:9 357:18
359:19 366:8,13
**aspen** 351:12
**assed** 323:19
**assets** 294:10
**assistance** 219:2

**associated** 260:8
302:10,15
**assume** 176:22
**assuming** 188:13
216:15 331:23
**assure** 208:19
239:25
**asterisks** 286:5,7
**astronomical**
179:7
**attached** 167:22
242:10 245:13
322:9 370:25
**attachment**
184:14 245:3,18
255:3 323:5
**attempt** 343:8
**attempted** 278:21
335:21
**attention** 170:16
180:23 183:17
242:12 302:20
313:19 355:25
**attitude** 233:9
**attorney** 365:10
371:9
**attorneys** 167:9
171:4,8,11,15,21
172:4,8,11,15,18
172:22 173:4,8,11
173:15,18,22
174:4,7,10,14,17
174:21 316:18
371:7
**attorneys'eyes**
171:25
**attractive** 209:2
**audits** 234:7
**aug** 286:9
**august** 173:7,10
235:9,17 257:1

259:13,21
**aundrea** 168:3
**aut** 192:16 331:14
**authenticom**
168:7 264:22
296:21 297:4,7
298:9,20 299:12
299:21 314:14
325:3 328:21
348:21 349:5,15
350:9,11 353:25
355:23
**authenticom's**
349:1
**authority** 315:20
**authorization**
205:13
**authorized** 255:9
313:17
**auto** 190:12
192:12
**autoalert** 257:3,17
258:3 259:22
260:22 262:4
267:8 281:22
283:20
**autoalert's** 258:11
**autoloop** 168:8
**automate** 300:22
**automated** 327:17
327:19,25 328:11
**automatic** 274:18
309:17
**automatically**
296:7 322:10
324:1
**automotive** 168:7
184:20 186:17,19
189:5 191:25
192:16,23 193:2
193:12,20 194:3

197:18 198:13
293:5,24 294:9
319:16 331:3,9
339:22
**automotive's**
293:20
**autosoft** 300:22
**available** 188:17
188:22 189:1
323:18 367:21
**avenue** 169:4
**average** 195:12,14
197:9 199:2,4,7
200:16
**avoid** 280:8 336:7
**avps** 253:5
**awakening** 309:21
**award** 238:1,10,13
238:16,23 239:2
240:4,7
**awards** 237:19,22
237:24,25 238:15
238:16
**aware** 184:25
186:10 196:17
198:1,14 216:10
251:18 255:24
262:6 264:24
273:13 287:25
288:1,5 301:17
349:13,22 351:6
355:22 359:1

**b**

**b** 214:11 332:5
**back** 205:5 210:7
210:10 214:6,6
234:23 235:8
237:9 240:20
244:16 246:8,20
254:9 259:19
265:13,15 270:4

[back - bottom]                                                                              Page 6

270:13 275:3
277:10 287:10
296:8 307:14,22
308:15 309:7
310:3,23 318:23
324:4 325:22
326:2,11,18,24
327:3,4 333:25
338:23 339:1
341:16 345:21,24
346:15 353:16,22
354:24 359:25
366:20,23 367:7
**backing** 274:24
**backup** 274:17
   275:3
**backups** 274:20
   318:22
**bad** 248:15 279:2
   294:4 307:7,24
   319:10,19,23
   324:7 346:4
**balances** 221:8
**banditing** 236:23
**bandits** 245:25
   248:12 314:14,21
**bandwidth** 273:20
**bank** 339:14
**banked** 339:15
**banker** 339:14
**banks** 319:18,19
**barras** 174:3
   279:17 280:3
**barriers** 315:3
**base** 311:3
**based** 190:2
   199:16 202:15
   244:2 250:5 254:2
   262:3 346:9
   356:25

**basically** 207:7
   261:19 263:19
   334:23 344:5
**basis** 201:6 211:6
   211:7,9 222:1
   223:6,9 226:24
   251:25 274:18
   285:21 288:19
   296:4 326:15
**batch** 306:5 323:1
   323:8 324:11
**batches** 256:6
**bates** 184:5 201:12
   218:9 223:15
   230:4 241:14
   249:22 250:1,5
   276:18
**bauer** 241:25
   242:9
**bautista** 324:22
   354:4
**beach** 167:17
   175:11 370:13
   371:17
**bearing** 222:14
**began** 216:9
   334:22,22
**beginning** 237:8
   265:14 326:1
**begun** 305:17
**behalf** 175:10,11
   175:18 176:10
**belief** 193:2
   207:16 217:13
   240:9 265:3
**believe** 180:15
   185:2 191:3
   201:18 202:3,7
   206:12 213:16
   214:1 215:2
   221:21 231:12

236:11 241:23
246:10 249:21
262:11 283:10
286:20 290:4
293:5 318:19
351:19 354:8
366:7
**believed** 326:15
**bell** 201:25
**ben** 169:9 175:9
**beneath** 285:13
   286:5
**benefit** 238:12
**benefits** 294:9
**bent** 346:5
**best** 195:5 333:24
   338:17 341:6,14
**bet** 319:13
**better** 199:20
   203:3,10 238:21
   258:4,7 266:23
   268:18 295:12
   317:22 337:7
   341:6,12
**beyond** 324:8
   364:2,3
**big** 194:1 283:6
   299:24 315:5
   329:4 339:24
   344:2 346:23
   350:14
**biggest** 187:15
   361:9
**bihner** 214:10,10
   214:11,17
**bill** 197:20
**billing** 228:1
   340:13
**billion** 311:20,25
   356:7,8,9,11

**bills** 216:13
**bit** 193:1 204:5
   241:6 266:17
   283:13,18 337:3
   339:20 343:6
   345:9
**black** 278:19
**blacklist** 279:5,5
**blacklisted** 278:18
   279:7 280:8
**blacklisting** 280:1
**blank** 230:14
**blanket** 326:20
**blast** 278:23 279:3
   280:10
**blasts** 278:11
**bliley** 312:11
**block** 348:20
   349:1
**blue** 204:25
**bo** 306:19
**board** 210:21,24
   211:2,8 214:1,22
**bob** 171:3,6,10,13
   171:17,23 172:6
   172:13,17 173:3,6
   173:10,13,17
   174:12,16,19
   230:14,18 232:14
   242:19 253:4,18
   261:18 273:4
   296:12,12 338:22
   340:4 347:11
   359:17
**bogus** 306:19
   307:12
**bold** 202:15
   235:13 260:5
**bonuses** 321:10
**bottom** 245:6
   279:17 285:11

**[bottom - card]**                                                        Page 7

286:4,5 289:21
352:13,17 358:10
**bought**   196:21
197:22 340:14,14
350:2
**bowl**   212:1
**box**   322:16 362:15
**bragging**   260:8
**brand**   194:24
**breach**   315:7
317:22 319:15
355:12,22
**breaches**   262:8
**break**   177:2,3,5
210:1,2 240:14,15
265:8 287:3
317:23 325:20,21
**breaking**   255:6
256:12
**brice**   168:3 176:4
**brief**   241:9 300:11
318:1,9
**bright**   290:11
**brilliant**   185:7,11
185:17 189:17,25
193:20 362:1
**bring**   336:15,17
**broad**   267:12,24
**brockman**   167:8
167:12 170:4
171:3,3,6,10,13,17
171:23 172:6,13
172:17 173:3,6,10
173:10,13,13,17
173:17,20 174:3,7
174:9,12,12,16,16
174:19,19 175:5
176:2,8,13,17
183:25 197:25
201:8 210:10
218:9,11 221:17

221:17 230:5
234:24 235:3
237:15 241:1,15
241:18 244:20
248:2 252:7,10
256:22 259:7,9,10
262:8,20,22,24
265:18 268:22
269:1 271:13,15
276:14,16,19
278:3 281:12,20
284:10,12 287:13
288:13 289:10,18
292:14 296:16,18
300:6 318:13
347:11 354:12
357:16,22 360:20
362:8 365:12
367:3,20 368:2
369:2,12,14,17
370:9,16
**broker**   264:2,7,21
312:24 317:24
324:23
**brokers**   312:2,9
313:6 314:5,14
349:15 353:3
**brown**   168:21
176:9 186:7,14,21
339:13,18,18
**brown's**   186:15
**bruns**   167:19
168:4 175:13
176:2,5
**brushes**   304:2
**bucks**   344:13,16
**build**   274:3 309:25
310:5,6
**builder**   202:24,24
203:4,7,8,8 323:14

**building**   207:6
244:7 311:2
346:24
**built**   205:16
242:15 279:23
335:12 337:4
341:20 346:9
**bulk**   247:8
**bullet**   255:18
256:1 352:7,7,15
**bunch**   279:8
302:20 317:15
319:14 326:12
331:19,20
**business**   180:10
180:25 186:4,18
196:4 209:2 231:6
231:14 235:9
244:11 246:4
264:17 275:4
291:17,18,19,20
293:11 295:19
299:2,19,22
307:12,17 308:1
309:13,18 319:16
333:22 339:24
342:23,24 343:7
345:2 349:1 357:1
**bust**   310:14
**busy**   291:8
**button**   206:23
341:17
**buy**   197:6 344:7
**buyers**   298:7
**buying**   199:13
244:7 279:1
342:25
**buys**   194:12
**bwilkinson**   168:6
**bypass**   249:17

**c**

**c**   167:4 168:1
169:1 175:1 370:4
**calculated**   356:13
356:16
**calculation**   356:21
360:17
**california**   281:23
**call**   178:2,24 217:1
217:3 236:2
249:14 267:16
270:2 314:13
323:7 337:13
339:22 343:12
353:4 359:4
**called**   269:24
270:1 274:15
278:1 279:13
306:23 313:13,14
316:3 322:22
330:2 335:10
338:1,21 342:6,24
**calls**   213:6 291:2
319:15 344:25
**canadian**   282:10
**capability**   269:20
**capital**   353:20
**caps**   277:24,24,24
280:4,4
**captcha**   246:7,11
246:13,18 247:1
255:4,7,20
**car**   186:11,12
193:15 196:21
205:4,7,9,12
206:20 259:3
298:6 336:17
338:8 342:25
343:1,23
**card**   297:16
369:19

[care - charlotte]                                                                                         Page 8

care  321:4
carefully  209:4
carfax  253:20,23
  329:6,8,16,17
cars  193:5,10
  336:15
case  167:4 191:3
  195:6 203:15
  208:21 219:10
  232:2 257:14,16
  270:11 279:6
  283:10 286:9,20
  314:7 319:22
  348:3 370:4
cases  179:3 190:15
  190:22,24 191:15
  199:11 200:4
  297:18 309:8
  310:13 313:9
  327:5 359:9
cash  263:21 298:6
cat  353:5
catch  325:18
categories  303:6
category  302:19
cause  167:15
  269:20 353:8
  371:9
caused  304:8
  317:22 318:25
  355:22
causes  179:25
  187:8,23
causing  170:17
cautious  319:8
cbr  287:14,20,21
cdk  168:20 171:18
  176:10 177:14
  185:24 204:9,11
  207:11,13,13,17
  207:22,25 208:7

208:13,24 209:9
209:13,17 210:11
211:12 212:3,11
212:16,16 214:10
214:17,24 215:7
215:11,16,18,25
216:4,17 217:7,10
218:1 219:2,5,11
219:12,16,16,23
219:25 220:1,6,19
226:17 228:19,24
229:1,5 233:8,17
235:23 236:1
264:7,12 287:16
288:2 289:25
290:13,17,23
291:13 292:19,25
293:6 294:24
295:4 296:22
297:11,18 300:22
329:23 330:24
332:1,13 334:8,11
334:14 336:10
337:23 338:4,11
338:13 339:24
345:13,17 347:20
348:4,10,20 349:5
349:10,14,18,23
350:4,8,18,25
351:2
cdk's  233:9 333:18
  339:5 349:9 351:3
cdr  215:7
cease  229:4
celebrate  239:24
cent  270:21 272:5
center  249:14
  268:2 305:8
  343:16
centers  187:1,8

central  318:23
cents  270:17
ceo  213:3 231:3
certain  178:15
  204:20 274:14
  292:18,23 293:23
  312:13 358:25
certainly  179:17
  179:24 180:1,8
  189:13 190:22,24
  193:25 194:8
  206:15 208:8
  233:4 253:10
  255:14 260:24
  267:13 294:15
  302:24 312:6
  319:24 364:21
  366:15 367:13
certificate  170:9
certification
  260:11,13 261:3
  370:8
certified  259:24
  260:5,9 261:2,2,3
  262:1,5 299:4
  370:13
certify  370:15,20
  371:5
cfo  229:18
chain  171:2,6,9,13
  171:16,23 172:2,6
  172:9,13,16,20
  173:2,6,9,13,16,20
  174:2,12,15,19
  293:19
chair  183:23
chairman  367:20
challenging  187:5
chambers  190:11
  363:2

chance  184:6
  197:6 198:11
  201:14 235:3
  241:18 244:24
  248:2 252:16
  256:23 276:19
  305:20 321:24
change  178:18
  182:13,17 187:19
  191:1 192:19
  194:20,22,23
  195:1,3,12,18,22
  249:7,8,17 270:16
  306:18 309:1,3,5,6
  326:11,17 330:20
  336:11 341:12
  342:11 369:3
changed  270:3
  327:4 339:8
  343:25
changes  170:8
  182:4 183:4 193:2
  249:24 255:3
  284:5,8 327:24
  369:1 370:25
  371:1
changing  337:25
  341:18
characterize
  178:14 216:21
charge  186:14
  194:25 195:9,11
  195:12 258:21,24
  275:15,18,23
  276:2,8 308:9,9
  315:17 327:3,4
charged  274:20
  276:3
charges  275:13
charlotte  339:14

[chart - conception]

**chart**  190:9
192:12,19,22
332:21 362:16,23
**cheapest**  333:23
333:24
**check**  220:17
341:13
**checked**  306:4
**checks**  341:8
**cheer**  183:14
**cherry**  169:7
**chevrolet**  315:11
**chief**  180:25
229:12
**choice**  199:19
303:10 341:6
**choices**  197:3
344:12
**choose**  181:8
197:6 341:15
**chris**  172:20 322:8
**christopher**  171:6
**cia**  239:18
**cid**  171:18
**circled**  326:6
**circumstances**
315:23,24
**cite**  257:12,25
**civil**  167:21
**clarify**  289:7
**class**  168:8,14
175:19,21,24
**classified**  299:9
**cleaning**  308:3
**cleanup**  306:25
307:1
**clear**  214:5 313:15
342:13,13 366:10
**clearly**  240:8
253:15 254:3
258:9,18

**click**  341:16
**client**  184:20,22
184:25
**clients**  264:3
**close**  263:1 347:13
365:18
**closed**  283:25
**closely**  203:25
231:6
**closing**  196:24
367:9
**clustered**  302:1
**code**  175:14
**cohen**  169:3 176:6
176:6
**colleague**  175:25
**collision**  187:1,8
**colors**  204:22
**combining**  293:23
294:10,22
**come**  201:6 204:13
204:15 206:12
227:2 229:19
236:16,18 246:1
246:11 248:22
249:1 263:18,23
272:24 298:7
303:13 325:21
337:13 338:23
350:1 354:23
355:25 367:7
**comes**  204:19
259:3 285:23
299:23 344:1
353:2,17
**comfortable**  183:9
**coming**  211:24,25
236:15 246:3
253:13 361:7,10
364:19,21

**comment**  232:23
232:24 234:9
276:21 363:21
**commented**
189:16
**commenting**
232:19
**comments**  242:12
**commission**
369:24
**common**  179:9
**communicate**
239:20,24
**comp**  273:15
**companies**  294:14
313:7 350:8 363:8
**company**  169:8
176:3,8 216:15
222:5,9,16,24
230:17 231:3,5,9
231:21 232:1,7
239:13,15 240:13
263:10 281:9
299:1 303:11,17
304:14 305:4
312:6 315:12
322:22 339:24
346:8 367:21
**compel**  364:24
365:1
**compelled**  305:11
364:22
**compelling**  342:8
**compensation**
238:9 273:2,10
**compet**  259:1
**competing**  345:22
**competition**
330:20
**competitive**  193:3
259:1 331:23

**competitor**  208:14
208:17,19
**complained**
306:23
**complaint**  249:15
**complaints**  251:15
306:1
**complete**  188:22
189:5,10,12,13
200:6
**completed**  260:9
330:8,9
**completely**  191:6
197:1 215:15
231:7 273:23
307:19 316:8
321:7 323:19,20
343:25 344:9
358:8
**completion**  370:23
371:4
**complex**  283:7
345:16
**complexity**  183:22
282:25 283:9,11
**complicated**
183:19,22
**component**  273:21
**compute**  325:11
**computer**  313:14
313:14,16,16
316:11 317:17,20
320:8 324:5,10
**computers**  323:21
339:19
**con**  212:3
**concentrate**
183:17
**concept**  177:18
**conception**  342:20

**[concern - correct]**

**concern** 247:20
**concerned** 193:9
  236:13 242:18
  277:23 285:25
  314:9 319:22,23
  328:19
**concerning** 200:1
  208:7 211:13
  214:24 215:7
  221:23 228:24
  232:9,20 236:5
  251:16,25
**concerns** 248:8,10
**conclude** 290:6
  291:21 368:1
**concluded** 368:4
**confer** 287:3
**conference** 211:22
**confidential** 167:9
  171:4,8,11,15,18
  171:19,21,25
  172:4,8,11,15,18
  172:22 173:4,8,11
  173:15,18,22
  174:4,7,10,14,17
  174:21
**conscious** 303:9
**consider** 177:17
  181:2 249:15
  333:17 340:23
  341:22
**considerable**
  205:17 273:18
**considerably**
  215:14 216:9
**consideration**
  369:20
**considerations**
  365:11
**considered** 274:4
  312:12,16

**considering** 181:2
  185:24 253:20
**consistent** 209:23
  307:3
**conspiracy** 348:5
**consult** 284:3
**consumed** 186:12
**consumer** 278:1
  279:21,22 341:7
  344:1
**consumer's**
  206:22
**contact** 207:13,13
  207:18
**contacted** 207:16
  207:17
**contacting** 279:13
**contain** 243:22
**contains** 371:1
**content** 363:23
**contexts** 330:11
**continue** 203:10
  203:18 206:16
  295:11 360:5,10
  360:14
**continued** 175:4
  307:10,11
**continues** 254:13
**continuing** 176:19
  210:8 237:11
  240:22 248:17
  265:16 287:11
  295:20 326:3
**continuously**
  193:7
**contract** 194:25
  195:7 199:1,3,9,9
  199:13,16,17,19
  199:20,25 200:6
  200:11,12 201:6
  257:7,11 258:11

258:13,19,23
  261:25 276:10
  312:20 313:1,3
  334:10 340:12
**contracted** 334:19
**contractor** 338:13
  338:15
**contracts** 199:17
  199:22 200:12,22
  227:2 274:12
  313:5
**contractual**
  216:14
**contrast** 196:22
**control** 351:2
**controlled** 215:16
  351:1
**controls** 248:18
**convenience**
  258:10
**convention** 212:25
**conversation**
  207:25 208:3,4
  220:20,21,22
  338:10
**conversations**
  214:12 320:7
  349:23
**conversion** 177:15
  177:18,23 179:1
  179:14,17,18,25
  180:22 181:8,12
  181:14,17 190:17
  191:6,16 192:13
  192:24 193:25
  220:2,4,13 221:12
  332:19 333:6
  334:25 335:5,7
  336:11 337:23
  339:3

**conversions**
  177:25 179:6
  187:16 194:1
  331:9 337:20
**convert** 177:8,9
  181:8 186:24
  187:6,7 188:17
  189:1 193:22
  194:6 203:14
  332:1,2,13
**converted** 335:2
  337:5
**converting** 177:8
  186:25 219:23
  221:11 333:3
**converts** 178:2,5
  190:8
**convince** 193:21
  317:16
**copied** 346:8
**copies** 216:15
**copy** 221:8 362:4
**corner** 341:10
**corners** 240:12
**corporately**
  345:19
**corporations**
  227:20
**correct** 178:6
  179:22 181:4,6,21
  182:3,5,6,8,15
  183:6,7,10 185:25
  186:5,21 188:2,6,7
  192:1,25 193:22
  195:2 201:23
  203:21 204:9,10
  204:12 206:14
  208:15 210:14,22
  210:23 211:8
  215:7,19 218:3,24
  218:25 219:14

**[correct - customers]**

220:20 221:2,4,15
221:23,24 222:5,6
222:20 223:6,7,10
223:12,13 229:6
233:5,24 234:11
236:3,7,9,20
239:10,11 243:2
244:18 245:16,17
247:3,4,7,8,13,14
247:16 248:9
249:11 250:9
254:6 255:14
256:3,14 258:12
258:18 259:2,17
260:22 261:23
269:4,12,16
270:19 271:20
274:9 275:22,25
277:22 279:19
280:4,10,24
282:16 289:23
290:4,10 291:11
293:21,22,25
294:10 295:1,6,15
296:22,23,25
297:1,4,8,14,21
298:2,20 299:14
300:24 301:3,6,9
301:11 302:5,7,10
314:15,18 331:12
331:15,17 344:22
354:15,17 355:7
355:23 356:15,19
356:24 357:5
358:16,18,23
359:21 360:25
361:13,14 362:13
366:12,12 369:13
**correctly** 195:8
**correspondence**
  289:15

**cost** 179:21 180:1
  194:21 197:14
  227:10,18,24
  228:3 230:23,23
  232:2,16 258:20
  272:11,16,19
  273:6,12 274:9
  275:6,13 276:5
  283:17 302:5
  305:17 309:24
  311:11 319:4,13
  326:20 347:13,15
  347:16
**costs** 231:24
  272:17,18 273:1,4
  273:13,15,16
  274:7 286:9,17
  302:9,10,15 319:5
  332:19 333:1
**cottrell** 314:25
**counsel** 169:8
  175:15 196:1
  287:3 366:23,24
  371:5
**counselor** 356:11
**count** 277:12
  300:4
**counteract** 302:25
**countermeasure**
  353:7
**countermeasures**
  353:14,23
**counting** 305:6
**country** 184:24
  185:4 315:13
**county** 369:16
**couple** 288:25
  302:4 310:20
  327:17
**course** 231:8
  235:8 238:19

248:17 288:10,16
  294:13 310:7
  323:3 338:9
**courses** 333:8
**court** 167:1 175:7
  175:10 176:11
  315:1 364:23
  365:21 366:3,13
  370:1
**court's** 364:25
**cover** 213:17,18
  213:22 326:20,20
  366:5
**covered** 360:7
**covers** 275:16,16
  314:1
**cox** 168:7 293:4,16
  293:20,24 294:9
  331:2,8,14,15
**cpi** 271:7,8 272:8
**cr** 278:2
**cracks** 343:12
**craig** 172:3
**crazy** 227:20
  283:6 308:5
  337:24
**create** 267:20
  350:25
**created** 203:2
  309:1
**creates** 267:5
**creating** 266:11
**credible** 250:1
**credit** 196:10
  205:14,14 345:5
**crippled** 336:2,21
**criticized** 320:22
  320:23
**cross** 343:19
**crossed** 282:11

**crowed** 214:16
**crr** 167:17 371:17
**csr** 167:17 371:17
**curious** 236:15
**current** 286:9,18
**currently** 216:4
  220:12 233:21,23
  266:4 298:9,15
**customer** 177:18
  177:21 180:19
  190:18 191:17
  201:7,7 216:11,13
  219:22 220:10,16
  221:6,8 224:13
  254:14 274:18
  278:16,17 282:20
  283:11 286:1
  306:19,21 307:3,6
  307:13,15,24
  315:20,21,25
  319:1 320:19
  322:22 323:19
  329:18 332:2,3
  343:17 344:4
  350:3
**customer's** 306:14
**customers** 178:1
  178:10 190:25
  197:4,5 223:1
  224:2,3,6 227:1
  253:6 255:9
  260:13 269:18
  278:12 279:8
  280:17 281:10
  305:10 306:2
  307:10,11,22
  308:2 318:21
  326:16 327:18
  333:11 341:23
  344:24

**[cut - dealerships]**                                            Page 12

**cut** 220:17 360:11
**cuts** 193:10
**cutting** 243:14
**cvr** 215:13,18,24

**d**

**d** 175:1 239:23
**d.c.** 168:12 169:5
**dad** 320:4
**daily** 277:24 280:3
345:3
**damage** 236:24
**dan** 172:10 253:8
**dangerous** 232:4
**darts** 291:23
**data** 183:5,10
188:17,23 189:2
192:18 216:15
220:4 221:12
223:16 226:10
233:11,11 236:25
239:9,12 242:1,7
242:11,17,25
243:8,22 247:9
252:25 254:11
256:13 257:8
258:5,15 260:12
261:12 262:8
264:1,2,3,6,11,15
264:21 273:24
274:13,17,24
275:3,6,12,24
276:6,11,13 286:7
286:24 293:3,13
293:13 295:21,23
296:14 298:9,20
299:5,23 302:21
302:23 303:2,17
304:3 305:3,10
307:18 311:24
312:1,9,18,24,25
313:3,6 314:4,13

317:24 318:24
319:3,6,7,15
320:23 324:23
328:7,12,14,18,22
329:16 331:25
335:7 337:20
346:11 349:15,19
350:1,4,4,18 351:1
351:3 353:2,3,22
354:15,20,23,23
355:5,10,12,13,16
355:20,22 359:11
**database** 243:18
243:19,25 310:6
315:25
**databases** 243:17
243:21
**dataset** 328:18
**date** 209:7 255:24
268:16 286:9
334:1 369:2
370:24 371:17
**dated** 171:3,7,10
171:14,17,24
172:3,6,10,14,17
172:21 173:3,7,10
173:14,17,21
174:3,13,16,20
184:15 245:10
289:22 293:16
296:13 358:1
**dave** 250:5
**day** 167:15 195:21
196:2,3 222:15,15
246:18 259:16
289:13 304:6,10
311:25 323:15,16
325:11 336:11,16
337:7,25 338:21
348:14 365:9
369:17,21 371:12

**day's** 337:2
**days** 302:4 307:5
327:17 361:5
365:9 370:24
**dayton** 238:4,5
274:24
**dc** 168:22
**deal** 205:6 228:19
228:24 229:1,5
235:23 236:1,6
263:6 290:6 343:5
**dealer** 167:3 175:5
182:14 183:1
187:6,21,25 190:4
193:8 199:3,18
204:5 258:22
262:8 275:24
279:9 281:24
282:14,17 313:22
316:4,7,7 321:1,16
321:18 328:1,22
329:6 332:12,13
332:14,24 335:3
340:16,21,21
342:18 344:14
370:3
**dealer's** 242:16,25
243:8 278:23
280:10
**dealerbuilt** 262:12
318:20,20 320:21
355:4,4,16
**dealers** 182:17
187:6,6,7,22,22
189:2 195:18,20
196:2,7 197:17
199:10 249:6
251:2 258:16
260:14 274:11
278:12 282:11
297:11 298:20

328:6 330:20,22
330:24 331:13
342:9 355:5
**dealership** 168:14
175:19,21,24
177:13 178:2,5,6
178:11 179:2,2,8
179:10,22,24
180:2,12,19,23
181:1,8,13 182:4
183:4,9,14 186:13
187:17 188:6
191:2 194:12
196:8,14 198:2
199:15 200:1,9,16
204:18,20 205:11
216:16 243:19
249:1 263:23
275:5,7,11,13,21
275:23 276:2,4,6
293:9 312:16
313:1,21 315:11
315:13,21 318:23
320:25 321:5
322:3 333:7
334:23 335:2,12
335:12,24,24
343:16
**dealership's**
178:16 244:8
274:17,23 279:6
**dealerships** 177:8
177:9 179:6,13
180:4 186:25
188:17,23 189:1
190:12 191:12,20
193:3,5 194:6
197:5 251:16
253:8,9 257:9
258:15 308:18
312:12 320:19

**[dealerships - discounting]**                                            Page 13

335:22 339:20
358:16,20,23
359:21,24 360:19
360:24 362:11,13
362:22,23
**dealertrack**
205:16,22 207:5
209:3 293:10,20
293:25 294:10
300:22 301:13,14
331:9 332:2 333:4
**dealertrack's**
301:18
**dealertrak** 331:3
**dealing** 227:19
305:9 316:14
319:11
**dealt** 290:8 358:2
**dear** 253:11,12
**december** 171:17
174:9 213:18,20
214:2 288:8,11
**decent** 345:18,18
345:19
**decently** 263:22
**decide** 181:18
208:20
**decided** 219:24
229:13 262:2
295:10 310:16,16
334:17,19,21
336:10 339:17
340:1,3 343:1,2,3
346:15,20
**decides** 193:12,13
205:3 216:12
**deciding** 302:22
**decision** 207:10
209:3,9,12 254:2
264:25 270:24
283:1 310:24

340:5
**declaration**
353:18
**dedicated** 253:16
**defendant** 176:7
**defendant's** 318:5
318:8,11,17
321:20
**defendants** 318:6
**defense** 196:1
**definitely** 278:7
339:21
**definition** 210:19
288:15
**degree** 320:8
**delete** 203:9
270:16 306:18
309:1 326:11,17
**deleted** 270:4
308:13,16
**deleterious** 231:13
**deleting** 307:15
308:14
**department** 179:7
217:12,21 220:11
238:3,18,19,23
321:2 333:14
335:10
**departments**
297:17,18
**dependent** 282:22
**depending** 366:1
**depends** 188:5
212:20
**deponent** 170:20
370:21,22 371:3
**deposition** 167:8
167:12 170:16
175:4,12 314:12
364:7 365:7,10,13
365:22 366:3

367:2,10,23 368:2
368:4 369:13
370:9,18,23 371:4
**depositions** 346:18
365:1,4,6
**describe** 220:24
226:8 267:22
**described** 263:25
276:5 326:7
**describes** 189:14
**description** 171:1
172:1 173:1 174:1
323:10 369:18
**design** 303:15
**designed** 260:11
273:23
**desist** 229:4
**destroy** 349:5
**destroyed** 308:16
**detail** 234:5
**detailed** 286:3
**details** 350:14
360:1
**detect** 189:20
246:12 353:5
**detection** 248:12
**determination**
200:22
**determine** 200:15
201:5 282:17
**determined** 272:5
**develop** 231:18
**developer** 244:12
244:13,16
**developing** 231:23
272:17 273:14
**development**
203:17 204:3
213:6 223:3
244:10,13,14,16
303:16

**devise** 353:7
**different** 177:7
178:23 193:2
204:22,22,23
205:1 231:7
243:21 332:25
353:12
**dig** 246:22
**digit** 335:13,14
**diligent** 181:16
**direct** 231:20
238:14 263:7
279:2 301:8 314:2
351:14
**directing** 261:18
**direction** 296:14
**directly** 207:18
264:11 300:20
312:15 345:22
**director** 253:7
**directors** 210:21
210:24 211:3,8
**disabled** 279:9
**disagree** 194:23
367:24
**disappointed**
334:9
**disappointment**
249:24
**disarmed** 344:9
**disaster** 275:1
280:15 335:5
**disclose** 258:20
**disclosing** 257:8
**disconnected**
237:3
**discount** 199:15
199:18,21
**discounting**
193:14

**discovered** 306:8
306:15 309:12
**discuss** 202:22
212:3 255:9
349:19
**discussed** 239:13
239:16 287:22
332:9 349:9
**discusses** 332:18
**discussing** 232:9
318:15
**discussion** 233:2
233:10 241:9
300:11 318:1,9
342:3 366:23
**dishonest** 261:19
**disk** 221:9 328:17
331:22,22
**dislocation** 278:17
**disparate** 318:6
**dispirited** 346:20
**display** 341:9
**displayed** 341:3
**disposition** 280:13
**disruption** 180:19
180:21 190:18
191:17
**dissatisfaction**
343:17
**dissident** 292:5
**distinct** 355:13
**distracted** 285:10
**district** 167:1,1
175:7,7 370:1,1
**division** 167:2
175:8 370:2
**dmi** 353:25
**dms** 177:14,14
178:5,11,12 179:1
179:13 180:4,13
180:19 181:2

182:5,13 183:5,6,6
183:9 190:2 196:9
199:1,2,9,14,22
200:1 217:23
218:1 219:17
221:2 223:16
242:17,25 243:18
244:8 260:10
262:9 264:2,7
292:25 298:16
300:20,21 301:3,9
330:20,20 332:25
340:22 344:21,21
349:10 351:2,3
**dmss** 177:9,10,10
182:17 298:10
**docket** 365:2
**document** 184:5,6
194:24 195:4,13
195:23 198:25
201:15 213:13,16
218:9,11 221:16
221:22 223:14,15
230:4,6 235:1,4
240:3 241:14,16
241:17 245:9
255:6 268:20
269:6 271:21
284:16 288:10,18
292:16 300:14
351:16 352:24
355:3 357:22
362:9 369:19
**documents** 260:25
265:5 284:4
289:13 356:20
364:13,14,15,18
364:25 365:5
**docupad** 190:5
194:11,12,18,21
195:3,13,19,23

196:10,12,20,22
196:25 197:8,14
197:19,21 198:2
322:17 323:2
340:15,16,22
341:2,25 343:24
**docupads** 340:14
**dog** 308:6
**doing** 183:23
200:10 204:1
222:15 231:22
239:20 248:14
249:4 258:4
263:11 264:12,17
279:7 283:8 299:2
306:13 307:21
312:25 314:24
324:2 326:11,17
326:20 332:4
336:3 359:8,17
**dollar** 220:14
**dollars** 305:15
**dominant** 215:16
**door** 308:5 316:14
**doubled** 340:13
**download** 315:20
323:14 329:7,16
**downloading**
359:11
**downloads** 350:4
**dozen** 187:7
**draft** 242:1,10
255:4 332:8,17
**drag** 181:17,20,25
**dramatically**
226:5 335:18
**drawn** 316:5
**dreamed** 342:21
**drive** 221:9 259:22
263:18,20,24
298:7 331:22

**driven** 197:1
**drop** 190:16
191:15 192:9
332:18 361:9
**dsv** 239:10 240:7
273:1,15
**dt** 293:16
**due** 204:3 220:12
220:13 229:5
238:19 242:2
258:14 367:16
**duly** 167:14
176:14 370:16
**dumb** 323:19
**dummies** 353:11
**dummy** 306:19
**duplicate** 170:19
307:24
**duplicates** 307:23
**duplication**
170:17
**duration** 216:23
**dust** 343:12

**e**

**e** 168:1,1 169:1,1
175:1,1 214:11
370:21
**eagle** 253:8,9
**earlier** 170:16
224:23 253:1
255:8 286:6
287:15 311:10,15
326:5 351:11
352:22 357:16
**early** 248:22
255:11 334:1
345:24 354:5
**earth** 306:5 316:7
**easier** 242:17
**eastern** 167:2
175:8 370:2

**easy** 334:25
**economic** 342:10
**ed** 190:12 339:12
339:18,18
**edit** 267:20
**edited** 363:14
**edits** 242:12
**educate** 194:8
**education** 187:14
333:14
**effect** 317:7,9
329:23
**effective** 255:19
263:22
**effects** 303:1
**efficiency** 182:23
**efficient** 227:23
299:8
**efficiently** 181:3
**effort** 203:17
280:7
**efforts** 302:14,15
**eight** 189:3
**either** 178:4
216:24 224:14
283:25
**electrical** 320:10
**electronic** 343:11
**element** 276:10
**elevator** 312:7
**eliminate** 264:6
349:14
**email** 171:2,2,6,6
171:9,9,13,13,16
171:16,23,23
172:2,2,6,6,9,9,13
172:13,16,16,20
172:20 173:2,2,6,6
173:9,9,13,13,16
173:16,20,20
174:2,2,12,12,15

174:15,19,19
184:8,11,14 185:5
185:8 201:19,19
201:20 202:4
203:24,25 213:17
213:18,19,22,24
218:16,20 219:1
230:10,13 232:8
234:14 235:7,8,12
235:18,21 238:24
239:4,6 241:22,24
242:3 244:15
245:2,5,14,15
248:5,8 251:20
252:18 253:2,4,7
253:17 254:24
256:25 258:8
259:12 260:1
263:3 271:11,18
277:3,7,18 278:11
278:18,23 279:2,3
279:3,24 280:7,10
281:7 289:14,22
289:22 291:22
293:15,19 296:12
310:18 322:7
334:1 345:10
357:23 358:1,10
**emailed** 237:2
**emails** 252:22
253:1 277:11
279:21,25 280:21
322:2
**employed** 263:17
354:24 371:6
**employee** 179:2
180:12 190:18
191:17 274:19
371:8
**employees** 178:10
178:16 180:24

181:3 281:9 314:2
**employing** 353:14
**employment** 207:3
**en** 208:16
**enable** 258:1
**encrypted** 318:24
**endeavoring** 203:3
243:10 245:23
**ended** 307:20
**endured** 233:14
**engineering**
320:10
**enhancement**
244:4 250:21
**enhancements**
239:14 242:16,25
243:7 248:8 250:8
250:17 251:2,6,8
251:17 255:12,19
256:2,3,5,14 290:8
321:13 358:2,11
**enjoyed** 205:17
**enjoying** 254:23
**enjoys** 303:20
**ensure** 260:12
**ent** 301:7
**enter** 205:19
207:11 208:16
246:7 301:8
313:15 350:24
**entered** 215:14
247:2
**entering** 301:2
**enterprise** 302:14
302:16
**entire** 197:19
307:6 315:20
365:2,8 367:22
**entirely** 342:13
**entirety** 315:25

**entities** 299:20
**entitled** 245:10,18
364:11
**entity** 195:7 202:9
228:11 263:14
326:11
**entrance** 315:2
**enumerate** 303:4
**environment**
336:1
**equipment** 182:10
182:16
**error** 195:6
247:10
**errors** 189:21
**especially** 182:11
238:18
**essential** 343:15
**estimate** 305:3
347:13
**estimated** 311:16
356:2
**evaluations** 264:4
**event** 224:14
275:1 365:2
**everybody** 193:14
210:16 231:9
283:6,16 303:22
337:3 343:4
**evidently** 298:24
**exact** 209:7 255:24
336:8 348:14
363:21
**exactly** 214:7
215:21 217:14
254:10 269:6
280:19 290:20
291:7,12 292:3
360:1
**examination** 170:5
170:5,6,6,7 176:15

210:8 237:11
240:22 265:16
287:11 289:8
300:12 326:3
354:10 357:14
**example** 202:12
231:16 293:9
323:24 324:10
329:5 332:12
358:13
**examples** 190:7
**exception** 253:19
254:4,6 359:18,25
**exceptions** 358:13
359:1,10,21 361:6
**excess** 345:23
**exchange** 204:5
226:10 322:4
334:1
**excuse** 358:6
**executed** 369:20
**executive** 302:20
308:9 339:22
**executives** 305:7
**exempted** 330:11
330:11,12
**exemption** 202:13
202:13,20 203:21
203:23
**exemptions** 249:9
250:8,17 357:17
358:23 360:25
361:10
**exercise** 258:9
**exhibit** 171:2,6,9
171:13,16,20,23
172:2,6,9,13,16,20
173:2,6,9,13,16,20
174:2,6,9,12,15,19
184:1,2 201:9,10
213:9,12 218:5,8

221:18,19 226:12
228:15 229:25
230:3 234:20,21
237:12,16 238:24
240:23 241:2,8,21
244:21,22,25
247:23 248:1,3
249:10 250:13
252:2,5,11,16
254:17,18,21
256:19,22,23
257:1 259:6,7,10
259:16 262:20,23
262:25 268:21,22
268:25 269:2
271:13,16 276:14
276:17,20 281:13
284:11,12 288:7
288:13 289:14,18
292:14 293:15
296:11,16 300:15
300:16 318:2,5,17
321:22 351:11
357:21 361:15,20
361:21
**exhibits** 170:16,17
170:20 171:1
172:1 173:1 174:1
300:7
**exist** 288:3
**existed** 288:2
**existence** 216:10
**expect** 332:24
**expectation**
229:11
**expected** 190:16
191:16 337:6
**expecting** 228:17
**expects** 229:5
**expediency** 204:3

**expense** 231:20
310:10,12
**expensive** 317:23
**experience** 180:9
196:22 337:23
346:5 357:1
**experienced**
337:21 339:22
**expiration** 371:17
**expires** 369:24
**explain** 227:9
243:10 321:16
352:23
**explaining** 305:17
**export** 247:8
**exported** 247:2
**exports** 247:6,12
**exposed** 196:19
319:2,6,7
**exposure** 318:25
319:4
**expressed** 249:23
369:20
**extended** 341:4
343:9
**extension** 366:9
**extensive** 359:3
**extent** 315:6
**extra** 326:13 367:2
367:4
**extracting** 312:25
**extraction** 264:2
**extreme** 246:22
**extremely** 190:4
303:17
**eyes** 167:9 171:5,8
171:12,15,22
172:5,8,12,15,19
172:22 173:5,8,12
173:15,19,22
174:5,8,11,14,18

174:21 365:11
**eyesight** 335:3

**f**

**f&i** 341:21 344:17
**fabric** 343:13
**faced** 307:13
**facilitates** 207:4
**facility** 326:22
328:14
**fact** 187:19 190:1
204:17 248:21
258:14 260:8
261:1 269:4
292:22 295:10,11
299:17 301:7,8
304:9 313:9,20
315:10 316:15
320:17 323:21
363:16
**factor** 179:13
208:23
**factors** 194:2
272:23
**facts** 206:19
**fair** 176:23 178:25
180:3,7,11,18
181:7 183:20
191:14 194:5
202:19 208:14
226:3,19 242:24
243:6 247:19
249:19 250:3
269:9,13 279:11
327:15
**fairly** 263:22
297:11 298:24
**falls** 278:18
**familiar** 204:6
215:13 224:11
225:1 253:8 257:3
318:12 332:4

363:3

**fangs** 354:6

**far** 181:14 187:15
189:22 193:2,9
213:5 216:21
222:24 223:2
228:8 246:9
254:22 285:25
303:18 310:23
311:3 314:8
328:18 359:10
363:20 365:3

**fashion** 258:3

**fault** 317:18

**fdc** 316:3,3

**feature** 242:22
259:22

**features** 242:1,11

**february** 174:13
226:4,11 289:16
289:23 348:16

**federal** 167:21

**fee** 194:18 257:13
258:15 268:10
269:14,23,24
270:2,3,9,12,15,17
270:21 271:22
276:12 281:25
282:14,18 326:8
326:24

**feed** 261:15

**feeds** 264:11

**feel** 231:15 242:18
312:1,5 314:19
345:13 367:14

**feelings** 345:20
347:20

**fees** 257:8 276:9
282:10 286:7
347:15

**felt** 305:11

**fico** 205:15 206:22

**field** 346:11,11,12

**fields** 346:12

**figel** 168:10

**fighting** 347:15

**figure** 245:24
286:23 305:14
307:5 338:7
353:11,21

**file** 200:12,13
307:6 310:22

**filed** 296:21

**files** 216:15 274:24
315:20

**filing** 274:21
366:10

**final** 280:12,20
343:8

**finalize** 343:7

**finally** 181:17
205:3 320:3,14
336:4 343:22
346:19 347:10
355:8

**finance** 194:24
196:23 197:4,11
342:23 344:15

**finances** 221:23

**financial** 171:20
174:6,9 220:16,18
222:4,7,8 229:12
234:1,4,8 284:15
288:7 301:23
312:12,17

**financially** 371:9

**financials** 223:12
231:10

**financing** 205:8,10
205:16 207:5
312:19 343:2

**find** 212:8 307:7
307:23 351:10
361:17,18

**fine** 240:16 329:18
365:17

**finish** 205:23
206:2,4,9 227:14
229:10 305:19,20
364:2 365:15,21

**finished** 262:1
296:18

**finite** 323:21

**fire** 185:19 273:25
338:3

**fireproof** 274:21

**firm** 175:16
227:25

**firm's** 349:19

**firms** 350:10,18

**first** 176:14 179:1
185:6,8,10,14,16
185:21 186:23
189:17,20 190:17
191:16 195:8
206:5 207:24
211:10 214:13
219:23 233:1
236:22 239:8
241:3 252:25
268:7 277:15,18
279:16 292:17
297:6 302:19
314:24 315:9
319:4,4,14 323:9
323:12 333:25
334:22 337:25
339:10 361:15,21
361:25

**fit** 315:24

**five** 187:22 199:7
199:10 212:22

222:16 231:17
252:12 270:17,21
324:16 330:3,3,4
340:12 344:18,18
347:10,16 359:24
360:19,24

**fix** 195:9 246:12
308:24 309:13,16
309:17 310:21,23
347:8

**fixed** 211:4,10
212:7,20

**flat** 344:2

**floating** 321:17

**floor** 168:17
303:25 304:1
346:23

**flow** 273:21

**focus** 255:17 269:4
281:14 302:21

**focusing** 205:21
210:10

**folks** 210:17 261:7
292:6 299:22
338:3 354:1

**follow** 233:21
234:4

**followed** 232:5

**following** 238:7
239:17 370:15

**follows** 176:14
233:24

**footnote** 228:16
229:23

**force** 194:9 347:1

**forced** 204:2

**foregoing** 369:12
369:19

**foreign** 246:5

**forever** 209:2
292:19 293:6

294:24 295:15
311:24 336:7
**forgery** 202:7
**forgiveness** 337:4
**form** 177:11,16
178:7,13 179:4,15
179:23 180:6,14
180:20 181:5,10
181:22 182:2,18
183:11,21 186:1
187:3,12 188:10
189:7,11,19
191:10,18 192:2
193:23 194:15,20
195:13,23,25
198:5,9,15,20
200:2,19,23 201:3
202:5,14,21
204:14,16 205:13
207:23 209:14,19
211:16 212:4,12
213:21 214:3
215:4,8 216:5
217:5,9,11 218:2
219:13,18 221:3
222:21 224:4,9,16
224:20,24 225:9
226:6,15,21 227:7
229:7,21 233:6,18
233:25 234:3,12
234:17 236:8,19
243:1,9 244:17
249:12 250:10,18
250:23 251:4,11
252:20 253:25
254:7 255:13,22
256:10,15 257:10
257:19 258:17
260:18,23 261:24
262:10,16 263:15
264:8,23 265:2,21

266:7,15,22
267:10,21 268:12
268:15 269:11,15
269:25 270:14
271:1,23 272:6,12
273:17 274:8
275:8,14,19 276:1
276:7 277:5,9,16
278:13,24 279:14
279:18 280:5,11
280:18,25 281:5
281:18 282:3,8,19
283:21 284:21
285:3,18 286:11
286:19,25 287:17
287:24 288:4,12
288:21 290:3,18
291:1,10,15 292:2
292:21 293:7
294:1,11,25 295:5
295:16,24 297:9
297:15,22 298:3
298:11,14,17,21
299:15 354:16,21
355:11,18,24
356:18,23 357:4,9
358:5,17,24
359:23 360:21
361:1 362:14,17
362:19,25 363:15
**formal** 215:25
**forming** 208:7
**forth** 312:23
338:15 353:17,22
366:23
**fortunately**
306:23 316:16,16
**forward** 233:13
242:11 261:6
262:2

**forwarding**
289:15
**found** 185:15,15
263:22 264:19
285:16 307:1,4
324:6 362:6
**founded** 209:6
215:23
**four** 187:6 211:6
324:16 325:11
347:4,5
**frame** 245:21
255:25 268:13
**francisco** 212:1
**franklin** 315:11
317:12 318:15
**frankly** 179:18
201:23 228:4
242:5
**fraud** 313:14,14
**frcp** 370:20
**frederick** 168:10
**free** 195:4
**freight** 275:2
**frequently** 325:7
327:7
**friday** 238:7,8
364:21
**friend** 254:14
**front** 230:17
253:17 260:25
300:17 345:10
355:3
**frustration** 249:24
**ftc** 316:13,15,23
317:16 319:12
**ftc's** 317:9
**fully** 186:12
**function** 309:3
**functionality**
247:9 257:24

258:6 265:20,24
266:6,8 267:2,3,9
267:11,13,17,19
267:24 282:22
311:2 328:6
**functions** 268:2,4
**fund** 292:6
**further** 170:6,7
242:16,25 243:7
284:25 285:11
300:1 306:24
334:20 354:8,10
357:14 367:17
370:20 371:5,8
**future** 366:11
367:12

**g**

**g** 175:1
**gaining** 315:2
**gap** 296:5
**gears** 345:8
**general** 169:8
183:13 199:6
221:7 251:5
264:24 271:2,3,7
297:23 301:25
302:1,16 315:13
315:17
**generally** 180:10
211:9 215:13
220:25 276:11
**generate** 236:18
**generated** 228:18
**generates** 326:12
**generating** 342:15
**generation** 347:1
347:2,18
**generator** 197:15
323:14 342:2
**gentlemanly** 292:8

**getting**  276:22
279:7 280:8 315:2
319:24 320:13
321:9 353:6
**giant**  205:7
**gibbs**  167:19
168:4 175:12
176:1,5
**gibbsbruns.com**
168:6,6
**give**  181:18 183:2
210:14 218:12
221:10 238:3,4,4
261:9 277:2,11
289:16 293:17
296:14 314:21
328:7 341:14
345:3 365:9
**given**  190:17
191:17 195:21
220:6 237:19
250:8 261:23
344:4 364:10
369:21 370:18
**global**  168:20
176:10
**go**  180:1 181:15
182:24 185:21
187:24 189:14
190:6 193:16,17
198:25 199:19,20
200:11 201:5
204:23 205:5,15
206:4,16 216:21
223:14 237:4
243:16 255:5
262:2 277:10
285:7 303:4 307:6
307:22 309:7
310:3,20,23 324:4
325:19 333:4

337:6 339:23
340:5 341:16
343:20,23 344:9
344:25 353:14
360:11 361:15
362:7 366:8,8,25
**goal**  207:8 304:5
304:12 335:22
340:19
**goals**  304:18
**god**  260:6 308:10
308:16,19 310:23
345:6
**goes**  179:17
182:23 189:15
234:7,7 238:10
281:8 283:6
299:23 331:22
345:21
**going**  179:19
187:19 191:25
192:19 211:25
212:1 220:2,4,12
221:10 222:4
225:5,5 227:13
234:25,25 244:10
254:1 255:16
261:5,8,9,20 271:7
276:22,24 277:1
278:6 281:11,14
282:18 283:9,12
284:15,16 285:14
288:23 299:4,8,9
304:18,25 306:6,9
307:14 309:3
310:25 315:8
321:8,17,20
324:15 325:20,21
334:8 337:15
343:3 346:25
347:18 348:11

350:10 359:18,25
360:5,9,14 364:6,7
364:16 365:13,14
365:18 366:2
**good**  175:2 176:17
203:1 205:5
206:11 207:5
209:25 225:11
250:6 252:13
254:14 260:6
262:18 265:18
289:10,11 294:16
299:18 307:25
308:10 311:8
316:16 321:10,11
323:2 325:16,18
325:20 329:5
341:6 345:1,20
357:5 363:20
**gordon**  192:12
**gotten**  319:10
338:18 348:4
**grace**  308:19
**gramm**  312:11
**grammar**  189:23
**granted**  254:5
**granting**  202:13
202:20
**great**  278:17 347:4
**greater**  187:22
**greatest**  189:22
333:6
**greatly**  183:12
236:11
**green**  204:24
**gross**  234:6 344:14
344:17
**grossman**  168:16
175:18,21
**group**  184:20,23
185:4 186:17,19

190:8 192:1,13,23
198:13 337:14,23
**groups**  192:5,8
249:18
**grow**  185:19
**grown**  320:13
**guess**  211:5 278:5
**guesstimate**
356:25 357:3,12
**guestraq**  201:17
201:25 202:9,20
203:21
**gulley**  168:3 170:6
176:1,1 177:11,16
178:7,13 179:4,15
179:23 180:6,14
180:20 181:5,10
181:22 182:2
183:11,21 186:1
187:3,12 188:10
189:7,11,19
191:10,18 192:2
193:23 194:15
195:24 198:5,9,15
198:20 200:2,19
200:23 201:3
202:5,14,21
204:14,16 205:23
206:2,9,14,16
207:23 209:14,19
209:25 211:16
212:4,12 213:21
214:3 215:4,8
216:5 217:5,9,11
218:2,7 219:13,18
221:3 222:21
224:4,9,16,20,24
225:3,9,18,21
226:6,15,21 227:7
227:13 229:7,10
229:21 233:6,18

233:25 234:3,12
234:17 236:8,19
237:2 240:16
241:5,13 243:1,9
243:13,16 244:17
249:12 250:15,18
250:23 251:4,11
252:20 253:25
254:7 255:13,22
256:10,15 257:10
257:19 258:17
260:18,23 261:24
262:10,16 263:15
264:8,23 265:2,4,7
265:21 266:1,7,15
266:22 267:10,21
268:12,15 269:11
269:15,25 270:14
271:23 272:6,12
273:17 274:8
275:8,14,19 276:1
276:7 277:5,9,16
278:13,24 279:14
279:18 280:5,11
280:18,25 281:5
281:18 282:3,8,19
283:21 284:19,21
285:1,3,18 286:11
286:19,25 287:5
287:17,24 288:4
288:12,21 289:1,7
290:3,18 291:1,10
291:15 292:2,21
293:7 294:1,11,25
295:5,16,24 297:9
297:15,22 298:3
298:11,14,17,21
299:15 300:3,13
301:7,12,18,22
302:8,13 303:9
304:12,19,23

305:1,16 309:24
310:10 311:1,10
311:22 312:1,7
314:3,12,19
316:19,22 317:6
318:4,10 320:1,14
321:24 322:7,14
322:19 323:4
324:13 325:2,6,12
325:19 326:4
327:9,16,21,25
328:5,10,21 329:2
329:13,19,22
330:1,10,15,19
331:2,7,13 332:7
332:17,24 333:11
333:17,25 334:10
334:14,15,17
339:9 340:1,9,15
340:21 341:25
342:6,12 344:20
345:8 346:1
347:22 348:3,10
348:16,19,25
349:4,9,13,18,22
350:7,17,24 351:6
351:10,24 352:2,6
352:12,21 353:24
354:7,16,21 355:3
355:11,18,24
356:7,10,18,23
357:4,9,18 358:5
358:17,24 359:13
359:23 360:3,8,21
361:1,11,24 362:2
362:14,17,19,25
363:12,15 364:1
364:18,22 365:23
366:2,7,13,16,22
367:19

gunning  292:11
guns  316:5
guts  268:7
guy  248:15 292:7
  338:2
guys  316:11
  319:23 324:15
  337:15 338:8

**h**

h  172:20 214:11
  338:1 340:3
hacker  315:4,6
  324:2
hackers  245:25
  314:14,21 353:3
hacking  229:4
  236:23
half  185:6,10,16
  189:17 211:20
  212:9 254:9
  285:24 305:15
  308:5 311:18,20
  311:25 325:10,11
  337:2 356:10
  362:1 365:9
halfway  186:23
  357:23
hall  330:18
hand  212:21
  224:18 289:13
  296:6 308:4
  321:20 328:10
  332:7 338:7
  351:11 369:21
handed  292:16
  293:14 296:11
  344:11
handful  231:4
handing  318:4
handle  197:11
  344:15

handles  217:13
handling  279:21
hands  214:15
  319:10 343:4
handwriting
  281:15,19,23
  282:12,15
handwritten
  282:6,9
hansen  168:10
  175:24
happen  180:10
  187:20 217:20
  294:13 309:4,13
  309:23 319:21
  327:24 350:15
  355:1
happened  180:8
  222:16,17,18
  244:3,9 254:9
  269:17 270:6
  279:1 280:15,15
  308:11 309:8,18
  316:8 317:21
  318:20 320:4
  322:21 323:17
  337:20 354:14
  355:9
happening  191:23
  243:3 248:15,20
  248:23 260:24
  261:17 290:20
  291:5 298:22
  299:6 306:15
  319:8,25
happens  182:25
  193:7 205:12
  217:19 220:25
  309:11 320:25
  342:22 343:24

**[happy - implemented]**                                     Page 21

**happy**  177:3 299:6
  299:17 308:7
  316:2 337:1
**hard**  221:9 246:10
**hardware**  276:3,9
  339:6
**harvard**  290:12
**harwood**  169:9
  175:9
**hate**  344:8
**he'll**  193:9 340:9
**head**  186:9 213:6
  272:25 321:2
**heading**  185:22
  224:18,19
**headquarters**
  335:4
**health**  365:10,11
  367:6,13,16
**hear**  319:20
**heard**  195:18
  314:13 339:3
**hearing**  253:5
  296:25
**heart**  205:4
  294:17
**heat**  272:20
**heavily**  282:21
**hedge**  292:6
**held**  175:12
  211:24 231:6
  362:12,23 363:8
**hell**  308:22 315:8
  317:22
**hellyer**  172:20
**help**  205:11 267:6
  292:10 333:11
  337:13 346:21
  347:22
**helpful**  269:3

**hendrick**  184:15
  184:19 185:1,23
  185:23 186:4,7,15
  186:19,21 189:5
  191:25 192:23
  193:22 198:12
  332:9 334:2
  335:20 336:10
  337:11,13 338:6
  339:9 358:14,15
  358:25
**hendrick's**  335:4
  338:18
**herb**  190:11 363:2
**herb's**  190:11
**hereto**  167:22
**hero**  338:7
**high**  179:9 237:20
  276:24 306:13,20
  343:17 344:3
**higher**  283:13
**highest**  260:12
**highlight**  225:16
**highlighted**
  225:14 286:6
**highlighting**
  285:10
**highly**  167:9 171:4
  171:8,11,15,19,21
  171:25 172:4,8,11
  172:15,18,22
  173:4,8,11,15,18
  173:22 174:4,7,10
  174:14,17,21
**hill**  172:6
**hired**  223:1
  339:18 346:24
**hires**  286:1
**historical**  222:13
**history**  324:10

**hit**  308:7
**hold**  346:15
**holding**  290:9
  365:7
**holds**  211:7
**hole**  278:19 311:8
**honestly**  213:23
  217:12 240:5
**honors**  216:13
**hope**  310:23
**horrible**  179:11
  180:16
**hostile**  324:23
**hour**  211:20 212:9
  285:24 366:5,9,14
  366:15
**hours**  255:20
  323:15,16 325:11
  365:8 367:22
**house**  253:12
  303:25
**houston**  167:20
  168:5 175:14
  238:4 346:8,24
**hub**  273:22
**huge**  262:19
  341:24
**hughes**  168:16
  175:20,20
**huh**  300:23 345:12
**humans**  246:14
**hurry**  292:9
**hurt**  233:14
**hurtful**  233:12

**i**

**ibm**  303:13,14
**idea**  242:14
  317:24 337:24,24
**ideas**  319:24
**identical**  267:1,2

**identifiable**
  264:16
**identification**
  184:3 201:11
  213:10 221:20
  230:1 234:22
  237:13 240:24
  244:23 247:24
  252:3 254:19
  256:20 259:8
  262:21 268:23
  271:14 276:15
  284:13 288:14
  289:19 292:15
  296:17 318:3
  321:23
**identified**  190:1
  276:12
**identify**  258:2
  307:16,16
**identity**  369:18
**ids**  297:13 330:11
  330:11
**ignored**  323:21
**ii**  171:3 318:13
**illinois**  167:1
  175:7 370:1
**image**  305:12
**images**  326:14
**imagine**  273:5
**immediately**
  255:19
**immense**  323:23
**impact**  222:17
  253:1 325:12
  326:23 327:9
**implement**  245:20
  246:25 268:10
  358:3,3
**implemented**
  247:15,20 269:14

**[implemented - intelligence]** Page 22

270:9,12 358:11
**implements** 217:8
**implied** 177:21
**implies** 206:5
**importance**
233:20
**important** 222:24
223:4 259:18
260:4 270:6
273:20 286:2
299:19 303:17
333:10 335:10
**imposes** 227:24
**impossible** 230:24
**improve** 243:24
248:18 290:24
291:14 304:25
**improved** 304:7
327:13
**improvement**
247:5
**improvements**
245:11,19,19
246:24 247:1,16
247:20 249:11
**inaccurate** 198:14
198:19 215:3
249:22
**inadvertent**
170:16
**inaudible** 196:1
289:11 329:21
332:16
**incentive** 336:25
**inches** 304:1
**incidences** 196:17
**incident** 269:7,8
309:12 318:16
354:13,14,19
355:15,19 367:6

**incidents** 198:1
**include** 272:17
305:7
**included** 273:11
302:21
**including** 347:14
**incomes** 234:5
**increase** 225:25
270:23,25 271:4
271:22,25 272:2,4
283:9,17 326:20
**increased** 224:15
270:21,22
**increases** 238:21
**increasing** 282:25
**incredible** 320:24
**indemnifies**
312:22
**independently**
299:2
**index** 170:1
**india** 246:16,17
**indicate** 213:23
**indicating** 193:18
341:17 343:20
344:3
**individual** 175:24
183:13 201:6
237:24 238:15
271:5 319:1
345:17
**individually** 246:7
247:2 256:7
**individuals** 359:6
359:7
**industry** 179:10
193:7 290:15
294:14
**inevitably** 238:21
321:15

**infancy** 239:15
**infer** 191:21
**inference** 353:17
**inferior** 333:18
**inform** 217:4
**informal** 212:6
216:4,20 217:1
219:2,5,9,11,15,20
287:14,22
**information**
196:23 205:19
206:24 219:25
222:8,13 228:6
231:5 244:7
264:17 267:6
284:4 300:9
301:24 308:17
316:2,20 317:4
319:9 326:12
329:7 331:25
**informed** 251:2
**informing** 258:14
**inherent** 205:6
**inherently** 193:3
**inherited** 303:25
**initial** 197:14
213:12 338:3
**initially** 207:14,22
**initiated** 299:13
**initiative** 335:19
**injunction** 296:24
**innovators** 354:20
**inputs** 206:19
**inquiries** 233:19
**insert** 257:23
**inserted** 229:24
**inserting** 258:5
282:2
**inside** 205:5
230:17 335:19
343:13 345:17

346:12,12,12
**install** 282:14
333:15 338:17
**installation** 194:13
195:9 281:24
282:10,18 337:25
**installations**
182:25
**installer** 338:5
**installers** 333:15
**instance** 167:13
179:7 188:4
194:24 229:23
248:21 273:19
292:23 327:6
328:16 332:2
341:4
**instant** 284:1
**instantly** 341:9
**institution** 312:17
**institutions** 312:12
**instruction** 198:21
255:23
**instrument** 369:19
**insurance** 274:1
342:23
**integra** 353:25
**integral** 265:25
266:3 267:4,17
268:1
**integrate** 181:3
**integration** 257:8
258:15
**integrator** 354:15
354:23,24 355:14
355:16,20
**integrators** 355:6
355:10
**intelligence**
293:12 295:19

**[intend - kind]**

**intend** 244:9
**intended** 186:6
**intent** 218:19
**intention** 264:10
**inter** 220:8
**interact** 197:1
**interacts** 214:24
**interest** 215:17
**interested** 223:1
228:23 229:16
233:4,7 236:10
278:5,7 285:25
320:11 371:10
**interesting** 310:7
324:6 337:19
**interface** 202:18
267:7 270:13
295:3,4 354:14
**interfaces** 266:9
272:17 273:14
282:21 283:20
292:19 293:6
294:23 295:3,14
**interiors** 205:1
**interlopers** 246:9
**intermediate**
220:8
**internal** 193:17
227:10,18
**internally** 319:20
**internet** 273:19
315:25
**interval** 309:11
**invade** 304:10
**invent** 197:21
345:5
**inventory** 204:24
221:7,7
**invest** 202:17
303:10

**invested** 305:3
**investigating**
209:5
**investigation**
317:10
**investment** 244:2
311:16,24
**investments**
243:23
**involve** 205:10
354:23
**involved** 177:23
178:15 186:8,11
208:9 210:16,17
231:16 245:23
264:14 271:4
308:1 315:7
317:18,21,24
340:6
**involvement** 271:6
**involves** 205:8
219:21
**involving** 262:12
296:25
**iphone** 178:21
**iphones** 178:22
**irvine** 281:23
**issue** 187:13 188:1
224:10 254:13,16
268:17 273:25
278:20 280:14
282:24 302:21
305:10,25 307:1
307:14 326:8
**issued** 249:16
334:7
**issues** 190:1
193:25 281:8
290:7,8 302:24
305:9,18 330:14
330:16 340:25

**issuing** 249:5
**it'd** 296:6
**item** 271:5

**j**

**j** 168:15
**january** 167:10,16
171:20,24 175:3
196:4 211:24
224:1,22 230:11
369:2 370:10
371:12
**jlong** 168:13
**job** 207:6 283:7
288:11,16,17
328:16 334:25
**jobs** 306:5 323:1,8
324:11 331:20
332:3
**joe** 175:25 214:13
**john** 168:16
175:20 253:7,9
**joint** 204:8 207:11
207:21 208:16
215:11
**jointly** 350:10
**joke** 225:3
**jon** 173:20 208:9
214:25
**jonathan** 172:10
173:13 174:3
**joseph** 168:10
**journalling** 309:1
309:2
**judgement** 299:24
**judgment** 264:20
**july** 173:17 174:3
174:6,20 271:11
277:4,8,8,19,20
284:14,17 286:8
296:13,20 351:24

**jump** 183:14
**jumped** 226:4,20
226:24 365:17
**june** 172:21 173:3
173:14 174:16
253:3 254:25
255:11,21 260:6
263:3 268:10
293:16
**junk** 280:7 307:2

**k**

**k** 168:3,22
**keep** 177:19 186:3
186:18 195:15
199:4,5 225:14
228:1,11 231:5
285:14 296:3
304:12 305:12
310:8,13,21,25
311:13 336:3
341:18 364:7
367:1
**keeping** 367:22
**keeps** 361:7
**keith** 172:6
**kellogg** 168:10
175:23
**kellogghansen.c...**
168:12,13
**kelly** 330:18
**kept** 199:5
**key** 190:1 238:18
333:10 338:1
343:11
**keystroke** 335:16
**kill** 308:6
**killer** 345:4
**kind** 178:21
193:18 195:10
203:5 204:20
205:5,20 227:20

| | | | |
|---|---|---|---|
| 235:12 247:12 | 207:4 208:21,24 | 267:25 268:1,7,18 | 321:13,18 322:23 |
| 261:7 264:18 | 209:5,21,21,22 | 268:19 269:4,5,16 | 323:22 324:5,7,8 |
| 267:14 268:5 | 210:18,19 211:6 | 269:18 270:2,5,23 | 325:17 326:23 |
| 269:20 291:19 | 211:10,11 212:7,8 | 271:3,5,6,8 272:4 | 327:5,7,14,15 |
| 292:6 294:15 | 212:9,21,21 213:2 | 272:22 273:10,12 | 328:19 329:4,13 |
| 303:3,23 304:6 | 213:3,4,8,22 214:4 | 273:19,20 274:22 | 331:18,23 332:1,5 |
| 308:9,12 313:9 | 214:4,6,11,13 | 276:12 277:1,24 | 333:3,4,7,21 334:6 |
| 315:14,15,23 | 215:15 216:9,10 | 278:19 279:4,5,9 | 334:20,24 336:4,8 |
| 317:24,25 319:3 | 216:12,24,24 | 280:12,13,14,19 | 336:14,16,17,22 |
| 319:18 320:11 | 217:12,14 219:20 | 280:19,20,22 | 336:23 337:4,8 |
| 325:1 333:6 | 219:20 220:6,11 | 281:6,6,7,8,11 | 338:3,3,5,5,7,9,16 |
| 335:12,16 336:15 | 221:6 224:11 | 282:22,23 283:3,8 | 338:22 339:1,2,5 |
| 338:1,2,16,18 | 226:17,25 227:1 | 283:12,14,14,15 | 339:20 340:3 |
| 341:6 343:2,4 | 227:11,16,20,23 | 283:16 284:1 | 341:1,4,5,18,21,22 |
| 348:5 349:23 | 227:25 228:1,5,9 | 288:15 290:21,22 | 342:10,19,24 |
| 353:5,16,16 | 228:10 229:13 | 291:2,3,19,19,22 | 343:11,13 344:1,9 |
| 354:24 357:12 | 231:1,3,16,17,19 | 292:3,5,5,24 293:2 | 344:25 345:23,24 |
| 359:18,25 | 231:20,21,25 | 293:11 294:2,16 | 346:5,8,13,14,18 |
| **kinds** 283:2 343:9 | 232:6,17,25 233:1 | 295:21 296:3 | 348:1,14 350:11 |
| **knew** 339:16 | 233:3,10,13,21 | 298:25 301:18 | 350:20 351:15 |
| 364:18 | 234:5,5,6,25 | 302:22,25 303:3,3 | 353:11,16,19,22 |
| **know** 177:1,2 | 235:19 236:21,23 | 303:7,16,18,19,19 | 354:4,25 356:25 |
| 178:14,20,23 | 236:24 237:3,23 | 303:24 304:5,8,10 | 357:11 358:25 |
| 179:16,17 180:9,9 | 238:15,17,21 | 304:18 305:7,8,11 | 359:8,10,11,18,18 |
| 181:12,18 182:19 | 240:10,11 241:16 | 305:13 306:5,7,7 | 361:2,2 363:1,10 |
| 182:24 183:1 | 243:23 244:2,5,6 | 306:19,20 307:4 | 363:21,21 364:24 |
| 186:16 187:5,8,16 | 246:9,13,14,18 | 307:12,13,24 | 366:25 367:1 |
| 187:18,19,23 | 247:8,17 248:11 | 308:4,8,16,17,18 | **knowing** 200:20 |
| 189:21,23 190:23 | 248:12,15,21 | 308:19,19,19,22 | 227:16 278:6 |
| 190:24 191:1,2,2,4 | 249:5,7,14,15 | 308:25 309:3,15 | **knowledge** 192:11 |
| 191:22 194:10 | 250:25 251:13,18 | 309:18,19 310:3 | 195:5 220:24 |
| 195:8,14,15,16,16 | 253:23 254:1,8,10 | 310:12,14,16,19 | 319:12 350:16 |
| 196:2,20,21,21,23 | 254:12,12 255:15 | 311:12 312:6,9,10 | 356:25 363:7 |
| 196:24,25 197:2,3 | 256:6,8 257:12,21 | 312:11,11,21 | **knowledgeable** |
| 197:9,18,21 | 257:22,23 258:21 | 313:2,4,6,10,24 | 330:15 |
| 198:10 199:2,6,7 | 258:22,23 260:7,7 | 314:11 315:2,2,5,8 | **known** 239:10 |
| 199:11 200:11 | 260:11,25 262:7 | 315:9,12,16,22 | 304:17 369:17 |
| 201:4,5 202:11 | 262:17,18 263:21 | 316:1,4,4,11,13,14 | **knows** 308:17 |
| 203:4,11,17 205:2 | 264:9,10,15,19,21 | 317:7 319:1,1,4,8 | 339:19,20 |
| 205:7,8,19 206:10 | 266:8,10 267:3,3,5 | 319:9,16,24 320:8 | |
| 206:19,20,21 | 267:6,11,13,14,16 | 320:12,19 321:2 | |

**[l - long]** Page 25

## l

**l** 167:17 370:13
  371:17
**lack** 310:17
  337:23
**lady** 253:11,12
**lamb** 170:17
  171:10 174:16
  184:9,16 185:6,8
  185:23 186:4,19
  186:20,25 188:8
  188:16 189:4
  190:15 191:8
  192:22 193:19
  198:12 230:20
  293:15,19 294:20
  332:9,18 361:19
  361:25 363:13
**laptop** 315:21
**large** 319:15
  358:19 359:2,6
**larger** 185:1
  227:19
**largest** 184:19,20
  184:22,23 185:4
  208:14,17,18
  358:21 359:2
**laser** 182:11,11
**late** 211:24 255:12
  305:1,2 356:11
**laugh** 324:7
**law** 167:19 227:25
  313:11,18
**lawsuit** 264:18
  296:21,25 299:23
**lawyer** 301:19
**lax** 309:22
**layouts** 346:10,11
  346:11
**leach** 312:11

**lead** 259:22
**leader** 348:6
**leaders** 191:2
**leading** 190:5
**leap** 205:5 317:19
**learn** 178:16,20
  179:19,25 181:19
  183:15 194:9
  333:9 348:10
**learned** 291:17
**learning** 180:24
  181:14,16 187:20
**leather** 205:2,2
**leave** 216:12
  242:17 253:12
  331:14
**ledger** 221:7
**left** 224:18 315:22
  315:23 354:9
**legacy** 280:17
**legal** 286:7 288:15
  312:10 313:5
  347:15
**lender** 206:24,25
**length** 199:2,12,16
**letter** 184:14,17
  185:6,10,17,21,22
  185:22 186:4,19
  186:20,23 189:4
  189:17 190:7
  191:9,25 192:18
  198:12,13 319:5
  332:9,17 361:23
  361:25 363:11,13
  363:17,25
**letters** 240:12
**letting** 237:3
**level** 188:11
  199:14 222:6
  233:2 234:5
  260:12 276:24

303:4 363:22
**levels** 204:22
**liabilities** 264:14
  312:23 321:16
**liability** 321:7,8
**liable** 231:22
  264:19
**license** 279:23
  313:21,22,23,23
  314:1,1 344:21
**lie** 338:20
**life** 303:24
**light** 272:20
**lights** 193:8,11
**likes** 283:16 308:6
**lime** 243:20,24
  263:13,14 279:13
  279:20,23 280:24
  281:1,4
**limit** 203:23
  247:11 277:18
  278:22 280:9
  360:10,23
**limited** 232:8
  268:4,4 313:23
**line** 181:24 223:23
  223:24 225:18
  230:13 258:9
  285:4 349:1 352:6
  369:3
**lines** 284:23 285:7
**link** 353:25
**lisa** 254:13
**list** 249:23 250:3
  250:19 253:14
  274:3,7 287:18
  300:21 303:4
  323:7 336:16
**listed** 192:8
  214:23 249:10,18
  250:12 362:12,22

**listings** 315:15
**lists** 190:10 279:2
**litigation** 167:4
  175:6 286:18
  299:13 370:4
**little** 193:1 200:4
  204:5 207:1
  222:14,25 241:6
  245:5 248:19
  249:3 266:17
  283:13,18 295:12
  296:7 298:25
  299:1 303:5 313:7
  337:3 339:20
  343:6 345:9 359:5
**lives** 308:5
**lloyds** 213:2
**llp** 167:19 168:4
  168:16 175:13
**load** 275:2 283:11
  305:8 323:22
  327:10,14
**local** 318:22
**located** 175:13
  323:11
**location** 306:14
**locked** 209:2
**locks** 343:11
**log** 309:5,6 310:6
  310:8 311:2
**logging** 309:15
  327:14
**logic** 308:12
**logical** 244:11
**long** 168:10
  175:25 177:3
  199:20 216:12
  231:16 266:17
  293:1,2 310:8,13
  310:25 314:3,11
  320:15 338:10,14

[long - marking]

343:22 345:2
360:6,10 364:9,10
**longer** 182:1
199:22 254:13,16
274:3 280:14
288:3 290:7
334:21 365:8,12
365:23
**longest** 199:25
200:3
**look** 183:1 185:5
200:22 202:23
206:25 241:8
245:25 246:1,4,13
246:18 248:14
259:20 266:9
268:5 285:21
288:8 292:11
316:9 321:21,24
324:13,18 336:2
336:22 357:21
**looked** 226:12
228:16 249:20
267:14 286:6,13
311:17 347:4
363:17,20
**looking** 204:20,22
227:4 233:13
241:10 285:5
323:5 332:20
351:16 352:16
361:4,20
**looks** 203:15 214:7
224:1,25 246:5
272:7
**loop** 247:18
**loose** 317:23
343:22
**lord** 345:3 346:20
**lose** 177:21 307:18
307:18 339:9

**loses** 185:19
**loss** 178:9,10,10
308:9 310:14
**lost** 177:17,25
337:2 346:19
**lot** 182:25 189:2
189:21 196:6
231:23,24 251:15
258:4,4 292:4
310:21,21 313:19
318:21 320:8,23
323:25 336:18
337:20 347:19,21
352:21 360:6,7
364:10
**lots** 277:11 360:7
**louisiana** 167:20
168:4 175:13
**love** 197:4,5 320:4
**low** 338:1
**lowering** 192:24
**lunch** 265:5,9,12
265:13

### m

**m** 168:11
**ma'am** 176:21,24
177:6 179:16
182:3 184:7,10,13
184:18 185:20
186:2,6 187:4
194:19 195:20
196:2,11,13,16
198:22 199:24
200:17,24 201:16
202:2,6 204:7
210:12 211:23
213:14 214:4
215:5,9 216:18
217:3,6 218:18,22
219:7,10 222:2
223:18 228:20

229:17 230:7,9,21
233:7,19 234:18
235:5,18 239:5
241:20 242:4,21
245:1,22 251:18
252:17,21,24
254:8,23 257:2
259:11,14 263:1,2
276:21 282:4,7
360:22 361:2
362:10,21 363:1,9
**machine** 167:18
**mad** 345:24
**magic** 341:2
**magnitude** 340:5
**mail** 279:2
**main** 247:20
261:20
**mainline** 257:23
261:14
**maintain** 203:10
**maintenance**
194:18 272:19,20
273:15 275:15,17
276:3,9
**major** 187:1
249:10,19,23
250:3,7,12 294:13
**maker** 207:10
270:24
**making** 193:13
209:12 283:1
284:8 342:14
356:24 365:21
**management**
167:3 175:5
186:13 190:11
221:22 297:25
298:13 370:3
**manager** 197:4,11
214:19 315:13,18

344:15
**manager's** 196:24
**managers** 344:18
**manner** 293:12
294:17 299:8
**manpower** 272:22
**manually** 253:15
**manufactured**
322:25
**mark** 168:21
176:9 218:6
**marked** 184:1,2
201:9,10 213:9,12
218:5,8 221:18,19
228:15 229:25
230:3 234:20,21
237:12,15 240:23
241:1 244:21,22
247:23 248:1
252:2,5 254:18
256:19,22 259:5,7
262:20,23 268:22
268:25 271:13,16
276:14,17 281:13
284:10,12 288:13
289:18 292:14
296:11,16 318:2
321:22 332:8
351:11
**market** 259:1,2
264:3 294:21
347:16 350:25
**marketing** 243:19
243:20,25 263:17
**marketplace**
207:9 231:18,19
233:10 302:23
303:21 305:13
345:22
**marking** 254:17
318:4

**[martin - motion]**

| | | | |
|---|---|---|---|
| **martin**  173:20 | **mechanism** | **milberg.com** | 296:14 318:15 |
| **massive**  197:15 | 329:16 | 168:18,19 | 321:21 |
| **master**  315:14 | **medals**  239:23 | **million**  228:18 | **moments**  281:10 |
| **master's**  320:9 | **media**  237:5,9 | 229:6 305:15 | **monday**  247:7 |
| **matter**  175:5 | 265:10,14 325:23 | 311:7,18 346:13 | 306:1 336:14,18 |
| 191:12 232:18 | 326:2 | 346:15 347:16 | **monetary**  238:9 |
| 269:3 294:12 | **meet**  212:2,11,16 | 356:4,8 | **money**  193:13 |
| 307:14 315:10 | 349:18 | **millions**  311:4 | 302:25 317:15 |
| 316:15 | **meeting**  210:19 | 356:7 | 319:19 342:8 |
| **mayer**  168:21 | 212:5,6,15 214:1 | **mind**  242:5 317:20 | **monitor**  182:22,24 |
| 176:9 | 214:22 351:12 | **mine**  302:20 | 183:3 |
| **mayerbrown.com** | **meetings**  210:11 | **minor**  202:9 | **monitors**  182:22 |
| 168:23 | 210:15,21,24 | 310:15 | 182:24 |
| **mba**  290:12 | 211:3,8,12,21 | **minute**  227:13 | **monopoly**  207:7 |
| 320:10 | 212:2 | 240:15 287:4 | **monster**  335:3 |
| **mcohen**  169:5 | **memorized**  336:4 | 318:10 340:16 | **month**  194:18 |
| **mdl**  167:3 370:3 | **memory**  214:5 | **minutes**  214:1,22 | 197:12,13 199:17 |
| **mdsc**  168:8 | **mentioned**  194:11 | 215:3 222:12,13 | 222:11,18 224:23 |
| **mean**  177:21 | 214:10 264:21 | 265:5 300:5 | 285:23 321:10 |
| 182:1 209:1 | 328:5 331:7 | 323:16 325:10 | 337:16 344:16,17 |
| 225:15 246:21 | **menu**  344:5,6 | 354:9 360:16 | 344:19 358:3 |
| 252:6 266:17 | **merger**  293:16 | 365:16 366:25 | **monthly**  194:17 |
| 289:3 291:14 | 303:10 | 367:3,4,8 | 221:25 223:6,8 |
| 292:1,3 295:3 | **message**  246:16 | **miracle**  197:6 | 257:13 258:15 |
| 308:7 311:11 | 247:10 | 342:20 344:7 | 275:18,23 276:9 |
| 316:5 320:5,14 | **met**  212:11,24 | **miraculous**  197:23 | 277:24 280:4 |
| 322:19 324:6,9 | 214:14 239:9,12 | **mis**  170:16 | 282:10 285:21 |
| 340:19 345:19 | 315:10 | **mischaracterizat...** | **months**  181:24 |
| 365:12 | **method**  348:12 | 222:10 | 182:1 183:8 |
| **meaning**  236:17 | 353:6 | **misspellings** | 310:20 |
| 239:19 259:21 | **michael**  168:9 | 363:19 | **mopping**  303:24 |
| **means**  193:10 | 169:3 176:6 | **misused**  278:16 | **mops**  304:2 |
| 197:13 224:12 | 315:10 | **mms**  242:1,11,16 | **morale**  232:4 |
| 260:2,3 261:6,14 | **mid**  268:14 269:9 | 242:25 243:7,19 | **morning**  175:2 |
| 278:18 279:8 | 270:9 | 243:25 244:4 | 176:17 249:2 |
| 282:21 283:17 | **middle**  235:12 | 297:7 | 289:11 336:19 |
| 309:2,7 310:21 | 246:1,3 281:24 | **mnemelka**  168:12 | **mornings**  336:14 |
| **meant**  319:3 | **mike**  175:23 | **model**  333:22 | **morse**  190:12 |
| 336:24 352:23 | 289:10 356:12 | **moment**  218:13 | **moss**  172:3 |
| **measurement** | **milberg**  168:16 | 277:12 280:21 | **motion**  364:23 |
| 193:4 | 175:18,20 | 289:17 293:17 | 365:1,21 366:10 |

motivate 263:18
motivated 333:7
motivation 298:6
motivations 194:3
  236:21
motors 297:23
mouse 353:5
move 197:24
  221:14 225:3
  335:23
movement 261:12
moving 185:24
  244:8 264:15
  273:24
mryan 168:23
mullin 169:3
  176:7
multiple 361:3
multistep 220:23
mumbling 232:15
myriad 313:4

**n**

n 168:1,9 169:1
  175:1 214:11
n.w. 168:11,22
nada 211:18,19,21
  212:2,25 214:14
naked 243:20,24
  263:13,14 279:13
  279:20,23 280:24
  281:1,4
name 175:9 193:8
  193:11 208:3
  212:13 213:7
  214:13 232:21
  257:5 315:4,11
  319:5 338:6 369:2
  369:19
named 168:7
names 209:20
  314:21 316:2

nature 333:22
  353:22
near 207:7
nearly 179:3
  190:15 191:15
necessarily 189:22
  191:21 259:4
  295:10 301:22
necessary 303:2
need 177:1 207:2
  219:19 225:17
  227:9 230:18
  290:6 292:18
  293:5,12 295:14
  295:22,22 296:1
  304:1,2 316:10
  326:17 327:8
  340:7 365:23
  366:7 367:12
needed 337:13
needing 235:21
needs 245:16
  299:14 301:1,1
  302:22
negotiating 199:12
  290:1
neither 371:5
nemelka 168:9
  170:5,6 175:23,23
  252:9 288:24
  289:4,5,9,10,21
  290:5,21 291:6,12
  291:21 292:12,16
  293:4,14 294:3,19
  295:2,9,22 296:2
  296:18 297:13,20
  298:1,8,12,15,19
  299:10 300:1,14
  301:5,16,20
  302:18 304:16
  305:24 310:2

311:6 312:4
  314:17,23 317:14
  322:12 323:6
  324:25 325:4,15
  327:12 328:25
  329:11 330:2,5,25
  331:5 334:5
  340:18 344:23
  345:9,15 347:25
  348:23 351:15
  353:1 354:3,11,18
  355:2,15,21 356:1
  356:9,13,20 357:2
  357:7,13 360:16
  361:18 362:6
  364:14 367:17
never 178:21
  218:12 230:16
  248:22,24 257:5,6
  303:19 310:23
  316:15 319:20
  329:17 340:5
  342:21 356:13
nevertheless
  331:13
new 168:18,18
  178:16,21 179:19
  179:25 180:24
  181:4,14,16,18
  182:5,7,9,14 183:6
  183:9,15 187:20
  194:10,24,24
  223:2 239:15
  242:1,10 250:8
  275:2 280:17
  286:1,1,1,1 309:25
  333:9,9 334:23,24
  336:2,5,11,21
  337:5 343:23
  346:9 358:11

news 192:16 193:2
  193:12,21 194:3
  197:18 241:3
  252:13 255:6
  256:13
nice 292:7 296:1
  315:24
nicer 296:7
nifty 205:16
nigh 197:22
  342:19
night 246:2,3,17
  274:20 364:21
nine 324:15
nobody's 231:6
noise 321:13
nominally 339:13
non 332:1 341:22
nonsense 365:18
noon 337:1
noontime 337:8
nope 366:4
normal 251:25
  261:11,11 270:23
  294:12
normally 212:2
northern 167:1
  175:7 370:1
notary 369:23
note 259:15 286:7
  357:23
noted 369:13
notes 351:12,21
notice 310:19
noticed 286:16
notices 334:7
notification
  219:21 260:7
notified 251:20,21
  251:22,24

**notify** 219:25
242:18
**notifying** 220:1
283:23
**november** 171:3
172:7 184:15
238:7,25
**number** 188:4,12
188:23,24 193:5,5
199:4 205:8
224:12,13 225:6
228:8,21 229:14
229:15,18 233:14
234:6 240:12
253:6 269:18
271:5 273:18
276:18 278:22
280:10 282:20
285:21 291:17
292:24 296:8
297:11 305:14
323:12 326:16,24
335:14 342:1
352:15 356:4,14
356:17 357:2
359:6,7 361:6,7
365:3
**numbered** 167:15
324:14,15
**numbering** 170:16
170:19
**numbers** 193:16
193:17 223:23,25
227:8 228:10,12
228:12,13 232:1
274:4 282:6
284:17 286:3,6
318:6,7 320:19,19
323:11
**numerically**
237:23

**numerous** 314:13

## o

**o** 175:1
**oath** 369:18
**object** 182:18
206:11 243:14
250:10 255:22
271:1 275:14
362:2 367:22
**objection** 178:7,13
179:4,15 180:6,14
180:20 181:5,10
181:22 182:2
186:1 187:3 189:7
189:11,19 191:10
191:18 192:2
195:24,25 196:1
198:15,20 200:2
200:19,23 201:3
202:5,14,21
204:14,16 207:23
209:14,19 212:12
213:21 215:4
216:1,5 217:5
218:2,21 219:13
219:18 221:3
224:4,9,16,20
226:6,15,21,22
227:7 229:7,21
233:6,18,25
234:12,17 236:8
236:19 243:1,9
249:12 250:15,18
250:23 251:4
253:25 255:13
256:15 257:10,19
258:17 260:18,23
261:24 262:10,16
263:15 264:8,23
265:2,21 266:1,7
266:15,22 267:10

267:21 268:12
269:11,15,25
270:14 271:23
272:6,12 274:8
275:8 276:1,7
277:5 278:13,24
279:14,18 280:5
280:11,18,25
281:5,18 282:3,19
283:21 284:19,21
285:3,18 286:11
286:19,25 287:17
287:24 288:4,12
290:3,18 292:21
293:7 294:11
295:16 297:9,15
297:22 298:3,11
298:17,21 299:15
301:4,5,10,15,16
301:20 302:6,11
302:17,18 303:12
304:15,16,21,24
305:5,23,24 310:1
310:2,11 311:5,6
311:21,23 312:3,4
312:8 314:6,16,17
314:22,23 317:5
317:13,14 318:18
320:6 322:5,12,15
322:20 323:6
324:24,25 325:4,9
325:14,15 326:25
327:11,12,20,22
328:3,8,13,24,25
329:10,20,24
330:5,6,13,17,25
331:4,5,11,16
332:15,22 333:2
333:13,19 334:4,5
334:12,15,18
339:11 340:2,11

340:17,18,24
342:5,7,17 344:23
345:14,15 346:3
347:24,25 348:8
348:13,18,22,23
349:2,7,11,16,20
349:25 350:12,22
351:4,8,23,25
352:4,10,19,25
353:1 354:2,3
355:11,18,24
356:18 357:4,9
358:17 359:23
360:21 361:1,11
362:14 363:15
367:1
**objections** 206:11
329:11
**obligation** 220:15
220:18
**obligations** 216:14
**oblivious** 313:9
**observation** 199:6
**observe** 353:13
**obsolete** 203:11
**obviously** 177:22
225:1 261:25
299:2,16 317:11
317:15 320:20
337:22 338:24
347:19 367:20
**occasion** 198:8
314:13
**occur** 180:22
194:10 211:3
**occurred** 249:25
257:14 262:9
269:21 305:2
308:13
**occurring** 246:20
342:18

**occurs**  197:6
  217:14 220:13
  280:1 284:2
  309:12 342:25
**oct**  305:1
**october**  172:3
**od**  287:18
**odd**  339:15
**ode**  204:5,11,13,15
  205:21,25 206:1
  207:11 208:7
  209:6 210:10,11
  210:21 211:7,13
  212:3,17,24 213:3
  214:2,24 215:24
  287:13
**ode's**  207:8
**offer**  199:9,11
**offering**  243:24
  274:15
**office**  274:25
  342:24 343:7
  346:23 369:21
**officer**  214:21
  229:12 370:17
**offices**  167:19
**oh**  285:8 316:21
  328:1 338:14
  345:3 356:10
**ohio**  274:25
**okay**  176:19 177:7
  185:15 189:9
  192:22 206:6
  223:24,24 226:3
  226:14,18 235:10
  235:13,15 243:17
  248:15 252:8
  267:12 268:3
  271:24 278:25
  285:16 292:12
  294:7 302:3

316:19,21 321:19
  324:19 335:1
  337:18 338:14
  343:7 352:14
  361:19 363:11
  366:16 367:9
**old**  183:6 203:11
  225:11 279:22
  320:12 323:1
**older**  322:24
**once**  183:9 211:17
  212:22 213:8
  222:11 238:4,4
  285:23 307:21
  327:3 328:19
  338:20 365:6
**one's**  324:7
**ones**  227:3 250:11
  250:16 272:24
  277:12 309:16
  354:5
**ongoing**  203:20
  310:10,12 311:11
**onsite**  275:17
  315:17 333:15
**opcode**  335:13
  336:3,23
**opcodes**  335:11,11
  335:17,21,25
  336:2,5,11,21
  337:25 339:8
**open**  204:5 259:19
  315:1 364:7 365:7
  365:14 367:2,23
**opened**  260:16,21
  261:16,22 283:25
**opening**  261:10,13
  335:15 336:20
**openly**  233:2
**operate**  256:17
  290:23 307:10,11

**operated**  231:8
  299:7
**operates**  228:11
  231:21
**operating**  203:18
  203:19 231:12
  258:6
**operation**  186:13
  186:14 231:14
**operational**  328:7
**operations**  217:21
**opinion**  180:17
  250:5,6,6 295:7,8
  295:14,17 299:18
  313:12
**opportunities**
  258:2
**opportunity**
  208:20 237:16
  274:1
**options**  204:23
**oral**  167:8,12
  370:9,17
**orchestrated**
  201:4
**order**  193:21
  197:11 210:14
  261:10,16 265:19
  265:24 266:5,21
  267:3,9,11,15,16
  267:16,20,23
  268:3 270:5
  283:20,22,24
  292:25 293:2,10
  295:15,20,23
  311:25 312:15
  313:5 327:6
  335:16 336:20
  365:19
**ordering**  258:11
  258:13

**orders**  257:25
  260:2 261:13
  266:11,12 267:5
**ordinary**  235:8
  246:4 257:21
  288:10,16
**organiza**  239:7
**organization**
  185:3 204:6
  207:20 208:1
  209:23 217:14,21
  223:4 227:22
  232:4,14,20
  234:10 239:18,19
  239:21
**organizational**
  228:9
**organizationally**
  227:18
**organizations**
  359:2
**oriented**  303:14
**original**  342:20
  347:14
**originally**  188:6
  303:13
**ought**  209:4 323:2
**outcome**  371:10
**outdo**  252:9
**outliers**  313:13
**outlook**  321:6
**outputted**  220:5
**outside**  230:17
  266:10 267:1
  279:1 304:9
  306:12 316:17
  328:18
**overall**  222:4
  228:9 249:8
**overhead**  178:15
  178:24 227:24,25

[overhead - percent]                                                           Page 31

327:15
**overloads** 325:16
**overrun** 323:1
**owned** 184:23
185:4 215:18,19
293:24,24 363:4
**owner** 184:19
**ownership** 215:17
**owns** 313:20

**p**

**p** 168:1,1 169:1,1
175:1
**p&l** 223:16
**p.a.** 169:3
**p.m.** 167:16 247:6
247:12 265:11,12
265:14 287:7,8,9
325:24,25 326:2
366:18,19,21
368:3,4
**pace** 336:24
**package** 171:20
174:6,9 178:18,19
206:24 231:17
282:18 284:15
285:23
**packets** 273:24
**pag** 358:14,15,25
**page** 170:1 171:1
172:1 173:1 174:1
185:14,21 186:23
186:24 188:16
189:14 190:6,9
223:14 228:15,17
235:1,6,12 241:17
241:24 245:6,9
252:25 253:17
254:3 255:5
277:15,18 281:14
281:16,22,24
284:15,16 285:7,8

285:12 286:4
332:20 333:25
351:14 357:23
362:11,18 369:3
371:1
**paged** 230:3
**pages** 252:12
364:14,15
**paid** 197:19
336:25
**pain** 242:18
**pale** 324:8
**paperwork** 343:7
**paragraph** 189:13
239:6,8 260:4
279:16 363:22
**paramount** 367:13
**parcel** 309:20
**parentheses**
300:21
**park** 274:25
**parse** 331:24
**part** 177:18 205:7
206:5 217:20
228:9 245:24
247:18 259:24
263:9,13 265:25
266:3,4 267:4,17
268:1 270:22
273:4 274:11
278:10,12 283:1,1
288:17 303:16
306:12 309:20
310:7 313:7
342:23,24
**partially** 269:6
**participated**
211:12
**particular** 188:11
191:12 201:24
208:21 214:5

234:14 238:16
249:6,17 254:11
257:14,16 263:11
269:6 282:20
283:10,11 284:4
285:23 292:25
319:13 354:22
355:19 359:9
**particularly**
193:25 232:2
233:8 299:22
**parties** 211:19
227:1 267:14
326:21 327:19
328:7 371:6
**partner** 208:25,25
**parts** 179:9 221:7
**party** 201:17,18
202:13 219:3
245:24 253:20,23
257:4 261:6 266:5
266:20 267:1,8,18
268:6 283:24
299:4 309:22
312:20 313:24
314:4 315:6 328:1
349:15 353:3
370:22 371:4
**pass** 333:8
**passed** 315:2
**passing** 258:16
**password** 315:14
315:19
**patient** 337:17
**pause** 214:8
**pay** 180:24 183:17
264:19 274:12
275:7 313:19
315:8 337:2
**paying** 344:21

**payment** 206:21
207:1 263:21
341:9,12,14,18
**pays** 216:13
**pcs** 182:19,20
304:11
**peggy** 168:15
175:17 265:4
300:7 360:3,9
**pending** 177:4
243:5 278:3
**pennsylvania**
168:17 169:4
**penske** 185:2
**penultimate**
352:16
**people** 179:19
183:3,23 188:4,12
193:4 194:8,9
203:14 208:1,8
209:15 212:3,14
212:16,17 213:5
230:18 231:4
238:18,19 246:3
248:22 249:1,13
249:16 250:19
263:18,23 264:17
299:20 304:9
313:19 316:1,24
316:25 319:10,19
321:12 333:16
334:24 336:14
339:7 343:18
345:17,18
**perceive** 249:2
**perceived** 248:23
**percent** 179:8
183:2 204:11
205:9 215:18,19
223:20 224:15
225:25 228:3

[percent - preparation]                                                                 Page 32

271:9 272:8
337:16
**percentage**  179:9
205:7 226:23
271:7 285:4
**perfect**  220:25
248:13
**perfectly**  258:19
**performing**
237:20
**period**  233:22
251:15,19 254:4
277:8 367:5
**permission**  306:17
**permitted**  258:22
328:23
**person**  209:23
210:11,25 211:13
212:13,16,17
214:17 232:19,22
234:16 250:2
253:16 291:7,13
292:7 315:17
319:6 338:9,12,19
338:19 345:18,19
369:19
**personal**  264:16
319:9 321:8
**personally**  180:15
182:21 264:16
292:7 340:6
348:19 349:4
359:1 369:17
**personnel**  179:24
181:13 183:14
187:15,17,17
188:1 227:23
273:1,15 333:7
337:21,21
**pertinent**  339:12

**phased**  203:4
**phil**  324:22 354:4
**phillips**  168:16
175:18,21
**philosophy**  303:14
**phone**  210:18,25
211:1 213:4 291:3
**pick**  190:22
214:15 246:14
291:3 344:6
**picture**  197:18
**pictures**  246:14
**piece**  202:25
228:11 306:9
316:17 347:18
**pieces**  182:10
307:2
**pile**  259:19 317:16
**ping**  269:24
**pitch**  239:1 334:3
**place**  176:19 195:8
212:8 213:2 220:2
220:4 233:1
236:22 238:2
246:16,17 250:21
251:8 255:12
256:8 257:5
260:22 321:14
323:9 324:9 336:5
339:10 344:4
**places**  192:20
212:24
**plaintiff**  167:14
168:7
**plaintiff's**  184:1
201:9 213:12
221:18 228:15
230:3 234:20
237:16 238:24
241:2 244:21,25
248:1,3 252:5,10

254:17,21 256:22
256:23 257:1
259:6 262:23,24
268:20,25 269:1
271:16 276:17,20
281:13 284:11
288:7 289:14
293:14 300:15,16
318:5,7 332:8
357:22
**plaintiffs**  168:14
170:18,18 175:19
175:22,25 348:4
351:11 354:8
365:3,4 366:24
367:9
**plan**  201:4
**planned**  236:16,17
262:3
**planning**  208:2,7
**plaque**  238:17
**plaza**  168:17
**please**  175:15
176:12,25 177:2
242:10 255:2
345:3 359:19
362:21
**pleased**  189:21
303:18 363:19
**plus**  271:7,8 272:8
326:13 347:14
**point**  185:2 186:7
186:11 197:15
206:18 235:10
242:21 255:18
257:20 259:25
279:15 288:23
318:23 333:5
365:2 367:24
**pointed**  236:9

**points**  256:13
352:15
**policies**  330:12
349:10,19 350:19
**policy**  230:14
231:1 232:5
242:15 243:6
251:5 264:25
330:14 341:12,14
350:2 357:17
**polishing**  303:25
**polite**  292:8 312:6
**pontis**  214:23
**poor**  180:23
**poorly**  179:18,19
**position**  215:21
220:9,23 232:15
251:12
**possibility**  355:13
**possible**  264:11
277:1
**post**  315:24
**posted**  316:2
**posture**  344:10
**potential**  205:20
206:24 209:5
264:14
**potentially**  264:16
354:25
**power**  272:20
294:21
**practice**  216:22
217:3,4,8
**prayer**  345:3
**predicting**  320:15
**prefer**  299:22
**preliminary**
296:24
**preparation**
351:21

**prepared** 222:6
223:5 317:22
**prepares** 223:12
**present** 169:6
175:10,11 211:19
**president** 169:8
186:17 208:5
339:13
**presidents** 222:7
**press** 206:23
**pressure** 197:3
292:4
**prestige** 190:11
**prestigious** 238:23
**presume** 202:6,18
240:10 255:25
262:7
**pretty** 182:10
246:8,15 262:12
311:8 325:18
334:25,25 357:5
363:3,20
**prevent** 257:7
308:23 321:18
**prevention** 308:10
**previous** 194:11
206:3 225:7,23
259:15 284:20
303:7
**previously** 187:14
218:5,8 236:10
248:11 281:13
**price** 193:11
194:13 206:21
258:21,23 270:23
270:25 271:4,22
271:25 272:1,4
283:13 347:14
**prices** 283:18
**pricing** 268:9
269:10

**primarily** 186:6
256:16
**principal** 179:18
208:23
**principally** 208:1
237:24
**print** 235:13
328:16 331:19,20
331:20,21 332:3
**printed** 328:16
331:24
**printers** 182:7,9,9
182:11,12,14
**prior** 200:12
220:21 278:14,25
298:25
**privacy** 316:24,25
**privately** 184:23
362:12,23 363:4
**privileged** 316:20
317:4
**prize** 238:14,16
**probably** 211:5
216:6 222:9,11
228:2 256:5 263:8
274:1 286:15,16
286:22 302:19
305:6 309:8 311:8
311:8,25 322:25
323:23 339:2,6,19
350:13 354:4
357:11
**problem** 187:15
190:25 194:1
269:21 279:12
280:13,22 281:2
306:25 307:9
312:9
**problems** 180:25
338:22

**procedure** 167:21
**procedures** 233:12
**proceed** 176:12
209:4,4,9 241:6
336:23 367:8
**proceeding** 371:7
**process** 181:12,17
183:19,22 186:8
199:13 200:10
204:18 207:5,7,8
220:3 244:6
248:13 249:8
260:9 267:6 278:9
279:25 312:19
317:25 326:10
330:8 331:17
333:5 335:9
336:20 342:25
343:18,25 344:8
**processes** 204:3
**produce** 200:13
365:4
**produced** 167:13
195:7 364:12,23
**producer** 196:20
342:2
**produces** 197:8
**producing** 342:16
364:24
**product** 207:6
208:2,6 223:2,16
243:24 244:1
258:3,7,21 263:10
263:11 265:19,22
274:15,22 278:1
278:15 279:13,20
279:21,22,22,23
280:21 293:1,2
295:18 299:1
**productivity**
183:2 228:5

**products** 190:3
278:11 295:11
**profit** 193:17,17
196:20 197:12
227:8 228:12,13
231:20,25 232:3
342:2,16 343:16
344:14,17 348:1
**profitability** 228:8
230:15,22,25
232:9,15,19
**profitable** 190:4
227:5,12,16 231:5
232:6,17,25
234:11
**profits** 197:9,16
233:2 347:23
**program** 260:11
276:5 310:4
348:12
**programmers**
309:22 346:25
**programming**
307:22 310:17
332:5,6
**programs** 221:12
331:24 336:25
**prohibit** 341:1
**prohibited** 258:18
**prohibition** 232:9
**project** 187:1,9,21
201:4
**projects** 212:21
223:2 286:1
**promise** 337:15
340:4,9
**promised** 338:17
340:4
**promptly** 194:10
**prone** 196:2

**[proof - rci]**                                                          Page 34

proof  207:2
properly  181:12
  194:9 295:15
proposal  338:25
prospect  204:19
  205:3,14
prospective  298:6
protectant  343:13
protection  309:25
  343:10
protocol  365:19
proved  369:18
provide  219:2
  292:25 327:19
  328:12
provider  221:2
  260:10 279:4,24
  280:8 300:21
  312:20,21 332:25
providers  217:23
  221:5 300:22
  301:3,9 330:20
provides  222:23
  274:17 275:1
  298:5
providing  258:5
  291:23
provisions  167:21
public  188:24
  191:12 231:9
  305:13 339:24
  369:23
publicity  319:23
publicly  185:4
  188:17,22 189:1
  231:10 363:7
publish  258:23
  283:22
published  231:11
pull  205:14,14
  298:20 324:4

pulled  259:19
pulling  298:9,15
pumps  304:2
punctuation
  189:23 363:20
punish  338:23
purchase  194:13
  347:14
purpose  222:3
  264:3 335:14
purposes  369:20
pursuant  167:20
  370:20
pursue  367:12
put  176:18 198:24
  203:16 215:1
  225:14 240:3
  250:21 251:8
  255:12 280:24
  281:3 283:12
  286:24 292:12
  296:9 308:22
  324:16,17 326:21
  331:25 335:25
  345:10 346:23
  347:5 352:7,17
  355:3 365:1 367:3
pwedgworth
  168:18

**q**

qualified  357:11
qualifies  315:4
quality  337:21
quarter  211:10,10
  211:11 272:4
quarterly  211:6,7
  211:9
quenched  338:4
query  202:24,24
  203:4,7,7,8 323:14

question  176:22
  176:23 177:1,3,4
  191:19 197:25
  198:3 203:13
  206:12,13 213:13
  218:24 219:23
  236:5 243:5,12,13
  266:14 268:19
  270:8 277:17
  278:3,8,10 285:1
  288:9 289:2
  291:16 294:4,5,6
  294:21 326:6
  333:20 339:12
  345:17 354:13
  362:20 364:9
questioning
  332:10 352:22
  360:14,15
questions  235:1
  241:16 288:25
  289:12 300:1,3
  301:23,25 302:9
  303:7 305:9,17
  351:13 357:19
  363:12 364:4,10
  365:16 367:18
quickie  246:16
quickly  181:9,15
  197:14
quieted  254:12,15
quit  216:24
quite  178:23 179:8
  188:14 203:2
  223:22 238:2
  252:12 253:6
  254:22 261:7
  263:1 275:9
  320:12 359:4
quota  280:16,24
  281:3

quote  347:11
  353:19
quoted  239:16
quotes  193:20
quotient  187:24

**r**

r  168:1 169:1
  175:1 214:11
r&r  214:22
racing  186:11,13
  338:8 339:18
rahal  358:14,15
  359:5
raise  282:17
raised  269:10
ran  346:23
randall  322:3,22
randolph  322:10
rang  291:3
rank  192:25
ranked  192:17
  343:17
ranking  193:3,9
  193:12,21 194:3
rarely  199:8
  211:14
rate  205:3 206:18
  306:13,20
rbdr  274:16,22
  275:12 276:5
rci  202:18 203:14
  203:16 223:19
  224:2,22 225:6,19
  226:4,19 227:2,5,8
  227:11,15 228:8
  230:16 232:10,20
  232:24 233:4,8,16
  234:10 239:15
  257:21 259:24
  260:9,11 261:2,3
  261:11,11 262:1,4

**[rci - referred]**                                                    Page 35

268:11 269:10,18
272:10,16 273:1,4
273:13,16 274:7
284:17,18,24
285:14 292:18
293:5 294:23
295:2,3,14 299:3
302:2,9,10 326:16
329:17 354:14
**rdr**  167:17 371:17
**reach**  278:1
279:21,22
**react**  302:23
**read**  198:16,18,22
225:15 234:24
255:8 263:8
289:17 294:15
307:6 310:4 320:1
358:6,7 363:22
369:12
**readily**  264:13
**real**  258:1 259:22
260:16,21 261:9
261:13,16,22
265:19,23 266:5
266:20 267:9
282:21 283:19
284:2 337:22
**reality**  231:23
**realize**  227:19
235:23
**realized**  236:6
338:17
**really**  189:3 192:5
198:22 203:1
224:11 233:21
238:1 254:22
261:7 276:21
283:12 284:1
285:22 290:14,22
294:23 295:8

297:23,24 317:23
319:15 320:24
325:16 327:8
331:17 332:4
334:6,6 336:23
337:22 338:14
340:7 350:2 359:8
359:8 365:12
**reason**  179:18
197:4,8 202:3,7
213:25 215:2
217:18 222:12
227:17 228:7
229:9 230:21
231:14 232:8
233:7 236:10
244:5 249:21
259:18 264:12
299:18 308:21
335:22 346:14,14
346:16 369:3
**reasons**  194:4
236:13 247:10
256:16,17 364:7
364:16 371:1
**rec**  311:17
**recall**  192:8
207:15 208:4
213:1,24 234:15
242:5 250:20,24
251:1,14 262:12
262:15 263:6,16
264:9 284:9
292:19 301:24
318:20 322:4
332:10 351:16
356:5 358:2,4
362:8
**receipt**  370:24
**receivable**  220:9

**receive**  202:4
219:21 221:25
238:21 239:4,23
241:21 252:18
254:24 256:25
259:12 263:3
271:10,18 277:3,7
288:10,18
**received**  213:19
218:16 238:25
248:5 250:16
251:15 301:24
**receiving**  306:1
**recess**  210:5 237:7
240:19 265:12
287:8 325:25
366:19
**recipient**  328:22
**recipients**  278:22
280:10
**reciprocal**  217:4,8
217:22,25
**recognize**  242:3
**recognized**  294:8
**recollection**
255:10 263:7
**recommendation**
280:24 299:11
**recommending**
297:5
**recompense**
236:14,24
**record**  167:22
175:3,16 184:4
191:13 210:4,7
225:14 237:4,6,10
240:18,20 241:4,5
241:7 265:11,15
270:3 287:4,5,6,10
307:24 309:4
320:2 323:4

324:17 325:19,24
326:2 342:13,14
364:3 366:8,9,11
366:16,17,20,22
367:25 368:3
370:18 371:9
**recorded**  175:4
**records**  228:1,2
306:13,18,19,21
307:3,7,13,15
309:14 319:2
320:20 331:25
346:13
**recover**  180:5
187:11 188:9
192:10 194:7
197:13
**recovered**  192:6
**recovering**  233:13
**recovery**  275:1
**recurring**  225:6
225:19 284:18,24
284:24 285:14,15
285:15
**red**  204:25
**reduce**  278:22
**reduced**  327:1
**reed**  322:3,22
**reed's**  322:10
**refer**  229:1 253:11
273:22
**reference**  234:25
253:24 256:9
259:18 269:6
**references**  256:2
256:13,16
**referencing**  256:2
**referred**  219:9
226:7 292:22
361:24

**referring** 236:1
253:17
**reflect** 170:20
201:19 271:21
**reflecting** 356:21
**refresh** 255:10
**refuse** 179:19
**regard** 193:21
195:3,13 199:1
200:14 232:24
249:10 251:7
264:5 266:20
268:9,11 269:22
271:22 272:16
274:7 286:17
363:11
**regarding** 210:11
212:17 218:1
219:17 233:10
254:11 255:19
**regards** 233:8
**register** 249:14
**registered** 319:5
**regrowing** 354:6
**regular** 288:19
**reining** 244:15
**relate** 241:17
280:21 290:11
326:7
**related** 300:19
305:18 350:8,18
371:6
**relates** 199:13
233:16 277:25
278:15 293:20
**relating** 322:3
**relation** 230:16
**relationship** 215:7
215:10 216:17,22
217:2,22,25 219:2
219:5,9,11,16,20

221:1 287:13,14
287:14,19,22
301:14
**relationships**
215:25 216:4
286:2 287:16
288:2 297:3
299:12 300:20
301:2,9
**relative** 371:8
**relatively** 331:18
**relearn** 335:25
**released** 242:14
244:19 251:17
255:8
**relies** 295:20
**religiously** 232:5
**remainder** 300:2
**remaining** 220:15
220:18 288:24
289:2,3
**remarkable**
253:15,18
**remember** 184:16
201:24 202:8,10
208:11 209:7,20
213:7 227:21
232:21 235:19
240:5,8 242:8,23
267:2 319:17
329:4 332:20
342:3 345:11
357:18 363:18
**reminder** 297:16
**remindertrax**
297:14
**remote** 274:18
333:15
**remotely** 274:23
324:11

**removed** 247:9
**renewal** 201:6
**repair** 257:25
260:2 261:9,13,16
265:19,24 266:5,9
266:11,12,21
267:3,5,9,11,15,16
267:16,20,23
268:3 272:21
275:17 283:20,22
283:24 327:6
335:15 336:20
341:5
**repeat** 181:15
273:5 287:18
**replacement**
272:21 275:17
**replicate** 207:8
**repman** 297:20,23
**report** 221:22
222:3,11,25
224:11 225:1
247:2 322:3,9
323:3,13,18 324:3
346:10
**reported** 167:18
**reporter** 175:11
176:11 370:14
**reporter's** 170:9
370:8
**reporters** 304:19
**reporting** 202:25
203:3 328:6,14
329:16
**reports** 200:13
221:6,9,11,25
222:19 248:22
249:2 253:14
315:15 322:10
323:18 324:1
331:19

**representative**
168:8
**representing**
175:21,24 176:2,7
192:23
**represents** 220:15
256:4
**reputation** 297:24
303:20
**request** 258:10
260:13
**requested** 286:24
370:22 371:3
**requests** 283:2
**require** 293:1
294:23 348:11
**required** 283:12
313:5,10 339:13
**requirement**
183:3 276:11
**requires** 257:22
302:24
**research** 245:24
274:25
**reservation** 327:7
**reserve** 288:24
289:2,3 300:2
360:8 364:5
367:11
**resisted** 337:24
**resolution** 280:20
**resources** 313:8
323:22
**respect** 305:21
331:9 354:18
356:4,5
**respond** 242:13
280:2 364:11
**responded** 218:16
**responding** 218:23
253:3

**response** 201:20
206:17 219:8
235:7 299:11
305:16 322:17
323:2 364:25
367:19
**responsibilities**
312:13
**responsibility**
274:23 283:1
**responsible**
207:12 308:3
312:17,22
**rest** 239:20 255:15
363:4
**restate** 177:1
**restatement**
266:23
**restore** 309:9
**restricted** 255:20
**restriction** 255:7
**restrictions** 314:4
**result** 191:6 227:3
232:5 298:23
329:17 336:13
346:17
**resulting** 278:16
**results** 197:22
**retention** 310:22
**retired** 339:15
**return** 196:10
**returned** 370:24
370:25
**reveal** 317:4
**revenue** 223:19
224:19 225:6,20
226:4 228:17,23
228:25 229:6
233:4,8,16 234:6
235:22 236:6,13
236:18 284:18,24

285:13,14,15
342:2,15
**revenues** 226:20
**reverserisk** 292:23
293:9,11 295:18
350:2
**review** 184:6
198:12 201:15
218:10 230:5
235:4 237:17
241:16,19 242:2
242:10 244:25
248:3 252:16
256:23 262:24
276:20 293:17
296:15 318:10
**reviewed** 198:18
252:10 254:20
259:10 269:1
361:24
**reviewing** 184:16
**revolves** 211:18
**reward** 237:20
**rewards** 237:23
**rework** 341:24
**reycid0074420**
173:18
**reycid0074422**
173:18
**reymdl00045179**
174:20
**reymdl00045348**
171:14 201:13
**reymdl00045445**
172:18
**reymdl00045556**
171:24 230:4
**reymdl00050127**
172:14
**reymdl00061987**
174:13

**reymdl00061988**
174:13
**reymdl00068321**
172:21
**reymdl00068325**
172:21
**reymdl00071272**
173:4
**reymdl00071273**
173:4
**reymdl00238490**
173:7
**reymdl00238491**
173:7
**reymdl00238492**
173:11
**reymdl00238493**
173:11
**reymdl00244021**
171:11 184:5
**reymdl00244025**
171:11
**reymdl00263055**
218:10
**reymdl00263065**
173:14
**reymdl00263066**
173:14
**reymdl00263304**
171:4
**reymdl00333091**
172:11 241:15
**reymdl00333092**
172:11
**reymdl00470609**
173:21
**reymdl00503332**
174:4 276:18
**reymdl00503335**
174:4

**reymdl00583889**
174:17
**reymdl00583890**
174:17
**reymdl00590725**
172:4
**reymdl00590727**
172:4
**reymdl00611282**
171:7
**reymdl00611284**
171:7
**reymdl00661495**
172:7
**reymdl00661497**
172:7
**reymdl00719700**
171:21
**reymdl00719787**
171:21
**reymdl00722459**
174:10
**reymdl00722550**
174:10
**reymdl00723521**
174:7
**reymdl00723612**
174:7
**reyn** 275:7
**reynolds** 169:8,8
171:20,20 174:6,6
174:9,9 176:2,3,7
176:8 177:9,14,15
177:20 184:21,25
185:24 188:16,25
190:8 195:4 196:9
196:9 197:20
199:1,9,22,25
200:8,9,16,18,25
204:8,11 207:12
208:6,16 210:11

**[reynolds - salesperson]**                                          Page 38

212:16 214:23
215:6,11,15,19,24
216:3,11 217:8,10
219:12,17 220:19
221:1,23 222:3,15
222:20 223:6,11
229:5 231:2,8
232:6 233:23
237:19 243:7
245:20 246:25
247:15 250:4,7
251:15,17 255:11
257:7 260:10,10
264:5 265:18,22
266:4,21,21
267:25 268:2,8,10
269:9 272:10
274:6,12,12 275:7
275:13 278:11,15
278:17,21 279:12
279:13 280:9
287:15 290:1
293:6 295:4
296:22 297:3,7,8
297:10,14,21
298:2,4,9,16,19,20
301:13,14 302:5
302:13,15 303:11
303:11,23 304:13
304:14 305:4,4
306:10,14 313:20
314:8,20 315:3
316:11 325:7,13
327:18,18 328:2,6
329:23 330:12,22
331:8,14 332:19
333:1,11 340:16
341:20,22 348:7,7
349:14 350:8,18
350:25 351:2,22
356:4,16 358:11

**rice** 320:9
**rick** 184:15 338:6
  338:18 339:16,17
  340:7
**rick's** 338:7,7
**rid** 203:8
**right** 185:14 188:9
  198:8 202:17
  213:7 238:20
  251:20 252:15
  260:17 272:24
  278:3 284:1 289:4
  289:5 290:2,13,25
  291:7,13 293:6
  294:23,24 295:4,8
  295:9 296:2,10
  297:13 298:10
  300:6,16 301:22
  304:6 306:16
  311:19 316:24
  322:2 324:12
  325:6 330:19
  331:10 332:16
  336:18 337:6
  341:20 342:6
  345:8 348:2 352:6
  354:20 355:2,6,10
  355:17 357:2,3,8
  357:13 358:20
  362:24
**rights** 258:20
  367:11
**ring** 201:25
**rise** 234:13
**rising** 337:9
**risk** 178:8,9,15
  178:24 187:23
  188:11
**risks** 178:6,11
  186:24 187:2,9,10
  314:20

**ro's** 260:2,2,21
**robert** 167:8,12
  168:15 170:4
  171:3,13,23 172:3
  172:13,17,20
  173:3,6,10,17,20
  174:12,19 175:4
  176:13 237:2
  318:13 368:2
  369:2,12,14,17
  370:9,16
**role** 217:17 239:13
  239:16
**rollbacks** 249:5
**ron** 171:17 174:16
  184:16 185:6
  208:4 209:23
  212:14 293:15
  345:18 361:19
  363:13
**ronald** 170:16
  171:10
**room** 353:20
  367:8
**ros** 261:22
**roughly** 195:13
**routinely** 229:14
**row** 324:14
**rows** 324:14
**rude** 309:21
**rule** 370:20
**ruled** 364:23
**rules** 167:21
  176:18,20
**ruling** 364:25
**rulon** 171:6
**run** 221:6,12
  222:9 231:2
  248:22 249:2
  267:6 282:24
  291:18 309:10

315:14 322:10,10
323:3,15 324:3
328:16 331:20,24
344:12 347:4
**running** 186:12
  222:24 253:15
  274:20 306:3,4,11
  322:17 325:18
**runs** 322:16
  323:15
**rust** 343:12
**rwallner** 168:19
**ryan** 168:21 176:9
  176:9 182:18
  206:10 216:1
  218:21 226:22
  243:14 250:10
  271:1

---

                    **s**

**s** 167:14 168:1
  169:1 175:1 294:5
**sadly** 241:7
**salary** 238:21
  273:4,16
**salemen's** 305:9
**sales** 178:10 179:7
  190:16 191:15
  192:9,25 193:16
  193:21 197:10
  205:7,10 206:21
  222:20 224:3,7,7
  224:12 228:12
  255:6 256:12
  259:3 261:1 305:9
  332:18 342:25
  347:1 351:12
  352:1,2 363:17,25
**salesman's** 205:4
**salespeople** 189:22
**salesperson**
  205:13 206:18

263:20
**salespersons**
    351:21
**san**  212:1
**sat**  305:14 308:15
    308:21
**satisfactorily**
    330:9
**saturday**  247:6
**save**  326:13
    335:15
**savvy**  359:8
**saw**  185:13 197:22
    232:11,14 311:17
    315:24 345:6
**saying**  193:1,20,24
    194:1 202:16
    203:15 225:16
    227:15 246:6
    261:5 277:22
    280:3 306:2
    308:10 337:10
    344:10 357:18
    359:19,20
**says**  188:8,16
    190:7 192:4
    213:17 224:5,18
    228:17 229:8
    235:19,20,21
    239:7,8 241:23
    244:18 247:8
    249:22 253:4
    255:6 260:1,5
    272:7 279:12,19
    281:22 290:19
    297:6 298:8
    312:15 313:24
    321:19 322:16
    328:1 352:12
    358:22

**scale**  187:8 347:6
**scenes**  239:23
**schaef**  296:20
**schaefer**  171:13
    171:23 172:3,13
    172:17,21 173:3,6
    173:17,20 174:19
    201:20 204:1
    229:19 230:10,20
    235:7,7,16 236:4
    238:25 239:7
    240:10 251:24
    252:4 253:2 255:2
    261:18 289:15
    296:13 297:2
    357:24 358:9,22
    359:17
**schaefer's**  217:17
    232:14,20 234:10
    240:4,7 273:4,16
    299:11 300:19
**schafer**  173:10
    174:12
**schedule**  211:4
    212:20
**scheduled**  322:9
    323:8 324:1
**scheduling**  220:3
**science**  320:9
**scientific**  199:7
**score**  205:15
    206:22
**scott**  169:7
**scrapped**  347:11
**scratched**  281:25
**scratching**  282:1
**screen**  197:2
    246:19 341:2
    344:2 346:10
**screens**  341:2

**screenshots**
    252:13
**se**  353:19
**sea**  300:8
**seal**  369:21
**searching**  242:5
**second**  182:22,22
    183:3 185:4
    211:10 235:1,6
    239:6 241:17,24
    254:3 255:5 290:5
    335:2 337:7
    352:16 362:11,18
**secondly**  231:1
    233:1 313:13
**secret**  304:13
**section**  352:22
**secure**  302:14,15
**security**  233:11,11
    237:1 239:14
    245:10,19,19
    246:24 247:1,5,9
    247:15,19,21
    248:8,18 249:6,8
    249:11,17 250:8
    250:17,21 251:2,6
    251:8,16 253:1
    254:11 255:11
    256:3,4,5,13
    260:12 290:8
    302:21,24 303:2
    303:10,15,17,21
    304:3,25 305:3,10
    311:16,24 312:18
    315:3,7 320:24
    321:4,13 327:24
    330:12,14 352:8
    352:13,17,23
    353:2,22,24 356:5
    357:17 358:2,11

**see**  185:8,11,19
    188:18 190:8,12
    190:18 192:6,13
    192:20 199:5
    200:6,7,12 205:6
    219:3 222:17
    223:16,20,21,24
    224:3,19,21 225:8
    225:23 226:1,2
    228:19 232:13
    235:24 249:25
    252:9 253:20
    255:2 271:24
    278:1 281:10
    285:2,17 286:10
    292:9 298:12,16
    298:18 299:6
    300:21 322:11
    324:13 352:8,12
    352:18 357:24
    360:20 361:16
    364:21
**seeing**  224:5 245:4
    285:4
**seen**  195:16 196:5
    196:6 200:4
    213:13 218:12
    230:8 323:24
**seesaw**  353:16
**sell**  182:23 193:10
    193:14 196:12,14
    198:2 243:20
    244:1 271:5
    297:17 311:13
    343:8
**selling**  341:22
**send**  206:24
    246:16,20 279:3
    313:2 319:5 329:7
    331:21

**[sending - slowing]**                                                      Page 40

**sending**  280:7
    318:22
**sends**  186:4
**senior**  208:5 222:6
**sense**  312:25
**sensible**  342:11
**sensitive**  227:22
**sent**  198:12 201:21
    213:17 223:8
    277:13,14 320:1
    322:7 328:17
    343:6
**sentence**  185:9
    188:15 189:12
    192:4 202:23
    290:5 297:6
**separate**  273:23
**september**  171:7
    171:10 184:9
    322:8 334:1,2
**series**  246:14
    322:2 331:24
    365:16
**serious**  187:1,9,20
    254:23 278:20
**server**  272:19,20
    272:20,21,21
    273:15 274:19,24
    275:2,5,16,25
    276:3,8 306:10,12
    306:14 318:22
    322:11,23,24,24
    325:17
**servers**  182:5
    273:24 306:23
    307:7
**serves**  320:17
**service**  259:22
    265:19,22 267:4
    267:18 268:2,8
    273:14 274:25

279:24 280:7
    297:16,17,18
    311:3 312:20,21
    327:7 335:10,23
    336:1,22
**services**  190:11
    223:16 239:9,12
    286:8 297:4
**set**  203:3 204:4
    221:16 296:10
    323:9 336:5
**sets**  187:16
**seven**  188:25
    189:3 199:8,23
    212:23 310:22,25
    365:8 367:22
**shaken**  214:15
**shakes**  343:4
**shape**  304:6 346:6
**shauna**  167:17
    175:11 370:13
    371:17
**sheer**  187:4,8
**sheppard**  169:3
    176:6
**sheppardmullin....**
    169:5
**shocking**  316:6
**shook**  338:6
**shoot**  308:6
**shop**  267:6
**shopping**  205:15
**short**  199:17,19
    210:5 237:7
    240:19 245:5
    287:2,8 312:15
    320:3 321:2,6,11
    325:25 366:19
**shorten**  335:17
**shorthand**  167:18
    370:13

**shortly**  345:9
**show**  183:25 201:8
    213:11 218:4
    221:17 222:19
    228:14 230:2
    234:19 237:15
    241:1 244:21
    247:25 252:4
    254:16 256:21
    259:5 262:22
    263:19 268:20,24
    271:15 276:16
    281:12 284:10
    288:6
**shown**  191:5,20
**showroom**  263:19
    298:13
**showroommagnet**
    263:9,13,16 264:1
    264:6 298:1,13
**shows**  322:9 323:8
    323:13
**shut**  306:24
**sic**  289:23
**side**  207:12 224:18
    341:7 344:1
**sign**  324:2 334:10
**signature**  170:8
    369:1,13 370:21
    371:1,15
**signed**  184:16
    205:13 226:13
    340:12
**significant**  190:16
    191:15
**signs**  199:3
**silver**  204:25
**similar**  217:22
**simple**  288:9
    331:18 332:4,6
    334:25 338:19

**simplest**  312:24
**simply**  198:1
    270:8 305:12
    317:16 326:15
    342:10
**single**  364:9
**sir**  300:17 316:20
**sis**  325:7 353:25
**sit**  202:1 211:19
    274:2 344:1
    351:16
**sitting**  183:23
    242:4
**situation**  188:11
    201:24 203:5
    204:2 208:19
    263:25 304:3
    307:20 309:10
    310:15 319:13
    320:17 326:7
    327:13 343:24
    353:5 354:22
    355:4,5,12
**situations**  178:17
    191:22 195:10
    251:22 274:14
    345:2
**six**  212:23 284:23
    285:7 300:4
**size**  187:4 188:5
    262:17 294:16
**sizeable**  318:21
**sized**  262:18
**skill**  310:17
**skipped**  318:7
**sky**  324:5
**skype**  213:4
**slight**  185:7,11,17
**slot**  332:5
**slowing**  306:22

**[slowly - starting]**                                              Page 41

| | | | |
|---|---|---|---|
| **slowly**  306:3 | **solutions**  324:23 | **speaking**  267:20 | **staffs**  359:3 |
| **small**  221:9 | **solved**  279:12 | 351:21 | **stamped**  184:5 |
| 227:22 231:2 | **somebody**  203:6 | **special**  212:7 | 201:12 218:9 |
| 263:21 269:18 | 207:19 209:1 | 257:22 261:10 | 230:4 241:14 |
| 297:11 298:5 | 225:10 227:19 | **specific**  213:2,16 | **stand**  183:14 |
| 313:7 334:22 | 244:14 245:13 | 213:24 249:6,20 | 189:18 191:8 |
| 346:8 359:7 | 246:17 261:18 | 250:11 264:9 | 226:16,19 227:3 |
| **smaller**  188:3 | 279:12 291:4 | 284:4 306:4 324:3 | 229:3 233:9,16 |
| 359:5 | 292:11 308:5,8 | 330:14 357:17 | 235:22 236:2,6,22 |
| **smart**  317:25 | 310:24 326:10 | 359:10 | 330:8 344:24 |
| 337:14 | 350:10 353:6 | **specifically**  190:1 | 348:15 361:13 |
| **smoothly**  180:1 | **someday**  239:23 | 190:2 207:15 | 363:13 367:4 |
| **snail's**  336:24 | **somewhat**  188:22 | 208:12 233:11,15 | **standard**  182:12 |
| **snapshot**  309:4,6 | **son**  318:14 320:2,8 | 235:11,19 239:21 | 193:4 |
| **sniffed**  296:7 | 355:3,8 | 245:22 254:1 | **standardize** |
| **software**  178:17 | **soon**  351:10 | 257:12 284:7 | 335:21 |
| 178:18,19 179:20 | **sophisticated** | 286:21 | **standardized** |
| 179:25 181:16 | 279:20 359:4 | **specified**  216:23 | 182:20 |
| 187:20 194:10 | **sorry**  177:12 | **specifies**  257:11 | **standards**  179:11 |
| 202:25 203:1,3,9 | 184:20 186:20 | 312:21 | **standing**  299:25 |
| 203:10,12 213:6 | 195:24 209:20 | **speculative**  357:7 | **standpoint**  191:4 |
| 219:12 231:17,23 | 223:22 225:4,18 | 357:10 | 220:16,24 222:24 |
| 246:5,10,11,12 | 232:21 245:4 | **speech**  312:7 | 230:15 231:2,13 |
| 257:23 258:6 | 250:24 266:2 | 353:21 | 244:11 261:1 |
| 261:14,15,20 | 272:14 285:10 | **spelling**  189:21,23 | 273:9 296:5,5 |
| 266:11 267:25 | 316:20 329:2 | **spend**  222:12,12 | 303:2,21 304:3 |
| 268:3 276:9,10 | 330:2 356:10,11 | 285:22 302:24 | 307:22 312:10 |
| 282:22,25 283:4 | 356:11 360:9 | 311:2 339:17 | 321:8 335:5 |
| 283:10 286:1 | 363:9 | **spending**  303:24 | 341:23 342:9 |
| 295:19 297:19 | **sort**  189:24 228:2 | 317:15 | 363:18 |
| 303:15 306:10 | 300:8 333:1 348:5 | **spent**  356:5 | **start**  177:7 241:24 |
| 307:6 308:25 | 353:20 359:11 | **spin**  311:14 | 264:15 267:15 |
| 313:16,20,22,25 | **sounds**  189:2 | **spite**  193:19 | 285:6 290:14 |
| 314:7 315:3 | 227:20 315:23 | **split**  365:8 | 319:11 334:23 |
| 331:24 333:9 | **source**  180:21 | **spoke**  208:7 | 347:17 |
| 335:6 339:4,4,5 | 295:20 | 209:12 287:15 | **started**  176:17 |
| 347:18 | **space**  325:3 | **spots**  324:15 | 205:25 206:1 |
| **sold**  193:5,6 223:1 | **speak**  200:3 | **square**  168:11 | 300:4 305:25 |
| 297:10 346:13 | 207:21 209:18 | **sta**  222:22 | 306:1,7 317:15 |
| **solution**  223:16 | 284:7 | **staff**  183:8 | **starting**  185:18 |
| | | | 239:14 304:11 |

**[starts - swear]**                                                                    Page 42

| | | | |
|---|---|---|---|
| **starts**  312:10 | **stick**  198:19 | **structure**  187:18 | **suffered**  236:11 |
| **stat**  195:15 199:5 | 300:14 342:9 | 335:13 | 367:6 |
| **state**  167:18 | **sticky**  342:6 | **stuff**  308:13 | **suite**  167:20 168:5 |
| 175:15 189:8 | **stock**  186:11,12 | 310:22 311:12 | 168:11 169:4 |
| 254:10 303:18 | **stockholders** | 340:13 344:6 | 175:13 278:11 |
| 369:15,23 370:14 | 292:5 | **stupid**  279:10 | **sum**  283:15 |
| **stated**  167:22 | **stole**  346:10 | 299:8,9 309:23 | 351:20 |
| 187:14 267:25 | **stop**  236:23 | **styled**  167:15 | **sumner**  168:11 |
| 285:22 288:20 | 279:25 280:7 | **stylus**  197:2 341:7 | **super**  211:25 |
| 357:16 | 308:23 347:7 | 344:4,11 | **superior**  324:17 |
| **statement**  180:8 | **storage**  274:12 | **subject**  230:13 | 324:23 333:18,21 |
| 181:6 183:13 | 275:6,24 276:13 | 236:25 242:1 | **supervise**  272:22 |
| 187:2 188:20,21 | **store**  253:13 276:6 | 245:15 252:25 | **support**  232:3 |
| 189:6,8,15 190:21 | 276:11 323:11,12 | 269:23 293:16 | 249:14 253:7 |
| 190:24 191:8,25 | 323:12 | 296:13 353:2 | 282:10 305:8 |
| 200:6 208:14 | **stored**  351:1,3 | 367:10 | 333:16 |
| 230:19 249:19 | **stores**  275:12 | **subscribed**  369:19 | **suppose**  177:23 |
| 267:12 288:8 | 323:10 | 371:11 | **supposed**  181:13 |
| 295:7 | **stories**  339:3 | **subsequent**  220:22 | 235:23 241:10 |
| **statements**  222:8 | **story**  255:18 | 269:8 281:7 | 301:21 |
| 234:2,4,8 300:19 | 309:21 334:21 | **subsidiaries**  168:8 | **sure**  178:17 |
| 367:10 | **straightedge** | **substance**  283:15 | 184:22,23 202:10 |
| **states**  167:1 175:6 | 225:10,24 | 299:20,21 351:20 | 208:11 215:21 |
| 358:12 370:1 | **straightforward** | **substantial**  262:13 | 224:5 240:10,11 |
| **stating**  363:18 | 198:3 261:7 | 264:14 292:24 | 247:17 249:3 |
| **statistical**  191:4 | **strategy**  354:25 | **substantially** | 272:23 280:12 |
| **statistics**  191:11 | **strawsburg** | 348:15 | 311:18 324:1 |
| 191:20 222:23 | 172:10 173:14 | **subtly**  290:24 | 327:1 358:7 363:3 |
| **stats**  191:4 | 174:3 208:9,10 | **success**  205:17 | 365:25 |
| **status**  363:4 | 214:25 218:24 | 223:4 231:16 | **surprise**  195:17,22 |
| **stay**  241:5 276:24 | 219:8 257:16 | 337:20 | **surprised**  205:9 |
| 340:9 365:14 | **stray**  244:10 | **successes**  239:22 | 226:25 305:13 |
| **stayed**  256:8 | **street**  168:11,22 | 239:25 | 356:2,3 |
| **staying**  246:17 | 175:13 | **successful**  207:9 | **surprising**  192:5 |
| **stays**  200:9 | **strike**  197:24 | 231:14 246:8 | **suspended**  255:7 |
| **stealing**  319:19 | 221:14 225:3 | **sudden**  347:17 | 255:11,20,21 |
| **step**  220:9 | 294:3 | **sue**  301:13 | 256:14 |
| **stepped**  309:16 | **string**  277:11 | **sued**  299:18 | **suspension**  255:4 |
| **steps**  366:24 | **strong**  347:20 | 301:13 346:17 | **suspicious**  246:2 |
| **steve**  212:14 213:2 | | **suffer**  281:2 | **swear**  176:12 |
| 289:22 292:4,6 | | | 344:24 |

**[switch - terms]** Page 43

**switch** 177:10
330:22,24 331:2
331:14 334:16,17
334:19,20,21,22
340:1,3 345:8
**switched** 334:14
**switches** 177:14
178:3,11,11
180:12,19 196:9
**switching** 180:4
181:2 332:25
**sworn** 167:14
176:14 370:17
371:11
**sync** 242:2,7,11
**synchronization**
242:2,11 244:6
**synergies** 294:18
**system** 180:24
181:4,14,18
183:15 199:14
248:13 258:1
263:17 266:21
267:4,18 268:8
273:23 293:10,12
296:6,8,9 302:14
302:16 303:10,19
306:3 311:16
313:1,16,17,21
314:20 317:17,20
323:18 325:7
327:10,13,18
328:11 331:23
336:12 337:5
341:21 344:5,12
346:9 347:1,2
348:11 349:10
353:6,8
**systems** 167:4
175:6 219:17
220:7 229:4

236:24 292:25
297:12 304:11
306:8 335:6 370:4

**t**

**t** 318:13
**tab** 332:5
**table** 188:4 282:15
341:8 344:2
**tadler** 168:16
175:18,20
**tag** 243:20
**take** 177:2,3,5
180:4 183:8
187:11,11,21
188:8,13,14 210:2
220:2 231:17
240:14,15 241:8
257:3 260:1,20
261:21 263:20,23
276:22 298:7
303:5,5 309:2,4,5
317:19 318:10
321:13,20 325:20
333:8 344:25
345:5 364:9 365:5
**taken** 167:14
371:8
**takes** 193:10 194:6
196:25 205:5
220:3 228:2 254:2
272:22 274:22
302:20 344:4
**talk** 204:4 211:20
213:3 219:19
233:10 255:4,9
263:19 266:8
270:5,6 276:23
290:13,16,25
291:4,8,13 303:6
316:10,19 317:1
320:11 340:15

348:6
**talked** 209:16
257:6 273:6
292:17,20,20
316:9 327:16
328:11 330:19
336:9 338:2,5,15
361:5
**talking** 210:15
226:9 242:6,6,8
245:6 256:13
291:8 305:21
311:3 316:10,22
316:23,24,25
326:5 338:8
341:25 342:14
346:1 358:10
**talks** 190:3 202:24
248:21
**tap** 341:11,13
**tape** 220:5,5,17
274:21
**taught** 187:18
290:15
**tax** 296:4
**team** 217:17
223:11 237:25
238:1,10,13 239:1
239:2,2,9,12,17
240:4,4,7 338:17
**teams** 237:20,25
238:1
**technical** 305:8
340:25 341:23
**technicians** 336:24
337:11
**techniques** 196:24
248:12
**technology** 325:13
**techs** 337:8,18

**telephone** 167:17
213:6 214:12
**telephonic** 211:7
**telephonically**
168:15
**tell** 183:1 217:15
227:4 241:3
242:22 300:7
304:23 309:7,16
319:6 350:13
360:1 361:4
365:14
**telling** 344:10
**temporarily**
203:22
**temporary** 249:5
249:9,16
**ten** 188:24 200:4,5
366:25 367:2,4,8
**tend** 211:19
213:23
**tends** 212:5
**tens** 281:9
**tenure** 200:9,16
201:5
**term** 178:4 199:17
199:19,20 230:15
231:16 321:2,6,11
**terminals** 347:4
**terminate** 297:3
299:11
**terminated** 258:11
258:14
**termination**
258:10 334:7
**terms** 177:24
267:14 271:3
274:4 301:2,25
302:1,16 311:1
320:18 342:1
350:7

**terrible** 304:4
**terry** 249:22
**test** 263:18,20,24
  298:7 367:7
**testified** 176:14
  219:6 221:22
  248:11 302:4
  351:20 354:12
  356:1
**testify** 367:15
**testimony** 356:6
  370:18
**tests** 333:8
**texas** 167:18,20
  168:5 175:14
  370:14
**thank** 237:2
  241:13 265:9
  266:24 284:22
  289:21 300:6
  354:7
**thanks** 225:24
  300:3
**theoretical** 273:9
**therefor** 371:2
**theron** 171:3
  176:13
**thing** 187:5 189:24
  221:13 228:2,4
  238:20 261:10
  278:14 299:9
  316:13 334:6
  337:15,19 347:12
  353:20 354:25
  359:12
**things** 196:6 221:6
  231:22 236:14
  245:25 248:19
  273:19 274:4
  278:7 290:24
  291:14,18 299:7,8

302:3 303:5
313:11 320:11
327:5 337:6 343:9
343:9 345:24
**think** 177:23
  180:7,21 181:23
  182:21 183:12
  186:6 188:21,23
  188:24 189:8
  190:22 191:19
  196:19 204:17
  206:13 207:18
  209:21 210:14
  213:1,5 214:13,20
  216:2 217:18,19
  218:5 226:23
  227:2 228:16
  231:22,25 240:6
  245:12,12 252:14
  256:4 264:13
  266:16 273:18
  274:2 277:14
  280:3 283:7
  286:15,21 288:24
  292:3,4,22 294:3
  294:12,20 298:22
  299:19,21 300:10
  304:2 310:22
  314:7 315:4
  317:20 318:5
  319:14,21,22,23
  320:24 324:20,22
  326:6 327:2 329:3
  333:20 337:3
  339:23 342:9,12
  342:19 357:5
  361:4 363:11,18
  366:5
**thinker** 321:12
**thinking** 329:9,14

**third** 201:17,18
  202:13 211:11
  219:3 223:23,24
  227:1 245:24
  253:23 257:4
  261:6 266:4,5,19
  267:1,8,14,18
  268:6 283:23
  299:4 309:22
  312:20 313:24
  314:4 315:6
  326:21 327:19,25
  328:7 349:15
  353:3
**thought** 189:25
  229:22 269:7
  308:22
**thousands** 281:10
  308:20 311:3
**three** 181:24 182:1
  211:6 214:6 262:9
  286:5,7 320:3
  324:16 335:14
  365:16
**throat** 365:17
**throw** 229:13
  307:7
**throwing** 279:24
  291:23
**thrown** 232:1
**thumb** 221:9
  331:22
**thumbed** 286:15
**tight** 248:19 249:3
  303:20
**tighten** 193:13
**time** 177:2 185:2
  185:23 186:7,12
  198:23 201:6
  202:17 203:18,23
  209:25 210:3,6

212:8,11 213:2
214:5 215:15
216:9 218:10
220:13 223:19
224:19 228:1
230:5 233:22
237:6,9 239:14,16
240:17 245:21
247:11 249:7
251:15,17,19
255:7,25 258:1
259:21,22 260:16
260:21 261:9,13
261:16,22 262:24
265:11,14,19,23
266:5,20 267:9
268:13 270:3
277:8 280:21
281:10 282:21,24
283:8,19 284:2
285:13,15 287:9
288:24 289:3,3,25
300:2 305:1,7,7,9
309:11 320:16
323:2 324:3 325:8
325:11,24 335:15
336:8 339:18
345:3 350:5,14
354:7 359:14
360:4,6,8 364:2,3
365:15 367:5
**timeliest** 258:2
**timelines** 269:5
**times** 180:9 203:6
  211:6,15 212:23
  273:6 322:18
  328:6 344:18
**tire** 343:10
**title** 186:15
**titular** 186:9

**[today - understand]**                                                                 Page 45

**today**   170:16
175:2 176:20
177:7 199:3
287:15,23 295:12
295:18 355:21
361:16,21 367:10
367:15,16
**today's**   368:2
**todd**   168:10
**told**   291:6,9
304:25 305:19
347:1 360:10
**tom**   213:7 242:13
**tommy**   174:3
**tomorrow**   216:25
**top**   190:7,9 191:1
223:15,17 258:8
260:1 264:1
272:24 281:22
284:24 285:6,8
303:3 322:7
337:10 351:21
357:23
**topic**   177:8 327:16
**topical**   363:18
**topics**   360:6,7
**total**   220:15 286:9
305:14 311:24
352:5 361:6
**totally**   303:20
**toyota**   335:3
**track**   177:9,15,19
177:25,25 200:8
228:11 229:14
230:22,24 233:16
255:4,9 272:10
296:4 328:20
**tracked**   228:21
**tracking**   308:1
**tracks**   188:16,25

**trade**   343:3
**traffic**   278:18
**trained**   188:13
**training**   187:14
188:1
**trampling**   306:17
**trans**   197:9
**transact**   307:12
**transacted**   307:17
**transaction**
197:10 205:20
206:20 268:10
269:14,23 270:2,9
270:12,15,18,21
271:22,25 294:13
326:8,15,23 344:3
344:14 346:16
**transactional**
264:2
**transactions**
197:12 205:10
273:21 308:1
309:13,18 310:6,8
326:24 327:3
344:16
**transcript**   311:17
370:17,25
**transferred**   183:5
183:10 336:6
**transmit**   328:18
**transmitted**
278:19 318:24
**trashed**   306:21
**treat**   350:10
**tremendous**
335:16
**tried**   200:15,18
292:8 333:5
**trim**   204:22
**trip**   238:12,17

**trouble**   202:17
**true**   189:9 190:23
191:5,7,7,21 259:4
282:5 286:22
337:10 369:13
370:18
**truthful**   184:11
218:19 252:23
**try**   184:11 193:14
246:22 252:23
269:19 276:24
277:6,12 310:21
333:22 361:18,20
**trying**   185:13
186:3,18 206:15
242:21 252:9
321:18 358:12
**turn**   216:14 246:8
284:16 333:25
**turned**   290:16
**turnover**   179:2,6,8
179:10,13 180:12
180:16 190:18
191:1,17 209:22
**twice**   212:22 238:3
**two**   179:1 181:21
181:24 182:1,24
187:6,21 190:17
191:16 194:7
212:13 226:11
243:17 252:13
254:9,9 255:19
256:2,4,13 304:1
324:16 325:10
335:13 349:19
350:10,18 360:16
361:5 365:9,16
**type**   203:11,11
204:21 206:20
221:22 222:15
268:5,7 291:18

292:6
**types**   205:1 290:12
**typewritten**
281:25
**typical**   182:13
196:23 197:11
336:18 344:15
**typically**   182:9
193:5 199:7
203:13 211:1,18
219:21 323:25
335:13 342:23
344:13
**typing**   335:15

**u**

**u.s.**   246:21
**ucs**   303:16 304:13
314:7
**uh**   300:23 345:12
**ultimate**   270:24
**ultimately**   251:9
253:3 353:13
**unable**   305:18
353:8 367:7
**unattached**   322:9
**unattended**
324:11
**unaware**   363:5
**undercoating**
343:14
**undercoats**   343:14
**underneath**
190:10 258:22
**understand**
176:23,25 177:12
211:25 222:4
230:18 231:4,21
239:19 245:8
248:25 266:17
273:8 316:10
321:19 337:18

**[understand - war]**                                                                 Page 46

350:1 358:7,12
365:5 367:23
**understanding**
215:12,20 275:9
281:1 367:9
**understands** 204:1
**understood**
248:24 350:5
**unequivocally**
348:9
**unfair** 326:19
**unfortunately**
309:10 336:8
343:16 367:7
**unhappy** 320:16
322:23 334:6
**unique** 335:11
**uniquely** 357:11
**unit** 194:14
**united** 167:1 175:6
370:1
**universal** 182:10
**university** 320:9
**unknowledgeable**
316:8
**unlimited** 313:23
366:3,4
**unprintable** 312:5
**unprofitable**
232:17
**unsatisfactory**
180:17
**unsolicited** 291:2
**unusual** 315:16
**unwritten** 216:20
**update** 269:20
327:6,7
**updates** 255:7
**updating** 266:12
**upgrade** 185:18
258:2

**upset** 253:6 279:4
**upshot** 336:9
**usage** 203:9
253:20,23
**use** 178:4 195:18
196:15 203:7
227:23,23 246:4
248:12 264:6,11
275:12 276:4
293:2 297:11,18
312:19 313:25
314:4 324:11
329:15,15 333:9
340:22 354:19
**user** 197:1 323:8
330:11
**users** 182:22 329:4
**uses** 267:5 293:9
**usual** 180:16
**usually** 211:24
**utilize** 293:11
**utilizing** 264:1
**uttered** 230:16

**v**

**vain** 320:18
**valid** 249:15
**valuable** 242:17
243:8
**value** 343:3
**variable** 333:6
**variance** 223:20
**variants** 230:16
**varies** 183:12
**various** 330:11
**vastly** 304:7
320:20
**vault** 274:21
**vaulted** 311:12
**vauto** 294:22
295:22 296:6,9

**vehicle** 197:10
204:21 205:20
221:7
**vehicles** 193:6
**vendor** 168:8
221:10 257:4,8
259:1
**vendors** 257:7
268:11 269:23
270:13 348:11
**venture** 204:8
207:11,21 208:17
215:11
**verbally** 341:17
**verified** 220:10
367:6
**veritext** 170:19
175:10,12
**versus** 224:8,23
225:22 309:12
**vice** 169:8 208:5
222:7
**victory** 347:11
**videographer**
169:9 175:2,10
176:11 210:3,6
237:5,8 240:17,20
265:10,13 287:6,9
325:23 326:1
366:17,20 368:1
**videotaped** 167:8
167:12 370:9
**violation** 232:12
232:13 313:18
**vision** 225:11
**visit** 204:24
344:25
**vol** 167:8
**volume** 167:13
370:11

**voucher** 298:6
**vps** 352:1,2

**w**

**w** 353:20
**wailing** 337:12
**wait** 227:13 290:7
**waiting** 236:5
**wake** 319:15
**walk** 204:23
310:18
**walked** 338:4
**wall** 324:10
**wallner** 168:15
**want** 183:2 193:8
198:16 202:16
203:8,9,10,16
204:4 233:15
243:25 246:7,25
255:17 264:17
282:23 283:25
284:1 287:3 288:6
290:14,22 291:7
304:10 309:12
318:25 324:3,18
327:6 333:23,24
341:8,15 343:1
344:6 347:22
348:5 353:3 364:9
**wanted** 177:7
245:20 290:16,21
290:25 291:13
311:18 315:16
329:7 336:7
339:17,23,23
340:22 358:3
**wanting** 290:12
**wants** 291:4 321:2
321:3,3 359:17
**war** 353:17,19,20
353:24

**[warned - willing]**                                        Page 47

**warned**  343:18
**warning**  341:5
**warranties**  343:10
**wars**  352:8,17,23
**washington**
  168:12,22 169:5
**wasted**  346:17
**water**  304:1
**way**  182:23 187:22
  193:17 200:11,20
  203:19 222:16
  223:3,3 227:16
  231:8,15 233:1
  236:16 246:8,22
  256:18 261:19
  263:22 267:22
  272:11 278:8,9
  279:20 288:20
  299:21 303:21
  312:5 317:17
  329:14 335:23
  350:14 353:12
  361:8 364:1,2
  367:23
**we've**  203:2 223:1
  223:1 256:22
  260:9 283:17
  299:17 303:1
  306:4 314:13
  315:8 325:20
  326:13,13 330:19
  338:22 340:20
  345:6 359:9 361:5
  367:23
**wedgworth**
  168:15 170:5,7
  175:17,17 176:16
  177:13,20 178:9
  178:25 179:12,21
  180:3,11,18 181:1
  181:7,20,25 182:4

183:4,19,25 184:4
184:8 186:3
187:10,25 188:15
189:10,16 190:6
191:14,24 192:4
194:5,17 196:8
197:24,25 198:7
198:11,17,24
200:8,21,25 201:8
201:12,14 202:12
202:19 203:20
204:15 205:21
206:1,7 207:10
208:6 209:17
210:2,9 211:21
212:10,15 213:11
213:25 214:9
215:6,10 216:3,7
217:7,10,16 218:4
218:8,23 219:15
220:19 221:14,16
221:21 223:5
224:7,14,22 225:2
225:5,13,19,22
226:10,18 227:5
227:11 228:14
229:15 230:2
233:15,23 234:1,9
234:15,19,23,24
236:17 237:4,14
240:14,25 241:7
241:12,14 243:4
243:11 244:12,20
244:24 247:25
249:18 250:12,16
250:20 251:1,7,14
252:4,22 254:5,15
254:20 255:17
256:1,12,21
257:15 258:8,25
259:9 260:20

261:21 262:4,14
262:22 263:25
265:1,6,8,17,24
266:2,13,19,24
267:19 268:9,14
268:18,24 269:13
269:22 270:7,17
271:10,15 272:1
272:10,14 274:6
274:11 275:11,18
275:21 276:4,16
277:6,14,17
278:21 279:11,16
280:2,9,16,23
281:3,12,19 282:5
282:9 283:19
284:3,14,20,23
285:2,6,20 286:13
286:23 287:2,12
287:20 288:1,6,17
288:23 289:6
300:10 301:4,10
301:15 302:6,8,11
302:17 303:12
304:15,21,24
305:5,23 310:1,11
311:5,21,23 312:3
312:8 314:6,16,22
317:5,13 318:18
320:6 322:5,15,20
324:24 325:9,14
326:8,25 327:11
327:20,22 328:3,8
328:13,24 329:10
329:20,24 330:1,6
330:10,13,17
331:4,11,16 332:8
332:15,22 333:2
333:13,19 334:4
334:12,18 339:11
340:2,11,17,24

342:1,5,7,17
345:14 346:3
347:24 348:8,13
348:18,22 349:2,7
349:11,16,20,25
350:12,22 351:4,8
351:12,15,23,25
352:4,10,19,25
354:2 357:15
358:9,19 359:16
360:2,5,13,18,23
361:9,12,19,23
362:4,7,8,15,18,22
363:6,24 364:1,6
364:15,20 365:20
365:24,25 366:4
366:12,15 367:11
367:20,25
**wednesday**  238:7
**weeds**  276:22
**week**  255:8
**weekend**  212:1
  250:22 336:16
  364:16
**went**  188:13 214:7
  251:19 296:7
  306:24 308:24
  334:25 337:13
  338:2 346:22
  360:6
**westmark**  346:24
**whale**  258:3
**whatnot**  346:18
**wheel**  343:10
**whirl**  277:2
**widely**  318:6
**wilkinson**  168:3
  176:4,4
**willie**  249:22
**willing**  197:17
  367:3

**win** 239:1 240:4
**wind** 290:1 329:22
**windows** 190:2
**windshield** 343:11
**wise** 228:25
**withdraw** 367:1
**withdrawn** 251:9
**witness** 167:13
　168:2 169:2 176:8
　176:12 243:14
　300:23 316:21
　345:12 369:2
　370:16,19
**witnesses** 364:4
**won** 240:7 346:22
**wonder** 225:10
　322:16
**wood** 254:13
**word** 267:24
　306:16
**words** 248:14
　320:3
**work** 182:20 205:6
　207:2 219:16
　266:9 293:3
　294:23 295:8,11
　295:12,15,20
　304:8 323:23
　326:13 335:17
　337:1 347:5
　353:12
**worked** 203:25
　315:1 347:2,3,3,7
　347:9,9,9,10 350:6
**working** 195:8
　347:8
**workman** 171:17
　208:4 209:13,23
　212:14 213:17,19
　345:18

**works** 214:25
　278:8,9
**world** 204:18
　249:1 320:25
　350:15
**worried** 321:9
**worries** 319:18
**worry** 315:5
**worrying** 320:18
**worse** 280:22
**worst** 323:23
　324:11 325:1
　354:5
**worth** 208:21,22
　255:16 325:11
**worthy** 253:19
　254:3
**write** 185:6 202:4
　219:1 230:10,13
　230:14 235:2,8
　241:21 242:20
　245:2,8,9,16
　252:18 253:18
　254:24 255:2
　256:25 258:9
　259:12 261:21
　270:4,13 271:10
　271:18 277:3,7,19
　290:6,22 291:7
　294:19 307:5
　308:15 310:4
　326:11,18,24
　327:3 354:24
**writes** 186:19,20
　186:25 188:16
　189:4 190:15
　239:1,7 241:25
　242:9 257:16
　279:17 298:15
**writing** 218:20
　261:15 297:2

**written** 189:9
　245:13 361:25
**wrong** 188:13
　248:16 317:17
　319:10 339:6,7
　360:17
**wrote** 184:9 185:8
　185:23 191:8
　201:20 230:20,22
　235:6,7,16 245:5
　245:12 248:5
　252:23 255:15
　294:24 299:13,14
　332:18 355:8
　356:2 363:13,16
**wyler** 358:14,15
　359:5

| x |
| --- |

**x** 370:22
**xtime** 268:16
　269:7,8,21 270:6
　305:18,22 306:16
　309:21 326:5,7,11
　354:13,14,19

| y |
| --- |

**yeah** 203:22
　213:24 250:1,5,5
　252:1 256:16
　265:7,8 266:25
　278:25 288:20
　320:3 329:15
　342:8 354:22
　363:16
**year** 179:1,8
　190:17 191:16
　192:9,13,16 196:4
　211:6,17 212:22
　212:23 213:8
　224:23 225:7,23
　238:3,5,23 270:20

271:8 272:9
　284:20 321:5
　330:3,4 337:17
　340:12 346:18
**years** 180:4
　181:21 187:11
　188:9 194:7 196:5
　199:8,8,10,23
　200:4,5 201:7
　214:6,6 222:16
　225:11 231:17
　233:12,14 236:12
　236:25 239:8
　254:9 262:9
　291:17 310:22,25
　314:8,9 320:12
　322:25 330:4
　337:12 339:15,16
　345:21,23 346:7
　347:10,16 353:4
**yesterday** 176:18
　176:19 194:12
　208:13 221:21
　226:12 228:15,16
　248:11 292:17
　300:8
**york** 168:18,18
**young** 290:12
　338:9
**ytd** 174:9 286:8
　288:8

| z |
| --- |

**zip** 175:14

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.